1

```
 1                 UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF VIRGINIA
 2                     ALEXANDRIA DIVISION

 3   UNITED STATES OF AMERICA,    )  Case 1:14-cr-00230
                                  )
 4              Plaintiff,        )
                                  )
 5       v.                       )  Alexandria, Virginia
                                  )  July 11, 2016
 6   MUNA OSMAN JAMA,             )  9:11 a.m.
     and                          )
 7   HINDA OSMAN DHIRANE,         )
                                  )
 8              Defendants.       )  Day 1
                                  )  Pages 1 - 289
 9

10                    TRANSCRIPT OF TRIAL

11        BEFORE THE HONORABLE ANTHONY J. TRENGA

12          UNITED STATES DISTRICT COURT JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25      COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
```

```
 1  APPEARANCES:

 2  FOR THE PLAINTIFF:

 3       JAMES P. GILLIS, ESQUIRE
         DANYA E. ATIYEH, ESQUIRE
 4       OFFICE OF THE UNITED STATES ATTORNEY
         2100 Jamieson Avenue
 5       Alexandria, Virginia  22314
         (703) 299-3700
 6
     FOR DEFENDANT MUNA OSMAN JAMA:
 7
         WHITNEY E.C. MINTER, ESQUIRE
 8       GEREMY C. KAMENS, ESQUIRE
         OFFICE OF THE FEDERAL PUBLIC DEFENDER
 9       1650 King Street, Suite 500
         Alexandria, Virginia  22314
10       (703) 600-0800

11       JOSHUA M. SIEGEL, ESQUIRE
         COOLEY, LLP
12       1299 Pennsylvania Avenue, N.W., Suite 700
         Washington, D.C.  20004-2400
13       (202) 842-7800

14  FOR DEFENDANT HINDA OSMAN DHIRANE:

15       ALAN H. YAMAMOTO, ESQUIRE
         LAW OFFICE OF ALAN YAMAMOTO
16       634 South Washington Street
         Alexandria, Virginia  22314
17       (703) 684-6643

18       PAULA SEMMES DEUTSCH, ESQUIRE
         OFFICE OF THE FEDERAL PUBLIC DEFENDER
19       1601 Fifth Avenue, Suite 700
         Seattle, Washington  98101
20       (206) 553-1100

21  THE DEFENDANT, MUNA OSMAN JAMA, IN PERSON

22  THE DEFENDANT, HINDA OSMAN DHIRANE, IN PERSON

23  MARYAM ABDI, SOMALI INTERPRETER

24  HASSAN ABDI, SOMALI INTERPRETER

25
```

1                        **I N D E X**

2                                                        PAGE

3   Opening Statement by Ms. Atiyeh              23

4   Opening Statement by Ms. Deutsch             43

5
    WITNESS                 EXAMINATION          PAGE
6
    Matthew Bryden          Direct by Ms. Atiyeh         50
7                           *Voir Dire* by Ms. Minter    69
                            Further Direct by Ms. Atiyeh 78
8                           Cross by Ms. Minter          266

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1          THE CLERK:  Criminal Case 1:14-cr-230, *United*

 2  *States of America v. Muna Osman Jama and Hinda Osman*

 3  *Dhirane*.

 4          Will counsel please identify themselves for

 5  the record.

 6          MR. GILLIS:  Good morning, Your Honor.  Jim

 7  Gillis and Danya Atiyeh for the United States.  With us

 8  at counsel table is Special Agent C.J. Goodman of the

 9  FBI.  Behind them are Wayne Sharp, also an agent with

10  the FBI, and Katherine M. Holden, a special agent with

11  the FBI.  We have assisting us Laura Galban and Rosie

12  Pierro-Arthur.  They are going to be helping us with

13  the evidence and court technology presentation.

14          THE COURT:  All right.

15          MR. GILLIS:  Agent Goodman is expected to

16  testify as a witness, Your Honor, but he is at counsel

17  table representing the United States as the party that

18  we're entitled to.

19          THE COURT:  All right.

20          MR. GILLIS:  Thank you, Your Honor.

21          THE COURT:  Ms. Minter, good morning.

22          MS. MINTER:  Good morning, Your Honor.

23  Whitney Minter and Geremy Kamens on behalf of Ms. Jama.

24  We are also joined this morning by Joseph Boyd seated

25  next to Mr. Kamens and by Joshua Siegel of the Cooley

1  law firm, who is *pro bono* counsel on this matter as

2  well.

3           THE COURT:  All right.  Welcome.

4           MR. YAMAMOTO:  Good morning, Your Honor.

5  Alan Yamamoto for Ms. Dhirane, and Ms. Dhirane is here.

6  She just got in from Seattle last night.  I'm here with

7  Paula Deutsch from the Seattle Public Defender's Office

8  and Donna Maxwell, who is a paralegal there.

9           THE COURT:  All right.  Very good.

10          We're here for trial.

11          The government is ready to proceed?

12          MR. GILLIS:  We are, Your Honor.

13          THE COURT:  All right.  Before we do, we'll

14  have the interpreters sworn.

15          Would you identify yourselves and be sworn.

16          THE INTERPRETER:  Hassan Abdi.

17          THE INTERPRETER:  Maryam Abdi, Somali

18  interpreter.

19      (The interpreters affirm.)

20          THE COURT:  Have each of you satisfied

21  yourselves that you're able to communicate with the

22  defendants?

23          THE INTERPRETER:  Yes, Your Honor.

24          THE INTERPRETER:  Yes, Your Honor.

25          THE COURT:  Thank you.

1          I'd be pleased to hear any preliminary

2    matters either side would like to raise.  Let me

3    identify a few that I want to talk about.

4          The first is the potential CIPA issue that

5    the parties have raised.  It's my intention to defer

6    dealing with that issue until the government presents

7    the witness, and we'll decide how to proceed at that

8    point.

9          Also, Mr. Gillis, how long does the

10   government expect to present its case?

11         MR. GILLIS:  Your Honor, I expect that we

12   will go until Thursday.  There's the possibility that

13   we would bleed over into Monday, but I expect that our

14   case will be in by then.

15         THE COURT:  All right.  The Court's schedule

16   is such that we need to get all the evidence in by the

17   close of Thursday.  We'll go a little later than I

18   normally do in order to do that.  If we go past

19   Thursday, there may be some scheduling issues as far as

20   when we can pick it up again.

21         Ms. Minter.

22         MS. MINTER:  Your Honor, if I may, one of the

23   preliminary matters that I had intended to raise this

24   morning is that, based on the Court's scheduling order

25   and the government's representation of their need for

1   four days to present testimony, we had scheduled our

2   expert witness that we've noticed to testify for Monday

3   and scheduled his flights accordingly.

4           I'm certainly happy to see if there's any

5   flexibility with that, but I had actually intended to

6   advise the Court of that fact and ask the Court's

7   permission to either take him out of order should the

8   government's case run long or to recess until he could

9   be here Monday should the government's case be shorter

10  than expected.  So I raise that for the Court at this

11  time.  We'll certainly see if there's any flexibility.

12          THE COURT:  All right.  I'm going to review

13  the Court's schedule as well and see what, if any,

14  flexibility the Court might have.

15          MS. MINTER:  Thank you, Your Honor.

16          THE COURT:  All right.  Mr. Gillis, any other

17  preliminary issues you would like to raise?

18          MR. GILLIS:  Not from the government, Your

19  Honor.

20          THE COURT:  All right.  Ms. Minter?

21          MS. MINTER:  Your Honor, there are two

22  matters, and I suppose that the Court could take them

23  up during the course of evidence if the Court saw fit.

24  But I would tell the Court that we have filed --

25  there's been numerous pleadings with respect to our

1    original motion for a bill of particulars, and that, I

2    think, remains unresolved.  In response to the

3    government's response, we have filed a motion to

4    exclude any evidence that was not brought forth as a

5    result of the Court's order.  That remains outstanding.

6            We yesterday filed what, I think, technically

7    could be viewed as an evidentiary objection during the

8    course of trial.  But for the sake of advising the

9    government and also clarity for the Court, we had filed

10   a written motion with respect to certain aspects of

11   testimony that might come from the government's expert.

12           So I don't know if the Court wishes to take

13   those up now.

14           THE COURT:  All right.

15           MS. MINTER:  I will also tell the Court that

16   the parties have stipulated with respect to certain

17   evidentiary aspects of parts of the government's case.

18   I don't know if the government wants to present those

19   stipulations to the Court at this time.

20           THE COURT:  All right.  Do you want to be

21   heard any further on the motion *in limine* with respect

22   to the bill of particulars response?

23           MS. MINTER:  Your Honor, Mr. Siegel had a

24   brief argument with respect to that.

25           THE COURT:  All right.  Mr. Yamamoto,

1    anything else you would like to raise?

2              MR. YAMAMOTO:  No, Your Honor.

3              THE COURT:  All right.  Mr. Siegel, I'll hear

4    you further on your motion.

5              MR. SIEGEL:  Thank you, Your Honor.

6              In response to the defense's motion for a

7    bill of particulars, the Court ordered the government

8    to provide very specific information in response to the

9    motion, and that included the details of transfers that

10   were not identified in the indictment, the dates those

11   transfers occurred, and the identities of the

12   recipients if they were beyond the recipients

13   identified in the indictment.

14             The government responded saying it was unable

15   to provide that information.  The most it gave in its

16   response was that beyond the initial recipients, the

17   funds were transferred, according to the response, to

18   someone or to others and so forth.

19             They did identify that one of the initial

20   recipients, according to the government, transferred

21   the funds to Barira Abdullahi.

22             THE COURT:  Hold on one second.

23             Yes.

24             MR. SIEGEL:  But even beyond that one

25   transfer he identified, they went on to allege that

1  Ms. Abdullahi transferred the funds to others and so

2  forth.   It's the defense's position that the

3  government's response did not satisfy the Court's

4  order.

5          As to the identities the Court ordered the

6  government to produce, those were missing from the

7  government's response.   Essentially, the government

8  said it wanted the Court to infer that the money was

9  eventually sent to --

10         THE COURT:   Well, they say they can't provide

11 the information.

12         MR. SIEGEL:   Correct, Your Honor.   They

13 essentially concede that they didn't provide the

14 information in the Court's order.

15         THE COURT:   Because of an inability to do so.

16         MR. SIEGEL:   I'm sorry?

17         THE COURT:   Because of an inability to do so,

18 and their position is that the information isn't

19 necessary for the purposes of making out their case.

20         MR. SIEGEL:   Well, I think I would have two

21 responses to that, Your Honor.   First is it was

22 necessary in response to the Court's order.   The

23 Court's order is very explicit as to what information

24 they had to disclose.   The extent that they are arguing

25 now that they don't have to disclose that, that's

1   really trying to relitigate the motion for a bill of

2   particulars this Court has already ruled on.

3          THE COURT:  All right.

4          MR. SIEGEL:  The second point is I don't

5   think it's efficient for the government's case to

6   simply say that the money went to someone.  It is an

7   element of the case that they're going to have to show

8   that material support was provided to al-Shabaab.  They

9   want the Court to simply conclude that it was sent to

10  al-Shabaab without --

11         THE COURT:  Well, isn't that an issue the

12  Court will take up within the context of a Rule 29

13  motion?

14         MR. SIEGEL:  Well, I think it's possible,

15  Your Honor.  I think that could be a Rule 29 issue.  I

16  also think that asking the Court to infer something

17  when the government concedes it doesn't have the

18  evidence that it happened should exclude the government

19  from trying to present argument that it did, especially

20  in this circumstance where the government concedes it

21  didn't comply with the order.

22         THE COURT:  All right.

23         MR. SIEGEL:  Beyond just the identities,

24  there's also the issues of the dates they didn't

25  provide.  Again, the Court was explicit in its order

1  that it wanted the government to identify the dates.

2  Without evidence of the dates, it deprives the defense

3  of the ability to challenge the transfers.

4           For example, if the subsequent transfers

5  happened before the initial transfers, the government

6  could argue that it could have been -- the transfer

7  could have been the same.  The defense could argue that

8  a subsequent transfer had occurred too close to the

9  initial transfer to have been possible.  It wouldn't

10 have been possible for someone to transfer money to

11 Somalia and then transfer that money to al-Shabaab

12 within that window.  But the government didn't give us

13 the information the Court ordered and deprived the

14 defense of that argument.

15          The same reason the identity is not

16 sufficient.  Because by simply saying it went to

17 al-Shabaab, the defense can't challenge whether the

18 person it went to is part of al-Shabaab or not.  Again,

19 that goes to the issue of why the Court ordered the

20 bill of particulars in the first place.

21          Essentially, there's no details the Court

22 ordered the government to disclose in its bill of

23 particulars.

24          Touching briefly on the legal remedy is that

25 there are two independent bases for excluding evidence

1  of subsequent transfers.  The first is violation of the

2  Court's order.  I think we were very clear on that

3  standard in our papers.  The remedy for a violation of

4  the order is exclusion on a bill of particulars, and

5  the alternate basis is under Rule 403 for --

6          THE COURT:  When you say exclusion, as I

7  understand the government's position, they're not going

8  to present or rely on any information that hasn't

9  already been provided to the defense.  So what would I

10 be excluding?

11         MR. SIEGEL:  Well, I think you would be

12 excluding evidence -- to the extent the government

13 wants to say the evidence they have leads to the fact

14 that the money was transferred subsequent to the

15 transfers in the indictment, that would be excluded.

16         THE COURT:  So I would be restricting the

17 inferences that the government could argue for the

18 purposes establishing a sufficiency of the evidence.

19         MR. SIEGEL:  Correct.  It would be the

20 purpose for which the government is using that

21 evidence.

22         THE COURT:  All right.

23         MR. SIEGEL:  As to Rule 403, it's the second

24 basis to exclude it.  Again, the law is very clear that

25 we cited in the papers, that the remedy for unfair

1   surprise is exclusion.  The government's response

2   challenged some of the law on violation of the Court

3   order, and we distinguished that and explained in our

4   papers why the government's response was deficient and

5   the discovery -- the government ignored some of the law

6   we cited and did not even address in its papers the

7   Rule 403 issue as to unfair prejudice to the defense.

8           The government has not cited law that says

9   exclusion is not the proper remedy.  The government has

10  not provided the Court with law that says there is no

11  remedy for its failure to comply with the Court's

12  order, and they have not cited law that the subsequent

13  transfers should not be excluded under 403.

14          THE COURT:  All right.  Thank you.

15          Mr. Gillis -- Ms. Atiyeh.

16          MS. ATIYEH:  Your Honor, I certainly take

17  issue with Mr. Siegel's representation that the

18  government didn't comply with Your Honor's order.

19  Mr. Siegel seems to have read your order --

20          THE COURT:  Well, as I understand the

21  government's position, the substantive offenses were

22  completed, were committed upon delivery of the moneys

23  to the individuals on the dates indicated in the

24  indictment.  Is that correct?

25          MS. ATIYEH:  That's true, Your Honor, and we

1  will argue that.  I think we do intend to argue that

2  the money may have been transmitted further in the

3  sense that al-Shabaab used the money to purchase

4  things, that the money may have been transmitted from

5  al-Shabaab's fundraising wing to active fighters.

6         But essentially, Your Honor, Mr. Siegel is

7  suggesting that Your Honor's order required the

8  government to produce this evidence even if it didn't

9  exist and that the evidence that we did produce that

10 does exist should be excluded because we didn't produce

11 the evidence that didn't.  Your Honor, I admit that's

12 not how I read your order.

13        THE COURT:  One question I had about the

14 government's response is it was unclear to me on what

15 theory the government really is proceeding.  On one

16 hand, it said that the offenses were complete upon

17 delivery of the moneys from the defendants to the

18 persons named.  Then it went on to say that the

19 substantive offenses continued to be committed.

20        How were these continuing offenses?  What's

21 the theory?  Why would there be a continuing offense as

22 opposed to a new offense based on subsequent transfers

23 by someone other than these defendants if the

24 defendants' offense was complete upon delivery?

25        MS. ATIYEH:  I think, like many continuing

1   offenses, it may be complete at a certain point, but it

2   continues as the money continues to be transferred.

3   That was always our theory, Your Honor, and I think

4   that's what we said in our response.

5           THE COURT:  How is this a continuing offense?

6           MS. ATIYEH:  Mr. Gillis just suggested like a

7   kidnapping.  For example, where a kidnapping occurs and

8   then it continues to occur as the victim continues to

9   be in the custody of the kidnapper.  I suppose that's a

10  good example.  That's how we have been thinking about

11  this, that the crime continues to be committed as the

12  money remains in the possession of al-Shabaab.

13          THE COURT:  All right.  Anything else?

14          MR. GILLIS:  May we have one moment, Your

15  Honor?

16          THE COURT:  Yes.

17      (Counsel confer.)

18          MS. ATIYEH:  Your Honor, Mr. Gillis suggested

19  that I point out that there's certainly evidence which

20  I think we laid out in our response to your order

21  originally.  There's evidence in the transcripts and to

22  some extent in the witnesses' testimony basically

23  concerning the money continuing to be used by

24  al-Shabaab.

25          For instance, there's a transcript where the

 1  defendants discuss the capture of a truck that was
 2  carrying supplies for al-Shabaab.  There's some
 3  implication that we certainly intend to argue can be
 4  inferred from the transcripts that the defendants are
 5  saying that the money they had raised was used to
 6  purchase the supplies in that truck.  So that's the
 7  sort of thing we're talking about when we say that
 8  we -- we may ask to draw further inferences about
 9  transactions that happened, but we certainly don't
10  intend to introduce evidence other than those
11  transcripts, other than that information that we've
12  already discussed that would go to support the specific
13  date or time or the person to which the money was
14  transferred to purchase supplies for the truck.
15          So that's how we understood Your Honor's
16  order initially, was that we needed to produce the
17  evidence or at least explain the transcripts and
18  testimony that we intended to use to show these further
19  transactions.  But because we don't intend to
20  produce -- and, in fact, as Your Honor knows, we don't
21  have evidence of a specific transaction where the
22  supplies on the truck were purchased by a specific
23  person.  We didn't believe your order to encompass
24  producing details like that.
25          THE COURT:  All right.

1            MS. ATIYEH:  That's all, Your Honor.  Thank
2 you.
3            THE COURT:  Thank you.
4            Mr. Siegel, anything further?
5            MR. SIEGEL:  One very quick point, Your
6 Honor.  Actually, I think two quick points.
7            As to whether the government complied with
8 the order and what was supposed to be disclosed, the
9 order explicitly says the government shall provide the
10 details concerning the subsequent transfers, including
11 the dates of delivery and the identities of those
12 receiving those funds.  The government said in its
13 response it was unable to provide the dates of delivery
14 and the identities of those receiving those funds.  So
15 I'm not sure how the government can say it thought it
16 complied with the order when it explicitly said it was
17 unable to.
18            As to the second issue, the government seems
19 to say it's sufficient to say that it went to someone
20 or so forth.  If you look at the cases on 2339B -- and
21 these are the cases that are cited in our papers on the
22 motion for a bill of particulars and the cases we cited
23 in the motion *in limine* -- that in those cases, the
24 government has always identified something far more
25 specific.  For example, that the money went to an

1    al-Qaeda trainer or it went to a specific bank account

2    controlled by a terrorist group or it went to a

3    specific leader of a terrorist group or it went to a

4    Hamas committee and identified the people on those

5    committees.  It is far different than the government

6    simply saying it went to someone, to others, and so

7    forth.  I don't think that complies with the bill of

8    particulars, and I don't think that's sufficient for

9    the defense to avoid unfair surprise and prepare their

10   defense.

11            THE COURT:  All right.  Thank you.

12            I've reviewed the motion *in limine*.  The

13   Court's purpose in ordering the bill of particulars was

14   to give the defendants notice of the specifics of the

15   government's claims, and to the extent the government

16   was relying on specific dates and transactions, to

17   provide those to the defendants.  The Court did not

18   intend to make decisions as to what evidence was, in

19   fact, required in order to sufficiently prove the

20   elements of the claim.

21            As I, again, understand the government's

22   position, they're relying on the theory that the

23   offenses were complete upon delivery of the amounts to

24   the persons identified in the indictment on the dates

25   of those indictments and are not relying on specific

1  dates of other subsequent transfers, but rather would

2  point to more general testimony concerning what

3  happened to those moneys after they were delivered to

4  the defendant for the purposes of inferences that would

5  relate to the sufficiency of their evidence as to their

6  primary theory.

7          I understand the government has provided all

8  the evidence that they intend to rely on to the

9  defendants.  So the Court will limit the government to

10 that evidence and will not allow any evidence that has

11 not been previously identified to the defendants.

12         But the Court is not going to, at least at

13 this point, restrict the government in its theory.  I

14 think the defendants' positions can be evaluated more

15 appropriately within the context of a Rule 29 motion at

16 the conclusion of the government's case in chief.  So

17 we're going to proceed on that basis.

18         So the defendants' motion in limine is denied

19 without prejudice to raising any sufficiency of the

20 evidence claims following the government's case in

21 chief.

22         All right.  Anything else?

23         MS. MINTER:  Your Honor, I think that leaves

24 remaining the motion that we had filed yesterday.

25         THE COURT:  On the expert?

1          MS. MINTER:  Correct, Your Honor.

2          THE COURT:  All right.

3          MS. MINTER:  I understand that's to be the

4  government's first witness.

5          THE COURT:  Oh, it is.

6          MS. MINTER:  So to the extent that the Court

7  was inclined to take it up when that witness testified,

8  my understanding --

9          THE COURT:  All right.  Well, what I can do

10  is I'll let you *voir dire* the witness, and I'll take it

11  up in connection with the government offering him as an

12  expert.

13         MS. MINTER:  Very well, Your Honor.

14         One other thing that I wanted to advise the

15  Court before that particular witness took the stand,

16  which is that we on behalf of Ms. Jama and, as I

17  understand, counsel for Ms. Dhirane as well --

18  although, they'll obviously have to speak to this -- we

19  would stipulate that at the time in question al-Shabaab

20  had been designated as a terrorist organization.

21  Accordingly, we would submit that any testimony

22  regarding what I would term unrelated acts of terrorism

23  by al-Shabaab would be irrelevant in this matter.

24         I understand it is the government's

25  obligation to prove that the defendants knew that it

1  was a designated terrorist organization, and

2  accordingly, some limited testimony about events that

3  the defendants could be shown to be aware of, I think,

4  if otherwise admissible, is appropriate.  But I would

5  submit, Your Honor, that a lengthy history of graphic

6  and unpleasant acts undertaken by al-Shabaab is

7  irrelevant given that it's a bench trial and also given

8  that we are stipulating that it is, in fact, a

9  designated terrorist organization.

10         THE COURT:  All right.  I'm not going to rule

11 at this time.  I'll take that up in response to

12 specific objections as we work through the testimony.

13         MS. MINTER:  Yes, Your Honor.

14         THE COURT:  All right.  Anything else?

15    (No response.)

16         THE COURT:  Do the parties want a rule on

17 witnesses?

18         MS. MINTER:  Please, Your Honor.

19         THE COURT:  All right.  Are there any

20 witnesses in the courtroom other than the special

21 agent?

22    (No response.)

23         THE COURT:  All right.  Counsel for both

24 parties will advise any potential witnesses that they

25 are to remain outside of the courtroom until called and

1   not discuss their testimony before or after testifying.

2           MS. MINTER:  Your Honor, if I could ask the

3   Court's indulgence.  We do have one potential witness

4   here in the courtroom.  If we could briefly be

5   permitted to advise that witness.

6           THE COURT:  All right.  What I'm going to do

7   is take a short recess, and then we'll come out and

8   proceed.

9           All right.  The Court will stand in recess.

10       (Recess from 9:35 a.m. until 9:48 a.m.)

11          THE COURT:  Mr. Gillis, does the government

12  want to make a brief opening statement?

13                    OPENING STATEMENT

14          MS. ATIYEH:  Yes.  May it please the Court

15  and counsel.

16          This case is about a group of women who were

17  raising money to support al-Shabaab, a terrorist

18  organization in Somalia.  You will learn about the

19  conspiracy almost entirely in the words of the

20  defendants and their coconspirators.  Though sometimes

21  they used veiled language and coded words to cover up

22  their intent, you will be able to hear their true

23  meanings shining through.

24          In a chat room in July 2012, Muna Osman Jama

25  was talking with Fardowsa Jama Mohamed, one of the

1    other women who was charged in the indictment.

2    Ms. Jama said of the conspiracy, If you work with the

3    women and pretend that you're supporting your family,

4    can the infidels and the animals who work with them

5    find out what is in our heart?

6              Fardowsa responded, The answer is no.

7              The conspirators thought that it was

8    impossible for us to prove their intent using only

9    their veiled speech, coded language, and cover stories.

10   We submit that this is not the case, and the contours

11   of the conspiracy and its violent purposes will be

12   quite clear to you once you hear everything the

13   defendants had to say.

14             Al-Shabaab is not a terrorist organization

15   that is particularly familiar to many Americans.  It's

16   been designated a foreign terrorist organization by the

17   U.S. government since 2008, but it conducts its

18   operations in Somalia, its country of origin, and the

19   surrounding countries in the Horn of Africa.

20             Al-Shabaab is a force of instability and

21   destruction in the region committing assassinations,

22   suicide bombings, and other terrorist attacks.  It's a

23   secretive organization, in part, because it's widely

24   disliked and distrusted.  Nevertheless, its supporters

25   are scattered through the world, and the defendants are

1  two of those supporters.

2          Muna Osman Jama and Hinda Osman Dhirane were

3  part of a conspiracy that spanned across the globe with

4  members in the United States, in Canada, across Europe,

5  and in Africa.  The conspiracy got its start in an

6  online chat room called Dacwatu al-Tawhid, and that's a

7  Somali spelling of an Arabic phrase that means

8  something along the lines of invitation to Islamic

9  unity.  It's known in some U.S. circles as the ISDAC

10  chat room.

11          The ISDAC chat room is a gathering place for

12  al-Shabaab supporters all over the world.  Now, the

13  conversation touches on any number of topics, but

14  overall and in general, it valorizes al-Shabaab.

15  Al-Shabaab leaders would traditionally come to the chat

16  room to give lectures to the people gathered there

17  about different political and religious topics.

18          And historically, especially in the year or

19  two prior to the conduct charged in the indictment, it

20  was used as a platform to raise money for al-Shabaab

21  causes.  Essentially, an al-Shabaab member would come

22  to the chat room, and they would make a pitch to

23  solicit money from the people gathered there.  They

24  would tell them about a need or a cause that al-Shabaab

25  had, and then they would direct them to send money to a

1    certain name or account number or place.

2             And in 2010, two women in Minneapolis were

3    arrested on terrorism charges or material support

4    charges for sending money to some of the people who had

5    been fundraising in the ISDAC chat room.  Their names

6    were Amina Ali and Hawo Hassan.  The evidence will show

7    that the defendants followed their case very closely.

8             Al-Shabaab, as I mentioned, was already a

9    very secretive organization, and its supporters picked

10   up on the need for security.  In particular, after the

11   Minneapolis arrests, it became known that you had to be

12   more careful.  You could only open up your fundraising

13   to people you trusted.  You had to use code language or

14   at least veil your meanings when you spoke.

15            Essentially, you had to understand that

16   sending money to al-Shabaab was illegal and treat it

17   accordingly.  The FBI might be listening.  After all,

18   they were listening to Amina and Hawo.  You had to be

19   prepared to destroy evidence, to wipe your computer.

20   You had to have cover stories rehearsed with the people

21   you were working with that the money was for charity,

22   that you were just sending money to your family.  Now,

23   this was a readily available cover story.

24            And you'll hear a fair amount of testimony

25   from the government's expert witness, Matthew Bryden,

1    about the importance of remittances in Somali culture.

2    Remittances are a tradition so powerful that they're

3    almost an imperative.  That's a tradition where family

4    members working far from home send money back to their

5    families.  Maybe more traditionally, this was people

6    from the countryside going to work in the city and

7    sending money back home to their village.  In more

8    modern times, it's typically done by members of the

9    Somali diaspora, all of the Somalis who have gone to

10   live overseas and work sending money home to Somalia to

11   their families.

12           Remittances, you'll hear, are ubiquitous.

13   They are a major driver of the Somali nation's economy.

14   So much so, Mr. Bryden will testify, that it's widely

15   understood that the Somali nation's economy would

16   actually collapse without them.  They make up the

17   majority of the income of many of the everyday Somalis.

18   Because of all of this, because they're so very

19   ubiquitous, they make an ideal cover for disguising

20   money.

21           You'll see a number of conversations among

22   the defendants and their coconspirators where they talk

23   about how to camouflage the money they're sending.

24   They talk about pretending to be one another's family

25   members.  You'll see a transcript between Muna Osman

1 Jama and Fardowsa Jama Mohamed where they say, Oh, I

2 can pretend to be your aunt.

3          You'll see another conversation where the

4 women talk about Farhia Hassan, one of the women

5 charged in indictment, sending money to a woman named

6 Hodan Ismail Hassan.  And they comment, Oh, well, they

7 have the same last name, so they can pretend to be

8 sisters.

9          When Ms. Jama said that you can pretend to be

10 supporting your family to cover what is in your heart,

11 the evidence will show that this is exactly what she

12 meant.

13          Remember, this money is being sent to Somalia

14 every day by the millions of members of the Somali

15 diaspora, and everyday Somalis don't worry that the

16 money they're sending home to their families will bring

17 them to the attention of the FBI, but the defendants

18 did.  You'll see this in the transcripts over and over,

19 that there's something different about the money

20 they're sending, something that isn't like other

21 remittances, something that would interest the FBI.

22          You'll see the transcript where Ms. Dhirane

23 tells Ms. Jama that this money that they're sending

24 carries a 15-year prison sentence.  As Your Honor

25 knows, at the time of the indictment, that was the

1 statutory maximum penalty for a violation of 18, U.S.

2 Code, 2339B, a statute the defendants are, in fact, now

3 charged with violating.

4          These were no everyday living expenses that

5 the defendants were sending, but the evidence requires

6 us to assemble all of the puzzle pieces of the

7 defendants' discrete statements and put them together

8 to see an image of what the conspiracy actually looked

9 like and how it operated.  This is a preview of what

10 the evidence will look like when it's put together.

11          Muna Osman Jama and Hinda Osman Dhirane were

12 members and, it might be fair to say, even leaders of a

13 small subset chat room that was sort of a breakoff of

14 the ISDAC chat room I mentioned before.  There were

15 about 15 women who spoke in the chat room and got

16 together in the chat room at any given time with some

17 periodically leaving and others periodically joining.

18          These women lived all across the world.  What

19 they had in common was that they were sympathetic to

20 al-Shabaab and they had built up a certain amount of

21 trust or credibility among the other members of the

22 group.  Essentially, what they did was they would meet

23 periodically in the chat room to organize sending

24 payments to al-Shabaab.

25          At the beginning of the conspiracy, you'll

1   mainly see transcripts where the women in the chat room

2   are discussing sending money to Fardowsa Jama Mohamed.

3   That's one of the women charged in the indictment.

4   You'll see in the indictment she uses the chat room

5   user name Umu Camaar.  It's spelled C-A-M-A-A-R, but

6   you'll hear from the government's expert that Cs are --

7   they're a Somali rendition of a glottal stop.  So in

8   English they're not pronounced.

9            Umu Camaar lived in Nairobi, Kenya, and she

10  ran a safe house there for wounded al-Shabaab fighters.

11  In order to keep the safe house running, she had to

12  make monthly rent payments.  So the chat room would

13  send money in support of those rent payments.  Small

14  amounts of money from each of the 15 women, maybe $25

15  or $50 apiece, but then pooled together and sent each

16  month, that would make up enough money to cover the

17  rent.

18           Of the 20 substantive counts in the

19  indictment, 18 consist of contributions paid to

20  Fardowsa Jama Mohamed towards those monthly payments.

21  Most, you'll see from the indictment, were sent

22  directly by Jama.  You'll see a few where we charged

23  transactions sent by Ms. Jama's husband, Ali Bakri

24  Sheikh, on her behalf.  You'll see one of the

25  conversations, for instance, where she directs him who

1  to send the money to, a transcript where she just

2  essentially says, Hey, I need you to send some money.

3  Here's the name and number.  Can you do this for me?

4           The evidence will show that each of those

5  transactions was sent to support Mohamed in running the

6  safe house and otherwise aiding al-Shabaab fighters in

7  the region.

8           Umu Camaar/Fardowsa Jama Mohamed was a close

9  contact of Ms. Jama's, and Jama worked with her to keep

10  close watch on which members of the chat room were

11  keeping up with the monthly payments.  You'll actually

12  see notebooks that were seized from Ms. Jama's house

13  with ledgers that she kept with the list of all of the

14  women's chat room monikers next to the sums of money

15  they had pledged to donate each month.

16           You'll hear that the women who weren't

17  regular about sending money were berated by the other

18  women in the chat room and tended to be less trusted.

19           You'll hear from the government's cooperating

20  witness, Amina Esse, that different members of the chat

21  room had different levels of knowledge about the

22  details of the conspiracy.  As some knew everything,

23  others were sort of only let in on some of the details.

24           Ms. Esse will tell you that at first she was

25  told that the money they were raising was for charity.

1   But as it became increasingly clear that that was not

2   the case, she asked Ms. Jama follow-up questions, and

3   Ms. Jama told her the truth:  That this money was for

4   the al-Shabaab safe houses.

5           You'll see a number of conversations among

6   the women in the conspiracy about cover stories that

7   they could use to get money, to raise money from women

8   who weren't in the know about the al-Shabaab aspects of

9   the conspiracy.  You'll see, for instance, a

10  conversation between Ms. Jama and Ms. Dhirane about the

11  importance of not using cover stories that are readily

12  falsifiable.  Essentially, that if you say you're

13  supporting a specific charity, people who live in the

14  area might come check to see where their money is

15  going.  And when it becomes clear that there's no such

16  charity, the fundraisers will be exposed as frauds.

17          Now, at the same time all of this was going

18  on, the group was also fundraising for some contacts of

19  Ms. Dhirane's in Somaliland, which you'll hear is an

20  autonomous region, a self-declared state in northern

21  Somalia.  There the women sent money directed toward

22  the way of Barira Hassan Abdullahi, who is one of the

23  other women charged in the indictment.  You'll hear

24  that she's a well-known al-Shabaab fundraiser in the

25  region, and she collected money for al-Shabaab fighters

1  who fought in the Galgala region of north Somalia.

2  You'll see the transcripts that I mentioned in argument

3  earlier where the group discusses the capture of the

4  supply truck sent to al-Shabaab.  That was a supply

5  truck headed towards the al-Shabaab fighters in the

6  Galgala Mountains in Somalia.

7          Also, working with Barira Hassan Abdullahi

8  were two women whose names you'll hear fairly

9  frequently, Hodan Ismail Hassan and Ifrah Abdi Bashir.

10 These women lived in the capital of Somaliland, which

11 is Hargeysa.  So the women in the chat rooms referred

12 to this money as the Hargeysa side.

13         In late December 2012, the defendants stopped

14 sending money to the Nairobi side, to Fardowsa Jama

15 Mohamed.  You'll see a number of conversations where

16 Ms. Jama explains why.  Essentially, you'll hear the

17 story about how she went to transmit her monthly

18 payments to Fardowsa Jama Mohamed.  She goes to the

19 money transmittal business, Dahabshiil.  She gets

20 there, and she's told that the transaction is blocked

21 because a name is on a list from the government.

22         As you can probably tell, that was very

23 unclear.  It wasn't clear whose name was blocked,

24 whether Ms. Jama was blocked from sending money or

25 whether Fardowsa Jama Mohamed was blocked from

1  receiving it.  It wasn't clear whether this list had

2  come from the U.S. government or the Kenyan government

3  or some other government altogether.

4         All of this uncertainty sent ripples

5  throughout the members of the conspiracy.  You'll see a

6  long online chat between Ms. Jama and Umu Camaar where

7  Umu Camaar tells Ms. Jama to delete any evidence that

8  could be used against them because they might be under

9  investigation.  The women in the chat room decided that

10 it was no longer safe to send money to Nairobi.

11        Instead, they switched their focus to the

12 Hargeysa side.  The transcripts will show you this

13 shift in focus.  You'll see, for instance, a series of

14 transcripts of calls from mid-January 2013, a few weeks

15 after Ms. Jama's Dahabshiil incident, where Farhia

16 Hassan is sending money to the new contacts and is

17 confused about who to send the money to.  You'll see a

18 series of conversations where Ms. Jama calls

19 Ms. Dhirane, and then Ms. Dhirane calls the women in

20 the Hargeysa side trying to figure out what name Farhia

21 Hassan should send the money to and what name they

22 should expect to receive it under.

23        This is an illustration of what I mean when I

24 say that the case is made up of puzzle pieces because

25 each of these individual calls taken on its own doesn't

1 particular make very much sense at all.  But when you

2 put them together and see the sequence, a clear story

3 emerges.

4          Of the substantive counts in the indictment,

5 two involve money being sent to the Hargeysa side.

6 These are the two counts in which Ms. Jama is charged

7 with making $50 payments to her father, Osman Jama.

8 You'll notice when you see the financial records that

9 underlie these transactions that each transaction was

10 actually for $200.  Ms. Jama's own words in the

11 transcripts explain why we charged that $50 of those

12 $200 were being provided to al-Shabaab.

13          You'll have the opportunity to read the

14 transcript of Ms. Jama's conversation that she has with

15 her father about the money where she explains that she

16 sent him $200 but that she needs him to deliver 50 of

17 those dollars to some women who will come pick up the

18 money from him.  He asked her who these women are, and

19 she explained that it's the female relatives of a man

20 who teaches her children Koran lessons.

21          Then you'll see the transcripts of further

22 conversations between Ms. Jama and Ms. Dhirane and the

23 Hargeysa side where they basically explain that the

24 Hargeysa side women went to pick up the money from

25 Mr. Jama and he asked so many questions that at first

1   they thought he knew what was going on.  But then

2   eventually, he seemed perfectly comfortable with them

3   and gave them the money.

4        The Hargeysa side women make it clear that

5   they were trying to hide their purpose, that they

6   didn't tell him the whole truth.  They say that they

7   gave him fake names.  They swapped their last and

8   middle names around in case he did end up reporting

9   them.  And so because of that, after only a few

10  transactions, the Hargeysa side women say that they've

11  decided it's not really safe to send money through him.

12  They're going to have to find another avenue to do so.

13       So all of this evidence put together is how

14  we're going to show that these two $50 payments to

15  Ms. Jama's father were intended to be delivered to the

16  Hargeysa side women for the support of al-Shabaab.

17       Now, as an element of the government's case,

18  it's necessary for us to prove the defendants'

19  knowledge that it's illegal to send money to

20  al-Shabaab.  There's two ways the statute permits us to

21  do this.  Either we can prove that the defendants knew

22  that al-Shabaab was a designated foreign terrorist

23  organization under the meaning of the statute, or we

24  can prove that the defendants knew that al-Shabaab

25  engaged in terrorism.  We believe that the evidence

1    here will show both.

2            As I mentioned before, the defendants very

3    closely followed the prosecutions in Minneapolis of

4    Amina Ali and Hawo Hassan for providing material

5    support to al-Shabaab for similar fundraising activity.

6            You'll also hear that one member of the small

7    chat room was a woman named Amran Yusuf whose sister,

8    Nima Yusuf, pled guilty in San Diego to another charge

9    of providing material support to al-Shabaab, again, for

10   similar fundraising activity.

11           You'll see any number of transcripts where

12   the defendants discuss all of these legal proceedings

13   that are going on.  What they make very clear is that

14   the defendants know that al-Shabaab is a foreign

15   terrorist organization, know that it's illegal to send

16   money to them, know specifically what statute it's

17   violating to do so.

18           As I mentioned before, there's the

19   conversation where Ms. Dhirane tells Ms. Jama

20   specifically that this carries a 15-year prison

21   sentence.  There's another conversation where

22   Ms. Dhirane tells the same thing to Barira Hassan

23   Abdullahi.  She says, Anyone caught sending money will

24   be sentenced to 15 years.

25           That being said, the defendants were well

1  aware of al-Shabaab's terrorist activity.  In fact,

2  they reveled in it.

3          You'll hear about the Westgate Mall terrorist

4  attack, which was an attack that al-Shabaab committed,

5  where a number of al-Shabaab fighters stormed the

6  Westgate Shopping Mall in Nairobi, Kenya, and they

7  carried long guns and grenades.  They took hostages.

8  They threw grenades at the people shopping and shot

9  them with long guns indiscriminately.  They basically

10 held the mall under siege for several days until Kenyan

11 forces retook it several days later.

12         You'll see one transcript where Ms. Dhirane

13 is actively celebrating the attack where she says

14 specifically she's happy al-Shabaab has taught a lesson

15 to the Kenyans.

16         You'll see another transcript where

17 Ms. Dhirane and her husband are discussing an attack by

18 al-Shabaab on a courthouse in Mogadishu, the capital

19 city of Somalia.  Ms. Dhirane's husband expresses some

20 frustration that al-Shabaab went into the courthouses

21 and shot civilians indiscriminately.  He sort of

22 implies, Well, you know, if they want to take the

23 government, that's all well and good.  Why would they

24 just shoot civilians?

25         Ms. Dhirane replies with disdain.  She says,

1  Let the civilians be killed.

2          You'll see another transcript where

3  Ms. Dhirane talks about an assassination attempt by

4  al-Shabaab on a Somali government intelligence chief,

5  Khalif Ahmed Ereg.  The assassination attempt was a

6  suicide bombing that was unsuccessful.  It killed some

7  of the people near him, but he escaped without injury.

8  You'll hear Ms. Dhirane say, God did not kill the one I

9  wanted to die.

10          You'll see another transcript of a group

11  conversation where the defendants, both Ms. Jama and

12  Ms. Dhirane, and a number of other women from the chat

13  room are talking, and they're talking about suicide

14  bombings.  They refer to them as martyrdom operations.

15  They're talking quite approvingly about them in fact.

16  You'll hear from Mr. Bryden that al-Shabaab is the only

17  group in the region that uses suicide attack as a

18  tactic of terror.

19          So from all of these conversations, you'll

20  see that the defendants were well aware of al-Shabaab's

21  acts of terrorism, assassinations, bombings, shootings

22  often involving the indiscriminate killing of

23  civilians.

24          Now, it's certainly possible, probably even

25  likely that some of the money that the defendants sent

1   overseas at various points in time was for legitimate

2   purposes.  Many people in the conspiracy talk at

3   various points about sending legitimate money to their

4   family or legitimate money to actual charities.  But

5   that wasn't the case for the money that the small group

6   was sending, the money charged in the indictment.

7          Ms. Jama says it outright in a transcript

8   with Amina Esse.  She says, This money is for the

9   brothers in the mountains so the work they're doing

10  becomes easier for them.

11          You'll hear that right at the time she said

12  this, there was an act of al-Shabaab presence, active

13  fighting going on in the Golis Mountain region in

14  Somalia.  In fact, you'll see that Ms. Jama had,

15  shortly before that conversation, just read an article

16  online about the al-Shabaab fighting going on in the

17  mountain region.

18          The women knew that this money they were

19  sending wasn't legitimate.  They talk openly about the

20  need to use code words or veiled speech.  There's a

21  conversation where Ms. Jama explains that in the chat

22  room they don't use the actual names of al-Shabaab

23  leaders; they only use designations.  They might call

24  someone the grandfather.  You'll hear that that was a

25  reference that they used for Ahmed Abdi Godane, who was

1  the leader known as the emir of al-Shabaab until he was

2  killed in a drone strike in 2014.

3        You'll hear another conversation where

4  Ms. Jama and Umu Camaar talk about an incident that

5  happened in England where some of the members of the

6  chat room lived.  Umu Camaar says that they've become

7  paranoid because the police had come around asking

8  questions about them raising money in chat rooms.  And

9  Umu Camaar reports that the women said they deleted

10  their computers.  And not only did they delete them,

11  they formatted them to wipe the hard drive in case the

12  police came back around looking.

13        If when you send money you pretend to support

14  your family, can anyone tell what is really in your

15  heart?  And the answer is yes, you can tell from their

16  own words, from the way Ms. Jama and Ms. Dhirane talk

17  about al-Shabaab as our soldiers, our men, our

18  brothers.  The leader of al-Shabaab is our grandfather.

19        You can tell from the fact that they

20  themselves say the money is for the brothers in the

21  mountains, from the way they cheer on al-Shabaab's

22  attacks on civilians, from the way they send some money

23  overseas without fear but other transactions must be

24  concealed, transactions that they describe as evidence

25  to be hidden, transactions that they describe as making

1   the women paranoid, transactions that they very

2   specifically say carry a 15-year prison sentence.

3              When you hear all of the defendants'

4   conversations and you hear their import explained, when

5   you see how the transactions match up with

6   conversations that the defendants had explaining what

7   the money is being sent for, when you put all of the

8   puzzle pieces together, there will be only one

9   explanation that the facts support, that the defendants

10  were conspiring to provide material support to

11  al-Shabaab and that each of the substantive counts of

12  the indictment was an instance of them doing so.

13             And so at the end of the case, the government

14  will respectfully ask that you find the defendants

15  guilty on all counts.

16             Thank you.

17             THE COURT:  Thank you.

18             Ms. Minter.

19             MS. MINTER:  Your Honor, we will respectfully

20  reserve our right to make an opening statement until

21  the inception of our case.

22             THE COURT:  All right.  Mr. Yamamoto, would

23  you like to make an opening statement?

24             MR. YAMAMOTO:  Ms. Deutsch is going to make

25  it.

```
 1              THE COURT:  All right.  Yes, Ms. Deutsch.
 2              MS. DEUTSCH:  Good morning, Your Honor.
 3              THE COURT:  Good morning.
 4                       OPENING STATEMENT
 5              MS. DEUTSCH:  Some men have scored the goal
 6   for us.  May God protect them.  The army that rose up
 7   for our sake are seeking a home in paradise.  Oh, you
 8   the Shabaab who earned God's glory, you defended us
 9   against the enemy that caused us agony.  The whole
10   world is petrified.  The ignorant who came along them
11   have regretted with frustration.  Having found
12   themselves in a tight corner, they wail:  God has dealt
13   defeat to the enemy.
14              Your Honor, this is a poem written by Hinda
15   Dhirane, and it's Government Exhibit 4B7.  The
16   government will introduce into evidence Exhibits 4B1
17   and 4B19, and these were poetry that were found in
18   Ms. Dhirane's house pursuant to the search warrant.
19              And in that poem and in all the poems, she is
20   expressing her support of al-Shabaab, what she thinks
21   of al-Shabaab:  Oh, you, the Shabaab, who earned God's
22   glory.
23              We're not making any bones about this, Your
24   Honor, that Hinda Dhirane did support al-Shabaab.  She
25   expressed her feeling not only in her poetry, but also
```

1  in online chats in the Paltalk chat room and in phone
2  conversations.  But I think if you put this in context
3  of the history of Somalia and Somaliland, it's easier
4  to understand why she was so ardently a supporter of
5  al-Shabaab.
6          The government's expert and I think also
7  Ms. Muna's expert will talk some about the history of
8  Somalia.  In the history of Somalia, one sees one
9  government after another that was corrupt.  They
10  tortured people.  They siphoned off moneys, tax money,
11  aid money into the pockets of the prime minister, the
12  president, any of the finance ministers, or any other
13  ministers.  People were left without aid because that
14  was being siphoned off.
15          And the only period, really, of stability for
16  a long time was when the Islamic courts were in
17  session.  They started in, I think, 2000 or the early
18  2000s.  That was groups of people affiliated by clan.
19  They were not seen as corrupt by the people.  They
20  maintained peace.  Al-Shabaab grew up in this Islamic
21  court system.
22          Now, in about 2006, the Somali government at
23  that time, the Transitional Federal Government, invited
24  in Ethiopian troops.  I think there were 20,000 troops
25  that came in to suppress any insurgency.  Those troops

1  killed Somali citizens.  They raped civilians.  They

2  took over their farms.  They took their food.

3  Basically, they were doing what the government had

4  done.

5          And so al-Shabaab grew even stronger in about

6  2006-2007, and many of the people who were in the

7  diaspora by that time saw al-Shabaab as the hope.  They

8  saw them as the hope to establish peace and order and

9  the hope to establish a sharia government.

10          Now, Ms. Dhirane felt this way, and she often

11 spoke with like-minded women on the phone and in the

12 chat room, including Ms. Jama here at counsel table.

13 Ms. Atiyeh had gone over some of the conversations

14 which Ms. Dhirane had had with various people.  Again,

15 we make no bones about the fact that she was a

16 supporter of al-Shabaab.

17          In fact, there were other conversations where

18 she demonstrated her support.  There was one

19 conversation on April 14, 2013, when she was speaking

20 with her husband, Rashid.  They talked about the

21 bombing of the Banadir courthouse in Mogadishu, and

22 there were civilians killed in that bombing.  Again, it

23 was al-Shabaab who did the bombing.  And at that time,

24 the conversation became heated and Ms. Dhirane said,

25 Let them perish.  Nonbelievers are present in Somalia.

1               And there was other bombings of military

2       convoys, and there was one where Ms. Dhirane said,

3       Thanks to God.  Let him die, someone who is wounded.

4               So we see these conversations throughout the

5       evidence, Your Honor, but again, it's talk.  It doesn't

6       necessarily prove that Ms. Dhirane provided substantial

7       assistance to al-Shabaab.

8               Now, she met with others in a chat room, the

9       Dacwatu al-Tawhid or ISDAC chat room, and Ms. Atiyeh

10      told you that was a place where supporters of

11      al-Shabaab gathered.  And there were lectures by people

12      who supported al-Shabaab.  There were women who went

13      into the chat room who made pledges, and the government

14      has ledgers that they say were found in Ms. Muna's

15      house at the time of the search warrant.  And those

16      ledgers have names and amounts of money next to them.

17              I don't think that they can prove, Your

18      Honor, that actually the women who pledged, whose names

19      are in the book, went through with their pledges.

20      There's no evidence of that.  There's no evidence that

21      Ms. Dhirane ever went through with any pledges, if she

22      made pledges, and I'm not sure that there is any proof

23      of that.

24              Now, in regards to the search of

25      Ms. Dhirane's residence, there were no records of

1   pledges found in the search of her place.  The
2   government can't state that she was involved in any
3   pledges.  There are no recorded calls in which
4   Ms. Dhirane is soliciting pledges or following up to
5   encourage someone who has pledged.
6          The remittances which are in the indictment,
7   Your Honor, as overt acts, those remittances were not
8   sent through the hawalas as a result of pledges in the
9   chat room.
10         There is a confidential informant, I
11  understand, and she will testify that there was some
12  code language used in the chat room in regard to
13  al-Shabaab.  I believe that she will testify that it
14  was Ms. Jama who took her aside and told her that the
15  words to be used in place of the words al-Shabaab.  I
16  believe that Ms. Esse, the informant, will talk about
17  the fact that Ms. Jama told others in the group that
18  they were to use these words.  But there's no evidence
19  that Ms. Jama took aside Ms. Dhirane and asked her to
20  use these so-called code words.
21         The informant will talk, I believe, about
22  someone named Abu Kowthar.  Abu Kowthar was the manager
23  of the Dacwatu al-Tawhid or ISDAC chat room, and
24  Ms. Esse, the informant, will tell us that he used to
25  post the names of needy people in the chat room.  These

1  needy people were people that the people in the chat

2  room were to send money to help them survive.  Some of

3  them were in various European or in American countries,

4  and others were back in Somaliland or Somalia.

5         The government contends that it was Barira

6  Hassan Abdullahi who was the so-called conduit in

7  Hargeysa, Somaliland, through which moneys were

8  funneled to al-Shabaab.

9         Now, in the overt acts in the indictment, we

10  see that there are remittances sent by Ms. Abdullahi on

11  three occasions to Ms. Dhirane.  Those took place on

12  December 31, 2011, January 1, 2012, and January 2,

13  2012.  We do not know what happened to those moneys.

14  They were sent by Zaad, a device commonly used in

15  Somaliland to transmit money.  In any event, Your

16  Honor, we don't know what happened with those moneys.

17         In regards to Ms. Abdullahi, I think what's

18  important is there will be defense exhibits presented

19  to the Court of conversations with Ms. Abdullahi by

20  Ms. Dhirane and also conversations with other people

21  about the conversation.

22         We know from those conversations that

23  Ms. Abdullahi was deeply in debt.  We know from those

24  conversations that the Somaliland government was

25  condemning part of her land.  This was a parcel of land

1  near the airport.  They were expanding the airport, and

2  they were taking her land.

3          We also know, from a conversation, that

4  Ms. Abdullahi had taken a loan from TELESOM, which is a

5  big like telephone company in Somaliland.  They loan

6  money.  She had taken a large loan.  As a result, her

7  payments were $1,540 a month.  She tells United Arab

8  Emirates she had used the bulk of the money borrowed to

9  pay off the most urgent of her debts.  She had a number

10 of debts.  She was asking Ms. Dhirane in that phone

11 conversation to help her out.  In other words, to send

12 money so that she could pay off to TELESOM what she

13 owed them monthly.

14         There was then a subsequent conversation

15 between Ms. Dhirane and Ms. Jama about the fact that

16 they were flabbergasted, really, that Ms. Abdullahi

17 would think to ask them to pay that much money when

18 they really couldn't afford to pay that much money.

19         Now, Your Honor, the government has to prove,

20 as you know, that any money sent were to provide

21 substantial help or support to a terrorist

22 organization, al-Shabaab.  I think that it will be very

23 hard for them to prove that.  I think, Your Honor,

24 finally, that they will have to prove that Ms. Dhirane

25 was sending money knowingly, in other words

1  intentionally providing support to al-Shabaab.  I don't

2  think, Your Honor, that they will be able to prove

3  that.

4            Thank you.

5            THE COURT:  All right.  Thank you.

6            The government will call its first witness.

7            MS. ATIYEH:  Your Honor, the government calls

8  Mr. Matthew Bryden.

9            THE COURT:  All right.  Mr. Bryden will come

10  forward.

11        MATTHEW BRYDEN, PLAINTIFF'S WITNESS, AFFIRMED

12                   DIRECT EXAMINATION

13  BY MS. ATIYEH:

14  Q    Good morning, sir.  Could you please state your

15  name and spell it for the court reporter.

16  A    Good morning.  My name is Matthew Bryden.  I spell

17  that M-A-T-T-H-E-W.  Bryden is B-R-Y-D-E-N.

18  Q    Would you please tell the Court the city and the

19  country where you currently live.

20  A    I live in Nairobi, Kenya.

21  Q    Where did you grow up?

22  A    I grew up first in the United Kingdom and then in

23  Canada.

24  Q    Did you attend university?

25  A    I did.

Bryden - Direct by Ms. Atiyeh

1   Q    Where was that?

2   A    In Canada.

3   Q    Which university did you attend?

4   A    McGill University, Montreal.

5   Q    And what did you study there?

6   A    History and political science.

7   Q    Did you earn a degree?

8   A    I did.

9   Q    What was that?

10  A    That was a joint honors degree in both history and

11  political science, Bachelor of Arts.

12  Q    Mr. Bryden, what languages do you speak?

13  A    English, French, and Somali.

14  Q    And how would you characterize your ability to

15  speak, read, and write the Somali language?

16  A    I would say I don't have a native proficiency, but

17  I'm fluent.

18  Q    Where and when did you study Somali and become

19  fluent in the language?

20  A    I haven't formally studied Somali, but I have

21  lived and worked there on and off for over 25 years.

22  So I've acquired it through practice.

23  Q    You're aware that some of the government's

24  evidence in this case consists of the recorded

25  telephone calls; is that right?

Bryden - Direct by Ms. Atiyeh

1   A     That's correct.

2   Q     Have you been able to listen to those calls?

3   A     Yes, I have.

4   Q     All of them or --

5   A     No, not to all of them.  Some of them to check

6   against transcripts to assess their accuracy.

7   Q     In what language are the calls?

8   A     In Somali.

9   Q     Were you able to understand the calls when you

10  listened to them?

11  A     Yes, I was for the most part.

12  Q     And have you had the chance to review the

13  transcripts of those calls?

14  A     Yes, I have.

15  Q     Let me actually just go back.  You say for the

16  most part.  Were there sections that you weren't able

17  to understand?

18  A     There were sections of some calls that were

19  unintelligible.

20  Q     Were those sections identified in the transcripts

21  as being unintelligible?

22  A     Yes, they were.

23  Q     Following university, you underwent a period of

24  military service in Canada; is that right?

25  A     That's right.

Bryden - Direct by Ms. Atiyeh

1  Q     Could you briefly describe your military

2  experience to the Court.

3  A     I was a reserve infantry officer.  I did my

4  parachute -- combat parachute training.  I was a -- I

5  had reached the rank of lieutenant, and I was company

6  commander for a recruit company and trained recruits

7  for two years.

8  Q     Over what time period were you with the Canadian

9  Army?

10 A     From 1985 until 1989.

11 Q     And after you left the army in 1989, what was your

12 first job?

13 A     My first job was as a refugee registration officer

14 under the auspices of the United Nations but with a

15 nongovernment organization called CARE in southwest

16 Somalia.

17 Q     What sorts of things did you do in southwest

18 Somalia as a refugee registration officer?

19 A     Well, refugees were being registered either to

20 return to Ethiopia where they were from or to remain in

21 Somalia or to seek resettlement in a third country.  My

22 job was to register the preferences of each family and

23 to take photographs of the members of each family and

24 to pass that on to the United Nations for processing.

25 Q     And since 1989, would it be fair to say that your

1  professional work has kept you consistently involved

2  with issues in the Horn of Africa?

3  A     That's right.

4  Q     Since I just said this, what is the Horn of

5  Africa?

6  A     The Horn of Africa is the eastern part of the

7  continent that consists primarily of Somalia, Ethiopia,

8  Eritrea, Djibouti, and then some would also add Sudan,

9  South Sudan, and other neighboring countries in what's

10 sometimes called the Greater Horn of Africa.

11           MS. ATIYEH:  If the court security officer

12 could please show you what's been marked as

13 Government's Exhibit 1.

14 BY MS. ATIYEH:

15 Q     Can you identify this document?

16 A     I can.  This is a map of Somalia with parts of

17 neighboring countries.

18 Q     And based on your knowledge of the region, is it

19 an accurate map?

20 A     Yes, it is.

21           MS. ATIYEH:  The government moves Exhibit 1

22 into evidence.

23           THE COURT:  Any objection?

24           MS. MINTER:  Without objection, Your Honor.

25           THE COURT:  All right.  Without objection,

Bryden - Direct by Ms. Atiyeh

1   Government Exhibit 1 is admitted.

2           MS. ATIYEH:  If we could, put that up on the

3   screen.

4   BY MS. ATIYEH:

5   Q    Could you identify Somalia on this map, please.

6   A    Yes.  This is the territory of Somalia.

7   Q    And if you could, just point to Ethiopia on the

8   map.

9   A    Ethiopia or eastern Ethiopia is this part of the

10  map.

11  Q    And Kenya?

12  A    Kenya is here.

13  Q    And the country of Djibouti?

14  A    Here.

15          MS. ATIYEH:  We can clear the marks and put

16  that down for now.

17  BY MS. ATIYEH:

18  Q    After your time in Somalia working with the NGO,

19  could you please give the Court a brief summary of your

20  career in Somalia and in the Horn of Africa.

21  A    Yes.  After my work with CARE, which was just two

22  months, I joined the United Nations as an emergency

23  coordination officer in the northwestern part of

24  Somalia, which is marked on the map as Somaliland.  I

25  worked there managing relief efforts until the collapse

Bryden - Direct by Ms. Atiyeh

1  of the Somali government in 1991.

2       Then I returned with another humanitarian agency,

3  Doctors Without Borders, or Médecins Sans Frontières is

4  its French name.  I worked in relief efforts in

5  different parts of the country.

6       I was then engaged by the Canadian government as

7  adviser to the Canadian ambassador on Somali affairs, a

8  combination of political, military, and humanitarian

9  advice.

10      After Canadian forces -- Canadian forces were

11  deployed to Somalia at that time.  I took a brief

12  break.  I worked in Afghanistan, again, in relief

13  efforts for a few months.

14      Then I returned to the Horn of Africa and worked

15  in the Somalia region of Ethiopia for two years with

16  the United Nations, again, as an emergency field

17  officer.

18      After two years in that position, I moved back to

19  Nairobi, Kenya.  I worked briefly in government issues

20  with the European Union and then set up and ran,

21  between 1996 and 2002, a research program called the

22  War-Torn Societies Project which established three

23  Somali research institutions in different parts of the

24  country looking at reconstruction issues and

25  peace-building issues.

1    In 2003, I was hired by an organization called the

2 International Crisis Group which provides research and

3 analysis mainly for the diplomatic and humanitarian

4 communities on various conflicts.  I was director of

5 their Horn of Africa program until 2006.

6    In 2007, I worked for the United States Embassy

7 principally for the defense attaché's office on Somali

8 affairs.

9    Between 2008 and 2012, I headed the United Nations

10 sanctions monitoring team on Somalia and Eritrea.

11    Since then I've headed my own independent think

12 tank and consultancy.

13 Q   Could you talk a little bit about the work you did

14 for the sanctions monitoring U.N. group.

15 A   The sanctions monitoring began first as monitoring

16 of an arms embargo on Somalia that was imposed by the

17 U.N. security council.  It's been in place since 1992.

18 I've been in my second year of work with the group.

19    The security council expanded our mandate to

20 include all manner or threats to peace and security in

21 Somalia, principally acts that threaten the government

22 or the African Union mission, the peacekeeping forces

23 on the ground, any obstruction of humanitarian

24 assistance, any violation of human rights, and then

25 subsequently expanded the mandate to include also

Bryden - Direct by Ms. Atiyeh

1  Eritrea, which was accused of exporting arms ammunition

2  to supporting groups in Somalia and other parts of the

3  region.  So it was an investigative mandate.

4      I headed ultimately a team of eight investigators

5  from different countries and different backgrounds and

6  reporting to the security council on an annual basis.

7  Q    Your investigations into sanctions monitoring, did

8  that involve an investigation into al-Shabaab at

9  various points in time?

10 A    Yes, it did.

11 Q    You said that you now work at a think tank, Sahan.

12 Can you please explain the work you do there?

13 A    Sahan has three principal programs, one of which

14 is security governance.  We assist donor governments

15 providing support to rebuilding the Somali National

16 Army and Somali police.  We have a peace and safe

17 building program which involves providing advice to

18 various Somali governments, both the federal government

19 and the local regional government, and to donors in

20 trying to rebuild the Somali state.

21     We have a verification of monitoring program which

22 involves monitoring the way assistance is provided,

23 mainly humanitarian assistance, and to ensure that

24 corruption is minimized and wastage is minimized.

25     We have a transnational security threat program

Bryden - Direct by Ms. Atiyeh

1  which involves working with the countries of the

2  region, the governments of the region on a range of

3  threats, including counterterrorism, transnational

4  organized crime, human smuggling, and the use of

5  improvised explosive devices.

6  Q    Is it fair to say that both with the sanctions

7  monitoring group and with Sahan, you're doing

8  investigative work into any number of issues in the

9  region?

10  A    That's right.

11  Q    Could you explain to the Court how you conduct

12  your research and fieldwork when you conduct these

13  investigations.

14  A    Well, the standards that did apply with the United

15  Nations and continue to apply involve the standards of

16  evidence that are required by the U.N. security council

17  for these types of investigations.

18      That involves trying to reach primary sources as

19  far as possible -- it's not always possible in a

20  conflict zone to reach primary sources -- but then to

21  have a minimum of two independent and mutually

22  corroborating sources for any assertion made in the

23  report.  Frankly, I think that's -- we try to exceed

24  that standard.  Two independent sources for us was

25  considered too low.

1    We would seek to also corroborate any information

2 that we provided to the council with evidence, whether

3 it was documentary, it was video evidence, photographic

4 evidence.  And so to also then give those who were

5 cited in any of our reports and any allegation to write

6 a reply which was to be included in our presentations

7 to the security council.

8    In addition to our reporting, we were mandated and

9 required to present statements of case against

10 individuals and entities who were accused of violating

11 the sanction's regimes and to recommend them for

12 designation by the security council for targeted

13 measures.

14 Q    In the course of this investigation, how do you

15 gather information about al-Shabaab?

16 A    Well, first, there is a lot of information that is

17 publicly available inside the country and outside the

18 country because al-Shabaab is a transnational movement.

19 It originated in Somalia, but it's now active in at

20 least six countries of the region.

21    Part of that information derives from past

22 activities of al-Shabaab, people who have been arrested

23 and convicted of activities on behalf of al-Shabaab.

24 Some of it came from interviews with former members or

25 defectors of al-Shabaab or prisoners who have been

Bryden - Direct by Ms. Atiyeh

1  convicted.

2  Q    So you've personally interviewed former members of

3  al-Shabaab?

4  A    I have.

5  Q    I'm sorry.  You can continue.

6  A    Some of it comes from information that was shared

7  by member states, whether that was intelligence

8  information or information that was being used by law

9  enforcement that they chose to share with the United

10 Nations, at least for corroborative purposes for our

11 own investigations.  Well, any number of other ways,

12 but there is a great deal of information.

13      I could explain further.  Sometimes, for example,

14 we would have access to information transcripts or of

15 recordings of audio that member states had gathered on

16 al-Shabaab.

17      We also monitored al-Shabaab online.  We would

18 enter some of the forums and chat rooms that al-Shabaab

19 members used to communicate.  We would monitor those

20 and record them for the purposes of submission to the

21 U.N.

22 Q    Were you ever able to investigate towns or regions

23 that had been liberated from al-Shabaab control?

24 A    We were, and we collected evidence from those

25 areas, including documentation that al-Shabaab had

Bryden - Direct by Ms. Atiyeh

1  kept.  We would take weapons and ammunition that were

2  from al-Shabaab or had been left behind.  We would

3  trace them to try to find out the origin and the chain

4  of custody and then to put together as full a picture

5  of al-Shabaab as possible.

6  Q    You mentioned this to some extent.  Could you give

7  the Court some background on how you use open source

8  research in your work and investigations.

9  A    Open source research, I would say, is a critical

10  part of the work we do because so much is available in

11  open source, whether that's online or it's gray

12  literature.  By some estimate, I think the governments

13  I've worked with would say about 80 percent of

14  intelligence collection is now open source.

15      The Somali community is an extremely active online

16  community.  There are, by the last estimates I've

17  received, over 700 websites that relate to all kinds of

18  Somali issues.

19      Al-Shabaab has maintained websites in the past and

20  radios.  There are also affiliated sites that aren't

21  official al-Shabaab sites, but they're sympathetic or

22  supportive.  They provide a great deal of information

23  publicly from which to understand the positions, the

24  claims of at least sometimes the operations of

25  al-Shabaab.

1  Q    What would you describe as the sort of industry

2  standard methods for analyzing or confirming open

3  source information?

4  A    Well, the industry standard methods -- I neglected

5  to mention that I did work, as well, as an analyst for

6  the Open Source Center, a U.S. government facility that

7  monitors open source information.  I provided analysis

8  on Somalia.

9      That work required a set of guidelines in the

10 standards that we were required to meet.  It involves

11 understanding the sources that you're referring to,

12 that you're using in each report, understanding as far

13 as possible who is behind a given website or newspaper

14 or radio station, the bias or tendencies of that

15 website or radio station, whatever that source of

16 information is is likely to involve, whether or not

17 it's related to a particular region, locality, or to a

18 clan of political affiliation, to reflect that in your

19 analysis and compare and contrast it with other sources

20 of information.

21 Q    Overall then, what's the method that someone in

22 your field uses to derive opinions?

23 A    Well, I would say that we would use all source

24 information but not in the sense that a government

25 would in that we don't have access necessarily to all

Bryden - Direct by Ms. Atiyeh

1  sources being classified or highly classified

2  information.  We take all of the sources available to

3  us.  We would assess, and we actually do formally

4  assess using a rigorous system of assessing reliability

5  and credibility of both sources and information.

6      We would also use peer review to challenge the

7  contents of any reports that we prepared, to have them

8  looked at by other professionals either within our team

9  or sometimes outside of our team and to seek as much

10  corroborating information for any assertion as we

11  possibly can.

12  Q    Have you testified as an expert witness in the

13  past?

14  A    Yes, I have.

15  Q    And was your testimony in those trials related to

16  al-Shabaab?

17  A    Yes, it was.

18  Q    About how many trials was this?

19  A    I believe it's three in the United States, one in

20  Canada, and one in Finland.

21  Q    And you mentioned that you had reviewed the

22  transcripts in this case.  Did you have experience with

23  similar transcripts in the other cases in which you

24  were qualified as an expert?

25  A    Yes, I did.

Bryden - Direct by Ms. Atiyeh

1  Q     In those cases, did you discuss code words or

2  veiled language that was used by those defendants in

3  those cases?

4  A     Yes, I did.

5  Q     In the transcripts and communications you reviewed

6  in this case, did you find that the defendants were

7  often using coded language or veiled speech?

8  A     Yes.

9  Q     How did you reach that conclusion?

10  A     Well, partly from experience because that -- it's

11  a common practice that I've encountered.

12          MS. MINTER:  Your Honor, I would object at

13  this point.  I think that gets to the underlying

14  testimony.  I think at this point the government should

15  be laying a foundation.

16          THE COURT:  Well, I think this is part of the

17  foundation.

18          I'll let you get into this, and then you're

19  going to offer him as an expert?

20          MS. ATIYEH:  I was, Your Honor.  I was trying

21  to lay the foundation.

22          THE COURT:  All right.  Without getting into

23  the substantive testimony.

24  BY MS. ATIYEH:

25  Q     If you can, just speak to this generally, how you

Bryden - Direct by Ms. Atiyeh

1  reached the conclusion that the defendants used veiled

2  language in these transcripts maybe without going into

3  the substance of those transcripts.

4  A      Well, it's something that I've encountered outside

5  the context of trials or reading transcripts.   It's a

6  fairly common practice.   Even the use of veiled

7  language, alternative language for describing

8  al-Shabaab is quite common in the Somali media and also

9  in the kinds of interviews that I've conducted during

10 the course of my investigations.

11      And then in previous trials, I've seen that

12 practice continued and elaborated upon in order to --

13 in my assessment, to conceal the meaning that is

14 actually being discussed.

15 Q     Do you assess this meaning in relation to the

16 current events, the events in Somalia that you're

17 familiar with?

18 A      Yes.   And sometimes it's necessary to relate the

19 language being used to a specific date, a specific

20 location in order to understand exactly what it means.

21 Q     Did your fluency in Somali aid you to reach some

22 of these conclusions about code language?

23 A      Yes, it did.

24 Q     How so?

25 A      Well, because a term that might be an ordinary

Bryden - Direct by Ms. Atiyeh

1  Somali term for, let's say, the youth or for an animal

2  or for some everyday object would be used out of

3  context in order to refer to something else with a

4  different meaning.

5  Q    Did your familiarity with al-Shabaab and Somali

6  government personalities and individuals aid you in

7  determining the meaning of the coded or veiled

8  language?

9  A    Well, to the extent that in conversations with

10 Somali individuals, whether they were government

11 officials or former al-Shabaab members, often terms

12 would come up that I recognized from either

13 conversations or audio that I had listened to or other

14 conversations that I had had.  So patterns of veiled

15 speech have become quite common in my work.

16 Q    And in the transcripts in this case -- again,

17 without going into any specific details -- did you see

18 instances in which the defendants actually explained

19 parts of the codes they were using?

20 A    Yes, I did.

21 Q    And did you find that some of these veiled terms

22 or code words maybe were used in separate conversations

23 many times?

24 A    Yes, I did.

25 Q    Did some of these words seem -- I think you

1 mentioned this a little bit.

2          MS. MINTER:  Your Honor, I would renew my

3 objection.

4          THE COURT:  All right.  Why don't you offer

5 him as an expert at this point.

6          MS. ATIYEH:  Okay.  May I ask one follow-up

7 question, Your Honor?

8          THE COURT:  All right.  Go ahead.

9 BY MS. ATIYEH:

10 Q    Did the context of the calls help you to decipher

11 the veiled language?

12 A    Yes, it did.

13          MS. ATIYEH:  We tender Mr. Bryden as an

14 expert at this time.

15          THE COURT:  On what specific issues?

16          MS. ATIYEH:  On the history of Somalia, of

17 al-Shabaab, of the Somali language, of the -- Your

18 Honor, I'm not sure that it's necessary, based on what

19 Mr. Bryden is going testify to, to tender him as an

20 expert in al-Shabaab code language because I'm not

21 precisely sure that that's how he would describe it, as

22 being sort of a universal al-Shabaab code.  But to the

23 extent he's going to testify about the meaning of

24 certain words or phrases that the defendants used, we

25 would tender him as an expert in that language.

Bryden - *Voir Dire* by Ms. Minter

1        THE COURT:  All right.  Ms. Minter, do you

2   want to *voir dire* this witness before I rule?

3        MS. MINTER:  Yes, Your Honor.

4                *VOIR DIRE* EXAMINATION

5   BY MS. MINTER:

6   Q    Good morning, Mr. Bryden.

7   A    Good morning.

8        MS. MINTER:  Your Honor, I will tell the

9   Court that we have no objection to Mr. Bryden being

10  presented as an expert in the history of Somalia or

11  al-Shabaab and its history.

12       THE COURT:  All right.  You're focused on his

13  ability to express opinions as to the meaning of the

14  language in the transcripts?

15       MS. MINTER:  Yes, Your Honor.  Given the

16  testimony, I would also *voir dire* on his expertise with

17  regard to the Somali language.

18       THE COURT:  All right.

19  BY MS. MINTER:

20  Q    Mr. Bryden, you said that you're not a native

21  Somali speaker?

22  A    That's correct.

23  Q    You have no formal training in the Somali

24  language?

25  A    That's correct.

Bryden - *Voir Dire* by Ms. Minter

1  Q     So you weren't educated in that at McGill

2  University?

3  A     No.

4  Q     Or in your current doctorate studies?

5  A     No.

6  Q     Okay.  No informal training, perhaps casual Somali

7  language classes?

8  A     Well, from time to time I try to engage Somali

9  teachers to assist, but I would say most of what I

10 acquired, I acquired through practice on my own.

11 Q     If you would, your testimony was that you lived

12 and worked on and off for 20 years in Somalia.  How

13 much total time did you spend in Somalia during those

14 20 years?

15 A     Something over a decade I would say.  I could go

16 through it year by year if that would help.

17 Q     No.  That's fine.  Thank you.

18       And during the ten years of collective time that

19 you were in Somalia, were you speaking exclusively with

20 native Somali speakers during that time?

21 A     No, not exclusively.

22 Q     And the agencies that you worked for -- or the

23 organizations is probably a better term.  The

24 organizations that you worked for, have they employed

25 solely Somali speakers?

Bryden - *Voir Dire* by Ms. Minter

1   A    No.

2   Q    They employed English speakers?

3   A    Yes.

4   Q    Speakers of other languages?

5   A    Yes.

6   Q    And please advise me if you believe it would vary

7   from organization to organization, but what percentage

8   of your work would you say was conducted in the Somali

9   language?

10  A    I'm not sure.  I could give you a real estimate of

11  the percentage of my time.  What I would say is that

12  over time I reached the point where I would conduct

13  professional interviews or research interviews that

14  were exclusively in Somali.

15  Q    Perhaps it would be easier to phrase it this way:

16  In your average workday, during the time that you were

17  living and working in Somalia, what percentage of the

18  day would you expect that you were speaking Somali

19  versus English?

20  A    Well, it depended.  When I was working with the

21  War-Torn Societies Project and I was setting up Somali

22  research institutions, I was working exclusively with

23  Somali speakers; although, they also spoke English.  So

24  we would switch back and forth during the course of the

25  day.  Sometimes we'd speak for hours in Somali.

Bryden - *Voir Dire* by Ms. Minter

1  Sometimes we would speak in English.  We produced

2  documents in both languages.

3      When I worked for the United Nations, much more of

4  my language -- my time was spent in the English

5  language.  When I would travel to Somalia for interview

6  purposes, then I would spend a greater percent of my

7  time speaking Somali than English.  So I don't -- I

8  couldn't give you an estimate.  Obviously, it depends

9  on where I was and who I was engaging with at a given

10  time.

11  Q    It's safe to say you weren't speaking or

12  discussing in Somali 24 hours a day?

13  A    No.

14        MS. MINTER:  The Court's indulgence, Your

15  Honor.

16  BY MS. MINTER:

17  Q    Mr. Bryden, the government asked you some

18  questions about code words.  What do you understand

19  code words or coded language to mean?

20  A    Well, there are different kinds.  One of the terms

21  referred to is veiled speech, which is simply just an

22  attempt to substitute one word for another in order to

23  obscure the meaning.  Sometimes it's not even an

24  attempt to obscure the meaning.  It's a colloquial way

25  of referring to something.

Bryden - *Voir Dire* by Ms. Minter

1       Coded words -- I would say the actual use of the

2   word "code" would be if there's a systematic attempt to

3   substitute one term for another and that is understood

4   by both parties.  So most of what I would say that I've

5   listened to relates more to veiled speech than to the

6   actual use of codes.

7   Q    When you say most of what you've listened to

8   refers to veiled speech, is that in your experience

9   general or specific to this case?

10  A    Well, in relation to this case, in relation to

11  previous cases, and again, in relation to discussions,

12  investigations I've conducted into al-Shabaab and

13  discussed with people with direct knowledge of

14  al-Shabaab, whether they were members of the group or

15  not --

16  Q    So specific to this case then.  You would say that

17  it encompasses veiled speech more than a formal

18  systematic coded language?

19  A    Yes.

20  Q    And just to be clear, you said that veiled speech

21  can also include a colloquial way to refer to

22  something?

23  A    Well, I shouldn't confuse the two.  Sometimes

24  terms that are used in veiled speech may also be the

25  same terms that are simply used in colloquial language,

Bryden - *Voir Dire* by Ms. Minter

1 but the intent is different.  So I could give examples,

2 but perhaps this isn't the time.

3 Q    So particular words then could imply an intent to

4 disguise the language but could also simply be the

5 colloquial use of the term?

6 A    Yes, it would depend on the context.

7 Q    Now, you described a systematic attempt to use

8 coded language.  That would imply a universal standard

9 for the words that were utilized?

10 A    I'm not sure universal standard.  It would just be

11 that the two parties would have had to establish in

12 advance which words were to be used for -- or which

13 numbers or which symbols would be used as substitutes

14 for others or how they would reorganize data in a way

15 that it couldn't be deciphered by someone else.  So a

16 code just tends to be more complex, more rigorous than,

17 say, veiled speech would be.

18 Q    So a formal system?

19 A    A formal system and a rigorous one whereas veiled

20 speech is sometimes improvised.

21 Q    So veiled speech, such as you've seen here, would

22 likely vary from circumstance to circumstance?

23 A    I'm sorry.  In what way?

24 Q    For example, you testified that you've seen veiled

25 speech in other cases that you've previously testified

1  in.

2  A    Yes.

3  Q    So the speech engaged in those cases could well be

4  different than the speech engaged in this case?

5  A    Yes.  I certainly wouldn't say that there's a

6  universal standard for veiled speech.

7  Q    That it's more likely to be unique to the

8  circumstance or the parties or the conversation at

9  hand?

10 A    If not unique -- well, it will be unique in its

11 entirety.  Sometimes I've seen the same veiled speech

12 being used by different people in different contexts

13 but, in fact, referring to the same thing.  There are

14 some common terms.

15         MS. MINTER:  The Court's indulgence, Your

16 Honor.

17         Your Honor, nothing further with respect to

18 the *voir dire*.  We would have argument.

19         THE COURT:  All right.  Mr. Yamamoto, do you

20 want to engage in any *voir dire*?

21         MR. YAMAMOTO:  No, Your Honor.

22         THE COURT:  All right.  Ms. Minter, I'll hear

23 you.

24         MS. MINTER:  Your Honor, I would submit to

25 the Court, as we indicated, that Mr. Bryden is clearly

Bryden - *Voir Dire* by Ms. Minter

1  an appropriate expert with regard to the history of

2  Somalia and the history of al-Shabaab as an al-Shabaab

3  organization.

4       We would submit that he should not be

5  qualified as an expert in the Somali language given

6  that he has had no formal training.  And while he has

7  certainly engaged in the Somali language over the

8  course of his time -- by his testimony, it is over a

9  time period of approximately ten years where he might

10 be using the Somali language or engaging in the Somali

11 language at times during the course of the day but

12 certainly not exclusively.

13      Accordingly, Your Honor, we would submit that

14 the government has not properly qualified him as an

15 expert with respect to the Somali language.

16      Furthermore, Your Honor, with respect to

17 coded or veiled language, I would submit to the Court

18 that this is perhaps more extensively covered in the

19 motion that we have filed.  So on some level, it goes

20 also to the appropriateness of the testimony, as well

21 as his expertise.

22      But I would submit, Your Honor, that his

23 experiences with veiled language have varied across the

24 course of the different cases he's been involved in.

25 That does not give him any particular expertise that

Bryden - Direct by Ms. Atiyeh

1  will educate the Court beyond the Court's ability to

2  understand, as the finder of fact, what the language in

3  this case would mean.

4          Accordingly, I would submit that he should

5  not be qualified as an expert with respect to coded

6  language, veiled language, or anything of the like.

7          THE COURT:  All right.  Thank you.

8          I think there's sufficient grounds to

9  recognize Mr. Bryden as a person who is qualified by

10  training or experience to express opinions concerning

11  the history of Somalia, al-Shabaab as an organization,

12  and also the meaning of various speech patterns within

13  the context used.

14          I think the matters you've raised go to the

15  weight to be given to that testimony.  So I'm going to

16  overrule the objection, and I'll recognize Mr. Bryden

17  as an expert.

18          MS. MINTER:  Your Honor, I would just ask to

19  reserve the objections that we've made in our motion *in*

20  *limine* and those that are raised here for specific

21  testimony.

22          THE COURT:  You may do that.

23          MS. MINTER:  Thank you, Your Honor.

24          THE COURT:  Ms. Atiyeh.

25          MS. ATIYEH:  If we could, put back up on the

1    screen Government Exhibit 1, please.

2                 FURTHER DIRECT EXAMINATION

3    BY MS. ATIYEH:

4    Q    Mr. Bryden, just to go into some general

5    background about the country of Somalia, what's the

6    approximate size of the country?

7    A    I've generally heard it referred to as being

8    equivalent to the size of the State of Texas.

9    Q    What's its population?

10   A    There's no definitive data on the population.

11   Estimates range from anywhere between 7 to about 12

12   million.  I tend to come down somewhere in the middle

13   and assess it at somewhere between 9 and 10 million,

14   but that's really no more than a sort of middle ground

15   between the various estimates that I've seen.

16   Q    Are there also people of Somali descent who live

17   outside of the national borders of Somalia but in the

18   neighboring countries?

19   A    Yes, there are.  Somalia is actually unique in

20   that its entire land border is inhabited on both sides

21   by people of the same nationality or the same ethnic

22   background.  So in Djibouti, Ethiopia, and Kenya, all

23   along that border there are Somalis on both sides of

24   the border.

25   Q    About how many Somalis live outside of the

Bryden - Direct by Ms. Atiyeh

1  national boundary?

2  A    That is also indeterminate.  The census data from

3  the neighboring countries is also contested.  So the

4  estimates would range from anywhere from about 5 to

5  9 million people living on the other side of the

6  Somalia border in neighboring countries.

7  Q    Are there also Somalis or people of Somali descent

8  living elsewhere in the world?

9  A    There are Somali communities all over the world

10  and significant communities on -- I think it's safe to

11  say -- every continent.

12  Q    What's that known as?

13  A    That's usually referred to as the Somali diaspora.

14  Q    What's the population of the Somali diaspora?

15  A    That's also unknown.  Again, the low estimates are

16  typically around 1.5 million, but I think it's probably

17  safer to look at larger figures, probably 2 to

18  3 million and possibly above that.

19  Q    How do Somalis who live in the diaspora who have

20  left the country get their news and information about

21  what's going on in Somalia?

22  A    There's a number of ways.  First of all, there's

23  an enormous amount of movement between Somali

24  communities outside Somalia and Somalis inside the

25  country.  So in some ways, the description of a Somali

Bryden - Direct by Ms. Atiyeh

1  diaspora is almost a misnomer because there's so much

2  movement in both directions.

3       There is a lot of telephone communication, a lot

4  of oral communication.  There is the Internet, as I

5  said, hundreds of websites, and, of course,

6  word-of-mouth information.  If someone receives

7  information from a relative in Somalia, it doesn't

8  usually just remain with that person.  That will be

9  then discussed locally with friends, with relatives.

10  Somalia is typically described as an oral society, and

11  news passes very quickly by word of mouth and through

12  all of the available channels.

13  Q    What does the Somali economy consist of?

14  A    The economy is mainly -- the largest sector is the

15  livestock sector, livestock exports to the Gulf states

16  which aren't shown on the map, but to Somalia and to

17  Yemen and to the United Arab Emirates.

18       There has been historically an agricultural

19  sector, particularly in the southern part of the

20  country, exporting citrus and banana.  Much of that

21  export economy has dropped off.  So there's

22  agricultural for domestic use.

23       There is transit trade.  Somalia has ports that

24  service the neighboring countries of Ethiopia and

25  Kenya.  So commodities and electronics and fuel are

1   passed through those ports.

2       Then there are remittances, so money that's sent

3   back by Somalis in the diaspora to relatives in the

4   homeland.

5   Q   How much of Somalia's economy is driven by

6   remittances?

7   A   The current estimates, I think, by the World Bank

8   are about $1.5, $1.6 billion a year.

9   Q   And what percentage of the Somalian economy is

10  that?

11  A   I'm not sure what percentage of GDP that would

12  reflect.  I'm not an economist by training, but I think

13  it's widely understood that if the remittances were to

14  be cut off, that the economy would be in deep crisis or

15  collapse.

16  Q   And are you familiar with the importance

17  culturally of sending remittances to family in Somalia?

18  A   Yes.  Remittances or the redistribution of wealth

19  within the family is a form of obligation.  Somalis

20  redistribute wealth, share.  It's a matter of

21  tradition, I would say, of culture.  So even people who

22  are making very small amounts, very low incomes in the

23  diaspora will routinely send a share of that back to

24  their families in Somalia.

25  Q   Could you describe the banking system in Somalia.

Bryden - Direct by Ms. Atiyeh

1  A    Until recently I would have said there is no

2  formal banking system in Somalia.  There are some state

3  banks.  There's a Central Bank in Mogadishu.  There is

4  a Central Bank in Hargeysa.  But in terms of a

5  commercial banking system, until recently there was

6  nothing.  It's only in the last few years that a few

7  private banks have been established in Mogadishu.

8       Instead, Somalia has depended on money transfer

9  companies or hawalas.  These are primarily money

10 transfer companies who move money across borders or

11 within Somalia.  But some of the larger ones have

12 started to function as banks, at least within Somalia,

13 offering accounts and banking services.  But they don't

14 have the international licenses to operate as banks for

15 the most part.

16 Q    Could you give me some examples of hawalas that

17 are commonly used in Somalia.

18 A    I think the largest is Dahabshiil.  Other large

19 money transfer companies include Amal, Kaah, and then

20 you can go on.  There are dozens of them, but those

21 would probably be the largest.

22 Q    You're familiar with one called Iftiin?

23 A    Iftiin, yes.

24 Q    And these hawalas are how individuals in the

25 diaspora typically send money to Somalia?

1  A    Yes, that's the most common way.

2  Q    Are you familiar with a system known as the Zaad

3  Service?

4  A    Yes, I am.

5  Q    And what's that?

6  A    That's electronic money transfer over mobile

7  phones.  It's linked to the hawala system, but it

8  allows money just to be sent from phone to phone

9  instead of cash having to be withdrawn.

10 Q    Does one need a smart phone to do this, or does it

11 simply just work over the telephone system?

12 A    It will work over the telephone system.  It can be

13 done by SMS.

14 Q    Going back to Government's Exhibit 1, to the map

15 of Somalia, I'd like to direct your attention to the

16 northern part of the country.  Could you please

17 identify the region of the country known as Somaliland.

18 A    Yes.  It's this part of the country here.

19 Q    How is Somaliland governed?

20 A    Somaliland declared itself independent of Somalia

21 in 1991 and set up its own government in its capital,

22 Hargeysa.  After some period of instability, it settled

23 down around 1997.  It then developed its own

24 constitution.  It's had several rounds of elections.

25 It now has an elected lower house in parliament, a

Bryden - Direct by Ms. Atiyeh

1   clan-based upper house of parliament, and a

2   directly-elected president.  It formally, at least,

3   doesn't participate in the politics in the rest of

4   Somalia.

5   Q    Looking back at the map, could you identify the

6   region that's known as Puntland.

7   A    So Puntland is this northeastern area, and there

8   is a contested zone that both Somaliland and Puntland

9   claim that I've marked with that zigzag.

10  Q    How is Puntland governed?

11  A    Puntland established its own government in 1998.

12  It declared itself as the first federal state of a

13  future Somali federation; although, at that time, there

14  was no other part of Somalia that was looking for

15  federation.  And it has now had successive governments

16  that are elected not through general election but

17  through the parliament, which is a clan-based

18  parliament then electing a president.

19  Q    So unlike Somaliland, Puntland is not a

20  self-declared state?

21  A    No.

22  Q    It's not its own country?

23  A    No.  It doesn't seek to secede from Somalia.  It

24  is a federal member state of a future Somali

25  federation.

Bryden - Direct by Ms. Atiyeh

1    Q    And what currency is used in Somalia?

2    A    There are two Somali currencies.  There's the

3    Somali shilling which is used throughout Somalia except

4    most of Somaliland.  Somaliland has its own currency,

5    the Somaliland shilling.  In reality, much of the

6    economy is dollarized.  So any large transactions

7    typically take place in dollars.

8         In the larger towns, you'll find many of the money

9    transfer companies, the bigger businesses will also

10   take European currencies.  In Somaliland, the Ethiopian

11   currency is also widely accepted.  So it's really

12   something of a hybrid.

13   Q    What's the exchange rate between the dollar and

14   the Somali shilling?

15   A    Until recently it was about 15,000 shillings to

16   the dollar.  It's recently -- since the time of the

17   events in this trial, it's been pegged lower, but about

18   15,000 to the dollar.

19   Q    The Somaliland shilling, does that have the same

20   value as the Somali shilling, or is it different?

21   A    No.  That was until recently about 6,000 shillings

22   to the dollar.  Again, recently, it's climbed up

23   somewhat.  It's fallen again to the dollar to about

24   7,500.  At this time, it's about 6,000.

25   Q    Now, what would the cost or the value be of, say,

Bryden - Direct by Ms. Atiyeh

1  a month's wages for an average Somali citizen?

2  A    That's hard to say because much of the economy is

3  in a way informal.  So people don't receive regular

4  wages, especially in the rural areas.  In the towns, it

5  varies between whether you're working for Somali

6  business or whether you're working for international

7  organization.  A large business or an international

8  organization, the lowest paid staff would probably not

9  receive much less than say $100 a month.  A Somali

10  business might pay as low as $30 or $50 a month to its

11  lowest paid employees.

12  Q    What about the cost of something like a cup of

13  tea?

14  A    A cup of tea is typically the cost of the lowest

15  useful denomination of currency.  So in Somaliland

16  that's been about 500 shillings, and in Somalia, it's

17  been about 1,000 shillings.

18  Q    What about something like a meal in a restaurant?

19  A    Well, there are different types of restaurants.

20  Those local restaurants can be very cheap indeed.  You

21  could get a decent meal for the equivalence of $3 to

22  $5.  But you could also go to one of the large -- you

23  could pay less than that.  You could also go to one of

24  the large fancy restaurants in Mogadishu or Hargeysa,

25  and you could pay $20 or $30 a person.

Bryden - Direct by Ms. Atiyeh

1  Q    What's the cost in Somalia of an AK-47?

2  A    Right now I'm not certain of the cost.

3         MS. MINTER:  Your Honor, I would object to

4  the relevance.  The government specifically argued in

5  their trial brief that the amounts involved were

6  irrelevant, and this appears to go to the ability to

7  spend money in Somalia and the value of a dollar in

8  Somalia.  I would submit, based on their argument, that

9  the amounts transferred are irrelevant to prove the

10 underlying offense, that this testimony is irrelevant.

11         MS. ATIYEH:  Your Honor, some of this

12 discussion of the costs, the value of certain objects

13 goes to what we're going to posit as some of the veiled

14 speech being used in the transcript, which is why I'm

15 asking.

16         THE COURT:  The Court will hear it.  The

17 objection is overruled.

18 BY MS. ATIYEH:

19 Q    I'm sorry.  Could you go back to the cost of a

20 firearm, an AK-47.

21 A    The cost of firearms has varied over the time that

22 I've observed them.  The AK-47 I've seen as low as $250

23 and as high as $700 and rarely -- sometimes as high as

24 $900.  That depends on the age of the weapon.  It

25 depends on the type of AK-47, the country that it's

Bryden - Direct by Ms. Atiyeh

1  manufactured in.  It also depends on demand.  But by

2  and large, the AK-47s run fairly cheap.  Things like

3  handguns would be more expensive, a higher demand.

4  Q    What's the cost of a truck or a vehicle?

5  A    A town car, a kind of --

6           MS. MINTER:  Your Honor, I would just renew

7  my objection.

8           THE COURT:  Overruled.

9  A    A small vehicle, a saloon car would be -- usually

10 the cars that come into Somalia are reconditioned.

11 They're not brand new.  They'll come from the United

12 Arab Emirates or Japan where they're secondhand.

13 They've been reconditioned.  So they're quite cheap,

14 and they come in with low taxes.  So you could have a

15 reconditioned saloon car for as low as $2,500, $4,000.

16 You wouldn't have to pay much more than that.  For a

17 four-wheel drive, you could pay as little as $10,000 or

18 $12,000.  You could pay up to 20, 25 if it was a fairly

19 new and elaborate version of a four-wheel drive.

20 Q    What's the value of a camel?  How much would it

21 cost to purchase one?

22 A    The value of a camel actually -- at the moment,

23 I'm not certain.  I've seen -- in looking at market

24 data, I've seen different figures.  But anywhere from

25 about $600 to $1,200 for a camel.

1   Q     If we could, go back to Government's Exhibit 1.
2   Could you just identify the capital of Somalia on the
3   map.
4   A     The capital of Somalia is here, Mogadishu.
5   Q     Close to Mogadishu, could you identify a city
6   called Afgooye.
7   A     It's so close that it's difficult to distinguish.
8   I've just tried to put it there.
9   Q     If it's causing you to have to mark over the
10  cities, you don't need to do the marking if it's
11  blocking your ability.
12        And around Mogadishu, is there an area known as
13  Ex-control?
14  A     Yes.  To my knowledge, there are two areas that I
15  have heard referred to as Ex-control.  These are the
16  two last checkpoints on the main roads out of
17  Mogadishu, one towards Afgooye and one to the north
18  towards the towns of Bal'ad and Jowhar.
19  Q     When you say checkpoints, who are these
20  checkpoints run by?
21  A     Well, that has varied over time.  It depended on
22  which militia was in control of that area.  At the
23  moment, these would be controlled by the Somali federal
24  government.
25  Q     Historically, were they ever controlled by

Bryden - Direct by Ms. Atiyeh

1    al-Shabaab?

2    A    At times they were controlled by al-Shabaab and at

3    times by various factional clan militias.

4    Q    Is there a place in Mogadishu known as the Bakara

5    Market?

6    A    There is.

7    Q    What can you tell me about the Bakara Market?

8    A    Bakara Market is considered the hub of Somali

9    business.  It's where the exchange rates are fixed

10   every day.  It's where all of the largest businesses,

11   whether they're telecommunications or money transfer,

12   have their Somali headquarters.  It's in the southwest

13   part of the city.  It's known as a place where you can

14   get pretty much anything.

15   Q    Is it known for any affiliations with al-Shabaab?

16   A    At different times, yes, it has.  In the mid to

17   late 2000s, it was one of the areas that was considered

18   either under control of al-Shabaab, or at times it was

19   a -- although it was a commercial area, it was a no-go

20   zone for government forces because of al-Shabaab's

21   either presence or sympathies in the market.

22   Q    When you say a no-go zone for government forces,

23   you mean that it's not safe for government forces to be

24   there?

25   A    That's right.

Bryden - Direct by Ms. Atiyeh

1  Q    Slightly south of Mogadishu, could you identify a

2  city called Marka.

3  A    Yes, there on the map, the dot to the south of

4  Mogadishu.

5  Q    And another city sightly south of that, Baraawe.

6  A    That's there.

7  Q    And then further south a city called Kismaayo.

8  A    There.

9  Q    Could you just briefly explain the economic

10 situation in Kismaayo and the time period leading up to

11 and through 2012.

12 A    Kismaayo was -- it's been contested throughout

13 most of the history of the civil war because it's a

14 very lucrative port, and its economy is based on

15 commerce through its port.

16      During the period in question, it was initially

17 subject to joint control between al-Shabaab and other

18 militias.  That coalition broke down and -- well, in

19 terms of sequencing, from 2009 to about 2011 under

20 al-Shabaab control, exclusively al-Shabaab control.  It

21 would have been the primary source of revenue for

22 al-Shabaab, principally because of charcoal exports

23 through the port to the Gulf state, Somalia, and to the

24 United Arab Emirates.

25      The management of the port then became a source of

Bryden - Direct by Ms. Atiyeh

1   dispute, and al-Shabaab eventually lost control, partly

2   when Kenyan forces entered and took over.  So it has

3   changed hands during the period in question, but

4   initially, it was al-Shabaab's primary source of

5   revenue.

6   Q    Mr. Bryden, when you look at the map, you can see

7   that a number of the cities have alternate spellings

8   listed.  Is there a universal way of spelling place

9   names and other words in the Somali language?

10  A    No, there isn't.  Somali has only been written

11  since 1972, and spellings are phonetic.  So they

12  reflect sometimes different forms of pronunciation.

13  They also reflect regional preferences in pronunciation

14  and also regional differences in the way, say, numbers

15  are expressed, figures are expressed.  So it's quite

16  common to see different spellings for different names.

17  Q    And is that true of all sorts of words in Somali,

18  not just place names but also people's names and other

19  words?

20  A    Yes.  There will be great variation, and that also

21  reflects the fact that not many names will be -- people

22  will spell them differently depending on who they're

23  writing them for, whether they're writing them for an

24  English speaking audience or a Somali audience.

25  Sometimes the names will be some combination of an

Bryden - Direct by Ms. Atiyeh

1  Anglicized spelling and a Somali spelling.

2  Q    So a given sound might be written down using

3  different letters at different times?

4  A    That's right.

5  Q    And could you give me some examples of letters

6  that are used to mean different things in the language.

7  A    Well, there are some Latin letters that don't

8  correspond with letters in the English alphabet.  So,

9  for example, the X is not an English X.  It's a hard H,

10 a hu sound.  The C is not a C as it is in English.  It

11 represents a very hard glottal stop, sort of au, which

12 is analogous to an Arabic ine.  The combination letters

13 DH is pronounced in the north of Somalia, Somaliland

14 area is pronounced as a hard D or du, but in the south,

15 it would be pronounced more as a ru, an R sound.  So

16 these type of variations exist.

17 Q    And different people use different vowel spellings

18 also as they spell out words?

19 A    Yes.  For example, the name Cosman, which would

20 begin with a C because it begins with a glottal stop,

21 might be spelled, then the next letter might be a U or

22 it might be an I or it might be O as in Osman in an

23 Anglicized spelling.

24 Q    Going back to the map, could you identify the

25 capital city of Somaliland, please.

Bryden - Direct by Ms. Atiyeh

1  A     The capital city of Somaliland is there at

2  Hargeysa.

3  Q     Could you identify a city called Boorama.

4  A     Yes.  It's here on the Ethiopian border.

5  Q     And a city in the region that you identified as

6  Puntland called Bosaso.

7  A     Yes, that's here.

8  Q     Could you just talk very briefly about the

9  colonial background in Somalia and, in particular, the

10  colonial differences between the region of Somaliland

11  and the region of Somalia.

12  A     Well, the Somali territories in the late 19th

13  century were taken over by different powers.  So

14  Somaliland by the British as a protecter, which meant,

15  essentially, the British didn't colonize it.  They used

16  a small number of administrators to run it for

17  strategic purposes.

18        Southern Somalia was controlled by Italy, and

19  Italy did seek to colonize Somalia, particularly in the

20  south.  There were large numbers of Italian nationals

21  who lived there and owned property.  Then the Somali

22  population in Kenya was controlled by the British; and

23  Ethiopia, of course, by Ethiopia; and in Djibouti by

24  the French.

25  Q     Tell us what year Somalia became independent.

Bryden - Direct by Ms. Atiyeh

1  A    Somalia became independent in 1960.  So Somaliland

2  received its independence on 26 June 1960, which was

3  five days before the Italian Somalia received

4  independence on July 1.  And so Somaliland existed very

5  briefly as an independent state, and it was

6  acknowledged as such by the United Nations, many member

7  states, and the security council.  So it's on that

8  basis that Somaliland claimed a legal foundation for

9  its independence from the rest of Somalia.

10      On the 1st of July, Somalia became independent,

11 and the two entered into a *de facto* union.  There has

12 been some dispute as to whether the legal basis of the

13 union was solid or not.  It depends on which side of

14 the dispute you come down on.

15 Q    After Somalia became a unified and independent

16 nation, how was it governed?

17 A    Well, for the first nine years, from 1960 to 1969,

18 it was a democratic system and there were several

19 rotations of government through elections.  It was

20 considered chaotic and a quite seriously corrupt

21 system, which became increasingly unpopular because of

22 the perceptions of corruption and inefficiency.

23      In 1969, the civilian government was overthrown by

24 a military coup headed by General Siad Barre initially

25 with quite a degree of popular enthusiasm.  But then

Bryden - Direct by Ms. Atiyeh

1  increasingly the dictatorship became unpopular, and

2  rebellions began against Barre's rule.

3  Q    At some point, was Barre overthrown?

4  A    Barre was overthrown in January 1991.

5  Q    Since then, what's been the status of central

6  government in Somalia?

7  A    Somalia was effectively without any functional

8  central government from 1991 until 2000.  Then we saw

9  the first of several transitional governments

10 established.  The first one was the Transitional

11 National Government which was formed in neighboring

12 Djibouti and then relocated to Mogadishu but was unable

13 to establish any meaningful authority.

14     It was replaced in 2004 by a Transitional Federal

15 Government which was formed in neighboring Kenya and

16 then relocated to Somalia but not to Mogadishu

17 initially.  Then that government took several forms

18 until 2012, which is when the current Somali federal

19 government was established.

20 Q    During the time period that you were discussing,

21 as Somalia struggled to achieve a functioning central

22 government, was there an organization known as the

23 Islamic Courts Union?

24 A    Yes, the Islamic Courts Union did play an

25 important role.

1  Q     Can you talk about their role?

2  A     The Islamic Courts Union, its roots go back to the

3  late 1990s when the first Islamic courts were

4  established in different parts of Somalia.  These

5  courts, although they were based in Islamic law and

6  Sharia law, they typically were linked to Somali clans.

7  Somali society is organized very much along clan lines.

8       So the courts needed a way to work together

9  because they were from different clans and because

10 they -- why a court might arrest and want to try

11 someone from another clan which was potentially

12 problematic.  So they set up a council to coordinate

13 between them in, I believe, 1998.  This council

14 eventually grew into what became known as the Islamic

15 Courts Union.

16      In 2006, the Islamic Courts Union, through a

17 series of events, fought with elements of the

18 Transitional Federal Government and took control,

19 first, in Mogadishu and then expanded its control

20 across much of southern Somalia both northwards toward

21 the town of Gaalkacyo and in the middle of central

22 Somalia and also southwards towards the Kenyan border.

23      And in December 2006, alarmed by not just the

24 Islamic courts' expansion but also by some of the

25 positions the court's leadership had taken, Ethiopia

1  invaded Somalia to dismantle the Islamic courts.

2  Q    Are you familiar with an individual named Hassan

3  Dahir Aweys?

4  A    Yes, I am.

5  Q    Who is he?

6  A    Hassan --

7  Q    I'm sorry.  Go ahead.

8  A    Hassan Dahir Aweys was a leading member of

9  Somalia's first jihadist movement, which was a group

10  called al-Ltihaad al-Islamiya.

11  Q    Could you spell that for the court reporter.

12  A    Good question.  It's depending on which language

13  you spell it in.  A-L, hyphen, I-T-I-H-A-A-D, and then

14  A-L, hyphen, I-S-L-A-M-I-Y-A.

15  Q    What is al-Ltihaad?

16  A    Well, al-Ltihaad was a militant, an Islamic Salafi

17  movement that emerged in the early 1990s and tried to

18  take control of part of Somalia at that time.  It aimed

19  to have control of all of Somalia and possibly parts of

20  neighboring countries.  Hassan Dahir Aweys was the

21  deputy chairman.  He was the head of its military wing.

22  Q    Just to interrupt you briefly, you used the word

23  "Salafi."  Can you just define that briefly for the

24  Court.

25  A    It is one interpretation of Islam that wasn't

1 traditionally practiced in Somalia but has become

2 increasingly widespread over the last few decades.

3 It's a puritanical and, I would say, fundamentalist

4 interpretation of Islam.

5          THE COURT:  Thank you, Mr. Bryden.

6          We're going to take our morning recess at

7 this time.  We'll stand in recess for 15 minutes.

8          Mr. Bryden, do not discuss your testimony

9 during the recess.

10          THE WITNESS:  All right.

11      (Recess from 11:34 a.m. until 11:54 a.m.)

12          THE COURT:  Counsel.

13          Mr. Bryden, you remain under oath.

14 BY MS. ATIYEH:

15 Q    Mr. Bryden, you were talking about Hassan Dahir

16 Aweys and his role in a group known as al-Ltihaad.  Can

17 you maybe continue with what you were saying on the

18 subject?

19 A    Yes.  Hassan Dahir Aweys was, as I said, the vice

20 chairman and the head of the military wing of the

21 movement.  Al-Ltihaad operated between 1992 and 1996 in

22 different parts of Somalia.  In 1996, it was finally

23 driven out of its last remaining bases and dismantled

24 by Ethiopian forces.

25      Hassan Dahir Aweys took some time away from the

Bryden - Direct by Ms. Atiyeh

1   country.  He was dormant for a couple of years, and

2   then around 1998, he reemerged to establish the first

3   of what became the Islamic Courts Union.  Between about

4   1998-2002, he became the chairman of one of those

5   Islamic courts, a court called Ifka Halan in

6   northwestern Mogadishu.  That was in a court that was

7   notable because its militia was among the most

8   militant, among the most hard line among the Islamic

9   courts.

10      And he then emerged as the *de facto* leader of the

11  council of the United Islamic Courts.  And although he

12  didn't take a formal position, perhaps as expected, as

13  the chairman of the Islamic Courts Union -- that was

14  given to somebody else -- he was widely viewed as the

15  power behind the Islamic Courts Union when it took

16  power in Mogadishu in 2000.

17  Q    Can you explain what connections exist, then,

18  between al-Ltihaad, the Islamic Courts Union, and

19  al-Shabaab?

20  A    Well, al-Shabaab -- when al-Ltihaad was dismantled

21  in 1996-1997, its members moved in different

22  directions.  Hassan Dahir Aweys and some other members

23  of the group established a new movement that has become

24  known as I'tisaam b'il Kitaab wa Sunna.  So I'tisaam

25  became, essentially, the nonviolent political wing of

Bryden - Direct by Ms. Atiyeh

1   the Salafi movement in Somalia.

2       Other members of al-Ltihaad moved on with their

3   lives, became businessmen, became imams in mosques or

4   teachers, and remained members of their communities.

5   And then a number of them decided to revive the concept

6   of armed conflict jihad to impose their vision on

7   Somalia.  Some of them traveled to Afghanistan to take

8   part in the war there and then returned to Somalia.

9   And they became the nucleus of what we now know as

10  al-Shabaab.  So it's divided in these different ways.

11      Hassan Dahir Aweys was an interesting character in

12  that he remained in many respects above the divisions

13  trying to retain relationships with all of these

14  different parts of the old al-Ltihaad movement until

15  finally he wasn't able to maintain the balance anymore.

16  Q    So what was the genesis of al-Shabaab?  You said

17  from Itihaad.  How did that relate to the Islamic

18  courts?

19  A    Well, in the early 2000s -- and we're talking

20  about a movement that was very secretive, especially in

21  the early days.  And so there are different versions of

22  al-Shabaab that emerged.

23      But in the early 2000s, a number of former members

24  of al-Ltihaad returned to Somalia from Afghanistan and

25  Pakistan and elsewhere and began to set up an

1  underground movement that became known later as

2  al-Shabaab.  At that time it had no name.

3      And in 2002 -- so the same time -- roughly the

4  same time that this group returned to Somalia, the

5  al-Qaeda East Africa network carried out its second

6  major set of attacks in the region.  This was a network

7  that had been responsible for bombing the U.S.

8  embassies in Kenya and Tanzania in 1998.  Then in 2002,

9  it bombed the Paradise Hotel north of the Kenyan town

10 of Mombasa.  Mombasa is M-O-M-B-A-S-A.  And that was a

11 suicide bombing of a tourist hotel.  They also tried to

12 shoot down a charter airliner as it departed the

13 international airport in Mombasa.

14      MS. MINTER:  Your Honor, I would renew my

15 objection at this point as to the relevance given our

16 stipulations as to the organization.

17      THE COURT:  I'll hear it.  Objection

18 overruled.

19 A   The individuals responsible for those attacks

20 relocated to Somalia where they sought the protection

21 of the militia that became known as al-Shabaab, and in

22 particular, the protection of someone known as Aden

23 Hashi Ayro.  That's A-D-E-N, second word H-A-S-H-I, and

24 the third word is A-Y-R-O.  Aden Hashi Ayro was the

25 commander of the militia of the Islamic court where

Bryden - Direct by Ms. Atiyeh

1  Hassan Dahir Aweys was the chairman, and he was from

2  the same subclan as Hassan Dahir Aweys.

3       And so what we saw in 2002 was the convergence of

4  Hassan Dahir Aweys as a former al-Ltihaad leader, Aden

5  Hashi Ayro and his associates as the new generation of

6  jihadists to become al-Shabaab, and the remnants of

7  al-Qaeda East Africa network all coming together in

8  Mogadishu.

9  Q    Let me ask you:  At the time of the Islamic

10  courts, what was the public's perception of the courts?

11  A    Well, initially, the courts -- before they became

12  the power in Mogadishu, individually, they were

13  generally seen as benign because they provided a degree

14  of law and order in their respective subclan areas.

15  And at that time, it's important to remember that

16  Mogadishu was not under any effective government

17  control.  It was divided between various warlords and

18  factions.  So it was very insecure.  To the extent the

19  courts provided security, they were well seen.

20       After 2004, when the new Transitional Federal

21  Government was set up, the courts acquired a new source

22  of support.  That was because in Mogadishu and parts of

23  southern Somalia, the new president was deeply

24  unpopular.  Many feared that as a former faction leader

25  and warlord, he was going to take his revenge on them

1 in southern Somalia and that he was going to do so with

2 the support of Ethiopian government.

3     And so the Islamic court, while on the one hand

4 being a religious movement, also earned the support of

5 certain clans who most feared the new president and

6 what he was likely to do with Ethiopian support.  So

7 the courts became increasingly popular.

8     In 2006, there was a battle in Mogadishu between

9 faction leaders who were opposed to the government on a

10 clan basis, backed by the United States in order to

11 hunt al-Qaeda operatives on one side, and on the other

12 side the Islamic courts.

13     Given the history of the faction leaders and their

14 notoriety as warlords over the last roughly 15 years,

15 most of the community in Mogadishu and the business

16 community threw their weight behind the Islamic courts

17 and supported them to become the authority in

18 Mogadishu.  The faction leaders in that period of

19 Somali history and of the warlords ended in 2006 thanks

20 to the Islamic courts.

21 Q    So was there a -- actually, I'm sorry.  Let me ask

22 a different question.

23     After the fall of the Islamic courts, did there

24 come to be an attempt to restructure the Transitional

25 Federal Government?

Bryden - Direct by Ms. Atiyeh

1  A    Yes.  After the fall of the Islamic courts in

2  2007, initially, the government and its international

3  backers, and Ethiopia in particular, tried to establish

4  the government's authority by force.  By late 2008, it

5  was clear that was not going to succeed.  There was a

6  widespread insurgency against the government, against

7  the Ethiopians.  Southern Somalia had become extremely

8  violent.  The violence had spread by 2008 also to

9  northern parts of Somalia in terms of suicide bombings

10 and attacks.

11      So in 2009, there was a negotiated process through

12 which the president was effectively forced to step down

13 and a new president, Sheikh Sharif Sheikh Ahmed, became

14 president of Somalia.  And Sheikh Sharif was the former

15 chairman of the Islamic Courts Union.  So this was

16 expected to be a compromise between perhaps the largest

17 part of the Islamic Courts Union and its former

18 opponents.  They would jointly form a government to

19 stabilize Somalia.

20 Q    You had mentioned earlier an insurgency against

21 the Transitional Federal Government before the new

22 president was installed.  What was al-Shabaab's

23 relationship to that insurgency?

24 A    They were a key component in the insurgency, but

25 they weren't the only one.  Initially, the insurgency

1  was popularly known as muqaawamada, which was just a

2  sort of term meaning resistance.  It incorporated

3  elements of the Islamic courts, clan militias, and

4  al-Shabaab.

5       But increasingly -- and one part of this

6  opposition also based itself in a country that's not

7  shown on the map, the country of Eritrea.  It called

8  itself the Alliance for the Re-liberation of Somalia,

9  and Hassan Dahir Aweys was part of it, as was Sheikh

10 Sharif.  So it was really a sort of umbrella -- it was

11 an amalgam of different groups all fighting against the

12 government.  But increasingly, al-Shabaab took the lead

13 on the battlefield until 2009 after the change of

14 government when they were left alone.

15 Q    So let me ask you then:  Up until 2009 and the

16 change of government, it's fair to say that the

17 insurgency that al-Shabaab was participating in was

18 supported by many others in Somalia?

19 A    That's right.

20 Q    So what changed after 2009?

21 A    After 2009, two things changed.  One was that

22 Sheikh Sharif and many other members of the former

23 Islamic Courts Union moved into government.  In terms

24 of clan, there was a shift as well.  Sheikh Sharif was

25 from the Hawiye and from the Mogadishu area clans,

1  which represented, politically, a shift in terms of

2  regional politics within Somalia.

3       Thirdly, Ethiopia withdrew in February 2009.  So

4  there was no longer this large occupying force across

5  southern Somalia.  There was, at that time, a fairly

6  small force of the African Union located principally

7  around the airport and the presidency in order to

8  protect the institutions of government.

9  Q    So how did the sort of wider public perception of

10 al-Shabaab into the insurgency change between the

11 period leading up to the transition of government in

12 2009 and then after?

13 A    Well, the perception changed in the sense that the

14 main reasons for the insurgency had been removed.

15 President Abdullahi Yusuf had been removed.  Ethiopian

16 forces had been removed.  Those who supported the

17 Islamic courts now found themselves in government.  And

18 so the primary drivers of the conflict no longer

19 existed.

20 Q    What's the full name of the terrorist organization

21 known as al-Shabaab?

22 A    The full name is Harakaat al-Shabaab

23 al-Mujahideen.

24 Q    Now, what would that translate to in English?

25 A    That would be the mujahideen youth movement.

Bryden - Direct by Ms. Atiyeh

1  Q    And what language is the term "Harakaat al-Shabaab
2  al-Mujahideen" in?

3  A    Those are loan words from Arabic, and the spelling
4  would be a Somalization of Arabic.

5  Q    Are there any other names by which al-Shabaab is
6  commonly known in Somalia?

7  A    Well, it's typically just referred to by the
8  abbreviation al-Shabaab, and then people refer to it in
9  different ways.  Colloquially, the federal government
10 also has come up with a word for it which nobody uses,
11 but yes, there are other ways to refer to it.

12 Q    Is it ever referred to as The Youth?

13 A    Yes, it's often referred to as The Youth.

14 Q    What's the Somali word for that?

15 A    Dhallinyarada.

16 Q    And based on your investigations into al-Shabaab,
17 are there different ways the members of al-Shabaab
18 might refer to themselves?

19 A    Well, they would typically refer to themselves as
20 the mujahideen.

21 Q    And do they ever use veiled language when they're
22 referring to themselves?

23 A    Only when they believe they're at risk of being
24 overheard.

25 Q    Now, in a general matter, what are the objectives

Bryden - Direct by Ms. Atiyeh

1  of al-Shabaab?

2  A    Al-Shabaab's aim -- it's aims vary.  Certainly,

3  one aim is to establish its rule over the territory of

4  Somalia and to establish an Islamic emirate in Somalia.

5  It also seeks to carry its jihad to neighboring

6  countries.  Now, for some members of al-Shabaab, that

7  includes what it considers to be the liberation of the

8  Muslim communities in those neighboring countries and

9  their absorption into an Islamic emirate.  For others,

10 it is simply to punish the neighboring countries for

11 their role, whether military or political, in

12 sustaining what they see as an apostate regime in

13 Somalia.

14 Q    What's al-Shabaab's objective as far as

15 instituting Islamic law in Somalia?

16 A    Well, if it were to establish its rule in Somalia,

17 it would -- and in the areas that it does control, it

18 applies its own interpretation of Islamic law, which is

19 considered by many to be an extreme interpretation.

20 Q    Would you characterize al-Shabaab as a military

21 group?

22 A    I would say that it is, for the moment, primarily

23 a military group in the sense that it doesn't

24 administer much territory and the vast majority of its

25 members inside Somalia are part of a military

Bryden - Direct by Ms. Atiyeh

1 organization.

2 Q    Does al-Shabaab, for instance, wear uniforms?

3 A    Some of them -- most of them -- the conventional

4 fighters of al-Shabaab do wear different forms of

5 uniforms.  However, there are parts of the movement

6 that are clandestine.  Its security intelligence

7 apparatus is clandestine.  Many of its supporters and

8 sympathizers wouldn't wear uniforms either.

9 Q    So to the extent that al-Shabaab fighters do wear

10 various types of uniforms, are there anything unique

11 about them?

12 A    One of the characteristics about them is that they

13 like to wear their head shawl, known as an 'immamad, in

14 a way that it covers most of the face.  They like to

15 carry their black flag.

16 Q    Could you spell the word for the head shawl that

17 you used.

18 A    Apostrophe I-M-M-A-M-A-D.

19 Q    Now, why do al-Shabaab fighters keep their faces

20 covered?

21 A    I haven't actually asked an al-Shabaab fighter why

22 they cover their faces, but I do think it's fair to say

23 that it is part of their uniform.  It is part of their

24 mystique.  It does help to instill a degree of

25 uncertainty and fear into the population.  And for

1  many, it allows them the option of also operating, as

2  it were, undercover, clandestinely among the civilian

3  population without being recognized.

4  Q     How large is al-Shabaab's fighting force?

5  A     That's unknown.  There are estimates that range as

6  high as 13, 14,000 fighters.  The difficulty in

7  assessing the size of the fighting force is that there

8  is al-Shabaab proper, which is a hard-core ideological

9  nucleus of the group, and then there are opportunistic

10 fighters, militias, some of whom the al-Shabaab refer

11 to as al-ansaar.  And al-ansaar tends to refer to the

12 militia of friendly clans, clans that collaborate with

13 al-Shabaab often for specific operations or in a

14 specific area.  So at any given time, al-Shabaab's

15 forces can grow or shrink depending on where they're

16 operating and whether they need the support of friendly

17 clan militias.

18 Q     You had mentioned that al-Shabaab sometimes

19 protects their identity so that they can operate

20 clandestinely by wearing face coverings.  Are there

21 other ways that they attempt to conceal their

22 identities?

23 A     Well, there are the -- the secret part of

24 al-Shabaab, what's known as the amniyaad -- that's

25 spelled A-M-N-I-Y-A-A-D.  The amniyaad, as a general

Bryden - Direct by Ms. Atiyeh

1  rule, all of its members would try to conceal their

2  identities.  In other ways, some of the leaders of

3  al-Shabaab have adopted pseudonyms, false names.

4  Q    What are some examples of that?

5  A    Well, the emir of al-Shabaab for a long time, the

6  leader, publicly used the name Sheikh Mukhtar

7  Abdirahman Abu Zubeyr, which was a false name.  His

8  real name was Ahmed Abdi aw-Mohamed Godane; yet,

9  al-Shabaab propagated this alternative name for its

10  leader.  Another key figure, Ibrahim Haji Jama Mee'aad,

11  or Ibrahim al-Afghani, went by the name, for a long

12  time, Sheikh Abu Bakr al-Zaylai.  And so using these

13  names presumably to conceal or confuse their

14  adversaries.

15  Q    Is it fair to say that nicknames are fairly common

16  in Somali culture?

17  A    Nicknames are common in Somali culture.

18  Q    What are typical Somali cultural nicknames like?

19  A    They would include names that might refer to the

20  way somebody looks or the way somebody behaves, or they

21  might be inherited for the same reason from a father or

22  grandfather and then passed down.  But they typically

23  relate to some aspect of that person's character,

24  appearance, or history.

25  Q    What are some examples of that?

Bryden - Direct by Ms. Atiyeh

1   A     Well, somebody who's tall, somebody who's short

2   would have a nickname.  Someone who's dark, someone

3   who's light, someone who has a loud voice.  The former

4   president, Mohamed Siad Barre, was known as Afweyne,

5   big mouth.  These are the kinds of common types of

6   nicknames.

7   Q     Are they sometimes ironic?

8   A     They are sometimes ironic.  Sometimes one who's

9   tall would be referred to as short and vice versa.

10  Q     How are the pseudonyms that al-Shabaab uses

11  different from these types of nicknames?

12  A     The pseudonyms al-Shabaab uses are different in

13  two ways.  First, the way that I referred to, the

14  pseudonyms.  Having a false name is not a common Somali

15  practice.  But also, al-Shabaab liked to use the -- the

16  loan word from Arabic is a kunya.  It's a nickname that

17  would -- for example, it would typically include Abu,

18  Umu, Abu Zubair, Abu Muslim, and would, essentially, be

19  borrowed from Arabic tradition rather than Somali.

20  Q     So these Abu or Umu kunyas that we see with

21  al-Shabaab, are those typical elsewhere in Somali

22  culture?

23  A     No, they're not.  I can't say that they're never

24  used outside al-Shabaab, but they are typically

25  al-Shabaab.  But I haven't seen them widely used by any

Bryden - Direct by Ms. Atiyeh

1  other group.

2  Q    So you've seen a number, for instance, of the chat

3  room user names being used in this case.  How would you

4  explain those in relation to the general context of

5  Somali nicknames?

6  A    It certainly suggests --

7         MS. MINTER:  Your Honor, I would object to

8  the extent that it calls for speculation.

9         THE COURT:  Overruled.

10        You may answer.

11 A    I think it's fair to say that in Somalia today, if

12 you see any individual referring to himself or herself

13 using this type of kunya, it's suggestive of either

14 sympathy or an affiliation with al-Shabaab.

15 Q    Are you familiar with al-Shabaab's status as a

16 foreign terrorist organization designated by the United

17 States under Section 219 of the Immigration and

18 Nationality Act?

19 A    I am.

20 Q    Are they so designated?

21 A    They are so designated.

22 Q    When did that designation occur?

23 A    In 2008.

24 Q    What was al-Shabaab's reaction to being designated

25 a foreign terrorist organization by the United States?

Bryden - Direct by Ms. Atiyeh

1  A    The then spokesman of al-Shabaab welcomed the

2  designation as a kind of badge of honor.

3  Q    What is al-Shabaab's affiliation with al-Qaeda?

4  A    Al-Shabaab has a historical affiliation with

5  al-Qaeda, first of all, from those members of the

6  movement who did go and fight side-by-side with

7  al-Qaeda in Pakistan.

8         MS. MINTER:  Your Honor, I would object to

9  this testimony for the grounds we laid out earlier in

10 that we stipulated al-Shabaab is a designated terrorist

11 organization.

12        THE COURT:  I understand.  I'll receive it as

13 background.

14        Let's get through this.

15        MS. ATIYEH:  Okay.  I can skip that, Your

16 Honor.

17 BY MS. ATIYEH:

18 Q    You had mentioned the spokesperson of al-Shabaab,

19 Mukhtar Robow.  Could you just tell us a little more

20 about him.

21 A    Mukhtar Robow was a former member of al-Ltihaad.

22 He was an associate of Sheikh Hassan Dahir Aweys, who I

23 mentioned earlier as the leader of al-Ltihaad.

24 Q    You can continue then.

25 A    And he was from a different part of Somalia.  He

Bryden - Direct by Ms. Atiyeh

1  was from the Bakool region of Somalia.

2  Q     Where is that?

3  A     Shall I show on the map?

4  Q     Sure, or if you just want to give directions,

5  generally.

6  A     It's northwest of Mogadishu towards the Ethiopian

7  border, and so from a different clan.  He then became

8  one of the leaders of the Islamic courts and did

9  establish a court representing his constituency.  And

10  he then became the spokesman of al-Shabaab.

11  Q     During the time period of the indictment, 2011 to

12  2013, who was the leader of al-Shabaab?

13  A     That would have been Ahmed Abdi aw-Mohamed Godane.

14  Q     You had mentioned before a kunya that he used.

15  A     Sheikh Mukhtar Abdirahman Abu Zubeyr.

16  Q     Was there a term that al-Shabaab used to refer to

17  him other than the kunya?

18  A     As the emir.

19  Q     What does emir mean?

20  A     The leader.

21  Q     What was Godane's background?

22  A     Godane was from northern Somalia.  His family

23  roots are in the area of Hargeysa, the town of

24  Hargeysa.  He had studied in Pakistan.  He had returned

25  to Somalia or Somaliland where he had worked in a money

Bryden - Direct by Ms. Atiyeh

1  transfer company and then briefly with an airline

2  company.

3      And in 2003, he was part of a group that was -- it

4  was discovered in 2003-2004 that they were involved in

5  the killings of a number of foreign aid workers in

6  Somaliland.  And he, together with others, then fled to

7  Mogadishu where he joined Aden Hashi Ayro and the

8  southern members of al-Shabaab.

9  Q    How did he go on to become a leader of al-Shabaab?

10 A    The actual decision of when he became leader, how

11 that decision was taken is a disputed version of

12 events.  I couldn't answer at what point he actually

13 became officially its leader except that he was

14 announced as its leader in 2007, I believe, as Mukhtar

15 Abdirahman Abu Zubeyr.

16 Q    And generally, in this time frame, how was

17 al-Shabaab led?

18 A    Well, initially, al-Shabaab had a collective

19 leadership.  So despite the fact that there was an

20 emir, there was a council known as a shura, S-H-U-R-A,

21 and each member of the shura had a given

22 responsibility.  Decisions were taken in a consultative

23 and collective way.

24 Q    During the time frame of the indictment, did there

25 begin to be fractures between Godane and other members

Bryden - Direct by Ms. Atiyeh

1   of al-Shabaab?

2   A     Yes, there were.  Increasingly from about 2009

3   onwards, there were growing fissures within al-Shabaab,

4   and factions began to emerge in opposition to Godane's

5   leadership.

6   Q     Now, what city was Godane from originally?

7   A     From Hargeysa.

8   Q     Are you aware of an incident in May of 2013 where

9   the Somaliland government attempted to capture Godane

10  in Hargeysa?

11  A     Yes, I am.

12  Q     What were you aware of as far as that incident?

13  A     I am aware that this was not the first time.

14  There had been repeated reports that Godane had visited

15  Hargeysa either simply to surveil the city for

16  operational purposes or to visit one of his wives or

17  other members of his family.  On this occasion, it was

18  again reported that he had come to visit one of his

19  wives, and his mother's house was raided by the

20  Somaliland authorities.

21         MS. ATIYEH:  Now, if the court security

22  officer could please bring you Government's

23  Exhibit 8Q1.

24  BY MS. ATIYEH:

25  Q     Are you familiar with this document?

Bryden - Direct by Ms. Atiyeh

1  A    I am, but I don't think this is the document.

2         THE COURT SECURITY OFFICER:  I'm sorry.  Here

3  you go, sir.

4         THE WITNESS:  Thank you.

5  BY MS. ATIYEH:

6  Q    Is that the right one?

7  A    Yes.

8  Q    What is that?

9  A    This is a translation of an article describing the

10 Somaliland authorities attempt to arrest Godane by

11 raiding his family home.

12        MS. ATIYEH:  Your Honor, we have not yet

13 admitted the stipulations that defense counsel and the

14 government have agreed to, but my understanding is that

15 there will be no objection to the authenticity and

16 admission of these exhibits.

17        At this point, is that a correct

18 understanding, Counsel?

19        MS. MINTER:  Your Honor, I do think it would

20 be appropriate to address the stipulations.  What I

21 will tell the Court is that we reached a stipulation --

22 and if I could have the Court's indulgence.

23    (Counsel confer.)

24        MS. MINTER:  Your Honor, we've reached a

25 stipulation with regard to information that was

Bryden - Direct by Ms. Atiyeh

1  recovered as a result of the court-authorized

2  surveillance in that we stipulate that, essentially --

3  and I believe the government has the stipulations in

4  writing to provide to the Court.  I can if they do not.

5  But, essentially, we've agreed to stipulate that these

6  were appropriately captured through the

7  court-authorized surveillance.  That is, were the

8  government to bring in a custodian, that custodian

9  would testify to the processes that are used and that

10  those to their knowledge functioned properly.

11        We do not stipulate to anything about the

12  authenticity of the things that are described in the

13  articles or that --

14        THE COURT:  You mean the accuracy?

15        MS. MINTER:  Correct, Your Honor.  Excuse me,

16  the accuracy.  Yes, that's correct.

17        But we would stipulate that were the

18  government to have brought that witness, that they

19  would testify that the procedure was followed

20  appropriately, in short, obviating the need for a

21  custodian.

22        I do think it might be appropriate to provide

23  the Court with those stipulations.

24        THE COURT:  It would.  Do you have those

25  stipulations?

1      MS. ATIYEH:  We do.

2      MR. GILLIS:  Your Honor, I was going to put

3  them in a more formal form with a caption and file

4  them, and we can do that this afternoon if that would

5  be appropriate.

6      THE COURT:  All right.  Let's try to have

7  that in shape when we come back from the luncheon

8  recess.

9      MS. ATIYEH:  Would Your Honor like us to hand

10 up a copy just for the moment?

11     THE COURT:  If you have one, that would be

12 helpful.

13     But there's no objection to this particular

14 Exhibit 8Q1?

15     MS. MINTER:  Your Honor, again --

16     THE COURT:  With your qualification?

17     MS. MINTER:  Correct, Your Honor.

18     THE COURT:  All right.  The Court will admit

19 it for the limited purpose that is within the scope of

20 the stipulation.

21     MS. ATIYEH:  I do want to make clear, Your

22 Honor, that this is also a translation of an article.

23 There's another stipulation that addresses the accuracy

24 of the translations.

25     THE COURT:  All right.  We'll take that up

1  when you present it.

2          MR. GILLIS:  I'll get this draft of proposed

3  stipulations to Mr. Burns.

4          MS. ATIYEH:  So 8Q1 is admitted; is that

5  correct, Your Honor?

6          THE COURT:  Yes.  It's admitted to the extent

7  it's within the scope of the stipulation.

8  BY MS. ATIYEH:

9  Q    If you could, just take a look and summarize the

10 content of the article.

11 A    The article just states that Somaliland

12 Intelligence Agency has issued a statement saying that

13 they had raided the parental home of the al-Shabaab

14 emir, Ahmed Godane's house, in Hargeysa.

15         MS. MINTER:  Your Honor, I would object to

16 the form of the testimony.  If the document has been

17 admitted, I would submit it speaks for itself.

18         THE COURT:  We're still doing a lot of

19 background.  What I'd like you to do is really get into

20 the substance of his testimony and present any

21 additional background, as necessary, within the context

22 of that testimony.

23         MS. ATIYEH:  Absolutely, Your Honor.

24         Could we then give the witness Government's

25 Exhibit 151, please.

Bryden - Direct by Ms. Atiyeh

1  BY MS. ATIYEH:

2  Q     Have you seen this document before?

3  A     Yes, I have.

4  Q     Just generally, what is it?

5  A     This is the transcript of a telephone call.  How

6  much detail would you like me to give?

7          MS. ATIYEH:  Your Honor, at this point, I

8  think this is also something we can offer pursuant to

9  the stipulation.

10          THE COURT:  Is there any objection to

11  Exhibit 151?

12          MS. MINTER:  Your Honor, there is, and I'll

13  tell the Court it's a somewhat complicated objection.

14  What I will tell the Court is that it is covered by the

15  stipulation in that we would likewise agree that this

16  was captured pursuant to court-authorized surveillance

17  and that we raised no -- but we had retained our right

18  to object on relevance grounds or other admissibility

19  grounds.

20          THE COURT:  All right.

21          MS. MINTER:  I will tell the Court:  We do

22  have a somewhat lengthy objection to provide to the

23  Court.

24          THE COURT:  All right.  I'll admit it while

25  reserving on your relevance objection.

1      Do you want him to speak to specific language

2  in here?

3          MS. ATIYEH:  Yes, Your Honor.

4          THE COURT:  Is there any objection to the

5  accuracy of the translation?

6          MS. MINTER:  There is no objection to the

7  accuracy of the translation, Your Honor.

8          THE COURT:  All right.

9          MS. MINTER:  I would simply add that --

10  perhaps relevance is not the best way.  It's really a

11  foundational objection.  So to the extent that we can

12  reserve on those issues.

13          THE COURT:  All right.

14          MS. ATIYEH:  If you could, pull up the next

15  page, please.

16  BY MS. ATIYEH:

17  Q    If you could, just take a look at this page.

18  There's discussion about the commotion in the city and

19  news that grandfather was in his family home.  Based on

20  your understanding of events in the region at the time

21  of this call, what's your understanding of what this

22  conversation means?

23  A    My understanding is that this relates to --

24          MS. MINTER:  Your Honor, I would object to

25  the speculation on the part of the expert.  I think it

Bryden - Direct by Ms. Atiyeh

1    goes to the intent of the speakers, which, again, we'll

2    argue to the Court is inappropriate.

3              THE COURT:  What I'd like you to do is direct

4    his attention to specific language and ask him very

5    specific questions so I could rule on the objection.

6              MS. ATIYEH:  The Court's indulgence, Your

7    Honor.  It's a little bit hard for me to see on the

8    screen.  So if you wouldn't mind letting me grab a copy

9    of the physical document.

10             THE COURT:  All right.

11   BY MS. ATIYEH:

12   Q    At the beginning of the page, you see a question

13   where one speaker speaks to the other saying, Did the

14   commotion in the city quiet down?

15        Then a conversation continues:  Yesterday's

16   commotion, where was the commotion happening?

17        In the city as I heard.  There was news that

18   grandfather was in the city.

19        Could you take a look at the date of this

20   conversation?

21   A    Yes.

22   Q    What's the date?

23   A    May 7, 2013.

24   Q    Based on your understanding of events in the

25   region, do you know what city is being referred to

1  here?

2  A     Based on the timing and also on the events I just

3  referred to, my understanding is this relates to

4  Hargeysa and to the announcement by the Somaliland

5  authorities that they had made this raid and that two

6  people had been arrested during the course of this

7  raid.  It corresponds closely to that account.

8  Q     What's the basis for you to draw that opinion?

9          MS. MINTER:  Your Honor, we would renew our

10  objection on the grounds that there's a lack of

11  foundation that's been laid here as to --

12          THE COURT:  All right.  I'll let it in.

13  Based on his knowledge and expertise that I've

14  recognized, I will let him express an opinion as to

15  what he has concluded these references mean.

16          MS. MINTER:  We'd add it calls for

17  speculation is our objection, Your Honor.

18          THE COURT:  All right.  If you can, do it

19  without speculating.

20  A     I can just say that based on my understanding of

21  what did actually happen, the previous article, the

22  translation, was -- in general terms, it was accurate.

23  The Somaliland authorities did conduct such a raid.

24  They did make such arrests, and this appears to be a

25  fairly clear reference to the events that were referred

Bryden - Direct by Ms. Atiyeh

1  to in that article, the raid on the family home and the

2  questioning of Godane's relatives by the Somaliland

3  Intelligence Service.

4         MS. MINTER:  Your Honor, I would, again,

5  renew our objection.  I think it's perfectly

6  appropriate for the witness to testify about events

7  that happened, and then the Court, as the finder of

8  fact, can review the evidence the government has

9  introduced.  But I think it calls for speculation, and

10  it calls for the expert to speculate on the intent of

11  the speakers.

12         THE COURT:  All right.  I'm not accepting it

13  as any opinion as to intent.  I will accept it as

14  testimony relating to events that may be consistent

15  with a description in this translation.

16         MS. ATIYEH:  If we could, give the witness

17  Government's Exhibit 148, please.

18         MS. MINTER:  Your Honor, while that's being

19  provided to the witness, I will tell the Court that we

20  would have the identical objection with respect to 148.

21         THE COURT:  All right.

22  BY MS. ATIYEH:

23  Q    Have you seen this document before?

24  A    Yes, I have.

25  Q    What is this?

Bryden - Direct by Ms. Atiyeh

1  A    This is another transcript relating to a

2  conversation, apparently, about events in Somalia.

3  Q    And what's the date of this conversation?

4  A    This is 6 May 2013.

5       MS. ATIYEH:  Again, Your Honor, we're

6  offering this pursuant to the stipulation as an

7  exhibit.

8       THE COURT:  All right.  I'll allow you to ask

9  him whether he's aware of historical events in or

10 around the date of this e-mail that are consistent with

11 the kinds of comments in this e-mail.

12 BY MS. ATIYEH:

13 Q    Mr. Bryden, are you aware of events in Somalia at

14 the time of this conversation that are consistent with

15 the events being discussed in the conversation?

16 A    Yes, I am.

17 Q    What are those events?

18 A    This, again, appears to relate to two issues.

19 First, the question of the raid that we've already

20 discussed, but also on reading this --

21      MS. MINTER:  Objection.  Nonresponsive, Your

22 Honor.

23      THE COURT:  I'll let him finish his answer.

24 A    Also, to the question of the circulation of a

25 photograph, that appears to me to be a reference to a

1  photograph that was circulating of the emir of

2  al-Shabaab at the time, and the description of the

3  photograph in this phone call and the references to the

4  individual's background having studied in Pakistan, the

5  context of the phone call itself and the origin of the

6  photograph are all consistent with what I understand

7  happened at the time.

8  Q    What do you mean when you say that?  What is it

9  about the description of the photograph in this

10 conversation that leads you to your conclusion that

11 it's a reference to a photograph of the emir of

12 al-Shabaab?

13 A    The emir of al-Shabaab was initially an enigmatic

14 figure, and many people didn't know who he was or

15 speculated about what he might look like.  When

16 authorities were searching for him, the first photo to

17 circulate of Ahmed Abdi Godane was of him wearing -- it

18 was of him probably several years earlier wearing

19 glasses and a small Muslim cap, known in Somalia as a

20 koofiyad, K-O-O-F-I-Y-A-D.

21      This was widely circulated online.  It was

22 circulated among agencies, whether they were

23 intelligence agencies or law enforcement, looking for

24 al-Shabaab.  I was aware of it at the time due to my

25 work.  One of the possible origins of this photograph

1    was believed to be the Transitional Federal Government

2    headed by Sheikh Sharif, and there is a reference to

3    Sharif in this phone call.  So my understanding of this

4    conversation is that it relates to the circulation of a

5    photograph of Ahmed Abdi Godane.

6    Q    So then based on that interpretation and based on

7    your understanding of events, do you have an opinion as

8    to who the person being referred to as grandfather in

9    this conversation is?

10             MS. MINTER:  Same objection.

11             THE COURT:  I'll let him answer.

12             Based on everything you know, have you

13   reached an opinion or a conclusion as to what the

14   reference in here relates to by way of historical

15   events?

16             THE WITNESS:  I do have an opinion that the

17   use of the term "grandfather" is used to refer to Ahmed

18   Abdi Godane.

19             MS. ATIYEH:  If you could, please hand the

20   witness Government Exhibit 149.

21             Your Honor, was 148 admitted?  I'm sorry.

22             THE COURT:  It was admitted within the scope

23   of the stipulation.

24             Is that correct?

25             MS. MINTER:  Again, Your Honor, we have no

Bryden - Direct by Ms. Atiyeh

1  objection and would submit that the government has laid

2  a proper foundation with respect to how the evidence

3  was obtained.  We would --

4          THE COURT:  And that the translation is

5  accurate?

6          MS. MINTER:  Correct, Your Honor.

7          We would retain our objection with respect to

8  both relevance and lack of foundation and speculation

9  on the part of the witness.

10          THE COURT:  All right.  Over objection,

11  Exhibit 148 is admitted.

12  BY MS. ATIYEH:

13  Q    Do you have 149 in front of you now?

14  A    Yes, I do.

15  Q    Are you familiar with that document?

16  A    Yes, I am.

17  Q    Generally, what is it?

18  A    This document also appears to refer to the same

19  events, the raid discussed previously, that they -- as

20  the document says, they searched his mother's house.

21  They arrested some people and took a briefcase.  It

22  also refers to the fact that, quote, his brother was

23  already in custody, unquote.

24      And I was aware at the time that Ahmed Abdi

25  Godane's brother, a former -- I believe a former police

1  officer, was resident in Hargeysa and was either taken

2  into custody or questioned as to any knowledge he had

3  about his brother's presence in Hargeysa.

4         MS. ATIYEH:  Your Honor, we'd move

5  Government's Exhibit 149 in at this time contingent on

6  the same objections the defense is raising.

7         THE COURT:  Same objection?

8         MS. MINTER:  Yes, Your Honor.

9         To be clear, I was previously referring to

10 Government's 148.  Now, in reference to 149, the same

11 with respect to the stipulations, same objections based

12 on lack of foundation and speculation.

13        THE COURT:  All right.  Over objection, 149

14 is admitted.

15        MS. ATIYEH:  If we could, please give the

16 witness Government's Exhibit 84.

17        The Court's indulgence, Your Honor.

18 BY MS. ATIYEH:

19 Q    Have you seen this document before, Mr. Bryden?

20 A    Yes, I have.

21 Q    Generally, what is it?

22 A    Again, it's a transcript of the conversation from

23 9 June 2012.

24        MS. ATIYEH:  The government moves Exhibit 84,

25 again, contingent on the defense's objections.

1        THE COURT:  Same objection?

2        MS. MINTER:  Your Honor, actually, we would

3   likewise agree it falls within the stipulation

4   regarding the capture and the accuracy of the

5   translation.  We don't object to the admissibility of

6   the document.  However, we would object, again, to the

7   speculation on the part of the expert as to the intent.

8        THE COURT:  Over objection, I'll admit

9   Exhibit 84 and admit it for the same purpose that I've

10  ruled previously as to the other documents.

11       MS. ATIYEH:  Thank you, Your Honor.

12       If you could, bring up page 4 of the

13  translation which actually may be numbered page 4, but

14  it may be the fifth page.

15  BY MS. ATIYEH:

16  Q   If you could, just take a look at this section

17  talking about no one has a picture of grandpa, so what

18  is the picture these damned people produced.  Based on

19  the date of this conversation and your understanding of

20  events in Somalia at the time, do you have an opinion

21  as to what this conversation is referring to?

22  A   I do.  I believe this refers to the same issue.

23  It's the same terminology, the use of grandfather as a

24  moniker for Ahmed Abdi Godane.  Again, the absence of a

25  reliable picture of Godane was for a long time

1  considered a problem by services looking for him.  And

2  even to this day, there are very few pictures of Godane

3  circulating.  So this to me appears to refer to exactly

4  the same set of issues.

5  Q    To be clear, then, in your opinion, based on your

6  background knowledge, who is the person being referred

7  to as grandpa in this conversation?

8  A    Ahmed Abdi Godane.

9        MS. ATIYEH:  If we could, give the witness

10  Government's Exhibit 78, please.

11  BY MS. ATIYEH:

12  Q    Are you familiar with this document?

13  A    Yes, I am.

14  Q    Again, generally, what is this?

15  A    This is a transcript of a -- it looks like a chat

16  room conversation online.

17        MS. ATIYEH:  The government moves in

18  Exhibit 78, again, pursuant to the defendant's

19  objections.

20        MS. MINTER:  Your Honor, same parameters as

21  the original set of stipulation as to the capture and

22  the translation.  However, we would object on the

23  grounds of lack of foundation, and we would also object

24  to any testimony by the expert that speculates as to

25  the intent.

1        THE COURT:  All right.  Over objection, the

2   Court will admit Exhibit 78 also for the same purpose,

3   that is for the purposes of eliciting any opinion as to

4   whether the language used in this document refers to

5   any historical events.

6        MS. ATIYEH:  Could you please pull up page 5

7   and look at that section, invite the emir one day, to

8   the bottom of the page.

9   BY MS. ATIYEH:

10  Q    Based on your understanding of al-Shabaab figures

11  and al-Shabaab leadership, does this reference to

12  someone named the emir mean anything to you?  Are you

13  able to draw any opinions on this?

14  A    Yes, I do have an opinion.

15       First of all, there is no other group in Somalia

16  that I'm aware of that refers to its leaders as emirs,

17  only al-Shabaab.  So the use of the term "emir" would

18  appear to associate whoever these users are, these

19  people having the conversation with al-Shabaab.

20       The only uncertainty here is that there is --

21  although there is one emir who is the leader of the

22  movement, al-Shabaab sometimes refers to the leaders of

23  departments as emirs as well.  So there can be an emir

24  for finance or an emir for the propagation of the

25  faith, an emir for defense.  But normally, then they

1   would refer to which emir they're talking about.  So in

2   the absence of any qualification, inviting the emir

3   would appear to refer to the leader of al-Shabaab.

4   Q    Is there anything about the statement there, he

5   does not even speak on the phone, that helps you draw a

6   conclusion about which emir they may be referring to?

7   A    Yes.  To the extent that Godane and many other

8   senior leaders of al-Shabaab were extremely conscious

9   of operational security, and particularly after the

10  death of perhaps the best known military commander,

11  Aden Hashi Ayro in an airstrike -- Aden Hashi Ayro

12  referred to earlier is A-D-E-N, H-A-S-H-I, A-Y-R-O --

13  there was a great deal of suspicion within al-Shabaab's

14  leadership that they were being monitored, that they

15  were being surveilled, and that they could be located

16  through the use of their telephones.

17       And so key leaders of al-Shabaab and the emir, in

18  particular, were believed to not use cell phones and,

19  in fact, not even to allow people with phones to come

20  close to them when meeting with them for their own

21  protection.

22  Q    Since the time frame of the conversations that

23  we've just indicated here, what has happened to Godane?

24  A    Since between this date and today?

25  Q    Yes.

1  A     He has been killed in an airstrike.

2  Q     When was that?

3  A     2014, I believe.

4  Q     Could you talk a little bit about tactics or

5  practices that make al-Shabaab unique among the groups

6  operating in Somalia.

7  A     Yes.  Al-Shabaab has been one of many fighting

8  factions.  One of the things that we do is analyze the

9  tactics, techniques, and procedures of various groups,

10 including al-Shabaab, or the TTPs for short.

11      Al-Shabaab's TTPs are unique in a number of ways.

12 They were the first group in Somalia to use suicide

13 bombing.  They began in 2006, and they have -- to the

14 best of my knowledge, they are still the only group to

15 use suicide bombing.

16      They are the group that makes the most

17 widespread -- possibly the only group, but we can't say

18 that with certainty -- to make widespread use of

19 improvised explosive devices for the purposes of their

20 operations and assassinations.

21      MS. MINTER:  Your Honor, I would renew our

22 objection with respect to the fact that we have

23 stipulated to the fact that it's a designated terrorist

24 organization, and the only remaining issue should be

25 the understanding of the defendants as to such.

1           MS. ATIYEH:  Your Honor, again, I'm eliciting

2    this testimony because of conversations in the

3    transcripts that relate to these subjects in order

4    to --

5           THE COURT:  The Court overrules the

6    objection.  I think it goes to an alternative basis for

7    liability under the statute as far as the status of

8    al-Shabaab as well.

9    BY MS. ATIYEH:

10   Q    You can continue, sir.

11   A    The third -- I'd say a third defining

12   characteristic of al-Shabaab's TTPs is the use of

13   complex attacks.  So the combination of the use of

14   either suicide bombers or improvised explosive devices

15   or suicide infantry altogether in order to have the

16   maximum impact during the course of their operations.

17          Also, during the course of operations,

18   increasingly we've seen them filming their own

19   operations in order to record them, remaining in

20   telephone contact with the fighters conducting those

21   operations in order to have recording and audio for

22   propaganda purposes, and, frankly, a highly

23   sophisticated and often gruesome propaganda strategy to

24   transmit or to broadcast the results of their

25   operations after the fact.

Bryden - Direct by Ms. Atiyeh

1  Q     Just briefly, could you talk about the

2  relationship between al-Shabaab and aid groups or NGOs

3  operating in the region.

4  A     It's been a generally hostile relationship, that

5  is, to western NGOs.  They've had different

6  relationships with some Islamic NGOs but not all.

7        With western NGOs, the relationship began badly

8  with the murders of western NGO workers in Somaliland

9  in 2003 and 2004.  NGO workers, both Somali and

10 non-Somali, have been kidnapped, killed by al-Shabaab

11 throughout southern Somalia since then.

12       The first known video recording of a beheading by

13 al-Shabaab was of an aid worker from the World Food

14 Program, the United Nations agency, around 2007, I

15 believe.

16       And al-Shabaab eventually set up something that it

17 called OSAFA, O-S-A-F-A, or the office -- it was an

18 office for the oversight of foreign assistance, and it

19 was generally described by groups -- including my own

20 team which was mandated to assess these issues, but

21 also by other watchdog organizations -- as a group that

22 was, in fact, intended to obstruct and to limit the

23 access of western aid agencies to populations in

24 distress.  That really mattered in 2011 when there was

25 a quite serious problem of famine in southwestern

1  Somalia.

2  Q     How is al-Shabaab funded?

3  A     Al-Shabaab has been funded in different ways over

4  the years.  It's changed over time.  Initially, it was

5  a very small group, and the first reported operations,

6  which included these killings of aid workers in

7  Somaliland, were funded in part by cash that was stolen

8  from a local businessman, an operation in which Godane

9  was himself implicated.

10       Subsequently, as al-Shabaab grew, particularly

11  when it was fighting -- it was part of the insurgency

12  fighting the Ethiopians, a lot of funds were raised

13  from businesses and from Somalis in the diaspora who

14  believed in the cause, who believed in the rebellion

15  against Abdullah Yusuf's government and against

16  Ethiopia.  And so a lot of funding from the outside

17  came in.

18       In 2009, when Ethiopia left, financing moved into

19  a new phase because al-Shabaab took over much of

20  southern Somalia territory.  First, the port of

21  Kismaayo that I mentioned was its primary source of

22  revenue generating over $100 million in tax revenue for

23  charcoal exports every year.

24       Kismaayo also served as the basis for a

25  trade-based money-laundering scheme.  The proceeds of

Bryden - Direct by Ms. Atiyeh

1  the charcoal that was sold in the Gulf states were

2  actually overvalued in order to allow well-wishers to

3  top up those financial deposits and increase their

4  value and the money remitted to al-Shabaab.

5      Also, throughout southern Somalia, al-Shabaab

6  taxed the population either in cash or in kind,

7  agricultural produce or livestock.  And then from the

8  big businesses, the telecommunications and the hawalas

9  in particular, who work across Somali territory, they

10 had to pay, or they suffered threats to their assets

11 and to their personnel.

12     Then lastly, since al-Shabaab lost territory, some

13 of these types of taxation or extortion, if you will,

14 have continued.  Al-Shabaab continues to collect taxes

15 from businesses.  The contributions by the diaspora

16 have dropped off because the primary cause of

17 insurgency was removed.  So al-Shabaab has, again,

18 become primarily reliant on internal revenues, plus

19 whatever they can raise from diaspora support networks.

20 Q    Are you familiar with an online chat room known as

21 the Dacwatu al-Tawhid?

22 A    Yes, I am.

23 Q    Are you aware of any other names by which it's

24 known?

25 A    I know that it's known to the law enforcement

1  community, especially here, as ISDAC.

2  Q    What sort of activity takes place in ISDAC?

3  A    ISDAC first came to my attention in 2008, I

4  believe, when I was with the United Nations.  It was

5  one of the first online forums that we, in a sense,

6  entered and monitored to see what was being discussed.

7  And it was for a long time the primary forum for

8  supporters and sympathizers of al-Shabaab to exchange

9  information about what was happening on the ground in

10 Somalia.  It was a forum where key al-Shabaab leaders,

11 including Mukhtar Robow and others whom we haven't

12 discussed yet, would actually brief on what was

13 happening on the battlefield and then solicit support

14 for the mujahideen.

15 Q    When you say support for the mujahideen, do you

16 mean financial support?  Physical support?  What

17 exactly are you referring to?

18 A    All kinds of support.  Financial support was one.

19 And in some sessions, not only would funds be

20 solicited, but then a collector of those funds would be

21 designated with a telephone number and account number

22 and a name:  Send your money to this person.

23     Also, the support in terms of recruits was

24 discussed online and how recruits could arrive in

25 Somalia and join al-Shabaab.  So there were discussions

1  about whether it was safer to go through Kenya or to

2  fly through United Arab Emirates or to come through

3  some other route, any information that the audience

4  actually wanted, any questions the audience had.

5       Only when very sensitive information was being

6  discussed, al-Shabaab's spokesman online would

7  sometimes say, Let's discuss this in a different forum,

8  and they would take that discussion off-line where at

9  least we, as the United Nations, couldn't monitor it.

10            THE COURT:  Thank you, Mr. Bryden.

11            We're going to take our luncheon recess at

12  this time.

13            We'll stand in recess until 2:00.

14            Mr. Bryden, do not discuss your testimony

15  during the recess.

16            Also, if you would, provide any spellings

17  that Ms. Montgomery needs about names that you have

18  mentioned.  I would ask you to do that as well during

19  the break.

20            All right.  The Court will stand in recess.

21       (Recess from 1:02 p.m. until 2:03 p.m.)

22            THE COURT:  Yes.

23            MS. MINTER:  Your Honor, I would ask to be

24  heard on one issue that we've sort of been raising

25  piecemeal.  I realize the witness is on the stand, but

Bryden - Direct by Ms. Atiyeh

1  it does relate to that witness.

2          THE COURT:  All right.  Should we excuse the

3  witness?

4          MS. MINTER:  That's up to the Court's

5  preference.  I don't think --

6          THE COURT:  What's the issue?

7          MS. MINTER:  It doesn't have anything to do

8  with respect to the testimony in particular.

9          THE COURT:  All right.

10         MS. MINTER:  Your Honor, it has to do with

11 the objection that we've raised throughout Mr. Bryden's

12 testimony, which is that it's improper for an expert to

13 speculate what a particular individual means by their

14 statements.

15         As I think I said previously, we would agree

16 that it's appropriate for the government to move into

17 evidence certain phone calls and chats and for the

18 government to elicit testimony from that witness about

19 current events that occurred simultaneously.  But I

20 would submit to the Court that it is exclusively for

21 the finder of fact to determine if what those

22 individuals were talking about were the facts that the

23 government alleges.  That's certainly appropriate for

24 argument.

25         But I would pass up to the Court the *Fowler*

1  case, Your Honor, which is a Fourth Circuit case,

2  932 F.2d 306.  In that case, it was actually the

3  reverse circumstance, that the defense sought to

4  introduce an expert to testify that the defendant in

5  that case was confused and, I think, ultimately didn't

6  understand what was going on and couldn't form the

7  requisite intent.

8         The Fourth Circuit found that that was

9  inappropriate, that the jury was the finder of fact in

10 that case, was privy to all of the statements, actions,

11 transactions, and they had the ability to determine,

12 and that an expert provided no further insight, which

13 is, of course, what's required by 702 in order to

14 assist the finder of fact.

15        Accordingly, we would ask the Court to limit

16 any testimony about what the individuals in these calls

17 meant by their statements.

18        THE COURT:  All right.  I'm not admitting the

19 testimony for the purposes of establishing any

20 particular subjective intent on the part of these

21 defendants but simply as assistance to the Court, for

22 whatever weight the Court deems appropriate, with

23 respect to the placement of these conversations within

24 the historical context and how, from this expert's

25 perspective, the references in these statements would

Bryden - Direct by Ms. Atiyeh

1  objectively appear to have reference to contemporary

2  events going on at the time.

3          So I understand your objection, and to the

4  extent it's an objection, the Court is overruling the

5  objection.  The Court will give it such weight as it

6  deems appropriate.

7          All right.

8          MS. MINTER:  Thank you, Your Honor.

9          THE COURT:  All right.  Mr. Bryden, you

10 remain under oath.

11 BY MS. ATIYEH:

12 Q    Mr. Bryden, before we stopped for lunch, you had

13 been talking about the ISDAC chat room as being a forum

14 for al-Shabaab.  Are there any other websites

15 associated with al-Shabaab?

16 A    There are and have been numerous websites and

17 forums.  Again, they change over the years.  Some of

18 them have been shut down.  New ones are started.

19      The most prominent ones, to my recollection, over

20 the years have been alkataib.net -- that's

21 A-L-K-A-T-A-I-B dot net; alkataib.info; al-Qimmah,

22 which is A-L-Q-I-M-M-A-H.

23      There are websites that are supportive of

24 al-Shabaab but not necessarily official al-Shabaab

25 mouthpieces, such as *Somali Memo*.  There is Calaamada,

1  which is C-A-L-A-A-M-A-D-A, and al-Furqaan is an

2  official -- as far as we know, an official mouthpiece.

3  So they have proliferated.  There are quite a number.

4  Q    Is there any distinction between the al-Shabaab

5  websites you just mentioned and the ISDAC chat room?

6  A    The difference is that some of them are just

7  websites that disseminate information, news, propaganda

8  while others actually serve as forums for the

9  communication and interaction between participants.

10       And so at the time that I was actively monitoring,

11  most actively monitoring the Paltalk chat room --

12       Also, al-Qimmah was serving as a different kind of

13  forum, more written than spoken.

14       The main difference was that the Dacwatu al-Tawhid

15  chat forum was a place where al-Shabaab leaders

16  actually engaged with followers or sympathizers and

17  where we saw active fundraising taking place.

18  Q    Just to clarify, Dacwatu al-Tawhid, that's the

19  same as the ISDAC chat room?

20  A    That's the ISDAC, yes.

21       MS. ATIYEH:  Can we bring Government's

22  Exhibit 1 back up, please.

23  BY MS. ATIYEH:

24  Q    In Somalia, is there a mountain region called the

25  Golis Mountains?

Bryden - Direct by Ms. Atiyeh

1  A     Yes, they're more highlands than mountains, but

2  yes, there is.

3  Q     Could you identify where that's located on the

4  map.

5  A     The Golis range -- the full range runs from the

6  southwest corner of Somaliland to the northeast,

7  roughly along this line here.

8  Q     And is there a region of the Golis Mountains that

9  are known as the Galgala Mountains?

10  A     The Galgala area is to the southwest of Bosaso,

11  around here.  Galgala is actually a small area, a

12  settlement in those highlands.  The name of that full

13  area is actually the 'Almadow -- which is apostrophe

14  A-L-M-A-D-O-W -- and Galgala is one small area within

15  those highlands.

16  Q     Could you give the Court some background during

17  the time period of this indictment of the movements of

18  al-Shabaab from their original strongholds.

19  A     Well, at the time of the events that we're talking

20  about, while the main body of al-Shabaab was down in

21  southern Somalia and most active there, there were

22  elements of al-Shabaab in the north.  As I said, there

23  had been a string of suicide bombings in 2008, for

24  example, in Hargeysa and Bosaso.  So there was always

25  some activity.

Bryden - Direct by Ms. Atiyeh

1   There was one particular group of al-Shabaab

2   starting from around 2007 in the Galgala area that was

3   a semiautonomous group linked to al-Shabaab but also in

4   some ways, at least geographically, separated from the

5   main part of the movement.

6   After about 2010, when the African Union Forces in

7   the south started to make progress against al-Shabaab

8   and the momentum of their offensive operations

9   increased, there was increasing discussion of

10  al-Shabaab considering sending its forces northwards to

11  a refuge in the Galgala area as a contingency if they

12  were to lose ground further in the south.

13  And to that end, there were several changes of

14  leadership among the al-Shabaab group in the Galgala

15  area from leaders who were considered to be pragmatic

16  to those who were increasingly close to the emir and

17  the nucleus of al-Shabaab in the south.

18  Q   Over the time period of the indictment, did

19  al-Shabaab begin to suffer defeats in the south?

20  A   Yes, they did begin to suffer defeats in the

21  south.

22  They in 2010 -- 2009 and '10, their Ramadan, the

23  holy month of Ramadan offenses in Mogadishu were not

24  particularly successful, and in late 2011, they

25  withdrew their main forces from the capital, Mogadishu,

1  and started to withdraw into the interior.  And

2  although it was a very slow progress, that collapsing

3  in on itself in al-Shabaab territories has continued.

4  Q    You have discussed previously, when we were

5  talking about Ahmed Abdi Godane, a split or a schism

6  that occurred within al-Shabaab.  Could you just give

7  an additional brief summary about what, essentially,

8  went on there and who the major players were.

9  A    Well, the issue there -- there were two principal

10  factions within al-Shabaab that emerged during the

11  course of the tensions in the movement, Godane and his

12  inner circle and another group which involved Hassan

13  Dahir Aweys whom we referred to, also Mukhtar Robow.

14  Other leaders in that group included Ibrahim al-Afghani

15  and Ma'alim Burhan -- Ma'alim Burhan is M-A apostrophe

16  A-L-I-M, B-U-R-H-A-N -- and others.

17  Q    Just to clarify, Ibrahim al-Afghani and Ma'alim

18  Burhan, which side of the split were they on?

19  A    They were on the dissident group opposed to

20  Godane.

21      So really, although the tensions probably began

22  earlier, the split became public in February 2009 when

23  the Ethiopians withdrew from Somalia and Godane had

24  given instructions that any members of the Transitional

25  Federal Government or parliament who fell into the

1   hands of al-Shabaab -- al-Shabaab is now taking control

2   of southern Somalia -- any such officials should be

3   captured and implicitly put to death.

4        And Mukhtar Robow, who captured the town of Baidoa

5   in southwest Somalia -- captured but subsequently

6   released a number of officials from his subclan, from

7   his area.   And this was really, I think, the first

8   public airing of the differences between the two wings

9   of al-Shabaab.

10       Over the next few years, there was growing,

11  initially I suppose, rumor of division within the

12  movement.   But by 2010-2011, these became apparent in

13  terms of military tactics and strategy.   Robow withdrew

14  his forces from the battlefield at one time in 2011

15  leaving Godane and his forces exposed in Mogadishu.

16       Then the next public phase of the discussion began

17  when the American jihadist, Omar Hammami, began

18  tweeting about these problems within al-Shabaab on his

19  Twitter feed and accusing -- saying initially that his

20  life was in danger because there was this split within

21  al-Shabaab and he was on the wrong side.   He was

22  closely affiliated with Mukhtar Robow.

23  Q    Just to clarify, you identified Omar Hammami as an

24  American jihadi.  He was located where at the time?

25  A    He was located in southern Somalia.  He was with

Bryden - Direct by Ms. Atiyeh

1   the al-Shabaab leadership and almost always in the

2   company of Mukhtar Robow.

3   Q    Are you also familiar with an individual named

4   Fuad, F-U-A-D, Shongole, S-H-O-N-G-O-L-E?

5   A    Yes, I am.

6   Q    And who is he?

7   A    He was a Somali returnee from Sweden.  He had been

8   an imam at a mosque in a suburb of the Swedish capital,

9   Stockholm.  He returned to Somalia initially in the

10  early 2000s, joined the Islamic Courts Union, and

11  emerged as a leader of al-Shabaab.  And I believe his

12  initial position was the leader of the office of

13  da'wa -- D-A apostrophe W-A -- or propagation of the

14  faith.

15  Q    Which faction of the schism that you mentioned was

16  Fuad Shongole identified with?

17  A    Both.  He was able to move between the two.  And

18  initially, he was perceived as being in the dissident

19  faction.  But in the aftermath of all of the events

20  that have since played out, he has remained affiliated

21  with the Godane and post-Godane leadership of

22  al-Shabaab.

23  Q    Are you familiar with an individual named Sheikh

24  Abdulkadir, A-B-D-U-L-K-A-D-I-R, Mumin, M-U-M-I-N?

25  A    Yes, I am.

1  Q    Who is he?

2  A    Abdulkadir Mumin was a Somali resident in the

3  United Kingdom.  He returned to Somalia in 2010 to join

4  al-Shabaab.  He became an outspoken idealogue on behalf

5  of the movement, and he subsequently moved to northern

6  Somalia to the Galgala area where he became the third

7  emir of the al-Shabaab forces in that part of Somalia.

8  Q    Which of these factions that you've been talking

9  about was he affiliated with?

10 A    He has consistently been affiliated with the

11 Godane faction.  As I said earlier, he was the third --

12 and there was a progression from sort of pragmatic

13 clan-based leadership in 2006 and '07 towards

14 leadership that could be considered loyal to the

15 al-Shabaab leadership in the south, and Mumin was until

16 recently the chosen nominee of Godane and Godane's

17 successor.

18 Q    You've talked about a number of these people as

19 being members of al-Shabaab.  How in your work do you

20 identify someone as a member of al-Shabaab?

21 A    There are various ways.  Obviously, there are

22 those who simply demonstrate through their actions or

23 their words that they consider themselves to be members

24 of al-Shabaab or act as a part of the movement, some

25 participating in al-Shabaab propaganda and speaking on

1   behalf of the movement or are shown on the battlefield

2   or at least posing on the battlefield as members of

3   al-Shabaab.

4        I would add to that that there are some who just

5   self-identify as al-Shabaab by saying they are; yet,

6   perhaps by their actions, we might not see them picking

7   up a kalashnikov and fighting on the battlefield.  They

8   might have a more subtle role within the organization,

9   and that sort of identification would require perhaps

10  more research than sort of a *prima facie* demonstration

11  of being a fighter or leader of al-Shabaab.

12  Q    So in the context of your work, you've said that

13  there are some people who you identify as members who

14  are the sort of people who pick up the kalashnikov, but

15  there may members in a more background position in the

16  organization.  So how do you identify somebody like

17  that who might be a facilitator or fundraiser?

18  A    Well, during the course of my work with the U.N.,

19  we -- once al-Shabaab was designated by the United

20  Nations as a prescribed organization, we were required

21  to look at several categories of either al-Shabaab

22  members or supporters.  They broke down into either

23  members of the organization, their financiers, their

24  facilitators, or their active supporters.

25       For each of those categories, we would have to

1   determine what sort of actions we considered

2   constituted or demonstrated that someone merited that

3   designation.  And we would have to propose that to the

4   security council for consideration.  They could accept

5   or reject our proposals.

6        Now, financiers were pretty clear.  We would look

7   for financial transactions.  We would look for a

8   demonstration that someone had actually sent money or

9   contributed money for an al-Shabaab cause knowingly.

10       Facilitators included people who moved weapons on

11  their behalf, ammunition on their behalf, supported

12  them in terms of logistics, and active supporters,

13  those who mobilize support on their behalf, perhaps

14  those who hosted forums or websites.  They're examples

15  of the categories we were obliged to look at.

16  Q    So all of these people, all of those different

17  roles were people who worked on behalf of al-Shabaab?

18  A    That's correct.

19  Q    These were all people who were subject, at least

20  potentially, to U.N. sanctions as a result of that

21  work?

22  A    That's correct.

23  Q    Because of their work on behalf of al-Shabaab?

24  A    Yes.

25  Q    You had spoken earlier about the split of a group

1  known as Itihaad into al-Shabaab and another group

2  known as I'tisaam.

3      Could you talk a little bit about the relationship

4  between I'tisaam and the dissident faction, the

5  anti-Godane faction, you were discussing earlier.

6  A    I can't speak to direct relations between them.

7  I'm not aware if there were communications between

8  I'tisaam and the dissidents in al-Shabaab.  But there

9  was a convergence in terms of doctrine to the extent

10  that the dissident faction of al-Shabaab opposed

11  Godane's leadership on a whole number of grounds.  And

12  among those grounds were the indiscriminate violence or

13  the killing of civilians, which they opposed.  They

14  opposed autocratic rule and the absence of

15  consultation, the fact that Godane ultimately suspended

16  the shura and governed personally, exercised personal

17  rule.

18      But if I come back to I'tisaam, it would have been

19  the concern about the killing of civilians and also, to

20  an extent, the degree to which al-Shabaab used the

21  concept of takfir to designate other Muslims as

22  apostates to legitimize their killing.  So I'tisaam had

23  chosen, essentially, a nonviolent path.  To the extent

24  that the dissidents found Godane's leadership

25  excessively violent and that his doctrine legitimized

Bryden - Direct by Ms. Atiyeh

1  this violence, there was degree of convergence.  But,

2  again, I couldn't say that there was a relationship

3  between them.

4  Q    So the convergence that you're describing is the

5  sort of agreement in philosophical principle between

6  the dissidents and the I'tisaam group?

7  A    I would say that they shared concerns about the

8  way al-Shabaab was being led.

9  Q    In your research into the region, have you become

10 familiar with an individual named Barira Hassan

11 Abdullahi?

12 A    Yes, sir.

13 Q    Who is she?

14 A    Through my own work, which is -- since I left the

15 United Nations -- first, I'm aware that she was cited

16 in the United Nations report in, I believe, 2013 in

17 connection with -- that would have been 2014 -- in

18 connection with an attack on a restaurant in Djibouti,

19 a bombing, a suicide bombing.

20      Subsequently, through my own work with the

21 intergovernmental organization for the Horn of Africa,

22 which is known as IGAD, I-G-A-D, on transnational

23 security threats, we were forensically investigating an

24 attempt to conduct a suicide bombing at a shopping mall

25 in the Ethiopian capital, Addis Ababa.

1    During the course of that investigation, it turned

2  out that one of the people who had served as a courier

3  on behalf of the attempted suicide bomber was the

4  business associate and partner of Barira Hassan.  And

5  so in that context, in the context of that conspiracy,

6  a number of the people who were associated with that

7  conspiracy were also linked to the Djibouti attack.

8    Her name then came to our attention, and we were

9  advised by the authorities in Ethiopia and in

10 Somaliland that she had been a person of interest

11 associated with al-Shabaab, a leading figure of

12 al-Shabaab.

13   I subsequently traveled to Hargeysa to learn more

14 and was informed that she had been tried, convicted,

15 and was in prison.

16        MS. MINTER:  Your Honor, I will object to any

17 hearsay.

18        MS. ATIYEH:  Your Honor, experts are

19 permitted to --

20        THE COURT:  I understand.

21        Overruled.  I'll hear this.

22        I assume you're going to get --

23        MS. MINTER:  Your Honor, I think he's

24 entitled to use it as a basis of forming his opinion.

25 They're not entitled to use it as a back door to

1  introduce it at trial.

2          THE COURT:  I understand.

3  BY MS. ATIYEH:

4  Q    Let me then just ask you, Mr. Bryden:  What is

5  your expert opinion of Barira Hassan Abdullahi's role

6  in al-Shabaab based on everything that you've just

7  explained to the Court?

8  A    Based on everything that I have seen, I would say

9  that she would fit the category of active supporter,

10 and if not financier, I would say as a financial

11 organizer on behalf of the group based in Somaliland

12 and has been involved or has had knowledge of

13 activities in which -- operations that al-Shabaab has

14 carried out in that region.

15 Q    At around the time of the indictments and, more

16 specifically, from about April through about December

17 of 2012, was there fighting going on between al-Shabaab

18 and African Union troops?

19 A    Yes, there was.

20 Q    And I think at various points we may have used the

21 phrase AMISOM.  Can you just explain what that means?

22 A    AMISOM is the acronym for the African Mission in

23 Somalia, A-M-I-S-O-M.

24          MS. ATIYEH:  If we could, bring up

25 Government's Exhibit 8C1, please.

Bryden - Direct by Ms. Atiyeh

1          I'm going to ask for 8E1 and 8F1 shortly.

2    BY MS. ATIYEH:

3    Q    Are you familiar with this document?

4    A    Yes, I am.

5    Q    What is that?

6    A    This is the translation from the article

7    describing the departure of al-Shabaab from the town of

8    Marka to the south of Mogadishu and describing the

9    situation in the town.

10         MS. ATIYEH:  If we could -- actually, can we

11   move 8C1 into evidence pursuant to the stipulation

12   again?

13         THE COURT:  Any objection?

14         MS. MINTER:  Again, Your Honor, with the same

15   bases pursuant to the stipulation but reserving

16   argument with respect to whether the article speaks for

17   itself.

18         THE COURT:  All right.  For what purpose is

19   this exhibit being admitted?

20         MS. ATIYEH:  These are being admitted to show

21   the contemporaneous media coverage of these events

22   going on in Somalia.

23         THE COURT:  So as a basis for his opinions?

24         MS. ATIYEH:  These articles are not

25   necessarily the specific articles he viewed.  I was

Bryden - Direct by Ms. Atiyeh

1  going to ask him to follow up and ask if this was an

2  example of the media coverage.

3           THE COURT:  I guess what I'm asking is are

4  you admitting these for the truth of what's stated in

5  the substance of these articles or for some other

6  purpose?

7           MS. ATIYEH:  The Court's indulgence.

8           Your Honor, I think the witness is going to

9  testify the articles are accurate, but I don't think

10 we're necessarily admitting them for the truth of the

11 matter asserted.  We're admitting them -- these are

12 articles that we'll introduce testimony later that were

13 viewed by the defendants at various points in time.

14          THE COURT:  All right.  I'll admit

15 Exhibit 8C1 for that purpose, for the purpose to

16 establish what the defendants read or were exposed to.

17 BY MS. ATIYEH:

18 Q    Just to put this on the record, Mr. Bryden, is

19 this an example of contemporaneous media coverage of

20 the events going on in Somalia with regard to

21 al-Shabaab troop movements at the time?

22 A    This is an example; although, it's an example of

23 media coverage from the al-Shabaab perspective.

24          MS. ATIYEH:  If we could, bring up or give

25 the witness 8E1 now.

Bryden - Direct by Ms. Atiyeh

1           THE COURT:  D1?

2           MS. ATIYEH:  E as in egg.

3  BY MS. ATIYEH:

4  Q    And you've seen 8E1 before as well?

5  A    Yes, I have.

6  Q    That's another example of a news article about

7  al-Shabaab troop movements in the same time period?

8  A    Yes.  It covers the same events from a somewhat

9  different perspective.

10 Q    Another example of contemporaneous media coverage

11 of al-Shabaab troop movements?

12 A    Yes.

13          MS. ATIYEH:  I'd move Exhibit 8E1 into

14 evidence.

15          THE COURT:  It will be admitted for the same

16 limited purpose subject to being tied in to your other

17 evidence.

18          MS. ATIYEH:  Thank you, Your Honor.

19          Could we show the witness 8F1, please.

20 BY MS. ATIYEH:

21 Q    You've seen this document before?

22 A    Yes, I have.

23 Q    It is another media article regarding al-Shabaab

24 troop movements at the time?

25 A    Yes.

1  Q    Is it an example of contemporaneous media

2  coverage?

3  A    Yes, it is.

4            MS. ATIYEH:  I'd move 8 --

5            THE COURT:  All right.  8F1 will be admitted

6  for the same purpose.

7            MS. ATIYEH:  Could we please give the witness

8  Government's Exhibit 47.

9  BY MS. ATIYEH:

10  Q    Sorry.  Do you have this exhibit in front of you?

11  A    Yes.

12  Q    You've seen this document before?

13  A    Yes, I have.

14  Q    Is this a transcript of a chat that's dated

15  April 18, 2012?

16  A    Yes, it is.

17            MS. ATIYEH:  I'd move Exhibit 47 in.

18            THE COURT:  Any objection?  The same

19  objections?

20            MS. MINTER:  Your Honor, this comes back, I

21  think, to our initial series of objections about

22  relevance and lack of foundation at this point,

23  however, subject to the stipulations we've discussed

24  previously.

25            THE COURT:  All right.  The Court will admit

1   47 for the purpose of any opinions this witness has as

2   to how what's referenced in this e-mail, based on the

3   objective language, relates to any contemporaneous

4   events.

5   BY MS. ATIYEH:

6   Q    Mr. Bryden, if you could, take a look at the

7   section of this conversation, in particular, in the

8   middle of the page beginning, This money is a help

9   intended for supporting the brothers in the mountains.

10       Based on your understanding of contemporaneous

11  events around this time and your other knowledge of the

12  region and the history of the region, do you have an

13  opinion as to what the conversants are referring to

14  when they refer to the brothers in the mountains?

15            MS. MINTER:   Same objection as to

16  speculation, Your Honor.

17            THE COURT:   Overruled.

18  A    Given the broader context and in terms of

19  everything else that I've seen in terms of these

20  discussions, a reference to the brothers in the

21  mountains would typically be a reference to the

22  al-Shabaab in the northeast.   Somalia doesn't have many

23  mountain ranges.   So to refer to the mountains would

24  almost certainly be a reference to the northeast.

25  These are the most salient highlands in the country.

Bryden - Direct by Ms. Atiyeh

1          MS. ATIYEH:  Could you show the witness

2   Government's Exhibit 46, please.

3   BY MS. ATIYEH:

4   Q     You've seen this document before?

5   A     Yes, I have.

6   Q     And is that a transcript dated April 18, 2012,

7   again, the same date as we just discussed?

8   A     I see it as dated April 17.

9   Q     I'm sorry.  April 17?

10  A     And April 18.

11         MS. ATIYEH:  I'd move Government's Exhibit 46

12  in.

13         THE COURT:  Over objection, it will be

14  admitted for the same purpose as Exhibit 47.

15         MS. MINTER:  The same bases, Your Honor.

16  BY MS. ATIYEH:

17  Q     If you could, direct your attention to pages 6 and

18  7.

19         MS. ATIYEH:  And if we could maybe bring

20  those up side-by-side on the screen.

21         THE COURT:  What's the Bates number?

22         MS. ATIYEH:  I'm sorry?

23         THE COURT:  What's the Bates number of the

24  page?

25         MS. ATIYEH:  764.

Bryden - Direct by Ms. Atiyeh

1  BY MS. ATIYEH:

2  Q     If you can, look in particular -- just read

3  through these two pages in order to establish the

4  context of the conversation, but I'd like to direct

5  your attention to the section on the bottom of that

6  seventh page, which is Bates 765 at the bottom.

7        Again, based on your knowledge of contemporaneous

8  events and contemporaneous media recording and your

9  general understanding of the history of the region, do

10 you have an understanding as to who the people in the

11 mountains being referred to here are?

12 A     Well, in the context of this discussion and also

13 the reference to the wounded -- and I think the

14 reference, again, suggests very strongly this is a

15 reference to the northeast where there were combat

16 operations between al-Shabaab and Puntland authorities,

17 again, the mountains being a singular reference in

18 Somalia.

19            MS. ATIYEH:  If we could, give the witness

20 Government's Exhibit 79, please.

21            MS. MINTER:  For the record, Your Honor, same

22 objection as to --

23            THE COURT:  All right.  Over objection, 79

24 will be admitted for the same purpose.

25 BY MS. ATIYEH:

1  Q    You've seen this before, Mr. Bryden?

2  A    Yes, I have.

3  Q    This is the transcript of a conversation on

4  June 7, 2012?

5  A    Yes.

6  Q    If you could, direct your attention to pages 5 and

7  6, the pages numbered 5 and 6, which I believe are the

8  sixth and seventh pages of the exhibit.  If you could,

9  begin just taking a look at the bottom of the page

10 numbered page 5 there and then going on to the next

11 page:  I was told that at this place, the central area

12 with the mountains, and then continuing, The families

13 will be moving out.  There's an impending move upon the

14 family.

15 A    Yes.

16 Q    Based on contemporaneous media reporting and your

17 own knowledge of the history of events in the region,

18 do you have an expert opinion as to what's being

19 discussed here?

20 A    Well, as I had said earlier, at about this time,

21 as al-Shabaab was suffering losses in the south, there

22 was a lot of discussion of their preparations to move

23 leadership and supporters to safer areas in the north

24 into the mountainous areas of the northeast.

25      This is actually something that I wrote about at

1  the time.  So my looking at this conversation is that

2  it relates to that contingency planning that was

3  happening within al-Shabaab which didn't actually take

4  place, at least not until much more recently.  But at

5  the time, it was considered a very real possibility.

6           THE COURT:  What page are you referencing?

7           MS. ATIYEH:  We're on pages 5 and 6, Bates

8  2308 and 2309 -- wait.  I'm sorry.  That's -- is

9  that --

10          THE COURT:  All right.

11          MS. ATIYEH:  Yeah.

12 BY MS. ATIYEH:

13 Q    Based upon your knowledge, again, of the region,

14 do you have any opinion as to what the speakers are

15 referring to when they refer to the families or the

16 family in this section of the conversation?

17          MS. MINTER:  Same objection, Your Honor.

18          THE COURT:  Overruled.

19 A    My assessment is that it could refer to one of two

20 things.  Family is used at times to refer to a group,

21 whether that is the Islamic Courts or al-Shabaab or

22 another factional group.  It could also be used to

23 refer to the supporters of the fighters of a particular

24 group.

25      In this case, my assessment is that it would

Bryden - Direct by Ms. Atiyeh

1  either be a reference to al-Shabaab as a whole or to

2  the unarmed members affiliated with al-Shabaab.

3         MS. ATIYEH:  Could we show the witness

4  Government's Exhibit 82, please.

5  BY MS. ATIYEH:

6  Q    Have you seen this document before?

7  A    Yes, I have.

8  Q    This is a transcript of a conversation dated

9  June 8, 2012?

10  A    Yes, it is.

11        MS. ATIYEH:  I'd move Government's Exhibit 82

12  in.

13        MS. MINTER:  Same bases, Your Honor, same

14  objection, speculation.

15        THE COURT:  Overruled.  Exhibit 82 is

16  admitted.

17        MS. ATIYEH:  Could we please bring up pages

18  13 and 14.

19  BY MS. ATIYEH:

20  Q    And, Mr. Bryden, could you direct your attention

21  to those pages, please.  Mr. Bryden, could you review

22  that section starting at the bottom of page 13 --

23  sister, there was a gathering.  The family is on the

24  move -- and then going on to the next page.

25  A    Yes.

1    Q    Mr. Bryden, based on, again, contemporaneous media

2    reporting and your knowledge of events in the region,

3    do you have an opinion as to what's being discussed in

4    this conversation?

5    A    Yes.  This part of the conversation seems to me to

6    refer pretty clearly to the withdrawal of al-Shabaab

7    from Mogadishu, which is what was happening at that

8    time.  And although it could appear that it's talking

9    about areas needing to be vacated, in fact, al-Shabaab

10   withdrew without -- the fighting at that time was not

11   the type of fighting that displaced communities from

12   Mogadishu.  It wasn't a moment of great displacement.

13   It was actually a well-organized withdrawal.  So the

14   literal reading of that passage to me does not make

15   sense.  This looks like a reference to the withdrawal

16   of the forces from Mogadishu.

17   Q    And again, reviewing this document and based on

18   your understanding from the history involved here, do

19   you have an opinion as to what the speakers are

20   referring to when they are referring to the family?

21   A    Family would, in this case, be al-Shabaab and its

22   forces.

23   Q    Do you see a reference there on page 14 using

24   donkeys or camels as a means to move and carry water,

25   to move the family?

1    A    Yes.

2    Q    Are donkeys and camels typically used as a means

3    of transportation in Somalia?

4    A    Yes, they are.

5    Q    You see here discussion of the cost of something

6    that's being discussed here saying nine zero zero --

7    A    Yes.

8    Q    Is this consistent with the cost of camels or

9    donkeys in Somalia at the time?

10   A    I can't see any correlation between the figure

11   9,000 and the cost of a camel or a donkey.  In terms of

12   shillings, it's too low, and in terms of dollars, it's

13   multiplier is too high.

14   Q    Are you familiar with an address given in April

15   2012 by Sheikh Abdulkadir Mumin who we've spoken about

16   before?

17   A    Yes, I am.

18         MS. ATIYEH:  If we could, show the witness

19   what's marked as Government's Exhibit 8A1 and 8B1.

20         THE CLERK:  8A1 and 8B1?

21         MS. ATIYEH:  Yes.

22         THE CLERK:  Okay.  Thank you.

23   BY MS. ATIYEH:

24   Q    Have you seen these documents before?

25   A    Yes, I have.

1 Q    Are they contemporaneous media accounts of the

2 address by Sheikh Mumin that you just described?

3 A    Yes, they are.

4         MS. ATIYEH:  I'd move 8A1 and B1 into

5 evidence.

6         THE COURT:  Same objection?

7         MS. MINTER:  Same objections, Your Honor.

8         THE COURT:  All right.  It will be admitted

9 subject to being connected up.

10 BY MS. ATIYEH:

11 Q    Just briefly, Mr. Bryden, are you familiar with

12 the source of the news article from Government's

13 Exhibit 8A1?

14 A    Yes, I am.

15 Q    What is the source, the news organization, from

16 which that was gathered?

17 A    This is a Somali website that carries a mix of

18 news and information and portrays itself as

19 independent.  I would say in terms of open source

20 analysis, it leans towards support for the Somali

21 Islamic movement, particularly the Salafi movement, and

22 is generally sympathetic to al-Shabaab.  But it's not

23 what I would consider to be an al-Shabaab affiliate or

24 an al-Shabaab mouthpiece.

25         MS. ATIYEH:  Could we, please, show the

Bryden - Direct by Ms. Atiyeh

1  witness Government's Exhibit 43.

2  BY MS. ATIYEH:

3  Q    I'm sorry.  Do you have it in front of you?

4  A    Yes, I do.

5  Q    Are you familiar with the document?

6  A    Yes, I am.

7  Q    Is it a transcript of a conversation dated

8  April 13, 2012?

9  A    Yes, it is.

10         MS. ATIYEH:  I'd move Government's Exhibit 82

11  [sic] in.

12         MS. MINTER:  Same bases, Your Honor.

13         THE COURT:  Over objection, it will be

14  admitted for the limited purpose of allowing this

15  witness to express his opinion.

16         MS. ATIYEH:  Oh, I'm sorry.  I said -- it's

17  43.  I said 82 when I spoke there, but you have

18  Government's Exhibit 43 there.

19         If you could, bring up pages 1 and 2

20  side-by-side.

21  BY MS. ATIYEH:

22  Q    If you could, just take a moment, Mr. Bryden, to

23  read this section of the conversation from the

24  beginning, Mumin was famous.  That is the old man.  I

25  am telling you to sit, listen to, and absorb.

Bryden - Direct by Ms. Atiyeh

1     And then the large paragraph that the woman

2 identified as Ismahan is describing here.  Just take a

3 moment to read that, please.

4 A     Yes.  Okay.

5 Q     And based on your knowledge of contemporaneous

6 media reporting, your knowledge of the history of the

7 area at the time, do you have an opinion as to what the

8 speakers are discussing here?

9          MS. MINTER:  Same objection, Your Honor.

10          THE COURT:  Overruled.

11 A     If I may, I would say also based on the content of

12 the previous article and what I know of the content of

13 Mumin's speech, this appears to be a direct reference

14 to the address that Sheikh Abdulkadir Mumin gave at

15 this time publicly threatening to enlarge the efforts

16 of al-Shabaab against the Puntland authorities headed

17 by the president who's referred to here, President

18 Abdirahman Farole, and that this paragraph attributed

19 to Ismahan directly refers to statements that Mumin

20 made, that the people of Puntland should rise up

21 against their administration because the administration

22 was apostate and corrupt, and that while the leadership

23 was making money, they had nothing.

24 Q     So what was the basis for the tension that seems

25 to be reflected here between al-Shabaab and the

Bryden - Direct by Ms. Atiyeh

1  Puntland government?

2  A    Well, the tension that was reflected here is that

3  the al-Shabaab in the northeast since 2007 had been at

4  war with the Puntland authorities.  Admittedly, it was

5  a very small war confined largely to the highland --

6  Galgala highlands.

7       The arrival of Abdulkadir Mumin was particularly

8  alarming to the Puntland administration because until

9  his arrival, the al-Shabaab movement in Galgala had

10  been associated with just one subclan that was located

11  in the Galgala area.  Mumin is from a different subclan

12  from the east of Bosaso.  And so it seemed to signal to

13  the Puntland leadership that now al-Shabaab's

14  constituency and its support base in Puntland might

15  expand and it might pose an even greater threat to the

16  administration than it had in the past.

17       So the arrival of a new leader, Mumin, his subclan

18  affiliation, and the fact that he was considered loyal

19  to the Shabaab leadership in the south all suggested

20  that al-Shabaab was about to step up its operations in

21  Puntland.  I think that was the primary concern at the

22  time.

23  Q    Are you familiar with an incident in December 2012

24  in which the Puntland government reported having

25  captured an al-Shabaab supply truck headed to the Golis

1   Mountains.

2   A    Yes, I am.

3   Q    Do you have anything to add as far as what

4   occurred in that incident?

5   A    It was one of several incidents in which the

6   Puntland authorities seized supplies that were destined

7   for the Galgala highlands or at least claimed that they

8   were.

9       It certainly corroborated the findings of my team

10  at the time, that the al-Shabaab in the Galgala

11  highlands were primarily supported by members of the

12  business community in Bosaso, who facilitated a

13  logistical arrangement sometimes by sending supplies

14  from Bosaso, sometimes by arranging for supplies to be

15  brought in directly through the coast.  So this was not

16  unusual.

17      And in this particular incident, the nature of the

18  supplies coincided with supplies that had been found in

19  al-Shabaab camps that had been captured from or

20  recovered from Mumin's predecessor forces, the Shabaab

21  forces in the area.

22          MS. ATIYEH:  Could we show the witness

23  Government's Exhibit 8Z, please, Z as in Zed.

24  BY MS. ATIYEH:

25  Q    Are you familiar with this document, Mr. Bryden?

Bryden - Direct by Ms. Atiyeh

1   A    Yes, I am.

2   Q    Is this a document that you personally viewed from

3   open sources?

4   A    I don't believe this one, but I've seen others

5   like it that I've found personally from open source,

6   yes.

7   Q    Having reviewed the article, is this an accurate

8   recollection of the events that you described?

9   A    To the best of my knowledge, it is.  And the

10  documents that I've seen just included somewhat more

11  detail and more images of the supplies that were seized

12  during this incident.

13  Q    So, for instance, the image in this article is

14  similar or the same as other images that you saw online

15  at the time of the events?

16  A    That's correct.

17          MS. ATIYEH:  I'd move Government's Exhibit 8Z

18  into evidence.

19          THE COURT:  Again, this is for the purpose of

20  establishing what the defendants read or were exposed

21  to?

22          MS. ATIYEH:  This is not one that the

23  defendant has viewed personally.  This is one that

24  we're introducing to establish what was being reported

25  in the media generally at the time.

Bryden - Direct by Ms. Atiyeh

1       THE COURT:  All right.

2       MS. MINTER:  Your Honor, we would object on

3  that basis.  I'm happy to articulate further for the

4  Court, but the case law is very clear that news

5  articles can't be admitted for the truth of the matter

6  asserted therein.  I would submit to the Court that

7  it's inappropriate to the extent that it goes to show

8  that these events did, in fact, take place.

9       THE COURT:  All right.  I'm going to let it

10  in over objection for the limited purpose of the fact

11  of what was being reported in the contemporary news

12  media for whatever worth or relevance that may have.

13       MS. MINTER:  To that extent, Your Honor, then

14  we would object based on the lack of foundation and

15  that the government hasn't shown this as a reliable

16  news source.

17       THE COURT:  You're not contesting that it, in

18  fact, was published?

19       MS. MINTER:  No, Your Honor.  We're not

20  contesting that that may be published, but that does

21  not make the events themselves something that can be

22  relied on by the Court.

23       THE COURT:  I understand.  It's not being

24  admitted for the truth of anything in these articles,

25  simply for the fact that this article was published,

Bryden - Direct by Ms. Atiyeh

1  again, for whatever relevance that may have.

2         MS. MINTER:  Which we would submit would be

3  none, Your Honor.

4         THE COURT:  All right.  Well, the Court will

5  consider that.

6         MS. ATIYEH:  Could we show the witness

7  Government's Exhibit 100, please.

8  BY MS. ATIYEH:

9  Q    Mr. Bryden, could you take a moment -- well, first

10 of all, are you familiar with this document?

11 A    Yes, I am.

12 Q    Is it a transcript of a conversation that's dated

13 December 19, 2012?

14 A    Yes, it is.

15        MS. ATIYEH:  Could we move Government's

16 Exhibit 100 in at this time?

17        THE COURT:  The same objection?

18        MS. MINTER:  Yes, Your Honor, the same

19 objection in that we admit what -- it's covered by the

20 stipulations, but we would object on foundational and

21 relevance grounds.

22        THE COURT:  All right.  Over objection, the

23 Court will admit Exhibit 100 for the purposes of this

24 witness' opinions.

25 BY MS. ATIYEH:

1  Q    Now, Mr. Bryden, if you could, just start taking a

2  look at the section at the beginning of the first page:

3  Did you see the other day the small Danhu vehicle which

4  was loaded?

5  A    Yes.

6  Q    Continue reading down page 2 through this section

7  saying, One could have simply explained that the stuff

8  was collected by the civilian population, talking about

9  further down the way those two states spy on them.

10      And then going down onto the third page discussing

11 when choosing a truck for a shipment, you don't go with

12 an exclusive truck.  They should ship alongside other

13 shipments and so forth.

14      Just take a moment to read that section of the

15 transcript.  This is on pages 2 and 3.

16 A    Yes.  Okay.

17 Q    Based on your knowledge of the history of the

18 region and the contemporaneous media reporting, do you

19 have an opinion as to what's being discussed in this

20 transcript?

21           MS. MINTER:  Same objection, Your Honor.

22           THE COURT:  Overruled.

23 A    I do.  This appears to be a reaction to the events

24 that were widely reported at the time of the seizure of

25 this consignment.  Some of the references, I think,

1  seem to be quite clear, some of them not necessarily

2  well-founded criticisms.

3         But the way those two states spy on them

4  is -- in my opinion, that's either a reference to how

5  the Puntland government is spying on al-Shabaab and the

6  Somaliland government doing the same from its side or

7  the Puntland government and the United States.  Because

8  by that point, it was well known that the United States

9  had been providing support to the Puntland Intelligence

10 Services for quite some time.  That was essentially an

11 open secret, if a secret at all.

12        Then further down, the reference to using the

13 truck or an exclusive truck, obviously, the criticism

14 being that if you take one truck and you load it with

15 supplies for a single destination, then that could

16 attract the attention of the authorities.  Whereas if

17 it had passengers and supplies for other destinations,

18 it would have been perhaps less obvious.

19        I think, to my reading, this is both a

20 reaction to and a criticism of the operation in that it

21 had been poorly organized and poorly handled by

22 al-Shabaab.  And therefore, the loss of the supplies

23 was a tragic mistake.

24 Q    During the time period of the indictment, in

25 particular in 2012 and 2013, you have discussed the

Bryden - Direct by Ms. Atiyeh

1    rift or schism that occurred within al-Shabaab, and

2    you've mentioned a number of the people involved in

3    that schism.  When you're referring to the dissident

4    group, you talked about a number of subjects on which

5    the dissident group differed with the Godane faction.

6         Can you talk a little bit about the role of the

7    foreign fighters in that conflict?

8    A    In the split -- in the rift within al-Shabaab at

9    that time, most of what is known about it to outsiders

10   like myself comes from either former members of the

11   group who have since left, defected, and decided to

12   share their versions of the events, or at that time,

13   contemporaneously, there were three public sources of

14   information almost simultaneously.  One was -- Omar

15   Hammami had been tweeting for some time and continued

16   to tweet throughout this period.  His perspective of

17   the events --

18   Q    Can you just briefly remind the Court who Omar

19   Hammami is?

20   A    Omar Hammami being a non-Somali from the United

21   States who had joined al-Shabaab and had -- I believe

22   as early 2007 -- and had been especially affiliated

23   with Mukhtar Robow, one of the dissident leaders.

24        Then since 2012, he had begun to tweet about

25   feeling that his life was in danger because of the rift

Bryden - Direct by Ms. Atiyeh

1   within al-Shabaab and because of suspicions that the

2   al-Shabaab leadership harbored towards foreign

3   fighters, including himself.  He had also posted

4   photographs of himself with certain other foreign

5   fighters whose identities later became known.

6        Another public source of information was an open

7   letter written by Ibrahim al-Afghani, one of the

8   founders of al-Shabaab, also from Hargeysa and a very

9   close associate of Godane for a long time but who

10  turned against Godane and who wrote a letter to, at

11  that time, the leader of al-Qaeda, Sheikh al-Zawahiri.

12  And in that letter, he raised complaints about Godane's

13  leadership.

14       There was subsequently another letter written by

15  someone whose identity, I think, is not fully known but

16  who identified himself as Abu Zubayr al-Muhajir and was

17  said to be a foreign fighter who was mediating -- in

18  fact, head of the mediation committee between the

19  Godane faction and the dissident faction.  And

20  al-Muhajir also, apparently, lost patience and

21  published an open letter accusing Godane of many of the

22  same things that al-Afghani had accused Godane of.

23       And so the allegations against Godane, what was at

24  least known at the time, came basically from these

25  three sources.

1      MS. ATIYEH:  If we could, give the witness

2 Government's Exhibit 38, please.

3 BY MS. ATIYEH:

4 Q    Have you seen this document before?

5 A    Yes.  Yes, I have.

6 Q    Is it a translation of a chat dated April 8, 2012?

7 A    Yes, it is.

8      MS. ATIYEH:  I'd move Government's Exhibit 38

9 into evidence.

10      THE COURT:  Same objections?

11      MS. MINTER:  The same objections as to the

12 transcript, Your Honor, and lack of foundation and

13 speculation.

14      THE COURT:  All right.  Exhibit 38 is

15 admitted for the limited purpose of this witness'

16 testimony.

17      MS. ATIYEH:  Could you pull up page 18.

18 That's the 18th page, which I believe is Bates number

19 722.  That's how they're numbered here.

20 BY MS. ATIYEH:

21 Q    If you could, take a moment to read that page,

22 722, continuing down 723 and on to 724.

23 A    Yes.

24 Q    Based on your familiarity with events in the

25 region, are you able to form an opinion as to what the

1  speakers in this transcript are discussing?

2  A    Yes, I am, in general terms.

3  Q    In general terms, what are they discussing?

4  A    Well, the rift within al-Shabaab -- although, at

5  this point in time, as some of the references that I'd

6  referred to had not yet become public and this

7  foreshadows what later became known in the public

8  domain.  Sheikh Hassan Dahir Aweys had in 2007 left

9  Somalia.  He had moved to Eritrea where he coheaded and

10 founded the Alliance for the Re-liberation of Somalia.

11 Al-Shabaab's leadership accused that group of being

12 irrelevant.  And so, in 2009, Hassan had come back and

13 set up another movement called Hizbul Islam, but it

14 quickly fell apart.  And his part of Hizbul Islam was

15 disarmed and absorbed by al-Shabaab.  So he then became

16 identified closely with the dissident group, with

17 al-Afghani, and with those who opposed Godane's

18 leadership.

19     My assessment of what's discussed here is that

20 Hassan Dahir Aweys has already begun making clear,

21 together with Mukhtar Robow -- who was referred to in

22 this discussion as Abu Mansur; this is one of his

23 pseudonyms, his kunya.  And Sheikh Fuad became Sheikh

24 Fuad Shongole, he's been associated with members of, at

25 that time, the dissident group.  And the participants

1  in this conversation are concerned by this development

2  and are criticizing it.

3  Q    So to be clear, have the participants in this

4  conversation identified themselves with a given faction

5  in the rift?

6  A    Well, to the extent that they are critical of this

7  dissident group and, for example, saying that they do

8  not expect Sheikh Fuad Shongole to take this position

9  but that they would expect Sheikh Hassan Dahir to, they

10 appear to be aligning themselves with the Godane

11 faction within al-Shabaab rather than with the

12 dissident group.

13            MS. MINTER:   The same objection.

14            THE COURT:   Overruled.

15 BY MS. ATIYEH:

16 Q    If you could, continue reading this transcript --

17 I know this is something of a lengthy one -- and go on

18 to, I think, it's page 24 or 728, Bates Number 728.  If

19 you could, just take a moment to read this section

20 about discussing the presidency.

21            MS. ATIYEH:   If we could actually put up

22 Bates Numbers 728 and 729.

23 A    Yes.

24 Q    Based on your experience and your knowledge of the

25 region, do you have an understanding or an opinion as

Bryden - Direct by Ms. Atiyeh

1  to what the speakers are referring to when they say, I

2  heard that I'tisaam will get the presidency?

3  A    Yes, I do.  In April 2012, the -- this is an

4  election year in Somalia, and preparations have already

5  begun for the election by parliament of a new

6  president.  Although, again, it wasn't entirely obvious

7  at the time, the frontrunners for the presidency were

8  candidates chosen by the four main Islamic parties in

9  Somalia, one of which was I'tisaam.  So at this time,

10 there was a lot of speculation as to which parties,

11 which candidates were likely to emerge to claim the

12 presidency.

13      In this case, obviously, the concern is that

14 I'tisaam, who actually had a candidate at that time and

15 who subsequently stood for the presidency, might

16 succeed, and the speakers in this conversation are

17 displeased by the idea, first, that I'tisaam might

18 claim the presidency, and secondly, because the

19 international -- it appears from the following line

20 that because the Somalia government at the time was

21 essentially dependent on external aid, that it is

22 defined in this conversation as a president who is

23 supported by the infidels and, therefore, an

24 illegitimate government.

25 Q    On the next page that's there, 729, page 25,

1  there's this phrase here:  You are talking about

2  I'tisaam.  I swear if the emir himself joins the

3  infidels, we will oppose him as we did with Sharif.

4  A     Yes.

5  Q     What is your opinion, based on your knowledge of

6  the subject matter, as to what's being discussed there?

7  A     This seems to be a historical reference to Sheikh

8  Sharif, who was at one point considered the legitimate

9  leader of the Islamic Courts Union.  He was the face of

10 resistance to the Transitional Federal Government and

11 to the Ethiopians when they invaded.  But then he

12 changed sides and made a deal in order to become

13 president of Somalia, after which al-Shabaab remained

14 in the insurgency and opposed it.

15       So this reference suggests that even if the

16 current emir, who the speakers seem to support, were to

17 follow that path and make a deal in order to become

18 president of Somalia and, therefore, be aligned with

19 the infidels who support the government, on who the

20 government was dependent at the time, then they would

21 not follow him into that compact and would remain

22 insurgent against the government.

23 Q     If you could, continue reading through this

24 section and focus your attention on page 25 or Bates

25 Number 731.  If you could, take a moment to read that

Bryden - Direct by Ms. Atiyeh

1  section.

2  A    I'm sorry.  731?

3  Q    Yes, 731.

4  A    Yes.

5  Q    If you could, particularly direct your attention

6  to the statement near the middle of the page where

7  Sheikh Hassan said anyone who disagrees with the

8  Shabaab will be killed.

9  A    Yes.

10 Q    Based on your knowledge of the subject matter, do

11 you have an opinion as to what's being referred to

12 there?

13 A    Yes, I do; although, I admit that I don't

14 recollect the date of this pronouncement.  But my

15 assessment is this is actually a statement by not

16 Sheikh Hassen but Sheikh Hassan, Hassan Hussein, the

17 Nairobi-based al-Shabaab idealogue, who came out very

18 strongly, at that time, in favor of Godane's leadership

19 and argued that anyone who opposed al-Shabaab's -- not

20 only its leadership but also its actions in Somalia, it

21 was legitimate to kill them.

22 Q    In the context of your work with the U.N., were

23 you familiar in any way with Sheikh Hassan Hussein?

24 A    I was.  We began monitoring his activities, I

25 think, as early as 2008, recommending him for

1   designation as an al-Shabaab supporter to the security

2   council.  I built a statement of case against him and

3   continued to develop it during the course of my time

4   with the U.N.

5   Q    Is he designated by the U.N.?

6   A    I believe he is designated by the U.N.

7   Q    Do you know if he's designated by OFAC as well?

8   A    He would have to be designated by OFAC because the

9   U.N. security council cannot designate unless the

10  United States government has domestically met the

11  criteria for designation and taken that step.

12  Q    When we say designation, what is he being

13  designated as?

14  A    Under the U.N., he's being designated in

15  association with al-Shabaab as a threat to peace and

16  security in Somalia, and that implies actions that

17  are -- it requires association of actions that threaten

18  the government or the African Union by force.

19  Therefore, he's subject to a targeted arms embargo --

20  which speaks for itself -- an assets freeze, and a

21  travel ban.

22  Q    If we could, go on in this document to pages 29

23  and 30, which I believe are Bates 733 and 734,

24  beginning at the top of that page:  He was related to

25  Sheikh Abu Mansur.  Was he married to a woman who was a

1 relative of his?

2      And just continue on through the next page.  If

3 you could, just take a moment to read this part of the

4 conversation.

5 A    Yes.

6 Q    And based on your knowledge of the history and the

7 events in the region, do you have an opinion as to

8 what's being discussed by the conversants here?

9 A    I do.  I would say it also makes slightly more

10 sense to me in the context of what precedes on 732

11 where the phrases about imprisonment.  And also,

12 deporting somebody suggests to me strongly that we're

13 talking about Omar Hammami, the American jihadist.  He

14 was related to Sheikh Abu Mansur.  First of all, he

15 appeared in public with him and accompanied him most of

16 the time and was considered to be protected by him.

17      He was also, to the best of my knowledge, married

18 to a woman from not a subclan, but from the general

19 clan of Abu Mansur.  Therefore, related could also mean

20 by marriage.  That's referred to below:  They are

21 always together.

22      Again, that confirms that assessment on my part.

23 So I believe this discussion is referring to Omar

24 Hammami.

25 Q    If you could, continue reading on the next two

Bryden - Direct by Ms. Atiyeh

1   pages, pages 31 and 32 or 735 and 736, the section

2   beginning, And they want to replace the Sheikh.  You

3   mean Sheikh Abu Zabeyr?

4         And then continuing on the same page, Should the

5   leadership be given to someone who is seeking it?

6         Continuing on to the next page, That is Sheikh

7   Ayman's decision.

8         Just take a moment to read that part of the

9   conversation.

10  A    Yes.

11  Q    Based on your knowledge of events and the history

12  of the region, do you have an opinion as to what's

13  being discussed here?

14  A    Yes.  I think it's quite clear.  They want to

15  replace the sheikh is a reference to -- subsequently

16  Sheikh Abu Zubeyr, meaning that they want to replace

17  the emir of al-Shabaab.  Do Abu Mansur, Omar Hammami,

18  and the dissident group want to replace him?

19        The question as to whether they should be allowed

20  to do that, the reference to that as Sheikh Ayman's

21  decision, the only possible or perhaps the only

22  interpretation of that that makes any sense to me is

23  that's Ayman al-Zawahiri, the emir of al-Qaeda.

24  Because no other authority would be able to decide who

25  should be the emir of al-Shabaab and given that

1  al-Shabaab by then was declared an affiliate of

2  al-Qaeda and this seems to be suggesting that whether

3  or not Godane remains emir is a decision for al-Qaeda

4  to take and not for the dissident group or any other

5  members of al-Shabaab.

6        MS. ATIYEH:  If we could, give the witness

7  Government Exhibit 159.  We're actually going to talk

8  about 159, 160, 161, and 163 together.  So if you want

9  to pull all of those at once.

10       THE COURT:  Let's take a short break.

11       MS. ATIYEH:  Okay.  Thank you, Your Honor.

12       THE COURT:  All right.  We'll stand in

13  recess.

14    (Recess from 3:22 p.m. until 3:37 p.m.)

15       THE COURT:  Mr. Bryden, you remain under

16  oath.

17       Ms. Atiyeh.

18  BY MS. ATIYEH:

19  Q    Sir, I believe we've just handed you Government's

20  Exhibits 159 through 163.  Have you had the opportunity

21  to familiarize yourself with these exhibits?

22  A    I have not looked at them during the recess.  If I

23  could just take a moment.

24  Q    Could you take a moment then, please.

25  A    Yes.

1  Q    Each of these five exhibits is a transcript, each

2  of which has the date June 22, 2013?

3  A    That's right.

4  Q    And the participants are listed as five

5  individuals who are the same on each transcript?

6  A    Yes.

7         MS. ATIYEH:  I'd move Government's

8  Exhibits 159 through 163 in.

9         THE COURT:  All right.  Over objection, the

10  Court will admit 159 through 163 for the purposes of

11  this witness' testimony.

12  BY MS. ATIYEH:

13  Q    Let's begin with Exhibit 159 here.  If you could,

14  take a look on pages 2 and 3, the section in which the

15  participant identified as Ayan is speaking on these two

16  pages.  Just take a moment to read through that,

17  please.

18  A    Yes, pages 2 and 3.

19  Q    Mr. Bryden, based on your expertise in the subject

20  matter and the history and politics of the region, do

21  you have any opinions that you have drawn about the

22  location and the political ideology of the speaker

23  identified as Ayan here?

24         MS. MINTER:  Objection, Your Honor.  It calls

25  for speculation.

1        THE COURT:  I'll let him answer.

2   A    Based on just what I see on pages 2 and 3, the

3   speaker appears to be locating herself in parts of

4   Somalia under the control of al-Shabaab as she says the

5   Islamic provinces continue to function.  That's a

6   reference to what al-Shabaab would call Wilaayadka, the

7   Islamic government.  Wilaayadka is W-I-L-A-A-Y-A-D-K-A.

8        In these areas that -- their interpretation of

9   Sharia law is being implemented because people are

10  being whipped, lashed for consumption of alcohol and

11  hashish.  So at that time, there were -- the areas

12  controlled by al-Shabaab were getting smaller.  They

13  had lost a considerable territory to the combination of

14  government forces, African Union forces.  From this,

15  it's not possible to say exactly where in Somalia, but

16  it would be one of a shrinking number of areas where

17  she could be based.

18       And speaking from -- and since there were no other

19  groups in Somalia at that time applying this form of

20  Sharia law or describing themselves as Islamic

21  provinces, I think it's fairly clear that she's

22  aligning herself with al-Shabaab.

23  Q    Could you take a moment and turn to page 4, the

24  fourth page of that transcript, and read the next

25  paragraph, the speaker identified as Ayan.

1  A    Yes.

2  Q    Based on everything we've discussed, have you

3  formed an opinion as to what Ayan is continuing to

4  speak about here?

5  A    Well, I think this confirms what I've said

6  previously, that she appears to be equating the

7  practice of Sharia law with, as she puts it, a boy

8  turning himself into a martyr.  I interpret that to be

9  a suicide bomber.  She also, therefore, equates it with

10  the picking up of a gun so she can join the struggle or

11  turning herself into a bomb.  Again, this is consistent

12  with no other group in Somalia except al-Shabaab.  I

13  don't think it's reasonable to interpret her

14  affiliation any other way based on how she positions

15  herself in this conversation.

16  Q    If you could, move on to Government's Exhibit 160.

17         MS. MINTER:  Your Honor, we would raise the

18  same objection.  And given the posture of the witness,

19  I would submit that a hearsay objection would also be

20  proper if the Court would include that in our ongoing

21  objections.

22         THE COURT:  All right.  Over objection, I've

23  admitted 159-163 for the purposes of this witness'

24  opinions.

25  BY MS. ATIYEH:

1  Q    If I could direct your attention starting at the

2  bottom of page 2 there, How is the situation at the

3  small town.

4      And then continuing on to page 3, and on page 3,

5  there's some discussion about the clarity of the call.

6  So then let's just take a moment to read that and then

7  perhaps move on to the fourth page as well and read

8  those three pages and take a moment to familiarize

9  yourself with the context.

10      Mr. Bryden, have you had a chance to read it?

11  A    Yes, I have.

12  Q    Based on your knowledge of the subject matter, do

13  you have an opinion as to what's being discussed here?

14  A    Yes.  Given the time frame and the contents of the

15  discussion, this seems to be a reference to the

16  leadership dispute within al-Shabaab that was coming to

17  a head in June 2013 and in which the final purge of

18  Godane's rivals within the movement took place.

19      So I think the references here are quite clear.

20  The situation of the small town isn't precise.

21  Al-Shabaab at that point had established its

22  headquarters in the town of Baraawe to the south of

23  Mogadishu.  Although, it also controlled several other

24  towns in that area.  So, of course, it could relate to

25  another place.

Bryden - Direct by Ms. Atiyeh

1      But one of the speakers identified as Ismahaan
2   asks about -- oh, no.  I apologize.  I've just lost my
3   place.  There's a reference here to the two groups.
4   Yes.  It is Ismahaan.  The breakaway group which is
5   troubling the public, again, the dissident group.  The
6   discussion then goes on to cover what are believed by
7   the speakers to be the sources of the disputes.
8      Now, there are references in this discussion to
9   people losing their positions, and what had become
10  clear through the public pronouncements of the
11  dissident group is that one of their grievances related
12  to the suspension and the dissolving of the shura of
13  al-Shabaab and that Godane was rewarding his loyalists
14  with positions and with resources.
15     And so this discussion about people being removed
16  from their positions would be consistent with the
17  public statements that members of the dissident group
18  and the -- at one time, the mediator, Abu Zubayr
19  al-Muhajir, had also made about the dispute.
20     So yes, in my assessment, it would relate to those
21  developments.
22  Q    If you could, go on to take a look at pages 5 and
23  6 and take a moment to read those sections beginning on
24  the last paragraph of page 5 and continuing on to
25  page 6.

Bryden - Direct by Ms. Atiyeh

1  A     Yes.

2  Q     You see on the bottom of page 5 there the word

3  "fatwa."  What is a fatwa?

4  A     Well, as it says here, it's a religious edict.

5  It's, in a sense, a judgment that is handed down and is

6  considered binding.

7  Q     Based on your knowledge of the subject matter, do

8  you have an opinion as to what's being discussed here?

9  A     I do.  There are several issues that are being

10 combined here in this part of the discussion.

11      The first, the reference to a fatwa, whether or

12 not it actually relates to an actual fatwa or whether

13 it relates to a decree, as it were, of the emir.  There

14 were several decisions that the groups -- or

15 announcements that both groups made during the course

16 of the dispute about what was legitimate and what

17 wasn't legitimate.

18      Godane had issued a decree, perhaps what he

19 considered to be a fatwa -- but this would have been

20 prior to this particular moment -- saying that any

21 opposition to his leadership, any attempt to form a new

22 group, whether armed or unarmed, under al-Shabaab

23 during this period would be considered illegal and

24 punishable by death.

25      At the same time, the dissident group -- or

Bryden - Direct by Ms. Atiyeh

1  shortly thereafter, early 2013, prior to this date, the

2  dissident group had issued what they considered a fatwa

3  of their own saying that members of al-Shabaab who

4  received illegal orders from the emir were not bound to

5  follow them and that applied to actions like the

6  killing of civilians.

7      So both groups were issuing fatwas, and it's not

8  clear in this context which of these fatwa or decrees

9  they were relating to.

10      They then discuss an issue of arrest and

11  resistance to arrest.  And, again, during this period,

12  Godane's group ordered the arrest of Omar Hammami and

13  his associates and ordered them to appear before an

14  al-Shabaab court.

15      Now, the dissident group had accused Godane of

16  having taken control of the al-Shabaab courts -- so

17  they couldn't be considered independent -- and refused

18  to stand trial before an al-Shabaab court.  So Hammami

19  and his associates argued that they would only appear

20  in court if they were armed.  That, then, led to a

21  clash which meant that they actually escaped and were

22  not brought before a court.

23      And here, as you can see, that there was a

24  physical confrontation.  It was decided they should be

25  brought before a court of law but that some of them had

1  escaped.  To my reading, this relates to these

2  developments in which Hammami's group initially

3  resisted arrest and then fought with Godane's forces

4  and escaped.

5       Then I see also on page 6 mention of the spoils of

6  war, which I understand relates to the Islamic concept

7  of ghanima or spoils of war.  And one of the other open

8  and public allegations of the dissident group was that

9  Godane was taking the spoils of war and distributing

10 them unfairly to his loyalists and not to al-Shabaab as

11 a whole as a movement.

12      So all of the issues that are raised in these

13 discussions are consistent with the nature of the

14 dispute that was by now in the public domain within

15 al-Shabaab.

16 Q    Could you direct your attention to the next page,

17 page 7.  Take a moment to read this page, please.

18 A    Yes.

19 Q    Based on your knowledge of the subject matter, do

20 you have an opinion as to what continues to be

21 discussed here?

22 A    It seems to me to be a continuation of the same

23 discussion about why this group has resisted being

24 brought before court and questioning why they lack

25 confidence in the Islamic court.

1      Clearly, the speaker identified as Ayan is

2  implying that the court itself is legitimate, that the

3  leader is right in his positioning.  I would say I

4  interpret her statement I don't have confidence in such

5  a leader, then it means I don't have confidence in the

6  Islamic judicial system and God's book, and such a

7  person should not be around you.

8      It would suggest that, essentially, the leader's

9  words should be taken as the word of God and is

10 unquestionable.  So she very firmly places herself in

11 what I would assess to be Godane's camp in this

12 dispute.

13      MS. ATIYEH:  If we could move on and maybe

14 put pages 8 and 9 up side-by-side.

15 BY MS. ATIYEH:

16 Q    Take a moment to look at the section at the bottom

17 of page 8 where Ayan begins speaking to Sister Ifrah

18 and then continuing on to the next page.

19      Mr. Bryden, based on your knowledge of the subject

20 matter, do you have an opinion as to what the speakers

21 are referring to when they use the phrase "martyrdom

22 operations"?

23 A    Yes.  Martyrdom operations are suicide operations.

24 They take different forms, sometimes suicide bombing

25 and sometimes complex attacks involving suicide gunmen

Bryden - Direct by Ms. Atiyeh

1    or infantry.

2    Q    If we could, move on to Government Exhibit 161.

3            MS. ATIYEH:  Your Honor, just briefly, we had

4    moved in Government's Exhibit 159 through 163, and

5    Ms. Minter had asked me to clarify that all five of

6    those exhibits were moved in.

7            THE COURT:  Yes, they are.

8            MS. MINTER:  And subject to our objection.

9            THE COURT:  Overruled.

10   BY MS. ATIYEH:

11   Q    Could you take a look at the first page of

12   Government's Exhibit 161.

13   A    Yes.

14   Q    Have you had a moment to read it?

15   A    Yes, I have.

16   Q    Based on your knowledge of the subject matter, do

17   you have an opinion as to what the speakers are

18   discussing here in this section?

19   A    Yes.  Again, it seems to me to be a continuation

20   of the same discussion but now moving on to some other

21   issues.  There are a couple of references that suggest

22   how to deal with a group of dissidents.  At the very

23   least, they should not be released because there's a

24   risk that they may defect and share their secrets with

25   the enemy, which at that time was a concern for

Bryden - Direct by Ms. Atiyeh

1  al-Shabaab because there had been some high-level

2  defections and where -- for example, one of the leaders

3  of the Galgala Shabaab had defected and was considered

4  to have shared his secrets with the government and its

5  partners.

6       And as Ayan says in the middle of the page, some

7  who effectively took part in the operations are now

8  riding in cars with the infidels causing Muslims to be

9  killed.

10      It was believed and, I think, has been established

11 that there was a practice that the Somali Intelligence

12 Services were taking former al-Shabaab members and

13 having them ride around Mogadishu pointing out members

14 of al-Shabaab so they could be arrested.  And so this

15 seems to be a reference to facts that were known at the

16 time and certainly were known to me and other analysts.

17      Then the discussion moves on to Twitter.  Again,

18 Twitter almost certainly relates to Omar Hammami who

19 was, as far as I know, the only identified member of

20 al-Shabaab publicly or openly on Twitter and who did

21 speak to journalists.  I don't believe that, as

22 referred to here, he spoke to CNN, but he did speak to

23 other American news outlets.  So in my view, that's

24 simply confusion.  He certainly was a man with long

25 hair who was hiding out in the forest.  That seems to

1  be a description of him that is frequently used.

2      I've read at various times Omar Hammami's Twitter

3  feed and seen him refer to Godane by his proper name,

4  which in my assessment is causing some offense to Ayan

5  in this conversation.  Although, by this time, Godane's

6  real name was known to everybody, and I don't think he

7  was -- there was any widespread belief that Sheikh

8  Mukhtar Abdirahman Abu Zubeyr actually existed other

9  than as Godane himself.

10      So that's my assessment of the first page.

11 Q    If you could, move on and take a look at pages 2

12 and 3.

13 A    Yes.

14 Q    Have you formed an opinion as to what's being

15 discussed in this section of the transcript?

16 A    It seems to confirm my prior assessment in that

17 Ayan clearly states that there have been negotiations

18 with these men, as she calls them, for eight months.

19 So there's been an ongoing discussion with the

20 dissident group, that she has personally been involved

21 in these discussions.

22      And then, as she subsequently says, this

23 long-haired man -- so, again, I believe that refers to

24 Omar Hammami -- and the top leaders were both removed

25 from the shura council.  There, again, that would

1   appear to confirm that this relates to the leaders of

2   al-Shabaab and to the dispute that we've been referring

3   to, the shura council, the dissolution of the council,

4   and the grievances of the key leaders who lost their

5   positions.  So I think it just confirms that

6   understanding.

7       And I think it's worthy of note that if Ayan is in

8   a position to say, I personally talked to them, then

9   that places her in a position of some influence within

10  the Godane faction of al-Shabaab during the course of

11  these negotiations.

12  Q    If you could, go ahead and turn to Government's

13  Exhibit 162.

14  A    Yes.

15  Q    If you could, take a look at maybe halfway down

16  page 1 and then on to pages 2 and 3.  Take a moment to

17  familiarize yourself, again, with this transcript.

18  A    Yes.

19  Q    Again, based on your knowledge of the subject

20  matter, do you have an opinion as to what's being

21  discussed in this section of the conversation?

22  A    Well, they are in some ways repeating but also

23  somewhat enlarging on the same grievances, the same

24  sources of dispute within the group, which, again, were

25  some of those that were publicly known at the time.

Bryden - Direct by Ms. Atiyeh

1      Ayan refers to, on page 1, a dispute over those

2  who want to establish another front and not limit the

3  jihad.  That was a source of ongoing tension within the

4  movement, but the foreign fighters -- some of the

5  foreign fighters wanted to expand al-Shabaab's jihad

6  more rapidly beyond Somalia's borders than Godane did.

7      At that point, whether that was a serious source

8  of dispute, I think, is in question because al-Shabaab

9  had been fighting outside Somalia since 2010.  So

10  Godane had not limited the jihad to Somalia itself.  It

11  had started operations three years earlier and

12  continued.

13      She then goes on to discuss other grievances, and

14  again, those who are arrested for spying, one of the

15  grievances that was raised by al-Afghani in his letter

16  was that members of al-Shabaab were being arbitrarily

17  arrested and kept in secret prisons or tried by,

18  essentially, kangaroo courts, that there was no due

19  process within the movement.  So designation of someone

20  as a spy could not be taken at face value.  There

21  needed to be some kind of internal judicial process at

22  which he accused of Godane denying.

23      Then, lastly, the question of positions comes up

24  again and key people being angry because they'd left

25  the shura council.

1    So, again, all in all, given what was happening in

2  Somalia at the time, given that there was no other

3  group that referred to it in these terms, I can only

4  conclude this is a discussion about the disputes within

5  al-Shabaab.

6  Q    Just briefly, do you have any opinion on the

7  letter publisher described at the bottom of page 3

8  there?

9  A    The letter publisher, that's -- I can't conclude

10  who that is.  It could be either Ibrahim al-Afghani, or

11  it could be Abu Zubayr al-Muhajir, both of whom

12  published letters.  Or it could be someone who is

13  accused of having communicated this correspondence to

14  the outside world.  That would be my assessment.

15           MS. MINTER:  Your Honor, I would object to

16  speculation.

17           THE COURT:  Overruled.  I'll receive it.

18           MS. ATIYEH:  If we could, next pass the

19  witness Government's Exhibits 153 through 156.

20  BY MS. ATIYEH:

21  Q    If you could, just take a moment and review those

22  exhibits.

23    Have you had a moment to take a look at this?

24  A    To skim them, yes.

25  Q    Have you seen all of these documents before?

Bryden - Direct by Ms. Atiyeh

1  A    Yes, I have.

2  Q    And they're four transcripts of conversations that

3  are all dated May 30, 2013?

4  A    Two of the folders I have do not contain

5  transcripts.  They contain electronic media.

6  Q    We should be looking at 153, 154, 155, and 156

7  with none of the sub-exhibits for now, just the --

8  A    Yes.

9  Q    Okay.

10 A    Sorry.

11 Q    Those four exhibits, are they each transcripts of

12 conversations dated May 30, 2013?

13 A    Yes, they are.

14 Q    And the participants in each are identified in the

15 transcript as Muna O. Jama and Ayan Jama Warsame?

16 A    Yes.

17        MS. ATIYEH:  I'd move Government's

18 Exhibits 153 through 156 in.

19        MS. MINTER:  Same objections as to the

20 exhibits and the testimony.

21        THE COURT:  All right.  Over objection, these

22 will be admitted for the purposes of obtaining this

23 witness' opinions and assessments.

24 BY MS. ATIYEH:

25 Q    Could you take a look at Government's Exhibit 154,

1  please, and in particular, I direct your attention to

2  pages 2 and 3.

3  A    Yes.

4  Q    Mr. Bryden, based on your knowledge of the subject

5  matter, do you have an opinion as to what's being

6  discussed in this segment of this transcript?

7  A    There are a couple of issues.  One is a

8  reiteration, I think, by Ayan that the leader should,

9  essentially, not be questioned, and she refers to

10  Islamic history to make that point on page 2.

11      And then on page 3, there she seems to be making a

12  reference to -- well, she's disparaging those that she

13  disagrees with within the movement, and in particular,

14  she seems to be referring to what she calls some

15  high-profile troublemakers, those who came from the

16  same place:  They were nothing when they were in the

17  country with us, but when they came to the land of

18  Islam and jihad, they became somebody.

19      So she, essentially, seems to be saying that some

20  of the people causing trouble have returned to Somalia

21  from other countries, from outside, and that if they

22  had remained in those foreign countries, they would be

23  nothing.  They owe their positions to the fact they've

24  come back to join the jihad.

25      Now, that could relate to any number of the

1  al-Shabaab leadership, several of whom, including among

2  the dissidents, but in particular Ibrahim Haji Jama who

3  came back from the United States.  It could be Omar

4  Hammami; although, he is not a returnee.  They would

5  have been among those who returned to the country.  But

6  it's not clear beyond that description and the fact

7  that, again, she ties that to their arguments about

8  their positions, precisely whom she's referring to.

9  Q     Do you have an opinion as to who is being

10 referenced in this conversation when the speakers refer

11 to grandfather?  That's on both page 2 and page 3.

12 A     Yes.  I think on page 2 it's clearer than on

13 page 3.  Jama says, The grandfather is being opposed.

14 We do not say those names.  Only the grandfather, you

15 know.

16      I think this is a clear example of the veiled

17 speech that we were referring to earlier and a poor

18 example of it.  The grandfather is being opposed.  The

19 emir is being opposed, but we don't say that openly.

20 We refer to him as grandfather.

21      Then the next reference to grandfather is

22 consistent:  I'm blaming Muslims for the mess that he

23 created, blaming the head of the family, the

24 grandfather.

25      So again, suggesting that the head of the family

1   is the head of the Muslim family, which would relate to

2   al-Shabaab, while the others are aligned with the

3   infidels and the apostates, which she says previously

4   in the conversation.

5   Q    If you could, direct your attention to page 4 of

6   this exhibit just briefly and specifically to the

7   section where the speakers discuss a suitcase.

8   A    Yes.

9   Q    Based on your knowledge of events in the region,

10  do you have an opinion as to what the speakers are

11  discussing when they're referring to the suitcase?

12  A    Yes, I do.  Ayan describes this as a suitcase

13  carrying four big things that are meant to kill people,

14  that it came to us here, and it came down without

15  touching anything.

16      Prior to this discussion, there had been an

17  unmanned aerial vehicle that came down in the lower

18  Shebelle region.  I forgot the precise location.  In

19  that particular instance, al-Shabaab seized the vehicle

20  and publicized the fact that it had been brought down

21  claiming to have brought it down.  It was not -- as far

22  as I know, it wasn't actually an armed drone.  It was

23  an unarmed surveillance drone, but it was in the media

24  at this time.  And I think it's reasonable to conclude

25  that this is a reference to what was being reported

Bryden - Direct by Ms. Atiyeh

1  about a drone having been brought down by al-Shabaab.

2  Q    If we could, go on to Government's Exhibit 155,

3  and if you could, take a look at pages 1 and 2 of this

4  conversation.

5  A    Yes.

6  Q    Based on your knowledge of the subject matter, do

7  you have an opinion as to what's being discussed here

8  again?

9  A    I think this is a continuation, the same

10 arguments.  At this stage, it's become sort of a

11 dogmatic discussion of, in a sense, anybody who is not

12 part of the effort is being dismissed for various

13 reasons.  They're trying to hold on to a position in

14 the movement makes you akin to being an apostate who's

15 looking perhaps for a position in government or for

16 money.  Some of those that Ayan is dismissing, it's

17 because they have never fired a bullet, are not true

18 jihadists, not true fighters.  So it's simply a

19 continuation deploying more and more argument about why

20 any dissidents within the group are lacking merit.

21 Q    If you could, go on and take a look over page 4 of

22 this transcript.

23     Based on your knowledge of the subject matter, do

24 you have an opinion as to what's being discussed in

25 this segment of the transcript?

Bryden - Direct by Ms. Atiyeh

1  A    Yes.  There are several references here that I

2  recognize.  First, the continuation of the discussion

3  of the rift within al-Shabaab and that grandfather, or

4  Godane, is being accused of being some kind of dictator

5  with Jama saying that he's not a dictator.

6       There are references to Sheikh Hassan.  The only

7  Sheikh Hassan that I'm familiar with is Sheikh Hassan

8  who has consistently aligned himself with the Godane

9  faction and -- or he consistently did until after the

10 events covered in this trial where he took another

11 position.

12      Jama refers to Sheikh Fuad and to other men such

13 as so-and-so Karate opposing the leadership of

14 grandfather.  Now, Sheikh Fuad appears to be a

15 reference to Sheikh Fuad Shongole, one of the Shabaab

16 leaders, and Karate is a reference to Sheikh Mahad

17 Karate, who was the deputy emir of al-Shabaab and who

18 remained loyal to Godane throughout the rift.

19      So in the next line, it makes sense to me that

20 Ayan says, Not Fuad, but the other man -- the other man

21 she told you about, which the previous paragraph is to

22 Karate -- is my teacher.  There is no problem with that

23 man.

24      So Karate remained the deputy emir.  He had

25 previously held the position of leader of the Amniyat,

1 the intelligence and special operations part of

2 al-Shabaab.  So she seems to be, again, further

3 describing on which side each of these individuals has

4 come down during the dispute within the movement.

5 Q    If you could, go on and direct your attention to

6 the bottom of page 5 and onto page 6, the section where

7 Ayan says, Any man who talks from a distance and makes

8 the infidels happy, starting there.

9 A    Yes.

10 Q    Based on your knowledge of events in the region,

11 do you have an opinion as to what's being discussed

12 here?

13 A    Yes.  This seems to be, I think quite clearly, a

14 criticism of, in particular, Ibrahim al-Afghani, and

15 it's perhaps best understood reading backwards

16 beginning with where Jama says, The one who wrote the

17 letters, the one who scribbled on a letter and is

18 calling out those in the mountains, who was previously

19 in charge of the big town, the big town that is in

20 contention now.

21     I understand that to be a reference to the town of

22 Kismaayo which by this time has been taken from

23 al-Shabaab, and al-Shabaab forces are around the

24 outskirts of the town fighting with the Kenyans and

25 with the local forces that now hold it.

1      And the one who had been in charge of the town was

2  Ibrahim al-Afghani under the name of Abu Bakr

3  al-Zaylai, who had been briefly the mayor of Kismaayo.

4  He's also the one who has written a letter calling out

5  to those in the mountains or to what Jama calls a

6  faraway place beyond the mountains.

7      Again, my interpretation is that this is a

8  reference to al-Afghani's letter to al-Qaeda, to Ayman

9  al-Zawahiri, and the fact that he has called upon

10  al-Zawahiri's intervention to resolve the dispute

11  within al-Shabaab.

12      And interestingly, then Jama says, Why did they

13  not just sit down and discuss the issues and have the

14  book of God be their judge, why did these two factions

15  not discuss?

16      Ayan says, They have a short and simple line of

17  communicating with the people in the mountain that the

18  infidels cannot find out.  Why did they not use it?

19      This is suggesting if Ibrahim al-Afghani had

20  wanted to, he could have actually directly contacted

21  the al-Qaeda leadership directly instead of writing an

22  open letter.

23          MS. ATIYEH:  Could we show the witness

24  Government's Exhibit 167, please.

25  BY MS. ATIYEH:

Bryden - Direct by Ms. Atiyeh

1  Q    Do you have that in front of you?

2  A    Yes, I do.

3  Q    Have you seen this document before?

4  A    Yes, I have.

5  Q    It's a transcript of a conversation dated

6  September 12, 2013?

7  A    Yes.

8          MS. ATIYEH:  I'd move Government's Exhibit

9  167 into evidence.

10         THE COURT:  Over objection, 167 will be

11  admitted for the purposes of this witness' testimony.

12         MS. MINTER:  Your Honor, just for clarity, we

13  don't object to the admissibility as a general matter

14  with respect to this transcript.

15         THE COURT:  All right.

16         MS. MINTER:  We would object to the witness'

17  testimony.

18         THE COURT:  All right.  Without objection,

19  Exhibit 167 is admitted.

20  BY MS. ATIYEH:

21  Q    If you could, just direct your attention to page 1

22  and the discussion of websites and, in particular,

23  Halgan website and the website they created.

24  A    Yes.

25  Q    Just based on your experience, do you have an

Bryden - Direct by Ms. Atiyeh

1  opinion on what's being discussed here?

2  A    I know Halgan website as a website that is

3  affiliated with or expresses, generally, the views of

4  al I'tisaam.

5  Q    Then going on to pages -- well, the bottom of

6  page 2 and going on to page 3.  Could you take a look

7  at the section beginning, The man who goes by the name

8  of Abdiwahid who has his own website.

9       And then the things on page 3 that they're

10 relating that he posted.

11 A    Yes.

12 Q    Do you have an opinion as to what's being

13 discussed here?

14 A    They seem to just be criticizing the use of

15 terminology like the use of the term "ex" and then the

16 name that begins with "SH," ex-Shabaab, people who left

17 al-Shabaab.  They're critical of the use of this

18 terminology.  I'm questioning what purpose it serves.

19 Q    Going to the bottom of that page, Ms. Dhirane is

20 referring to an individual saying that he is no longer

21 associated with the name that begins with SH or the

22 umbrella name that begins with Q.  Do you have any

23 opinion as to what that's referring to?

24 A    Again, in the context of -- yes.  Of discussions

25 about al-Shabaab by these participants and the name

Bryden - Direct by Ms. Atiyeh

1  that begins with SH being al-Shabaab; the umbrella name

2  being the parent organization that al-Shabaab has

3  previously, the year before, associated itself with

4  officially being al-Qaeda.

5  Q    Going on to page 4, there's some discussion in

6  particular at the bottom of the page about shura

7  positions being taken away.  Do you have an opinion as

8  to what's being discussed here?

9  A    A repetition of the previous discussion that I

10  cannot assess who they're talking about, but one of the

11  previous Shabaab leaders who has lost his position and

12  is, therefore, critical of the Shabaab leadership.

13  Q    Could you take a look at page 6 where the speaker

14  identified as Ms. Jama saying, Oh, God, do not let us

15  squander our eternal destiny.

16      I'm just looking down to the next couple of lines

17  there.  If you could, take a moment just to read that.

18  A    Yes.

19  Q    Do you have any opinions as to what's being

20  discussed there?

21  A    Well, it seems to me to be an absolutist argument

22  that all of the disputes within al-Shabaab are

23  nonsensical because the ultimate aim of the Muja head

24  is to die.  So it doesn't matter whether you're killed

25  by a non-Muslim or whether you are unjustly killed by a

Bryden - Direct by Ms. Atiyeh

1  member of another Muslim group, you will go to heaven.

2  So why all of this infighting?  Why not just commit

3  yourself to the goal of martyrdom and get killed?

4  Q    Going on to page 7 and, in particular, at the

5  bottom of page 7, there's discussion here:  That one

6  was guiding them, and I don't know whether he, too, was

7  killed, and then a discussion of three foreigners who

8  were in a picture together.

9  A    Yes.

10 Q    Are you familiar with what's being discussed

11 there?

12 A    I believe I am.

13 Q    Do you have an opinion on it?

14 A    Well, because of the context here and, again, the

15 reference to hiding in the jungle.  There was a widely

16 circulated picture of Omar Hammami together with two

17 other foreign fighters who were identified by their

18 kunyas.  One is al-Britani and one is al-Masri, Khattab

19 al-Masri.  Khattab al-Masri, K-H-A-T-T-A-B, and then

20 al-Masri A-L hyphen M-A-S-R-I.  This picture was widely

21 circulated.  I'm not aware of another al-Shabaab

22 picture showing three foreign fighters in the same

23 frame.

24 Q    They're referencing someone being killed here.  Do

25 you have any opinion as to what's being discussed?

Bryden - Direct by Ms. Atiyeh

1  A    I'm sorry?  Where am I looking on the page?

2  Q    At the beginning of the page, they say they are

3  reporting that he was captured, and then going on, that

4  one that was guiding him, he may have been killed.

5  A    Well, given the time frame, this is when it was

6  reported that Omar Hammami had been finally killed

7  after several alleged attempts.  And so given the

8  context that the picture that's being referred to, this

9  would appear to be reaction to reports of Hammami's

10  death.

11          MS. ATIYEH:  If we could, show the witness

12  Government's Exhibit 166.

13          MS. MINTER:  Your Honor, just to be clear on

14  167 because I don't think the Court has the formal

15  stipulations.  We're stipulating to the admissibility

16  but not to the identity of the speakers.

17          THE COURT:  All right.

18  BY MS. ATIYEH:

19  Q    Do you have that in front of you now?

20  A    Yes, I do.

21  Q    Have you seen this exhibit before?

22  A    Yes, I have.

23  Q    Is it the transcript of a conversation dated

24  July 14, 2013?

25  A    Yes, it is.

1          MS. ATIYEH:  I'd move Government's

2    Exhibit 166 into evidence.

3          THE COURT:  All right.

4          MS. MINTER:  The same objections, Your Honor.

5          THE COURT:  All right.  Over objection, the

6    Court will admit this exhibit for the purposes of this

7    witness' opinions.

8          MS. ATIYEH:  If we could, just put up pages 1

9    and 2 side-by-side.

10   BY MS. ATIYEH:

11   Q    And if you could, just take a look.  This is a

12   fairly short transcript.  Read through it briefly.

13   A    Yes.

14   Q    Do you have an opinion as to what's being

15   discussed here?

16   A    All right.  Well, given the time frame, the

17   reference to the oldest guy in the family has been

18   arrested, this seems to be a reference to Hassan Dahir

19   Aweys who -- during the incidents in the previous month

20   when al-Afghani and other dissidents were killed,

21   Hassan Dahir Aweys escaped from Baraawe and traveled by

22   sea to central Somalia where he turned himself in to

23   the local authorities and was then subsequently handed

24   over to the Transitional Federal Government or the

25   Somalia federal government.

Bryden - Direct by Ms. Atiyeh

1    So this appears to be a reference to his finally

2 having been arrested, and that's been reported, again,

3 in the media.

4 Q    And just going on to the bottom of page 2 where

5 the speaker identified as Dhirane says, I heard they

6 were appeasing the two that left and those who were

7 hiding in the jungle, including the white guy with the

8 long hair.

9    Do you have an opinion as to what's being

10 referenced there?

11 A    Well, the white guy with the long hair, again, it

12 seems to be a clear reference to Hammami.

13    The two that left, it's less precise but in the

14 context, I think, again, the two leaders who were

15 killed at the same time.  Al-Afghani and Ma'alim Burhan

16 seem to be most likely references here.

17 Q    So to be clear, what eventually happens to Ma'alim

18 Burhan and al-Afghani?

19 A    They were executed by Godane's faction.

20 Q    If we could, go to Government's Exhibit 116,

21 please.

22         THE COURT:  Which exhibit?

23         MS. ATIYEH:  Exhibit 116.

24         MS. MINTER:  Same objection as to the exhibit

25 and the testimony, Your Honor.

Bryden - Direct by Ms. Atiyeh

1          THE COURT:  All right.  Over objection, it

2   will be admitted for the purposes of this testimony.

3   BY MS. ATIYEH:

4   Q    Do you have that in front of you?

5   A    Yes, I do.

6   Q    And is this a document you're familiar with?

7   A    Yes, it is.

8   Q    It's a transcript of a conversation dated

9   January 21, 2013?

10  A    2013?

11  Q    2013 is what I have.

12  A    Yes.

13          MS. ATIYEH:  I'd move Government's

14  Exhibit 116 into evidence.

15          THE COURT:  It's admitted.

16  BY MS. ATIYEH:

17  Q    If you could, take a look, Mr. Bryden, at page 2

18  to begin the conversation at the beginning of page 2

19  referring to the people in the east or, as you know, on

20  the mountains.

21  A    Yes.

22  Q    Based on your familiarity with this conversation

23  and with the surrounding events, do you have an opinion

24  as to what's being discussed in this section of the

25  transcript?

1  A    Yes.  The east, again, the northeast in Somalia,

2  the mountains, the Golis Mountain range, our people,

3  al-Shabaab, it seems to be a reference to the

4  northeastern Shabaab group.

5          MS. ATIYEH:  Then we can put up page 3 next

6  to that.

7  BY MS. ATIYEH:

8  Q    Mr. Bryden, if you could, just take a look at the

9  discussion in the bottom of page 2 and then on to

10  page 3.

11  A    Yes.

12  Q    Do you have an opinion as to what's being

13  discussed here?

14  A    Yes, I do.

15  Q    What is that?

16  A    Well, the references to the white guy, again,

17  being Omar Hammami.  During the course of this

18  conversation, they seem to be saying he says that they

19  are the guys, they are Shabaab leadership, are the guys

20  behind the airplanes incident.  But there was dispute,

21  and so that Saleh Nabhan was caught there.  And the

22  other one, the other guy whose book we read.  And then

23  subsequently she says the one that was a loner, the one

24  of the control area, he suspects the brothers were

25  behind it.

1    So Hammami, in his allegations against the Shabaab

2    leadership, accused or implied that because Godane's

3    faction was suspicious of the foreign fighters, that it

4    had played a role in arranging the deaths of two key

5    al-Qaeda figures, one mentioned here by name, Saleh

6    Nabhan, and the other one is not mentioned by name.

7        The guy whose book we read of the control area.

8    It seems to me to be a reference to Harun Fazul --

9    H-A-R-U-N, second name, F-A-Z-U-L -- who also goes by

10   the name Fazul Abdallah Mohammed -- Abdallah,

11   A-B-D-A-L-L-A-H -- who was also killed in a shootout at

12   the Ex-control area on the road from Mogadishu to

13   Afgooye and whose diary had been published online,

14   which appears to be a reference to the book we read.

15       In fact, the killing of these two senior figures

16   was one of the real concerns that Ibrahim al-Afghani

17   and Omar Hammami and others had, was that the foreign

18   fighters were now at risk because Godane's faction was

19   having them killed off.  That is what this discussion

20   appears to be about.

21       MS. ATIYEH:  Give Government's Exhibit 152 to

22   the witness, please.

23       MS. MINTER:  Your Honor, no objection as to

24   the admissibility subject to the stipulations.  We do

25   not stipulate to identity.

1          THE COURT:  All right.  Exhibit 152 is

2   admitted.

3   BY MS. ATIYEH:

4   Q    Mr. Bryden, this is a transcript of a conversation

5   dated May 8, 2013; is that right?

6   A    Yes, 8 May 2013.

7   Q    If you could, just take a --

8   A    Sorry.  Yes, 8 May 2013.

9   Q    If you could, just take a moment to read through

10  the transcript.  Again, it's a fairly short one.

11  A    Yes.

12  Q    Do you have an opinion as to what's being

13  discussed here?

14  A    Well, this seems to be a discussion of reports

15  that Omar Hammami has been killed, and that seems

16  fairly clear by the reference to Twitter and that he

17  was with a group of five foreigners when he was killed.

18          MS. ATIYEH:  If we could, give Government's

19  Exhibit 147 to the witness, 147.

20          MS. MINTER:  The same objections as to the

21  transcript and the testimony.

22          THE COURT:  All right.  Over objection, 147

23  is admitted.

24  BY MS. ATIYEH:

25  Q    Mr. Bryden, this is a transcript of a conversation

Bryden - Direct by Ms. Atiyeh

1  dated May 4, 2013; is that right?

2  A    That's right.

3        MS. ATIYEH:   The Court's indulgence, Your

4  Honor.   I think I have the wrong page number written

5  down.

6  BY MS. ATIYEH:

7  Q    There we go.   If you could, take a look at page 7,

8  please.

9  A    Yes.

10 Q    Perhaps going on to page 8 just a little ways.

11       Do you have an opinion as to what's being

12 discussed here?

13 A    This seems to be another reference to the

14 dissident group and particularly to the Omar Hammami

15 group and the very now public dispute between Hammami

16 and the al-Shabaab leadership and that Hammami was full

17 of bravado at the time in his Twitter feeds saying that

18 he wasn't afraid.

19       And there seems to be a reference also to the

20 prior attempt to arrest them, which they had resisted

21 and which they had escaped from, and that that

22 shouldn't be allowed to happen again.

23 Q    And if you could, just go on very briefly to

24 page 12 where there's a reference by the speaker

25 identified as Dhirane to the old man in the mountains,

1  the old man with the red beard.

2  A    Yes.

3  Q    Based on your knowledge of the subject matter, do

4  you have an opinion as to who's being referred to

5  there?

6  A    Well, given the reference to the mountains,

7  Abdulkadir Mumin, the sheikh who was heading al-Shabaab

8  at the time, is known for having an extremely long and

9  very well-hennaed red beard.  So it seems to me to be a

10 clear reference to Mumin.

11 Q    Just for background, is there a significance to

12 wearing henna in a beard?

13 A    That he's completed the Hajj, the pilgrimage to

14 Mecca.

15         MS. ATIYEH:  If we could, give the witness

16 Government's Exhibit 164, please.

17         MS. MINTER:  Same objection as to the exhibit

18 and the testimony.

19         THE COURT:  All right.  Over objection, it

20 will be admitted for the purposes of this witness'

21 opinions.

22 BY MS. ATIYEH:

23 Q    This is a transcript dated June 24, 2013; is that

24 right, Mr. Bryden?

25 A    Yes, that's right.

1  Q     And if you could, direct your attention to the

2  bottom of page 2 and on to page 3 and just take a

3  moment to read that section.

4  A     Yes.

5  Q     Do you have an opinion as to what's being

6  discussed here?

7  A     I do.  This seems to relate to a previous incident

8  in which al-Shabaab had discovered in the town of

9  Afgooye outside Mogadishu a weapons store, which it had

10 recovered and claimed.  And these weapons had

11 previously been the property of the Hizbul Islam party,

12 which is the jihadist faction established in 2009 by

13 Hassan Dahir Aweys.

14      When al-Shabaab sees these weapons, Aweys, who was

15 by then with al-Shabaab, claimed compensation from

16 Shabaab for the recovery of the weapons.  Although I

17 don't know the figures that were discussed, these

18 figures are consistent with what was circulated in the

19 media at that time.

20      So the suggestion here is that Hassan Dahir Aweys

21 had been paid off or sought to be paid off and cannot

22 be taken seriously as a leader because he is interested

23 in money.

24           MS. ATIYEH:  If we could, give the witness

25 Government's Exhibit 165.

1          MS. MINTER:  No objection to the

2   admissibility without stipulation to identity.

3          THE COURT:  All right.  165 will be admitted.

4   BY MS. ATIYEH:

5   Q    Mr. Bryden, this is the transcript of a

6   conversation dated June 24, 2013; is that right?

7   A    Yes.

8   Q    And just looking at the bottom of page 1, in

9   particular, a group called Hizbul Islam --

10  A    Yes.

11  Q    Do you have an opinion as to what's being

12  discussed in this part of the conversation?

13  A    Just on page 1 or --

14  Q    Going on to the next page to the extent that it's

15  relevant to the discussion.

16  A    Well, in combination, page 1 and page 2, the

17  suggestion that is being made here by Dhirane is that

18  when al-Shabaab proposed to capture Kismaayo in 2009,

19  that the group Hizbul Islam was formed under Hassan

20  Dahir Aweys' leadership and he returned to lead it and

21  then joined in an alliance with al-Shabaab to govern

22  the town of Kismaayo.  Afterwards, the two groups fell

23  out and fought with one another.

24      What is being implied here is that, in fact, the

25  formation of Hizbul Islam was some kind of trick to

1  deliberately enter into an alliance with and infiltrate

2  al-Shabaab in order to undermine its control of

3  Kismaayo at the time.

4       MS. ATIYEH:  Could we go to Government's

5  Exhibit 74, please.

6       THE COURT:  Exhibit 74 or 174?

7       MS. ATIYEH:  Exhibit 74.

8       MS. MINTER:  Your Honor, no objection to the

9  admissibility without stipulation as to the identity.

10       THE COURT:  All right.  Exhibit 74 is

11  admitted.

12       MS. MINTER:  Your Honor, I would object to

13  the extent that this and further transcripts involve

14  continued discussion of current events, that they're

15  not relevant if they simply involve discussion of

16  current events.

17       I would also say at this point it's becoming

18  cumulative.

19       THE COURT:  All right.  Over objection, I'll

20  admit Exhibit 74.

21       How much longer with this witness do we have?

22       MS. ATIYEH:  I have three pages left in my

23  outline, Your Honor.  Maybe another half an hour.

24       THE COURT:  And you've gone through two pages

25  already?

1          MS. ATIYEH:  Well, I have gone through 24

2    already but...

3          THE COURT:  All right.  Go ahead and proceed.

4    BY MS. ATIYEH:

5    Q    We're on Government's Exhibit 74.  If you could,

6    direct your attention to pages 5 and 6.

7    A    Yes.

8    Q    Do you have an opinion as to the subject matter of

9    this conversation?  And to the extent it's repetitive

10   of some of the conversations you've testified to

11   before, you may be able to shorten your testimony

12   somewhat for the Court.

13   A    Simply that it's back in time prior to the actual

14   purge of al-Shabaab's leadership.  It seems to be a

15   reference to Sheikh Hassan, the big cleric, that his

16   issue is now getting out of control, and that a faction

17   is forming with him, including Sheikh Fuad Shongole and

18   Sheikh Abu Mansur, who are both his supporters.  This

19   is a source of concern.

20         So this is a previous reference quite early before

21   these events really erupted fully into the public

22   domain.

23   Q    If you could, just go on to page 7 and take a

24   brief look at the discussion among the speakers about

25   camels, and, in particular, the discussion of camels

1 that are not recognizable and appear to be private.

2 A    Yes.

3 Q    Did you have an opinion as to whether this is

4 consistent with how camels are typically discussed in

5 Somali society?

6 A    I can't make sense of what this is supposed to

7 mean.  It certainly doesn't seem to be a sort of

8 standard discussion concerning camels and their

9 conventional uses and what it means that they would be

10 private because camels by definition are private

11 property.  Camels are private property.  They are owned

12 by individuals and families.

13 Q    If you could, just go on to page 8 very briefly

14 and take a look at the discussion of the tanks lined up

15 and the subject of conversation among the speakers

16 here.

17 A    Yes.

18 Q    Are you able to form an opinion as to the ideology

19 with which the speakers are aligning themselves here?

20 A    Well, they seem to be discussing either Somali

21 soldiers or members of another group who -- when I see

22 the phrase while they were being lectured by the silly

23 black guys, it probably refers to AMISOM soldiers and

24 instructors or, as they're known, mentors.  And they

25 were sitting all together with their vehicles fully

1   loaded so they made an easy target.  And then there is

2   a complaint that because they drive their armored

3   vehicles or their tanks over privately owned farms,

4   that they really are not in the interest of the people

5   and the people rise up against them.

6       So in that sense, it seems to be clearly aligned

7   with a group that is either antigovernment or

8   anti-African Union forces and not simply from a

9   ideological or philosophical perspective.

10      I say one bazooka would have been enough for all

11  of them, one rocket-propelled grenade.  I would say

12  aligned with armed opposition, and, therefore, with

13  al-Shabaab.

14          MS. ATIYEH:  If we could, give the witness

15  Government's Exhibit 157.

16          MS. MINTER:  No objection as to the

17  admissibility, Your Honor, subject to previous

18  conditions.  We would object to the identity.

19          THE COURT:  All right.  Exhibit 157 will be

20  admitted.

21  BY MS. ATIYEH:

22  Q    Mr. Bryden, do you have that in front of you?

23  A    Yes, I do.

24  Q    Is that a transcript dated May 4, 2013?

25          MS. MINTER:  And, Your Honor, I apologize.  I

Bryden - Direct by Ms. Atiyeh

1  would also add that any statements of other individuals

2  contained within this transcript would be hearsay if

3  they were submitted for the truth of the matter

4  asserted.

5          THE COURT:  All right.  The Court will take

6  that objection under advisement.

7  A    I have a date of May 30, 2013.

8  Q    Oh, I'm sorry.  I have the wrong transcript in

9  front of me.

10         Yes.  May 30, 2013?

11 A    Yes.

12 Q    Just very briefly, could you explain, if you take

13 a look at page 1, the bottom of page 1, what's being

14 discussed there.  Have you formed an opinion as to

15 that?

16 A    Yes.  This is in the period immediately prior to

17 the purge of the al-Shabaab dissident group.  It's a

18 reference to Ma'alim Burhan, which was a pseudonym for

19 one of the leaders of the dissident group.  And Dhirane

20 says, He is with the oldest man, the old man who wrote

21 the letter.  So a reference to Ibrahim al-Afghani.

22 Q    Then just briefly, going to the bottom of page 2,

23 there's a discussion of the other day there was a big

24 suitcase that God brought down to the ground.

25 A    Yes.

1  Q    Do you have an opinion as to what that is

2  reference to?

3  A    Only based on the previous reference to a suitcase

4  that this is likely to also be a reference to a drone.

5         MS. ATIYEH:  If we could, go to Government's

6  Exhibit 86.  If you could, give that to the witness,

7  86.

8         MS. MINTER:  Your Honor, no objection to the

9  admissibility but no stipulation, however, to the

10 identity of the speakers.

11        THE COURT:  All right.  It will be admitted

12 on that basis.

13        MS. ATIYEH:  Thank you, Your Honor.

14 BY MS. ATIYEH:

15 Q    Mr. Bryden, is this a transcript dated June 13,

16 2012?

17 A    Yes.

18 Q    If you could, just very briefly direct your

19 attention to page 2.  Based on current events in the

20 region and your knowledge of the subject matter, do you

21 have an opinion as to what's being discussed here when

22 the speaker identified as Dhirane says, Sheikh Hassan

23 is in prison and the fundraising is being held for him?

24 A    Yes.  I understand this to be a reference to

25 Sheikh Hassan Hussein, the pro-Shabaab idealogue in

Bryden - Direct by Ms. Atiyeh

1  Kenya who had been arrested earlier that week and was

2  being held by the Kenyan authorities.

3          MS. ATIYEH:  You can go ahead and take the

4  other transcript down now.

5  BY MS. ATIYEH:

6  Q    Are you familiar with an individual by the name of

7  Jamal Abdul Salam?

8  A    Yes, I am.

9  Q    Who is that?

10 A    Another al-Shabaab figure, an idealogue, who I

11 believe returned from the United Kingdom in 2010 and

12 became a public figure posing with al-Shabaab at public

13 ceremonies in Baraawe, widely posted on the Internet.

14     He was also involved in efforts by al-Shabaab to

15 enlist the support of clans in the lower Shebelle area

16 as Ansar or as militia supporters of al-Shabaab.

17 Q    Are you familiar with an individual by the name of

18 Bashir Gelle?

19 A    Yes, I am.

20 Q    Who is Bashir Gelle?

21 A    All I know of Bashir Gelle is that he came to the

22 attention of my team through the ISDAC forum and the

23 Dacwatu al-Tawhid forum, the Paltalk forum; that when

24 we were monitoring it, it was being used to solicit

25 funds for al-Shabaab.  But Bashir Gelle's name and

Bryden - Direct by Ms. Atiyeh

1  coordinates were given as a reference for where to send

2  the money.

3  Q     Are you familiar with an individual named Hassan

4  Haji or Hassan Haji Hanafi?

5  A     Yes, I am.

6  Q     Who is that?

7  A     He was a journalist who was accused of having

8  aligned himself with al-Shabaab, had been involved in

9  threatening and intimidating other journalists, and

10 eventually was implicated in the assassinations of a

11 number of Somali journalists and at some stage was

12 injured and went to Kenya for medical treatment where

13 he was arrested.  He was subsequently extradited to

14 Somalia for trial.

15 Q     Are you familiar with an individual named Xawo

16 Kiin Raage?

17 A     Only from testimony in previous trials, yes.

18 Q     When you say testimony in previous trials, do you

19 mean your own testimony?

20 A     No.  I mean from having listened to transcripts.

21 Q     What do you know about Xawo Kiin Raage?

22 A     That she was identified as the recipient of funds

23 by the defendants in that trial.

24 Q     Which trial was that?

25 A     Amina Ali.

1  Q    Are you familiar, in general, with some of the

2  terrorist attacks that have been attributed to

3  al-Shabaab or for which al-Shabaab has claimed

4  responsibility?

5  A    Yes, I am.

6  Q    Are you familiar with an individual named

7  Abdulkadir Nur Farah?

8  A    Yes, I am.

9  Q    Who is he?

10 A    He was a leading figure of, first, al-Ltihaad and

11 then subsequently of I'tisaam in Puntland, northeast

12 Somalia.

13         MS. ATIYEH:  If we could, show the witness

14 Government's Exhibit 8G1.

15 BY MS. ATIYEH:

16 Q    Have you seen this document before?

17 A    Yes, I have.

18 Q    Is it an example of contemporaneous media

19 reporting regarding Abdulkadir Nur Farah?

20 A    Yes, it is.

21         MS. ATIYEH:  I move Government's Exhibit 8G1

22 into evidence.

23         THE COURT:  Objection?

24         MS. MINTER:  Your Honor, subject to the

25 limitations of the stipulation, our understanding is

Bryden - Direct by Ms. Atiyeh

1  this was recovered pursuant to court-authorized

2  surveillance.

3            THE COURT:  All right.  Exhibit 8G1 will be

4  admitted.

5  BY MS. ATIYEH:

6  Q    Looking at this news article and also based on

7  your own knowledge of the event as it occurred, was

8  there some uncertainty as to who was responsible for

9  the assassination of Farah?

10 A    I wasn't privy to the actual investigation.  So in

11 terms of certainty, I can't say.  I know that it was

12 very much in dispute as to whether those who were

13 arrested and ultimately convicted were affiliated with

14 al-Shabaab or not.

15            MS. ATIYEH:  Could we show the witness

16 Government's Exhibit 122.

17            MS. MINTER:  No objection as to

18 admissibility, Your Honor.  We will reserve on the

19 identity of the speakers.

20            THE COURT:  All right.  When you say you

21 reserve on identity of the speakers, I take it that's

22 not part of the stipulation, that the speakers that are

23 named in the transcript are not, in fact, those

24 individuals.

25            MS. MINTER:  Correct, Your Honor.  They've

1  been referenced that way by the government, but we have

2  not stipulated that they are, in fact, the speakers.

3          THE COURT:  All right.

4  BY MS. ATIYEH:

5  Q    Just looking very generally at this transcript, do

6  you have an opinion as to the event that's being

7  discussed?

8  A    This is, I believe, clearly a reference to the

9  killing of Abdulkadir Nur Farah, who actually was

10 better known by his nickname Ga'amey, which is G-A

11 apostrophe A-M-E-Y.

12 Q    And if we could, go to Government's Exhibit 121.

13          MS. MINTER:  Your Honor, we would object

14 based on lack of foundation, speculation, and hearsay.

15          THE COURT:  What is 121?

16          MS. ATIYEH:  Exhibit 121 is a --

17          THE COURT:  All right.  Over objection, I'll

18 admit it for the purposes of this witness' opinions.

19 BY MS. ATIYEH:

20 Q    Do you have that in front of you, Mr. Bryden?

21 A    Yes, I do.

22 Q    Do you have an opinion, generally, again, as to

23 the subject matter as far as the events that are being

24 discussed in the conversation?

25 A    I do.  I see, again, a reference to the killing of

Bryden - Direct by Ms. Atiyeh

1  Sheikh Abdulkadir Nur Farah and the dispute that

2  erupted over his killing where the I'tisaam group

3  openly accused al-Shabaab of being behind the killing.

4       And there's a reference here to, I believe, what

5  they call a fatwa issued by Sheikh Hassan.  Sheikh

6  Hassan Hussein had issued opinions publicly that would

7  have legitimized the killing of members of I'tisaam.

8  And although he didn't take responsibility for

9  specifically ordering this killing, he did acknowledge

10 that killing Sheikh Abdulkadir Nur Farah would have

11 been consistent with his views on the matter.

12 Q    And just briefly on the second page here, what is

13 going on tonight at the 6th, do you have an

14 understanding or an opinion as to what that's a

15 reference to?

16 A    Yes.  I believe that is a reference to the Sixth

17 Street mosque in a part of Nairobi called Eastleigh,

18 E-A-S-T-L-E-I-G-H, which at that time was associated

19 with the I'tisaam movement.  And so the agitation at

20 the Sixth Street mosque would have been in opposition

21 to Sheikh Ga'amey's killing.

22          MS. ATIYEH:  If we could, give the witness

23 Government's Exhibit 124.

24          MS. MINTER:  No objection as to

25 admissibility, Your Honor.  We reserve with respect to

1  identity of the speakers.

2           THE COURT:  All right.  It will be admitted

3  on that basis.

4  BY MS. ATIYEH:

5  Q    Mr. Bryden, if you could, just take a very brief

6  look at page 2 in the middle of the page.  There's a

7  discussion by a speaker identified as Jama.  It says

8  what took place in Gedo, this old man who recently

9  died, which they're making a big deal.  Based on your

10 understanding of the events at the time, do you have an

11 opinion as to what that is a reference to?

12 A    This, again, appears to be a reference to the

13 killing of Sheikh Abdulkadir Nur Farah.  Then it's

14 somewhat confusing, but the reference to Sheikh Hassan

15 Dahir Aweys below -- Hassan Dahir made a public

16 statement denouncing Abdulkadir Nur Farah's killing.

17 This seems to be suggesting that he was somehow

18 convinced to make that statement.

19          MS. ATIYEH:  Could we go to Government's

20 Exhibit 146 for the witness, please, 146.

21          THE COURT:  Any objection?

22          MS. MINTER:  We would object for the

23 previously articulated reasons, Your Honor.

24          THE COURT:  All right.  It will be admitted

25 over objection for the purposes of this witness'

Bryden - Direct by Ms. Atiyeh

1  opinions.

2          MS. ATIYEH:  The Court's indulgence, Your

3  Honor.

4       (Counsel confer.)

5          MS. ATIYEH:  I'm sorry, Your Honor.  You said

6  146 was admitted?

7          THE COURT:  Yes.

8          THE COURT SECURITY OFFICER:  Counsel, hold on

9  a second.  The interpreters are switching batteries.

10          THE COURT:  Let's take a brief recess, and

11  then we'll come back and finish up with this witness.

12          MS. ATIYEH:  Thank you.

13          THE COURT:  All right.  The Court will stand

14  in recess.

15       (Recess from 5:16 p.m. until 5:28 p.m.)

16          THE COURT:  Mr. Bryden, you remain under

17  oath.

18  BY MS. ATIYEH:

19  Q   Sir, we were looking at Government's Exhibit 146.

20  I believe we can just move that into evidence.

21          THE COURT:  Any objection?

22          MS. MINTER:  Your Honor, the same objections

23  as to the exhibit and the testimony.

24          THE COURT:  All right.  Over objection, it

25  will be admitted for the purposes of this witness'

1  testimony.

2  BY MS. ATIYEH:

3  Q    Mr. Bryden, could you take a look at, really,

4  pages 1 and 2 of this transcript, the reference to

5  people who have been massacred by the man with the big

6  mouth in Puntland, and going on to the next page, to

7  page 2, Sheikh Mohamud Takar's son is among them.

8  A    Yes.

9  Q    In your experience in the subject matter we've

10 discussed, do you have an opinion as to what's being

11 discussed here?

12 A    Yes.  It's in relation to the murder of Sheikh

13 Abdulkadir Nur Farah.  The Puntland authorities

14 arrested a number of suspects, carried out a trial, and

15 convicted a number of them of responsibility for his

16 murder and executed a number of them.

17      Among those executed was the son of a reputed

18 al-Shabaab leader from Puntland known as Sheikh Mohamud

19 Takar from the southwest part of Puntland, and I think

20 that's as far as that goes.  It's a clear reference to

21 the Puntland government's actions in response to his

22 murder.

23 Q    Could I jump very quickly back to a question I had

24 asked you earlier.  I asked you about an individual

25 named Jama Abdul Salam.

Bryden - Direct by Ms. Atiyeh

1   A    Yes.

2   Q    Could you explain in maybe a little bit more

3   detail his affiliation with al-Shabaab.

4   A    I know Jama Abdul Salam simply from his public

5   statements, which were in open source and which I

6   monitored at the time when he returned from the UK,

7   announced his affiliation.  I think initially --

8   Q    Can I interrupt you briefly.

9        When did he return from the UK and announce his

10  affiliation?

11  A    2010, I believe.

12  Q    When you say his affiliation, you mean his

13  affiliation with al-Shabaab?

14  A    With al-Shabaab, which meant at that time his

15  opposition to the Transitional Federal Government, and

16  then he emerged as a public figure, a physical figure

17  in al-Shabaab propaganda.

18  Q    Thank you.

19       Are you familiar with an individual named Khalif

20  Ahmed Ereg or Ilig?

21  A    Yes.

22  Q    That's K-H-A-L-I-F, A-H-M-E-D, and there's

23  alternate spellings of the last name, E-R-E-G or

24  I-L-I-G.

25       Who is he?

Bryden - Direct by Ms. Atiyeh

1  A    He was at the time that we're discussing the chief

2  of security for the regional administration of

3  Mogadishu, which is also referred to as Banaadir,

4  B-A-N-A-A-D-I-R.

5  Q    Was he ever a target of al-Shabaab?

6  A    He was a target of al-Shabaab.  He was targeted in

7  an unsuccessful suicide bombing that injured some of

8  his escort and some other bystanders near the Jazeera

9  Hotel in southern Mogadishu.

10 Q    Why did al-Shabaab target him?

11 A    Al-Shabaab was targeting government officials and

12 particularly officials of the security services and has

13 done consistently, and as the chief of security

14 services of the Banaadir region, he would have been a

15 high-profile target.

16 Q    Do you know the date of this assassination

17 attempt?

18 A    Off the top of my head, I don't recall the date.

19 Q    Could I show you Government's Exhibit 8H1, 8I1,

20 and 8J1.

21       MS. MINTER:  Your Honor, there's no objection

22 as to admissibility as we understand these were

23 captured by court-authorized surveillance.  We would

24 object to any inference that what's contained within

25 the articles is, in fact, true.

Bryden - Direct by Ms. Atiyeh

1          THE COURT:  All right.  The Court will admit

2    it for the fact of these articles having been seized

3    during the authorized surveillance.

4    BY MS. ATIYEH:

5    Q    Mr. Bryden, in taking a look at these three

6    exhibits, are they examples of contemporaneous media

7    accounts of the assassination attempt we were just

8    discussing?

9    A    Yes, they are.

10          MS. ATIYEH:  Can we go to Government's

11    Exhibit 131, please, 131.

12          MS. MINTER:  Same objection, Your Honor, as

13    to the relevance and the hearsay and the testimony of

14    the witness.

15          THE COURT:  All right.  Over objection, 131

16    is admitted for the purposes of this witness' opinions.

17    BY MS. ATIYEH:

18    Q    Mr. Bryden, this is a transcript of a conversation

19    dated March 18, 2013?

20    A    Yes.

21    Q    And if you could, direct your attention to

22    pages 14 and 15 of this transcript.

23    A    Yes.

24    Q    Based on your experience with events at the time,

25    do you have an opinion as to what's being discussed on

1    these pages?

2    A    Well, also in reference to the articles that you

3    have just shown me, the dates, this appears to relate

4    to the attack on Ahmed Ereg and the fact that he

5    survived the attack; although, other people were killed

6    and injured.

7    Q    Most of the way down page 14, there's a reference

8    where a speaker identified as Dhirane says, There's an

9    idiot from the PS?

10   A    Yes.

11   Q    Based on your knowledge of the subject matter, do

12   you have an opinion or understanding as to what PS

13   refers to there?

14   A    I do.  The PS is actually a term that's usually

15   used to refer to what was then called the Puntland

16   Intelligence Service, but for people who dealt directly

17   or were mostly familiar with the Puntland Intelligence

18   Service, it could be used as a generic term for any

19   Somali Intelligence Service.  In this context, it seems

20   just like a misnomer for the actual National

21   Intelligence and Security Agency which was active in

22   Mogadishu.

23          MS. ATIYEH:  Could we go to Government's

24   Exhibit 130.

25          MS. MINTER:  Same objections, Your Honor, as

Bryden - Direct by Ms. Atiyeh

1  to the exhibit and the testimony.

2          THE COURT:  All right.  Over objection, 130

3  is admitted for the purposes of this witness'

4  testimony.

5  BY MS. ATIYEH:

6  Q    Mr. Bryden, this is a very brief transcript.  If

7  you could just take a brief look.

8       Have you been able to form an opinion based on

9  your understanding of the subject we've discussed as to

10 what's being discussed by the conversants here?

11 A    Yes.  Given the date and the content, this seems

12 to be also in relation to the attack on Khalif Ereg and

13 the fact that although he was the target, he was not

14 killed.

15 Q    Are you familiar with a terrorist attack on a

16 Mogadishu courthouse that took place on April 14, 2013?

17 A    Yes, I am.

18 Q    Who claimed responsibility for that attack?

19 A    Al-Shabaab.

20 Q    Where was the rationale behind al-Shabaab's attack

21 on the courthouse?

22 A    The courthouse was one of the key institutions of

23 that regional administration and, therefore, of the

24 federal government as well.  It was one of the

25 instruments of power, one of the institutions of what

Bryden - Direct by Ms. Atiyeh

1  they considered to be an illegitimate and infidel

2  administration.

3  Q     How was the attack carried out?

4  A     The attack was carried out by al-Shabaab fighters

5  who were dressed in government uniforms who tried once

6  unsuccessfully to enter the courthouse, and then the

7  second time they succeeded.  When they got to the gate,

8  two of the fighters were wearing suicide vests which

9  they detonated at the gate.

10       In the confusion, the remainder of the fighters

11 that entered the courthouse, they went into the offices

12 of the lawyers and legal teams and killed a number of

13 people they found there, continued to the court

14 chambers, killed people that they found there.

15       Two remaining fighters were left alive.  One

16 detonated a suicide vest harmlessly in a stairwell and

17 died.  The other was shot dead and fell from the second

18 floor balcony and died.  Then the operation ended.

19       A new tactic of al-Shabaab was as people gathered

20 to try to rescue the wounded and to end the attack,

21 when a crowd had gathered, they would send a second

22 explosive device to attack the crowd.  In this case, it

23 was a vehicle-borne improvised explosive device.  It

24 approached the courthouse as a secondary detonation.

25 But the security guards were able to shoot at the

Bryden - Direct by Ms. Atiyeh

1  vehicle, and the driver detonated it harmlessly in an

2  alley.

3         MS. ATIYEH:  Could we show the witness

4  Government's Exhibit 8K1, 8L1, 8M1, and 8N1, please.

5  So 8K through 8N1.

6         THE CLERK:  I don't have an 8L1.

7         MS. ATIYEH:  Oh, it may just be 8L then.

8         MS. MINTER:  No objection, Your Honor,

9  subject to the parameters of the stipulation.

10         THE COURT:  All right.  These are admitted

11  subject to the stipulation.

12         THE COURT SECURITY OFFICER:  You want M, K,

13  and L?

14         MS. ATIYEH:  K, L, M, N.

15         THE COURT SECURITY OFFICER:  Thank you.

16         THE COURT:  You're admitting K1, L, M, and N?

17         MS. ATIYEH:  K1L, M1, and N1.

18         THE COURT:  All right.

19         THE COURT SECURITY OFFICER:  Counsel, I want

20  to make sure because you have these all stuck together.

21  I've got a K1, M1, N1, and now you want 8L and 8S?

22         THE COURT:  And L?

23         MS. ATIYEH:  Yes.

24         THE COURT SECURITY OFFICER:  I'm missing the

25  two files you're looking for.

254

1          MS. ATIYEH:  What do you have there, sir?

2          THE COURT SECURITY OFFICER:  I have 8K1, 8M1,

3  and 8N1.

4          MS. ATIYEH:  Do you have 8L?

5          THE COURT SECURITY OFFICER:  That's what I

6  asked.

7          MS. ATIYEH:  Yes, that one.  I'm sorry.  I

8  misunderstood you.

9  BY MS. ATIYEH:

10  Q    Mr. Bryden, if you could, just take a brief look

11  at those exhibits.

12  A    Yes.

13  Q    Are those, again, contemporaneous media accounts

14  of the attack you just discussed?

15  A    Yes, they are.

16          MS. ATIYEH:  Are those in, Your Honor, or --

17          THE COURT:  Yes, they're admitted pursuant to

18  the stipulation.

19          MS. ATIYEH:  Thank you, Your Honor.

20          If we could next show the witness

21  Government's Exhibit 140.

22          MS. MINTER:  We would object, Your Honor,

23  based on the previous bases.

24          THE COURT:  All right.  Over objection, it's

25  admitted for the purposes of this witness' opinions.

1  BY MS. ATIYEH:

2  Q    Mr. Bryden, this is a transcript of a conversation

3  dated April 14, 2013?

4  A    Yes.

5  Q    If you could, take a look starting at the bottom

6  of page 5 and on to page 6, please.

7  A    Yes.

8  Q    The speakers are identified as Rashid and Dhirane.

9  They are speaking here, Many civilians perished in

10  Mogadishu.

11      Do you have an opinion as to the events being

12  discussed here?

13  A    Yes.  This almost certainly relates to the attack

14  on the court building, and Rashid refers to civilians

15  being killed in a court building.  Obviously, at this

16  stage, they're misinformed about some details, like the

17  number of fighters and the fact that they closed the

18  doors behind them.  There were no doors to close.  The

19  gate was blown open.  But in other respects, it seems

20  to relate to that attack.

21  Q    Are you familiar with the terrorist attack on the

22  Westgate Mall in Nairobi, Kenya?

23  A    Yes, I am.

24  Q    Could you just explain to the Court the timeline

25  of that attack.

Bryden - Direct by Ms. Atiyeh

1  A      That was late September 2013, and it was a

2  Saturday morning approaching midday when four armed men

3  entered the shopping mall.  They entered from the

4  ground floor and also from the third floor.

5       Those on the ground floor initiated the attack

6  with hand grenades thrown into a restaurant and then

7  opened fire on shoppers in the mall.  The second group

8  of gunmen walked up to the third-story parking where

9  there was a cooking event being held.  They opened fire

10  on the participants and then entered the shopping mall.

11       They had free rein at the mall for most of the

12  first day shooting anybody they could find, and late

13  towards the end of the first day, the Kenyan security

14  forces entered the mall.  By that time, most of the

15  attack was over.  The violence had, essentially, ended,

16  but it took three more days for the Kenyan security

17  forces to, actually, finally kill the attackers and end

18  the operation.

19  Q    Who claimed responsibility for the attack?

20  A    Al-Shabaab.

21  Q    Why was al-Shabaab targeting a shopping mall in

22  Nairobi?

23  A    Al-Shabaab was punishing Kenya.  Kenya had sent

24  its forces into Somalia to assist the African Union and

25  to assist the government and, most particularly, to

Bryden - Direct by Ms. Atiyeh

1  assist al-Shabaab's rival for control of the port of

2  Kismaayo, a group known as the Ras Kamboni forces.

3  That's R-A-S, and the second word is K-A-M-B-O-N-I.

4       And so, in general, for its role in supporting

5  forces that al-Shabaab was opposed to and for what

6  al-Shabaab considered to be the occupation of Somalia

7  in Muslim territories.  Also, by striking in a very

8  upscale commercial center, al-Shabaab probably hoped to

9  damage the Kenyan economy and to send a signal to

10 western interests who were also affiliated with Kenya

11 in supporting al-Shabaab's enemies in Somalia.

12 Q    What was the death toll of the Westgate Mall

13 attack?

14 A    I actually forget the precise figure.  It's in the

15 dozens.

16      MS. ATIYEH:  Could we go to Government's

17 Exhibit 168, 168.

18      MS. MINTER:  Same objection, Your Honor, as

19 to the exhibit and the testimony.

20      THE COURT:  Over objection, Exhibit 168 is

21 admitted for the purposes of this witness' opinions.

22 BY MS. ATIYEH:

23 Q    If you could, direct your attention, Mr. Bryden --

24 I'm sorry.  This is a transcript dated September 21,

25 2013?

1   A     Yes.

2   Q     If you could, direct your attention to pages 3 and

3   then on to page 4 beginning, A lot of people have been

4   massacred today in Kenya, on page 3.

5   A     Yes.

6   Q     As a general question, based on your knowledge of

7   events in the region, do you have an opinion as to

8   what's being discussed here?

9   A     Yes.  This seems to be a discussion that's taking

10  place while the attack is still going on and while

11  there was a lot of misreporting.  I see, for example,

12  they're saying that 50 people have been reported

13  killed.  In fact, now I think I recall the figure is

14  close to 70.  But at that time, there was a lot of

15  misreporting, and this seems to be a kind of

16  blow-by-blow attempt to follow what was happening at

17  Westgate.

18          MS. ATIYEH:  If we go on to Government's

19  Exhibit 169, please, 169.

20          MS. MINTER:  No objection as to admissibility

21  without stipulating to the identity of the speakers.

22          THE COURT:  All right.  Exhibit 169 is

23  admitted pursuant to the stipulation.

24  BY MS. ATIYEH:

25  Q     Mr. Bryden, this is a transcript dated

Bryden - Direct by Ms. Atiyeh

1  September 23, 2013; is that right?

2  A     Yes.

3  Q     If you could, just direct your attention to the

4  bottom of page 1 and on to page 2, please, The

5  situation at the place is still in turmoil.

6  A     Yes.

7  Q     Do you have any opinion as to what's being

8  discussed here?

9  A     This strikes me as a clumsy attempt to discuss

10 what's happened in Kenya.  It's still during the

11 Westgate attack.  There was no heavy rain anywhere.  I

12 don't think that this could refer to weather in Somalia

13 or Kenya or that it has awoken a sleeping public.  I

14 think, having read this transcript, it's a veiled

15 reference to the attack on Westgate.

16          MS. MINTER:  Your Honor, with respect to 169,

17 we would renew our previous objection regarding the

18 expert's qualifications and, of course, our continuing

19 objection about the speculation on his testimony.

20          THE COURT:  All right.  The Court will

21 overrule those objections.

22          MS. ATIYEH:  If we could, move on to

23 Government's Exhibit 173, please.

24          MS. MINTER:  Your Honor, the same objections

25 as to the exhibit and the testimony.

1          THE COURT:   All right.   Exhibit 173 is

2   admitted over objection for the purposes of obtaining

3   this witness' opinions.

4   BY MS. ATIYEH:

5   Q    Mr. Bryden, this is a transcript of a conversation

6   dated September 26, 2013; is that right?

7   A    That's right.

8   Q    Could you direct your attention beginning on

9   page 2, Give me an update about the people, the

10  broad-nosed ones that are still in mourning.

11  A    Well, that seems to be a reference, a translation

12  from the Somali into a term used for other Africans;

13  therefore, given the date, I think I would conclude

14  this is still a reference to Kenya and that Kenya is

15  still mourning what happened at Westgate.

16       In part, I would derive that opinion from the fact

17  that there were media reports at the time that the

18  Kenyan Security Services had resorted to the tactics

19  employed by the Russian Security Services when the

20  national theater had been attacked using a poisonous

21  compound to end the siege.   There was a lot of

22  speculation still as to how the Westgate operation had

23  concluded.

24       Then the discussion goes on to say the place is

25  empty since the fourth day.   At the end of the fourth

Bryden - Direct by Ms. Atiyeh

1  day, the mall had collapsed.  It was sealed off for

2  investigative purposes, and all of this seems to be

3  captured in this discussion.

4          MS. ATIYEH:  Could we show the witness

5  Government's Exhibits 8V1, 8W1, and 8X1, please, V as

6  in Victor.

7          MS. MINTER:  No objection, Your Honor,

8  subject to the parameters of the stipulation.

9          THE COURT:  All right.  8V1 -- and what were

10  the others?

11          MS. ATIYEH:  8V1, 8W1 and 8X1.

12          THE COURT:  8V1, 8W1, and 8X1 are admitted

13  subject to the stipulation.

14  BY MS. ATIYEH:

15  Q    Mr. Bryden, if you could, just review these

16  exhibits and let us know if these are examples of

17  contemporaneous media accounts of the attack we've just

18  been discussing.

19  A    Yes, they are.

20          MS. ATIYEH:  If we could show the witness

21  Government's Exhibit 8S1.

22          THE COURT SECURITY OFFICER:  S as in Sam?

23          MS. ATIYEH:  S as in Sam.

24          MS. MINTER:  Same position, Your Honor, with

25  reference to this exhibit.

Bryden - Direct by Ms. Atiyeh

1          THE COURT:  Which is that it's admitted

2  subject to the stipulation?

3          MS. MINTER:  Yes, Your Honor, and without

4  acquiescence to the facts contained therein.

5          THE COURT:  All right.  It will be admitted

6  on that basis.

7          Go ahead.

8          THE COURT SECURITY OFFICER:  I'm sorry.  I

9  don't have that one in the box.

10          MS. ATIYEH:  I'm sorry?

11          THE COURT SECURITY OFFICER:  I don't have

12  that one in the box.

13          MS. ATIYEH:  You don't have 8S1?

14          THE COURT SECURITY OFFICER:  No, ma'am.  I

15  don't have S unless it's stuck inside one of the

16  folders somewhere.

17          MS. ATIYEH:  That's entirely possible.

18          THE COURT:  Do we have another copy?

19          MS. ATIYEH:  Do we have another copy?

20          Do you guys have one in your binder?

21          THE COURT SECURITY OFFICER:  Counsel, I found

22  it.

23          MS. ATIYEH:  Okay.

24  BY MS. ATIYEH:

25  Q    Mr. Bryden, is this a media account of events

Bryden - Direct by Ms. Atiyeh

1   occurring in Somalia contemporaneously?

2   A    Yes, it is.

3   Q    And you'll see at the top there -- it's up on the

4   screen.  It's headed somalimemo.net.

5   A    Yes.

6   Q    What's *Somali Memo*?

7   A    Just to be clear, I'm looking at the Somali

8   version of this article.

9   Q    Okay.  Do you --

10  A    It's also somalimemo.net.

11  Q    I can hand up the English version if it's not in

12  the folder.  That's what's up on the screen.

13          THE COURT SECURITY OFFICER:  I've got that.

14  BY MS. ATIYEH:

15  Q    Can you explain what somalimemo.net is?

16  A    *Somali Memo* is an al-Shabaab affiliated website.

17  I would not say that it is an official al-Shabaab

18  website.  It publishes a wider scope of information

19  than simply al-Shabaab materials.  But it is pro

20  al-Shabaab, and it often has -- it's often one of the

21  first to release al-Shabaab's version of events.

22  Q    And is it sort of an al-Shabaab version of events

23  that's being described in this article here?

24  A    It's something that I think -- given where it's

25  being reported from, which is al-Shabaab territory,

1  only journalists in an al-Shabaab area would have had

2  access to and been able to report on.

3          MS. ATIYEH:  Could we go to Government's

4  Exhibit 158.

5          MS. MINTER:  The same objection, Your Honor,

6  as to the previous calls with respect to the exhibit

7  and the testimony.

8          THE COURT:  All right.  Exhibit 158 will be

9  admitted over objection for the purposes of this

10 witness' opinions.

11 BY MS. ATIYEH:

12 Q    Mr. Bryden, this is a transcript of a conversation

13 dated June 7, 2013; is that right?

14 A    Yes, it is.

15 Q    And could you direct your attention to page 3,

16 please.

17 A    Yes.

18 Q    What are the speakers discussing here?

19 A    This is -- they're discussing reports of an attack

20 on a Somali government official who was being

21 accompanied by Ethiopian forces between Mogadishu and

22 Baydhabo.

23 Q    I'm sorry.  Could you go down to the paragraph at

24 the bottom there, the two spies killed yesterday in

25 Baraawe.

1  A    Yes.  So this is a reference to the same article

2  that we've just looked at.  And here, again, there's

3  also this reference to PS, which appears in the

4  article.  The Puntland Intelligence Service doesn't

5  work anywhere near the location that's described in

6  this article.  So it really does reinforce it's just

7  being used as a generic for Somali Intelligence

8  Services.

9           MS. ATIYEH:  Could we go the Government's

10 Exhibit 65, please.

11          MS. MINTER:  No objection, Your Honor,

12 subject to the parameters of the stipulation that we

13 don't stipulate to the identity of the speakers.

14          THE COURT:  All right.  Exhibit 65 is

15 admitted subject to the stipulation.

16 BY MS. ATIYEH:

17 Q    Mr. Bryden, this is a transcript of a conversation

18 dated May 5, 2012?

19 A    Yes.

20 Q    Would you direct your attention to page 4 of this

21 exhibit.

22 A    Yes.

23 Q    Based on the date of this conversation and your

24 knowledge of events, do you have an understanding of

25 what's being discussed here?

Bryden - Cross by Ms. Minter

1   A    Well, given the date of the discussion, I think it

2   is probable that they are -- at this time, it was one

3   year since the killing of Osama bin Laden, and there

4   was a great deal of media coverage.  I think it's

5   reasonable to conclude that this is the subject of the

6   discussion here.

7   Q    So in your opinion then, who is the brother that's

8   being referred to?

9   A    The brother is Osama bin Laden.  The reference to

10  an anniversary, I think, makes that quite likely.

11              MS. ATIYEH:  The Court's indulgence, Your

12  Honor.

13              Your Honor, nothing further for this witness

14  from the government.

15              THE COURT:  All right.  Okay.

16              Ms. Minter.

17              MS. MINTER:  The Court's indulgence.

18                       CROSS-EXAMINATION

19  BY MS. MINTER:

20  Q    Mr. Bryden, to go back to some of the topics that

21  you covered earlier this morning, it's safe to say many

22  Somalis were opposed to the Transitional Federal

23  Government?

24  A    Yes, that's fair.

25  Q    It's a government that was formed in exile?

1  A    That's right.

2  Q    Outside of the country of Somalia?

3  A    Yes.

4  Q    So it was not established by the people?

5  A    No.

6  Q    Okay.  And at its inception, Abdullahi Yusuf was

7  installed as the president?

8  A    Yes, he was.

9  Q    And there was opposition to that almost

10 immediately?

11 A    There was opposition even before he was installed

12 since it was quite clear that that was the most likely

13 outcome of the process.

14 Q    And he was a former warlord?

15 A    That's right.

16 Q    With a reputation as a dictator?

17 A    That's right.

18 Q    And further concern about the Transitional Federal

19 Government is that many felt that it was run by a small

20 number of clans, correct?

21 A    Correct.

22 Q    It would have influence over the rest of the

23 country?

24 A    Yes.

25 Q    Imposing their will?

Bryden - Cross by Ms. Minter

1   A     Yes.

2   Q     It's safe to say that an additional difficulty of

3   the Transitional Federal Government was the lack of

4   infrastructure or, I should say, their inability to

5   provide an infrastructure?

6   A     I think that was a generic difficulty for anyone

7   trying to establish a government in Somalia.   All

8   meaningful infrastructure had been damaged or

9   destroyed.

10  Q     Certainly the Transitional Federal Government did

11  not solve that problem?

12  A     No, it didn't.

13  Q     And it was also the Transitional Federal

14  Government that brought in Ethiopian troops ultimately?

15  A     That is correct.

16  Q     Into Somalia?

17  A     Yes.

18  Q     And that was done at the request of President

19  Yusuf?

20  A     Yes.

21  Q     Although you actually believe that it was pushed

22  by the Ethiopians that Yusuf facilitated; is that fair

23  to say?

24  A     I believe the Ethiopians were inclined to enter

25  Somalia regardless, but they sought some form of

Bryden - Cross by Ms. Minter

1  international legitimacy.  So a request by the

2  Transitional Federal Government, in their view, served

3  to provide that legitimacy.

4  Q    Certainly, many Somali citizens were opposed to

5  that?

6  A    That's correct.

7  Q    And opposed to the Ethiopian presence, generally?

8  A    That's right.

9  Q    And that's certainly because they were blamed for

10  deaths of civilians in some instances, the Ethiopian

11  soldiers?

12  A    I think that would have been the case later on.

13  Initially, the objections to the Ethiopian intervention

14  were, for some Somalis, a sense of a aggravated

15  nationalism that Ethiopia would send troops into their

16  country and then the backing of an unpopular leader.

17  The question of civilian casualties came later after

18  hostilities escalated.  Initially, Ethiopia moved in so

19  rapidly that the question of civilian casualties really

20  didn't come into the equation, not for some time.

21  Q    So the initial concern was being invaded --

22  A    Yes.

23  Q    -- and the concern because of the sense of

24  nationalism.  But, ultimately, based on the actions of

25  the Ethiopians, the concerns turned to more serious

1  concerns, such as death, destruction of property, rape,

2  and the like?

3  A    Yes.

4  Q    And is it fair to say that at times the Somalis

5  would have preferred no government to a bad government?

6  A    I think that's been widely said.  I think that

7  varies among the Somalis that you speak to.  I don't

8  think that you could generalize about and say that all

9  Somalis would feel that way.  There are many Somalis

10 now who would prefer to see back the dictatorship of

11 Siad Barre than to live through another decade of

12 statelessness.

13 Q    With respect to the Transitional Federal

14 Government, certainly there are people who would rather

15 see no government than that government; is that fair to

16 say?

17 A    I don't know.  I know there were people who sought

18 to overthrow that government.  I expect they preferred

19 or expected to install something in its place rather

20 than just to have a vacuum.

21 Q    With respect to those who sought to overthrow the

22 government, that was a fairly broad-based insurgency?

23 A    It was fairly broad-based.  It had three main

24 components.  As I referred to earlier, nationalists who

25 were opposed to Ethiopian intervention; clan,

1    initially, primarily among the Hawiye clan -- which is

2    H-A-W-I-Y-E; although, elements of other clans did

3    eventually associate themselves with it.  And then

4    lastly, the coalition of Islamists groups that was

5    known as the Islamic Courts Union.

6    Q    That's how you've described the insurgency in your

7    literature, correct?

8    A    That's correct.

9    Q    So, clearly, it was not just al-Shabaab that

10   opposed the Transitional Federal Government?

11   A    No.

12   Q    And you testified in response to the government's

13   questions about the perception of the Islamic Courts

14   Union?

15   A    Yes.

16   Q    They were certainly seen differently, at least

17   prior to 2004?

18   A    In parts of Somalia, yes.

19   Q    I believe "benign" is the term that you used.

20   A    Yes.

21   Q    Okay.  They were certainly popular in specific

22   clan areas and neighborhoods, correct?

23   A    That is correct.

24   Q    That's because they provided a sense of stability

25   and a sense of order?

1   A     Yes.

2   Q     And some civic institutions?

3   A     Yes.

4   Q     And that's, in part, because the court system

5   there is, safe to say, different than what we would

6   consider a court system here in the United States?

7   A     Yes, that's correct.

8   Q     So with respect to each individual court, it

9   wasn't simply a building with judges.  It was more

10  elaborate than that?

11  A     The original Islamic courts involved, essentially,

12  qadis, religious judges, and militia who served as a

13  kind of court police.  Q-A-D-I for qadi.

14  Q     In addition, they would provide a jail of sorts, a

15  place where individuals would be held?

16  A     Correct.

17  Q     So somewhat more complex than simply a building

18  with judges?

19  A     Yes.

20  Q     Okay.  And that militia is part of how they were

21  able to provide some stability to the region; is that

22  fair to say?

23  A     That's right.

24  Q     You've described a number of groups that were

25  fighting the Transitional Federal Government on the

Bryden - Cross by Ms. Minter

1   ground, correct?

2   A    Correct.

3   Q    Could you briefly summarize, again, the different

4   organizations that were actively engaged in fighting.

5   A    Yes.  In addition to al-Shabaab, there were

6   militia of the defunct Islamic Courts Union who still

7   refer to themselves as mahacinta, the courts, even

8   though the courts no longer existed.

9        The Alliance for the Re-liberation of Somalia was

10  also involved, and that was sort of an umbrella

11  organization that brought together members of the

12  Islamic Courts Union and also members of the

13  Transitional Federal Parliament under one roof in

14  Eritrea.  There were also clan militias who, for their

15  own reasons in their own locales, fought against the

16  Ethiopians and against the Transitional Federal

17  Government.

18  Q    If we could go back for a moment to the Alliance

19  for the Re-liberation of Somalia, that's an

20  organization that fought alongside al-Shabaab?

21  A    It did fight alongside al-Shabaab for some time,

22  yes.

23  Q    But they were an independent organization?  They

24  were not al-Shabaab proper?

25  A    Al-Shabaab operated autonomously from them.

Bryden - Cross by Ms. Minter

1  Al-Shabaab, initially, coordinated with them.  Pretty

2  quickly al-Shabaab started to refer to the ARS, which

3  was the acronym for the Alliance for the Re-liberation

4  of Somalia, essentially as a bunch of old men outside

5  the country not really doing what needed to be done to

6  liberate Somalia.

7  Q    Ultimately, the ARS fragmented, correct?

8  A    Correct.

9  Q    The group divided in terms of their policies or

10 how to proceed?

11 A    Yes.

12 Q    That was partly over the issue of whether they

13 should work with the Transitional Federal Government?

14 A    That's right.

15 Q    So some individuals were inclined to align with

16 the Transitional Federal Government; others were

17 inclined to keep opposing it?

18 A    That's right.

19 Q    In addition, there was what I would call civil

20 opposition to the Transitional Federal Government,

21 perhaps political opposition without force?

22 A    Yes.

23 Q    And those included people who were not military

24 people?

25 A    Who simply opposed the government or opposed the

Bryden - Cross by Ms. Minter

1  Ethiopian intervention, yes.

2  Q     Some form of political figures?

3  A     Yes.

4  Q     Former members of the Islamic Courts Union?

5  A     Do you have anyone in mind?  Most of them either

6  went to the ARS or remained on the ground.

7  Q     We can come back to that.

8        Were there former members of the Transitional

9  Federal Government who ultimately opposed it?

10  A    There were active members of the Transitional

11  Federal Government who actively opposed it.  The

12  government itself was already split.

13  Q    In short, there was legitimate opposition by the

14  Somalis who wanted to get rid of the Transitional

15  Federal Government?

16  A    That's right.

17  Q    You yourself have been a critical opponent of

18  Transitional Federal Government?

19  A    That's correct.

20  Q    So an individual could oppose the Transitional

21  Federal Government without *de facto* being a member of

22  al-Shabaab?

23  A    Yes.

24  Q    You could oppose that same government without

25  supporting al-Shabaab?

Bryden - Cross by Ms. Minter

1   A     Correct.

2   Q     You also spoke this morning about membership in

3   al-Shabaab?

4   A     Yes.

5   Q     You described a number of various roles that an

6   individual within al-Shabaab could play?

7   A     Yes.

8   Q     You said the most members are members of the

9   military branch or the fighting force?

10  A     Correct.

11  Q     What percentage would you say that is?

12  A     As I said, since we don't even have a clear sense

13  of the size of al-Shabaab, I think assigning a

14  percentage would be difficult.  But in terms of

15  organization, the al-Shabaab proper is typically

16  referred to as either Jabhadda or Jayshka, which means

17  army -- it's the military component -- followed by the

18  Amniyat, and then the sort of political administrative

19  component is the smallest.

20       Now, in percentage terms, I couldn't say, but I

21  would think you're probably looking at at least

22  80 percent in terms of the fighting force and the

23  Amniyat combined, possibly more.

24  Q     Does that mean, then, that in order to be a member

25  of al-Shabaab, an individual must fall into one of

Bryden - Cross by Ms. Minter

1   those three categories?

2   A    No.  A member of al-Shabaab could undertake any

3   number of support roles for the organization.

4   Q    What other roles could an individual serve other

5   than those three and be considered a member of

6   al-Shabaab?

7   A    Well, as I said, we also looked at the categories

8   of financiers, facilitators, active supporters.  Those

9   kind of activities could include raising funds on

10  behalf of al-Shabaab; transmitting funds to al-Shabaab,

11  which wasn't necessarily the same as raising them;

12  undertaking or facilitating the logistical support for

13  al-Shabaab in terms of the provision of weapons, the

14  provision of ammunition, provision of supplies.  There

15  are some businesses that actively rather than passively

16  will provide support to al-Shabaab forces.  Then the

17  active supporters, those who would mobilize support,

18  those who would assist in recruitment, mobilization on

19  behalf of the organization.

20  Q    When you say mobilize support, you just mentioned

21  recruitment, for example.

22  A    Yes.

23  Q    Things that would benefit the organization?

24  A    Yes.

25  Q    Okay.  You would not include in the definition of

Bryden - Cross by Ms. Minter

1    mobilizing support simply articulating in favor of

2    al-Shabaab?  In other words, simply arguing that

3    al-Shabaab was a positive organization or a legitimate

4    organization?

5    A    I think simply expressing one's views, we might

6    have considered that to be a sympathizer of al-Shabaab.

7    Q    With respect to raising funds on behalf of

8    al-Shabaab, that was a category that your organization

9    deemed so you would have an official definition of what

10   it meant to be a fundraiser, correct?

11   A    Well, the United Nations security council

12   instructed us to look into the financing of al-Shabaab.

13   So we then began to look into the types of fundraising

14   activities that took place and tried to provide the

15   council with definitions that it could consider.

16        In a sense, because we were breaking new ground

17   with the new resolutions, we could only provide

18   information to the council to consider.  We didn't come

19   up with the legal definitions for the council.

20   Q    What was the definition that you put forth for

21   them to consider?

22   A    We provide them typically with cases where we

23   would demonstrate the ways in which funds were raised.

24        So, for example, the use of a Paltalk forum and

25   that there were individuals involved in these forums

1  who were either soliciting the funds or receiving the

2  funds.  We wouldn't, for example, have argued that the

3  Paltalk hosts were themselves worthy of designation

4  simply for hosting a forum, which at that time they may

5  or may not have been even aware of what was happening

6  inside the forum.  But participants in the forum who

7  were taking deliberate actions that we could see and

8  then interpret for the council, we would.

9       Otherwise we were looking at businessmen who were

10  directly providing funds for al-Shabaab.  We looked at

11  whether businesses provided voluntary contributions or

12  were subject to extortion and then tried to draw that

13  kind of distinction for the council.

14       All of this was contained in the reports that we

15  provided.  Not so much in terms of definitions but in

16  the statements of case that accompanied the reports

17  when we recommended individuals and entities for

18  designation.

19  Q    Is it fair to say, then, that it's a case-by-case

20  basis as opposed to perhaps a hard-and-fast rule?

21  A    I would say that each case was an attempt to

22  provide the council with a precedent.  If the council

23  decided that that was a strong enough basis on which to

24  designate, then it would open the door to further

25  designations on the same basis.

1   Q     Now, you testified to the role of members of the

2   diaspora in providing funding to al-Shabaab, correct?

3   A     Yes, correct.

4   Q     A member of the diaspora who transmitted money to

5   al-Shabaab would not fall into your definition of a

6   fundraiser?

7   A     An individual who sent money to al-Shabaab could

8   be considered a financier but not a fundraiser since

9   that would involve soliciting funds from other people,

10  but a financier directly contributing funds, yes.

11  Q     Did you have a standard for what that would be,

12  amounts or how often or their ability to provide

13  finance?

14  A     No, we didn't.  We would have looked principally

15  at whether the person involved was providing finances

16  knowingly or whether there's any evidence to show that

17  that person knew that the recipient was a member of

18  al-Shabaab and the purpose for which it was intended.

19        One of the reasons we wouldn't have fixed amounts

20  or standards was partly because given the investigative

21  resources of the U.N. sanctions monitoring team -- we

22  were not a law enforcement agency with resources at our

23  disposal.  We had a broad mandate covering two

24  countries.  It was the largest sanctions monitoring

25  regime, I think, in Africa at the time with only eight

1  people, limited resources.

2       So we would take a case and develop it to see if

3  it had merit either because it was important enough to

4  merit the council's attention or because it set an

5  important precedent and, therefore, a signal.

6  Q    Certainly not every member of the diaspora who

7  sent funds intending to go to al-Shabaab would be

8  considered a financier by your standards?

9  A    I think they probably would be considered a

10 financier.  Whether they would merit the effort to

11 pursue them and to prosecute or to bring them to the

12 council's attention, perhaps not.  But I think anyone

13 who we identified as knowingly sending funds to

14 al-Shabaab for al-Shabaab's use, we would consider a

15 financier of al-Shabaab.

16 Q    And by your standard, then, that would make them a

17 member of al-Shabaab?

18 A    No.  That would have put them in the category of

19 financial supporter, and that would have been grounds

20 for potential designation.

21 Q    So it does not automatically make them a member by

22 the definition of member?

23 A    No.  If, on the other hand, we have that person

24 also online speaking on behalf of al-Shabaab or

25 soliciting on behalf of al-Shabaab, self-identifying as

1   a member of al-Shabaab, and we have the transmission of

2   funds, then we might consider these elements together

3   and at some point reach a conclusion that we were

4   dealing with a member of al-Shabaab, rather than

5   someone who was making perhaps a one-off donation to

6   al-Shabaab as a financial supporter.

7   Q      But there can be individuals who are supporters of

8   al-Shabaab who are not, in fact, members by your

9   standards?

10  A      I think that is probably true.

11  Q      In terms of being a financier, what was your

12  agency at the time's standard for providing funds to

13  al-Shabaab?  In other words, how would you measure

14  whether that money was going to al-Shabaab?

15  A      Well, we'd have to look at the elements of both

16  testimony evidence that we would be able to assemble.

17  So if we had a business person providing funds to

18  al-Shabaab, that might come to us initially through

19  sources, human intelligence.  We might seek to

20  corroborate it through looking at transactions through

21  money transfer organizations.

22       If we couldn't find evidence and all we had was

23  human reporting, we might not be able to take that case

24  forward depending on the credibility of sources.  So,

25  again, in each case, we would have to weigh the

Bryden - Cross by Ms. Minter

1  elements that we had at our disposal.

2  Q    How did you determine if al-Shabaab was the

3  recipient?

4  A    Well, in some cases, it's been fairly clear

5  because you would have, for example, an audio recording

6  of someone speaking to an al-Shabaab official saying,

7  Send the funds to this person for us, and we will

8  arrange for it to be picked up.

9      In some cases, we would have knowledge of people

10 who were acting as financial supporters for al-Shabaab

11 and receiving funds.  Or perhaps mostly obviously in

12 the case of the Paltalk forum, you have an al-Shabaab

13 fundraiser identifying an individual, providing a

14 telephone number.  In some cases, we saw fundraising

15 forums providing bank accounts and saying that this

16 would be for a school or a mosque rehabilitation, but

17 in fact, that would not be the case.  Through various

18 means, we'd be able to identify, because of the people

19 involved, what the true purpose was.

20 Q    So in each of those circumstances, there was a

21 direct connection to al-Shabaab?

22 A    Ideally, there would be a direct connection to

23 al-Shabaab, yes.

24 Q    Because that's the clearest way to know?

25 A    That's the clearest way to know.

1  Q     You also testified with respect to sources of news

2  for Somali people?

3  A     Yes.

4  Q     And especially for the diaspora, individuals who

5  live outside the country?

6  A     Yes.

7  Q     You mentioned that there were a number of ways

8  that people could get news, but a great deal of news

9  was shared by individuals calling one another?

10 A     Correct.

11 Q     Would you say that's somewhat unique to the Somali

12 culture?

13 A     I don't know.  I don't know enough about other

14 cultures, but I know that Somalis certainly have a

15 reputation for passing information at a phenomenal

16 speed and orally perhaps more so than for most.  I'm

17 not sure it's unique.

18 Q     There's a great deal of communication between

19 people inside the country and outside the country?

20 A     That's right.

21 Q     So it certainly would not be unusual for Somalis

22 inside the country and outside the country to discuss

23 current events with one another?

24 A     No.

25 Q     Especially things that are going on in Somalia?

1  A    No.

2  Q    It's safe to say the current events in Somalia are

3  probably of greater interest than the reverse?  The

4  diaspora has a greater interest in knowing news going

5  on in Somalia than, say, a Somali individual might want

6  to know about goings-on in the United States?

7  A    I think that's right.

8  Q    It's also common for members of the diaspora to

9  read the news on the Internet?

10  A    Yes.

11  Q    Specifically, news about what's going on in

12  Somalia?

13  A    Yes.

14  Q    I believe you've described them as a very active

15  Internet community?

16  A    Yes.

17  Q    That's part of an attempt to maintain a connection

18  to Somalia?

19  A    That's correct.

20  Q    So it certainly wouldn't be unusual for a Somali

21  person outside Somalia to read about current events in

22  Somalia?

23  A    No.

24  Q    Even violent current events?

25  A    No.

Bryden - Cross by Ms. Minter

1  Q    Mr. Bryden, you in your previous testimony

2  described al-Shabaab as secretive.  Was that the term

3  that you used?

4  A    Yes, that's correct.

5  Q    Is it fair to say that at the origins, they were

6  more secretive?  Perhaps they've become less secretive

7  since then?

8  A    That's correct.

9  Q    Certainly there are some things that are perhaps

10 speculated about initially and only confirmed later?

11 A    Correct.

12 Q    Did I understand your testimony correctly?

13 A    Yes.

14 Q    You might receive word about certain things, but

15 it is only later in retrospect that you are able to

16 confirm those events?

17 A    That's right.

18 Q    That's part of al-Shabaab's operational nature, if

19 you will?

20 A    I think that's the nature of an information-based

21 society on many things, not just al-Shabaab.  But given

22 al-Shabaab's secretive nature, perhaps it was more

23 relevant in that case.

24 Q    They make a point to not publicize details about

25 their organization?

Bryden - Cross by Ms. Minter

1  A     They make a point not to publicize some details

2  about their organization and publicize others.

3  Q     So if you, as an expert, may not know the full

4  details about the workings of al-Shabaab, certainly an

5  ordinary Somali citizen would not?

6  A     That's a complex assertion.  As an outsider, I may

7  or may not have better access to sources than an

8  ordinary Somali.  An ordinary Somali may have no access

9  to sources about al-Shabaab.  An ordinary Somali may

10  also have a nephew or a niece who's somehow associated

11  with al-Shabaab and, therefore, has a lot of

12  information about certain workings of al-Shabaab in a

13  given location and a given time.

14      So in a sense, there's no single case for the

15  ordinary Somali.  One of the things that al-Shabaab

16  exploits is the kinship relationships in the Somali

17  society in order to remain active in all parts of the

18  country.

19      So I'm not sure that helps, but it would be a

20  generalization to say that I would know more than an

21  ordinary Somali.  I don't think that's necessarily the

22  case.

23  Q     Fair enough.  To use your example of the nephew,

24  just because an individual had a nephew who was a

25  member of al-Shabaab, that does not necessarily imply

Bryden - Cross by Ms. Minter

1  that they are a member of al-Shabaab?

2  A    No.

3  Q    So they could have access to information about

4  al-Shabaab but have no membership or affiliation with

5  al-Shabaab?

6  A    That's true.

7         THE COURT:  Thank you, Ms. Minter.  I'm going

8  to adjourn for the day.

9         All right.  We'll reconvene tomorrow at 9:00.

10         Mr. Bryden, do not discuss your testimony

11  during the evening recess.

12         THE WITNESS:  Yes, Your Honor.

13         THE COURT:  All right.  Anything before we

14  adjourn?

15         MS. MINTER:  Not at this time, Your Honor.

16         THE COURT:  All right.  I hope to be in a

17  position tomorrow morning to give you a little more

18  clarification about the Court's schedule as far as its

19  ability to continue over into Monday.

20         MS. MINTER:  Very well, Your Honor.  We'll do

21  our best to reach out to our expert; although, he is

22  currently out of the country.  So we have some

23  limitations there.

24         THE COURT:  I'm hopeful the Court's schedule

25  will be able to accommodate that.

Rhonda F. Montgomery   OCR-USDC/EDVA   (703) 299-4599

1              MS. MINTER:  Thank you.

2              THE COURT:  All right.  The Court will stand

3    in recess until tomorrow morning.

4              -----------------------------------
                     Time:  6:32 p.m.
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21
         I certify that the foregoing is a true and
22
     accurate transcription of my stenographic notes.
23

24
                                    _____
                                           /s/
25                                  Rhonda F. Montgomery, CCR, RPR


     R h o n d a   F .   M o n t g o m e r y   O C R - U S D C / E D V A   ( 7 0 3 )   2 9 9 - 4 5 9 9