1

2                    UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF VIRGINIA
3                       ALEXANDRIA DIVISION

4    UNITED STATES OF AMERICA,     )   Case 1:14-cr-00230
                                   )
5                 Plaintiff,       )
                                   )
6         v.                       )   Alexandria, Virginia
                                   )   July 12, 2016
7    MUNA OSMAN JAMA,              )   9:09 a.m.
     and                           )
8    HINDA OSMAN DHIRANE,          )
                                   )
9                 Defendants.      )   Day 2
                                   )   Pages 290 - 519
10   ─────────────────────────────

11                     TRANSCRIPT OF TRIAL

12          BEFORE THE HONORABLE ANTHONY J. TRENGA

13             UNITED STATES DISTRICT COURT JUDGE

14

15

16

17

18

19

20

21

22

23

24

25        COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

1   APPEARANCES:

2   FOR THE PLAINTIFF:

3        JAMES P. GILLIS, ESQUIRE
         DANYA E. ATIYEH, ESQUIRE
4        OFFICE OF THE UNITED STATES ATTORNEY
         2100 Jamieson Avenue
5        Alexandria, Virginia  22314
         (703) 299-3700
6
     FOR DEFENDANT MUNA OSMAN JAMA:
7
         WHITNEY E.C. MINTER, ESQUIRE
8        GEREMY C. KAMENS, ESQUIRE
         OFFICE OF THE FEDERAL PUBLIC DEFENDER
9        1650 King Street, Suite 500
         Alexandria, Virginia  22314
10       (703) 600-0800

11       JOSHUA M. SIEGEL, ESQUIRE
         COOLEY, LLP
12       1299 Pennsylvania Avenue, N.W., Suite 700
         Washington, D.C.  20004-2400
13       (202) 842-7800

14   FOR DEFENDANT HINDA OSMAN DHIRANE:

15       ALAN H. YAMAMOTO, ESQUIRE
         LAW OFFICE OF ALAN YAMAMOTO
16       634 South Washington Street
         Alexandria, Virginia  22314
17       (703) 684-6643

18       PAULA SEMMES DEUTSCH, ESQUIRE
         OFFICE OF THE FEDERAL PUBLIC DEFENDER
19       1601 Fifth Avenue, Suite 700
         Seattle, Washington  98101
20       (206) 553-1100

21   THE DEFENDANT, MUNA OSMAN JAMA, IN PERSON

22   THE DEFENDANT, HINDA OSMAN DHIRANE, IN PERSON

23   MARYAM ABDI, SOMALI INTERPRETER

24   HASSAN ABDI, SOMALI INTERPRETER

25

1                                **I N D E X**

2   <u>WITNESS</u>                 <u>EXAMINATION</u>                      <u>PAGE</u>

3   Matthew Bryden          Further Cross by Ms. Minter      295
                            Cross by Ms. Deutsch            324
4                           Redirect by Ms. Atiyeh          361

5   Kera O'Reilly           Direct by Ms. Atiyeh            369
                            Cross by Mr. Kamens             385
6
    Wayne Morgan            Direct by Mr. Gillis            386
7                           Cross by Mr. Kamens             396

8   Colette Coulombe        Direct by Mr. Gillis            397

9   Vincent Mordino         Direct by Ms. Atiyeh            405
                            Cross by Mr. Kamens             408
10
    M. ShAbdurahman         Direct by Mr. Gillis            411
11                          Cross by Mr. Kamens             423
                            Cross by Mr. Yamamoto           427
12                          Redirect by Mr. Gillis          428
                            Recross by Mr. Kamens           431
13                          Recross by Mr. Yamamoto         433
                            Redirect by Mr. Gillis          433
14
    Amina Mohamud Esse   Direct by Mr. Gillis               436
15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Good morning.

2          Mr. Bryden, you remain under oath.

3          Ms. Minter.

4          MS. MINTER:  Your Honor, if I could very

5   briefly raise two preliminary issues.

6          THE COURT:  All right.

7          MS. MINTER:  The first is with respect to the

8   scheduling for this week.  We have consulted with our

9   expert, and he could possibly be available to testify

10  on Thursday.  I would tell the Court that I would

11  request Friday.  I know the Court had not intended to

12  sit Friday.  The concern is we have not been able to

13  afford to bring our expert in to meet with us

14  previously.

15         THE COURT:  I understand.  Let me just tell

16  you:  At this point, I'm confident we'll be able to

17  carry over to Monday, if necessary.

18         MS. MINTER:  I will tell Your Honor that our

19  witness is certainly available Thursday.  We can make

20  that happen, if necessary.

21         THE COURT:  Other than the expert?

22         MS. MINTER:  Both, Your Honor --

23         THE COURT:  I see.  All right.

24         MS. MINTER:  -- our nonexpert witness and our

25  expert witness.  We could accommodate on Thursday, but

1 we would need to know now for arranging his flight.

2          THE COURT:  No.  We'll be able to carry over

3 into Monday either for your witness or if the

4 government's case requires it.

5          MS. MINTER:  Very well, Your Honor.

6          THE COURT:  All right.

7          MS. MINTER:  If I can ask if Mr. Siegel can

8 briefly be excused then.  As I said, our witness is out

9 of the country.  So timing his travel -- we'd like to

10 notify him.

11          THE COURT:  That's fine.

12          MS. MINTER:  Also, Your Honor, to the extent

13 that it was unclear, since there was a fair amount of

14 objecting yesterday, I would just like to make clear

15 for the record that our objections to Mr. Bryden's

16 testimony about speculation as to what the speakers

17 intended or were discussing were intended to apply to

18 any conversation to which he offered such an opinion.

19          THE COURT:  That's fine.  The objection is

20 lodged as to all of that information.

21          MS. MINTER:  Thank you, Your Honor.

22          THE COURT:  Are you ready to proceed?

23          MS. MINTER:  We are, Your Honor.

24          THE COURT:  All right.

25

1                        FURTHER CROSS-EXAMINATION

2   BY MS. MINTER:

3   Q     Good morning, Mr. Bryden.

4   A     Good morning.

5   Q     To return to something that we discussed

6   yesterday, you mentioned various websites that have

7   some connection with al-Shabaab.

8   A     Yes.

9   Q     And you testified that there are some that are

10  affiliated with al-Shabaab and that there are some

11  websites that are perhaps in favor of al-Shabaab that

12  are not affiliated with al-Shabaab?

13  A     That's right.

14  Q     So that would be a circumstance where someone who

15  has no connection to al-Shabaab might say things that

16  were favorable to al-Shabaab or in support of

17  al-Shabaab?

18  A     In websites, it's less about individuals saying

19  things.  It's more about the sorts of news reporting

20  that they would include.

21        So official al-Shabaab websites tend to simply

22  broadcast statements by al-Shabaab and news by what are

23  clearly al-Shabaab correspondences or sources.

24        Websites that are sympathetic to al-Shabaab might

25  carry also news from other sources that may align with

Bryden - Cross by Ms. Minter

1 their point of view but aren't officially or clearly

2 al-Shabaab positions.

3      And then there are some that would simply include

4 references to the same incidents that al-Shabaab would

5 report on but possibly from a different perspective.

6 Q    The same could be said about a forum or a chat

7 room, that is to say that there are some that are

8 directly affiliated with al-Shabaab, correct?

9 A    Yes.

10 Q    I believe you said yesterday that perhaps one

11 indicia of that might be someone from al-Shabaab who

12 appears in a chat room.

13 A    Correct.

14 Q    A dialogue with the participants.

15      There could also be a forum or a chat room that is

16 in support of al-Shabaab but is not affiliated with

17 al-Shabaab; is that fair to say?

18 A    That's fair to say.

19 Q    You would consider that to be a forum or a chat

20 room where people express pro-al-Shabaab sentiments

21 perhaps?

22 A    That's where you might see a debate between

23 pro-al-Shabaab members of a chat room and those who

24 hold other views.

25 Q    But those would not be affiliated with al-Shabaab?

Bryden - Cross by Ms. Minter

1  A     The chat room, no.  And even the chat room --

2  describing an affiliation is difficult because some

3  chat rooms are hosted by sites, for example, Paltalk.

4  We can't say that Paltalk is affiliated with al-Shabaab

5  just because there is a certain chat room that is a

6  pro-al-Shabaab chat room.

7  Q     Certainly.

8        With respect to a person who managed a forum or

9  acted as moderator, for example, to such a forum, one

10 that was not affiliated with al-Shabaab, you would not

11 consider that person to be a member of al-Shabaab?

12 A     Not on simply the basis of hosting a forum in

13 which different views were expressed, no.

14 Q     Would an individual in that circumstance be

15 subject to U.N. sanctions?

16 A     No, not unless that person were identified as an

17 active supporter or financier or facilitator of

18 al-Shabaab, in which case if the moderator's actions,

19 for example, promoted the al-Shabaab point of view,

20 precluded other points of view, and we had other

21 information indicating that the moderator perhaps had

22 an association with al-Shabaab, then that might lead us

23 to propose them for designation.  But it would require

24 several different elements to be taken under

25 consideration.

Bryden - Cross by Ms. Minter

1  Q    To be clear, can an individual be subject to U.N.

2  sanctions without being a member of al-Shabaab?

3  A    Yes.  There are many different aspects of the

4  sanctions regime that could bring someone to the

5  attention of the security council.

6       But with respect to al-Shabaab specifically,

7  al-Shabaab falls under an aspect of the sanctions

8  regime, specifically Resolution 1844, that relates to

9  threats to peace and security.  So other threats to

10 peace and security have been defined under Resolution

11 1844.

12 Q    If we could also revisit some of your testimony

13 about the post-Barre -- am I saying that correctly?

14 A    Correct.

15 Q    -- the post-Barre time period.  It's certainly

16 safe to say that Somalia and Mogadishu, in particular,

17 was a dangerous place after the government fell?

18 A    That's right.

19 Q    Perhaps some people might have protection from

20 their clan militia?

21 A    Yes.

22 Q    But if not, they were fairly vulnerable?

23 A    That's possible.  It's a little more complicated

24 than that, but yes, that's fair.

25 Q    Certainly, an individual in Mogadishu at that time

Bryden - Cross by Ms. Minter

1  could be the victim of robbery, theft --

2  A     Those were common at the time.

3  Q     Murder?

4  A     Yes.

5  Q     That's especially true for women, correct?

6  A     That's true.

7  Q     When people fled the city, they did so in large

8  groups, correct?

9  A     Many did.  Some in smaller groups, but there was a

10 mass exodus initially when the government fell.

11 Q     Let me put it this way:  It was certainly safer to

12 travel in large groups, correct?

13 A     Yes.

14 Q     To help protect from some of these things we've

15 talked about?

16 A     That's correct.

17 Q     It was certainly a dangerous process even fleeing

18 the city?

19 A     In '91 and '92, yes.

20 Q     If we could talk a little bit about the

21 nongovernmental organizations operating in Somalia, you

22 had testified yesterday that the western NGOs were

23 rebuffed by al-Shabaab, correct?

24 A     Correct.

25 Q     Al-Shabaab would not work with those

1  organizations?

2  A    Would not work with most of them.  It would

3  tolerate some of them.

4  Q    What organizations would they tolerate?

5  A    Some areas were accessible to the International

6  Committee of the Red Cross through its affiliate, the

7  Red Crescent Society.  There were some local Somali

8  organizations that were contracted by western or

9  international organizations.  So, for example, the

10 United Nations Children's Fund, UNICEF, would contract

11 Somali NGOs to operate, and some of them could operate

12 in al-Shabaab areas.  Doctors Without Borders was able

13 to operate briefly in al-Shabaab areas.  I think that

14 operation had to be terminated at some stage.

15      But there were ways in which organizations were

16 able to negotiate access for certain periods, and

17 that's an issue that I personally studied in 2007, to

18 look at on what basis it would be possible to operate

19 in al-Shabaab areas.

20 Q    On what basis it would be possible for an NGO to

21 operate in an al-Shabaab area?

22 A    Yes.

23 Q    In those areas, those organizations would provide

24 relief efforts to Somali citizens?

25 A    Yes, they would, or they would try.

Bryden - Cross by Ms. Minter

1  Q     What type of aid did they provide?  For example,

2  you mentioned the Red Crescent Society.

3  A     Different kinds.  In some areas, food assistance.

4  In some areas, medical assistance, sanitation, water.

5  But, as I said, these varied, and it also depended on

6  the Shabaab authorities.  For example, in 2011 the

7  Shabaab leadership denied that there was actually a

8  famine.  So food aid was not permitted in most areas

9  under their control whereas medical assistance would be

10 permitted.

11 Q     When you describe food assistance, you mean quite

12 literally providing food to individuals who don't have

13 it?

14 A     That's right, distribution of food to individuals

15 or setting up of feeding centers for malnourished

16 children.

17 Q     But nothing along the lines of perhaps helping

18 them grow crops or something, literally directly

19 providing --

20 A     I can't say with certainty.  I know that the Red

21 Cross/Red Crescent has for a long time been involved in

22 the promotion of expansion of livestock herds.  Other

23 organizations as well have been involved in seeds and

24 tools provision, digging of irrigation canals.  So I

25 think some activities probably would have related to

Bryden - Cross by Ms. Minter

1    more developmental-type work than just handing out

2    food.

3    Q    You also described medical assistance.  What would

4    that constitute?

5    A    Either supporting a hospital or a clinic or a

6    mother and child health center with medical supplies,

7    possibly by providing stipends to pay the staff so they

8    could stay on the job.  Sometimes carrying out surveys

9    to determine, for example, ensuring that -- there was a

10   polio eradication campaign, which was, I believe,

11   difficult to negotiate because there were concerns

12   within al-Shabaab as to whether polio vaccine was

13   genuine or not.  So these types of activities would

14   fall under the medical umbrella.

15   Q    You also referenced Doctors Without Borders as an

16   organization that operated at least briefly?

17   A    Yes.

18   Q    What assistance did Doctors Without Borders

19   provide?

20   A    One of the facilities that I'm most familiar with

21   was a clinic in Dayniile, a district to the west of

22   Mogadishu, which at one time was under al-Shabaab

23   control and then subsequently changed hands.  But for

24   at least a period while it was under al-Shabaab

25   control, Doctors Without Borders was able to operate

1  there.

2  Q    What sort of care -- you referenced a clinic.

3  Would that be acute medical care?

4  A    It was a small referral hospital.  So all

5  different kinds of clinical services, including some

6  surgery.

7  Q    So certainly treatment for individuals who were

8  ill or injured would be included in the services the

9  clinic would provide?

10  A    In the services of the hospital, yes.

11  Q    To be clear, that's something that Doctors Without

12  Borders provided in this instance that you described?

13  A    I didn't access the hospital, so I don't know what

14  services were provided.  Doctors Without Borders in

15  that case didn't have a medical team in the hospital.

16  They were providing support to a local hospital run by

17  national staff.

18  Q    You're familiar with Doctors Withouts Borders?

19  A    Yes.

20  Q    Generally, their mandate would be to provide care

21  to individuals who are ill or wounded?

22  A    Generally, they would provide assistance to people

23  who are ill or wounded, yes.

24  Q    Regardless of who that individual was, correct?

25  A    Yes, in principle, that's true.  In practice, that

1   can be difficult, but yes, in principle, it's

2   humanitarian neutrality.

3   Q    So, for example, they would not be able to

4   discriminate who they treated based on clan

5   affiliation?

6   A    No.

7   Q    Or governmental affiliation?

8   A    No.

9   Q    Or any other affiliation?

10  A    No.

11  Q    Including association with an organization like

12  al-Shabaab?

13  A    No.

14  Q    With respect to al-Shabaab, given your experience

15  with the organization, how do members of al-Shabaab

16  receive medical care?

17  A    I'm sorry?

18  Q    How do members of al-Shabaab receive medical care?

19  A    Mainly through their own medical teams.  Again, as

20  I said, they were very resistant to the presence of

21  western NGOs.  There were some Islamic NGOs that worked

22  in al-Shabaab area, but to the best of my knowledge,

23  there were not many.  So al-Shabaab itself looked after

24  its own wounded.  And so, in fact, it was not uncommon

25  for medical supplies to be confiscated or looted by

1  al-Shabaab so that they could look after their own

2  troops.

3  Q    So when you say through their own medical teams,

4  presumably, that means doctors or nurses or other care

5  providers?

6  A    Right.

7  Q    When you say their own, that means that they were

8  members of al-Shabaab?

9  A    Not necessarily.

10 Q    Or affiliated with al-Shabaab?

11 A    Not necessarily.

12 Q    What term would you use?

13 A    Well, in some cases, they might be members of

14 al-Shabaab who would accompany al-Shabaab into battle,

15 and there would be first responders on the battlefield.

16     In other cases, if al-Shabaab controlled a town

17 and there was a hospital in that town or doctors or a

18 clinic in that town, if al-Shabaab brought wounded to

19 that clinic and said treat them, they would be treated.

20 There would be no choice.

21     So in one case you have active al-Shabaab

22 participants, and in another, you would have people who

23 would simply cooperate because they would have no

24 alternative.

25 Q    Is that no alternative because of al-Shabaab's

Bryden - Cross by Ms. Minter

1   control over the town or because of their Hippocratic

2   oath, if you will?

3            THE COURT:  I'm sorry.  Their what?

4            MS. MINTER:  The Hippocratic oath.

5   BY MS. MINTER:

6   Q    In other words, a sense of obligation as a medical

7   professional versus --

8   A    I think that would be a very personal decision.  I

9   wouldn't say that every medical practitioner in Somalia

10  would volunteer their services simply on the basis of

11  humanitarian or Hippocratic obligations.  Some would,

12  but others would do so because they were coerced to do

13  so.

14  Q    So certainly both are possible?

15  A    Both are possible.

16  Q    On an unrelated topic, you described a nickname

17  yesterday, a kunya of Abu Mansur?

18  A    Yes.

19  Q    Are there multiple individuals that you've

20  testified to who use that nickname?

21  A    I have testified to two who've used that nickname

22  in this courtroom.

23  Q    Is Mr. Hammami the other?

24  A    Yes.

25  Q    Mr. Bryden, you also testified yesterday about the

1  practice of remittances?

2  A     Yes.

3  Q     Of sending money back to Somalia by individuals

4  who live outside the country.  That is a significant

5  amount of money that's sent back to Somalia every year?

6  A     That's right.

7  Q     I believe you testified in previous cases that the

8  diaspora sends as much as between $500 million and

9  $1 billion every year back to their homeland.  I

10  realize that might be a somewhat dated figure but --

11  A     Yeah.  I think I said yesterday that the current

12  estimates are actually higher.  They're closer to

13  $1.5 billion.

14  Q     You also testified yesterday that redistribution

15  of wealth is a cultural obligation?

16  A     Yes.

17  Q     You meant by that benefiting others who don't have

18  the benefit of your income in short?

19  A     Redistribution within the family.

20  Q     Specifically, you said that with reference to

21  remittances, correct?

22  A     No.  It's a general obligation.  It takes various

23  forms, including the practice of sort of socially

24  acceptable sponging where I would just come and say, I

25  need something from you.  And I'll have an obligation

Bryden - Cross by Ms. Minter

1  because of some familial tie or friendship to give you

2  something that day.  But in terms of the context of

3  remittances, family members are under a sense of

4  obligation for the most part to share some of their

5  income with their family back home.

6  Q    You also testified yesterday fairly extensively

7  about the clan system in Somalia, and that is part of

8  what you mean when you say family, correct?

9  A    That's part of what I mean within certain

10 parameters, yes.

11 Q    The clan system is very important to Somalis,

12 correct?

13 A    Yes.

14 Q    Okay.  Certainly, one of the first things they

15 learn about each other and that identifies who that

16 person is?

17 A    Yes.

18 Q    Certainly, clan connections are very important to

19 Somalis, correct?

20 A    That's right.

21 Q    So being from the same clan would impose a sense

22 of loyalty?

23 A    Yes.

24 Q    And familiarity?

25 A    Since I didn't actually testify extensively about

1   the clan system, I would just add that clan is

2   segmentary.  So when we use it, it's a very loose term.

3   Clan can be your immediate extended family, or it can

4   be several hundred thousand people or over a million

5   people.  So your loyalty probably will extend most

6   immediately to your extended family, not necessarily to

7   the entirety of the clan to which you normally belong.

8   Q    But certainly, there would be a greater sense of

9   loyalty to -- well, let me back up.

10       The reason for these large groups in the clan is

11  because there are clans and then subclans, correct?

12  A    Right.

13  Q    Then smaller clans below that?

14  A    Yes.

15  Q    So when you talk about immediate family, your

16  immediate family might be part of a sub-subclan?

17  A    Correct.

18  Q    Which is part of a larger subclan and so on and so

19  on up to the clan?

20  A    Yes.

21  Q    There are only a small handful of clans in

22  Somalia, what we would consider the top row of clans,

23  correct?

24  A    The top level, yes.

25  Q    Somewhere in the range of four to six?

1   A     That's the generally accepted.

2   Q     Okay.  But, again, as I said, certainly, you would

3   have a greater sense of loyalty to your own clan than

4   perhaps other of the larger clans?

5   A     Again, it's complicated.  You will have a greater

6   sense of loyalty to your own clan, but your own clan is

7   also -- your sense of identity is also mitigated by

8   your maternal clan, by your marital clan affiliations,

9   and so on.  So yes, but with the qualification that

10  it's quite complex.

11  Q     Is it fair to say, then, that a Somali would have

12  a sense of loyalty to multiple clans with which they

13  had some affiliation?

14  A     Yes.

15  Q     Be it maternal or through marriage or paternal?

16  A     Yes.

17  Q     Is it possible that Somalis might refer to each

18  other as relatives even if they weren't related by

19  blood?

20  A     Yes.

21  Q     Due in part to that clan system?

22  A     Yes.

23  Q     With respect to the sense of obligation of being

24  in the same clan or being relatives, be it blood or

25  clan-based, does that play into the process of

1  remittances?  In other words, would someone feel a

2  sense of obligation to send money to someone who is in

3  the same clan, or could that be a part of why they feel

4  a sense of obligation?

5  A    As far as I know, that's not really the basis on

6  which remittances are sent.  Remittances tend to be

7  sent to immediate family, to mother, to brother, to

8  siblings, to perhaps the next circle of the nuclear

9  family.  Beyond that, there may be a sense of

10 obligation if a distant cousin requires assistance.

11 But beyond the extended family, that attenuates quite

12 quickly.  If someone just came to me and said, I'm from

13 your clan, send me money, and we didn't have an

14 identifiable familial relationship, then no, because

15 the obligations would never cease and they'd become

16 unbearable.

17 Q    So the sense of obligation is more driven by the

18 relationship with the individual?

19 A    Yes.

20 Q    Obviously, that would apply, as you said, to

21 immediate family members?

22 A    Yes.

23 Q    You testified a moment ago about friendship

24 perhaps as an obligation?

25 A    Yes.

Bryden - Cross by Ms. Minter

1    Q     So an individual could feel a sense of obligation

2    to financially support a close family friend?

3    A     Yes.

4    Q     If they had a connection to the family, a

5    long-time relationship?

6    A     Yes.

7    Q     An important part of the Muslim culture is

8    charitable obligations, correct?

9    A     That's right.

10   Q     An important part of those charitable obligations

11   is caring for orphans?

12   A     Yes.

13   Q     To be clear, in the Somali culture, that can mean

14   a child who has lost one parent, correct?

15   A     That's correct.

16   Q     So both parents don't necessarily have to be

17   deceased for a person to be an orphan?

18   A     No.

19   Q     To go back to your testimony yesterday and a

20   little from this morning about al-Shabaab obstructing

21   aid and some of the other NGOs that they did not

22   permit, did that have the effect of increasing the need

23   for remittances?  In other words, if individuals are

24   not able to get benefits from NGOs, does that drive a

25   need or a request for remittances for other sources of

1  income?

2  A    It would've driven the need for resources.  People

3  would have looked for resources wherever they could

4  find them.  During that period where al-Shabaab was

5  resistant to assistance and we entered a period of

6  famine, those who were most severely affected were also

7  those who had the least access to remittances.

8       So part of what happened was instead they started

9  to try to relocate to areas where they could access

10 assistance.  In many cases, al-Shabaab denied them the

11 opportunity to relocate and required them to remain in

12 areas under their control.

13      So in that instance, those weren't people really

14 who, for the most part, had access to the remittance

15 system.  They were from poor communities, or they

16 couldn't count on relatives who were able to support

17 them.  Those were the worst affected.

18      Those who could access remittances, I suppose,

19 were probably not those who were going to require

20 humanitarian assistance *per se*.  They would have

21 initially turned to other coping strategies, selling

22 off livestock, selling off assets, and, then, if

23 assistance was available, certainly trying to access

24 it.  But people have multiple coping strategies in such

25 a situation.

Bryden - Cross by Ms. Minter

1   Q    But regardless of whether individuals who were in

2   need of remittances could access them, is it fair to

3   say that with al-Shabaab restricting access to NGOs,

4   the need for another source of assistance, such as

5   remittances, would be greater?

6   A    It's a logical conclusion.  I don't know if it's

7   borne out by the data, but it makes sense.

8   Q    With respect to al-Shabaab, you testified

9   yesterday that they have a significant income

10  themselves, correct?

11  A    Yes.

12  Q    A fair amount of that comes from taxes and

13  extortion?

14  A    Yes.

15  Q    As well as some other resources within Somalia

16  that they've been able to control at various times?

17  A    That's right.

18  Q    Okay.  If you would, just reiterate what their

19  annual income is.

20  A    I don't know now.  At the time that we actually

21  studied their annual income, it appeared to exceed

22  $100 million from a combination of export tax and

23  checkpoint controls and then an unknown degree of

24  taxation on commerce.  But we estimated in excess of

25  $100 million.  However, with the loss of Kismaayo port,

1   with the loss of territory and the internal revenues

2   that that generates, I would estimate a loss of

3   probably 50 percent or more of that income.  But that's

4   a real finger-in-the-wind estimate.

5        I have not looked at -- what we did was count the

6   number of checkpoints, talked to truck drivers, find

7   out how much they paid, roughly what the volume of

8   traffic was on certain roads.  We talked to the various

9   ports and beach ports to talk about taxation values.

10       I have to say I haven't looked in that much detail

11  in a couple of years.  So I can't say with certainty to

12  what degree they've lost income.  It's clearly

13  significant because they now control no major ports and

14  very few internal revenue entry points.

15  Q    Just to go over again, when did they lose control

16  of the Kismaayo port or city and port?

17  A    I believe we're talking August 2012.

18  Q    So until August 2012, they had that significant

19  source of income?

20  A    That's right.

21  Q    You agree that they also obtained a significant

22  amount of money from taxes and extortion?

23  A    Yes.

24  Q    Would that make up the other 50 percent that you

25  testified to?

1  A    If you include checkpoints, taxation at border

2  controls, that would have been -- it wasn't 50 percent.

3  That was probably another 15 to 20 percent if I recall

4  correctly.

5  Q    If you could, just explain for the Court what you

6  mean by al-Shabaab's income from taxes and extortion.

7  What were they doing to obtain that money?

8  A    Well, let's say I own a telecommunications company

9  and I provide services across southern Somalia.  My

10 headquarters might be in Mogadishu, but I need to have

11 telecommunications masts rebroadcasting the signal

12 throughout the territory.  Al-Shabaab in one part of

13 that territory would say -- well, they might come to me

14 or send a messenger and say, You will pay us so much,

15 or you will suffer the consequences.

16     Now, the consequences could be that they would

17 place explosives on the telecommunications mast and cut

18 off service in part of the country.  It could be that a

19 bomb would go off in my office in Mogadishu or in

20 Kismaayo or another major antenna of my business, or it

21 could be that my staff would be subject to reprisals.

22 So I would have no choice but to pay to al-Shabaab.

23 Q    Those actions by al-Shabaab were well known?

24 A    The phenomenon is well understood, but the

25 business community is reluctant to talk about it

Bryden - Cross by Ms. Minter

1   because they're afraid that then they will be labeled

2   as al-Shabaab supporters.  Therefore, it remains --

3   until recently it was an open secret.  I think it's

4   very recently that some business leaders have come out

5   publicly and said, Until the government provides

6   protection, we will pay extortion money to al-Shabaab.

7   We have no choice.

8   Q    So even if the businesses are not admitting that

9   they're doing this, the fact that al-Shabaab is

10  undertaking these activities was well known --

11  A    Yes.

12  Q    -- among the Somali citizens?

13  A    Yes.

14  Q    You talked a little bit about the involvement of

15  the United States in the situation in Somalia

16  yesterday, and you said that the United States

17  designated al-Shabaab as a designated terrorist

18  organization in 2008; is that correct?

19  A    I believe so.

20  Q    At one point, you also testified that they were

21  providing intelligence information to a foreign

22  government.  Did I understand your testimony correctly?

23  A    Not intelligence.  In providing assistance,

24  security assistance.

25  Q    Who was that to?

Bryden - Cross by Ms. Minter

1  A    Well, the U.S. has provided security assistance at

2  one stage to some of the faction leaders involved in

3  fighting the Islamic courts, to the Puntland

4  Intelligence Service, to the Somali National Army, and

5  Somali National Intelligence Service.

6  Q    The United States has also been involved

7  militarily, correct?

8  A    Yes.

9  Q    They engaged in drone strikes against members of

10 al-Shabaab?

11 A    That's correct.

12 Q    Including Godane, who you testified yesterday was

13 killed in a drone strike in 2014?

14 A    That's right.  I believe so.

15 Q    Okay.  You also testified with respect to the

16 droughts that Somalia experiences?

17 A    Yes.

18 Q    I think you've testified in particular to one in

19 2011.

20 A    Yes.

21 Q    But that's not unique, correct?

22 A    No.

23 Q    In fact, droughts happen regularly in Somalia?

24 A    That is right.

25 Q    On a somewhat --

1          INTERPRETER ABDI:  The interpreter did not

2 hear.

3          THE COURT:  Would you repeat that.

4          MS. MINTER:  Certainly.

5 BY MS. MINTER:

6 Q    The question was droughts are not unique to

7 Somalia?

8 A    That's correct.

9 Q    They happen regularly?

10 A    Yes.

11 Q    In fact, in cycles?

12 A    Yes.  Not entirely predictable cycles, but in

13 cycles, yes.

14 Q    You also testified that it is an agricultural

15 society?

16 A    Agropastoral society.

17 Q    Perhaps my definition of agricultural is

18 inaccurate.  Certainly, a primary source of their

19 economy is raising livestock, correct?

20 A    That's right.

21 Q    Also, to a lesser degree, growing crops?

22 A    Correct.

23 Q    I believe you said in the southern part of the

24 country.

25 A    Mainly, and also in parts of the north.

Bryden - Cross by Ms. Minter

1   Q     So certainly, those are two industries that are

2   very dependent upon the weather?

3   A     Yes.

4   Q     The droughts are devastating?

5   A     They can be, yes.

6   Q     Is that also something that impacts the need for

7   remittances?

8   A     Yes.  If a family is feeling stressed because of a

9   long drought or long dry season and livestock are

10  dying, then they'll place greater pressure on their

11  relatives to send money.

12  Q     You also testified yesterday to the use of a kunya

13  or a nickname?

14  A     Yes.

15  Q     That's not a formal process, correct?

16  A     Correct.

17  Q     Okay.  It could be a nickname that's given to you

18  by other individuals?

19  A     A nickname, yes.  I wouldn't conflate kunya to a

20  nickname, but yes.

21  Q     It could be a nomenclature given to you by

22  individuals?

23  A     Yes.

24  Q     It could also be a name you give yourself in some

25  instances?

1  A    I suppose so; although, I think that might not

2  necessarily be accepted by others, that you give

3  yourself a nickname.  But some might have done so, yes.

4  Q    But it's certainly not something that's formally

5  bestowed by al-Shabaab, for example?

6  A    Well, when I'm talking about a nickname, I'm

7  talking about a traditional Somali nickname.  If we're

8  talking about a kunya, I'm not sure if there's a

9  procedure through which al-Shabaab bestows a kunya.

10    I think in that case, individuals would give

11  themselves a kunya, for example, the father of

12  so-and-so, the mother of so-and-so.  And often a part

13  of the kunya is your supposed country of origin.  So

14  Omar Hammami would have been Abu Mansoor al-Amriki as

15  an American.  That's not a formal process, but it's

16  accepted as -- there are conventions, I suppose, that

17  guide the way kunyas are adopted.

18  Q    But if an individual is referred to by a kunya,

19  that's not necessarily something that's been bestowed

20  upon them by al-Shabaab proper?

21  A    That's right.

22  Q    Someone who has a kunya could be a supporter of

23  al-Shabaab?

24  A    Yes.

25  Q    Or they could not have any affiliation at all?

Bryden - Cross by Ms. Minter

1  A     They could not have any affiliation.  But as I

2  said, the practice of adopting kunyas has been, in my

3  experience, exclusively associated with al-Shabaab and

4  its associates, sympathizers.  It's not something

5  that's widespread in Somali society.

6  Q     But it could apply to someone who's simply a

7  supporter and not a member?

8  A     It could.

9  Q     It could apply to someone who's not affiliated at

10 all?

11 A     In theory, it could.

12         THE COURT:  Mr. Bryden, so a kunya is a name

13 that someone adopts for themselves as opposed to

14 something that's conferred upon them by someone else?

15         THE WITNESS:  Your Honor, the term "kunya,"

16 which is also an Arabic loan word, applies to,

17 typically, Arab or Muslim names often with a prefix Abu

18 or Umu, which is not typical in Somali society.  It's

19 an affectation adopted more from Arabic tradition, and

20 so it's -- it tends to be used -- so far it seems to

21 have been used only by al-Shabaab and its sympathizers.

22 Even other Salafi groups don't seem to use this

23 formula.

24         THE COURT:  But it's a name that someone

25 adopts for themselves?

Bryden - Cross by Ms. Minter

1          THE WITNESS:  As far as I know, yes.  I
2   believe an individual -- if an individual's friends
3   said, We are going to call you such-and-such, and
4   they'd give them an appropriate kunya, it might stick
5   like any nickname.

6          THE COURT:  I understand.

7   BY MS. MINTER:

8   Q    I think we've covered this, Mr. Bryden, but I've
9   been informed that I may have talked over your answer,
10  which I tend to do from time to time.

11         Just to be clear, someone who has a kunya may not
12  be a member of al-Shabaab at all?

13  A    In theory, they may not be a member of al-Shabaab
14  at all.

15  Q    You also testified yesterday regarding a
16  significant number of phone calls and chats that you
17  reviewed as part of your expert analysis of this case.
18  You don't know the individuals who participated in
19  those calls?

20  A    No.

21  Q    Or in those chats?

22  A    No.

23  Q    You've never met any of them?

24  A    No.

25  Q    You don't know their proper names?

1  A     No.

2  Q     You don't know where they live?

3  A     No.  I know only what I've seen written on the

4  transcripts.

5  Q     So you don't know if they've ever sent money to

6  al-Shabaab?

7  A     No.

8          MS. MINTER:  Nothing further, Your Honor.

9          THE COURT:  All right.  Thank you.

10         Any redirect?

11         MS. ATIYEH:  Does Mr. Yamamoto have any

12  cross?

13         THE COURT:  Yes.  I'm sorry.

14         Mr. Yamamoto or Ms. Deutsch?

15         MS. DEUTSCH:  Yes, Your Honor.

16         Good morning.

17         THE COURT:  Good morning.

18                CROSS-EXAMINATION

19  BY MS. DEUTSCH:

20  Q     Good morning, Mr. Bryden.

21  A     Good morning.

22  Q     Mr. Bryden, my name is Paula Deutsch, and I'm with

23  Mr. Yamamoto representing Hinda Dhirane along with

24  Donna Maxwell, a paralegal from our office, which is

25  the Federal Public Defender's Office in Seattle.  I

Bryden - Cross by Ms. Deutsch

1  wanted to ask you a few questions.

2      Mr. Bryden, we were talking yesterday about the

3  fact that the Somali society is an information society;

4  is that right?

5  A    Yes, that's right.

6  Q    Okay.  The Somalis became what many analysts

7  thought was one of the most active online communities

8  in the world, right?

9  A    Right.

10  Q    Members of the Somali community tend to identify

11  closely with what's happening in Somalia; is that

12  right?

13  A    That's right.

14  Q    Okay.  The Somali members of the diaspora stay

15  connected with Somalis in the homeland, correct?

16  A    Correct.

17  Q    Somalis in the diaspora stay connected with other

18  members of the diaspora outside the homeland, right?

19  A    That's right.

20  Q    Somalis stay connected through telephones, right?

21  A    Yes.

22  Q    Through chat rooms?

23  A    Yes.

24  Q    Through Facebook and other social media?

25  A    Yes.

Bryden - Cross by Ms. Deutsch

1  Q    There are a number of telecommunication companies

2  in Somalia and Somaliland?

3  A    That's right.

4  Q    Is one of them TELESOM?

5  A    Yes.

6  Q    Okay.  The mobile phone system in Somalia is one

7  of the cheapest in Africa I think you've said before.

8  Is that right?

9  A    I believe that's true, yes.

10 Q    You also said that there is something like 700

11 Somali websites?

12 A    That's the last estimate that I have been given,

13 yes.

14 Q    Those 700 are all in the Somali language?

15 A    They will all have some component in the Somali

16 language.  I think almost all.  Some will also have

17 English.  Some will also have Arabic.  Some will also

18 have Swahili, possibly other languages.

19 Q    You said yesterday that many of the websites and

20 news sources are aligned with certain groups, right?

21 A    That's right.

22 Q    So there are websites that are aligned with

23 al-Shabaab?

24 A    Yes.

25 Q    There are other websites that are sympathetic to

Bryden - Cross by Ms. Deutsch

1   al-Shabaab but not aligned?

2   A    That's right.

3   Q    The fact that someone listens to the news on a

4   website and then calls other Somali people and

5   discusses the news, that's not odd; is it?

6   A    No.

7   Q    They share news with each other over the Internet

8   all the time; is that right?

9   A    That's right.

10  Q    You had said that the Somali society is an

11  information society, right?

12  A    Right.

13  Q    It's an oral society?

14  A    Yes, that's right.

15  Q    You also said that Somalis pass information along

16  at great speed?

17  A    Yes.

18  Q    So the fact that a news article comes out one day

19  and the same day Somali people are discussing it,

20  that's not odd; is it?

21  A    No, it's not.

22  Q    Now, I want to talk a little bit about this case.

23  Yesterday on direct exam, you identified a bunch of

24  news articles introduced by the government, right?

25  A    Right.

Bryden - Cross by Ms. Deutsch

1  Q    I want to just go over it a little bit.  You went

2  over an article describing the Somaliland attempt to

3  arrest Godane in Hargeysa, right?

4  A    Yes.

5  Q    You went over the departure of al-Shabaab from

6  Marka or Merca?

7  A    That's correct.

8  Q    You went over articles about Sheikh Abdulkadir

9  Mumin, right?

10  A    Yes.

11  Q    There was also an article about a man arrested for

12  assassinating Sheikh Abdulkadir Nur Farah, right?

13  A    Right.

14  Q    He was in, I believe, a mosque at the time he was

15  assassinated.

16  A    That's what's reported, yes.

17  Q    All right.  Another set of articles you went over

18  were about Khalif Ahmed Ereg, who was the subject of a

19  bombing by al-Shabaab?

20  A    That's right.

21  Q    There were also news articles about the bombing of

22  the Banaadir courthouse in Mogadishu?

23  A    That's right.

24  Q    About the Westgate Mall bombing in Nairobi?

25  A    Yes.

Bryden - Cross by Ms. Deutsch

1  Q    I think that the final one that you looked at was

2  an article about the execution of two spies in Baraawe,

3  right?

4  A    Yes.

5  Q    Now, yesterday after you identified the news

6  articles, you were shown transcripts of conversations

7  between the defendants and also, at times, other

8  ladies, right?

9  A    That's right.

10  Q    The fact that the defendants were discussing these

11  news articles, that wasn't odd; was it?

12  A    I'm sorry?

13  Q    The fact that the defendants and others were

14  discussing these news articles, that wasn't odd or

15  unusual; was it?

16  A    That's not unusual, no.

17  Q    In some of these news items, the defendants did

18  appear to be supporters of al-Shabaab, right?

19  A    That's correct.

20  Q    In other words, being a supporter of al-Shabaab

21  doesn't mean that you're a member of al-Shabaab; does

22  it?

23  A    No, it doesn't.

24  Q    It just means that you believe in what they're

25  doing?

Bryden - Cross by Ms. Deutsch

1    A    That's right.

2    Q    In one conversation that you looked at,

3    Ms. Dhirane said in the article about the bombing in

4    which Khalif Ereg was the subject -- she said, God

5    didn't kill the one I wanted to die.

6         Do you remember that?

7    A    I do.

8    Q    All right.  In a second conversation you were

9    shown in regard to the bombing of the Banaadir

10   courthouse, she said, The civilians, let them be

11   killed; is that right?

12   A    That's right.

13   Q    All right.  Now, the fact, again, that these

14   ladies were verbally supportive of al-Shabaab doesn't

15   mean they were providing material aid; does it?

16   A    In and of itself, no.

17   Q    It doesn't mean they were members of al-Shabaab,

18   correct?

19   A    No.

20   Q    Now, I wanted to talk a little bit about that chat

21   room.  Dacwatu al-Tawhid, is that right?

22   A    Dacwatu al-Tawhid, yes.

23   Q    Okay.  Can we call that DT?

24   A    Okay.

25   Q    You monitored that chat room in 2008, right?

1  A    Through 2011 or thereabouts, yes.

2           THE COURT:  Until when?

3           THE WITNESS:  2011.

4  BY MS. DEUTSCH:

5  Q    I think at that time you were working for the U.N.

6  Somali monitoring group.

7  A    That's right.

8  Q    One of the ways you monitored that chat room was

9  you entered it, correct?

10 A    Yes, that's correct.

11 Q    How often did you enter that chat room?

12 A    I personally didn't enter that chat room.  One of

13 our team entered the chat room.

14 Q    Was there only one person of your team that

15 entered the chat room?

16 A    Yes.

17 Q    How often did he or she enter the chat room?

18 A    On an almost daily basis.

19 Q    For how long of a period of time did he or she

20 enter the chat room on a daily basis?

21 A    That would depend because within the chat room,

22 appointments would be fixed for certain events.  So our

23 monitor would listen to see when the next event was

24 going to be, and we'd log in to make sure that he or

25 she was online for that event and would try to remain

Bryden - Cross by Ms. Deutsch

1   for the duration of the event and listen to what the

2   agenda of the chat room was.  So that would depend.

3   Q    So was it that the person on your team who entered

4   the chat room entered for events only?

5   A    No.  The person on the team would monitor to see

6   if there were discussions of interest going on, threads

7   of interest to be followed.  If not, then had other

8   work to do monitoring other websites and other forums.

9   But if there was an event that was noteworthy, such as

10  we will have a speaker from the mujahideen at a certain

11  time, then our monitor would try to ensure that that

12  event was covered.

13  Q    Now, about how many hours a week did your team

14  monitor that chat room by entering it?

15  A    At this stage, I couldn't say how many hours a

16  week.  I could only go back and look at the frequency

17  by which we had reporting from the chat room, which was

18  sometimes daily and sometimes maybe just two or three

19  times a week.

20  Q    The events that you talked about, are those events

21  involving a speaker from al-Shabaab maybe?

22  A    Some of them, yes.

23  Q    Were they also speakers who were supporters of

24  al-Shabaab but maybe not members of al-Shabaab?

25  A    Yes.

1  Q     Were there people, attendees, in the chat room who

2  also spoke and that would be considered an event?

3  A     The events that were brought to my attention were

4  exclusively related to al-Shabaab activities.

5  Q     All right.  Were there people who lectured in the

6  chat room about the Koran?

7  A     Yes, there were.

8  Q     Were there people who were not a member of

9  al-Shabaab who lectured in the chat room?

10  A     I don't recall any.  Definitely, our impression of

11  that particular chat room was that it was a forum for

12  like-minded people who sympathized with -- not only

13  supported al-Shabaab, but because of the level of

14  detail in which they discussed al-Shabaab operations,

15  because of the way they discussed how to send money to

16  al-Shabaab, or how to travel to join al-Shabaab, it

17  was -- I think, in my assessment, an almost exclusively

18  al-Shabaab chat room.

19       It would have been of interest to people like us

20  who wanted to know what al-Shabaab was thinking or

21  doing.  But if you just wanted to talk about Koran and

22  even to talk or learn about Koran from people

23  sympathetic to al-Shabaab, there were many other places

24  to do it where you wouldn't also have your time taken

25  up with operational details of which towns al-Shabaab

1    claimed to have taken or not taken and how the battle

2    was progressing.

3        So that chat room had a very specific character at

4    the time that we were monitoring.

5    Q    Well, there were sheikhs who were sympathetic to

6    al-Shabaab, right?

7    A    Yes, there were.

8    Q    Did any of those sheikhs appear in the chat room?

9    A    Well, the principal sheikhs that we listened to in

10   the chat room were leaders of al-Shabaab.  That's why

11   it was of interest.

12   Q    Did they ever lecture about the Koran?

13   A    I wouldn't say they didn't.  Almost every speech

14   by a leader of al-Shabaab would invoke the Koran to

15   some degree to legitimize what they were saying.  But

16   leaders of al-Shabaab wouldn't limit themselves,

17   generally, to lecturing about the Koran because they

18   were expected to give briefings on what was happening

19   inside the country.

20        There were others, such as Sheikh Hassan Hussein,

21   who spoke from a more ideological or religious

22   perspective, a theological perspective, and yet were

23   very specifically oriented towards legitimizing the

24   acts of al-Shabaab.

25        I don't recall Hassan Hussein speaking in that

Bryden - Cross by Ms. Deutsch

1   chat room.  We didn't need to monitor him in forums.

2   He was very active online at the time.  That chat room

3   was very, if I may say, operational.

4   Q     Did anyone talk about the installation of Sharia

5   law in that chat room?

6   A     This is a constant theme in al-Shabaab discourse.

7   They believe that Muslims should be governed by Sharia

8   law.  But, of course, their interpretation of Sharia

9   law is not necessarily shared by other Somalis.

10         It's important to know that the Constitution of

11   Somalia is anchored -- it's based on Sharia law.  The

12   Constitution of Somaliland is based on Sharia law.  The

13   Constitution of Puntland is based on Sharia law.  So

14   when al-Shabaab says that these are apostate regimes

15   and Somalia should be governed by Sharia law, it's

16   indicative of a fundamental difference of

17   interpretation of what Sharia law involves.

18   Q     So because someone is interested in Sharia law, it

19   doesn't mean they're necessarily a member of

20   al-Shabaab?

21   A     Not at all.

22   Q     Right.  Now, during the time that you were

23   monitoring that chat room, did your group gather any

24   data as to how much money al-Shabaab received through

25   solicitation or lectures or whatever?

1  A    No.   In the aggregate, we didn't.  We typically,

2  because of the nature of our work, would follow

3  specific transactions and specific individuals to get a

4  sense of how the system operated and use case studies

5  to illustrate that.  Our investigations were time

6  bound.  We had to report on a regular basis to the

7  security council.  And so coming up with aggregate

8  figures was beyond the scope of what was possible.

9  Q    All right.  Did you gather any data on what -- let

10 me see.  Did you gather any data on what percentage of

11 the people who went to that chat room, the DT chat

12 room, actually gave money to al-Shabaab?

13 A    No, we didn't quantify the percentages.

14 Q    All right.  Now, yesterday we were talking about a

15 conversation involving a woman named Ayan Jama Warsame?

16 A    Yes.

17 Q    At the time you were monitoring that chat room,

18 did you know of her?

19 A    No.

20 Q    Did you know anything about her prior to your

21 working on this case?

22 A    No.

23 Q    So in that conversation that you looked at, you

24 don't know, really, whether she was telling the truth

25 or not about her involvement with certain factions of

1   al-Shabaab?

2   A    No, I don't know if she was telling the truth.  I

3   can say -- and again, based on working as an open

4   source analyst -- that the degree to which her accounts

5   were consistent with other sources of information that

6   I had access to and the level of detail that she was

7   able to provide certainly gave me the impression that

8   she was someone who had firsthand knowledge of an

9   event.  But that is only an impression that I've gained

10  from looking at the substance of that translation and

11  the original.

12      But I absolutely would not claim to know who she

13  was or definitively where she was or whether she was

14  speaking of events in which she knew directly or

15  didn't.  But that's certainly the impression that I

16  obtained from reading that.

17  Q    But you can't really say that she talked to the

18  people she said she talked to, right?

19  A    I can't say that for sure, no.

20  Q    In that chat room, that DT chat room, there were

21  postings of people in need, in other words, the names

22  of people in need, such as orphans and widows?

23  A    Well, I think I'd say the same thing, which is

24  simply posting a name and a number and saying someone

25  is in need doesn't necessarily indicate that's really a

Bryden - Cross by Ms. Deutsch

1   person in need or a widow or an orphan any more than

2   Ayan's narrative indicates that she is actually

3   speaking the truth.

4       In such chat rooms as the Paltalk forum that we've

5   discussed, often names and numbers would be given as a

6   place to send money.  If I may, when you refer to the

7   practice of giving money to the importance of

8   supporting orphans, that would typically be done by

9   many Muslims through the annual payment of zakat.  It

10  wouldn't be a direct obligation to support necessarily

11  orphans all the time.  There could be fundraising

12  drives for this purpose.

13      So, again, as an analyst, I would look at the

14  aggregate of what is being discussed in a given forum,

15  the opinions that are being expressed, the degree to

16  which these seem to correspond with other sources of

17  information, and then reach some conclusions as to

18  whether or not this is really about a charitable cause

19  or whether it seems to be oriented towards other

20  purposes.

21      Those were the answers that I gave in my testimony

22  yesterday.

23  Q    But you're an analyst, right?

24  A    That's right.

25  Q    You've got years of experience being an analyst,

Bryden - Cross by Ms. Deutsch

1  right?

2  A    Yes.

3  Q    Someone coming to that chat room and seeing the

4  posting of a name and maybe some kind of an address of

5  people in need, they wouldn't necessarily be able to

6  analyze the situation as you would, right?

7  A    Not necessarily, but I think -- you know, as,

8  again, an information society, Somalis can be quite

9  discriminating about the sources of information they

10 consider legitimate and illegitimate.  So even people

11 looking at Web pages and talking about yesterday's news

12 is not unusual.  But their selection of which pages

13 they choose to look at, how consistently they look at

14 them, how they react to them and report on them, those

15 all give indication as to their orientation vis-a-vis

16 that information.

17      So if someone enters a chat room and sees that the

18 character of discussion or the flow of discussion is in

19 a direction with which they're uncomfortable -- as I

20 think we see in some of the transcripts -- there's

21 either a lively debate and there are disputes between

22 members of the chat room or people may voluntarily

23 leave and go and seek another chat room that's more to

24 their liking.

25 Q    Let me get back to that in a second, please.

Bryden - Cross by Ms. Deutsch

1       Now, a couple of times while you've been on the

2    witness stand, people have talked to you about giving

3    charity, right?

4    A    (Nods head up and down.)

5    Q    Giving charity is one of the pillars of the Koran?

6    A    It's one of the pillars of Islam.

7    Q    It's, what, the second or third pillar of Islam?

8    A    It's one of five.

9    Q    I believe the Hajj, going to the Hajj is number

10   five.  Right?

11   A    Yes.

12   Q    So giving charity is actually more important than

13   going to the Hajj?

14   A    That's an interpretation.  The Hajj is dependent

15   on whether one has the resources to make the Hajj.

16   Q    Right, but it's listed --

17   A    So in a sense, it's not optional.  It's obligatory

18   if one can manage to do it.  But in terms of ranking,

19   that would be a question of religious interpretation.

20   Q    All right.  Would you say that giving charity is

21   at least as important as going to the Hajj?

22   A    I would say that all of the pillars of Islam are

23   considered by most Muslims to be obligatory and,

24   therefore -- and whether or not they choose to rank

25   them, again, is a matter of choice.  But paying zakat,

Bryden - Cross by Ms. Deutsch

1   charity is an obligation.   Zakat is an obligation.

2   Q    Now, paying zakat means you pay a percentage of

3   your income to charity?

4   A    Yes.

5   Q    When you pay a percentage of your income to

6   charity, how do you do that?   Where does that money go?

7   A    It depends.   There are foundations that will offer

8   to take zakat and distribute it on your behalf.   You

9   may pay it through your local mosque.   In some

10  countries, it's a parastatal arrangement through which

11  zakat is paid.

12          THE COURT:   I'm sorry.   What kind of an

13  arrangement?

14          THE WITNESS:   Parastatal.   In some Muslim

15  countries, it's the government that manages the

16  collection and redistribution of zakat.

17          THE COURT:   I see.

18  BY MS. DEUTSCH:

19  Q    Now, is it true that Somali people believe that

20  giving to charity brings you rewards in this world?

21  A    Brings you rewards principally in the next world.

22  Q    But also the next world, right?

23  A    Yes.

24  Q    And so is it fair to say that anyone who is a

25  Muslim, no matter what faction of the Muslim faith you

Bryden - Cross by Ms. Deutsch

1  are in, that anyone believes that giving charity is

2  very important?

3  A    Anyone who adheres to the tenets of the faith

4  would believe that, yes.

5  Q    Would that be true of people in al-Shabaab, that

6  they would believe in the importance of giving charity?

7  A    I can't speak to all members of al-Shabaab, but

8  they would be well aware of their obligations.

9  Q    All right.  Now, let's see.  We talked a little

10 bit about droughts and famine before?

11 A    Yes.

12 Q    There was one famine between 2010 and 2012; is

13 that right?

14 A    That's right.

15 Q    Have there been major famines since then?

16 A    There had been a drought since then.  We haven't

17 seen a famine on that scale since then, no.

18 Q    During the time of these droughts, is it fair to

19 say that there's a food shortage because the crops are

20 affected or livestock is affected?

21 A    Yes.

22 Q    Is it also fair to say that many of the children

23 become acutely malnourished?

24 A    Over time, yes.

25 Q    In the period of time 2010 to 2012, do you

Bryden - Cross by Ms. Deutsch

1    think -- in your opinion, were there more children who

2    were malnourished in that drought than in other

3    droughts?

4    A    That was declared a major emergency by a number of

5    humanitarian organizations, including the U.N., yes.

6    Q    Did the number of remittances to Somalia from the

7    diaspora increase during those years because of this?

8    A    I can't say that I have the data specifically from

9    those years.  In general, there's been a trend that the

10   numbers -- the volume of remittances returning to

11   Somalia seems to be increasing over time.  There's also

12   what many would describe as a fatigue of -- remittance

13   fatigue as second-generation family members start to

14   lose contact and lose the sense of obligation with the

15   homeland.  But in general, we seem to see an increasing

16   trend, and I'm sure at that time there were some areas

17   that experienced increases in remittances to try and

18   alleviate the impact of the famine.

19   Q    All right.  Now, I wanted to talk to you a little

20   bit about the hawala system.  Is it fair to say that

21   the hawalas function kind of like a Western Union?

22   A    The official hawalas, those that are regulated

23   operate almost under the same rules as Western Union.

24   The traditional hawala is an informal arrangement which

25   operates differently.

1  Q    With the hawalas, a person who wants to send a

2  remittance to someone goes there, and for a fee, their

3  money is taken.   Then the person in the hawala calls

4  someone in another hawala who is in the area of the

5  beneficiary.   Is that fair?

6  A    You wouldn't necessarily have the money moved

7  between hawalas.   Normally, the money would move -- you

8  would choose a hawala or an MTO, a money transfer

9  organization, because that organization would deliver

10 the funds directly to the beneficiary.

11 Q    The person picking up the money, the beneficiary,

12 would have to show some sort of ID; is that right?

13 A    That's the theory.   In practice, that's not the

14 case.

15 Q    Can you tell what the case is?

16 A    Well, again, it's the difference between a money

17 transfer organization and a hawala.   A company that is

18 regulated, let's say has headquarters in the U.K. or

19 operates in Europe or the U.S., operates within a

20 regulatory framework and so would be required to show

21 the beneficiaries had shown some form of identification

22 in order to meet their audit requirements.

23      Informal hawalas aren't subject to those

24 regulations.   So no ID may be shown.   But the caveat is

25 that in Somalia, often even those regulatory

Bryden - Cross by Ms. Deutsch

1  requirements -- there is no national ID system.  So

2  what ID am I supposed to show if I'm in a part of

3  Somalia where I don't have a passport?  Or if I do, I

4  choose not to show it if there are no ID cards.

5       So often the person collecting -- what we'll see

6  is the person who goes to the hawala is either not the

7  person who is the beneficiary, is sent by or claims to

8  be sent by, and so there is -- it's very difficult to

9  identify the beneficiary.  What we see typically

10  instead, then, are arrangements being made by the

11  sender and the recipient as to how exactly they will

12  access those funds that would differ from the official

13  regulatory requirements.

14  Q    Now, we talked about the fact that remittances are

15  sent to family members, right?

16  A    That's right.

17  Q    Can you tell us:  Are remittances also sent to

18  organizations that, for example, collect money for

19  hospitals or schools?

20  A    They are; although, that usually follows a

21  somewhat different pattern.

22  Q    What pattern does that follow?

23  A    That would follow the pattern, again, of a

24  fundraising campaign where perhaps a central focal

25  point might be designated to receive the funds on

Bryden - Cross by Ms. Deutsch

1  behalf of the organization.  Someone would not go to a

2  hawala and say, I want to send this money to simply

3  this organization, this school, and send it.  You'd

4  first have to find out who is collecting the funds on

5  behalf of that school, what the number is, and that

6  would often be done first through some kind of outreach

7  campaign by the school or by the mosque as to what

8  they're doing, how much money they need, and who should

9  receive the funding.

10      So familial remittances will typically follow the

11  pattern of small sums of money every month to the same

12  beneficiaries.  A fundraising campaign will appear as a

13  different transactional pattern.

14  Q    But is it ever a possibility that someone in the

15  diaspora will send money to a relative or a family

16  member in Somalia for purposes of giving it to a mosque

17  or a charitable organization?

18  A    It's not inconceivable.  I can't say that it's

19  something that I have seen as common practice, but it

20  could happen.

21  Q    Okay.  I want to talk to you about -- well, first

22  of all, I wanted to ask you.  You had mentioned Sheikh

23  Hassan Hussein a few times in your testimony.

24  A    Yes.

25  Q    Is he the sheikh who had a library in a mosque in

1 Nairobi?

2 A    He managed a library.  He didn't own the library.

3 But yes, I believe we're talking about the same person.

4 Q    Are libraries connected to mosques important in

5 Somali society?

6 A    I would say, in my experience, most mosques I've

7 seen in Somalia don't have libraries.  They're places

8 of prayer and congregation.

9        The library with which Hassan Hussein is

10 associated is more related to a center than actually to

11 a mosque.  The mosque that he was associated with at

12 the time that he came to our attention was actually not

13 so much as a mosque but several rooms in a housing

14 estate in Nairobi.

15 Q    Typically, a library connected to a mosque would

16 have religious books?

17 A    That's right.

18 Q    Would people, private citizens, be allowed to read

19 those books?

20 A    They would, but as I said, that's not the most --

21 that's not a very common practice.  Increasingly, there

22 are centers where you might find a mosque, a library,

23 teaching and training facilities in Somalia.  These are

24 relatively new phenomenon as opposed to the traditional

25 mosque which wouldn't necessarily have a library.

Bryden - Cross by Ms. Deutsch

1  Q    Well, the library that is run by Sheikh Hassan

2  Hussein, is that library accessible to other people?

3  A    I don't know.  I haven't tried to visit his

4  library.

5  Q    I want to talk to you about rotating money pools.

6  Are you familiar with rotating money pools?

7  A    Yes.

8          THE COURT:  Money pools?

9          MS. DEUTSCH:  Rotating money pools.

10         THE COURT:  Pools?

11         MS. DEUTSCH:  Yes.

12  BY MS. DEUTSCH:

13  Q    Are they popular in Somalia?

14  A    Yes, they are.

15  Q    Are there other countries in which rotating money

16  pools are popular?

17  A    I wouldn't claim to know.

18  Q    Are they popular in the United States or -- let's

19  put it this way -- amongst people in the diaspora?

20  A    In Somali society, they're popular, and they can

21  be used anywhere within the Somali community.

22  Q    Can you tell us how they work?

23  A    The simplest form would be that -- and

24  particularly among women -- each participant

25  contributes funds every month.  The total is given to

Bryden - Cross by Ms. Deutsch

1  one member of the pool, and the recipient of the total

2  rotates every month.  So it's almost like a savings

3  program.  You pay in.  Then after a certain period, the

4  aggregate comes back to you.

5  Q    Is each participant in a rotating money pool

6  expected to contribute a certain amount every month?

7  A    Yes.

8  Q    The person who gets that aggregate pool, does that

9  person pay fees or interest on the money?

10 A    No.

11 Q    So in the diaspora, would you think it's fair to

12 say that people use these rotating money pools to buy a

13 large item, such as a car, because they don't have to

14 pay fees or interest?

15 A    They could use it for whatever purpose they want,

16 but yes, it would be used for -- generally, it's a form

17 of imposing self-discipline.  On the one hand, you

18 could simply save for six months or eight months or

19 however long it would take, or you're -- there's a

20 certain discipline by contributing to the pool that

21 money that you cannot touch until it comes back to you

22 through the rotation.  Then you can use the aggregate

23 for a large expense.

24 Q    Okay.  I wanted to talk to you also about the Zaad

25 system.  Can you tell us what that is?

1   A     Zaad is an electronic money transfer.

2   Q     Is it common in Somalia?

3   A     Yes, it is.  It's increasingly common.

4   Q     Is it common outside of Somalia?

5   A     Not for receiving funds, no.  You can send funds

6   from outside Somalia that will enter the Zaad system

7   and be received through the Zaad system in Somalia.

8   Q     Can you send money from Somalia to another country

9   through the Zaad system?

10  A     You could.  This is complicated, and I think

11  probably in some respects I'd say it exceeds my

12  expertise.

13        But the way money moves through the hawala or

14  money transfer system requires a number of steps.  So

15  while Zaad actually operates within Somalia, once it

16  leaves Somalia, it will be moving through, technically,

17  other systems.  They may all be known as Zaad.  It will

18  have to go into a bank account in a third country, a

19  clearinghouse, and then move through a distinct

20  transfer operation to the recipient unless Zaad is

21  licensed in that country.  I can't say that I know

22  which countries, if any, Zaad is licensed in outside

23  Somalia.

24  Q     Did Zaad become popular because at one time there

25  was no banking system in Somalia?

1  A    No.   Zaad became popular because it was linked to

2  one of the major more successful telecommunications

3  companies, and also because I think it was the first

4  electronic money transfer system.   So it was the first

5  opportunity for people to start paying over mobile

6  phones instead of trying to find wads of cash, almost

7  valueless cash.

8  Q    Okay.   Earlier, I think yesterday, you were

9  talking about how you worked for CARE, I think, in

10 1990.

11 A    That's right.

12 Q    You were working in some of the refugee camps?

13 A    That's right.

14 Q    After you worked for CARE, did you continue to go

15 to refugee camps or monitor refugee camps?

16 A    I did visit refugee camps after that period, yes.

17 Q    All right.   Did you ever visit a refugee camp in

18 Kenya by the name of Benadir?

19 A    I don't believe so.

20 Q    What about al-Barra camp in Ethiopia?

21 A    Al-Barra, no.

22 Q    Do you know anything --

23 A    Oh, Aw-Barre?

24 Q    Yes.

25 A    Yes, I've seen Aw-Barre.

Bryden - Cross by Ms. Deutsch

1  Q    Can you describe the conditions in that camp?

2  A    It depends what time we're talking about.  In the

3  early 1990s, when there was a lot of movement and camps

4  were being established, they tended to be very

5  rudimentary.

6       Now if you go to most of these camps, they're

7  well-established.  They're like poorly administered

8  towns, shantytowns.  They are administered.  They have

9  basic facilities.  Life is certainly not good, but some

10 would argue it compares fairly with the shantytowns in

11 major cities in the region.  It just depends which camp

12 and which period of time we're talking about.

13 Q    What about during the period about 1995-1996 in

14 Aw-Barre?  What were the conditions like there?

15 A    They weren't -- I would say they were not good.

16 Life in a refugee camp I would never describe as good,

17 but they didn't compare unfavorably with other more

18 recent refugee camps.

19      Aw-Barre is in a part of Somalia where there had

20 been no major -- well, outside a part of Somalia where

21 there had been no major conflict.  People were not

22 fleeing large scale fighting.  It was almost the mirror

23 image of some refugee camps that had been very

24 well-established on the other side of the border for

25 well over a decade.

1      In some ways, it was also a sort of border center

2  of commerce.  So it wasn't the kind of place that you

3  would expect to find people fleeing conflict, fleeing

4  famine, fleeing drought.  It is quite a stable area.

5  Q    But the conditions in the camp, were they -- was

6  there enough food for people in the camps in that

7  period?

8  A    At that time, I was working with the U.N. in

9  Ethiopia and visited the refugee camps on that side of

10  the border, and there were from -- between '94 and '96,

11  there had been -- as far as I know, there had been no

12  serious interruption in assistance to those refugee

13  camps.  There were problems further east, but the

14  refugee camps of Aw-Barre, Harshin, Hartishiek, all of

15  the camps along the western part of the Ethiopia-Somali

16  border, there had been some disruption because

17  Ethiopia's government had also changed in 1991.  And it

18  had taken some time for things to settle.  But the

19  United Nations high commissioner for refugees had an

20  office, a base, nearby in the town of Jijiga and had

21  been able to maintain the flow of assistance to the

22  camps.

23           THE COURT:  These are camps in Ethiopia?

24           THE WITNESS:  That's correct, Your Honor.

25  BY MS. DEUTSCH:

1  Q    Again, many Somali people fled to camps in

2  Ethiopia and Kenya during the period of military action

3  in Somalia?

4  A    Most people fled to Kenya.  There were some

5  Ethiopian camps to which people fled.  Aw-Barre, again,

6  was not really one of them because it was too far from

7  those parts of Somalia where conflict was taking place.

8  Q    All right.  I wanted to go into a little bit about

9  the Transitional Federal Government.  You've talked

10  about the Transitional Federal Government during your

11  testimony here, right?

12  A    Yes.

13  Q    Okay.  During the time of the Transitional Federal

14  Government, there was torture used against Somali

15  people by some of the agents, right?

16  A    That's right.

17  Q    How prevalent was that during the reign of the

18  Transitional Federal Government?

19  A    I don't know how prevalent.  I know that it was

20  common enough that it was considered a serious problem

21  and that the Transitional Federal Government was

22  specifically criticized for both the routine practice

23  of torture in some of its cells and also for having

24  secret cells in some places.

25  Q    The purpose of that torture was to extract

1  information or payment from people?

2  A    That's what I understand, yes.

3  Q    I also wanted to talk with you a little bit about

4  the -- and I'll call it the TFG for short --

5  A    Yes.

6  Q    -- the misappropriation of money during the TFG

7  reign.

8  A    Yes.

9  Q    You had said that the TFG received revenues from

10 the port of Mogadishu, right?

11 A    That's correct.

12 Q    They received money from taxation, right?

13 A    At the port principally and some checkpoints, yes.

14 Q    Also, the TFG was receiving money from other

15 countries, is that right, donor money?

16 A    That's right.

17 Q    Do you know during the period of the reign of the

18 TFG how much money a year were they receiving from

19 other countries?

20 A    I don't, and I'm not sure it would even be

21 possible because a lot of the money that was

22 transferred to the TFG reportedly came in suitcases

23 from friendly governments.

24      What I can say is that the practice of corruption,

25 the scale of corruption inside the Transitional Federal

Bryden - Cross by Ms. Deutsch

1 Government became so important that my team in the U.N.

2 described it as actually being the system of governance

3 in that it represented as great or greater threat to

4 peace and security than the conflict.  As a result, the

5 United Nations security council made misappropriation

6 of financial resources within the Transitional Federal

7 institutions a potentially sanctionable offense as a

8 threat to peace and security.  It was a very, very

9 serious problem.

10 Q    Where did that money go?

11 A    Some of it into private hands of the officials

12 within the government, some of it for political

13 patronage purposes, some of it into illicit purchases

14 of arms and ammunition for the various militias

15 fighting under the umbrella of the government.

16 Q    That was despite the fact that there was an

17 embargo?

18 A    That's right.  The embargo has never been

19 respected in the 24 years that it's been in place.

20 Q    Some of that money went to line the pockets of the

21 president of the TFG; is that right?

22 A    I can't say that with certainty.  I would say

23 there were differences -- there were two presidents of

24 the TFG.  One seemed to use the money more for the

25 purposes of acquiring authority and patronage networks,

Bryden - Cross by Ms. Deutsch

1  and another intended to use money more for, perhaps,

2  private purposes and for the inner circle.  I couldn't

3  say for sure.  I could not prove that the funds went

4  into his pocket.

5  Q    What about the speaker of the parliament and the

6  minister of finance?

7  A    We certainly suspected them all, but I'd have to

8  go back and review our findings to say to what degree

9  we implicated them in corrupt practices.  I would say

10  more generally we found the Central Bank was being used

11  as a slush fund for private purposes.  The armed forces

12  was a major source of corruption, the money that was

13  going into the Somali National Army.  But in terms of

14  which individuals we identified as receiving funds, I

15  would have to refresh my memory.

16  Q    During what period of time did the TFG last?

17  A    From 2004 until 2012.

18  Q    During that time, the TFG invited in the Ethiopian

19  troops; is that right?

20  A    The TFG invited in the Ethiopian troops as soon as

21  it was constituted in 2004.

22  Q    How many troops came in?

23  A    That's disputed.  That's a good question.  At the

24  time, it was widely reported that over 20,000 Ethiopian

25  troops came in.  My understanding is that the initial

Bryden - Cross by Ms. Deutsch

1  offensive involved about 6,000 troops, and then the

2  occupation was sustained with between 15 and 16,000

3  troops after that.

4  Q    During the time the Ethiopians were there, did

5  they pillage, such as occupying people's land without

6  the people's permission?

7  A    The Ethiopians -- I wouldn't characterize their

8  occupation that way, and I'm on record as having been

9  an intense critic of the occupation and some of the

10  practices of the Ethiopian Army at the time.

11        The Ethiopian Army is, by and large, a

12  disciplined, well-regulated force, but there were

13  abuses.  Some of these abuses used the quite deliberate

14  use of force against segments of the population in

15  order to affect an outcome, such as changing sides in

16  the conflict.  There were certainly also abuses by

17  individual soldiers and units, but I wouldn't

18  characterize it as an occupation that featured pillage

19  and looting.  It was a quite deliberate and regulated

20  use of force.

21  Q    It wasn't popular amongst the Somali people; was

22  it?

23  A    It was not popular among the Somali people, no.

24  Q    Going back to the Transitional Federal Government,

25  that was a government that started in about, what,

Bryden - Cross by Ms. Deutsch

1   2000?

2   A     Yes.

3   Q     Okay.  They had a mandate to go until, I think,

4   2004.

5   A     That's right.

6   Q     But it was aborted, I think.  Wasn't that right?

7   A     It was ineffective.  By 2002, the government had

8   clearly got to the point where it could no longer

9   function, and a new political process started halfway

10  through its mandate in order to begin the process of

11  replacement.

12  Q     Was there corruption in that regime, too?

13  A     There was corruption in that regime, too.

14  Q     Going back before that, I think that between 1991

15  and 1999, there was no government in Somalia.  Is that

16  right?

17  A     There were several individuals who -- there were

18  several attempts to form a government.  There was a

19  government formed in 1991 under the leadership of Ali

20  Mahdi Muhammad.  It controlled virtually nothing.  It

21  was ineffective.  Other individuals subsequently

22  declared themselves president of Somalia at different

23  times, but none of them ever established a meaningful

24  form of authority.

25  Q     Before that was the regime of Mohamed Siad Barre;

Bryden - Cross by Ms. Deutsch

1   is that right?

2   A     Yes.

3   Q     He reigned from, like, 1969 to 1991, I think.

4   A     That is correct.

5   Q     Basically, he was a dictator?

6   A     That's correct.

7   Q     He was deposed, I think, in 1991.  Correct?

8   A     That's correct.

9   Q     His regime was not popular either; is that right?

10  A     It was popular until about the mid-1970s.  Then it

11  started to lose popularity.

12  Q     Was there corruption during that regime?

13  A     Yes, there was.

14  Q     Has there ever been a regime in Somalia between,

15  let's say, 1969 and 2012 that was not corrupt?

16  A     Not to my knowledge.

17          MS. DEUTSCH:  Your Honor, may I consult with

18  Mr. Yamamoto, please?

19          THE COURT:  Yes.

20          MS. DEUTSCH:  I have no further questions.

21          THE COURT:  All right.  Any redirect?

22          MS. ATIYEH:  I do, Your Honor.  Would Your

23  Honor like to take the morning break at this point?

24          THE COURT:  How long do you think you'll be?

25          MS. ATIYEH:  Five to ten minutes.

Bryden - Redirect by Ms. Atiyeh

1        THE COURT:  Why don't you go ahead.

2        MS. ATIYEH:  Okay.

3                    REDIRECT EXAMINATION

4  BY MS. ATIYEH:

5  Q    Good morning, Mr. Bryden.

6  A    Good morning.

7  Q    You had spoken a little bit yesterday about a time

8  period in which a group called the Alliance for

9  Re-liberation of Somalia fought alongside al-Shabaab?

10 A    Yes.

11 Q    There was, I think, a little bit of confusion when

12 we were talking about it.  Could you just talk about

13 the time period in which that occurred.

14 A    That's between 2007 and 2009 --

15 Q    Thank you.

16 A    -- the beginning of 2009.

17 Q    The other subject that I maybe wanted to clear up

18 some confusion on is when you're talking about someone

19 as a member of al-Shabaab and when you talk about a

20 member in the context of your U.N. work, is it fair to

21 say that that's something of a term of art?  It has a

22 specific defined meaning?

23 A    It has -- our instrument, the monitoring group,

24 tried to define it for the council.  Often the

25 council's guidance is broad, and it's left to the

Bryden - Redirect by Ms. Atiyeh

1    secretary and its instruments, including the monitoring

2    group, to try to interpret and then present to the

3    council through the sanctions committee its best

4    interpretation of that guidance.

5         Because the security council is by nature a

6    political body, that interpretation is subject to

7    change depending on the members of council and their

8    positions on the sanctions regime.  But as best we

9    could, we would try to establish a standard, have it

10   accepted by the sanctions committee, and then hold the

11   members of the committee to it.

12   Q    What I would like to clarify is you've sort of

13   divided people who might be subject to sanctions into

14   four categories; is that fair to say?  And those were

15   members, financiers, facilitators, and active

16   supporters?

17   A    That's correct.

18   Q    So any number of people in those final three

19   categories, the financiers, facilitators, and active

20   supporters, might be working on behalf of or under the

21   direction of al-Shabaab without being defined by your

22   U.N. group as a member?

23   A    Because our guidance did not include specifically

24   members of al-Shabaab -- well, it did include members

25   of al-Shabaab.  Since it also included those other

Bryden - Redirect by Ms. Atiyeh

1  categories, we were obliged to present to the sanctions

2  committee all information of interest to the committee,

3  and that might be required for the designation of

4  individuals and entities for their role in supporting

5  al-Shabaab.  All of those categories that you just

6  cited fell within that category of sanctionable

7  offenses and individuals whom we would, therefore, be

8  obliged to report on.

9  Q    Is it fair to say that all of those people who

10 fell into that sanctionable category were working in

11 some form or another on behalf of or under the control

12 of al-Shabaab?

13 A    That's right.

14 Q    You testified earlier this morning that -- again,

15 I just want to clear up some confusion here -- that one

16 might be subject to U.N. sanctions without being a

17 member of al-Shabaab?

18 A    Correct.

19 Q    That included those other three categories I

20 mentioned, is that correct, or were you -- my question

21 is were you referring to those other three categories,

22 or were you referring to people who might be subject to

23 U.N. sanctions for posing a threat to peace and

24 stability in the region other than by affiliation with

25 al-Shabaab?

Bryden - Redirect by Ms. Atiyeh

1  A    I was referring to the latter category or to

2  people who violated the arms embargo or who obstructed

3  humanitarian assistance or, for example, pirates who

4  constituted a threat to peace and security who we

5  investigated and reported on.

6  Q    So when you said that others might be subject to

7  U.N. sanctions, you were referring to people sort of

8  outside the auspices of al-Shabaab?

9  A    That's correct.

10  Q    You had discussed in your testimony this morning

11  the many different sources of income that al-Shabaab

12  has used over the years.

13  A    Yes.

14  Q    That included taxes and extortion and natural

15  resources?

16  A    That's correct.

17  Q    Was soliciting contributions from the diaspora

18  online one of the sources of income for al-Shabaab?

19  A    Yes, it was.

20  Q    You had talked a little bit about the ISDAC chat

21  room, Dacwatu al-Tawhid, and you had mentioned that

22  sometimes speakers in that chat room might be

23  supporters of al-Shabaab but not members?

24  A    That's right.

25  Q    I just wanted to clarify that sometimes the

Bryden - Redirect by Ms. Atiyeh

1  speakers were members of al-Shabaab?

2  A    That's correct.

3  Q    Sometimes, in fact, they were major leaders of

4  al-Shabaab?

5  A    That's correct.

6  Q    Sometimes people in all of those categories

7  solicited money from the individuals in the chat room

8  on behalf of al-Shabaab?

9  A    That's correct.

10 Q    Mr. Bryden, are the pillars of Islam arranged in

11 order of importance?  Again, this is a point on which I

12 wanted to potentially clarify some confusion.

13 A    I think, again, I'd say that's a matter of

14 interpretation.  Whether the fact that they are learned

15 in order actually implies a ranking.  I'm not an expert

16 in Sharia law.

17 Q    Can you just explain since, again, I think there

18 was uncertainty:  What is the zakat?

19 A    The payment of tax under Sharia law.  It's one of

20 the five pillars of Islam.

21 Q    What does it obligate a Muslim to do?

22 A    To contribute.  There are various percentages, but

23 the most common is 2 percent of income to be paid

24 annually.

25 Q    You said that there are a number of ways that

Bryden - Redirect by Ms. Atiyeh

1 people typically adhere to this obligation. Could you

2 just briefly summarize that.

3 A    Well, there are organizations that often interpose

4 themselves between individuals and the beneficiaries.

5 It's a pragmatic issue, and not every individual is in

6 a position to take a percentage of their earnings and

7 then distribute them to those in need and determine

8 those who are in need.

9      Just as western NGOs will solicit funds from

10 well-wishers, charitable sources to provide services to

11 those in need, Islamic organizations will collect the

12 zakat from individuals and then provide that service.

13 It's considered more efficient.

14 Q    Is this typically done on a sort of larger

15 organizational scale -- because I think you mentioned

16 foundations or mosques or even state-run distribution

17 of zakat -- or is this more typically done based on an

18 individual sort of just giving money to a poor person

19 they know?

20 A    Well, from my experience, it's generally done on a

21 more institutional basis.  If I'm going to give you my

22 money to distribute, then I want to know that this is

23 something that you've established a track record in.

24 I'm not likely to give my money -- I haven't seen this

25 in common practice -- just to somebody on the basis of

1  a solicitation or trust and say, Okay, you're in a

2  better position than me to distribute it.

3       I will know that a given foundation or

4  organization is better positioned, has a track record,

5  has a reputation -- now, I may have a relationship with

6  individuals in that organization because that may be

7  how I established trust, but that would be more common

8  than just sending cash to an individual for that

9  purpose.

10 Q    When did the Ethiopian troops withdraw from

11 Somalia during the time period of the Transitional

12 Federal Government?

13 A    I believe that's the end of February 2009,

14 possibly the first week of March, but it was in that

15 time period.

16 Q    Are you aware of any concern that's typical or

17 routine among members of the diaspora that sending

18 remittances to their family from western countries is

19 illegal?

20          MS. MINTER:  I would object to the leading

21 comment.

22          THE COURT:  Sustained.

23 BY MS. ATIYEH:

24 Q    Are you aware of any typical concerns among

25 members of the diaspora about the legality or

Bryden - Redirect by Ms. Atiyeh

1  illegality of --

2           MS. MINTER:  Your Honor, it's the same

3  question.

4           THE COURT:  Go ahead.  I'll let you answer

5  the question if you can.

6  A    I am not aware of any widespread concerns within

7  the diaspora about sending remittances home.  I believe

8  that if widespread concerns existed, then we wouldn't

9  see the volume of remittances taking place on the scale

10 that we do.

11      The degree to which, I think, any Somali website

12 that you and me -- if we were to pull one up at this

13 moment, it would have advertisements for hawalas or

14 money transfer organizations promoting their ability to

15 get your money home.  If there were concerns, then I

16 think that would either be reflected in the advertising

17 or we'd see a lower volume of remittance.

18           MS. ATIYEH:  Nothing further, Your Honor.

19           THE COURT:  All right.  Thank you.

20           Mr. Bryden, you're excused.  Thank you for

21 your very informative testimony.  Please do not discuss

22 your testimony with any other witness outside of the

23 courtroom.

24           THE WITNESS:  Thank you, Your Honor.

25           THE COURT:  Thank you.

O'Reilly - Direct by Ms. Atiyeh

1          The witness may be excused?

2          MS. ATIYEH:  The Court's indulgence.

3          Your Honor, there is some possibility that we

4  would need to call --

5          THE COURT:  All right.

6          MS. ATIYEH:  -- Mr. Bryden in rebuttal.  So

7  we'd prefer not to excuse him.

8          THE COURT:  All right.  Mr. Bryden, please

9  continue to make yourself available.  You may be

10 recalled.

11         THE WITNESS:  Yes, Your Honor.

12         MS. ATIYEH:  Thank you, Your Honor.

13      (The witness stands aside.)

14         THE COURT:  The Court will take a morning

15 recess.

16      (Recess from 10:53 a.m. until 11:13 a.m.)

17         THE COURT:  The government will call its next

18 witness.

19         MS. ATIYEH:  The government calls Special

20 Agent Kera O'Reilly.

21         THE COURT:  All right.  Agent O'Reilly will

22 come forward, please.

23         Counsel.

24      KERA O'REILLY, PLAINTIFF'S WITNESS, AFFIRMED

25                DIRECT EXAMINATION

O'Reilly - Direct by Ms. Atiyeh

1  BY MS. ATIYEH:

2  Q    Good morning, Agent O'Reilly.  Could you just

3  please state your name and spell it for the reporter.

4  A    Of course.  My name is Kera O'Reilly.  O'Reilly is

5  spelled O, apostrophe, R-E-I-L-L-Y.

6  Q    How are you employed?

7  A    I'm a special agent with the Federal Bureau of

8  Investigation out of the Seattle Division.

9  Q    During the course of your duties as a special

10  agent, did you have the opportunity to execute a search

11  warrant regarding one of the defendants on trial here

12  today?

13  A    I did.

14  Q    On what date was that search conducted?

15  A    That was on July 23, 2014.

16  Q    What was the address of the location you searched?

17  A    The address is 10891 Southeast 214th Place in

18  Kent, Washington.

19  Q    Was this a residential address?

20  A    It was.

21  Q    Who were the residents of that address?

22  A    I don't know all of the residents.  I know that

23  the defendant was living there and --

24          THE COURT:  Which defendant?

25          THE WITNESS:  I'm sorry.  Ms. Dhirane.

O'Reilly - Direct by Ms. Atiyeh

1        There was another gentleman there named

2  Mr. Barhadle, and then there were a number of children

3  there.

4  BY MS. ATIYEH:

5  Q    At the time of the search, were you aware of other

6  warrants related to the case being executed?

7  A    I was.

8  Q    What were those?

9  A    I was aware that there was another search going on

10 in the Washington, D.C.-Virginia area, and I believe

11 that there were other searches as well.

12 Q    Were you aware of arrest warrants?

13 A    Yes.

14 Q    What were those?

15 A    I was aware that there was an arrest warrant for

16 Ms. Dhirane here at the location that I was searching.

17 I was cognizant there were other warrants for other

18 individuals, but I did not know their names.

19 Q    What was your role as part of the search team?

20 A    I was the search team leader.  I was also the

21 evidence custodian and the seizing agent at that

22 location.

23 Q    What were your duties in these three roles during

24 the search?

25 A    My duties included a number of things.  Basically,

1    I oversaw the search.  So my role was to serve as the

2    leader.  Number one was to execute the warrant with the

3    authority that we had been given.  Number two was to

4    ensure the safety of the officers that were there.

5         Part of my role was to feed information from the

6    search, the intelligence that we were gathering, out to

7    the investigators that were also in contact with other

8    agents and to execute that search warrant by the legal

9    authority.

10   Q    When you say execute the warrant by the legal

11   authority, what do you mean?

12   A    We had a federal search warrant that day to

13   execute.  So under the grounds of that federal search

14   warrant --

15             MR. KAMENS:  Your Honor, if she can slow down

16   for the interpreter.

17             THE COURT:  All right.

18             INTERPRETER ABDI:  I can't hear the volume.

19             THE COURT:  All right.  Let see if we can

20   correct that.

21   BY MS. ATIYEH:

22   Q    While we're fixing the volume, just, Agent

23   O'Reilly, if you could try to slow the speed of your

24   testimony down a little bit just so that the

25   translators have time.

O'Reilly - Direct by Ms. Atiyeh

1  A     Of course.

2  Q     Thank you.

3          THE COURT:  Are we all set?

4          INTERPRETER ABDI:  Yes, Your Honor.

5          THE COURT:  All right.  Very good.

6          Thank you.

7          THE WITNESS:  Of course.

8  BY MS. ATIYEH:

9  Q    You were talking about executing the search

10  warrant according to law.

11  A    So my role in having reviewed that search warrant

12  was to ensure that the items that we were seizing were

13  in compliance with what we had legally -- the legal

14  authority to take it that day that was specified on

15  that search warrant.

16  Q    At a general level, can you describe the procedure

17  you and your team used to conduct the search?

18  A    Sure.  So that day, as a search team leader, what

19  I did was conducted a search according to the standard

20  operating procedure for our evidence response team.

21  This is not a forensic search, but that's how I

22  conducted it.

23      So in general, what we did was we had all of the

24  search team members review the warrant and sign the

25  back.  We then were there at the scene.  We took entry

1  photographs and conducted a preliminary survey to

2  review what the search scene looked like.  We then

3  assigned the roles to the different searchers.  We

4  numbered -- we put alpha designators on all of the

5  spaces and rooms to provide uniform descriptors for the

6  spaces, and then we began the search.

7  Q    Once you began the search, how did you conduct

8  your seizures of items?

9  A    The way the items were collected was that I served

10 as the seizing agent as well.  So the way that the

11 search was conducted is that we had teams of at least

12 two FBI employees paired together to search the rooms

13 or spaces.  As they located an item of possible

14 evidence, they ensured that I reviewed that item to

15 confirm or concur that it did meet the stipulations of

16 the warrant, that we were allowed and authorized to

17 seize that item.

18      Whenever possible we tried to take photographs of

19 that item in place or noted that on a photography log.

20 We then added it to a sketch to show the approximate

21 location where the item of evidence was collected and

22 then entered it onto our evidence recovery log and

23 inventory of items seized.

24      The item was then taken to an evidence location

25 where we bagged it, put a tag or label on it, and

1  sealed it.

2  Q    What did you do with evidence once it had been

3  seized and you had verified that its seizure was

4  authorized by the warrant?

5  A    There at the scene, what we did was to line them

6  up in sequential order.  So the first item that was

7  collected was placed down, and then we just put them in

8  sequential order to be reviewed again at the very

9  conclusion of the search.

10 Q    During the search, did you have an opportunity to

11 see all of the rooms in the house and to witness where

12 items were seized from?

13 A    I did.

14 Q    During the search, did you have the opportunity to

15 observe a desktop computer?

16 A    I did.

17 Q    Where in the home was it located?

18 A    The desktop computer was located in the living

19 room, which was on the first floor, on sort of a desk

20 area underneath a window.

21 Q    Did you notice any additional hardware attached to

22 or near the computer?

23 A    I did.  In addition to having the desktop

24 computer, there was also a Vonage voice mail system --

25 or a voice box system, and there was a magicJack in the

1  area along with a cordless telephone.

2  Q    Just to clarify, what's a magicJack?

3  A    So a magicJack is basically a secondary means to

4  get a telephone to communicate with people without

5  using traditional telephone lines.  It uses the

6  Internet cable in order to make calls.

7  Q    During the execution of the warrant, did you have

8  the opportunity to search a walk-in closet on the

9  second story of the home?

10  A    I did.

11  Q    Did you discover anything of interest there or did

12  your teammates?

13  A    We did.

14  Q    What did you discover?

15  A    So in that closet off of the master bedroom --

16  that closet we labeled L as in Lincoln -- we found a

17  number of items that we collected.  Among those items

18  were some United States currency.  We also collected

19  some tax forms, some documents that were -- I believe

20  were in Somali that were about a sale of a property and

21  some financial information.

22  Q    Let me ask you about the currency.  How much

23  currency did you discover?

24  A    What we found was $10,200 in $100 bills.

25  Q    How was that stored?

O'Reilly - Direct by Ms. Atiyeh

1  A    So in the closet on the floor, there were three

2  suitcases stacked on one another on the right-hand side

3  if you're standing in the threshold of the door.   In

4  the very bottom suitcase, inside the suitcase, there

5  was fabric and curtains.   And inside one of the fabric

6  packages, we opened it and found something with tinfoil

7  or aluminum foil wrapped around it.   We opened up the

8  aluminum foil, and there were two envelopes in there.

9  One contained fifty $100 bills and the other one

10 contained fifty-two $100 bills.

11 Q    You had also -- well, did you discover anything

12 else of interest in the suitcase inside the walk-in

13 closet?

14 A    In another suitcase, the top suitcase -- so the

15 first one -- that was where we found the land documents

16 that had some financial information, and I believe it

17 was -- our translator described it as a sale of a

18 property in Somalia.

19 Q    So let me ask you:   Were you able to read the

20 documents personally?

21 A    I was not.

22 Q    So how did you determine on the scene whether the

23 documents fell within the scope of the warrant?

24 A    We had an FBI translator on-site to translate for

25 us the documents that were in Somali.

O'Reilly - Direct by Ms. Atiyeh

1  Q    And how did he identify the documents in that

2  folder that you described?

3  A    I asked him to review them, and then he described

4  for me what they said.  And then I made the

5  determination, based on his translation, that it met

6  with the confines of our search warrant.

7         MS. ATIYEH:  If the court security officer

8  could please show you Government's Exhibit 4C.

9  BY MS. ATIYEH:

10  Q    Do you recognize this item?

11  A    I do.

12  Q    What is it?

13  A    This is the document that was within the suitcase

14  that I just described that I was -- described as being

15  the land sale and financials.

16  Q    Here in court today, does it appear to be in

17  substantially the same condition as when you recovered

18  it from Ms. Dhirane's residence?

19  A    Yes, it appears consistent with what I recall.

20         MS. ATIYEH:  I move Government's Exhibit 4C

21  into evidence.

22         THE COURT:  Any objection?

23         MR. YAMAMOTO:  No objection, Your Honor.

24         THE COURT:  Without objection, Government 4C

25  is admitted.

1        MS. ATIYEH:  Your Honor, I would also like to

2   move in Government's 4C1 at this time, which is our

3   translation of that document, pursuant to stipulations.

4        THE COURT:  Any objection?

5        MR. YAMAMOTO:  No objection.

6        THE COURT:  All right.  Government

7   Exhibit 4C1 is admitted pursuant to the stipulation.

8   BY MS. ATIYEH:

9   Q    You had also mentioned, I believe, finding some

10  tax documents in that closet.  Is that correct?

11  A    Right.  We found some tax documents in that same

12  closet -- we called it Space L -- up on a shelf.

13  Q    The court security officer is going to show you

14  what's been marked Government's Exhibit 4D as in dog.

15  Do you recognize these documents?

16  A    I do.  These are the documents that I was just

17  mentioning that we located on a shelf within that

18  closet.

19  Q    Do they appear to be in substantially the same

20  condition as when you recovered them from Ms. Dhirane's

21  residence?

22  A    They do.

23        MS. ATIYEH:  I'd move Government's Exhibit 4D

24  into evidence.

25        THE COURT:  Any objection?

O'Reilly - Direct by Ms. Atiyeh

1          MR. YAMAMOTO:  No objection.

2          THE COURT:  Without objection, 4D is

3   admitted.

4   BY MS. ATIYEH:

5   Q    During the execution of the warrant, did you also

6   have the opportunity to search the master bedroom of

7   the home?

8   A    I did.

9   Q    Can you briefly describe the furniture you

10  encountered there?

11  A    Yes.  So the master bedroom included a queen-size

12  bed with a headboard.  That was a one-piece headboard

13  with built-in nightstands on either side.  There was

14  also a large black dresser with an attached mirror on

15  the right-hand side if you were facing the headboard.

16  Q    Let me direct your attention to the nightstands

17  you mentioned.  Did you search the nightstands in any

18  way?

19  A    We did.

20  Q    Did it appear, based on your search, that

21  different residents of the house used different

22  nightstands?

23  A    Yes.

24  Q    Why do you say that?

25  A    There were personal items in the nightstands, and

O'Reilly - Direct by Ms. Atiyeh

1  we were confident that Ms. Dhirane used the right-hand

2  side nightstand -- again, if one is facing the

3  headboard -- because a number of her personal items

4  were in there, including her identification, perfume.

5  There were a number of things that were attributable to

6  her, and there was mail with her name on it.

7  Q    Did you find any items of interest in the

8  nightstand that appeared to be used by Ms. Dhirane?

9  A    We did.

10 Q    What were those?

11 A    We found a number of things within that nightstand

12 that we seized.  There were a number of -- there were

13 financial records and receipts and items with telephone

14 numbers and names on them.  There were also the

15 notebooks and printouts that were translated for us

16 on-site that I --

17 Q    So, again, did you -- personally, were you able to

18 read the notebooks that you described?

19 A    Not all of them.  Some of them were in a foreign

20 language.

21 Q    Again, how did you determine whether they were

22 within the scope of the warrant?

23 A    The ones that were -- we had the translator there

24 who was able to translate for me and to read them for

25 me, the ones that were in Somali.

1    Then there were some items that I believed to be

2 in Arabic.  We did not have a translator on-site.  So I

3 packaged those separately to be determined later if

4 they were going to be used.

5 Q    You had mentioned printouts that were described to

6 you as poems.  The court security officer is going to

7 show you what's been marked Government's Exhibits 4B1

8 through 4B19, which is a lot.  I'm sorry.

9    When you get those, I'll just ask you to take a

10 look at each page because each page is marked as an

11 individual exhibit.

12 A    Okay.  Thank you.

13 Q    What are those documents?

14 A    So all of the documents that are in the foreign

15 language are familiar to me as having been or copies of

16 the items that I seized.  The other ones that are in

17 English are not --

18 Q    Do you have the ones in English in that section

19 too?

20 A    (Nods head up and down.)

21 Q    Just referring, then, to the ones that are in the

22 foreign language, do they appear to be in substantially

23 the same condition as when you recovered them from

24 Ms. Dhirane's residence?

25 A    They do.

O'Reilly - Direct by Ms. Atiyeh

1       MS. ATIYEH:  So I'd move Government's

2  Exhibits 4B1 through 4B19 in.

3       MR. YAMAMOTO:  No objection.

4       THE COURT:  Without objection, Government's

5  Exhibits 4B1 through 4B19 are admitted.

6       MS. ATIYEH:  And then 4B1A through 4B19A

7  pursuant to the stipulation.  Those are the

8  translations of each page.

9       THE COURT:  Any objection?

10       MR. YAMAMOTO:  No objection.

11       THE COURT:  Without objection, 4B1A through

12  4B19A are admitted.

13       MS. ATIYEH:  That's correct, Your Honor.

14  BY MS. ATIYEH:

15  Q    The court security officer is next going to show

16  you what's been marked as Government's Exhibit 4G.

17  A    Okay.

18       MS. ATIYEH:  Sir, if you could pull up 4G1

19  and 4G2, we're going to look at those in just a moment.

20  BY MS. ATIYEH:

21  Q    Do you recognize 4G?

22  A    I do.

23  Q    What's that?

24  A    That's another item that was taken from that

25  right-hand side nightstand.

1  Q    Does it appear to be in substantially the same

2  condition as when you recovered it from the nightstand?

3  A    Yes.

4  Q    If you could also, then, take a look at 4G1 and

5  4G2.  You've had the chance to review these, I believe.

6  A    Yes.

7  Q    Are these photocopies of pages that were contained

8  within Exhibit 4G?

9  A    Yes.  They appear to be the ones that were

10 contained within 4G.

11         MS. ATIYEH:  At this time, I'd move in

12 Exhibits 4G, 4G1, and 4G2.

13         MR. YAMAMOTO:  No objection.

14         THE COURT:  Without objection, 4G, 4G1, and

15 4G2 are admitted.

16         MS. ATIYEH:  If we could move in 4G1A and

17 4G2A, which are the translations of those two pages,

18 pursuant to the stipulation.

19         THE COURT:  Any objection?

20         MR. YAMAMOTO:  No objection.

21         THE COURT:  Without objection, 4G1A and 4G2A

22 are admitted.

23         MS. ATIYEH:  Thank you, Your Honor.

24 BY MS. ATIYEH:

25 Q    If the court security officer could next show you

O'Reilly - Cross by Mr. Kamens

1  what's been marked Government's Exhibit 4A.

2        MS. ATIYEH:  Again, shortly after that we'll

3  be asking for 4A1 through, I think, it's 4A8.

4        THE COURT:  Any objection?

5        MR. YAMAMOTO:  No, Your Honor.

6        THE COURT:  Exhibits 4A1 through 4A8 are

7  admitted.

8        MS. ATIYEH:  And 4A itself as well, Your

9  Honor.

10        THE COURT:  Exhibit 4A is admitted.

11        MS. ATIYEH:  That's all I have for you then,

12  Special Agent.

13        THE WITNESS:  Thank you.

14        MR. YAMAMOTO:  I'm sorry.  What was the last

15  exhibit?

16        THE COURT:  Exhibit 4A?

17        MR. YAMAMOTO:  Just 4A?

18        MS. ATIYEH:  Exhibits 4A and 4A1 through 4A8.

19        MR. YAMAMOTO:  Thank you.

20        THE COURT:  Any cross-examination,

21  Mr. Yamamoto?

22        MR. YAMAMOTO:  No, Your Honor.

23                  CROSS-EXAMINATION

24  BY MR. KAMENS:

25  Q    Agent O'Reilly, under your participation in this

Morgan - Direct by Mr. Gillis

1  investigation, did you have any role in investigating

2  anybody else?

3  A    No, sir.

4          MR. KAMENS:  Nothing further.

5          THE COURT:  All right.  Mr. Yamamoto, any

6  cross-examination?

7          MR. YAMAMOTO:  No, Your Honor.

8          THE COURT:  All right.  May this witness be

9  excused?

10          MS. ATIYEH:  Yes, Your Honor.

11          THE COURT:  All right.  Agent O'Reilly,

12  you're excused.  Please do not discuss your testimony

13  with any other witness outside of the courtroom.

14          THE WITNESS:  Thank you, sir.

15      (The witness stands aside.)

16          THE COURT:  The next witness, please.

17          MR. GILLIS:  Your Honor, the United States

18  calls Special Agent Wayne Morgan.

19          THE COURT:  All right.  Special Agent Morgan

20  will come forward.

21      WAYNE MORGAN, PLAINTIFF'S WITNESS, AFFIRMED

22                  DIRECT EXAMINATION

23  BY MR. GILLIS:

24  Q    Good morning, sir.  Would you tell us your name

25  and your occupation, please.

Morgan - Direct by Mr. Gillis

1  A     Special Agent Wayne Morgan with the FBI.

2  Q     How long have you been with the FBI?

3  A     Just over four years now.

4  Q     What kinds of cases do you investigate?

5  A     Counterterrorism, mainly Sunni extremism

6  originating in Africa.

7  Q     Did you participate in the search of Muna Osman

8  Jama's residence on July 23, 2014?

9  A     Yes, I did.

10  Q     What time of day did you enter the house?

11  A     It was approximately 6:00 in the morning.

12  Q     Can you describe for us how that search took

13  place?

14  A     Where would you like me to start?

15  Q     I beg your pardon?

16  A     Where would you like me to start?

17  Q     Well, why don't you start with the time that you

18  knocked on the door.

19  A     So we knocked on the door about 6:00 in the

20  morning.  We were allowed into the house.  The door was

21  opened from the inside voluntarily.  So we announced

22  who we were, what our authority was to be there.  Then

23  we entered the residence and did an initial security

24  assessment of what it was like on the inside of the

25  building.

Morgan - Direct by Mr. Gillis

1  Q    Okay.   What individuals did you encounter at the

2  home?

3            THE COURT:   What was the nature of the home?

4  Was it an attached home?   An apartment?

5            THE WITNESS:   It was a stand-alone

6  single-family residence, a split-level, sir.

7            THE COURT:   Where was it?

8            THE WITNESS:   In Annandale.

9            THE COURT:   All right.

10            THE WITNESS:   So I believe it was Omar who

11  opened the door for us, the husband, and then there

12  were a couple of younger children that we saw as well

13  once we made entry.

14  BY MR. GILLIS:

15  Q    Okay.   Did you eventually see an adult female?

16  A    Yes.   So the first room that we went into was kind

17  of a big living room.   We could see a set of stairs

18  going up and down to the right.

19       So we first encountered an adult female at the top

20  of the stairs, and we addressed her, announced our

21  authority from down the stairs.   She was at the top of

22  the landing.

23  Q    Did she come down?

24  A    Yes, she did ultimately.

25  Q    Did you do a protective sweep of the entire house?

Morgan - Direct by Mr. Gillis

1  A    Yes.  So once she came downstairs and was

2  cooperating with us, we conducted a protective sweep of

3  the remaining parts of the residence to make sure that

4  there were no additional people that we weren't

5  expecting for our safety and for theirs.

6  Q    Were there any other people other than the

7  husband, the defendant, and the children?

8  A    Other than the children, no, no other persons

9  inside.

10  Q    Did you call out a name when you saw the woman at

11  the top of the stairs?

12  A    I personally did not, but the name was called out,

13  yes.

14  Q    What name was called out?

15  A    Muna.

16  Q    And did the person respond to that name?

17  A    Yes, she did.

18  Q    So what was your role during the search of the

19  residence?

20  A    I was in charge of organizing the search of the

21  residence and executing it, as well as securing and

22  maintaining the organization of all of the items that

23  were seized during the search.

24  Q    All right.  Tell us a little more what that

25  involves.

Morgan - Direct by Mr. Gillis

1  A    So once the residence was deemed secure, I was in

2  charge of telling our boss who was there, Hey, this is

3  the condition of the house when we found it.  This is

4  what we did.  I kind of walked him through.  He went

5  and made sure that the residence -- or saw what the

6  residence was like.  So we explained what happened and

7  then just started organizing how the search would be

8  executed.  So organizing different agents into

9  different teams, saying, You'll search this room.  Once

10 it's photographed, you'll search this room.  Once it's

11 photographed --

12 Q    Okay.  So you go through -- do you give the rooms

13 particular identifiers?

14 A    Yeah.  So as we're doing that walk-through, once

15 it's secured, we put up a piece of paper on the wall

16 and identify each room by a letter code so that we can

17 reference it later.  Then the photographer will take

18 pictures from all angles of that room to identify its

19 condition prior to us actually doing any searching.

20 Q    Okay.  And then once the search is being

21 conducted, what was your role then?

22 A    So my official title is a seizing agent.  So I

23 would instruct the agents, Hey, you two, you're going

24 to search this room downstairs.

25     So they would be searching pursuant to the search

Morgan - Direct by Mr. Gillis

1    warrant.  They'd be searching for the actual items

2    themselves.  When they would discover an item in place,

3    they would call me over and say, Hey, I found this

4    here.  It looks like it meets the requirements.

5        So they were the ones who found it.  I was the one

6    who would then seize it.

7                INTERPRETER ABDI:  He is going too fast.

8                THE COURT:  Agent, you need to slow down a

9    bit.  We have interpreters who need to simultaneously

10   translate your testimony.

11               THE WITNESS:  Okay.  Gotcha.

12               So I would organize the agents to go into

13   certain rooms and conduct the actual search.  When they

14   would find an item, they would identify that they

15   thought that that fit within the scope of the search

16   warrant.  They would call me over, and then I would

17   say, Yes, I agree.

18               So they would then have a bag with a label on

19   the outside of the bag that would identify who found

20   it, which would be them, and who seized it, which would

21   be me, and then which room it was located in and where

22   in this room it was found.  That would be identified on

23   the outside of that bag.

24   BY MR. GILLIS:

25   Q    Okay.  And was that all done in this particular

Morgan - Direct by Mr. Gillis

1   search?

2   A     Yes, it was.

3   Q     Nothing out of the ordinary?

4   A     No.

5   Q     All right.  Once the evidence is all collected and

6   bagged and then marked, as you've said, what then

7   happens?

8   A     So they would actually be the one to put it in the

9   bag in that room that they found it in.  Once that was

10  all completed and the label was filled on the outside,

11  I would then take it to a central location which, in

12  this case, was over by the main door that we came in.

13  I would put it in a bag where I would catalog what was

14  in it, start preparing a receipt to leave pursuant to

15  the warrant.  Then I would be the one to actually

16  secure it when it would leave the residence all at

17  once.

18  Q     Describe the process that happens when you leave

19  with the evidence.

20  A     So when we leave with the evidence, however many

21  bags or items there were, I would place them into one

22  bin.  I would bring them out to the car with me.  They

23  would stay in my possession.  Then we would drive back

24  to our main office where I locked them in a room in our

25  squad area that I was the only one that had the key to.

1  Q    Okay.   Then what happened to the documents after

2  that?

3  A    So at that point, the case agents, if they wanted

4  to look at the items, they would coordinate with me, at

5  which point I would then allow them access into that

6  room.  They would look through what was taken from each

7  bag just so they knew what was there, and then I took

8  all of those bags, once that had been completed, over

9  to the evidence control room at our main office.

10 Q    Okay.   Throughout this review by the case agents

11 or anyone else, is there a process for assuring that

12 the chain of custody is not interrupted?

13 A    So each one of those bags that was identified --

14 or if it was too big to go in a bag, it would be

15 separate with a separate sticker -- each one of those

16 items had its own unique number that identified it, and

17 there would be a separate chain of custody paper to say

18 who was in control of it, if it changed -- transferred

19 from one person to another, when did that happen, and

20 what was the purpose of that transfer.  So each one had

21 its own chain of custody to go along with it.

22 Q    Okay.   Did you examine some evidence at the U.S.

23 Attorney's office before this trial?

24 A    Yes, I did.

25 Q    And did you recognize the evidence to be in the

Morgan - Direct by Mr. Gillis

1   bags that you had sealed at the search?

2   A    Yes.

3   Q    Were some of those items marked as exhibits?

4   A    Yes, they were.

5   Q    To do that, did you remove the items from the

6   bags?

7   A    Yes, I personally did, yes.

8   Q    And when you removed the items, did you mark them

9   in any way?

10  A    I put my initials and the evidence bag that they

11  came from, both of those are unique to each page -- for

12  each item, I should say.

13  Q    Okay.  If you would, please, Agent, is it possible

14  that the location of the search was in Reston?

15  A    Yes, it could be.  I'd have to look at the

16  warrant, but it sounds accurate, yes.

17  Q    If you would, look at Government's Exhibit 3.

18          MR. GILLIS:  Mr. Burns, all of these exhibits

19  are going to be in the 3 series.

20          THE COURT:  Let's identify all the exhibits

21  that reflect the items seized.  Do you have that list?

22          MR. GILLIS:  All of the items that were

23  seized?

24          THE COURT:  That you want to get in through

25  this witness.

1          MR. GILLIS:  I do.  I have that list, Your

2   Honor.

3          THE COURT:  All right.  Why don't you

4   identify those, and we'll see if there's any objections

5   to any of them.

6          MR. GILLIS:  All right.  If I may, Your

7   Honor, 3A, 3A1, 3A2, 3A3, 3A4, 3A5, 3A6, 3A7, 3A8, 3A9,

8   3A10, 3A11, 3A12, 3A13, 3A14, 3A15, 3A16, 3A17, 3B1,

9   3B2, B3, B4, B5, 3C1, 3C2, 3C3, 3C4, 3C5, 3D1, and 3D2.

10         THE COURT:  All right.  Any objection to any

11  of those exhibits, Mr. Kamens?

12         MR. KAMENS:  Your Honor, specifically, not

13  with respect to 3A1 through 17.  3B1 is a document

14  reflecting a name change.  I'm not sure what the

15  relevance is.  3B2 are advertisements for services,

16  including tax service.  We're not objecting to the tax

17  document itself.  I don't know why we need the

18  advertisements that were found, 3B1 and 3B2.  We also

19  object to any inference of authorship.

20         THE COURT:  How about C1 through 5?

21         MR. KAMENS:  No objection.

22         THE COURT:  All right.

23         MR. KAMENS:  No objection from us.

24         THE COURT:  All right.  Without objection,

25  Exhibits 3A1 through 17 are admitted.

1           Over objection, Exhibits B1 through 5 are

2   admitted.

3           And without objection, Exhibits C1 through 5

4   and D1 and 2 are admitted.

5           THE COURT SECURITY OFFICER:  Sir, I'm missing

6   Exhibit D2.

7           MR. GILLIS:  I beg your pardon?

8           THE COURT SECURITY OFFICER:  D, as in dog, 2.

9           MR. GILLIS:  3D2.

10          THE COURT SECURITY OFFICER:  I have

11  everything else.

12          MR. GILLIS:  Let me see if I could find it

13  for you.

14          Mr. Burns, if I could give that to you now.

15          THE COURT:  All right.  Mr. Gillis, any

16  further questions?

17          MR. GILLIS:  No, Your Honor.  I have no other

18  questions.

19          THE COURT:  All right.  Thank you.

20          Mr. Kamens, any cross?

21                    CROSS-EXAMINATION

22  BY MR. KAMENS:

23  Q    Sir, did you find any firearms in the house?

24  A    No, sir, we did not.

25  Q    The people there were cooperative?

Coulombe - Direct by Mr. Gillis

1  A    Overall, yes.

2  Q    You were there for about four hours?

3  A    I'd have to go back to the photo log, but

4  approximately, sure.

5           MR. KAMENS:  Nothing further, Your Honor.

6           THE COURT:  All right.  Any redirect,

7  Mr. Gillis?

8           MR. GILLIS:  No, Your Honor.

9           THE COURT:  All right.  The witness may be

10 excused; is that correct?

11          MR. GILLIS:  Yes, Your Honor.

12          THE COURT:  All right.  Agent Morgan, you're

13 excused.  Do not discuss your testimony outside of the

14 courtroom with any other witness.

15          THE WITNESS:  Yes, Your Honor.

16     (The witness stands aside.)

17          THE COURT:  All right.  The government will

18 call its next witness.

19          MR. GILLIS:  Your Honor, we call CBP Officer

20 Colette Coulombe.

21          THE COURT:  All right.  Colette Coulombe will

22 come forward, please.

23   COLETTE COULOMBE, PLAINTIFF'S WITNESS, AFFIRMED

24                   DIRECT EXAMINATION

25 BY MR. GILLIS:

Coulombe - Direct by Mr. Gillis

1   Q    Good afternoon -- or good morning, I guess.  Could

2   you tell us your name and spell your last name.

3   A    My name is Colette Coulombe, C-O-U-L-O-M-B-E.

4   Q    And where do you work?

5   A    I work at Chicago O'Hare International Airport.

6   Q    And is that with Customs and Border Protection?

7   A    Yes.

8   Q    You're a CBP officer?

9   A    Yes.

10  Q    How long have you been a CBP officer?

11  A    It will be 14 years in September.

12  Q    And do your duties include conducting inspection

13  of inbound passengers at Chicago O'Hare?

14  A    Yes.

15  Q    Can you describe briefly what an inspection

16  entails.

17  A    It's usually at interview of passengers coming

18  into the U.S., and if it warrants a bag exam, then it

19  also includes a bag exam.

20  Q    Okay.  Do you also examine what the passenger

21  might be carrying on her person?

22  A    Yes.

23  Q    And that includes any documents or electronic

24  devices?

25  A    Correct.

Coulombe - Direct by Mr. Gillis

1  Q     Were you working at the Chicago O'Hare Airport on

2  January 25, 2012?

3  A     Yes.

4  Q     Were you working with any other CBP officer at

5  that time?

6  A     Yes.

7  Q     Who was that?

8  A     Officer Waldemar Prokopiuk.

9  Q     Did you and Officer Waldemar Prokopiuk encounter a

10 returning passenger that day by the name of Hinda Osman

11 Dhirane?

12 A     Yes.

13 Q     Was she with someone at the time?

14 A     Yes, she was.

15 Q     Who was that?

16 A     She was traveling with her children.

17 Q     I'd ask you to look at Government's Exhibit 22,

18 please.

19       Do you have it in front of you there?

20 A     Yes.

21 Q     Could you tell me what Government's Exhibit 22 is?

22 A     It's her customs declaration and her driver's

23 license.

24 Q     And who fills that out?

25 A     The arriving passenger.

1  Q    And is it filled out by every passenger when they

2  enter the country?

3  A    Yes.

4  Q    And at what time is it filled out?

5  A    It's usually -- they hand them out on the plane as

6  they're approaching for a landing or when they arrive

7  at the arrival's hall.

8  Q    That's when they encounter you basically?

9  A    Yes.

10 Q    Okay.  So do you see the name of the passenger who

11 filled out that form?

12 A    Yes.

13 Q    Who is it?

14 A    Hinda Dhirane.

15 Q    Okay.  Did she sign the form?

16 A    Yes.

17 Q    Do you recognize the stamp that's on the document?

18 A    Yes.

19 Q    How does that stamp get on there?

20 A    The primary officer puts the stamp on the customs

21 form when they're done with their primary inspection.

22 Q    The date that's on the stamp, does that reflect

23 the same date that that stamp is put on there?

24 A    Yes.

25 Q    I see you also have on that Exhibit 22 a driver's

1  license.  Can you tell us what that is?

2  A    That's her Washington driver's license.

3  Q    Is that something that you requested from her?

4  A    Yes, I asked her for that.

5  Q    You made the copy at the time of this event that

6  we're talking about now?

7  A    Correct.

8  Q    All right.  Does this Exhibit 22 fairly and

9  accurately depict the customs declaration form and the

10 passenger's driver's license that you made that day?

11 A    Yes.

12         MR. GILLIS:  Your Honor, I'd move

13 Government's Exhibit 22.

14         THE COURT:  Any objection?

15         MR. YAMAMOTO:  No, Your Honor.

16         THE COURT:  Without objection, Government's

17 Exhibit 22 is admitted.

18 BY MR. GILLIS:

19 Q    Did you question Ms. Dhirane when she came through

20 customs?

21 A    Yes.

22 Q    Did you and Officer Prokopiuk examine her

23 belongings?

24 A    Yes.

25 Q    In examining her belongings, did you find any

Coulombe - Direct by Mr. Gillis

1   documents?

2   A    Yes.

3   Q    Can I ask you to look at Government's Exhibit 21.

4        Can you tell me what that is?

5   A    It's a copy of a payment voucher.

6   Q    I'm sorry.  Of a what?

7   A    A payment voucher.

8   Q    Okay.  Did you receive that as part of this search

9   at the border?

10  A    Yeah.  We found it on her belongings.

11  Q    What did you do with the original of the document?

12  A    I gave it back to her.

13  Q    Is Exhibit 21 a fair and accurate copy of the

14  document you took from her?

15  A    Yes.

16          MR. GILLIS:  I'd offer Exhibit 21, Your

17  Honor.

18          THE COURT:  Any objection?

19          MR. YAMAMOTO:  No, Your Honor.

20          THE COURT:  Without objection, Exhibit 21 is

21  admitted.

22  BY MR. GILLIS:

23  Q    Did you ask Ms. Dhirane if she had any electronic

24  devices?

25  A    Yes.

Coulombe - Direct by Mr. Gillis

1  Q    What did she tell you?

2  A    She told me she had a cell phone.

3  Q    Did you receive the cell phone from her?

4  A    Yes.

5  Q    Then did you hand it to anyone?

6  A    Yes.

7  Q    Whom did you hand it to?

8  A    Officer Prokopiuk.

9          MR. GILLIS:  Your Honor, pursuant to the

10 stipulation that we have with counsel, I would offer

11 Exhibits 20 and 20A, which are the computer imaging and

12 translation for that cell phone.

13         THE COURT:  All right.  Any objections?

14         MR. YAMAMOTO:  No, Your Honor.

15         THE COURT:  Without objection, Exhibits 20

16 and 20A are admitted pursuant to the stipulation.

17 BY MR. GILLIS:

18 Q    Did you ask Ms. Dhirane what country she had

19 visited that day?

20 A    Yes.

21 Q    What did she tell you?

22 A    She went to Somaliland.

23 Q    Did she tell you the purpose of the visit?

24 A    Just to visit family and friends.

25 Q    Did you ask her whether she was employed?

Coulombe - Direct by Mr. Gillis

1  A     She told me she was a housewife.

2  Q     Did you ask her anything about whether she was

3  carrying any money when she left the United States?

4  A     Yeah.  She told me she wasn't traveling with any

5  money.

6  Q     Did you ask her anything about whether she was

7  carrying money when she returned to the United States?

8  A     Yeah.  She told me she wasn't traveling with any

9  money.

10 Q     Is that also indicated on the declaration form

11 that we were looking at earlier?

12 A     Yes.

13 Q     Is Ms. Dhirane's address listed on the customs

14 declaration form?

15 A     Yes.

16 Q     Is that what she fills out?

17 A     Yes.

18         MR. GILLIS:  One moment, Your Honor.

19         That's all, Your Honor.

20         THE COURT:  Any cross-examination?

21         MR. YAMAMOTO:  No, Your Honor.

22         MR. KAMENS:  No, Your Honor.

23         THE COURT:  All right.  This witness may be

24 excused, Mr. Gillis?

25         MR. GILLIS:  Yes, Your Honor.

Mordino - Direct by Ms. Atiyeh

1      THE COURT:  Officer, thank you for appearing.

2  You're excused.  Please do not discuss your testimony

3  with any other witness outside the courtroom.

4      THE WITNESS:  Okay.

5      (The witness stands aside.)

6      THE COURT:  The government will call its next

7  witness.

8      MS. ATIYEH:  The government calls CBP Officer

9  Vincent Mordino.

10      THE COURT:  Mordino?

11      MS. ATIYEH:  Yes, sir.

12      THE COURT:  All right.  Mr. Mordino will come

13  forward, please.

14    VINCENT MORDINO, PLAINTIFF'S WITNESS, AFFIRMED

15              DIRECT EXAMINATION

16  BY MS. ATIYEH:

17  Q    Good morning, sir.

18  A    Good morning.

19  Q    Would you please state your name and spell it for

20  the court reporter.

21  A    Vincent, V-I-N-C-E-N-T, Mordino, M-O-R-D-I-N-O.

22  Q    How are you employed?

23  A    I'm employed with U.S. Customs and Border

24  Protection, Buffalo, New York.

25  Q    How are individuals in Buffalo, New York, entering

Mordino - Direct by Ms. Atiyeh

1  the country?

2  A    Entering through the Peace Bridge in Buffalo,

3  individuals enter via Canada, Ontario.

4  Q    That's typically via vehicle?

5  A    Yes, ma'am.

6  Q    And do your duties as a CBP officer include

7  conducting inspections of individuals crossing from

8  Canada at the Peace Bridge point of entry?

9  A    Correct.

10 Q    Were you working at the Peace Bridge point of

11 entry on July 9, 2013?

12 A    I was.

13 Q    Do you recall an incident where Muna Osman Jama

14 came through your port of entry?

15 A    I do.

16 Q    Were there other individuals with her?

17 A    Yes.

18 Q    Do you remember who those were?

19 A    I believe her husband, and there may have been

20 children that day.

21 Q    At that time, did you have the opportunity to

22 conduct an inspection of their vehicle and effects?

23 A    That's correct.

24 Q    During that search, did you inspect the contents

25 of Ms. Jama's purse?

Mordino - Direct by Ms. Atiyeh

1   A    I did.

2   Q    Did you notice anything there that was of interest

3   to you?

4   A    I did.

5   Q    What was that?

6   A    There were several envelopes in the purse that

7   contained different amounts of money --

8   Q    How many --

9   A    -- in each envelope.

10  Q    Let me start with how many envelopes, roughly.

11  A    It was between six and eight envelopes as I

12  remember.

13  Q    How much money was contained in each envelope?

14  A    It varied.  At that point, my concern was currency

15  over $10,000.  So I never took a very accurate count

16  only because it was under the $10,000 marker.  But

17  there was close to $200 or so in the envelopes.

18  Q    In each one?

19  A    Yes.

20  Q    Were there any markings on the envelopes?

21  A    Not as I recall on the envelopes.

22  Q    Did you ask Ms. Jama about the envelopes?

23  A    I did.

24  Q    What did she say?

25  A    She had told me that she collects money to return

Mordino - Cross by Mr. Kamens

1  to families in Somalia to support the families there.

2          MS. ATIYEH:  Nothing further, Your Honor.

3          THE COURT:  All right.  Any

4  cross-examination?

5                  CROSS-EXAMINATION

6  BY MR. KAMENS:

7  Q    Sir, did you take any pictures of those envelopes?

8  A    I did not.

9  Q    Your concern was whether Ms. Jama and her family

10  were violating the law about the importation of over

11  $10,000 worth of currency; is that right?

12  A    That was not my only concern.  The dollar amount

13  for reporting requirements is $10,000.  So we didn't

14  approach the $10,000.  But the fact that we had

15  separate money in envelopes was also another concern of

16  mine.

17  Q    All right.  Well, before we get to that concern,

18  you said that each of the envelopes contained different

19  amounts of money, and the total amounted to about $200?

20  A    Correct, roughly.

21  Q    So $30 to $50 in each envelope?

22  A    No.  We were in the hundred dollar range.

23  Q    Oh, $200 in each envelope?

24  A    Correct.

25  Q    In what currency?

Mordino - Cross by Mr. Kamens

1  A     U.S. currency.

2  Q     All right.  What was your other concern?

3  A     Seeing multiple envelopes with money in them

4  broken down in each envelope.  You just don't come

5  across people carrying money in that form.

6  Q     You're not familiar with groups of women who

7  collect money and may send them overseas?

8  A     Me personally?

9  Q     Yes.

10 A     No.

11 Q     Did you follow up on your concerns in any way?

12 A     For the inspection that day, other agencies were

13 notified, and nothing went further.

14           MR. KAMENS:  Nothing further.

15           THE COURT:  All right.

16           Mr. Yamamoto, any questions?

17           MR. YAMAMOTO:  No, Your Honor.

18           THE COURT:  Any redirect?

19           MS. ATIYEH:  No, Your Honor.

20           THE COURT:  May the witness be excused?

21           MS. ATIYEH:  Yes, Your Honor.

22           THE COURT:  Officer, you're excused.  Please

23 do not discuss your testimony outside of the courtroom

24 or with any other witness.

25           THE WITNESS:  Thank you, sir.

1          (The witness stands aside.)

2                THE COURT:  Next witness.

3                MR. GILLIS:  Your Honor, the government calls

4     Mohamed ShAbdurahman.  I beg your pardon for the

5     butchering of the next name.  I'll let him pronounce

6     it.

7                THE COURT:  All right.  Mr. ShAbdurahman will

8     come forward, please.

9                MR. KAMENS:  Your Honor, I think we

10    stipulated to everything.  This is about language as I

11    understand it.  I'm not sure if there's any need of the

12    witness.

13               MR. GILLIS:  This witness will be part of the

14    identification of the callers, Your Honor.

15               THE COURT:  All right.  We'll hear the

16    witness.  There's a need beyond the stipulation from

17    the government's perspective?

18               MR. GILLIS:  I beg your pardon?

19               THE COURT:  There's a need for this witness

20    beyond the stipulation?

21               MR. GILLIS:  Yes, there is, Your Honor.

22               THE COURT:  All right.  The witness will be

23    sworn.

24               MR. GILLIS:  I take it that counsel will

25    stipulate to his qualifications as a language expert?

1              MR. KAMENS:  That's fine, Your Honor.

2              THE COURT:  All right.  He'll be so qualified

3 as an expert in the Somali language.  Is that correct?

4              MR. GILLIS:  Yes, Your Honor.

5              THE COURT:  All right.

6              MR. GILLIS:  And English as well.

7              THE COURT:  And English.  Well, I'm not sure

8 he's an expert in English.  You're offering him as an

9 expert in the Somali language?

10             MR. GILLIS:  Yes.

11             THE COURT:  And he also speaks English?

12             MR. GILLIS:  Yes, Your Honor.

13             THE COURT:  All right.

14             MR. GILLIS:  Okay.  Thank you, Your Honor.

15 MOHAMED D. SHABDURAHMAN, PLAINTIFF'S WITNESS, AFFIRMED

16                      DIRECT EXAMINATION

17 BY MR. GILLIS:

18 Q    Would you tell me your last name again, please.

19 A    Mr. ShAbdurahman.

20 Q    Give it to me one more time.

21 A    Mr. ShAbdurahman.

22 Q    Mr. ShAbdurahman?

23 A    Yes.

24 Q    Okay.  Sir, how are you employed?

25 A    I'm employed as a linguist with the FBI.

Shabdurahman - Direct by Mr. Gillis

1  Q     Okay.  How long have you been doing that?

2  A     Just over five years now.

3  Q     Okay.  Could you just give us a brief description

4  of what you do as a linguist for the FBI.

5  A     I translate audio, documents, as well as I

6  interpret whenever is needed.

7  Q     Okay.  Do you also work with audio recordings from

8  court-authorized surveillance?

9  A     Yes.

10 Q     Do you translate those documents?

11 A     Yes, I do.

12 Q     In that case -- well, let's say in this case,

13 first of all, did you do that?

14 A     Yes, I did.

15 Q     Did you listen to the court-authorized

16 surveillance that was on Defendant Dhirane's residence

17 and facilities?

18 A     Yes, I did.

19 Q     Did you also listen to the court-authorized

20 surveillance that was on Defendant Jama's residence and

21 facilities?

22 A     Yes, I did.

23        MR. YAMAMOTO:  Can we have a time frame on

24 this, Your Honor?

25        THE COURT:  Yes.

Shabdurahman - Direct by Mr. Gillis

1              Mr. Gillis, if you would, bring out the time

2  frame.

3  BY MR. GILLIS:

4  Q    Okay.  Do you recall the time frame during which

5  you --

6              MR. GILLIS:  Actually, Your Honor --

7              THE COURT:  The time frame of the recordings

8  that he reviewed.

9              MR. GILLIS:  The time frame, Your Honor -- if

10  we could approach the bench -- may be a sensitive

11  matter, the precise time frame.

12             THE COURT:  All right.

13             MR. GILLIS:  If it suffices, I can ask him

14  about the --

15             THE COURT:  Are you going to ask him about

16  specific translations?

17             MR. GILLIS:  Well, in general, yes, I am,

18  Your Honor.

19             THE COURT:  Well, why don't we proceed, and

20  then we'll see if counsel needs to get into it further.

21             MR. GILLIS:  Okay.

22  BY MR. GILLIS:

23  Q    Sir, did you listen to all of the -- well, first

24  of all, what was your responsibility for this

25  particular case and the recordings that came from the

1  Dhirane and Jama facilities?

2  A    My responsibility was translating the audio,

3  document material into English to the best of my

4  ability.

5  Q    Okay.  Were there others that had done that before

6  you?

7  A    Yes.

8  Q    All right.  So if you would, describe the process

9  that the FBI has for producing a transcript that will

10 be used in court.

11 A    The process is we get the audio or the document.

12 We read, if it's a document, a couple of times, three

13 times.  If it's audio, we listen at least two or three

14 times before we translate.

15 Q    This is the first level of translation?

16 A    First level of translation, yeah.

17      And then translate the particular parts.  Then

18 send it for quality review and for a professional

19 review.

20 Q    Okay.  What does it mean to send it for quality

21 review?

22 A    Quality review is we -- the quality of the

23 translation is reviewed.  Operational review --

24 Q    Quality review?

25 A    Review, yes.

Shabdurahman - Direct by Mr. Gillis

1  Q      then operational review?

2  A      Operational review.

3  Q      Okay.  Could you speak just --

4  A      Or quality control, yeah.  Quality control and

5  operational review, yes.

6  Q      So that's a third level of review?

7  A      Yeah, first translation and quality review and

8  then operational review.

9  Q      Did you have a role of that kind in connection

10 with the transcripts in this case?

11 A      Yes.  I did a quality review, as well as the

12 operational review.

13 Q      So you were responsible for getting all of the

14 transcripts in the government's exhibits fully accurate

15 for entry as exhibits at trial?

16 A      Yes.  To the best of my ability, yes.

17 Q      Okay.  Are you familiar with all of the exhibits

18 that the government intends to offer in this case?

19 A      Yes, I'm familiar.  Most of them I'm familiar

20 with, yes, at least the ones that came through me.

21 Q      Okay, all of them that came through you.  Well,

22 all of the transcripts came through you?

23 A      I didn't --

24            MR. KAMENS:  It's leading.

25            THE COURT:  That's all right.  Go ahead.

Shabdurahman - Direct by Mr. Gillis

1   BY MR. GILLIS:

2   Q    So with respect to all of the transcripts that you

3   reviewed for us, can you tell us the process that you

4   went through, what recordings you listened to, where

5   those recordings were when you listened to them, and

6   then how you went about your activities?

7   A    Usually I receive audio in CD or some format, and

8   then I listen once, twice, three times before I even

9   translate.  And then I note down pertinent information,

10  participants of the conversation, and then I translate

11  that.  And then after I translate, I review at least

12  two or three times again before I finalize it.

13  Q    Okay.  Leading up to this operational review, is

14  part of your responsibility to identify the callers or

15  the speakers on the transcript?

16  A    Yes.

17  Q    All right.  And could tell us how you go about

18  doing that.

19  A    A lot of times in the conversation, in the

20  conversation, participants of that conversation

21  identify themselves most of the time.

22  Q    Actually, let me back up for one second.

23       So in the process of listening to these calls, can

24  you estimate how much time you spent listening to these

25  folks talk?

Shabdurahman - Direct by Mr. Gillis

1  A     The whole audios or a particular one?

2  Q     No.  The whole -- the total number of audios that

3  you listened to in connection with this case.

4  A     Oh, it's a long hours, I would say.  Maybe over

5  100 hours, maybe more.

6  Q     Okay.  Over what period of time, if you recall?

7  A     Maybe over two years, yeah.

8  Q     Okay.  So you spent --

9  A     Or maybe more.  I can't remember all of it.

10 Q     Okay.

11 A     Yeah.

12 Q     In that process, did you become familiar with

13 certain voices that were on those calls?

14 A     Yes.  The more you listen, the more you become

15 familiar with the voices.

16 Q     Okay.  Now, to begin with, those calls were coming

17 from just two sources; am I right?

18 A     Yes.

19 Q     So it was either going to be from a Dhirane

20 facility or from a Jama facility?

21            MR. KAMENS:  Objection.

22            THE COURT:  Sustained.

23            Why don't you lay the foundation that he

24 would know that.

25 BY MR. GILLIS:

Shabdurahman - Direct by Mr. Gillis

1  Q    As part of your duties, is it necessary to become

2  aware of where the recording is coming from?

3  A    Not my duty to know where the recording is coming

4  from.  I'm a linguist.  So usually I just receive

5  recordings, and I don't know how it came.  But my duty

6  is to translate.

7  Q    Okay.  In the process of receiving the materials

8  that you're to translate, are they identified in some

9  way as to where they were obtained?

10          MR. KAMENS:  They may be, but that's just

11 hearsay.

12          THE COURT:  Well, I'm going to let him

13 testify as to what information he was provided at the

14 time he was tasked with reviewing these recordings.

15          THE WITNESS:  I apologize.  Could you repeat

16 that question, please?

17 BY MR. GILLIS:

18 Q    When you received the recordings for translation,

19 are they identified in some way?

20 A    Sometimes.  Later on, mostly when we've already

21 established the participants of a conversation.

22 Q    So the recordings themselves that you received,

23 whom do you receive them from?

24 A    From the agent.

25 Q    From the case agents?

Shabdurahman - Direct by Mr. Gillis

1   A     The case agents, yes.

2   Q     All right.  So they provide you with the

3   recordings?

4   A     Yes.

5   Q     All right.  So over the course of your hundreds of

6   hours over the course of two years of listening to

7   these recordings, did you become familiar with the

8   speakers' voices?

9   A     Yes, I did.

10  Q     Okay.  Then how did you go about identifying in

11  your transcript who the speakers were?

12  A     When you listen to the calls, especially the

13  number of calls that I listened, certain participants

14  identify themselves, and then I note down this call is

15  X, Y, Z talking to each other.  When I --

16  Q     Let me just stop you there.  So what you're saying

17  is that in some of the calls, the callers will

18  self-identify themselves?

19  A     Yes.

20          MR. KAMENS:  Objection.

21          THE COURT:  It is leading, but I'll let him

22  get through this witness.

23          Just develop the testimony.  Go ahead.

24  BY MR. GILLIS:

25  Q     Is that a voice that you recognize?

Shabdurahman - Direct by Mr. Gillis

1  A    Yes.

2  Q    Do you come to associate, then, that voice with

3  the self-identification?

4  A    Yes.

5  Q    In your examination, do you find that that voice

6  becomes familiar to you as the person that identified

7  themselves?

8  A    Yes, over the course, yeah, you become familiar

9  with that voice.

10 Q    How else did you go about identifying the callers

11 in these transcripts?

12 A    I usually listen to caller, and then I note

13 down -- if somebody self-identifies themselves, I note

14 down the name, the conversation, what it was, what

15 audio it came from.  When I listen to the next call, if

16 that voice is familiar, I usually listen side-by-side

17 again to make sure that the voices are similar.  And

18 then over the course of listening to so many calls, you

19 become familiar with the voices.

20 Q    All right.  Were there particular voices that you

21 heard consistently in most of these calls?

22 A    Yes.

23 Q    How did you identify those voices?

24 A    By the tone, by their names, by the way they

25 speak.

Shabdurahman - Direct by Mr. Gillis

1  Q    Okay.  Who were those individuals?

2  A    Mostly Ms. Jama and Ms. Dhirane.

3  Q    Okay.  I believe you mentioned that there was a

4  number that was associated with what you received.

5  A    A number?

6  Q    Did you receive -- when you received the

7  documents, was there -- the recordings, was there a

8  telephone number that was associated with it?

9  A    Yeah.  Sometimes a telephone number is associated.

10  Sometimes dates are associated, yes.  Sometimes the

11  hours are associated.

12  Q    On what?  On the recordings that you receive?

13  A    On the recording, yeah.  Yeah, on the CD and on

14  the audio.

15          THE COURT:  This is information that's on the

16  recording that's given to you; is that correct?

17          THE WITNESS:  Yes.

18          MR. GILLIS:  May I have a moment, Your Honor?

19  BY MR. GILLIS:

20  Q    So in the government's exhibits, did the entire

21  transcript of the call get put into the transcript for

22  operational use?

23  A    Not necessarily.  If the certain parts are talking

24  about something that's not pertinent, we jump.

25  Q    Okay.  In terms of the translation?

Shabdurahman - Direct by Mr. Gillis

1  A     In terms of the translation, yes.

2  Q     Did you go listen to those parts that were not

3  included in the transcript?

4  A     Yes.  As I said in the beginning, every recording,

5  before we even translate, we listen at least two or

6  three times.  It doesn't matter how long the call is.

7  Q     Is there an online system that you have access to

8  where the recordings are provided?

9  A     I don't know.

10  Q     So when you went through this process of

11  operationally controlling the documents for the

12  government's transcripts, did you carefully check -- as

13  part of your quality control process, what did you do

14  with respect to each of the names that was in your

15  transcript?

16  A     Well, we -- I check every line, every conversation

17  that it accurately mirrors what it said in Somali and

18  that's translated into English.  That's very important

19  to us because you don't want to write or translate

20  something that's not there.  So we make sure that it's

21  accurate, what was Somali said is translated into

22  English.

23  Q     How about with respect to the names that are

24  reflected in the transcripts?

25  A     The same thing.  Based on identifying the voices,

1  we put the names in there.

2  Q    About how many times have you listened to this

3  recording by the time you get around to actually

4  identifying or assuring yourself of the names

5  associated with those voices?

6  A    Many, many, many times.  I would say certain

7  voices I probably listen hundreds of times.

8          MR. GILLIS:  May I have a moment, Your Honor?

9          THE COURT:  Yes.

10         MR. GILLIS:  That's all I have, Your Honor.

11         THE COURT:  Thank you.

12         Cross-examination, Mr. Kamens?

13                CROSS-EXAMINATION

14 BY MR. KAMENS:

15 Q    Mr. ShAbdurahman --

16 A    Yes, sir.

17 Q    -- you're an interpreter for the FBI?

18 A    Yes.

19 Q    You were not the only interpreter that was

20 involved in this case?

21 A    Initially, yes.

22 Q    Initially, you were the only interpreter?

23 A    No.  No.  It was others, but I took over

24 everything later on.

25 Q    All right.  How far into the investigation did you

Shabdurahman - Cross by Mr. Kamens

1  become the only interpreter in the case?

2  A    Just in the last couple of years.

3  Q    All right.  You testified that in this case, you

4  got the audio or the document from the case agent in

5  the case; is that right?

6  A    Yes.

7  Q    You would conduct quality or operational review?

8  A    Yes.

9  Q    And that was where you read the document or you

10 listened to a call?

11 A    Yeah.

12 Q    You would translate that into English?

13 A    Yes.

14 Q    You would review the translation?

15 A    Yes.

16 Q    You would have to make sure it was accurate?

17 A    Yes.

18 Q    But you also testified that you don't know how the

19 call or the document was obtained; is that right?

20 A    Yes.  Yes.

21 Q    That is that you weren't involved in obtaining the

22 document or the surveillance that resulted in the call?

23 A    Yes.

24 Q    You weren't physically part of the FBI

25 investigation that obtained those resources for

Shabdurahman - Cross by Mr. Kamens

1    translation?

2    A    Yes.

3    Q    You did say, however, that over the course of your

4    hundreds of hours of listening to the calls, you

5    associated certain voices with certain individuals; is

6    that right?

7    A    Yes.

8    Q    You would do that when people would self-identify?

9    A    Yes.

10   Q    You don't know whether those people were the

11   people in the courtroom?

12   A    I don't know.

13   Q    Because you've never spoken to, for example,

14   Ms. Muna Jama?

15   A    No, never.

16   Q    So you have no way of determining that the calls

17   were made by Ms. Muna Jama?

18   A    I have no way.

19   Q    You also cannot identify or determine whether the

20   people on the calls identified themselves with their

21   true name?

22   A    Yes, I don't know.

23   Q    There are also calls in which you could not

24   identify one or both of the speakers?

25   A    Yeah.  In certain cases, yes.

Shabdurahman - Cross by Mr. Kamens

1  Q    That is, even through all of the calls that you

2  listened to, you couldn't assign a name to one or both

3  of the people on the call?

4  A    On a rare occasion, yeah, if a call was just one

5  call.  But if that particular voice I listened over

6  many, many calls, then I would identify.  But if it was

7  just one call that I have never heard of, yes.  Yeah.

8  Q    But when you did assign a name to a speaker on the

9  call, that was based on the information that you

10 received from the case agent?

11 A    Name on a particular person.  Sometimes no.

12 Sometimes yes.

13 Q    Well, if a particular call did not involve a

14 speaker who self-identified, then the name that you

15 assigned to that caller must come from some other

16 source; is that right?

17 A    Yes, an unidentified name.

18 Q    Right.  Since you weren't involved in the actual

19 surveillance, you would write down a name that you got

20 from the case agent; is that right?

21 A    On occasions, yes.

22 Q    So your testimony about the identity of callers is

23 not based on your own knowledge; it's based on

24 knowledge you've heard from the case agent?

25 A    So 99 percent it's based on my own knowledge

Shabdurahman - Cross by Mr. Yamamoto

1    because I listened to all of these calls, yes.

2    Q    But your own knowledge does not allow you to

3    identify the speakers of the calls to anybody who

4    actually exists?

5    A    No.

6    Q    No means that's right?

7    A    Yeah, that's right.

8             MR. KAMENS:  Nothing further, Your Honor.

9             THE COURT:  All right.  Mr. Yamamoto?

10                    CROSS-EXAMINATION

11   BY MR. YAMAMOTO:

12   Q    Essentially, your knowledge of these calls is

13   based on what you heard during these conversations?

14   You don't know when the calls were made, what phones

15   the calls were made from or to, who were on the calls

16   unless they self-named themselves or the participants

17   said they were?  You don't know if those names are

18   accurate or not or if they're nicknames or whatever?

19   All you know is that you translated what was being said

20   in the calls?

21   A    That's right.

22   Q    Everything else was either given to you or you

23   assumed?

24   A    That's right.

25             MR. YAMAMOTO:  Thank you.  Nothing further.

Shabdurahman - Redirect by Mr. Gillis

1        THE COURT:  All right.  Any redirect?

2        MR. GILLIS:  Yes, Your Honor.

3                    REDIRECT EXAMINATION

4   BY MR. GILLIS:

5   Q    You were asked on cross-examination about not

6   being able to identify certain speakers.  Why was that?

7   A    As I said, it's just because if it's one time and

8   the person does not self-identify or just one voice

9   that I have never heard of or a group of speakers in

10  the conversation and one of them is not familiar, yes,

11  then I can't identify that.

12  Q    Okay.  With respect to the voice that you identify

13  in your transcripts to be that of the Defendant Jama,

14  if you were unable to identify the voice, would you

15  identify it?  Would you take a guess at who it was?

16  A    The voice of Ms. Jama and voice of Ms. Dhirane,

17  it's distinct.  I could identify in every call.

18  Q    You could identify them in every call?

19  A    Yes.

20  Q    All right.  So anytime that their names appear in

21  these transcripts, it's the same voice that was

22  speaking?

23  A    That's correct.

24  Q    Whether you've identified it as Jama or Dhirane?

25  A    That's correct.

1  Q    So take the case of Jama, that was the same voice

2  throughout all of these transcripts?

3  A    That's correct, yes.

4  Q    With respect to the voice of Dhirane, that was the

5  same voice throughout all of these transcripts?

6  A    That's correct.

7  Q    With respect to the others that you've identified

8  here, if the name is identified in the transcript, is

9  that a name that you had become quite familiar with

10 from listening to these audio calls?

11 A    That's correct, yes.

12 Q    If it was not a name familiar to you, what would

13 you do?

14 A    I would usually write unknown female or unknown

15 male, something like that.

16 Q    If you put a name, though, it was always the same

17 voice that was connected with that name --

18 A    Absolutely, yes.

19 Q    -- based upon the hundreds of hours in the two

20 years of experience that you had with these calls?

21 A    Yes.

22 Q    If you would, look, please, at Government's

23 Exhibit 30.

24           MR. GILLIS:  May I have a moment, Your Honor?

25 BY MR. GILLIS:

Shabdurahman - Redirect by Mr. Gillis

1  Q    So if you would, look, please, at Government's

2  Exhibit 33.

3            THE COURT:  Not 30?

4            MR. GILLIS:  Not 30.  I was mistaken.

5  Government's Exhibit 33.

6  BY MR. GILLIS:

7  Q    In the third line there, the person you've

8  identified as Jama says, Yes, Umu Barau -- God's peace,

9  mercy, and blessings be upon you.

10     Is that an example of the self-identification that

11  you relied upon?

12  A    Yes.

13  Q    So it might be either where the person identifies

14  themselves or the other communicant identifies the

15  person to whom they're talking to?

16  A    That's correct.

17  Q    Did you find that frequently to be the case in

18  your review of these audios?

19  A    That's correct, yes.

20  Q    When there was a self-identification either by the

21  caller or the person called, is that reflected in all

22  of your transcripts?

23  A    Yes.

24            MR. GILLIS:  That's all I have, Your Honor.

25            THE COURT:  All right.  May the witness be

1  excused?

2         MR. KAMENS:  Your Honor, can I recross?

3         THE COURT:  All right.  Briefly.  Go ahead.

4                    RECROSS-EXAMINATION

5  BY MR. KAMENS:

6  Q    If you could, keep that exhibit.  I think it's 33,

7  sir.  Do you see the names that are listed for the

8  speakers there?

9  A    Uh-huh.

10 Q    Just to be clear, for the name of Jama, you do not

11 know that the speaker of this telephone call is

12 Ms. Jama who is sitting here in court?

13 A    Here in court, no.

14 Q    That is, you don't know because you don't know

15 what Ms. Jama's voice sounds like?

16 A    No.  I know what her voice sounds like on the

17 audios.

18 Q    On the audio but not in real life?

19 A    Not in real life, no.

20 Q    I see.  In this exhibit, it says in the third

21 line -- the person who's identified as Jama says, Umu

22 Barau -- God's peace, mercy, and blessings be upon you.

23     Do you see that?

24 A    Yes, sir.

25 Q    Presumably, that's the name of the other person?

Shabdurahman - Recross by Mr. Kamens

1   A    Yes.

2   Q    But the other person isn't listed as Umu Barau?

3   A    Yeah, it's not listed.  It's listed as her name.

4   Q    That's right?

5   A    Her last name.

6   Q    Now, you only know what the person has

7   self-identified as?

8   A    Yes.

9   Q    Or what a person is called?

10  A    Yes.

11  Q    You don't know whether the person's name is

12  actually Esse?

13  A    No.  At that moment, no.

14  Q    Because the person has not self-identified as

15  Esse?

16  A    At that part, yes.  No.

17  Q    So the information about the identity of that

18  speaker is from someone else other than you?

19  A    Umu Barau, yes.

20  Q    All right.  The person who's identified as

21  Ms. Jama, she's not otherwise identified in this

22  telephone call, that is she doesn't self-identify her

23  name?

24  A    In this particular call, no, but in other calls,

25  yes.

1          MR. KAMENS:  Thank you.  Nothing further.

2          I would ask that this witness -- with respect

3   to the purpose that the government called the witness,

4   it's not about Somali language.  They want to establish

5   the continuity or the identity of the caller.  I would

6   say his testimony is only as a lay witness and not as

7   an expert.

8          THE COURT:  All right.  Mr. Gillis, did you

9   want to --

10          MR. YAMAMOTO:  Your Honor, I have one

11   question.

12                    RECROSS-EXAMINATION

13   BY MR. YAMAMOTO:

14   Q    Were there any instances where you were given the

15   name of the individual whose call you were listening to

16   and you from then on assumed that was the individual

17   that used that name?

18   A    I think one source.  So yes.

19   Q    Do you recall who that was?

20   A    I don't recall really.

21          MR. YAMAMOTO:  Thank you.

22          THE COURT:  Mr. Gillis, did you want to --

23                    REDIRECT EXAMINATION

24   BY MR. GILLIS:

25   Q    Just with respect to that same exhibit that

Shabdurahman - Redirect by Mr. Gillis

1  Mr. Kamens was asking you about, on page 3, the second

2  line there, do you see where Ms. Esse, who refers to

3  herself as Umu Barau in this transcript, there says,

4  Oh, no.  Umu Luqmaan, I do not have that much of a

5  time?

6  A    Yes.

7  Q    Is that another example of the self-identification

8  that you used to establish who the caller or other

9  party was?

10  A    Yes.

11  Q    Okay.  And as far as whether you were told who the

12  caller was or who the voice was, was that the case with

13  either of the defendants here, Jama or Dhirane?

14  A    No.  No.  Those were -- they're identified on a

15  lot of calls, self-identified.

16            MR. GILLIS:  Nothing further, Your Honor.

17            THE COURT:  All right.  May the witness be

18  excused?

19            MR. GILLIS:  Yes, Your Honor.

20            THE COURT:  All right.  Sir, you're excused.

21  Do not discuss your testimony outside of the courtroom

22  with any other witness.

23       (The witness stands aside.)

24            THE COURT:  All right.  The government will

25  call its next witness.

Shabdurahman - Redirect by Mr. Gillis

1          MR. GILLIS:  Your Honor, the government calls

2    Amina Mohamud Esse.

3          THE COURT:  All right.  Ms. Esse will come

4    forward.

5          MS. MINTER:  Your Honor, I will tell the

6    Court that we do anticipate some involved evidentiary

7    objections with respect to this witness' testimony.

8    Perhaps we can proceed as we did yesterday.  Maybe we

9    could take those up after the lunch break.

10          THE COURT:  That would be fine.  I understand

11    the issues would come to a head, really, at the time of

12    your cross-examination.  Is that correct?

13          MS. MINTER:  Your Honor, I think it depends

14    on how the government intends to proceed in terms of

15    admitting exhibits.

16          THE COURT:  All right.

17          MS. MINTER:  I would say that the objections

18    we had yesterday will continue with those exhibits for

19    today.

20          THE COURT:  All right.

21          MS. MINTER:  Perhaps after the lunch break we

22    could do a slightly more extensive argument.  The Court

23    may have a ruling that would address the remaining

24    testimony.

25          THE COURT:  Let's begin with the witness and

                    Esse - Direct by Mr. Gillis

1  see where we are at the lunch break.

2          MS. MINTER:  Yes, Your Honor.

3          THE COURT:  All right.

4    AMINA MOHAMUD ESSE, PLAINTIFF'S WITNESS, AFFIRMED

5                    DIRECT EXAMINATION

6  BY MR. GILLIS:

7  Q    Good afternoon, Ms. Esse.

8  A    Good afternoon.

9          MR. GILLIS:  Your Honor, the witness will

10 need an interpreter.

11         THE COURT:  Do we need an interpreter?

12         MR. GILLIS:  Yes.

13         THE COURT:  All right.  Have you made

14 arrangements for one?  Do we have one?

15         INTERPRETER ABDI:  Yes, Your Honor.  I can

16 interpret for the witness.

17         THE COURT:  All right.  Let's do that then.

18         All right.  Please, Mr. Gillis.

19 BY MR. GILLIS:

20 Q    Would you tell us your name, please.

21 A    Amina Mohamud Esse.

22 Q    What city do you live in?

23 A    Minneapolis.

24 Q    Where were you born?

25 A    Kismaayo.

Esse - Direct by Mr. Gillis

1  Q    Is that in Somalia?

2  A    Yes.

3  Q    When did you come to the United States?

4  A    2009.

5  Q    Did you come directly from Somalia?

6  A    No.  I came from Botswana.

7  Q    Ms. Esse, did you plead guilty in the United

8  States court in Minneapolis to conspiring to provide

9  material support to al-Shabaab?

10 A    Yes.

11 Q    Were you represented by an attorney at the time

12 that you entered your plea?

13 A    Yes.

14 Q    Was your guilty plea part of a written agreement

15 with the United States?

16 A    What did you say?

17 Q    Your agreement to plead guilty, was that part of a

18 written plea agreement?

19 A    Yes.

20 Q    I'd ask you to look, please, with Mr. Burns'

21 assistance at Government's Exhibit 5A.

22      Do you have 5A in front of you?

23 A    Yes.

24 Q    Tell us what that is, please.

25 A    It's a conversation I had with these women.

Esse - Direct by Mr. Gillis

1          MR. GILLIS:  Does she have 5A?

2          THE COURT SECURITY OFFICER:  She does.

3          THE WITNESS:  Yes.

4          MR. GILLIS:  Mr. Burns, can I ask if we're

5  looking at the same document there.

6          THE COURT SECURITY OFFICER:  Exhibit 5A,

7  Counselor.  She never opened the envelope.

8          MR. GILLIS:  Oh, all right.  Thank you.

9  BY MR. GILLIS:

10 Q    Ms. Esse, could I ask you to open that folder and

11 take a look at the document inside.

12 A    Yes.

13 Q    What is that, please?

14 A    It's the charge I pleaded guilty to.

15 Q    Do you also see that it's a written plea agreement

16 at the top of it there?

17 A    Yes.

18         MR. GILLIS:  Your Honor, I'd move to admit

19 Government's Exhibit 5A.

20         THE COURT:  Any objection?

21         MS. MINTER:  No objection, Your Honor.

22         THE COURT:  Without objection, Exhibit 5A is

23 admitted.

24 BY MR. GILLIS:

25 Q    So in addition to pleading guilty to the material

Esse - Direct by Mr. Gillis

1  support charge, what do you understand your plea

2  agreement to require of you?

3  A    To tell the truth and not hide anything.

4  Q    Do you hope to receive some sort of benefit from

5  cooperating with the government?

6  A    Yes.

7  Q    What's the benefit you hope to receive?

8  A    To decrease my sentence.

9         INTERPRETER ABDI:  The interpreter did not

10 hear the witness.

11        THE COURT:  Please repeat the answer.

12        THE WITNESS:  To decrease my sentence.

13 BY MR. GILLIS:

14 Q    What do you understand would be the consequence if

15 you were to lie or hold back the truth in your

16 testimony today?

17        INTERPRETER ABDI:  The interpreter would like

18 to clarify.

19 A    That I have increased sentence or sentence to

20 life.

21 Q    Would you please look at the statement of facts

22 that's on page 2 of the Government's Exhibit 5A.

23 A    I've seen it.

24 Q    When you signed the document, did you have the

25 opportunity to have it read to you by a translator?

1  A    Yes.

2  Q    Did you fully understand it?

3  A    Yes.

4  Q    Are the facts that are recited there on page 2 and

5  carrying over onto page 3, are those entirely true and

6  accurate?

7  A    Yes.

8  Q    Now, your plea agreement mentions that you and a

9  group of other women would use private chat rooms.  Can

10 you tell me:  What is a chat room?

11 A    It was a chat room that really supported extremist

12 groups.

13 Q    Maybe just to give us a little background, was

14 this on a particular service, this chat room?

15 A    I did not understand you.

16 Q    Is the name Paltalk familiar to you?

17 A    Yes, Paltalk.

18 Q    Okay.  So the chat rooms that you've mentioned in

19 your plea agreement, those were established on the

20 Paltalk system?

21 A    Yes.

22 Q    So in a Paltalk situation, are there a number of

23 different chat rooms?

24 A    Yes.

25 Q    Can you give us an idea of how many there might

1  be?

2  A     There are many.  I'm unable to give you an

3  estimate, but there are a lot.

4  Q     Okay.  How did the users of the chat room identify

5  themselves?

6  A     They use names for themselves, and they use their

7  e-mail.

8  Q     Okay.  Are you familiar with the term "username"?

9  A     Yes.

10  Q     Okay.  Do the people who use the Paltalk system,

11  do they select a name for themselves?

12  A     They choose --

13         MS. MINTER:  Your Honor, I'm going to object

14  to her general understanding.  I think she can testify

15  to what she's familiar with.

16         THE COURT:  Sustained.

17         Why don't you rephrase the question.

18         MR. GILLIS:  I'll withdraw it, Your Honor.

19  BY MR. GILLIS:

20  Q     Did you have a username that you used on Paltalk?

21  A     Yes.

22  Q     In fact, did you have more than one?

23  A     Many more, yes.

24  Q     Was there a particular username that you used most

25  often?

Esse - Direct by Mr. Gillis

1  A    Yes.

2  Q    What was that?

3  A    Umu Brau.

4  Q    Can you spell that for us?

5  A    Umu Barau.

6  Q    I'm sorry.  Could you repeat that again?

7  A    U-M-U, B-A-R-A-U.

8  Q    If I were to pronounce it oom baa-raw, would that

9  be pretty accurate?

10 A    Yes.

11 Q    When did you begin visiting these chat rooms that

12 were referred to in your plea agreement?

13 A    2011.

14 Q    Are there larger -- well, let me ask this:  Was

15 there one or more chat rooms that you visited more

16 often than others?

17 A    Yes.

18 Q    What was that?

19 A    ISDAC and al-Taqwa.

20 Q    Was ISDAC known by another name?

21 A    It was known as Dacwatu al-Tawhid.

22 Q    What language was spoken in those chat rooms?

23 A    Somali.

24 Q    Do you know why there were two different names for

25 the ISDAC chat room?

Esse - Direct by Mr. Gillis

1   A     What did you say?

2   Q     Do you know why the ISDAC chat room had a second

3   name of Dacwatu al-Tawhid?

4            INTERPRETER ABDI:  The interpreter did not

5   hear the witness, would like the witness to repeat the

6   statement.

7            THE COURT:  That's fine.

8   A     That was the Tawhid meaning support, supporting

9   the youth.  That's what it was.

10  Q     Supporting the youth.  What language is that in?

11  A     Tawhiid la ilaha illa allah.  That's in the Arabic

12  language.

13  Q     What about ISDAC?

14           INTERPRETER ABDI:  The interpreter did not

15  hear the witness.

16           THE COURT:  Go ahead.  She may repeat it.

17  A     I don't know what the word ISDAC means.

18           THE COURT:  Mr. Gillis, we'll take our

19  luncheon recess at this time.

20           MR. GILLIS:  Okay.  Thank you, Your Honor.

21           THE COURT:  The Court will stand in recess

22  until 2:00.

23           Would you please tell the witness not to

24  discuss her testimony during the recess.

25           The Court will stand in recess.

1    (Recess from 1:00 p.m. until 2:12 p.m.)

2         THE COURT:  Anything we need to deal with

3    before the witness returns to the stand?

4         MS. MINTER:  Your Honor, my understanding is

5    the government is planning to move a number of

6    additional phone call transcript exhibits and chat

7    transcript exhibits in through this witness but, like

8    yesterday, for a limited purpose so that the witness

9    can discuss them.  What I would say is perhaps if I can

10   put on the record that our objection to each of those

11   would be the same.

12        THE COURT:  All right.

13        MS. MINTER:  Then the government has

14   suggested -- and I would agree -- that we could have

15   argument about the overall admissibility at a later

16   point, perhaps tomorrow, after the witness has

17   testified.

18        THE COURT:  All right.

19        MS. MINTER:  I would, then, just put on the

20   record, Your Honor, that with respect to any calls or

21   chats that the government intends to introduce at this

22   point, that we would object based on lack of foundation

23   and lack of establishment of the speakers.

24        We would also argue that these are

25   inadmissible hearsay, and they are not otherwise

1  admissible as coconspirator statements.  That objection

2  would apply to anything the government intends to admit

3  today.

4          We would also object to any speculation by

5  this witness as to the intent of the speakers unless,

6  of course, it's her.

7          THE COURT:  All right.

8          MS. MINTER:  We would reserve our right to

9  elaborate that argument at the appropriate time.

10          THE COURT:  All right.  Anything you need to

11  add to any of that?

12          MR. GILLIS:  No, Your Honor.

13          THE COURT:  All right.  Let's proceed.

14          Bring the witness back in, please.

15      (Ms. Esse enters the courtroom.)

16          THE COURT:  All right.  Ms. Esse, you remain

17  under oath.

18  BY MR. GILLIS:

19  Q    Welcome back, Ms. Esse.

20  A    Thank you.

21  Q    Okay.  When we left off, we were discussing the

22  al-Taqwa and ISDAC chat rooms.  Those are two separate

23  chat rooms, right?

24  A    Yes.

25  Q    Okay.  Were those two chat rooms devoted to a

1  particular topic?

2  A    Yes.

3  Q    Let's talk about first the ISDAC chat room.  What

4  was the nature of that chat room?

5  A    It was to support al-Shabaab or other extremist

6  groups.

7  Q    You visited this chat room?

8  A    Yes.

9  Q    About when did you begin visiting it?

10  A    2011.

11  Q    How often did you visit the ISDAC chat room?

12  A    Every time.

13  Q    Every day?

14  A    Every day.

15  Q    Until when did you visit this ISDAC chat room?

16  A    From 2011 until 2012.

17  Q    Is there any particular event that you went that

18  time to?

19  A    I don't understand.

20  Q    Okay.  I'll withdraw the question.  I'll come back

21  to that later.

22       Did the al-Taqwa chat room differ from the ISDAC

23  chat room in some way?

24  A    Yes.

25  Q    How so?

1  A    Al-Taqwa is against al-Shabaab.

2  Q    Did the users of the ISDAC chat room, those who

3  were there, did they express views about al-Shabaab?

4  A    I don't understand that.

5  Q    Well, how would you describe the users of the

6  ISDAC chat room?

7  A    We were supporters of al-Shabaab.

8  Q    Okay.  You yourself were at that time?

9  A    Yes.

10  Q    How did you learn about the ISDAC chat room?

11  A    A woman introduce me to the name of it.

12  Q    What was the woman's name?

13  A    Amran Yusuf.

14  Q    Amran Yusuf?

15  A    Yes.

16  Q    How did you meet Amran Yusuf?

17  A    Previous husband was her teacher.  That's how I

18  got to know her.

19  Q    Okay.  What was your previous husband's name?

20  A    Mohamed Ali.

21  Q    How long were you married to him?  From when until

22  when about?

23  A    We got married May 9, 2011.  We separated

24  October 21, 2012.

25  Q    Do you know if your ex-husband had any views about

1 al-Shabaab?

2          MS. MINTER:  Objection, relevance.

3          THE COURT:  I'll allow it.

4          THE INTERPRETER:  The interpreter did not

5 hear the judge.

6          THE COURT:  Overruled.  I'll let her answer

7 that question.

8 A    Yes, he supported them.

9 Q    In what way?

10          MS. MINTER:  Objection, as to calling for

11 hearsay.

12          THE COURT:  If she knows.

13          Why don't you lay a foundation as far as what

14 she knew about how he supported al-Shabaab.

15 BY MR. GILLIS:

16 Q    Well, let me ask you this:  Were you an al-Shabaab

17 supporter before you and your ex-husband married?

18 A    No.

19 Q    All right.  So what happened to cause you to

20 become a supporter of al-Shabaab?

21 A    He changed my number, changed my friends, changed

22 my telephone.

23          THE INTERPRETER:  The interpreter would like

24 to clarify.

25 A    And also introduced me to supporters of al-Shabaab

Esse - Direct by Mr. Gillis

1  so he can control me.

2  Q    You're referring to your ex-husband?

3  A    Yes.

4  Q    Eventually, you came to share his views about

5  al-Shabaab?

6  A    Yes, I believe so.

7  Q    You mentioned that your friend Amran Yusuf told

8  you about the pro-al-Shabaab ISDAC chat room.  Did she

9  have a sister?  Do you know?

10         MS. MINTER:  Objection, leading.  It calls

11  for hearsay.

12         THE COURT:  Sustained.

13         Why don't you rephrase the question.

14  BY MR. GILLIS:

15  Q    Do you know whether Amran Yusuf had a sister?

16  A    Yes.  Yes.

17  Q    How do you know that?

18  A    She took -- I know because she told me her

19  sister's name is Nima.

20         MS. MINTER:  Objection, hearsay.

21         THE COURT:  Well, this is a conversation with

22  Amran; is that right?

23         MR. GILLIS:  Yes, Your Honor.

24         THE COURT:  All right.  I'll allow it.  I

25  understand the objection.  I'll allow the fact that she

1   told her she had a sister and her sister's name.

2   BY MR. GILLIS:

3   Q    And do you know whether she had any connection to

4   your ex-husband?

5   A    Yes.  He was her teacher.

6   Q    So are you aware whether -- first of all, what is

7   the sister's name?

8   A    Nima.

9   Q    Do you know her full name?

10  A    Nima Ali Yusuf.

11  Q    All right.  Do you know whether she came to have

12  some legal difficulties?

13       MS. MINTER:  Your Honor, I would ask for a

14  foundation.

15       THE COURT:  I'll let her answer this first.

16  A    Yes.

17  Q    How do you know that?

18  A    It was said in the room.

19  Q    Okay.  When you say it was said in the room, which

20  room are you speaking of?

21  A    ISDAC, Dacwatu al-Tawhid.

22       MS. MINTER:  Your Honor, in that case, I

23  would object on the basis of hearsay.

24       THE COURT:  All right.  I'm going to allow it

25  for the fact of what's been stated.  I'll reserve on

1  relevancy once I hear where this is going.

2         MR. GILLIS:  In fact, Your Honor, at this

3  point, I would ask the Court to take judicial notice of

4  Government's Exhibits 7A, 7B, and 7C, which are court

5  records relating to the prosecution and conviction of

6  Nima Ali Yusuf.

7         Since these are records of the Court, it's

8  well-established under the rule that the Court may

9  take --

10         THE COURT:  Is there any objection to those

11  three exhibits?

12         MS. MINTER:  No objection, Your Honor,

13  subject to our other objections.

14         THE COURT:  All right.  Exhibits 7A, B, and C

15  are admitted.

16  BY MR. GILLIS:

17  Q    Your plea agreement mentions that you conspired

18  with Muna Osman Jama.  Was she a member of one of these

19  chat rooms?

20         MS. MINTER:  Objection, lack of foundation.

21         THE COURT:  Well, why don't you lay a

22  foundation as far as whether -- on what basis she would

23  be able to answer that question.

24         MR. GILLIS:  Okay.  Yes, Your Honor.

25  BY MR. GILLIS:

Esse - Direct by Mr. Gillis

1  Q    Are you familiar with someone who used the Paltalk

2  username Umu Luqmaan99?

3         THE INTERPRETER:  The interpreter would like

4  the name repeated.

5  BY MR. GILLIS:

6  Q    Umu Luqmaan.

7  A    Yes.

8  Q    Do you know where she lived?  Well, first of

9  all -- I'm sorry.  Let me back up one second.

10      Did you come to have conversations with Umu

11  Luqmaan?

12  A    Yes.

13  Q    How so?

14  A    Many times, phone and the chat room.

15         MS. MINTER:  Your Honor, I would ask for a

16  clarification or some foundation as to whether the

17  witness is referring to a particular username or

18  whether she, in fact, knows an individual who utilized

19  that username because I think that affects her ability

20  to testify going forward.

21         THE COURT:  All right.  I'll --

22         MR. GILLIS:  We're going to get --

23         THE COURT:  Overruled.  I'll let you continue

24  with your foundation.

25  BY MR. GILLIS:

Esse - Direct by Mr. Gillis

1  Q    So you had conversations with her through Paltalk?

2  A    Yes.

3  Q    How does that work?

4  A    The way it works is you can chat with someone

5  privately or you can use the bigger room.

6  Q    How did you communicate with Umu Luqmaan?

7  A    Mostly if she calls me, I would call her back, or

8  we would meet in the room.

9  Q    You mentioned that you could do this either in

10 private or in a public room on Paltalk.  Which of those

11 two did you use to communicate with her?

12 A    Both.

13 Q    How would she call you?

14 A    Every day or every other day.

15 Q    How often -- well, first of all, how did she call

16 you?

17 A    She used to call me on the phone.

18 Q    All right.  How did she obtain your telephone

19 number?

20 A    We got to know each other in the room.  Afterward

21 we switched phone numbers.

22 Q    You mean you exchanged phone numbers?

23 A    Yes.

24 Q    So in these conversations -- I beg your pardon.  I

25 believe you said -- well, how often did you speak by

Esse - Direct by Mr. Gillis

1  telephone with Umu Luqmaan?

2  A    If she didn't call me, I would call her.  If I

3  didn't call her, she would call me.

4  Q    How often did you do that?

5  A    If I call her in the morning, she would call me

6  back in the afternoon.  If I did not hear from her that

7  day, she would call me back the next day.

8  Q    Okay.  Were these conversations daily or only once

9  a week or a few more times than that?  Can you give us

10  an idea of how often you spoke with her?

11  A    Once a day.

12  Q    In the Paltalk conversations, how often did you

13  talk?

14  A    Every day.

15  Q    During what period of time did you speak with Umu

16  Luqmaan?

17  A    Usually early in the morning, mornings for them or

18  mornings for me.

19  Q    By a month or so, about when was it that you began

20  to know Umu Luqmaan?

21  A    I don't remember the exact date, but it was around

22  April 2011.

23  Q    By a month or so, until about when did you

24  continue talking to her?

25          THE INTERPRETER:  The interpreter would like

Esse - Direct by Mr. Gillis

1   to clarify the statement.

2           THE COURT:  Yes.

3           THE WITNESS:

4   A    Until June 2012.

5   Q    Did Umu Luqmaan tell you where she lived?

6   A    Yes.

7   Q    Where was that?

8   A    Virginia.

9   Q    Did she ever tell you her true name?

10  A    Yes.

11  Q    Do you recall what name she told you?

12  A    Muna Osman Jama.

13          MS. MINTER:  Your Honor, I would just ask the

14  interpreter to repeat that.

15          THE COURT:  Yes.  Could you repeat.

16          THE INTERPRETER:  Muna Osman Jama.

17  BY MR. GILLIS:

18  Q    Did we play for you some telephone recordings for

19  you to listen to?

20  A    Yes.

21          MR. GILLIS:  If I could ask Mr. Burns to give

22  you Government's Exhibits 30B, 33B, 34B, 35, 36 --

23  those are all B -- 39B and 55B and 56B.

24          THE COURT:  Is there any objection to those?

25          MS. MINTER:  We're checking, Your Honor.  If

1  the government would list those again.

2         MR. GILLIS:  It's Government's Exhibits 30B,

3  33B, 34B, 35B, 36B, 39B, 55B, and 56B.

4         Mr. Burns, I'll try to do better next time in

5  getting you that information ahead of time.

6         THE COURT SECURITY OFFICER:  No problem, sir.

7         MR. GILLIS:  It actually is a problem for me.

8  I mean, I should have done it.

9         THE COURT SECURITY OFFICER:  That's okay,

10 sir.  No problem.

11        MR. GILLIS:  I can tell you actually that in

12 anticipation, I'm going to be then asking about the

13 corresponding transcripts, which would be the same

14 numbers but without the B.  It would just be, for

15 example, 30, 33, etc.

16        THE COURT SECURITY OFFICER:  I'll pull them

17 out.

18 BY MR. GILLIS:

19 Q    Okay.

20        THE COURT:  Hold on a minute.  Let's just see

21 if we have any objections.

22        MS. MINTER:  The Court's indulgence, please,

23 Your Honor.  Apologies, Your Honor.  I'm just matching

24 up the transcript with the call.

25        Your Honor, my understanding is that each of

1  these exhibits relate to the audio clips for which

2  subsequent transfers were produced.  I will tell the

3  Court we don't object to the admissibility of the audio

4  itself pursuant to the stipulations and what we expect

5  will be testimony that this witness recognizes them.

6  We would object to any testimony without a proper

7  foundation about who the other speaker is.

8          THE COURT:  All right.  Well, do you object

9  to the transcripts themselves?

10         MS. MINTER:  Your Honor, the objections to

11  the transcripts would --

12         THE COURT:  I know you're not agreeing to

13  the --

14         MS. MINTER:  -- would fall under the

15  foundational objection.

16         MR. GILLIS:  Your Honor, I'm hoping to clear

17  all of that up in a few minutes.

18         THE COURT:  All right.  Why don't you go

19  ahead.

20         MS. MINTER:  So, Your Honor, we don't object

21  to admissibility.  We would object to the witness'

22  ability to speculate.

23         THE COURT:  All right.  I'm going to admit

24  Exhibits 30B, 33B, 34B, 35B, 36B, 39B, 55B, and 56B

25  over objection.

1          MR. GILLIS:  Thank you, Your Honor.

2   BY MR. GILLIS:

3   Q    So do you have those in front of you?  You may

4   need to open those folders to see.  Why don't you stop

5   there for one moment and let me ask you a couple of

6   questions.

7          So the recordings that we asked you to listen to,

8   were they on disks that were marked with Government's

9   exhibits?

10  A    Yes.

11  Q    Then after you listened to them, did we ask you to

12  initial those disks?

13  A    Yes.

14  Q    Those disks that you're looking at there, do they

15  bear your initials?

16  A    Yes.

17  Q    When you listened to those recordings, did you

18  recognize any of the voices that were on them?

19  A    Yes.

20  Q    Whose voices did you recognize?

21  A    Mine and Umu Luqmaan.

22  Q    Is this the same Umu Luqmaan who told you her name

23  was Muna Osman Jama?

24  A    Yes.

25  Q    Was there any relationship between those

1  conversations there and the material support charges

2  that you pled guilty to?

3  A    Yes.

4  Q    How so?

5  A    That we send money, collect money in support of

6  al-Shabaab.

7            MS. MINTER:  Objection, unresponsive.

8            THE COURT:  I'm sorry?

9            MS. MINTER:  Nonresponsive, Your Honor.

10           THE COURT:  Overruled.

11           MR. GILLIS:  Your Honor, just to be clear,

12  I'd offer those exhibits, 30B through 56B, that we've

13  just been talking about for all purposes with respect

14  to the case.

15           THE COURT:  All right.  Any objection?

16           MS. MINTER:  Your Honor, this would fall

17  within the parameters of the objection I articulated

18  earlier.  So I would ask the Court to withhold final

19  ruling until we can have final argument.

20           THE COURT:  Over objection, the Court is

21  going to admit Exhibits 30B, 33B, 34B, 35B, 36B, 39B,

22  55B, and 56B.  I'll reserve as to the specific

23  objections that you've mentioned, Ms. Minter.

24           MR. GILLIS:  I'm sorry, Your Honor.  At this

25  point, the objection is a little unclear to me.  So

1  that I know what additional foundation I might need to

2  lay with this witness, could we --

3              THE COURT:  Well, the objection, as I

4  understand it, is that she's reserving her objection to

5  these exhibits and the audiotapes with respect to this

6  witness' characterization of those documents.

7              Is that basically it?

8              MS. MINTER:  Your Honor, we would object to

9  the admissibility generally with respect to the

10 government's ability to overcome the hearsay problem

11 and also what we believe will be the government's

12 inability to lay a proper foundation to tie this

13 individual's knowledge of these calls, which led to the

14 subsequent transcripts, to the defendants in this case.

15             THE COURT:  All right.  They're admitted

16 subject to any objection with respect to hearsay based

17 on the conspiracy issues in the case.

18             Is that basically the objection?

19             MS. MINTER:  That is with respect to the

20 hearsay, Your Honor.

21             With respect to the foundation, I can

22 paraphrase.  Quite simply, it boils down to we don't

23 believe this witness has the proper knowledge to

24 identify that the individuals with whom she

25 communicated with are either of the defendants.

1          THE COURT:  All right.  I understand that.

2          All right.  Those exhibits are admitted over

3    objection, and we'll proceed.

4          MR. GILLIS:  Thank you, Your Honor.  They

5    have been admitted for all purposes?

6          THE COURT:  Yes.

7          MR. GILLIS:  Thank you, Your Honor.

8    BY MR. GILLIS:

9    Q    Ms. Esse, when you were reviewing those disks, did

10   you also review the corresponding English translations?

11   A    Yes.

12   Q    You had reviewed those earlier with your lawyer

13   and with an interpreter?

14   A    Yes.

15   Q    So were you able to listen to the audio and then

16   read the transcript with the assistance of an

17   interpreter?

18   A    Yes.

19          MR. GILLIS:  If I could ask Mr. Burns, then,

20   to show you Government's Exhibits 30, 33, 34, 35, 36,

21   39, 55, and 56.

22   BY MR. GILLIS:

23   Q    Would you take a moment to look at those

24   transcripts and see if you can assure yourself that

25   those are the transcripts that correspond to the audio

1  that you've listened to?

2  A    Okay.

3  Q    Have you reviewed those transcripts?

4  A    Yes.

5  Q    Are those the transcripts that you reviewed along

6  with the audiotape of the corresponding conversations?

7  A    Yes.

8  Q    In reviewing those transcripts, did you see the

9  names Jama and Esse being indicated for the speakers?

10  A    Yes.

11  Q    Based upon your daily conversations by phone with

12  the person you knew as Muna Osman Jama, do those

13  transcripts accurately reflect whenever she was the

14  speaker?

15  A    Yes.

16  Q    Whenever it's indicated that you were the speaker,

17  did it accurately reflect that?

18  A    Yes.

19  Q    In reviewing all of those transcripts, did you

20  find any errors in the identification of who the

21  speakers were?

22  A    I don't understand.

23  Q    Did you ever find that, for example, there was an

24  indication that Jama was the speaker when, in fact, she

25  was not?

Esse - Direct by Mr. Gillis

1   A      No.

2           MR. GILLIS:  Your Honor, I'd move to admit

3   Government's Exhibits 30, 33, 34, 35, 36, 39, 55, and

4   56.

5           THE COURT:  Those are already admitted.

6           MR. GILLIS:  I beg your pardon?

7           THE COURT:  I've admitted those.

8           MR. GILLIS:  Your Honor, I believe they were

9   but conditionally.  I'm asking the Court now to remove

10  the condition.

11          THE COURT:  Over objection, Exhibits 30, 33,

12  34, 35, 36, 39, 55, and 56 are admitted.

13  BY MR. GILLIS:

14  Q    Now, you mentioned that you met or saw -- well,

15  just to be sure I'm not leading, did you see Defendant

16  Jama in the ISDAC chat room?

17          MS. MINTER:  Your Honor, I would object to

18  the form of the question.

19          THE COURT:  Sustained.  Why don't you clarify

20  what you mean when you say did you see her.

21  BY MR. GILLIS:

22  Q    In the ISDAC chat room in the Paltalk system, can

23  you see the usernames of the individuals who are in the

24  chat room?

25  A    Yes.

                    Esse - Direct by Mr. Gillis

1  Q     Did you see Umu Luqmaan's Paltalk name in the

2  ISDAC chat room?

3  A     Yes.

4  Q     When I say see her, I mean, just for clarity's

5  sake, how often did you see her username in the ISDAC

6  chat room.

7  A     Every day in the afternoon or in the mornings.

8  Q     Was that during that same period of time that you

9  mentioned when you were talking with the defendant by

10 phone or by chat?

11 A     Could you repeat that question?

12 Q     I'll withdraw it and ask what I hope is a better

13 one.

14       Over what period of time -- if you can, tell us by

15 a month and a year and another month and a year.  Over

16 what period of time did you see the defendant daily in

17 the ISDAC chat room?

18 A     From when I started up until when I left, I would

19 see her there.  So from 2011 to June 2012 when I left.

20 Q     Did you notice whether anything about how the

21 defendant was treated in the ISDAC chat room?

22            MS. MINTER:  Objection, calls for speculation

23 and hearsay.

24            THE COURT:  I'll let her answer the question.

25 A     She is someone that was very respected and highly

Esse - Direct by Mr. Gillis

1  regarded.

2  Q    How do you draw that conclusion?

3  A    I was one of the people that respected her a lot,

4  and I always welcomed her anytime she would enter.

5  Q    Did others do that as well?

6  A    Very few people were respected like that.

7  Q    I beg your pardon?

8  A    Very few people were respected like that.

9  Q    Well, I'm trying to find out what you mean by

10 that.  Are you speaking of Umu Luqmaan, the defendant,

11 when you --

12 A    Yes.

13 Q    When you say that she was very respected and

14 highly regarded, was she treated in a way that was

15 significantly different from the other ordinary members

16 of the ISDAC chat room?

17 A    Yes.

18 Q    Do you know anything about when and how early the

19 defendant joined the ISDAC chat room?

20          MS. MINTER:  Objection, calls for hearsay.

21          THE COURT:  Hold on.

22          MR. GILLIS:  I'll withdraw that question.

23          THE COURT:  Why don't you rephrase the

24 question or lay a foundation.

25 BY MR. GILLIS:

Esse - Direct by Mr. Gillis

1  Q    Did the defendant tell you anything about her

2  history with the ISDAC chat room?

3  A    She told me that she's someone that's respected

4  and that she's a member.  She did not tell me anything

5  else besides that.

6  Q    When you got to have conversations with the

7  defendant --

8          MS. MINTER:  Your Honor, I apologize for the

9  interruption.

10          As one of our objections is a foundational

11  objection, I would ask that the government limit its

12  questioning to the username or a name that the

13  individual she communicated with provided.  I think the

14  defendant is a connection that hasn't been established

15  yet.

16          THE COURT:  All right.  I understand what

17  you're eliciting in your question.  It's information

18  that she received from the person who identified

19  herself as Umu Luqmaan.  Is that right?

20          MR. GILLIS:  Yes, Your Honor.

21          THE COURT:  I understand that you've put in

22  other evidence that would link that name to this

23  defendant.  But in terms of the questioning, why don't

24  you make it clear that the information she is getting

25  is from the person who has identified herself as Umu

Esse - Direct by Mr. Gillis

1  Luqmaan, or if she has identified herself by another

2  name, it was that name that was used.

3  BY MR. GILLIS:

4  Q    So by the time you began associating with Umu

5  Luqmaan or Muna Osman Jama, were you already someone

6  who supported al-Shabaab?

7  A    Yes.

8  Q    Do you know whether there were people who were in

9  charge of the ISDAC chat room or who controlled it?

10  A    Yes.  There are a few people I remember.

11  Q    Okay.  Whom do you remember?

12  A    A man called Abu Kowthar.

13           THE INTERPRETER:  The interpreter would like

14  to clarify the name.

15           THE COURT:  Yes.

16  A    Ramzul Fidaa, a woman.

17  Q    How do you know that these folks were in charge of

18  or controlled the ISDAC chat room?

19  A    I know that if they did not like what someone

20  said, that they would block them or remove them from

21  the room.

22  Q    Do you know or did you hear Abu Kowthar himself

23  ever say anything in the ISDAC chat room in support of

24  al-Shabaab?

25           MS. MINTER:  Objection, calls for hearsay.

1       THE COURT:  Overruled.

2  A    Yes.

3  Q    Tell us about that.

4  A    I would hear him say, We need to collect money for

5  the brothers.

6  Q    What else did he say about al-Shabaab?

7  A    He would inform us of their victories.  He would

8  also invite and connect us with --

9       THE INTERPRETER:  The interpreter would like

10 to clarify.

11 A    -- leaders of al-Shabaab.

12 Q    When you say he would inform you of their

13 victories, are you talking about al-Shabaab's

14 victories?

15      MS. MINTER:  Same objection, Your Honor.

16 A    Yes.

17 Q    You mentioned that he would ask for money; he

18 would say we needed to collect money for the brothers.

19 Was that in connection with discussion of anything else

20 at the time, any current events at the time?

21      MS. MINTER:  Same objection.

22      THE COURT:  Overruled.

23 A    Yes.

24 Q    Tell us about that.

25 A    There were many African soldiers that came into

Esse - Direct by Mr. Gillis

1  the country.  He said the jihad will not be able to

2  continue if we do not collect money.

3  Q    Coming into what country?

4  A    Somalia.

5  Q    Based upon your daily visits to this ISDAC chat

6  room and the discussions that you heard from Abu

7  Kowthar, what was your understanding of what the

8  brothers referred to?

9         MS. MINTER:  Objection, calls for

10 speculation.

11        THE COURT:  I'll let her testify as to what

12 she understood the reference meant.

13 A    The word "brothers" is al-Shabaab.

14 Q    What about the word "jihad" as you were mentioning

15 earlier?

16 A    It's to kill and fight.

17 Q    Kill and fight whom?

18 A    Any infidels or people that invade the country,

19 like the African soldiers.

20 Q    Did you ever see any photographs in connection

21 with these requests for money for the brothers?

22 A    Yes.

23 Q    Tell us what you saw.

24 A    When they would collect the money, they would show

25 us someone that's injured, sick, burned.  After we

1  collect the money for them, they would show us the

2  person recovered.

3  Q    Were you ever shown any pictures of -- well, first

4  of all, who would show you those pictures?

5  A    Mostly Abu Kowthar.

6  Q    Abu Kowthar.  Did he ever show photographs of

7  al-Shabaab fighters in some sort of uniform?

8  A    Yes, many times.

9  Q    Okay.  Was there ever any money shown in those

10 photographs?

11           MS. MINTER:  Objection, leading.

12           THE COURT:  Overruled.

13 A    Yes.  I've seen them with money and also with

14 food.  I've seen all of that.

15 Q    Who showed the photographs of the al-Shabaab

16 fighters with money?

17 A    Abu Kowthar.

18 Q    Did Abu Kowthar say why he was showing the members

19 of the chat room photographs of money given to the

20 al-Shabaab soldiers?

21 A    Yes.

22 Q    What did he say about that?

23 A    So we wouldn't think that he took the money

24 himself and to show the money went to the people who

25 needed it.

1   Q     The people who needed it were whom?

2   A     The fighting mujahids.

3   Q     Who are they, the fighting mujahids, or what

4   organization are they associated with?

5   A     Al-Qaeda.  They're al-Shabaab, but they have a

6   connection with al-Qaeda.

7   Q     So Abu Kowthar was showing these photographs to

8   demonstrate that the money was going to the al-Shabaab

9   fighters?

10            MS. MINTER:  Your Honor, I would object to

11   the form of the question.  That's not the testimony.

12            THE COURT:  Overruled.

13            THE INTERPRETER:  Your Honor, the interpreter

14   did not hear counsel.

15            THE COURT:  All right.  Do you need the

16   question repeated or --

17            THE INTERPRETER:  Yes, Your Honor.

18            THE COURT:  If you would, repeat the

19   question.

20   BY MR. GILLIS:

21   Q     Okay.  So I'm trying to clarify.  When you said

22   that Abu Kowthar showed these photographs of money

23   being given to the al-Shabaab fighters so that people

24   would know that it was going to the mujahideen, who

25   were the mujahideen in this context that he wanted to

Esse - Direct by Mr. Gillis

1  show you the money was going to?

2        MS. MINTER:  Asked and answered.

3        THE COURT:  I'll let her answer the question

4  as far as what she understood she was seeing.

5  A    Al-Shabaab.

6  Q    You mentioned that Abu Kowthar would arrange for

7  al-Shabaab leaders or he would invite al-Shabaab

8  leaders to talk at the ISDAC chat room.  Is that right?

9  A    Yes, right.

10  Q    Do you recall who those people were?

11  A    Yes.

12  Q    Who were they?

13  A    Jama Abdulsalam, Sheikh Cali Dheere, and Sheikh

14  Abdulkadir Mumin --

15        MS. MINTER:  Objection.

16        THE COURT:  Overruled.

17        MS. MINTER:  Speculation and hearsay.

18        THE COURT:  Overruled.  I'll let this all in

19  for the fact of these statements.

20  BY MR. GILLIS:

21  Q    So let's start with Sheikh Abdulkadir Mumin.  Is

22  that right?  Do I have that right?

23  A    Yes.

24  Q    Okay.  Well, so the first name I heard was Jama

25  Abdulsalam.  Is that correct?

1   A     Yes.

2   Q     Another name that I heard was Sheikh Abdulkadir

3   Mumin.  Is that right?

4   A     Yes.

5   Q     Was there another name that you mentioned as being

6   one that Abu Kowthar arranged to come talk?

7   A     Yes.  Sheikh Cali Dheere and Sheikh Bali.

8   Q     Could you spell those names for us, Ms. Esse?

9   A     Sheikh Cali Dheere is spelled S-H-E-I-K-H.  Cali

10  is spelled C-A-L-I.  Dheere is spelled D-H-E-E-R-E.

11  Sheikh Bali is spelled S-H-E-I-K-H.  Bali is spelled

12  B-A-L-I.

13  Q     Okay.  Were you in the ISDAC chat room when those

14  four people were speaking?

15  A     Yes.

16  Q     Let's start with Sheikh Abdulkadir Mumin.  Who is

17  he?

18  A     He is one of the clerics of al-Shabaab.

19  Q     You heard lectures of his while you were in the

20  ISDAC chat room?

21  A     Yes.

22  Q     Were these recorded lectures, or were they live

23  lectures?

24  A     Both.

25  Q     Who arranged for them to be played?

1  A    Abu Kowthar.

2  Q    How would he arrange for the live lectures to be

3  played?

4  A    It would be advertised.  It would also be

5  announced on Facebook, on other websites so people

6  could attend at the appropriate time.

7  Q    Electronically or physically, how did the live

8  lectures get played on the ISDAC chat room?

9  A    We would listen to it clearly.

10  Q    Okay.  Was there anyone that suggested to you that

11  you should listen to lectures by Sheikh Abdulkadir

12  Mumin?

13  A    Yes.

14  Q    Who suggested that you should listen to his

15  lectures?

16  A    Umu Luqmaan and Abu Kowthar.

17  Q    Do you recall what Mumin said during these

18  lectures?

19          MS. MINTER:  Objection, hearsay.

20          THE COURT:  I'm letting it in for the fact

21  that it was being said.

22  A    Yes.

23  Q    So what was Sheikh Mumin's message?

24  A    To support jihad, to leave infidel countries if

25  you are living there.  If you're not living there, to

Esse - Direct by Mr. Gillis

1  do whatever you can.

2  Q    Did he elaborate on whatever you can referred to?

3  A    Yes.

4  Q    What did he say?

5  A    Kill.

6  Q    Kill whom?

7  A    Infidel.

8  Q    Was he any more specific about what sort of

9  support of jihad you should give?

10 A    Yes, money.

11 Q    Give money to whom?

12 A    Al-Shabaab.

13 Q    Did he say anything about the importance of giving

14 money?

15 A    Yes.

16 Q    What did he say?

17 A    He said the soldiers need funds for weapons, food,

18 and jihad without money cannot continue.

19 Q    Did he compare the importance of money to the

20 importance of fighting?

21 A    Yes.

22 Q    What did he say about that?

23 A    He would recite verses from the Koran saying that

24 what's more important than fighting physically is

25 providing the funds.

1  Q    Providing the funds for what?

2  A    To help the soldiers.

3  Q    During these lectures of Sheikh Mumin, did you see

4  Umu Luqmaan's username in the ISDAC chat room?

5  A    Yes.

6  Q    Did she discuss with you Mumin's lectures?

7  A    Yes.

8  Q    Do you know where Sheikh Mumin was at the time of

9  these lectures?

10  A    The mountains in northeast.

11  Q    Do those mountains have a name?

12  A    Golis.

13         MR. GILLIS:  May I have one moment, Your

14  Honor?

15         THE COURT:  Yes.

16  BY MR. GILLIS:

17  Q    Were there discussions in the larger ISDAC chat

18  room about al-Shabaab's activities as they were

19  occurring?

20         MS. MINTER:  Your Honor, I would object to

21  the leading.  Also, if I could lodge a continuing

22  objection to the hearsay about what was said in the

23  chat rooms.

24         THE COURT:  All right.  Overruled.

25  A    I don't understand the question.

1  Q    In the ISDAC chat room, from time to time, were

2  the activities of al-Shabaab discussed?

3  A    Yes.

4  Q    Were the activities related to news reports about

5  what al-Shabaab had been doing?

6  A    Yes.

7  Q    What was the type of news that would be -- and I'm

8  sorry.  One more question.

9       The al-Shabaab activities that were being

10 discussed, did they take place at the same time as the

11 news articles?

12 A    Fight, kill, loot, those are the things they would

13 mention, any good news on their end.

14 Q    Good news on whose end?

15 A    They would never mention if there were any

16 casualties on their end.  They were always the ones

17 that killed.  They always ended up getting weapons from

18 the other soldiers, capturing the other soldiers.

19 Q    These are all things that al-Shabaab was doing?

20 A    What?

21 Q    These were all things that al-Shabaab was doing?

22 A    Yes.

23 Q    How often would this news about al-Shabaab be

24 discussed in the ISDAC chat room?

25 A    They would always give us news of what's going on,

Esse - Direct by Mr. Gillis

1  but we would get the complete news on Fridays, a

2  series.

3  Q    A series on the ISDAC chat room on Fridays?

4  A    Yes.

5  Q    That would be when you get the complete news?

6  A    Yes.

7  Q    Was al-Shabaab news discussed during the rest of

8  the week, or was it all held for Friday?

9  A    We would get half, and they would say, We'll give

10 you the rest on Friday.

11 Q    Did that happen daily?

12 A    Yes.

13 Q    You mentioned that --

14          MR. GILLIS:  May I have one moment, Your

15 Honor?

16          THE COURT:  Yes.

17 BY MR. GILLIS:

18 Q    You also mentioned Jama Abdulsalam as a leader

19 that Abu Kowthar had come talk to the ISDAC chat room.

20 What did he do?  Did he provide lectures?

21 A    Yes.

22 Q    You heard those lectures?

23 A    Yes.

24 Q    Do you know whether Umu Luqmaan was present in the

25 ISDAC chat room at the time that those lectures were

Esse - Direct by Mr. Gillis

1  given?

2  A    Yes, both of us were in there.

3  Q    What did the lectures of Jama Abdulsalam consist

4  of?

5         MS. MINTER:  Objection, hearsay.

6         THE COURT:  Overruled.

7  A    It wasn't any different from what Sheikh Abu

8  Kowthar would lecture about.

9  Q    Are we talking about Abu Kowthar or Sheikh Mumin

10  or someone else?

11         THE INTERPRETER:  The interpreter would like

12  to clarify, Your Honor, the statement.

13         THE COURT:  Yes.

14  A    The question you asked was in regards to Jama

15  Abdulsalam, but there really wasn't any difference

16  between both Jama Abdulsalam and Sheikh Abu Kowthar.

17  Q    Do you mean there wasn't any ideological

18  difference, or are you saying that they were the same

19  person?

20  A    The same ideology.  They were the same.

21  Q    Same ideology as Sheikh Mumin?

22  A    Yes.

23  Q    In his lectures or in the introduction of the

24  lectures that you and Umu Luqmaan were present for, did

25  he or anyone say whether he was and how he was

Esse - Direct by Mr. Gillis

1   affiliated with al-Shabaab?

2   A    He told us that he was one of the clerics, and

3   everyone knew he was one of the clerics of al-Shabaab.

4   Q    Have you heard of Sheikh Hassan Hussein?

5   A    Yes.

6   Q    Have you heard him lecture?

7   A    Yes.

8   Q    Where have you heard him lecture?

9   A    That was Tawhid.  That was Tawhid.

10  Q    The ISDAC chat room?

11  A    Yes.

12  Q    Did anyone suggest to you that you should listen

13  to Sheikh Hassan's sermons?

14        THE INTERPRETER:  The interpreter would like

15  the name repeated, Your Honor.

16  BY MR. GILLIS:

17  Q    Did anyone suggest to you that you should listen

18  to Sheikh Hassan Hussein's lectures?

19  A    Yes.

20  Q    Who was that?

21  A    Umu Luqmaan, al-Mahaba, and my ex-husband.

22  Q    Umu Luqmaan, al-Mahaba, and your ex-husband, the

23  same ex-husband we've talked about?

24  A    Yes.

25  Q    Where did you hear Sheikh Hassan Hussein's

1  lectures?

2  A    Mostly that was the Tawhid.

3  Q    Okay.  What was the substance of Sheikh Hassan

4  Hussein's lectures?

5  A    To support jihad.

6  Q    Did he use any terms when saying that or any other

7  terms?

8  A    Yes.

9  Q    What did he say?

10 A    Brothers or Islam.

11 Q    Now, would you tell us how your relationship with

12 Muna Osman Jama/Umu Luqmaan developed?

13 A    It was good.

14 Q    I was more interested in -- well, let me see if I

15 understand it.

16      Initially, you saw her in the larger ISDAC chat

17 room?

18 A    Yes.

19 Q    You were saying you noticed that she was a

20 well-respected member of the chat room?

21 A    Yes.

22 Q    At some point, did you have some one-on-one

23 communication?

24          MS. MINTER:  Objection, leading.

25          THE COURT:  Overruled.

1          Go ahead.  Ask the question.

2   BY MR. GILLIS:

3   Q    At some point, did you have some one-on-one

4   communication with Muna Osman Jama?

5   A    Yes.

6   Q    So tell us how that came about.

7   A    First, you know, it started off with greeting.

8   After the greeting, she invited me to a room and added

9   me.

10  Q    Was there something that happened before that that

11  led her to contact you?

12          MS. MINTER:  Objection, leading.

13          THE COURT:  Overruled.

14  A    Yes.  When I first joined, I sent out a greeting

15  saying Merry Christmas and Happy New Year.  Then she

16  invited me to a room and said she wants to talk to me.

17  Q    Okay.  What did she say to you?

18  A    She said Islam has its own new year and not that

19  new years, and also, that only infidels celebrate

20  Christmas.

21  Q    Did she say anything to you about the al-Taqwa or

22  the ISDAC chat rooms?

23          THE INTERPRETER:  The interpreter would like

24  to clarify, Your Honor.

25          THE COURT:  Yes.

Esse - Direct by Mr. Gillis

1  A    So I only had one username.  She had two

2  usernames.  She ended up inviting me to another room

3  using the username I recognized.

4  Q    What was that username you recognized?

5  A    Umu Luqmaan.

6  Q    At that time, did you and Umu Luqmaan have a

7  discussion about the al-Taqwa chat room?

8  A    Yes.

9  Q    Tell us about that.

10 A    She told me that the Taqwa dislikes Islam.  They

11 oppose Islam and --

12        THE INTERPRETER:  The interpreter would like

13 to clarify the name of the other chat room.

14        THE COURT:  Yes.

15 A    And that Dacwatu al-Tawhid adheres to Islam.

16 Q    Did she mention al-Shabaab at that time?

17 A    Yes.

18 Q    What did she say?

19 A    She said they are the only ones that are going to

20 defend Islam.  They are the only ones that are going to

21 defend the country.  They are the only ones that are

22 going to stop the women from getting raped and killed.

23 Q    Did she use any term or terms to refer to

24 al-Shabaab?

25 A    The brothers.

1  Q    Do you recall other names that she used in that

2  conversation?

3  A    Shabaab, S-H-A-B-A-A-B.

4  Q    Were there times when she would avoid using the

5  term "al-Shabaab"?

6           MS. MINTER:  Objection, calls for

7  speculation.

8           THE COURT:  Sustained.  Why don't you

9  rephrase the question.

10          There's no need to answer.

11 BY MR. GILLIS:

12 Q    Were there times when she used terms other than

13 "al-Shabaab" to refer to al-Shabaab?

14          MS. MINTER:  I object to the form of the

15 question.

16          THE COURT:  I will let her answer whether she

17 used terms that she understood, alternative terms that

18 she understood referred to al-Shabaab.

19          THE INTERPRETER:  The interpreter would like

20 the question repeated, Your Honor.

21 BY MR. GILLIS:

22 Q    You mentioned that "the brothers" was a term that

23 Umu Luqmaan used to refer to al-Shabaab.  I'm wondering

24 whether at that time she used other words other than

25 al-Shabaab that you understood to be references to

Esse - Direct by Mr. Gillis

1   al-Shabaab.

2   A    Yes.  She would use the word the mujahids.  She

3   would use orphans, widows.

4   Q    Well, after this conversation you had with Umu

5   Luqmaan in which she criticized you for your post about

6   Merry Christmas, did she introduce you to a group of

7   women?

8   A    Yes.

9   Q    All right.  Tell us how that was done.

10  A    Yes.  It was news that I was new and that I had

11  said unfavorable things.  So I was invited to a private

12  room so I could be lectured on what the religion

13  permits and what it does not permit.

14  Q    Who was in this private room?

15  A    There were almost five women.

16  Q    Do you recall who those five women were?

17  A    Yes.  Umu Luqmaan, Ramzul Fidaa, Umu Camaar,

18  spelled U-M-U, C-A-M-A-A-R.  Thabaat is spelled

19  T-H-A-B-A-A-T.  Al-Maxaba is spelled A-L, M-A-X-A-B-A.

20  Q    Just for clarification.  Earlier, I believe, we

21  talked about al-Mahaba.  Is that a different person

22  from al-Maxabah?

23  A    No.  This is how it's written in Somali.  So in

24  place of the X, that would be an H.

25  Q    Okay.  I'm sorry.  I'm having trouble with the

1  spelling here.  Well, actually, could you just spell it

2  for me, then, one more time.

3  A    A-L, M-A-X-A-B-A-H, the Somali spelling; English,

4  A-L, M-A-H-A-B-A-H.

5          THE COURT:  Mr. Gillis, we're going to take

6  our afternoon recess at this time.

7          The Court will stand in recess.

8          Ms. Esse, do not discuss your testimony

9  during the break.

10          The Court will stand in recess.

11       (Recess from 3:57 p.m. until 4:21 p.m.)

12          THE COURT:  Ms. Esse, you remain under oath.

13          THE WITNESS:  Okay.

14          THE COURT:  Mr. Gillis.

15          MR. GILLIS:  Thank you, Your Honor.

16  BY MR. GILLIS:

17  Q    Welcome back again, Ms. Esse.

18  A    Thank you.

19  Q    In this private chat room that you were brought to

20  with the five women, did you eventually get introduced

21  to -- well, first of all, what did they tell you?  You

22  said that you were to get instruction on what Islam

23  permitted.  What did they tell you in this conversation

24  with the five of them?

25  A    That they should have, the women -- a Muslim woman

1  should help the movement, and they should follow orders

2  and help Islam.

3  Q    Muslim women should help what movement?

4  A    The jihad, and how to bring back Islamic country.

5  Q    Bring back the Islamic country where?

6  A    I didn't say Islamic country.  I said Islamic

7  government.

8  Q    Oh, pardon me.  The Islamic government?

9  A    Yes.

10 Q    So they were saying that the women should support

11 the jihad movement and bring back the Islamic

12 government to what country?

13 A    We were talking about Somalia, the country of

14 Somalia at that time.

15 Q    After you met with these five or so women, did you

16 get invited into a larger group, a larger private chat

17 room?

18 A    Yes.

19 Q    About how many people were in that chat room?

20 A    Most of the time 15, but sometimes they could go

21 over that number.

22 Q    Were these male or female participants?

23 A    Female.

24 Q    Do you know how this private chat room of 15 women

25 was created?

Esse - Direct by Mr. Gillis

1   A     Yes.

2   Q     How do you know?

3   A     Umu Luqmaan told me about it.

4   Q     So what did she tell you about the creation of

5   this group, the chat room?  What did she tell you about

6   the chat room and how it was created?

7   A     She told me that there's many of us.  And we live

8   in different countries around the world, and we come

9   together to talk about Islam issues.

10  Q     Did she say anything about who had created this

11  chat room?

12  A     She told me five of them, five that we know and

13  five unknown.

14  Q     Okay.  That there were five known and five unknown

15  who created the chat room?  Is that what you're saying?

16  A     Yes.

17  Q     Did you learn, then, who were the five -- and I'm

18  talking now about sort of the beginning of the time

19  that you were invited into this chat room.  Were you

20  told at the beginning who the five known and five

21  unknown women were, or were they discussed at the

22  beginning when you were first invited in?

23  A     They didn't tell me at the beginning.  They told

24  me after a few times that I enter the room.  Then I was

25  told about that.

1  Q    Okay.  You mentioned that the defendant -- pardon

2  me -- that Muna Osman Jama was someone who was quite

3  respected in the larger ISDAC chat room.  Did she

4  receive --

5          MS. MINTER:  Your Honor, I would, again,

6  object to the form of the question.  I think the

7  testimony was related to the username that was utilized

8  in that chat room.

9          THE COURT:  All right.  Why don't you just

10 ask the question.  I don't think you need to

11 re-summarize the testimony.

12         MR. GILLIS:  I beg your pardon?

13         THE COURT:  I don't think you need to

14 re-capsulate the testimony.  Why don't you just ask the

15 question.

16         MR. GILLIS:  Yes, sir.

17 BY MR. GILLIS:

18 Q    Did Muna Osman Jama receive deferential treatment

19 in this smaller chat room?

20         MS. MINTER:  Same objection, Your Honor.

21         THE COURT:  Overruled.

22 A    Yes.

23 Q    So you were beginning to talk about the membership

24 of this 15 or so women.  Can you tell me about when it

25 was that you were invited to the private chat room?

Esse - Direct by Mr. Gillis

1  A    It was in April or May, around that time.

2  Q    Of 2011?

3  A    Yes.

4  Q    I just referred to it as a private room, but

5  first, I need to ask you about that.  This smaller chat

6  room of 15 or so women, was it open to anyone?

7  A    Not anybody can be part of it.  The person who

8  created the chat room or one of the administrators will

9  bring you in; otherwise, you cannot just come into the

10 chat room.

11 Q    Was there somebody that invited you into the chat

12 room?

13 A    Yes.

14 Q    Who was that?

15 A    Umu Luqmaan.

16 Q    Did it become discussed in that private chat room

17 whether there was any sort of hierarchy among those 15

18 or so women?

19 A    Yes, indeed.

20 Q    Okay.  What was discussed about that in the chat

21 room?

22         THE INTERPRETER:  I'm sorry, Your Honor.  I

23 have to ask her again.

24         THE COURT:  Yes.

25 A    Special people, they would just lecture to us, and

1  Umu Luqmaan was one of them.

2  Q    Umu Luqmaan would lecture to you?

3  A    Yes.

4  Q    What did Umu Luqmaan's lectures consist of?

5  A    To collect money to support al-Shabaab.

6  Q    You mentioned a while ago about these five women

7  known and five women unknown.  Can you tell me more

8  about that?  Who were the five known women?

9  A    The five that I told you about earlier, Umu

10 Luqmaan, Ramzul Fidaa, Mahaba, Umu Camaar, and

11 Thabaat --

12 Q    Khuluud?

13 A    Khuluud.

14 Q    Can you spell that for us?

15 A    It's K-H-U-L-U-U-D.  That's the Somali version.

16 Q    Okay.  The women that brought you in initially to

17 give you instruction on what Islam permitted, you had

18 the same number except you had Thabaat.  Was she part

19 of this group of five or was Khuluud -- where did she

20 and Khuluud fall in this group of five known women?

21 A    So then Thabaat was one of the ladies who were

22 giving me advice or lecturing me about religion, but

23 Khuluud was one of the people who was managing the site

24 and tell us about new lectures or new events and things

25 like that.

1  Q    All right.  Then the group of five unknown women,

2  did you ever learn who they were?

3  A    I tried, but I was not told about them.

4  Q    Were you told why you couldn't know about the

5  group of unknown five women?

6  A    I cannot tell.

7  Q    You don't -- I'm sorry.  Do you mean you don't

8  recall or you don't know or --

9  A    I was denied to know their names.  I was told that

10 they are not important to you.

11 Q    Was that said to you personally, or was that said

12 in a larger setting?

13 A    I was told that in person.

14 Q    Who told you that?

15 A    Umu Luqmaan and al-Mahaba.

16 Q    After Umu Luqmaan invited you to join this group

17 of 15 or so women, did your conversations with her

18 indicate that she was trusting of you from the

19 beginning?

20 A    She didn't tell me in the beginning, but she told

21 me later on.

22 Q    I'm sorry.  She told you what?

23 A    She told me that she talked to my cousin, and he

24 told her that he knows me.  And then after that, she

25 trust me after that.

Esse - Direct by Mr. Gillis

1  Q    Okay.  The way that she behaved towards you before

2  that, did it suggest to you that she was trusting of

3  you from the outset?

4  A    No.  In the beginning, she was careful, but after

5  that, she started trusting me.

6  Q    That is when your cousin vouched for you?

7  A    Yeah.  He told her that she's my sister and

8  welcome here.

9  Q    All right.  So how would Umu Luqmaan know your

10 cousin?

11         MS. MINTER:  Objection, calls for

12 speculation.

13         THE COURT:  Overruled.

14 A    He was one of the -- he was a member of the chat

15 room.  He was one of the people who used to give

16 lectures in that room.  That's why they know each

17 other.

18 Q    He gave lectures in which chat room?

19 A    He used to read Koran in the big room, and he used

20 to tell us stories in the small room.

21 Q    Are you talking about the ISDAC chat room?

22 A    Yes.

23 Q    The big ISDAC chat room.  All right.

24      What were the nature of his lectures in that room?

25 A    Lectures about jihad.

1  Q     Can you be more specific?

2  A     To fight.

3  Q     You said he also came to talk in the smaller --

4  this is the chat room of 15 or so women?

5  A     Yes.

6  Q     What were the nature of those discussions?

7  A     He talked about fights against a group called

8  al-Ltihaad --

9          THE INTERPRETER:  I'm sorry.  I think I lost

10  what she said.  Can I ask it again?

11          THE COURT:  Yes.

12  A     He was talking about a war or a fight that they

13  had with a former president of Puntland whose name was

14  Abdullahi Yusuf in the northeast region of Somalia.

15  Q     Okay.  So I'm sorry.  This was a fight between --

16  you mentioned al-Ltihaad was one of the combatants in

17  this?

18  A     Yes.

19  Q     And the other combatants were who?

20  A     The government of Puntland at the time.

21  Q     What other stories, if any, did he tell you about

22  in the smaller group?

23  A     He talked about every means or method in raising

24  money for al-Shabaab and any other means of going back

25  to -- back home and any other ways of helping

1  al-Shabaab.

2  Q    Do you know who invited your cousin to speak to

3  the smaller group?

4  A    Yes.

5  Q    How do you know that?

6  A    She told me, the person who invited him told me.

7  Q    Who was the person who invited him?

8  A    Umu Luqmaan.

9  Q    When you learned that Umu Luqmaan was inviting

10 your cousin, how did you respond?

11 A    I told her, That's my brother.

12 Q    That that was your brother?

13 A    Yeah.  I told her that he's my brother, and I

14 talked to him in private chat room.

15 Q    Who is this cousin of yours?

16 A    His name is Farah Deeq.  First name is F-A-R-A-H.

17 The second name or the last name is D-E-E-Q.

18 Q    Was he someone that was known?  I mean, did he

19 have some sort of reputation?

20 A    Yes, indeed.

21 Q    Okay.  What was that?

22        MS. MINTER:  Objection, calls for

23 speculation.

24        THE COURT:  Overruled.

25 A    He used to recite the Koran in a very beautiful

1 way.

2 Q     Are you familiar with a publication *Somali Memo*?

3 A     Yes.

4 Q     Did Farah Deeq have any involvement with *Somali*

5 *Memo*?

6 A     Yes.

7 Q     What was that?

8 A     He used to write things for them, and he used to

9 publish advertisement about al-Shabaab.

10 Q     What were the nature of these things that he would

11 write for *Somali Memo*?  What was the nature of what he

12 was saying?

13 A     There were victors at places that they capture,

14 people that they killed.

15 Q     Did your cousin speak to Umu Luqmaan about you?

16 A     Yes, in the chat room.

17 Q     How do you know that?

18 A     She told me about it.

19 Q     She?  Who told you about it?

20 A     Umu Luqmaan.

21 Q     What did she tell you that your cousin had said

22 about you?

23 A     When I told her he's my cousin, she contact him to

24 verify that I'm indeed his cousin.  And he told her,

25 Yes, she's my cousin and work with her and let her be a

1  part of the group.

2  Q    Your plea agreement mentions that you provided

3  money for al-Shabaab.  Whom did you provide your money

4  to?

5  A    I took it to the hawala.

6  Q    Okay.  You took it to the hawalas, but whom were

7  you sending it to?

8  A    Fardowsa Jama.

9  Q    Did you know Fardowsa Jama by any other name?

10 A    Umu Camaar.

11 Q    Was that a Paltalk name that she used?

12        MS. MINTER:  Your Honor, I would object to

13 the lack of foundation unless the government can

14 elaborate --

15        THE COURT:  Why don't you establish how she

16 knows the alternative name of Jama.

17        MR. GILLIS:  I will, sir.

18 BY MR. GILLIS:

19 Q    How do you know that Fardowsa Jama also uses the

20 name Umu Camaar?

21 A    I was introduced to her.  We used to meet in the

22 small room, the 15 women.  She was one of the 15.  Umu

23 Luqmaan, she's the one who introduced me to her.

24 Q    Okay.  Was there any particular reason why she

25 would introduce you to her using her true name?

1  A     Yes.

2  Q     Why was that?

3  A     To direct the money to her.

4  Q     What kind of information would you need to send

5  money to her?

6  A     Can you repeat the question, please?

7  Q     Sure.

8        What information would you need in order to send

9  her money, send Fardowsa Jama money?

10  A     The person's name, his telephone number, and where

11  he lives.

12  Q     Where did Fardowsa Jama live?

13  A     Kenya.

14         THE COURT:  I'm sorry.  Where?

15         THE WITNESS:  Kenya.

16         MS. MINTER:  The same objection, Your Honor.

17         THE COURT:  Overruled.

18  BY MR. GILLIS:

19  Q     Ms. Esse, did you know from the start -- when you

20  were giving money to Umu Camaar or Fardowsa Jama, did

21  you know from the start that the money was going to go

22  to al-Shabaab?

23  A     No.  I was told the money would be for orphans.

24  Q     Who told you that?

25  A     Umu Luqmaan.

1  Q     Whose orphans?  Any particular orphans?

2  A     No.  I was just told orphans, but later on they

3  explained to me.

4  Q     Well, did you learn at some point that the money

5  you were sending to Fardowsa Jama was not going to

6  orphans?

7              MS. MINTER:  Objection, leading.

8              THE COURT:  Overruled.

9  A     Yes.

10  Q     Tell us how you learned that.

11  A     I was told that Camaar has two children and one of

12  them was -- he was burned, and we send the money.  And

13  after a while, Camaar, she came to the chat room, and

14  she told us that the kid is doing fine now.

15  Q     Okay.  How did that raise a question in your mind?

16  A     So after Camaar told us that the child is doing

17  fine and she was thankful to us, the money that we send

18  her, in the same month, Umu Luqmaan asked us to send

19  more money to the same person.  And that's when me and

20  Umu Luqmaan started arguing.

21  Q     Okay.  And what became of this argument?

22  A     We were told in the beginning to pay $50 or $100,

23  and then after a while, the matter of this woman came

24  up.  Then after that, she started asking us for more

25  money.

Esse - Direct by Mr. Gillis

1  Q    All right.  So what did you learn, if anything,

2  after that about Umu Camaar?

3  A    Then we start arguing and talking about the same

4  stuff again and again.  Then finally, Umu Luqmaan told

5  me that the money actually is not for orphans.  It's

6  for al-Shabaab.

7  Q    When was it that she told you that?

8        THE INTERPRETER:  Can you repeat that?

9  BY MR. GILLIS:

10 Q    Sure.  I'm sorry.

11     When was it that she told you that?

12 A    It was around March or April 2012.

13        THE COURT:  When was it?

14        THE WITNESS:  March or April of 2012.

15 BY MR. GILLIS:

16 Q    Once Umu Luqmaan told you that the money was

17 actually going to al-Shabaab, what was your reaction to

18 that?

19 A    I was very angry at the time because I like to

20 support al-Shabaab, but I don't like to send them the

21 money.

22 Q    Then did you eventually continue to send money to

23 Umu Camaar after Muna Osman Jama had told you that it

24 was going to al-Shabaab?

25 A    I continued, and it was -- I believe in the cause,

Esse - Direct by Mr. Gillis

1  and then after two months, actually, I stopped

2  altogether.

3  Q    Was there a discussion that you had with anyone

4  that led you to continue to give money?

5              MS. MINTER:  Objection, hearsay.

6              THE COURT:  Overruled.

7  A    My ex-husband and Umu Luqmaan.

8  Q    What did Umu Luqmaan tell you?

9  A    I was afraid at the time because there's other --

10 the case of some other women was ongoing.  So I was

11 afraid of the government.  So she convinced me and told

12 me that if you stop, actually, they will come after

13 you.  So she continue.

14 Q    Did she say anything about what would happen if

15 any of you was arrested?

16 A    She told me that if one of us gets captured, we

17 will not forgive you, and we will tell on you.

18             THE COURT:  I'm sorry.  Would you say that --

19             THE WITNESS:  We will not forgive you, and we

20 will tell on you.

21             THE COURT:  This is what Umu Luqmaan told

22 you?

23             THE WITNESS:  Yes.

24 BY MR. GILLIS:

25 Q    How often did this private chat room of the 15

                        Esse - Direct by Mr. Gillis

1   women meet?

2   A    Once or twice a month.

3   Q    When about?  Did it meet at a regular time?

4   A    The 25th or the 30th of the month, the 25th.

5   Q    Was there any discussion about payments --

6             MS. MINTER:  Objection, leading.

7             THE COURT:  Let me hear the question.  What

8   is it?

9   BY MR. GILLIS:

10  Q    Was there any discussion about payments by any of

11  the other women of this group of 15?

12            THE COURT:  Overruled.  The objection is

13  overruled.  She may answer.

14  A    Yes.

15  Q    Do you know whether the other women were sending

16  to the same people as you were?

17  A    Yes.

18  Q    How do you know that?

19  A    One of the five women will pick up the mic and

20  announced who paid and who did not.

21  Q    Would they announce who had received the money?

22  A    They used to announce both, who sent the money and

23  who received the money.

24  Q    Was Umu Camaar someone or this Fardowsa, was she

25  someone that other members of the group were sending

Esse - Direct by Mr. Gillis

1    money to?

2    A    Yes.

3    Q    Do you know whether this Umu Camaar or Fardowsa

4    Mohamed had any association with al-Shabaab?

5         MS. MINTER:  Objection, hearsay, lack of

6    foundation.

7         THE COURT:  Well, I'll let her answer yes or

8    no, and then we'll see where we are.

9    A    Yes.

10   Q    How do you know that?

11   A    They told me about it after they trusted me.

12   Q    Who told you about it?

13   A    Both Camaar and Umu Luqmaan.

14        MS. MINTER:  Same objection.

15        THE COURT:  Overruled.

16   BY MR. GILLIS:

17   Q    What did Umu Luqmaan and Umu Camaar tell you about

18   Fardowsa Mohamed's relationship with al-Shabaab?

19   A    That she's --

20        MS. MINTER:  Same objection.

21        THE COURT:  Overruled.

22   A    That she's in Kenya for them and that she does a

23   lot of work for them.

24   Q    What in particular did they say that she did?

25        MS. MINTER:  If I could, Your Honor, just

Esse - Direct by Mr. Gillis

1   lodge a continuing objection to this line.

2            THE COURT:  All right.

3   A    Yes.

4   Q    So could you provide a little more information

5   about what Umu Luqmaan and Umu Camaar told you about

6   what --

7            THE COURT:  Why don't you break it up into

8   each one so the record is clear.

9            MR. GILLIS:  Yes.

10  BY MR. GILLIS:

11  Q    What did Umu Luqmaan tell you about what this

12  Fardowsa or Umu Camaar did for al-Shabaab?

13  A    That she's one of the supporters of the

14  mujahideen, and we direct the money to her.

15  Q    Okay.  Was there any discussion of what particular

16  support she provided to the mujahideen?

17  A    That Umu Camaar, she rented two houses.  One of

18  them was for the wounded in the battlefield, and they

19  come to Kenya secretly.  And the other one, it's a safe

20  house where they keep their weapons and ammunitions,

21  and that's where they get ready to fight.

22  Q    Where who gets ready to fight?

23  A    Al-Shabaab.

24  Q    Who are the wounded fighters?  Whom did they

25  belong to?

Esse - Direct by Mr. Gillis

1  A    Al-Shabaab.

2  Q    When was it about that Umu Luqmaan told you this?

3  A    After we fought.

4  Q    Did Umu Camaar or Fardowsa herself tell you the

5  support that she was giving to al-Shabaab?

6  A    Yes.

7  Q    What did she tell you?

8         MR. GILLIS:  One moment.  I'm sorry.

9  BY MR. GILLIS:

10  Q    Just to clarify in case there was any problem with

11  my question the --

12         THE INTERPRETER:  I'm sorry.  I'm ready.

13  BY MR. GILLIS:

14  Q    Okay.  Let me ask that question again.  So what

15  did Umu Camaar herself tell you about the support that

16  she was providing to al-Shabaab?

17         MR. KAMENS:  Hold on one moment.

18         THE COURT:  Are we all right?

19         MR. KAMENS:  Yes.

20         THE INTERPRETER:  Yes, Your Honor.

21         THE COURT:  All right.

22  A    That she rented these two houses and that she

23  brings in doctors, and she gives them cash to treat

24  those wounded people.

25  Q    When you say treat those people, what do you mean?

1  A     The fighters of al-Shabaab.

2  Q     And about when, if you recall, did Umu Camaar tell

3  you this?

4  A     She gave it to us around the time that I fought

5  with her, with Umu Luqmaan.  She was trying to be

6  between us, mediation, mediate between us.

7  Q     Who was trying to mediate?

8  A     Umu Camaar.

9  Q     Well, in the private chat rooms when you met on

10 the 25th or 30th of the month, did Umu Luqmaan have any

11 particular role?

12 A     Yes.

13 Q     What was that?

14 A     That she will write down the names of the

15 participants, and she will put a check next to the

16 person who paid the money.  And the person who did not

17 pay the money, she will talk to the person privately.

18 Q     How do you know that she would write down the name

19 of the person and put a check and whatnot?

20 A     So when usually Camaar will write down the names

21 of the people who paid the money.  And then Umu

22 Luqmaan, she will pick up the mic, and she will say,

23 Let me write them down.  And that's how I know she used

24 to write them down.

25 Q     Was there a commitment among the women to pay on a

Esse - Direct by Mr. Gillis

1   regular basis?

2   A    Yes.  We promise each other, and we decided to

3   make the payments.

4   Q    Was there anybody that kept track of who had

5   pledged to pay money?

6   A    Yeah.  They used to write in a notebook.

7   Q    Who did that?

8   A    Umu Luqmaan or any one of the five ladies.

9   Q    Any of the five known ladies?

10  A    Yes, the known.

11  Q    How much did you commit to pay?

12  A    Sometimes $50, sometimes $100, sometimes $200.

13  Q    Once you joined this private chat room of 15, did

14  you begin to form your own relationships with the other

15  women in the group?

16  A    Yes.

17  Q    As part of the Paltalk system, would you be able

18  to see who was in the private chat room?

19  A    You cannot see who is in the private room.  You

20  can see who's online.

21  Q    You can see who's online but -- so when you're in

22  the private chat room, is there a way for you to tell

23  who you're communicating with?

24  A    When they invite you and bring you in, then you

25  will know who else is there.

1  Q    Oh, I see.  Okay.  So when you're a member,

2  though, of the private chat room and you've been

3  invited into the private chat room, are you able to see

4  who else is in the chat room?

5  A    Yes.

6  Q    So did you become familiar with the usernames of

7  the other women in the group?

8  A    Yes.

9  Q    Did you learn from talking with them what

10 countries they were located in?

11 A    After they tell you, you will know what country

12 they live in and which city.

13 Q    But they would have to tell you?

14 A    Yes, otherwise, you cannot know.

15 Q    And the other women in this private chat room,

16 where were they living?

17 A    So in U.S., Canada, Sweden, the UK, Holland,

18 Denmark, Norway, and Germany and Kenya where Camaar

19 used to live.

20 Q    Do you know whether -- I withdraw that question.

21     So what would happen if the women in this group of

22 15 did not pay the money they had pledged?

23 A    They would be criticized.  They would be given bad

24 names.  And then, finally, they would be kicked out

25 from the group.

1  Q    What would happen if one of the women didn't

2  attend one of these monthly chat meetings?

3  A    They will call you and tell you today is the day

4  for the monthly meeting, come and join us.

5  Q    If they continued to miss the meetings, did anyone

6  have any particular reaction to that?

7  A    They will all react in a negative way, and they

8  will start bad-mouthing you.

9  Q    Would Umu Luqmaan ever ask you to do something

10 about one of these women that didn't attend or didn't

11 provide money?

12 A    Yes.

13 Q    What would she ask you to do?

14 A    To contact her, to follow up with her, to befriend

15 her, and try to know why she's not paying the monthly

16 payments.

17 Q    All right.  Were there other things that she asked

18 you to do about women that she was concerned about?

19 A    Yes.

20 Q    What was that?

21 A    She would tell me to make sure that they're

22 using -- they're not using different usernames and that

23 they are who they say they are.  Since you don't go to

24 school or you don't have a job, so just follow up and

25 make sure that they're the same people.

Esse - Direct by Mr. Gillis

1  Q    Why did it matter whether the person was using a

2  different username, or why was it of concern to her

3  that they were who they said they were?

4  A    It might be someone who works for the government

5  and that we end up being arrested and go to jail for

6  that.

7  Q    Well, who told you that?

8  A    Umu Luqmaan.

9  Q    Did she give you any instruction on what to do if

10  she suspected someone of that?

11  A    Yes.

12  Q    What instructions did she give you?

13  A    To check the person's writing, the way she write

14  things, and spend a lot of time to figure out what's

15  this person up to.

16  Q    Was there anything said in this group of 15 about

17  recruiting other women?

18  A    Yes.

19  Q    Tell us what was said about that.

20  A    So to be invited to the room and to tell them that

21  we have lectures or lessons and --

22         THE INTERPRETER:  I'm sorry.  I think I

23  missed the rest.

24  A    To tell them that we're helping orphans, and we

25  learn new things -- not new things, but we learn things

1  about Islam and to take our role as Muslims.

2  Q    By this time, did you know that you did not

3  support orphans?

4  A    I didn't in the beginning, but later on I learned.

5  Q    Was there a similar sort of suspicion about the

6  recruitment of women?

7  A    Yes.

8  Q    What was that?

9  A    The person have to prove himself by being in the

10  big room first that he's a supporter.  Then we'll be

11  able to bring him -- invite him to the smaller room.

12  Q    What do you mean by the person would have to prove

13  herself?

14  A    So that somebody should vouch for him or should

15  he -- he will have his opinions in the public like in

16  *Somali Memo* or on Facebook that he's a supporter, and

17  then you'll be able to be back to the room.

18  Q    A supporter of what?

19  A    Al-Shabaab.

20  Q    Who was it that gave you these instructions about

21  the recruitment of women and how to approach that?

22  A    Umu Luqmaan.

23  Q    Were there others?

24  A    Al-Mahaba.

25  Q    Anyone else that you can recall?

Esse - Direct by Mr. Gillis

1 A     Umu Camaar.

2 Q     So were you to tell these recruits from the

3 beginning that they would be supporting al-Shabaab?

4 A     No.

5 Q     What would you tell them instead?

6 A     We will tell them that we are supporting the

7 orphans or women who are orphans or the elderly people.

8 Q     Were there any other buildings or projects that

9 you would tell them about?

10 A     Yes.

11 Q     Tell us:  What was that?

12 A     We would tell them that we're building a mosque or

13 well because of the drought in Somalia, or we tell them

14 about -- that we're building a school for Koran.

15 Q     If I could ask you to look at Government's

16 Exhibit 30, and in particular pages 1 and 2.  For now

17 I'm just going to ask you about pages 1 and 2.  If you

18 need the interpreter's help, we can ask him.

19 A     Yeah, I would like help.

20          MR. GILLIS:  All right.  Your Honor, may I

21 have a moment?

22          THE COURT:  Yes.

23          MR. GILLIS:  Your Honor, it might be faster

24 if we could just play the first clip from Government's

25 Exhibit 30B, the disk.

1          THE COURT:  How long is it?

2          MR. GILLIS:  It's fairly short, Your Honor.

3          THE COURT:  All right.  It's in evidence.

4  You may play it.

5          MR. GILLIS:  Thank you, Your Honor.

6       (Audio is played.)

7  BY MR. GILLIS:

8  Q    First of all, Ms. Esse, does this tape that we're

9  listening to here track with the first two pages of

10 Exhibit 30?

11 A    Yes.

12 Q    Okay.  Are we about at the end of it, just at the

13 end of that second page?

14 A    Yes.

15      (Audio is played.)

16 BY MR. GILLIS:

17 Q    So you've now listened to the first two pages of

18 that Exhibit 30?

19 A    Yes.

20 Q    Okay.  Can you tell us what this discussion is

21 about on these two pages?  What's going on here?

22 A    It was me and her, and we were talking about how

23 to look for somebody to verify the person.

24 Q    Okay.  When you say me and her, whom are you

25 referring to?

Esse - Direct by Mr. Gillis

1  A    Umu Luqmaan.

2  Q    That's the person you also know as Muna Osman

3  Jama?

4  A    Yes.

5  Q    So what was this part here about Jama asking you

6  to keep an eye on her for a while to find out if she is

7  one of those people but changed shirt?  Does changed

8  shirt have a particular meaning for you?

9          MS. MINTER:  Continuing objection as to

10  speculation, Your Honor.

11         THE COURT:  Overruled.

12  A    Yes.

13  Q    What does changed shirt mean?

14  A    We make sure if that person is one of the members

15  of the room, chat room, or if somebody else.

16  Q    Okay.  When she says that you have to keep an eye

17  on her in case she's one of those people, based on your

18  discussions with her, what did you understand that to

19  mean?

20  A    Someone who works for the government and will take

21  news from us.

22  Q    Then she says to you to check her name against

23  other names, if their writing is similar, if they reply

24  to each other.  What was that about?

25  A    To identify this person, to make sure who this

1  person is.

2  Q    She was telling you to compare the writing to

3  others.   What did you understand her to mean there?

4  A    There was some girls who were part of the

5  management team.   So she wants to make sure if they are

6  these women or if they are some other women.

7  Q    Please take a look at Government's Exhibit 48.

8              THE COURT:   Has this been admitted?

9              MR. GILLIS:   I don't believe it has.  I don't

10  believe it's been admitted yet, Your Honor.

11             THE COURT:   Any objection?

12             MS. MINTER:   The same objection, Your Honor.

13             THE COURT:   The same objection.   All right.

14  Over objection, Exhibit 48 is admitted.

15             MR. GILLIS:   Then, Your Honor, I would like

16  to have the witness look at 48A, which is the original

17  Somali version of which 48 is a translation.

18             THE COURT:   All right.

19             MR. GILLIS:   You have it there.   Okay.   Thank

20  you.

21  BY MR. GILLIS:

22  Q    In particular, if you would look at on the second

23  page where it begins at 19:15:00Z.

24             THE COURT:   What page?

25             MR. GILLIS:   It's on Bates Number 777 --

1   well, actually, for her, it would be on 1066 of the

2   Somali version, 48A.

3           THE INTERPRETER:  What's the line for this?

4   BY MR. GILLIS:

5   Q    It begins, I want to jump head first on Muhajira.

6   A    Okay.

7   Q    And then through 20:21:58Z.  I'm referring to the

8   timestamp on there if that can help you zero in on it.

9   That would be on 1067 of the Somali version.

10          Have you had a chance to look at that?

11  A    Yes.

12  Q    Okay.  First of all, one of the participants in

13  this is shown as Umu Yassac.  Do you know who that is?

14  A    That's Umu Luqmaan.

15  Q    How do you know that?

16  A    She used to use both names.

17  Q    How do you know that she used to use both names?

18  A    She was in my contact list, and she's the one who

19  asked me to add her.

20  Q    When she asked you to add her, did she tell you

21  who she was?

22  A    Yes.

23  Q    Then the fourth line down on the first page of 48

24  shows Umu Barau.  Who is that?

25  A    That's me.

1  Q    So what does she mean about jumping on the head of

2  Muhajira, if you know?

3  A    To encourage her to join the room and to pay

4  money.

5  Q    Okay.  And she says later, I'm thinking of

6  assigning the orphans to al-Mahaba.

7  A    I saw that.

8  Q    And so who are the orphans referred to there?

9  A    Al-Shabaab.

10 Q    Then a few lines later you say, Okay, do Istiqara.

11 What is that?

12 A    It's a special type of prayer, and you pray to

13 reach a decision.

14 Q    In the next three or four lines there -- actually,

15 for the remainder of that page, Umu Luqmaan as Umu

16 Yassac says, I'll not give her details.  I will be

17 tactical about it, and I will not tell her where I am,

18 you understand.

19          THE INTERPRETER:  I'm sorry.  Can you repeat

20 that?

21 BY MR. GILLIS:

22 Q    Pray for me many orphans are in need.

23          THE INTERPRETER:  Can you repeat that?  I

24 didn't hear you.

25          MR. GILLIS:  I'm sorry.

Esse - Direct by Mr. Gillis

1          THE INTERPRETER:  Umu something.  I didn't

2   catch that part.

3   BY MR. GILLIS:

4   Q    So Umu Luqmaan in this page here says of the woman

5   that you've been talking about here.  She says, I will

6   not give her details.  I will be tactical about it.  I

7   will not tell her where I am, you understand.  Many

8   orphans are in need.

9          Is this the sort of instruction that you received

10  from the women in the group of 15 about how to approach

11  a recruit?

12  A    Yes.

13  Q    In this context, what does orphans refer to there

14  when she says many orphans are in need?

15  A    Al-Shabaab.

16          MR. GILLIS:  Your Honor, I am finished with

17  that exhibit if this would be a good stopping place.

18          THE COURT:  How much longer do you have with

19  this witness?

20          MR. GILLIS:  I'm hoping that it will go

21  faster, but I have to say that I'm on page 23 of my

22  52-page outline.  However, the rest of this should go

23  faster, and our next couple of witnesses are going to

24  be very quick like the earlier ones we had.

25          THE COURT:  All right.

1           MR. GILLIS:  Then we have just a last witness

2    after that.

3           THE COURT:  All right.  We'll recess for the

4    evening with the expectation that the additional half

5    an hour that we're not using will be used for a better

6    purpose in preparation for tomorrow.

7           MR. GILLIS:  Yes, sir.  That will certainly

8    be the case.

9           THE COURT:  All right.  We'll adjourn until

10   9:00 tomorrow morning.

11          Ms. Esse, do not discuss your testimony

12   during the evening recess and return tomorrow morning

13   at 9:00 a.m.

14          All right.  Anything before we adjourn?

15          MS. MINTER:  Not at this time, Your Honor.

16          THE COURT:  All right.  We'll stand in recess

17   until tomorrow morning.

18          -----------------------------------
                      Time:  5:58 p.m.
19

20

21

          I certify that the foregoing is a true and
22
      accurate transcription of my stenographic notes.
23

24
                              _____
                                      /s/
25                            Rhonda F. Montgomery, CCR, RPR


          Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599