```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
 2                       ALEXANDRIA DIVISION

 3   UNITED STATES OF AMERICA,    )  Case 1:14-cr-00230
                                  )
 4                  Plaintiff,    )
                                  )
 5        v.                      )  Alexandria, Virginia
                                  )  July 13, 2016
 6   MUNA OSMAN JAMA,             )  9:22 a.m.
     and                          )
 7   HINDA OSMAN DHIRANE,         )
                                  )
 8                  Defendants.   )  Day 3
                                  )  Pages 520 - 737
 9

10                      TRANSCRIPT OF TRIAL

11          BEFORE THE HONORABLE ANTHONY J. TRENGA

12             UNITED STATES DISTRICT COURT JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25       COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
```

1   APPEARANCES:

2   FOR THE PLAINTIFF:

3        JAMES P. GILLIS, ESQUIRE
         DANYA E. ATIYEH, ESQUIRE
4        OFFICE OF THE UNITED STATES ATTORNEY
         2100 Jamieson Avenue
5        Alexandria, Virginia  22314
         (703) 299-3700
6
    FOR DEFENDANT MUNA OSMAN JAMA:
7
         WHITNEY E.C. MINTER, ESQUIRE
8        GEREMY C. KAMENS, ESQUIRE
         OFFICE OF THE FEDERAL PUBLIC DEFENDER
9        1650 King Street, Suite 500
         Alexandria, Virginia  22314
10       (703) 600-0800

11       JOSHUA M. SIEGEL, ESQUIRE
         COOLEY, LLP
12       1299 Pennsylvania Avenue, N.W., Suite 700
         Washington, D.C.  20004-2400
13       (202) 842-7800

14  FOR DEFENDANT HINDA OSMAN DHIRANE:

15       ALAN H. YAMAMOTO, ESQUIRE
         LAW OFFICE OF ALAN YAMAMOTO
16       634 South Washington Street
         Alexandria, Virginia  22314
17       (703) 684-6643

18       PAULA SEMMES DEUTSCH, ESQUIRE
         OFFICE OF THE FEDERAL PUBLIC DEFENDER
19       1601 Fifth Avenue, Suite 700
         Seattle, Washington  98101
20       (206) 553-1100

21  THE DEFENDANT, MUNA OSMAN JAMA, IN PERSON

22  THE DEFENDANT, HINDA OSMAN DHIRANE, IN PERSON

23  MARYAM ABDI, SOMALI INTERPRETER

24  HASSAN ABDI, SOMALI INTERPRETER

25

1                                    **I N D E X**

2    WITNESS                  EXAMINATION                     PAGE

3    Amina Mohamud Esse    Further Direct by Mr. Gillis    524
                           Cross by Ms. Minter            568
4                          Cross by Mr. Yamamoto          586
                           Redirect by Mr. Gillis         606
5
     Peter Tran             Direct by Mr. Gillis          607
6
     B. Cobbold-Bedeau     Direct by Ms. Atiyeh           618
7                          Cross by Ms. Minter            629

8    C.J. Goodman          Direct by Mr. Gillis           647
                           *Voir Dire* by Ms. Minter      689
9                          Further Direct by Mr. Gillis   690

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Mr. Hassan Abdi is not present.)

2               THE COURT:  Good morning.

3               Anything that we need to talk about before we

4     proceed, Mr. Gillis?

5               MR. GILLIS:  I beg your pardon, Your Honor?

6               THE COURT:  Anything we need to talk about

7     before we proceed?

8               MR. GILLIS:  I believe that opposing counsel

9     does.

10              THE COURT:  Yes.

11              MS. MINTER:  Good morning, Your Honor.  I

12    know that I had mentioned yesterday that perhaps taking

13    up our motions first thing in the morning might be

14    advisable.  I think, given that some of them are going

15    to relate to the government's failure to prove certain

16    things through this witness, it might perhaps make

17    sense to wait until after cross-examination and raise

18    them at that point.

19              THE COURT:  All right.  We'll proceed in that

20    fashion.

21              Ms. Esse, you remain under oath.

22              Also, Madam Interpreter, if you need a break

23    at any particular time, please let me know, and we

24    we'll happy to accommodate you.

25              THE INTERPRETER:  Thank you, Your Honor.

1             THE COURT:  Thank you.

2             All right.  Mr. Gillis.

3             MR. GILLIS:  Thank you, Your Honor.

4                   FURTHER DIRECT EXAMINATION

5  BY MR. GILLIS:

6  Q    Welcome back, Ms. Esse.

7       Could you tell us if you recognize the name

8  Nicmatu Rabbi?

9             THE INTERPRETER:  The interpreter would like

10 the name repeated.

11 BY MR. GILLIS:

12 Q    I can spell it.  It's N-I-C-M-A-T-U.  R-O-B-I is

13 the last name.

14 A    Yes.

15 Q    How do you know her?

16            MR. YAMAMOTO:  Your Honor, could the

17 interpreter speak up so Ms. Dhirane can hear --

18            THE COURT:  Yes, if you would.

19            MR. YAMAMOTO:  -- or use the microphone.

20 A    She was one of the women in the room.

21 Q    In which room?

22 A    ISDAC, Dacwatu al-Tawhid.

23 Q    Did she have any involvement with the group of 15

24 in the small chat room?

25 A    Yes.

Esse - Direct by Mr. Gillis

1  Q    Do you know where she lived?

2  A    Yes.

3  Q    Where was that?

4  A    Seattle, Washington.

5  Q    How do you know that?

6  A    Umu Luqmaan told me, spelled L-U-Q-M-A-A-N.

7  Q    Within the group of 15, did she have any

8  responsibility for a geographic area?

9            MS. MINTER:  I would object to the leading,

10 Your Honor.

11           THE COURT:  Overruled.

12 A    Yes.

13 Q    What was that?

14 A    Hargeysa, Somalia.  To find someone or to send the

15 money to someone there.

16 Q    We've talked about Fardowsa.  Did she have any

17 particular area of responsibility?

18 A    Yes.

19 Q    What was that?

20 A    She was in Kenya, Nairobi, for al-Shabaab.

21 Q    She's the one that you sent your money to?

22 A    Yes.

23 Q    Ms. Esse, did you write down the names of the

24 women who were part of this group of 15 or so?

25 A    Yes.

Esse - Direct by Mr. Gillis

1  Q    I'd like you to take a look at Government's

2  Exhibit 5C1A.  Do you have that in front of you?

3  A    I know what this is.

4  Q    What is that?

5  A    The names of the people the money used to be sent

6  to.

7        MR. GILLIS:  Mr. Burns, basically from 5C1

8  through --

9        THE COURT:  Are you offering 5C1?

10        MR. GILLIS:  Yes, Your Honor.

11        THE COURT:  All right.  Any objection?

12        MS. MINTER:  No, Your Honor, but I think to

13  be clear, it's 5C1A.

14        THE COURT:  5C1A.

15        MS. MINTER:  And there's no objection.

16        THE COURT:  All right.  Without objection,

17  5C1A is admitted.

18        MR. GILLIS:  There should be a 5C1.  That's

19  the physical document.

20  BY MR. GILLIS:

21  Q    Is that the actual planner that you used?

22  A    Yes.

23        MR. GILLIS:  Then, if you could, Mr. Burns,

24  from 5C1 through the end of the 5 series I'm going to

25  be asking about.

1  BY MR. GILLIS:

2  Q    So if you look at 5C1 --

3           THE COURT:  So 5C1 through 5C3D, is that what

4  you're going to deal with?

5           MR. GILLIS:  Yes, Your Honor.

6           THE COURT:  All right.  Is there any

7  objection to any of that series?

8           MS. MINTER:  Your Honor, I suppose I should

9  clarify with respect to my previous comment.  There's

10 no objection with respect to the admissibility.  I

11 would note a hearsay objection, but I assume that the

12 government is not introducing it for the truth of the

13 matter asserted but rather to show that this was

14 something that Ms. Esse wrote down herself.

15          THE COURT:  All right.

16          MR. GILLIS:  I don't believe it would

17 constitute hearsay, but to the extent it would, the

18 witness is here to be cross-examined.

19          THE COURT:  All right.  I'm going to admit it

20 for the purposes of this witness' testimony.  I'll

21 reserve on any hearsay objections that you'd like to

22 make after you hear the testimony.

23 BY MR. GILLIS:

24 Q    Ms. Esse, if you would, take a look at 5C1A.  In

25 the upper right corner under the date, do you see a

                    Esse - Direct by Mr. Gillis

1  name there?

2  A    This one?

3  Q    What name do you see there?

4  A    Ayan Jama Warsame.

5         THE COURT:  Are we looking at the same

6  exhibit?

7         MR. GILLIS:  We are, Your Honor.

8         If we could, bring it up on the screen.  I

9  can use this here to ask her particular --

10  BY MR. GILLIS:

11  Q    This name right under the date there, do you

12  recognize that name?

13  A    Yes.

14  Q    What name is that?

15  A    Nicmatu Rabbi.

16  Q    Is this the same person that we were discussing

17  who was in Seattle?

18  A    Yes.

19         THE COURT:  Ms. Esse, is this your

20  handwriting?

21         THE WITNESS:  Yes.

22         THE COURT:  All right.  Thank you.

23  BY MR. GILLIS:

24  Q    If you could, look at the name under my

25  sister-in-law.  Do you recognize that name?

Esse - Direct by Mr. Gillis

1  A    Yes.

2  Q    Was she a member of the group of 15?

3  A    Yes.

4  Q    Below that, there is a telephone number -- do you

5  see that -- that ends with 1284?

6  A    I see it.

7  Q    Do you know whose telephone number that is?

8  A    Yes.

9  Q    Whose is it?

10 A    Fardowsa Jama --

11         THE INTERPRETER:  The interpreter would like

12 to clarify the last name, Your Honor.

13         THE COURT:  Yes.

14         MS. MINTER:  Objection, lack of foundation.

15         THE COURT:  Overruled.

16 A    B-O-Q-O-R.

17 Q    Would you take a look, please, at Government's

18 Exhibit 13.

19         THE COURT:  Is there any objection to this

20 exhibit?

21         MS. MINTER:  Your Honor, there's no objection

22 in that it's a proper summary.  We would object to some

23 inferences and foundational aspects.

24         THE COURT:  The Court is going to admit

25 Government's Exhibit 13 as a summary.

Esse - Direct by Mr. Gillis

1  BY MR. GILLIS:

2  Q    If you would, tell us what -- well, let me ask it:

3  Exhibit 13, you've seen that before?

4  A    Yes.

5  Q    Does this summarize payments that you made in

6  connection with this conspiracy that you pled guilty

7  to?

8  A    Yes.

9  Q    Okay.  We see that number in the top line for

10  Fardowsa Jama Mohamed.  Do you know who that is?

11        THE INTERPRETER:  The interpreter would like

12  to clarify the other name, Your Honor.

13        THE COURT:  Please.

14  A    It's the same, Fardowsa Jama Mohamed or Umu

15  Camaar.

16  Q    Can you spell that last name?

17  A    U-M-U.  Camaar is spelled C-A-M-A-A-R.

18  Q    Now, if you would, above Fardowsa's name there,

19  it's written my sister-in-law.  Is that in your

20  handwriting also?

21  A    Yes.

22  Q    Why did you write that there?  Well, first of all,

23  let me ask you:  Fardowsa, was she your sister-in-law?

24  A    No.

25  Q    So why did you write my sister-in-law above her

1    name there?

2    A    It was part of the understanding that we had to

3    conceal what we plotted.

4    Q    The understanding with whom?

5    A    So if the government caught us, they wouldn't

6    think it was something serious, and they would think

7    it's our family.

8    Q    Is that particular entry something that you

9    discussed with anyone?

10            THE INTERPRETER:  The interpreter would like

11   the question repeated.

12   BY MR. GILLIS:

13   Q    In addition to the name, did you discuss that with

14   anyone?

15   A    Yes.

16   Q    Whom did you discuss it with?

17   A    Umu Luqmaan.

18   Q    What did the two of you say to each other about

19   that?

20   A    The idea was mine.  She agreed to it, that it was

21   a good idea.

22            THE INTERPRETER:  The interpreter would like

23   to clarify, Your Honor.

24            THE COURT:  Yes.

25   A    So we could hide ourselves.

Esse - Direct by Mr. Gillis

1  Q    Then you mentioned already the name Ayan Jama

2  Warsame on that -- that's there on the same day of the

3  calendar?

4  A    Yes.

5  Q    Who is Ayan Jama Warsame?

6         MS. MINTER:  Just to be clear, Your Honor, we

7  would lodge our continuing objection for this witness.

8         THE COURT:  All right.  Overruled.

9  A    She is one of the widows of the big al-Shabaab

10 guys that I sent money to.

11        MR. YAMAMOTO:  Your Honor, can we get a

12 foundation for that statement?

13        THE COURT:  All right.  Why don't you lay a

14 further foundation, Mr. Gillis.

15 BY MR. GILLIS:

16 Q    How do you know that?

17 A    Umu Luqmaan told me.

18 Q    Below that, there's a telephone number.  Do you

19 know whom that belongs to?

20 A    Yes.

21 Q    Whom does it belong to?

22 A    Ayan Jama.

23 Q    Did you get that telephone number from anyone?

24 A    Yes.

25 Q    Whom did you get it from?

1  A    Umu Luqmaan.

2  Q    Going back to Government's Exhibit 13, did you, in

3  fact, send Ayan Jama Warsame money?

4  A    Yes.

5  Q    Why did you do that?

6  A    I intended and I decided to give help to

7  al-Shabaab.

8  Q    Did anyone suggest to you -- well, first of all,

9  did you know Ayan Jama Warsame before you sent her

10 money?

11 A    No.

12 Q    Someone gave you her name?

13 A    Yes.

14 Q    Who was that?

15 A    Umu Luqmaan.

16 Q    Was that at about the time that you sent the

17 money?

18 A    Yes.

19 Q    Would you please turn with me to Government's

20 Exhibit C2, which I believe is also a physical

21 document.

22         THE COURT:  Before you do that, let me ask

23 the witness a question.

24         As far as you understood, is Fardowsa Jama

25 Mohamed the same person as Fardowsa Jama Boqor, or are

1   they different people?  Do you think those are

2   different people?

3           THE WITNESS:  The same person.

4           THE COURT:  Thank you.

5   BY MR. GILLIS:

6   Q    Would you please look at Government's Exhibit 5C2.

7   Can you tell us what that is, please?

8           THE INTERPRETER:  Your Honor, the interpreter

9   did not hear the witness.

10          THE COURT:  Yes.

11  A    It's my notebook.

12  Q    Please look at --

13          MR. GILLIS:  Well, first of all, Your Honor,

14  we offer that -- let me ask one more question.

15  BY MR. GILLIS:

16  Q    Does that document contain the names of anyone

17  involved in the group of 15?

18  A    I have 5C2A.

19  Q    Well, let's start with that.  Is 5C2A in your

20  handwriting?

21  A    Yes.

22  Q    Is that a page from the physical notebook that you

23  were looking at, 5C2?

24  A    Yes.

25          MR. GILLIS:  Your Honor, I'd offer 5C2 and

1    the related pages.  That would be 5C2A, 2B -- I beg

2    your pardon.  I withdraw 2B.  Why don't I do it as I go

3    through them, Your Honor.

4            THE COURT:  I've already admitted those

5    subject to further consideration of the hearsay

6    objections that the defense may want to raise at the

7    end of her testimony.

8            MR. GILLIS:  Okay.  Thank you, Your Honor.

9    BY MR. GILLIS:

10   Q    So you see the name there Nicmatu Rabbi, again, in

11   the middle of that.

12   A    Yes.

13   Q    Next to it there is some writing.  What does that

14   say?

15   A    The Koran teacher.

16   Q    Below the Koran teacher, there's a telephone --

17   well, there's a number.  Do you know what that is?

18   A    The person I sent the money to.

19   Q    Who was the person you sent the money to?

20   A    Ifrah Abdi Bashir.

21   Q    If you look at Government's Exhibit 13, do you see

22   her name there?

23            MR. GILLIS:  Perhaps if you ask her to look

24   at the document on the screen to your right there.

25   A    I see it.

Esse - Direct by Mr. Gillis

1   Q    So did you know Ifrah Abdi Bashir before you sent
2   her money?

3   A    No.

4   Q    Then where did you get her name from?

5   A    In the group of 15, Nicmatu Rabbi gave it out to
6   us.

7   Q    What were you told the money was for?

8   A    Yes.

9   Q    What were you told?

10  A    That we would get a teacher to teach us the Koran.
11  After a month, it stopped.

12  Q    Why did it stop?  Do you know?

13  A    They told us the Internet wasn't working, and for
14  that reason, it stopped.

15  Q    Did you ever get your $100 back after that?

16  A    No.  I wasn't even asked anything else.

17  Q    If you could, look at Government's Exhibit 5C3.
18  That's the physical document itself.

19  A    There is nothing in this one.

20          THE COURT SECURITY OFFICER:  There's no
21  composite book.

22  BY MR. GILLIS:

23  Q    All right.  Well, if you would, turn to 5C3A.  Do
24  you have that in front of you?

25  A    Yes.

Esse - Direct by Mr. Gillis

1  Q    Is that part of a notebook that you maintained?

2  A    Yes.

3  Q    There's a name that's written in the top left-hand

4  side.  Can you tell us what that is?

5  A    It's Umu Luqmaan's phone number and name.

6  Q    How did you get that phone number?

7  A    She gave it to me.

8  Q    If you could look in the middle of the top of the

9  page, there's a name there.  Is that the same Ayan Jama

10  Warsame we've talked about?

11  A    Yes.

12  Q    Then at the bottom of that document, there's a

13  name written.  Is that the same Umu Camaar that we've

14  talked about?

15  A    Yes.

16  Q    Is she the same as the Fardowsa Jama Boqor that

17  you've just talked about?

18  A    Yes.

19  Q    Okay.  Turn with me to Government's 5C3B, please.

20  Do you see a name at the top there?

21  A    I see it.

22  Q    What's that name?

23  A    Umu Khadaab.

24  Q    Was she a member of the group of 15?

25  A    Yes.

Esse - Direct by Mr. Gillis

1  Q    Did you know her before you joined the group of

2  15?

3  A    No.

4  Q    Is that, by the way, in your handwriting, the

5  writing on this page?

6  A    Yes.

7  Q    Just to jump back for a second.  The names that we

8  looked at in the document before, 5C3A, were those also

9  in your handwriting?

10 A    Yes.

11 Q    The telephone number below that, do you know whose

12 number that is?

13 A    This one that I have right now?

14 Q    Yes, for -- below the name Umu Khadaab?

15 A    Yes, it's her number.

16 Q    Do you recall how you got that number?

17 A    She gave it to me in the room.

18 Q    Who gave it to you?

19 A    Umu Khadaab.

20 Q    Do you see a name below that, a name and a number?

21 A    Yes.

22 Q    Is that in your handwriting?

23 A    Yes.

24 Q    What is that name there?

25 A    One of the 15 women.

Esse - Direct by Mr. Gillis

1  Q    Can you tell us what that name is there?

2          THE INTERPRETER:  The interpreter would like

3  to clarify the name, Your Honor.

4  A    Thabaat.

5  Q    Could you spell that for us.

6  A    T-H-A-B-A-A-T.

7  Q    The number next to Thabaat's name, do you know

8  what that is?

9  A    Yes.

10 Q    What's that?

11         THE INTERPRETER:  The interpreter would like

12 to clarify.

13 A    It's my cousin.

14 Q    Sorry.  The number is of your cousin?

15 A    Yes.

16 Q    Who is your cousin that you're referring to?

17 A    Farah Deeq.

18 Q    What I was trying to ask you before was there is a

19 number written after the name Thabaat that begins with

20 four four.  Do you see that?

21 A    Yes.

22 Q    Do you know who that number belongs to?

23 A    It's her number.

24 Q    Do you recall how you received that number?

25 A    She gave it to me in the room.

Esse - Direct by Mr. Gillis

1  Q    You mentioned Farah Deeq or Deeq, your cousin.  Is

2  this the person you were talking about earlier vouched

3  for you to Muna Osman Jama?

4  A    Yes.

5  Q    If you would, turn to Government's Exhibit 5C3C.

6  There's a name on the first line of that document.  Do

7  you see that?

8  A    Yes.

9  Q    What name is that?

10  A    One of the 15 women.

11  Q    What's the name there?

12  A    Ramzul Fidaa.

13  Q    Is that in your handwriting?

14  A    Yes.

15  Q    The number that precedes her name, do you know

16  what that is?

17  A    It's hers.

18  Q    How did you receive it?

19  A    She gave it to me in the room.

20  Q    Could you look, please, at Government's

21  Exhibit 3A1.

22       First of all, this is not in your handwriting; is

23  that right?

24  A    It's not.

25  Q    There's a name there under the calendar entry for

Esse - Direct by Mr. Gillis

1  two.  Do you see that?

2  A    I see it.

3  Q    What is that name?

4  A    It's Khuluud.

5  Q    Who is Khuluud?  Do you know?

6  A    She's one of the 15 women.

7  Q    If you would, turn to Government's Exhibit 3A5.

8  Do you see the names there that are numbered 1 through

9  6?

10 A    Yes.

11 Q    Do you recognize those names?

12 A    Yes.

13 Q    Who are they?

14 A    The 15 women, including me.

15 Q    Above it it's written -- do you see Golis written

16 there?

17 A    Yes.

18 Q    Did that have a particular meaning for you?

19         THE INTERPRETER:  The interpreter would like

20 the question repeated.

21 BY MR. GILLIS:

22 Q    Sorry.

23     That name or that word "Golis" in this group of

24 15, did it have a meaning for you?

25 A    Yes.

Esse - Direct by Mr. Gillis

1  Q     What did it mean?

2  A     The young Shabaab members in the mountains.

3  Q     If you would, turn to 3A6.  Do you see the name

4  Umu Saliima in the middle of that document?

5  A     Yes.

6  Q     Can you tell us who she is?

7  A     She is one of the 15 women.

8  Q     Underneath that, there's a name written there.  Is

9  that familiar to you?

10  A     Sahro Aadan Duraan, yes.

11  Q     How do you know her?

12  A     We met in the room, and we shared our real names

13  with each other.

14  Q     Okay.  What was her Paltalk name?

15  A     Umu Saliima.

16  Q     Do you know where Umu Saliima lived?

17  A     I'm uncertain, but I think she may have told me

18  Sweden.

19  Q     At the top, there is a name Amran Yusuf.  Do you

20  know where Amran Yusuf lived?

21  A     The last time I remember Minnesota, Minneapolis.

22  Q     This is the person that we talked about earlier?

23  A     Yes.

24  Q     Did she have any relationship to the group of 15?

25  A     Yes, she was one of them.

1  Q     If you turn to Government's Exhibit 3A8 --

2            THE COURT SECURITY OFFICER:  Mr. Gillis, you

3  said eight?

4            MR. GILLIS:  Yes, 3A8, please.

5            THE COURT SECURITY OFFICER:  Thank you, sir.

6  BY MR. GILLIS:

7  Q     Do you see the second name there, Ummaya?

8  A     Yes.

9  Q     Do you know what she is?

10  A     Yes.  She's someone that is one of the 15 women.

11  Q     Did you ever learn her real name?

12  A     No.  This is the first time.

13  Q     At the bottom of that document, there's a name Umu

14  Maryama.  Do you see that?

15  A     Yes.

16  Q     Do you know who she was?

17  A     Yes.

18  Q     Who was she?

19  A     She's one of the 15 women.

20  Q     Turn to Government's Exhibit 3A12, please.

21            MR. GILLIS:  Just for the record, Your Honor,

22  these are all in evidence exhibits that previous

23  testimony has established were taken from the residence

24  of Defendant Muna Osman Jama.

25  BY MR. GILLIS:

Esse - Direct by Mr. Gillis

1 Q    Do you see on the left-hand side of that document

2 a list of names?

3 A    Yes.

4 Q    Do you recognize those names?

5 A    Yes.

6 Q    Who are they?

7 A    Me and also the women, part of the 15.

8 Q    Okay.  Do you recall sending a sum of money in

9 that amount?

10 A    Yes.

11 Q    When was that approximately that you sent that

12 amount?

13 A    It was in 2012, but I don't remember if it was in

14 January or February.

15 Q    Do you recall what name you sent it in?

16         THE INTERPRETER:  The interpreter would like

17 to clarify, Your Honor.

18         THE COURT:  Yes.

19         THE WITNESS:  My ex-husband sent the money.

20 I don't know what name he used to send it.

21 BY MR. GILLIS:

22 Q    Where was your ex-husband at the time?

23 A    Nashville, Tennessee.

24 Q    Where were you at the time?

25 A    Minnesota.

Esse - Direct by Mr. Gillis

1  Q     What was your understanding of the purpose for the

2  sums of money there?

3  A     A machine was going to be purchased that day.

4  Q     How do you know that?

5  A     Umu Luqmaan told me.

6  Q     Was this something discussed in the group of 15's

7  private chat room?

8  A     Yes.

9  Q     You mentioned earlier that there was a group of

10 five known women who held a particular role within the

11 group of 15?

12 A     Yes.

13 Q     Do you recall whether they were present at the

14 time of this meeting?

15 A     Yes.

16 Q     Did they say anything at this meeting?

17 A     Yes.

18 Q     What did they say?

19 A     They encouraged us to send the money, and they

20 brought it to our attention.

21 Q     Was there any particular sum that was mentioned

22 that should be sent?

23 A     They said the minimum was $500.  Some people paid

24 $1,000.  So it really depended on the resources of the

25 individual.

Esse - Direct by Mr. Gillis

1  Q    During this conversation about sending a minimum

2  of $500, was it described to you what this machine

3  would be used for?

4  A    Al-Shabaab soldiers did not have an X-ray machine,

5  and they needed the X-ray machine to assess the

6  injuries of the individual.  So that was what was said.

7  Q    That's what the machine was?

8  A    That's the reason the money was being sent, so it

9  could be bought.

10 Q    An X-ray machine?

11 A    Yes.

12 Q    Would you turn with me, please, to Government's

13 Exhibit 3A15.

14      Do you see a list of names 1 through 14 on the

15 left side?

16 A    Yes.

17 Q    Some of these names we've seen before, but can you

18 tell us who these -- well, do you know who these women

19 are or who these people are?

20 A    Some new women that were included and some of the

21 15 women.

22 Q    At the top of this list of this column of dollar

23 figures, there's a couple of words written there.  Do

24 you see those?

25 A    Yes.

Esse - Direct by Mr. Gillis

1  Q    What's the first word there?

2  A    Name.

3  Q    I'm sorry.  Above name.  That's the -- I beg your

4  pardon.  So that's the word in parentheses?

5  A    It's the month.  It's the regular payments,

6  regular monthly payments.

7  Q    Okay.  How do you know that?

8  A    I was one of them.  I used to pay it.  I know.

9  Q    All right.  At the top of the column of numbers,

10  if you look to your screen there, you'll see I've

11  circled a couple of words.  Do you see that?

12  A    It's the month, monthly bill.

13  Q    Monthly bill?

14  A    Yes.  It was the monthly payments that could not

15  be stopped.  There was no excuse.

16  Q    These are the monthly payments for whom?

17  A    Al-Shabaab.

18  Q    Who kept track of that?

19  A    We were sending it to Fardowsa Jama.

20  Q    Did someone keep track of whether those payments

21  had been made on a monthly basis?

22  A    Yes.

23  Q    Who was that?

24  A    Umu Luqmaan.

25  Q    At the top there, that word "bisha" or -- is that

                    Esse - Direct by Mr. Gillis

1  the same --

2          MS. MINTER:  Your Honor, I would object to

3  her acting as a translator.  If the government can lay

4  a foundation for her understanding of the use of the

5  word, that might be a different story.

6          THE COURT:  Overruled.  I'll let you ask the

7  question.

8  BY MR. GILLIS:

9  Q    So is there another way to translate that word

10 bisha?

11 A    I don't remember.

12 Q    Was that a term that was used within the group of

13 15?

14 A    Yes.

15 Q    What did it refer to, or what was your

16 understanding of what it referred to?

17 A    Bisha means months like January, February.  It's

18 months.  That's what it means.  There's no other way

19 for me to explain it.

20 Q    Okay.  Did you use the word "bill" also?

21 A    Yes.

22 Q    Put together, was that one term?

23 A    Yes.

24 Q    What was the term?

25 A    It's a monthly bill that everyone pays.  So the

Esse - Direct by Mr. Gillis

1  way we understood it was it was the monthly bill.

2  Q     The monthly bill to pay to whom?

3  A     Al-Shabaab.

4  Q     The monthly bill to pay for what?

5  A     It was for the --

6              THE COURT:  Let's hold on a minute.

7              THE INTERPRETER:  Your Honor --

8              THE COURT:  Yes.

9              THE INTERPRETER:  -- can we have the witness

10  speak into the microphone.  We are having trouble

11  hearing.

12             THE COURT:  All right.  If she would do that.

13  A     It was for the rent.  It was for the injured.  It

14  was for the doctors that needed to be provided, the

15  doctors that needed to provide the care.

16  Q     When you say it was for the rent, what rent are

17  you talking about?

18  A     Two homes that Umu Camaar rented in Kenya.

19  Q     Are these the same two homes that we talked about

20  yesterday?

21  A     Yes.

22  Q     You said the money was also used for doctors.

23  A     Yes.

24  Q     What were the doctors doing?

25  A     It was meant for the injured so they can get care.

1  In Africa, if you give the doctor the money, they won't

2  deny care.

3  Q    This was what -- I mean, who were the injured?

4  A    The al-Shabaab soldiers.

5  Q    Turn with me, if you would, to Government's

6  Exhibit 3A16.  Do you see the list of names in the

7  lower right of that document?

8  A    Yes.

9  Q    We've seen some of these names before, but do you

10  recognize those names?

11  A    Yes.

12  Q    Who are they?

13  A    One of the -- some of the 15 women.

14  Q    Are there any there that you don't recognize as

15  being part of this group of 15?

16  A    The name Duniyo is the newest one.

17  Q    How do you know that she was a member of the group

18  of 15?

19  A    I think the arrow is pointing over to Umu Maryama,

20  and I think it may be her.

21         MS. MINTER:  Your Honor, I would object to

22  the speculation.  She's not the author of this

23  document.

24         THE COURT:  Overruled.  I'll give it whatever

25  weight the Court deems appropriate.

1  BY MR. GILLIS:

2  Q     If you would, turn to Government's Exhibit 3A17.

3  Do you recognize the names on the left side of that

4  document?

5  A     Yes.  It's us.

6  Q     These are all members of the group of 15?

7  A     Yes, except for one woman.

8  Q     Who's the woman that was not?

9  A     Faadumo Xassan Aadan.  I don't know the name of

10 that person.

11 Q     At the top of the document there?

12 A     Yes.

13 Q     Do you see the name next to the Number 4?

14 A     Yes.

15 Q     Whose is that name?

16 A     It's my name.

17 Q     That was another username that you used

18 occasionally?

19 A     It was one of the numerous names.

20 Q     Look at the name next to the Number 2.  Do you

21 recognize that name?

22 A     Yes.

23 Q     What does it say there?

24 A     Young Mujahida.

25 Q     Was there anything that you were asked to do in

Esse - Direct by Mr. Gillis

1   connection with Young Mujahida?

2   A    Yes.

3   Q    Who asked you to do something?

4   A    Umu Luqmaan.

5   Q    What did she ask you to do?

6   A    To go after her, talk to her, find out why she

7   didn't pay money.

8   Q    Did Umu Luqmaan tell you anything about her

9   concerns about her?

10  A    Yes.

11  Q    What did she tell you?

12          THE INTERPRETER:  The interpreter did not

13  hear the witness' last statement, Your Honor.

14          THE COURT:  All right.

15  A    That she works with the government, that she is a

16  spy.

17          THE COURT:  Mr. Gillis, would you clarify who

18  she's talking about.

19          MR. GILLIS:  Yes.  I'm sorry.

20  BY MR. GILLIS:

21  Q    Who is the person you're talking about?  First of

22  all, the person that had these concerns was Umu

23  Luqmaan; is that right?

24  A    Yes.

25  Q    All right.  The concerns that she had about this

Esse - Direct by Mr. Gillis

1   person being a spy or working for the government, was

2   that this person we've been talking about, Young

3   Mujahida?

4   A    Yes.

5   Q    If you would, please turn to Government's

6   Exhibit 3C2.

7           MR. GILLIS:  Again, Your Honor, for the

8   record, this is a notebook that was taken from

9   Defendant Jama's residence.

10  BY MR. GILLIS:

11  Q    First, on the left side of the document, do you

12  see there the name Khuluud?

13  A    Yes.

14  Q    Did you know her by another name?

15  A    Yeah.

16  Q    What other name did you know her by?

17  A    Ismahaan.

18  Q    Then on the top right side, you see there a list

19  of names?

20  A    I see it.

21  Q    Do you recognize those folks as being part of the

22  group of 15?

23  A    Yes.

24  Q    Do you see the third name there?

25  A    Yes.

Esse - Direct by Mr. Gillis

1  Q    What does that name mean to you?

2  A    The mother of the child that died.

3  Q    Is it a child that died in any particular way?

4  A    No.

5  Q    If you'd look at Government's Exhibit 3C3 on the

6  left side, do you see the list of names there?

7  A    Yes.

8  Q    Do you recognize those folks as being members of

9  the group of 15?

10 A    Yes.

11 Q    If you would look, then, at Government's

12 Exhibit 3D1.

13        MR. GILLIS:  Again, Your Honor, this is a

14 document seized from Defendant Jama's residence.

15 BY MR. GILLIS:

16 Q    Do you see the list of names there at the top?

17 A    Yes.

18 Q    Do you recognize those names?

19 A    Yes.

20 Q    Whom do you recognize them to be?

21 A    Yes.

22 Q    Are they members of this group of 15?

23 A    Yes.

24        THE INTERPRETER:  The interpreter would like

25 to clarify.

Esse - Direct by Mr. Gillis

1          THE COURT:  Yes.

2   A    The first three names, one, two, three, I used to

3   use those.

4   Q    Now, if you would, look at Government's

5   Exhibit 4A2.

6          THE CLERK:  I'm sorry.  Did you say 4A and

7   4A2?

8          MR. GILLIS:  No.  I'm sorry.  4A2.

9          THE CLERK:  Okay.

10  BY MR. GILLIS:

11  Q    Do you see the name in the -- well, first of all,

12  do you recognize any of the names on 4A2?

13  A    I know one of the names.

14  Q    Which name?

15  A    Barira.

16  Q    How do you know her?

17  A    It's Thabaat who was one of the 15 women.

18         MR. YAMAMOTO:  Can she repeat that, please?

19         THE COURT:  Yes.  Would you clarify what her

20  reference is, Mr. Gillis, to Thabaat.

21         MR. GILLIS:  Yes, Your Honor.

22  BY MR. GILLIS:

23  Q    Was this person a part of the group of 15?

24  A    Yes.

25  Q    Are you saying that you knew her by another name?

1    A     Thabaat, T-H-A-B-A-A-T.

2            MR. GILLIS:  May I have a moment, Your Honor?

3    BY MR. GILLIS:

4    Q     In this group of 15, did you discuss any charges

5    that had been --

6            MS. MINTER:  Objection, leading.

7            THE COURT:  Well, let me hear the question.

8    BY MR. GILLIS:

9    Q     Did you discuss any women that had been charged

10   with any crimes?

11           MS. MINTER:  Same objection.

12           THE COURT:  Overruled.

13   A     Yes.

14   Q     What were those women charged with?

15   A     That they supported the organization al-Shabaab.

16   Q     Whom were the women that you discussed?

17   A     Fifteen of the women and some other women that

18   would come into the room.

19   Q     I'm sorry.  Who were the women who had been

20   charged?

21   A     Nima, Amina, Hawo.

22   Q     Do you know Nima's full name?

23   A     Nima Ali Yusuf.

24   Q     This is the sister of Amran Yusuf that we talked

25   about earlier?

Esse - Direct by Mr. Gillis

1   A    Yes.

2   Q    Do you know Hawo's full name?

3   A    I think it may be Hawo Hassan, but I don't

4   remember.

5   Q    Where would the -- and the other one was Amina

6   Ali; is that what you said?

7   A    Yes.

8   Q    Where were they charged, Hawo and Amina Ali?

9   A    Minnesota.

10  Q    Nima Yusuf, where was she charged?

11  A    California.

12  Q    Who was a part of these discussions about the

13  women who had been charged with these crimes?

14  A    There were many women that participated in the

15  conversation, but I recall that Umu Luqmaan --

16          THE INTERPRETER:  The interpreter would like

17  to clarify the other name, Your Honor.

18          THE COURT:  Yes.

19  A    Nicmatu Rabbi and me.

20  Q    Why were these -- well, first of all, how

21  frequently were these charges discussed among the group

22  of 15?

23  A    Many times.

24  Q    What did the discussion consist of?

25  A    We used to get encouragement not to be afraid

Esse - Direct by Mr. Gillis

1   to -- it was compulsory to still support, and we would

2   visit them.  I actually used to visit them myself in

3   jail just to get an update on their health, well-being,

4   how they're doing.

5   Q    In the group of 15, is that where you were

6   discussing that you shouldn't -- well, in the group of

7   15, if you could, be specific to that.  What was it

8   that was discussed in connection with these charges?

9   A    That to hide if we get caught and to say that we

10  were helping orphans and people that are displaced,

11  people that are in need.

12  Q    In your group of 15, did you discuss the use of

13  coded language or veiled misleading language?

14  A    Yes.

15  Q    What was said about that?

16  A    For example, when we would send money, we would

17  say it's for the fields, it's for -- it's to build a

18  well or a mosque.  It's for a Koranic school.

19  Q    Are you familiar with the term "living expense"?

20          THE INTERPRETER:  Your Honor, the interpreter

21  would like to clarify.

22          The English term living expense or

23  interpretation in Somali of living expense?

24          MS. MINTER:  Your Honor, if we could also

25  have some context to the use of that term.

Esse - Direct by Mr. Gillis

1          THE COURT:  All right.  Why don't you re-ask

2   your question.

3   BY MR. GILLIS:

4   Q    In this group of 15 women, did you use a term

5   "living expense"?

6   A    Yes.

7   Q    Is that part of the code?

8   A    Yes.

9   Q    What did that mean?

10  A    Medicine.

11  Q    Medicine for whom?

12  A    Injured al-Shabaab.

13         THE COURT:  Mr. Gillis, we'll take our

14  morning recess at this time.

15         MR. GILLIS:  Thank you, Your Honor.

16         THE COURT:  Ms. Esse, do not discuss your

17  testimony during the recess.

18         The Court will stand in recess.

19     (Recess from 10:44 a.m. until 11:07 a.m.)

20         THE COURT:  I understand we'll have a second

21  interpreter here available by 1:30.  So what we'll do

22  is break for lunch at 12:30 and reconvene at 1:30.

23         All right.

24         MR. GILLIS:  Thank you.

25         THE COURT:  Ms. Esse, you remain under oath.

Esse - Direct by Mr. Gillis

1           Mr. Gillis.

2   BY MR. GILLIS:

3   Q    Ms. Esse, was there a term "orphans" that was used

4   in your group of 15?

5   A    Yes.

6   Q    Was that part of the code?

7   A    Yes.

8   Q    What did orphans refer to?

9   A    A child whose father died.

10  Q    In the group of 15 --

11  A    Yes.

12  Q    -- you said that the orphans was a code for

13  something.

14  A    So orphan was code, but orphan actually means a

15  child whose father died.  But for us, it had a separate

16  meaning.

17  Q    Okay.  What was the separate meaning that it had

18  for you?

19  A    Money being sent to the al-Shabaab soldiers.

20  Q    If you would, look at Government's Exhibit 47 and,

21  in particular --

22          MR. GILLIS:  If you could, pull up 772 with

23  773.

24          THE COURT SECURITY OFFICER:  I'm sorry.

25  Mr. Gillis, you said Exhibit 47?

Esse - Direct by Mr. Gillis

1      MR. GILLIS:  Yes, sir.  Mr. Burns, if you

2  could, give her Exhibit 47A, which is the Somali

3  version.

4      MS. MINTER:  Your Honor, we would have the

5  same objection previously lodged.

6      THE COURT:  All right.  Over objection,

7  Exhibit 47 is admitted.

8  BY MR. GILLIS:

9  Q    If you could, just read -- it would be on the

10  second and third pages.  Have you read that?

11  A    I've read it.

12  Q    So you're discussing there what?

13      THE INTERPRETER:  Your Honor, the interpreter

14  couldn't hear the witness.

15      THE COURT:  Yes.

16  A    To collect money and to also collect money from

17  the new people in any way possible.

18  Q    Collect money for whom?

19  A    The al-Shabaab soldiers.

20  Q    You say there that it would be better just to tell

21  them.  What are you referring to there?  You say, It

22  would have been better just to tell them that help is

23  needed.  Do you see that?

24  A    Yes.

25  Q    What were you talking about there?

1  A    I meant orphans and if they could help anyone else

2  we could think of.

3  Q    Say that again.  I'm sorry.

4       What was it that you thought that it would be

5  better to tell them?  First, when you say tell them,

6  whom are you referring to there?

7  A    New people that joined the room.  We were trying

8  to plot how we can get the money from them.

9  Q    I see.  Okay.  Would you look, please, at

10 Government's Exhibit 55, and also, if you could, look

11 at 56.

12 A    This one is in English.  Do you have it in Somali?

13 Q    Well, let me just ask the question, and I'll

14 withdraw the question about you looking at those two

15 exhibits.

16      At some point, did you decide to leave this group

17 of 15?

18 A    I believe there were times when responsibility

19 would be divided amongst the people.

20 Q    Was there a time when you stopped interacting with

21 this group of 15?

22 A    Yes.

23 Q    How did that come about?

24 A    It's a long story.  If you would like me to

25 explain, I can.

Esse - Direct by Mr. Gillis

1  Q    Well, let me ask you this:  Did you say something

2  about the FBI to them?

3            MS. MINTER:  Objection, leading.

4            THE COURT:  I'll allow it to develop this

5  testimony.

6            Go ahead.

7  A    Yes.

8  Q    All right.  What did you tell them about the FBI?

9  A    I always tried to figure out a way to leave.  At

10  first I said I was going to go do the pilgrimage.  That

11  did not work out.  Then I told them the FBI had come to

12  my home and that I can no longer participate.

13  Q    Was it true that the FBI came to your home?

14  A    No.

15  Q    Why were you trying to figure out a way to leave

16  the group?

17  A    It was very easy how I joined the group.  It was

18  very difficult in order to leave.  It was basically

19  like being killed.

20  Q    What do you mean by that?

21  A    Meaning if you take their ideology, it's very

22  difficult to keep living your life.

23  Q    At the time that you decided to leave the group,

24  did you still support al-Shabaab?

25  A    Yes.

Esse - Direct by Mr. Gillis

1  Q    After you left the group, did you continue to

2  provide any financial support or payments to

3  al-Shabaab?

4  A    No.

5  Q    Did your ability to pay the monthly bill have

6  anything to do with your decision?

7  A    There were times that I did not have the financial

8  means, and I still paid.

9  Q    After you left the group, did you continue to use

10  social -- well, let me withdraw that question.

11      Did you use Facebook?

12  A    Yes.

13  Q    Did you post things in support of al-Shabaab on

14  Facebook?

15  A    100 percent.

16  Q    Did you continue to post after you left this group

17  of 15?  Did you continue to post messages in favor of

18  al-Shabaab?

19  A    Many times.

20  Q    What was it that eventually caused you to turn

21  away from supporting al-Shabaab?

22  A    That's a very difficult question, but I will

23  answer it.

24          MS. MINTER:  I object to the relevance, Your

25  Honor.

1          THE COURT:  Overruled.

2  A    My marriage fell apart, and my family disliked me

3  because of that man.

4          THE INTERPRETER:  The interpreter would like

5  to clarify the statement.

6          THE COURT:  Yes.

7  A    And the reason why I ran away was because of the

8  U.S. government, and they were the ones that were

9  paying for the house I lived in.  They were the ones

10 that were providing food and support for my children

11 and me, health care, also the interpreter that would

12 provide interpreting services for the doctor and for

13 me, and the taxi that would bring me to my home and

14 back.  That's when I realized that I was wrong, and I

15 was no longer the person that I used to be.

16         MR. GILLIS:  The Court's indulgence, Your

17 Honor.

18         That's all I have for this witness, Your

19 Honor.

20         THE COURT:  All right.

21         MR. GILLIS:  Thank you, Ms. Esse.

22         THE COURT:  Ms. Minter.

23         MS. MINTER:  The Court's indulgence, Your

24 Honor.

25         Your Honor, if we could approach on one

1   matter that I think the Court is aware of, counsel and

2   the witness.

3          THE COURT:  All right.

4      (Conference at the bench, as follows:)

5          MR. GILLIS:  With the Court's permission, I

6   have invited Ms. Esse's attorney, Robert Sicoli, to

7   join us here.

8          THE COURT:  That's fine.

9          We also have Ms. Maura Peterson here.

10          MS. MINTER:  Your Honor, the short version is

11  I think that the work-around that the parties have

12  agreed to requires some instruction of the witness in

13  terms of how to proceed.  Given that she is on the

14  stand, I think it would be appropriate to do it in the

15  presence of the Court.  So quite simply, the government

16  just needs to advise her how to work around any of the

17  issues.  So if she could be brought up, I think the

18  government is prepared to do that now.

19          MS. ATIYEH:  Your Honor, have you issued the

20  order in question?

21          THE COURT:  I understand there's been a

22  proposed order that would govern this.  I'm prepared to

23  enter the order that was tendered relating to the

24  issues.  It doesn't refer to the silent witness rule,

25  but that's essentially what it is.  It is the proposed

Esse - Direct by Mr. Gillis

1   order without the one paragraph that references, I

2   think, that this Court was going to take it up two days

3   ago.  Other than that one paragraph, that's the order

4   I'm going to enter unless there's some issue about

5   that.

6           MS. MINTER:  I don't believe so, Your Honor.

7   We do have the copy of the order if anybody wanted to

8   review it.

9           THE COURT:  Why don't we take a very short

10  recess.  You can talk to the witness.  I'll enter the

11  order, and then we'll come out and proceed.  Does that

12  make sense?

13          MS. MINTER:  Very well, Your Honor.

14          MR. GILLIS:  With the Court's permission, I

15  would involve Mr. Sicoli in that conversation.

16          THE COURT:  That's fine.

17          MR. GILLIS:  Thank you, Your Honor.

18          THE COURT:  Thank you.

19      (Proceedings continued in open court, as follows:)

20          THE COURT:  All right.  The Court will take a

21  short recess before cross-examination.

22      (Recess from 11:28 a.m. until 11:40 a.m.)

23          THE COURT:  Any issues before we begin,

24  Mr. Gillis?

25          MR. GILLIS:  No, Your Honor.

1           MS. MINTER:  No, Your Honor.

2           THE COURT:  All right.  Ms. Minter.

3                    CROSS-EXAMINATION

4   BY MS. MINTER:

5   Q    Ms. Esse, you talked quite a bit yesterday about

6   visiting the ISDAC chat room?

7   A    Yes.

8   Q    You were visiting that chat room before you knew

9   Umu Luqmaan or anyone else from that group of 15 women,

10  correct?

11  A    Right.

12  Q    That's a large chat room, correct?

13  A    Right.

14  Q    There could be as many as 250 people in the chat

15  room at one time?

16  A    More than that if needed.

17  Q    But 250 is a number that one would expect to see

18  in the chat room, that many users?

19  A    I've never really counted.

20  Q    But it's a very large number?

21  A    Yes.

22  Q    Too large to count?

23  A    Yes.

24  Q    You testified previously that you went to that

25  chat room essentially every day from April 2011 to June

Esse - Cross by Ms. Minter

1  2012, correct?

2  A    Yes.

3  Q    So if that was about 420 days, you would have

4  visited that chat room about 420 times in that time

5  period?

6  A    You were the one that calculated.  I haven't.

7  Q    But if it was 420 days, you would have gone about

8  420 times to that website, correct?

9  A    That's possible.

10 Q    So you were very familiar with how the chat room

11 works?

12           THE INTERPRETER:  The interpreter did not

13 hear the last part.

14           THE COURT:  All right.

15 A    Little by little I learned.

16 Q    The things you learned were how you were able to

17 answer the questions of the government attorneys

18 yesterday?

19 A    That's what I believe.

20 Q    You told us yesterday that you can see usernames

21 of other people who are in the same chat room?

22 A    Yes.

23 Q    That means that someone using that username is

24 logged into the chat room, correct?

25 A    Yes.

Esse - Cross by Ms. Minter

1  Q    Now, you can't see the person sitting at their

2  computer from the chat room, correct?

3  A    Yeah.

4  Q    Does that mean that's correct?

5  A    Yes.

6  Q    So what you see is their username on your screen?

7  A    Yes.

8  Q    So you know that they're logged in, but you don't

9  necessarily know that they're seated at their computer?

10 A    I can know when they contact me.

11 Q    So if they send you a message, you believe that

12 they're sitting at their computer, correct?

13 A    Yes.

14 Q    But if they don't send you a message or don't

15 interact with you, you don't know if they're seated at

16 their computer or just logged in?

17 A    Right.

18 Q    With respect to the ISDAC chat room, you said that

19 there were requests or solicitations there for money?

20 A    Correct.

21 Q    And some of that was for charitable donations; is

22 that correct?

23          THE INTERPRETER:  The interpreter would like

24 to clarify, Your Honor.

25          THE COURT:  Yes.

1  A     Charity was never mentioned.  It was code.  It was

2  something that was understood.

3  Q     You testified yesterday that they would post

4  pictures in that chat room, correct?

5  A     Yes.

6  Q     Photos of individuals who needed help?

7  A     Yes.

8  Q     Those were not photos in the chat room; they were

9  links to go view photos; is that correct?

10  A     No.  They were photos of al-Shabaab members with

11  money being distributed with their rifles.

12  Q     Those photos would appear in the actual chat room?

13  A     Yes.  There is a method to send it to -- to send

14  it to each other.

15  Q     So the individuals who ran that chat room would

16  post requests for money for al-Shabaab?

17  A     Yes.

18  Q     They would explain how to send that money to

19  al-Shabaab?

20  A     Yes.

21  Q     But you never did that?

22        THE INTERPRETER:  The interpreter would like

23  to clarify, Your Honor.

24        THE COURT:  Yes.

25  A     I did not do that, but I did send the money.

1  Q     You did not send money through the ISDAC chat

2  room?

3  A     I did send money using that chat room.

4             THE COURT:  I'm sorry.  She did or did not?

5  What did she say?

6             THE WITNESS:  I did send money using that

7  chat room.

8             THE COURT:  All right.

9  BY MS. MINTER:

10  Q     Umu Luqmaan never asked you to send money using

11  that chat room?

12  A     She's asked me of a lot of things.

13             MS. MINTER:  The Court's indulgence, Your

14  Honor.

15  BY MS. MINTER:

16  Q     Just to be clear, Ms. Esse, you're talking about

17  the ISDAC chat room, correct?

18  A     Yes.  We used to talk to each other privately.

19  Q     Okay.  Well, I'm not asking you about the private

20  chats that you had.  I'm asking about the public, the

21  large public chat room.

22  A     She never asked me in the public room.

23  Q     You said that there were individuals who would

24  post requests in the public chat room, correct?

25  A     Yes.

1  Q     Requests for money?

2  A     Yes.

3  Q     Requests for money for al-Shabaab?

4  A     Yes.

5  Q     Did you ever respond to any of the requests in the

6  ISDAC chat room for money to go to al-Shabaab?

7  A     It's possible.  I don't remember.

8  Q     To be clear, when I say respond, did you ever send

9  money based on requests in the ISDAC chat room?

10  A     I think so.

11  Q     But Umu Luqmaan never asked you to send money to

12  anyone who posted a request in the ISDAC chat room,

13  correct?

14  A     She told me.

15  Q     Told you to respond to requests in the ISDAC chat

16  room?

17  A     No.  That's not what she said.  She told me to

18  send money.

19  Q     Those requests to send money took place in the

20  private chat room, correct?

21  A     Yes.

22  Q     One of the group of 15 would tell you specifically

23  where to send the money, correct?

24  A     Yes.

25  Q     Specifically, they would tell you to send money to

1 Fardowsa?

2 A    Yes.

3 Q    They would not tell you to go to the ISDAC chat

4 room and find information there about where to send

5 money, correct?

6 A    No.  That's not what they used to say.

7 Q    They told you directly where to send the money?

8 A    Yes.

9 Q    Now, when the group of 15 or someone from the

10 group of 15 would ask you to send money, you did that

11 sometimes?

12 A    Yes.

13 Q    You were living in the United States during that

14 time period, correct?

15 A    Yes.

16 Q    To be clear, when I say that time period, I mean

17 approximately April 2011 to April 2012 when you were

18 communicating with these women.

19 A    Yes.

20 Q    You did not go to Somalia during that time period?

21 A    No.

22 Q    You never went to a hawala in Somalia to pick up

23 money during that time period?

24 A    No.

25 Q    You never saw anyone else go into a hawala in

1   Somalia to pick up money?

2   A     No.

3   Q     You never witnessed someone spending any money

4   that you sent?

5   A     No.

6   Q     You never saw anyone give or deliver the money

7   that you sent to another individual?

8   A     No.

9   Q     So what you know about the money is what you were

10  told by these 15 individuals?

11  A     Yes.

12  Q     Now, when Umu Luqmaan told you the truth about the

13  use of the money, she, too, told you that Umu Camaar

14  had a safe house?

15  A     Yes.

16  Q     In Kenya?

17  A     Rent, yes.

18  Q     That was to provide medical care?

19  A     It wasn't just for health.  It was used for other

20  things.

21  Q     Well, let's back up.  How many safe houses were

22  there?

23  A     Two houses rented.

24  Q     One of the rented houses was used to provide

25  medical care, correct?

1    A    Yes.

2    Q    To treat wounded fighters?

3    A    Yes.

4    Q    Umu Camaar paid the rent for that house?

5    A    Right.

6    Q    The 15 women that you've talked about were

7    collecting money to pay the rent for that house?

8    A    Yes, and some other things.

9    Q    Well, your understanding is that the money was

10   going to pay the rent for that house?

11   A    Yes.

12   Q    So the safe house for the wounded fighters?

13   A    Yes.

14   Q    Not the other safe houses?

15   A    It's not.

16   Q    I'm afraid I don't understand your answer.

17   A    Right.

18   Q    The money was not for the other houses?

19   A    It was for the two houses.

20   Q    Ms. Esse, you've met with the law enforcement

21   agents in this case, correct?

22   A    Yes.

23   Q    The government attorneys in this case?

24   A    Yes.

25   Q    Back in February of this year, you told them that

Esse - Cross by Ms. Minter

1  the money that was raised by the 15 women was used to

2  pay for the safe house for medical care?

3  A    Yes.

4  Q    At the time, they told you they wanted you to be

5  honest with them?

6  A    Yes.

7  Q    You tried to do so?

8  A    Right.

9  Q    You told them everything to the best of your

10 recollection?

11 A    Yes.

12 Q    You told them that the money that was being raised

13 by the 15 women was for the medical safe house?

14 A    Right.

15 Q    Now, there was another safe house that you've

16 described?

17 A    Right.

18 Q    That safe house was used for cooking, correct?

19 A    Right.

20 Q    Now, you mentioned in response to the government

21 attorney's questions that at one time they told you

22 they needed $500 to pay for an X-ray machine?

23 A    Right.

24 Q    That was, again, for treatment of wounded

25 al-Shabaab fighters?

Esse - Cross by Ms. Minter

1    A     Right.

2    Q     Those were fighters in Mogadishu?

3    A     Right.

4    Q     Ms. Esse, if I could ask you again about the other

5    safe house, the one used for cooking, you were not told

6    that the money was going to the cooking safe house,

7    correct?

8    A     No, I was not told.  I was told about the orphans.

9    Q     When you were told about the safe houses, you were

10   told that the money that you were contributing, that

11   the 15 women were contributing, was to go to pay the

12   rent on the medical safe house, not the cooking safe

13   house?

14   A     Yes.

15   Q     That's what you sent your money for?

16         THE INTERPRETER:  The interpreter would like

17   to correct.

18   A     Yes.

19   Q     You never sent money for trucks?

20   A     What's a truck?  No.

21   Q     You never sent money directly to any fighters?

22   A     No.

23   Q     Ms. Esse, you do believe that some of the money

24   that you transferred during that time period did go to

25   orphans, correct?

Esse - Cross by Ms. Minter

1        THE INTERPRETER:  The interpreter would like

2   the question asked again, Your Honor.

3   BY MS. MINTER:

4   Q    You do believe that some of the money that you

5   personally transferred through the hawalas went to

6   orphans during that time period?

7   A    Some, yes.

8   Q    You received thank-you messages from some of the

9   people who received money?

10  A    Yes.

11  Q    Ms. Esse, you have had contact with an individual

12  known as Person 1, correct?

13  A    Yes.

14  Q    That's not someone you know through the 15 women?

15  A    It's not.

16  Q    You had contact with that person --

17        MS. MINTER:  The Court's indulgence, Your

18  Honor.

19  BY MS. MINTER:

20  Q    Ms. Esse, you had contact with that person during

21  approximately the same time as you had contact with

22  these women; is that correct?

23  A    Before that, I still contact them.

24  Q    Person 1 has contacts to al-Shabaab, correct?

25  A    No.

1  Q     Not to your knowledge?

2  A     Not from what I know.

3  Q     You also know an individual named Person 2?

4  A     I don't know this person.  I don't remember.

5  Q     You've had contact with a person by that name?

6  A     I don't remember, and I don't think I've seen that

7  name.

8  Q     Ms. Esse, when the government attorneys were

9  asking you questions, you said that Umu Luqmaan told

10 you that her name was Muna Jama?

11 A     Right.

12 Q     How did Umu Luqmaan tell you her name?

13 A     We were getting to know each other.

14 Q     In what format did she tell you?  Was that on the

15 phone?  Was that in a chat room?

16 A     I think it may have been in writing in private.

17 Q     In a private chat room?

18 A     Yes.

19 Q     So for a period of time, you were familiar with

20 the username Umu Luqmaan?

21 A     Yes.

22 Q     That was the only name you knew that individual

23 by?

24 A     There was another name I knew about.  I knew two

25 other -- I knew that person by two names.

1  Q     Well, initially, you were introduced to the

2  username Umu Luqmaan?

3  A     Yes.

4  Q     Then eventually, that individual sent you a

5  message saying they also used other usernames?

6  A     Yes, right.

7  Q     At some point, you believe that individual told

8  you their name, specifically told you the name Muna

9  Osman Jama?

10  A     Right.

11  Q     You believe that was during a chat?

12  A     Right.

13  Q     Now, Ms. Esse, you said a few minutes ago that

14  you've met with law enforcement agents about this case?

15  A     Right.

16  Q     As early as 2014?

17  A     Right.

18  Q     That was approximately two years ago, July 2014,

19  correct?

20  A     Right.

21  Q     The first time?

22  A     Right.

23  Q     That would have taken place approximately two

24  years after the events that you've talked about here

25  today?

Esse - Cross by Ms. Minter

1   A      Right.

2   Q      In 2014, when you first met with law enforcement

3   agents in the case, you told them that you did not

4   recognize the name Muna?

5   A      Right.

6   Q      That you only knew her as Umu Luqmaan?

7   A      Right.

8   Q      Ms. Esse, before you came here yesterday and

9   started answering questions, you met with the

10  government attorneys, correct?

11  A      Right.

12  Q      Okay.  You met with them several times over the

13  past couple of years?

14  A      Right.

15  Q      They talked to you about the questions they would

16  ask you?

17  A      Right.

18  Q      They talked to you about the things that they

19  would show you in court?

20  A      Right.

21  Q      They did ask you those questions yesterday and

22  today?

23  A      Right.

24  Q      They did show you those items yesterday and today?

25  A      Right.

1  Q    Ms. Esse, you have never met any of the 15 women

2  in person, correct?

3  A    I met with one.

4  Q    Who did you meet with?

5  A    Amran Yusuf.

6  Q    You knew Ms. Yusuf before you joined the group of

7  15 women, correct?

8  A    Right.

9  Q    Other than Amran Yusuf, you have never met any of

10 these 15 women?

11 A    There was one that I saw online.  We saw each

12 other online, the camera.

13 Q    But you've never met these individuals in person,

14 correct?

15 A    Right.

16 Q    You never saw any of those individuals transfer

17 money?

18 A    Right.

19 Q    You met them through their online profiling?

20 A    Right.

21 Q    Any information you have about them is information

22 they told you, correct?

23 A    Right.

24 Q    Or another member of the group told you?

25 A    Right.

1  Q    You have never seen any identification documents

2  for any of these women?

3  A    Right.

4  Q    Never been to their homes?

5  A    Right.

6  Q    Never met their families?

7  A    Right.

8  Q    Ms. Esse, the government during their questions

9  showed you a number of chats that you had, a printout

10 of a number of chats that you had, including ones with

11 Umu Luqmaan?

12 A    Right.

13 Q    Do you recall in one of them using the term

14 "precious sister"?

15 A    Many times.

16 Q    You used that in reference to Umu Luqmaan?

17 A    Right.

18 Q    She is not your blood relative sister?

19          THE INTERPRETER:  The interpreter would like

20 the question repeated.

21 BY MS. MINTER:

22 Q    Umu Luqmaan is not your blood relative sister?

23 A    Right.

24 Q    You do not share any parents?

25 A    Right.

1  Q    You used that term because she was a friend?

2  A    I had consideration and respect for her.

3  Q    So the term "sister" can be used in any ways?

4         THE INTERPRETER:  The interpreter would like

5  that clarified, Your Honor.

6         THE COURT:  Yes.

7  A    Yes.  I could even refer to you as sister.

8  Q    Very well.  It could mean a blood relative, of

9  course?

10 A    Right.

11 Q    Or a close friend?

12 A    Right.

13 Q    Or a term of respect like you said?

14 A    Right.

15 Q    The same is true for the word "brother"?

16 A    Right.

17 Q    A few moments ago, in response to the government

18 attorney's questions, you indicated that you had

19 numerous usernames, correct?

20 A    Right.

21 Q    A person like you could have many usernames?

22 A    Very well.

23 Q    That's because you create them yourself, correct?

24 A    Right.

25 Q    You select your username yourself?

Esse - Cross by Mr. Yamamoto

1   A    Right.

2   Q    To your knowledge, an individual could have as

3   many usernames and accounts as they like?

4   A    Right.

5   Q    You can't necessarily tell from a username if the

6   same person might be using more than one username?

7   A    You wouldn't be able to tell.

8         MS. MINTER:  The Court's indulgence, Your

9   Honor.

10        Nothing further, Your Honor.

11        THE COURT:  All right.  Mr. Yamamoto or

12  Ms. Deutsch, any questions?

13                    CROSS-EXAMINATION

14  BY MR. YAMAMOTO:

15  Q    Ms. Esse, I'm sort of confused about the chat

16  rooms, so I want to walk us through it again.  I'm

17  sorry if it's more confusing.

18        You started going to the Paltalk chat rooms when?

19  A    I've used Paltalk before, but the first time I

20  used the chat room was in 2011.

21  Q    When you went to Paltalk, where did you go

22  initially?

23  A    I went -- initially, I went to the music room.  I

24  went to the room where you get to know people for

25  people interested in marriage and a room called

Esse - Cross by Mr. Yamamoto

1   al-Taqwa.

2   Q     Can you spell al-Taqwa?

3   A     A-L T-A-Q-W-A.

4   Q     What kind of chat room is that?

5   A     It's a religious room.

6   Q     Now, Paltalk has hundreds and hundreds of chat

7   rooms, right?

8   A     Right.

9   Q     It covers everything?

10  A     Everything.

11  Q     This chat room was a religious chat room for

12  Islamic studies?

13  A     Right.

14  Q     Who taught in the chat room?

15          THE INTERPRETER:  The interpreter did not

16  hear part of the statement.

17          THE COURT:  All right.

18  A     It was online.  Sometimes there would be

19  recordings.  Other times there would be discussions.

20  Q     Were the discussions about the Koran?

21  A     Yes, and also some -- some joking around.

22  Q     Was there any political talk in that chat room?

23          THE INTERPRETER:  The interpreter would like

24  to clarify, Your Honor.

25  A     Usually, no.  Only when al-Shabaab does something,

Esse - Cross by Mr. Yamamoto

1  that's usually when they would be cursed.

2  Q    So when something happened in current events,

3  people might talk about it in the chat room?

4           THE INTERPRETER:  Your Honor, the interpreter

5  did not hear part of the witness' statement.

6  A    Only the person with the mic would be able to

7  speak in the chat room, and they would curse them.  And

8  the other people would make supportive comments and say

9  amen.

10  Q    Now, when did you go to this chat room?

11  A    I was on and out.  Sometimes I would go in.

12  Sometimes I would go in the other rooms.

13  Q    When did you first start?  What month and what

14  year?

15  A    I don't remember, but it's anywhere from 2009 to

16  2011.

17  Q    Okay.  Now, you at some point went to -- I guess

18  at some point you met Umu Luqmaan.  Was that in this

19  chat room?

20  A    She saw me --

21           THE INTERPRETER:  The interpreter would like

22  to correct.

23  A    I saw her making offensive statements.

24  Q    In this chat room?

25  A    Al-Taqwa.

Esse - Cross by Mr. Yamamoto

1    Q    And what was your response?

2    A    I told her not to say offensive things about

3    people.

4    Q    You two started to chat?

5    A    No.  That ended there, but there was another time

6    I came into the room.

7              THE INTERPRETER:  The interpreter would like

8    to clarify, Your Honor.

9              THE COURT:  Yes.

10   A    So afterward I went into the room ISDAC.  That's

11   when I had said Happy New Year, Merry Christmas.  She

12   said that's not our new year and invited me to a

13   private room to talk to her.  Then I saw her making

14   offensive statements in the al-Taqwa room.

15   Q    The first time you saw Umu Luqmaan was in the

16   ISDAC chat room or the al-Taqwa chat room?

17   A    ISDAC.

18   Q    So you had gone to the ISDAC chat room?

19   A    Yes.

20   Q    When was that?

21   A    2011.

22   Q    What month?  Do you recall?

23   A    It was somewhere around March, April, possibly

24   May.

25   Q    That's the first time you encountered Umu Luqmaan?

Esse - Cross by Mr. Yamamoto

1    A    Right.

2    Q    The next time was in the al-Taqwa chat room?

3    A    Yes.

4    Q    The next time after that was where?

5    A    Afterward I saw her at ISDAC.  She invited me, and

6    then that's when I accepted her invitation.

7    Q    When was that?

8    A    Same.  It was in 2011.

9    Q    March, April?

10   A    We started contacting each other around May.

11   Q    May 2011?

12   A    Yes.

13   Q    When you say contacting, do you mean contacting in

14   the chat room or contacting outside the chat room?

15   A    That's when we officially exchanged phone numbers,

16   and she told me where she was, those type of things.

17   Q    When was that?

18   A    It was May.  I don't remember the exact date, but

19   it was sometime around May.

20   Q    That's when you two started calling each other on

21   the phone?

22   A    Right.

23   Q    She would call you or you would call her?

24   A    Both.

25   Q    Were you also going to the chat rooms at that

1    time?

2    A    Yes.

3    Q    Which chat rooms?

4    A    Both.

5    Q    Both ISDAC and al-Taqwa?

6    A    Right.

7    Q    You were in the main portion of both chat rooms?

8              THE INTERPRETER:   The interpreter would like

9    the question repeated, Your Honor.

10             THE COURT:   Yes.

11   BY MR. YAMAMOTO:

12   Q    You were in the main portion of both chat rooms?

13   A    So I would be in both chat rooms.   There would be

14   two windows, and I would alternate between both

15   windows.

16   Q    So you had both open at the same time?

17             THE INTERPRETER:   The interpreter would like

18   to clarify, Your Honor.

19   A    Besides the one I'm currently logged on, I would

20   be able to hear what's going on in the other one.

21   Q    Okay.   So you would go to ISDAC and listen to

22   al-Taqwa or go to al-Taqwa and listen to ISDAC?

23   A    If I'm in al-Taqwa, I would be able to see what's

24   going on in ISDAC.

25   Q    Correct.   But you could hear?

Esse - Cross by Mr. Yamamoto

1 A    I wouldn't hear.

2 Q    You could not hear.  Okay.

3 A    I wouldn't be able to hear.

4 Q    What went on in the ISDAC chat room?

5 A    Arguments for and against al-Shabaab.

6 Q    So this was -- was it just al-Shabaab there were

7 arguments about, or were there other topics there were

8 arguments about?

9 A    Nothing else would be discussed.  Either they

10 would be advertised or a group would come in condemning

11 them.

12 Q    Were they arguing current events, what was

13 happening in Somalia?

14 A    Al-Taqwa was a religious room.  Most of the time

15 they were condemning there.  Offensive statements were

16 made of them.  The other room, ISDAC, they were mostly

17 praised in that room.

18 Q    Did you stop going to al-Taqwa at some point?

19 A    Yes, when I was convinced about the ideology of

20 al-Shabaab.

21 Q    Were you pro-al-Shabaab when you started going to

22 ISDAC?

23 A    I was a half supporter and half not supporting

24 them because I was against their actions and killings,

25 targeting the nonprofit workers that would bring food

Esse - Cross by Mr. Yamamoto

1  to Somalia.

2  Q    How long were you in ISDAC before you and Umu

3  Luqmaan started chatting in the ISDAC chat room?

4  A    Before we started talking to each other.

5  Q    So you chatted in the ISDAC chat room before you

6  started the phone calls?  Is that what you're saying?

7  A    No.  We knew each other only a month.  We really

8  got to know each other better the second month.

9  Q    What do you mean?

10 A    So at first I would see what she writes.  She

11 would see what I write.  Then she made comments about

12 what I wrote, but it took a while for us to understand

13 each other.

14 Q    In the ISDAC chat room, one person has the

15 microphone and everybody else can type things that all

16 the other people can read; is that right?

17          THE INTERPRETER:  The interpreter would like

18 to clarify the witness' statement, Your Honor.

19 A    Yes, and you can also see the writing.

20          THE COURT:  Thank you, Mr. Yamamoto.  We're

21 going to take our luncheon break at this time.

22          The Court will stand in recess until 1:30.

23          Ms. Esse, do not discuss your testimony

24 during the luncheon recess.

25          The Court will stand in recess.

Esse - Cross by Mr. Yamamoto

1      (Recess from 12:33 p.m. until 1:44 p.m.)

2      (Mr. Hassan Abdi is present.)

3           THE COURT:  Mr. Yamamoto.

4           MR. YAMAMOTO:  Thank you, Your Honor.

5           THE COURT:  Ms. Esse, you remain under oath.

6           Good afternoon.

7           THE INTERPRETER:  Good afternoon, Your Honor.

8           MR. YAMAMOTO:  Has he been sworn, Your Honor?

9           THE COURT:  He was sworn yesterday, I

10 believe.

11          THE INTERPRETER:  Yes, the day before.

12          THE COURT:  Yes.

13 BY MR. YAMAMOTO:

14 Q    Ms. Esse, when we left, we were taking a

15 pedestrian path through chat rooms.

16 A    That's fine.

17 Q    You indicated that March or April of 2011 you

18 went -- or started going into the ISDAC chat room, and

19 you and Umu Luqmaan were in a chat there and also

20 talked on the phone, right?

21 A    That's correct.

22 Q    ISDAC chat room, people were pro- and

23 anti-al-Shabaab?

24 A    So people just come in and start arguments.

25 Q    But mostly it was pro-al-Shabaab?

Esse - Cross by Mr. Yamamoto

1  A     That's correct.

2  Q     Now, in the large chat room, you would talk about

3  al-Shabaab.  Would there be requests for contributions

4  for widows and orphans and needy people?

5  A     Yes.

6  Q     I think you indicated earlier that sometimes

7  people would give money, and then there would be a

8  photograph or a voice mail thank you or something

9  posted to the chat room.

10 A     That's correct.

11 Q     Now, when did Umu Luqmaan invite you to the

12 private chat room?  Do you remember what month that

13 was?

14 A     I think it was in May or April.

15 Q     April or May.  So soon after you went into the

16 ISDAC chat room, she invited you to a private chat

17 room?

18 A     After two or three weeks, maybe two weeks, three

19 weeks, maybe a month later.

20 Q     Now, how often did you go to the private chat

21 room?

22 A     Most of the time I would not log in unless she

23 invites me in.

24 Q     You have to be invited to get into the private

25 chat room; is that right?

Esse - Cross by Mr. Yamamoto

1   A     Yes.

2   Q     Now, you had been asked to contribute to

3   Fardowsa's child who was burned or badly injured,

4   right?

5              THE INTERPRETER:  Your Honor, the interpreter

6   did not hear counsel's question.

7              THE COURT:  All right.  If you would repeat

8   it.

9              MR. YAMAMOTO:  I forgot the question.

10             THE COURT:  You've been asked to contribute

11  to Fardowsa's child who was burned or badly injured?

12  BY MR. YAMAMOTO:

13  Q     Ms. Esse, you had been asked to contribute to

14  Fardowsa's child who had either been burned or badly

15  injured, right?

16  A     Yes.

17  Q     When was that?

18  A     It was around October, November, or December,

19  around that time.

20  Q     You contributed money to Fardowsa soon after that?

21  A     That's correct.

22  Q     If you could, look at Government's Exhibit 13.

23        It shows $200 going to Fardowsa Jama Mohamed on

24  December 28, 2011.  Does that time frame sound right to

25  you?

Esse - Cross by Mr. Yamamoto

1   A      That's correct.

2   Q      Is that the first time you contributed in the

3   private chat room?

4   A      I believe so.

5   Q      Now, you'd been in there, you say, since March,

6   April, May of that year, 2011.  So you'd been in there

7   seven, eight, nine months and had not contributed; is

8   that right?

9   A      I believe so, yeah.

10  Q      Okay.  Had you been asked to contribute during

11  that time?

12  A      Yes.

13  Q      Were you not able to contribute because you didn't

14  have money?

15  A      I was getting money from the government but was

16  not enough money for me.  It wasn't enough.

17  Q      It wasn't enough to be able to contribute?

18  A      Yes.

19  Q      Now, during that period of time, were you being

20  asked to contribute to widows and orphans and needy

21  people?

22  A      Many times.

23  Q      So during that period of time through at least

24  December 2011, you thought the money from the private

25  chat room was going to needy people?

Esse - Cross by Mr. Yamamoto

1   A     That's correct.

2   Q     And in December -- on December 28, when you sent

3   $200 to Ayan Jama Warsame, you thought that was going

4   to a needy cause?

5   A     That's correct.

6   Q     Do you recall when you were next asked to give

7   money for Fardowsa?  You gave money, apparently, in

8   January.  Was that also for the burned or injured

9   child?

10  A     No.  It was March 24.

11  Q     March 24 what?

12  A     2012.

13  Q     No.  It indicates here that you gave money on

14  January 17, $100, to Fardowsa Jama Mohamed.  Was that

15  for a needy cause?

16  A     Yes.

17  Q     Okay.  So all during this time, even though you're

18  in a chat room that's pro-al-Shabaab, the money that

19  you were contributing you felt was going for needy

20  people, for orphans and widows?

21  A     That was my understanding.

22  Q     When did that understanding change?

23  A     March, end of March.

24  Q     March is when they asked you to contribute the

25  $500 for an injured child and you asked why?

Esse - Cross by Mr. Yamamoto

1  A    That's correct.

2  Q    That's when you were taken to a private chat room

3  and it was explained to you that the money wasn't going

4  to needy people but going to help support al-Shabaab?

5  A    That's correct.

6  Q    So you stayed for a few more months, and then you

7  decided to leave?

8  A    That's correct.

9  Q    Now, when did you leave?

10 A    June (in English).

11 Q    April, May, June.  Did you leave the -- let me

12 back up.  Did you leave ISDAC, or did you just leave

13 the small chat room?

14 A    First, I left ISDAC and then the whole chat room

15 altogether after that.

16 Q    Well, if you weren't in ISDAC, you weren't in the

17 chat room; were you?

18 A    No.  You can be still in the big room; although,

19 you have not been invited to the small group.

20 Q    Right.  I think we get confused here.

21      Did you leave just the small room initially and

22 stay in the big room, or did you leave the big room and

23 leave ISDAC altogether?

24 A    So I exited the small room first, but I was still

25 in the big room.  So sometimes they would invite me to

Esse - Cross by Mr. Yamamoto

1  the small room.  I just ignore them.

2  Q    Okay.  So you stayed in ISDAC and just ignored the

3  small room, ignored the invitations from Umu Luqmaan?

4  A    Correct.

5  Q    People from the small chat room tried to contact

6  you, but you wouldn't talk to them?

7  A    After that, I start removing them from my contact

8  list.

9  Q    Do you recall when you stopped going to the small

10  chat room?

11  A    I don't remember exactly when, but it was around

12  April 2012.

13  Q    So you left the small chat room about April 2012.

14  Did you leave ISDAC in June 2012?

15  A    That's correct.

16  Q    When was the last time you spoke to Umu Luqmaan?

17  A    After I told her that I was visited by the FBI.

18  Q    Now, you testified about code words, that certain

19  things meant al-Shabaab or that orphans meant

20  something.  When did you learn that?

21  A    After I -- after my argument with Umu Luqmaan and

22  Umu Camaar, and then another woman from the 15

23  contacted me then after that.

24  Q    So it's when Umu Luqmaan takes you aside for the

25  $500 for the, quote, injured child, that's when you

Esse - Cross by Mr. Yamamoto

1  learn about al-Shabaab and that's when you learn about

2  the code words?

3  A    No.  Actually, at first I was paying the monthly

4  expenses.  Then after that, they asked me for the $500.

5  Q    Right.  But when they asked you for the $500,

6  that's when you learned about al-Shabaab?

7  A    I knew before that.

8  Q    When did you know?

9  A    End of April.

10  Q    End of April 2012?

11  A    That's when I figured out that the money was going

12  to al-Shabaab; it was not going to orphans or none of

13  that.

14  Q    Now, Umu Luqmaan took you aside and took you in

15  the private chat room because she said she trusted you

16  now, right, after all of this time?

17  A    That's correct.

18  Q    That's when she explained to you about Fardowsa

19  and what the purpose of the money was?

20  A    That's correct.

21  Q    That's March, April 2012.  You'd been in there

22  almost a year.  Excuse me.  That would have been

23  February or so of 2012.  You were in there ten months

24  or so?

25  A    That's correct.

Esse - Cross by Mr. Yamamoto

1  Q    Now, at some point, you indicated that you thought

2  Thabaat was Barira.  Doesn't Thabaat live in England

3  and Barira live in Somalia?

4          THE INTERPRETER:  I'm sorry.  I'm going to

5  ask her to repeat that.  Thank you.

6  A    So I did know in the beginning that Thabaat was

7  Barira.  But later on I learn that Barira is Thabaat

8  and that she's in the UK.  And she run away from the

9  French government, and now she lives in Somaliland.

10 Q    Who told you that?

11 A    A man who used to log into the chat room and was

12 part of the group.

13 Q    Did you ever talk to Barira Thabaat?

14 A    I talked to Thabaat.

15 Q    Where was she at the time you talked to her?

16 England?

17 A    Yes.

18 Q    When was this?

19 A    While I was in the group.  I don't know exactly

20 when.

21 Q    So sometime between March-April 2011 and April-May

22 2012?

23 A    Yes, around that time.  And we used to -- she used

24 to call me sometimes.

25 Q    From England?

1  A    That's correct.

2  Q    Did you know Barira at all?

3  A    I didn't have good knowledge about that person.

4  Q    Okay.  Now, the government showed you a number of

5  exhibits.  It was a 3 series starting with 3A, B, C, D,

6  3A1, 5, 6, 3A8, 12, 15, 16, and 17.

7      I'm going to slow down.  He's going to kill me if

8  I don't.

9      Those were not things that you wrote; were they?

10 That was a different book than yours?

11 A    Yes.

12 Q    Okay.  Now, the names in the book were not names

13 that you wrote but you were familiar with?

14 A    Yes, indeed.

15 Q    The lists were not lists that you prepared?

16 A    That's correct.

17 Q    They were prepared by somebody else for whatever

18 reason?

19 A    Are you asking me about the one in my notebook

20 or --

21 Q    No, not your notebook.  The other book, the one

22 that wasn't yours.

23 A    That's correct.

24 Q    You know what you put in your notebook, I know.

25 A    Yes, indeed.

Esse - Cross by Mr. Yamamoto

1  Q    Now, Nicmatu Rabbi's name doesn't appear in there;

2  did it?

3  A    It was there.

4  Q    Okay.  We are going to have to go through them,

5  then, starting with 3A1.  Is Nicmatu Rabbi there?

6  A    No.

7  Q    Do you have 3A5?  Is Nicmatu Rabbi there?

8  A    No.

9  Q    3A6, is Nicmatu Rabbi there?

10  A    No.

11  Q    3A8, is Nicmatu Rabbi there?

12  A    No.

13  Q    No?

14  A    No.

15  Q    Okay.  3A12 -- 3A8, is she there?

16  A    No.

17  Q    3A12, is she there?

18  A    No.

19  Q    3A15, is she there?

20         THE COURT SECURITY OFFICER:  Counsel, which

21  one?

22         MR. YAMAMOTO:  Which one did you give her?

23         THE COURT SECURITY OFFICER:  3A15.

24  BY MR. YAMAMOTO:

25  Q    Is she there?

Esse - Cross by Mr. Yamamoto

1   A    No.

2   Q    3A16, is she there?

3   A    No.

4   Q    3A17, is she there?

5   A    No.

6   Q    Now, 3A7?

7   A    No.

8   Q    So she wasn't on any of the lists; was she?

9   A    Yes.

10  Q    Yes, she was or no, she wasn't?

11  A    It was not those ones.

12  Q    She wasn't on all the others.  She's on this one,

13  right, 3A7, but that just has her name and her phone

14  number?

15  A    That's correct.

16  Q    It doesn't have other members of the 15 group on

17  there?

18  A    That's correct.

19       MR. YAMAMOTO:  The Court's indulgence.

20       I'm done.  Thank you, Your Honor.

21       THE COURT:  All right.  Any redirect?

22       MR. GILLIS:  Yes, Your Honor.

23       MS. MINTER:  Your Honor, very briefly.  We're

24  still trying to manage the schedule for our expert.

25  Could Mr. Siegel briefly be excused to contact him?

Esse - Redirect by Mr. Gillis

1              THE COURT:  Yes.

2              MS. MINTER:  Thank you.

3                    REDIRECT EXAMINATION

4  BY MR. GILLIS:

5  Q    Ms. Esse, would you take a look, please, at 3A --

6  rather 3C2, please.  Do you have 3C2?

7  A    Yes.

8  Q    Do you see in the upper right-hand corner of 3C2?

9  A    Yes.

10 Q    Do you see that entry?  Who is that?

11 A    Nicmatu Rabbi.

12      Do you want me to spell that for you?

13            THE COURT:  Yes.

14            THE INTERPRETER:  N-I-C-M-A-T-U, R-A-B-B-I.

15            MR. GILLIS:  May I have one moment, Your

16 Honor?

17            THE COURT:  Yes.

18            MR. GILLIS:  Nothing further, Your Honor.

19            THE COURT:  All right.  Thank you.

20            May this witness be excused?

21            MR. GILLIS:  Yes, sir.

22            THE COURT:  All right.  Ms. Esse, you're

23 excused.  You may leave the courthouse.  Please do not

24 discuss your testimony outside of the courtroom with

25 any other witness.

Tran - Direct by Mr. Gillis

1          THE WITNESS:  I can leave, right?

2          THE COURT:  Yes.

3       (The witness stands aside.)

4          THE COURT:  The next witness.

5          MR. GILLIS:  Your Honor, the government calls

6  Peter Tran, please.

7          THE COURT:  All right.  Peter Tran will come

8  forward.

9          MR. GILLIS:  Mr. Burns.

10         THE COURT SECURITY OFFICER:  What, sir?

11         MR. GILLIS:  I was calling you to tell you

12  that the exhibits for this gentlemen will be --

13  Mr. Burns, what I was trying to articulate was that the

14  exhibits I'm going to be asking Mr. Tran about are in

15  the 201 series.

16         THE COURT SECURITY OFFICER:  All right, sir.

17       PETER TRAN, PLAINTIFF'S WITNESS, AFFIRMED

18                  DIRECT EXAMINATION

19  BY MR. GILLIS:

20  Q    Good afternoon, sir.  Would you tell us your full

21  name and spell your last name for us.

22  A    Peter Tran, T-R-A-N.

23  Q    Mr. Tran, where are you employed?

24  A    I'm employed with the King County Housing

25  Authority.

Tran - Direct by Mr. Gillis

1  Q     Where is King County?

2  A     It's in the metropolitan Seattle, Washington,

3  area.

4  Q     What's your position there?

5  A     I'm a fraud investigator.

6  Q     What do you do as a fraud investigator?

7            THE INTERPRETER:  Your Honor, the interpreter

8  could not hear the witness' response.

9            THE COURT:  All right.  If you would, repeat

10  your last answer.

11            THE WITNESS:  I'm a fraud investigator.

12  BY MR. GILLIS:

13  Q     For how long have you been a fraud investigator?

14  A     Seven years.

15  Q     As part of your position at the King County

16  Housing Authority, are you familiar with the records of

17  the housing authority?

18  A     I am.

19  Q     Are you familiar with how those records are

20  created?

21  A     I am.

22  Q     Are you familiar with how they're maintained?

23  A     I am.

24  Q     What records of the housing authority do you have

25  access to?

Tran - Direct by Mr. Gillis

1  A    All records pertaining to the tenant.

2  Q    Whom does the tenant refer to?

3  A    Ms. Dhirane.

4  Q    Would it be also accurate to say the tenant is the

5  recipient of benefits --

6  A    Correct.

7  Q    -- from the housing authority?

8  A    Correct.

9  Q    If you would, would you look at Government's

10 Exhibit 201C.

11      Do you have that in front of you, sir?

12 A    I do.

13 Q    Can you tell us what that is?

14 A    This is Ms. Dhirane's individual tax return that

15 she supplied to the housing authority.

16 Q    Where did that document come from?  I mean, did it

17 come from the housing authority records that you have

18 access to?

19 A    Correct.

20 Q    Who provides that income tax return to the housing

21 authority?

22 A    I'm assuming from Ms. Dhirane or a representative

23 from her household.

24 Q    It is provided by the recipient of the benefits?

25 A    Correct, that's what I meant.

1          MR. GILLIS:  Your Honor, I'd offer

2  Government's Exhibit 201C.

3          THE COURT:  Any objection?

4          MR. YAMAMOTO:  No objection.

5          THE COURT:  I'm sorry?

6          MR. YAMAMOTO:  No objection.

7          THE COURT:  Without objection, Government's

8  Exhibit 201C is admitted.

9  BY MR. GILLIS:

10 Q    What does 201C say about the gross income that was

11 claimed by Ms. Dhirane and her household?

12 A    The adjusted gross income is $14,419.

13          THE INTERPRETER:  Your Honor, the interpreter

14 did not hear the amount.

15          THE COURT:  Repeat that, please.

16          THE WITNESS:  $14,419.

17 BY MR. GILLIS:

18 Q    What's the gross income reflected on that

19 document?

20          THE COURT SECURITY OFFICER:  Your Honor, we

21 have an issue with the hearing aids.

22          THE COURT:  Take a moment and correct it.

23          All right.  Thank you.

24 A    The income that's provided here on the tax form, I

25 believe it's from -- employment from her husband.

Tran - Direct by Mr. Gillis

1  Q    The gross figure shown there on line 22?

2  A    Is $15,515.

3  Q    Does it show when the document was prepared?

4  A    I believe on the back.

5  Q    You know, I'll withdraw the question.  The

6  document will show that.  Thank you.

7      Sir, would you take a look at Government's

8  Exhibit 201D.

9  A    Okay.  I have it.

10  Q    Do you have it in front of you?

11  A    Yes.

12  Q    Can you tell us what that is?

13  A    This is Dhirane's family certification of,

14  basically, who's in the household, household

15  composition, and their income and assets when

16  certifying to the housing authority.

17  Q    What are they certifying, or why are they

18  certifying something to the housing authority?

19  A    Because we determine what their subsidy will be

20  based off of the information provided.

21          MR. GILLIS:  Your Honor, I'd offer 201D.

22          THE COURT:  Any objection?

23          MR. YAMAMOTO:  No, Your Honor.

24          THE COURT:  Without objection, 201D is

25  admitted.

Tran - Direct by Mr. Gillis

1  BY MR. GILLIS:

2  Q    First of all, that is for what period of time?

3  Well, let me ask it this way:  There's a received stamp

4  on there of August 22, 2011.  Would that be about the

5  time that it was submitted to the housing authority?

6  A    Correct.

7  Q    How does the housing authority receive that

8  document?

9  A    By the tenant or the person receiving the subsidy

10 either in person or mailed or e-mailed to us.

11 Q    The handwriting on it typically would be whose?

12 Somebody from the housing authority or somebody else?

13 A    Well, the person filling out the form would be

14 from the person that's the tenant or the person

15 receiving the benefits.  When it's in receipt, we stamp

16 it.  We typically don't write anything over it but just

17 stamp it.  It's the -- the tenant in this case,

18 Ms. Dhirane, would be the one who filled it out and

19 provided it to the housing authority.

20 Q    There's a certification that's required that it's

21 true and accurate?

22 A    Correct.

23 Q    What does it show pertaining to the applicant for

24 the total family income as of August 21, 2011?

25 A    Under the family income, they certified that their

Tran - Direct by Mr. Gillis

1   monthly income was between $1,200 to $1,400.

2   Q    Would you please look at Government's

3   Exhibit 201F.  Do you have that in front of you?

4   A    I do.

5   Q    Do you recognize the stamp on there?

6   A    I do, for August 22, 2011.

7   Q    Is that a stamp that the housing authority puts

8   on?

9   A    Correct.

10  Q    Did this come from the housing authority records?

11       THE INTERPRETER:  Your Honor, the interpreter

12  can't keep up.

13       MR. GILLIS:  I'm sorry.

14       THE COURT:  All right.  If you would, just

15  slow down a little bit.  We're having a simultaneous

16  translation.

17       THE WITNESS:  Okay.

18       MR. GILLIS:  It may have been my fault

19  actually.

20       THE COURT:  That's all right.

21  BY MR. GILLIS:

22  Q    So who provides that tax return to the housing

23  authority?

24  A    It would be the tenant receiving the subsidy.

25  Q    In this case, it would be Dhirane or somebody from

Tran - Direct by Mr. Gillis

1  the Dhirane household?

2  A     Correct.

3           MR. GILLIS:  Your Honor, I'd offer

4  Government's Exhibit 201F.

5           THE COURT:  Any objection?

6           MR. YAMAMOTO:  Your Honor, I'm not sure what

7  all of these documents are for.

8           THE COURT:  I'm not either, but do you have

9  an objection to it?

10           MR. YAMAMOTO:  I'm objecting because it's not

11  relevant.

12           THE COURT:  All right.  Over objection, I'll

13  receive these exhibits, but I assume you'll make clear

14  the relevance.

15           MR. GILLIS:  Yes, Your Honor.

16           THE COURT:  All right.

17  BY MR. GILLIS:

18  Q     That document shows a gross income of the family

19  household of $13,000?

20  A     $13,055, correct.

21  Q     Would you look, please, at Government's

22  Exhibit 201J.

23  A     I have it.

24  Q     Is that something that came from the housing

25  authority?

1  A     From our records, yes, but it's given to us by the

2  tenant.

3  Q     In this case, someone in the Dhirane household?

4  A     Correct.

5          MR. GILLIS:  I'd offer Government's

6  Exhibit 201J.

7          THE COURT:  Any objection?

8          MR. YAMAMOTO:  Same objection, Your Honor.

9          THE COURT:  All right.  Over objection, the

10  Court will admit 201J.

11  BY MR. GILLIS:

12  Q     It shows a total gross income for that year, 2011,

13  of $14,548; is that right?

14  A     Correct.

15  Q     Would you please look at Government's

16  Exhibit 201M.

17  A     I have it.

18  Q     That's a tax return for 2013?

19  A     Correct.

20  Q     Is that from the housing authority records?

21  A     Correct.

22  Q     Was that submitted by somebody in the Dhirane

23  household?

24  A     Correct.

25          MR. GILLIS:  I'd offer 201M.

1          THE COURT:  All right.  Over objection, 201M

2    is admitted.

3          MR. YAMAMOTO:  May I have one moment, Your

4    Honor?

5          THE COURT:  Yes.

6    BY MR. GILLIS:

7    Q    What benefits did the housing authority provide

8    initially to the Dhirane household?

9    A    We provide a rental subsidy.

10   Q    How does that rental subsidy work?  Is it given

11   directly --

12         MR. YAMAMOTO:  Your Honor, this whole line of

13   questioning is irrelevant.

14         THE COURT:  Where are you going with this?

15   What's the relevance?

16         MR. GILLIS:  Your Honor, the relevance is to

17   prove that substantial sums of money that were sent by

18   the Dhirane household or by the defendant in this case,

19   including substantial sums of money that were sent by

20   her husband to her during this period of time totaling

21   more than $40,000 while she was in Somalia, the

22   relevance is to show for the inference that the $40,000

23   that was transferred to her while she was in Somalia

24   did not come from their own income but implicit from

25   other sources.

1           THE COURT:  I'm not quite sure how that all

2    connects up.  I'll allow this testimony, but let's get

3    through it.

4    BY MR. GILLIS:

5    Q    Is that sum paid directly to the applicant?

6    A    Correct.

7    Q    What about the landlord?  How does the landlord --

8    A    Well, when she was on the program for the first

9    two years, she was in public housing, which is -- the

10   landlord is the housing authority.  And from, I

11   believe, 2012 and on, she was under the Section 8

12   program, which is a voucher that she can use to rent

13   from private landlords.

14   Q    Is that voucher something that can be transferred

15   into cash that she can --

16   A    It's just a voucher.  Basically, it pays to the

17   landlord that is allowing her to rent from them.

18   Q    Okay.  Did the housing authority, then, ever pay

19   directly to the Dhiranes a subsidy for rent?

20   A    We paid on behalf of Dhirane to the landlords that

21   she --

22   Q    Not directly?

23   A    Not directly to her.

24           MR. GILLIS:  That's all I had, Your Honor.

25   Thank you.

Cobbold-Bedeau - Direct by Ms. Atiyeh

1          THE COURT:  All right.  Thank you.

2          Any cross?

3          MR. YAMAMOTO:  No, Your Honor.

4          THE COURT:  All right.  May the witness be

5   excused?

6          MR. GILLIS:  Yes, Your Honor.

7          THE COURT:  All right.  Mr. Tran, you're

8   excused.  Please do not discuss this testimony outside

9   of the courtroom with any other witness.

10          Thank you.

11      (The witness stands aside.)

12          THE COURT:  The next witness.

13          MS. ATIYEH:  The government calls Beatrice

14   Cobbold-Bedeau.

15          THE COURT:  All right.  Ms. Cobbold-Bedeau

16   will come forward, please.

17   BEATRICE COBBOLD-BEDEAU, PLAINTIFF'S WITNESS, AFFIRMED

18                   DIRECT EXAMINATION

19   BY MS. ATIYEH:

20   Q    Good afternoon, ma'am.  Could you please state

21   your name and spell it for the court reporter.

22   A    Beatrice Cobbold-Bedeau, B-E-A-T-R-I-C-E; last

23   name C-O-B-B-O-L-D hyphen B-E-D-E-A-U.

24   Q    How are you employed?

25   A    I work for Fairfax County Department of Housing as

Cobbold-Bedeau - Direct by Ms. Atiyeh

1  a housing services specialist.

2  Q    How long have you been a specialist?

3  A    With Fairfax County?

4  Q    Yes, ma'am.

5  A    It's going on about ten years come October.

6  Q    What are your duties as a specialist with the

7  housing authority?

8  A    I'm responsible for recertifying families of the

9  Housing Choice Voucher Program, which is a federal

10  subsidized rental program for families of low to

11  moderate income, as well as elderly and people with a

12  disability.

13  Q    How are you assigned the individuals that you work

14  with?

15  A    It's based on the location that they are in.  I

16  have about four locations, Annandale, McLean, Oakton,

17  and Burke.

18  Q    How do you interact with the families that you

19  work with?

20  A    I call them once a year for the recertification,

21  normally 120 days in advance from their effective date

22  of the recertification.

23  Q    What do you do then?

24  A    Once I call them in, normally, what I do is I mail

25  out the packet to them with an interview date.  When

Cobbold-Bedeau - Direct by Ms. Atiyeh

1  they come in for their actual interview, they are

2  supposed to have the application already filled out.

3  So when I do meet with them, I'm basically going over

4  the application and making sure everything is filled

5  out accurately.  I'm also collecting any documentation

6  they may have brought with them.  I'm also asking them

7  if they have any questions or any concerns that we can

8  go over at that time.

9  Q    What do you do after you've reviewed the

10  applicant's housing applications with them?

11  A    So after I've reviewed the information, I verify

12  the information and make sure everything is accurate.

13  Thirty days prior to the effective date of their

14  recertification, I would mail out a notice of the

15  findings as far as how much they would have to pay

16  towards the rent.

17  Q    In the course of your duties as a specialist, did

18  you come into contact with Ms. Muna Osman Jama and her

19  family?

20  A    Yes, I did.

21  Q    In what context did that occur?

22  A    When they came in for recertification at whatever

23  time it was that they needed to come in.

24  Q    So Ms. Jama was somebody who lived in the ZIP

25  codes you mentioned?

1  A    Yes, ma'am.

2  Q    Do you remember the time period in which that was?

3  A    I believe that was back in either 2011 or -- 2011

4  through '12, '13, around there.

5  Q    At some point, she moved to another residence?

6  A    Yes, she did.

7  Q    Where was that residence?  Do you know?

8  A    I don't recall.

9  Q    So you were no longer her specialist after she

10 moved from her Annandale residence to the other

11 residence?

12 A    That's correct.

13 Q    Are you generally familiar with the records that

14 are kept by the Fairfax County Housing Authority?

15 A    Yes, I am.

16 Q    You're familiar with how they're made?

17 A    Yes, I am.

18 Q    How they're retained by the housing authority?

19 A    Yes, I am.

20        MS. ATIYEH:  Could we please show the witness

21 Government's Exhibit 200C.

22        Mr. Burns, these will all be 200 with letters

23 after them.

24        THE COURT SECURITY OFFICER:  200P?

25        MS. ATIYEH:  200C as in cat.

1          THE COURT SECURITY OFFICER:  Okay.  I'm

2  sorry, ma'am.

3  BY MS. ATIYEH:

4  Q    Are you familiar with this document?

5  A    Yes, I am.

6  Q    Is it a copy of a record kept by the Fairfax

7  County Housing Authority?

8  A    Yes, it is.  It's the tenant's application.

9  Q    Was it kept in the course of regularly conducted

10 business activity?

11 A    Yes, it was.

12 Q    In fact, signed by the applicant?

13 A    Yes.

14         MS. ATIYEH:  I'd move Government's 200C into

15 evidence, Your Honor.

16         THE COURT:  Any objection?

17         MS. MINTER:  Your Honor, we don't object in

18 that it's a properly kept business record.  We would

19 object to anything in it being taken for the truth of

20 the matter asserted.  The inherent reliability of a

21 business record comes from the fact that the business

22 prepares it themselves and has an interest in preparing

23 it correctly.  This was not a document that was

24 prepared as such.

25         THE COURT:  I'm going to admit it as a

Cobbold-Bedeau - Direct by Ms. Atiyeh

1  document that was filed with the housing authority.

2        MS. ATIYEH:  If we could, put up page 1,

3  please.

4  BY MS. ATIYEH:

5  Q    You see that this has a section listing the head

6  of household, and there's a number of phone numbers

7  listed here?

8  A    Yes.

9  Q    This is a form that Ms. Jama filled out?

10 A    Yes.

11 Q    If you go to page 6, you'll see a section under

12 Number 8 there about a previous name that might have

13 been used.

14 A    Yes.

15 Q    You see that section.  Then if you go on to -- I

16 believe it's page 7, you see there's a signature on

17 this document?

18 A    Yes.

19 Q    It's signed under penalty of perjury?

20 A    Yes.

21 Q    It's signed by Muna Jama?

22 A    Yes.

23        MS. ATIYEH:  Mr. Burns, please show the

24 witness 200D.

25 BY MS. ATIYEH:

Cobbold-Bedeau - Direct by Ms. Atiyeh

1  Q    Do you have that in front of you?

2  A    Yes, I do.

3  Q    What's this document?

4  A    This is the notice of rent that we normally send

5  to the participants whenever we are conducting a

6  recertification or an interim evaluation of their

7  income.

8  Q    So that's the document that you send them in

9  response to the application we previously discussed?

10 A    That's correct.

11 Q    This is a copy of a record kept by the housing

12 authority?

13 A    Yes, it is.

14        MS. ATIYEH:  I'd move Government's 200D in.

15        MS. MINTER:  Your Honor, the same objection

16 slightly differently phrased, I suppose.

17        THE COURT:  All right.  The Court will admit

18 this as a document that came from the records of the

19 County of Fairfax.

20        MS. ATIYEH:  Mr. Burns, could we show the

21 witness 200G as in George.

22 BY MS. ATIYEH:

23 Q    You're familiar with this document?

24 A    Yes, I am.

25 Q    What is this?

1   A    The housing application again.

2   Q    Do you see the date on this one?

3   A    It's dated December 14, 2011.

4   Q    This is another copy of a record kept by the

5   Fairfax County Housing Authority?

6   A    Yes, it is.

7         MS. ATIYEH:  I'd move Government Exhibit 200G

8   into evidence.

9         THE COURT:  The Court will admit it as a

10  document that was found within the records of the

11  Fairfax County Housing Authority.

12  BY MS. ATIYEH:

13  Q    If you could, again, just take a look at page 7.

14  This is a document signed by Muna Jama?

15  A    Yes, it is.

16  Q    Is that signed under penalty of perjury?

17  A    Yes, it is.

18  Q    If we could, just take a look at 200H, please.

19  What's this document?

20  A    Again, this is the notice of rent that we normally

21  send to the tenants.

22  Q    So this is the notice that's, again, sent in

23  response to the application we just discussed?

24  A    That is correct.

25  Q    This is an accurate copy of a record kept by the

1  housing authority?

2  A    Yes, it is.

3            MS. ATIYEH:  I'd move Government's 200H into

4  evidence.

5            THE COURT:  The Court will admit it as a

6  document that was prepared and found in the records of

7  Fairfax County.

8  BY MS. ATIYEH:

9  Q    If we could, next go to Exhibit 200J, please.

10 Have you seen this document before?

11 A    Yes, I have.

12 Q    What's this?

13 A    The housing application.

14 Q    This is another copy of a record kept by the

15 housing authority?

16 A    Yes, it is.

17           MS. ATIYEH:  I'd move Government's 200J into

18 evidence.

19           MS. MINTER:  Your Honor, the same objection.

20 As I understand the government's purposes for moving it

21 in, I would submit at this point that it's cumulative.

22           THE COURT:  All right.  The Court is going to

23 admit it as a document that was found among the records

24 of Fairfax County.

25 BY MS. ATIYEH:

Cobbold-Bedeau - Direct by Ms. Atiyeh

1  Q    Again, if you could, just take a look at -- I

2  think it's page 9 here.  This is dated October 13,

3  2012?

4  A    That's correct.

5  Q    It's signed by Muna Jama?

6  A    Yes, it is.

7  Q    Again, under penalty of perjury?

8  A    Yes, it is.

9  Q    If you could, take a look at 200K, please.  What

10  is that?

11  A    This is the notice of rent that we sent out to

12  them.

13  Q    Again, that's what you send to the recipient in

14  response to the application filled out before?

15  A    Yes, it is.

16         MS. ATIYEH:  I'd move Government's 200K into

17  evidence.

18         THE COURT:  All right.  The Court will admit

19  it as a document prepared by Fairfax County.

20  BY MS. ATIYEH:

21  Q    If we could, go to 200N.  Are you familiar with

22  this document?

23  A    Yes, I am.

24  Q    What is this?

25  A    The housing application.

Cobbold-Bedeau - Direct by Ms. Atiyeh

1  Q    This is a copy of a record kept by the Fairfax

2  County Housing Authority?

3  A    Yes, it is.

4            MS. ATIYEH:  I'd move 200N into evidence.

5            MS. MINTER:  Same objection.

6            THE COURT:  The Court will admit it as a

7  document found among the records of Fairfax County.

8  BY MS. ATIYEH:

9  Q    If you could, just take a look at the first page

10 there under the head of household section.  There's a

11 head of household e-mail address.  Do you see that

12 there?

13 A    Yes, I do.

14 Q    Could you just read that off for me.

15 A    Makkah30@hotmail.com.

16 Q    If you go on to page 9, this document is dated

17 January 23, 2014?

18 A    That's correct.

19 Q    Again, it's signed by Muna Jama?

20 A    Yes, it is.

21 Q    Is that under penalty of perjury also?

22 A    Yes, it is.

23 Q    If we could, go to 200P.  Are you familiar with

24 this document?

25 A    Yes, I am.

Cobbold-Bedeau - Cross by Ms. Minter

1  Q     Is it another record kept by the housing

2  authority?

3  A     Yes, it is.

4         MS. ATIYEH:  I'd move Government's 200P into

5  evidence.

6         THE COURT:  Again, the Court will admit it as

7  a document that was prepared by Fairfax County and

8  found among its records.

9         MS. ATIYEH:  Thank you, Your Honor.

10         I have nothing further for this witness.

11         THE COURT:  All right.  Any

12  cross-examination?

13         MS. MINTER:  Briefly, Your Honor.

14                  CROSS-EXAMINATION

15  BY MS. MINTER:

16  Q     Ma'am, do you still have Government's

17  Exhibit 200C, as in cat, in front of you?  If not, I'll

18  impose upon Mr. Burns to return that to you.

19  A     Yes, I do.

20  Q     You indicated that this document would be filled

21  out by the applicants, correct?

22  A     Correct.

23  Q     You did not see or witness any applicant fill out

24  this document, correct?

25  A     That's correct.

1  Q    In fact, I believe, based on your testimony, this

2  document would predate your supervision of Ms. Jama's

3  case, correct?

4  A    Could you clarify that?

5  Q    You said you started handling her case in 2011.

6  Did I understand that correctly?

7  A    If I remember correctly.

8  Q    Okay.

9  A    But, actually, it's 2010 based on the application

10 that was earlier.

11 Q    Okay.  But as a general matter, this is something

12 that an individual completes beforehand and submits to

13 you, correct?

14 A    That's correct.

15 Q    Would that be true for each document that you've

16 reviewed today titled Housing Application, Fairfax

17 County Department of Housing and Community Development?

18 A    Yes.  All housing applications are completed by

19 the family before their appointment.

20 Q    If I could draw your attention to Government's

21 Exhibit 200D.  You indicated that this is a document

22 that your agency produces, correct?

23 A    That's correct.

24 Q    That's based on the information contained in the

25 application you receive?

1   A     That's correct.

2   Q     Correct.  Would that be true for each of the

3   government's exhibits captioned Notice of Rent?

4   A     That is correct.

5               MS. MINTER:  The Court's indulgence, Your

6   Honor.

7   BY MS. MINTER:

8   Q     None of the information contained in that document

9   would be based on your firsthand knowledge, correct?

10  A     No.

11  Q     Or anyone at your agency?

12  A     No.

13              MS. MINTER:  Nothing further, Your Honor.

14              THE COURT:  All right.  Mr. Yamamoto,

15  anything?

16              MR. YAMAMOTO:  No questions, Your Honor.

17              THE COURT:  All right.  Any redirect?

18              MS. ATIYEH:  No, Your Honor.

19              THE COURT:  All right.  May the witness be

20  excused?

21              MS. ATIYEH:  Yes, Your Honor.

22              THE COURT:  Ma'am, you're excused.  Please do

23  not discuss your testimony outside of the courtroom

24  with any other witness.  Thank you.

25          (The witness stands aside.)

1            THE COURT:  The government's next witness.

2            MR. GILLIS:  Your Honor, the government calls

3  Special Agent C.J. Goodman.

4            THE COURT:  All right.  Special Agent Goodman

5  will come forward, please.

6            Yes.

7            MS. MINTER:  Your Honor, if I may, I'm just

8  wondering whether now might be an appropriate time to

9  take up the evidentiary objections that we've lodged.

10  I don't believe, unlike perhaps the last witness, that

11  this witness is going to purport to have any firsthand

12  knowledge about these documents.  So I think maybe,

13  having heard Ms. Esse's testimony, the Court might be

14  in a position now, and that may avoid the necessity to

15  object throughout this witness' testimony.

16            THE COURT:  All right.  I'll hear you.

17            Agent Goodman, why don't you resume your seat

18  while we take this up.

19            THE WITNESS:  Yes, sir.

20            MS. MINTER:  Your Honor, with respect to all

21  of the calls and chats that have been conditionally

22  admitted throughout the course of the trial, we would

23  submit that none of those, except for those that we

24  specifically withheld an objection, are admissible.

25            The government indicated in their trial brief

1    that they were submitting these as evidence of

2    coconspirator statements and that that formed the basis

3    of their admissibility.

4         The federal rule which governs this,

5    801(d)(2)(E), states that it's a statement offered

6    against an opposing party that was made by the party's

7    coconspirator during and in furtherance of the

8    conspiracy.

9         The case law has fleshed out -- and I'm happy

10   to pass up to the Court.  The case law has fleshed out

11   a three-part standard, namely, that a conspiracy

12   existed; that the declarant and the defendant against

13   whom the statement is being offered participated in the

14   conspiracy, or, in short, were members of the

15   conspiracy; and that the statement was made in

16   furtherance of the conspiracy and during its pendency.

17        Here, Your Honor, the government struggles

18   with the second two components.  The first is that they

19   cannot prove that the declarant in many of these

20   circumstances was a member of the conspiracy.  To be

21   clear, Your Honor, we're not --

22        THE COURT:  We're talking about the

23   transcripts of the chat rooms?

24        MS. MINTER:  The calls and the chats, Your

25   Honor, exclusive of those that only involve Ms. Jama

1  and Ms. Dhirane.  Those, we would concede, are

2  admissible.

3          THE COURT:  Do you have exhibit numbers by

4  any chance?

5          MS. MINTER:  Your Honor, there is a

6  substantial number of them.

7          THE COURT:  I know there is.

8          MS. MINTER:  I would propose perhaps we could

9  submit something to the Court in writing.

10          THE COURT:  All right.  That would be

11  helpful.

12          MS. MINTER:  There will also be, I would

13  submit, varying levels of objections.  So I think the

14  clearest way might be for us to provide something to

15  the Court in writing.

16          THE COURT:  All right.

17          MS. MINTER:  Your Honor, the government is

18  unable to prove that the declarant -- and again,

19  exclusive of Ms. Jama or Ms. Dhirane to the extent that

20  they've laid a proper foundation, which I'll get to in

21  a moment -- was a member of the conspiracy.

22          As Ms. Esse testified, we don't know who

23  these people are.  Ms. Esse has never met them.  No

24  witness has ever met these individuals.  There's no

25  evidence of where they lived, their phone number, their

1    IP address, their e-mail address, a name that's

2    associated with an account.  In short, we have vague

3    usernames that purport to be live individuals involved

4    in this conspiracy.

5            The only basis for proving that they're a

6    member of the conspiracy is their statements.  In

7    short, there's no other evidence that shows that those

8    individuals are a member of the conspiracy.

9            THE COURT:  What about the seized documents?

10           MS. MINTER:  I believe the Court would be

11   referencing the notebooks --

12           THE COURT:  Yes.

13           MS. MINTER:  -- in essence.

14           Your Honor, we would submit --

15           THE COURT:  Doesn't that provide some

16   evidentiary proof separate and apart from the

17   conversations themselves?

18           MS. MINTER:  Your Honor, I would submit that

19   the notebooks fall into the same category as the

20   usernames.  They are these ubiquitous names that appear

21   to be floating around.

22           THE COURT:  I understand that.  That's a

23   different issue, though.  The question is was there a

24   conspiracy, and then what's the identity of the people

25   participating in the conspiracy?

1          MS. MINTER:  Correct, Your Honor.  It is the

2   latter that, I think, the government suffers the

3   greater evidentiary problem.

4          THE COURT:  All right.

5          MS. MINTER:  But I would submit that the

6   anonymous written name gives no further clue as to the

7   identity of the individual.

8          In the average case, Your Honor, you would

9   have a circumstance -- take, for example, a drug

10  conspiracy where a witness could come into court and

11  say, Yes, I observed that person, and I observed that

12  person engage in these activities that, therefore,

13  prove that that person was a member of the conspiracy.

14  They asked someone to sell drugs, they themselves sold

15  drugs, or they purchased drugs, concrete activities

16  that can be tied to that person to indicate that they

17  were a member of a conspiracy.

18          Conceding without agreeing, Your Honor, that

19  a conspiracy existed, but we're focused on points two

20  and three.  The government is required to show that

21  these people were a member of the conspiracy, and being

22  unable to identify who they even are, they are unable

23  to prove that that person participated in the

24  conspiracy.

25          For example, with no ability to associate

1  these names with any person, we don't know that each

2  time a particular username appeared that the same

3  individual was behind it.  We don't have any way of

4  knowing that multiple people couldn't be accessing the

5  same account using the same username.  We don't know

6  other than the statements, the hearsay statements that

7  were put forth through Ms. Esse where those people

8  purported to live or who they purported to be.

9          The only basis for proving that they're a

10 member of the conspiracy is their statements which,

11 standing alone, is insufficient.

12         THE COURT:  Well, proving their identity is

13 their statements, right?  That's what your position is,

14 is that when someone online named Umu Luqmaan

15 self-identifies as Ms. Jama, without knowing anything

16 more than that, that's an insufficient evidentiary

17 basis upon which a fact finder could conclude that Umu

18 Luqmaan is the defendant.

19         MS. MINTER:  That is certainly part of it,

20 Your Honor.  That is absolutely correct.

21         The second prong of that second factor, if

22 you will, is that they are unable to prove that a

23 person is a member of a conspiracy based solely on

24 their statements.  So, in other words, there needs to

25 be something above and beyond what they have said to

 1  show that they're a participant.  I believe the

 2  government cited precisely this case law in their trial

 3  brief.

 4          In short --

 5          THE COURT:  Well, you do have the testimony

 6  of the interpreter who, based on his hundreds of hours

 7  of review, testified that the voices were recognizable

 8  as consistently associated with the same identifier.

 9          MS. MINTER:  Correct, Your Honor, but even --

10  for the sake of argument, even agreeing perhaps that we

11  could somehow identify a particular --

12          THE COURT:  That doesn't address your

13  objection that there's no linkage between Umu Luqmaan

14  and Jama other than testimony that that person

15  self-identified as such.

16          MS. MINTER:  Precisely, Your Honor.  Because

17  of that, it's impossible for the Court to have the

18  necessary subsequent evidence of other acts involved in

19  the conspiracy.

20          In other words, what the government needs

21  here is a witness that would take the stand and say on

22  this date, I observed Fardowsa go to a hawala and

23  collect a certain amount of money or I observed this

24  other action.  Those are the additional -- and that's

25  not to say that the Court can't consider the

1    statements.  The Court can.  But the statements

2    standing alone are insufficient to prove that the

3    individual was a member of a conspiracy.

4              That's why I say two prongs of the second

5    element, Your Honor, because the two go together.

6    Because there's no way to identify who these people

7    are.  There's no way to prove or provide to the Court

8    additional evidence that they were involved in the

9    conspiracy.

10             The final point I would make, Your Honor --

11   and this is what I mean when I say that they're sort of

12   layered objections -- is that there are a considerable

13   number of statements that have been admitted through

14   the calls and the chats that are not in furtherance of

15   the conspiracy.  That's the third element that's

16   required, that they be in furtherance of the

17   conspiracy.

18             Simply making statements about support for

19   what is perhaps a designated terrorist organization is

20   not necessarily in furtherance of the conspiracy.  So

21   in order to be admissible, that last prong has to be

22   met.  I would submit that arguably there are some that

23   fail at that prong and some that do not, and that's why

24   I would --

25             THE COURT:  It may go to knowledge and

1   intent.

2          MS. MINTER:  Your Honor, if they can prove

3   the individuals making those statements.

4          THE COURT:  I understand.

5          MS. MINTER:  If that element, again, can be

6   tied to the particular defendants in this case, which,

7   I would say, leads me to my next point, which is the

8   issue of usernames and electronic authorship.  I think

9   probably the easiest thing, Your Honor, is simply to

10  pass up the case law because I think the cases put it

11  most concisely.  But I would draw the Court's attention

12  to the *Vayner* case and to the *Shah* case.

13         In short, the *Shah* case tells us that the

14  courts demand a more stringent standard -- or

15  showing -- pardon me -- than would be required in the

16  face of ordinary evidence when it comes to these type

17  of electronic communications.  And the Court cites

18  cases saying that, in other words, there needs to be

19  something above and beyond just that particular

20  individual.

21         I think the *Vayner* case gives the best

22  example that we can look to.  That was an issue about a

23  profile on a Facebook page, Your Honor.  What the Court

24  said is that there was no evidence that that

25  individual -- to be clear, that witness had created

1   that page in that he was responsible for its contents.

2   The Court analogized it to finding a flyer on the

3   street that purportedly contained information about

4   that individual.  It's at page 132 of the opinion, Your

5   Honor, which in our printout is the bottom right-hand

6   page of page 6.

7              THE COURT:  All right.

8              MS. MINTER:  Your Honor, the Court analogizes

9   it to if this information were literally floating

10  around in the world as opposed to figuratively floating

11  around on the Internet, that something further would be

12  required to show that the witness that it was

13  associated with had created that particular piece of

14  paper.

15             Likewise, they hold the same standard to

16  creating a profile.  I would analogize an e-mail

17  address, anything along those lines.  As Ms. Esse

18  stated, it could be developed by anyone is required.

19             Accordingly, Your Honor, I would submit that

20  the government has failed to make all of those

21  necessary linkages in this case.  Accordingly, we would

22  ask the Court to exclude those particular documents.

23             THE COURT:  All right.  This argument,

24  really, is part and parcel of your Rule 29 motion;

25  isn't it?

1          MS. MINTER:  Your Honor, the --

2          THE COURT:  Because you're asking for

3    evidence to be excluded on these evidentiary bases, and

4    without the evidence, then there's insufficient

5    evidence as a matter of law to establish the elements

6    of the crime.

7          MS. MINTER:  I certainly think that is the

8    logical conclusion, Your Honor, as a result.  But I

9    would submit that these are individual evidentiary

10   judgments that the Court has to make about what

11   evidence will come in.  So I think they are properly

12   made as evidentiary objections, and we would submit

13   that each of the documents that --

14         THE COURT:  There are two issues.  I've let

15   these documents in for what they are, which are the

16   transcriptions of the calls.  The issue is whether they

17   provide a sufficient evidentiary basis for the

18   substantive elements of the claim.

19         MS. MINTER:  That is certainly true, Your

20   Honor, but I would submit that in addition, the

21   question is to what evidentiary use can the Court take

22   them?  In other words, are they admissible for what

23   they purport to say, that these things were, in fact,

24   said, that the things that were said were, in fact,

25   true versus simply the issue of admissibility?

 1          But I think that the Court has to make a

 2   preliminary judgment about what use can be made of this

 3   particular evidence prior to a Rule 29 motion so that

 4   it's clear what the evidence is.

 5          THE COURT:  I understand.  I'm not sure the

 6   Court can do that separate and apart from the Rule 29

 7   consideration.  I'll hear from Mr. Gillis, but I don't

 8   think I'm in a position right now to definitively rule

 9   on these.  I'll likely take it up within the context of

10   Rule 29 at the conclusion of all the evidence.

11          MS. MINTER:  To that extent, then, Your

12   Honor, we would certainly ask to reserve our objections

13   until the Rule 29.

14          THE COURT:  I understand.

15          Mr. Gillis.

16          MR. GILLIS:  Your Honor, in order to

17   establish the admissibility of this evidence, as

18   Ms. Minter has pointed out and as we said in our trial

19   brief, the three parts that need to be proven in order

20   to admit the alleged coconspirator statements are we

21   must show by a preponderance of independent evidence,

22   one, that a conspiracy existed.  Well, you've heard

23   from Ms. Esse, who testified that she pleaded guilty to

24   conspiring with the defendants.

25          THE COURT:  As I understand Ms. Minter's

1   argument, assuming the evidence is sufficient to

2   establish a conspiracy, the question is who were the

3   members of the conspiracy?

4           MR. GILLIS:  Well, Your Honor, first of

5   all --

6           THE COURT:  Other than the names that are

7   referenced in these documents, what real live person,

8   in fact, do those names hook up with?

9           MR. GILLIS:  Well, first, each and every one

10  of the transcripts and the calls from which they were

11  based, each and every one of them came either from the

12  defendants -- either from Defendant Jama's residence or

13  facilities or from Defendant Dhirane's.

14          THE COURT:  I'm sorry.  Say that again.

15          MR. GILLIS:  So all of the calls and chats

16  that we plan to introduce, Your Honor, were obtained

17  through court-authorized surveillance on a facility

18  that is demonstrably --

19          THE COURT:  Linked to that physical location.

20          MR. GILLIS:  I beg your pardon?

21          THE COURT:  Linked to that physical location

22  where these defendants resided.

23          MR. GILLIS:  Exactly, Your Honor.

24          You've heard testimony that Ms. Esse spoke

25  directly with someone who identified themselves as Muna

1   Osman Jama, and you'll hear additional testimony that

2   the facilities, the other facilities, will come back to

3   Jama's residence.  For example, the Umu Luqmaan Paltalk

4   moniker does come back to residences of Ms. Jama.  The

5   same is true for the Nicmatu Rabbi.

6           So we will prove -- there's no doubt, Your

7   Honor, that one of these -- that in the case of the

8   overhears from Ms. Jama's residence, we've already

9   established, Your Honor, that Ms. Jama was the only

10  adult female in that house.  Clearly, the calls were of

11  an adult female.

12          With respect to Ms. Dhirane, as I said, we

13  will do the same.  We will prove that that was taken

14  from facilities that are definitively connected to her,

15  and she similarly was the only adult female at that

16  residence.  So there's an abundantly strong inference

17  that it is she that's talking on these overhears.

18          With respect to who the other person is, we

19  also expect to prove, in large part, who these folks

20  were, at least that they are the same person because of

21  various identifiers that come up for these various

22  individuals for each of the court-authorized

23  surveillance.  So in other words, when the chat is

24  captured, there is a unique number that's applied to it

25  that's based upon the location of the other person that

1  is the opposite to one of the defendants.

2            THE COURT:  All right.

3            MR. GILLIS:  That number is consistent --

4            THE COURT:  Is this what Agent Goodman is

5  going to get into?

6            MR. GILLIS:  Yes, sir.

7            THE COURT:  All right.

8            MR. GILLIS:  I do want to point out that the

9  cases that -- I haven't had a chance to study them,

10 Your Honor, but both of them, the *Vayner* and the *Shah*

11 case, deal with the question of authenticity, not the

12 reliability in general of electronic communications.

13 Obviously, in this day and age, that would be an absurd

14 conclusion to reach.

15           But, for example, in the case that -- part of

16 the language that Ms. Minter was -- I beg your pardon,

17 Your Honor.  Here we go.  So I'm sorry.

18           So on the *Shah* case, for example, at the

19 Headnote 11, it says that it's incumbent upon the

20 government to introduce evidence connecting the

21 defendant to the statements in order to establish their

22 relevance.  Well, that we've done.

23           But with respect to this case that she's

24 cited, it has only to do with the authenticity of it.

25 That's precisely what they stipulated to with respect

 1  to all of the calls and all of the chats and the

 2  accuracy of the transcripts saving the identity of the

 3  speaker.  We submit that we've proven that and will

 4  prove that abundantly to be the case.

 5          THE COURT:  All right.

 6          MR. GILLIS:  Do you want to hear more, Your

 7  Honor?

 8          THE COURT:  I don't need to right now.  As

 9  I've indicated, I'm going to continue to reserve on all

10  the 801(d)(2)(E) hearsay objections until I hear all

11  the evidence.  All right.

12          MR. GILLIS:  Thank you, Your Honor.

13          MS. MINTER:  Yes, Your Honor.

14          THE COURT:  All right.  Agent Goodman.

15          MR. GILLIS:  Yes.

16          THE COURT:  Have you been sworn?

17          THE WITNESS:  Yes, sir.

18          THE COURT:  All right.  Thank you.

19       C.J. GOODMAN, PLAINTIFF'S WITNESS, AFFIRMED

20                 DIRECT EXAMINATION

21  BY MR. GILLIS:

22  Q    Agent Goodman, would you, please, tell us your

23  full name.

24  A    C.J. Goodman, G-O-O-D-M-A-N.

25  Q    Where do you work?

Goodman - Direct by Mr. Gillis

1   A     Federal Bureau of Investigation.

2   Q     How long have you worked there?

3   A     Eight years.

4   Q     What kind of cases do you investigate?

5   A     Terrorism-related cases.

6   Q     Are you one of the agents assigned to the

7   investigation that led to this prosecution?

8   A     Yes, sir.

9   Q     Were you present at Defendant Dhirane's arrest?

10  A     Yes, sir.

11  Q     Did you also interview the defendant at that time?

12  A     Yes, sir.

13  Q     About how long did you talk with her?

14  A     Just during the interview.

15  Q     Well, about how long in total have you talked to

16  her?

17  A     It was probably a little over six hours.

18  Q     Have you listened to the various calls that were

19  captured through court-authorized surveillance of

20  Defendant Dhirane's residence?

21  A     Yes, sir.

22  Q     Based upon your discussion with her during the

23  interview after her arrest, were you able to recognize

24  the defendant's voice on any of those calls?

25  A     Yes, sir.

1  Q    Did you read the transcripts of those calls in

2  which the defendant was a participant?

3  A    Yes, sir.

4  Q    I'm speaking of Defendant Dhirane throughout this,

5  okay?

6  A    Yes, sir.

7  Q    Were you able to determine from your review of the

8  transcripts and the recordings of these calls whether

9  the transcripts were accurate in identifying when the

10 defendant was a participant in --

11            THE COURT:  Hold on one moment.

12            Yes.

13            THE INTERPRETER:  Mr. Gillis, could you slow

14 down a little bit.

15            MR. GILLIS:  I will, yes.

16            THE INTERPRETER:  Thank you, sir.

17 BY MR. GILLIS:

18 Q    Did you find any instances where you heard the

19 defendant's voice on a recording where on the

20 transcript the speaker was misidentified?

21 A    No, sir.

22 Q    Did you find any instances when the defendant was

23 identified in a transcript and you found it to be

24 inaccurate based upon your review?

25            MR. YAMAMOTO:  Your Honor, we went through

1  this with the interpreter.

2          THE COURT:  Yes.  Why is this testimony

3  needed for the transcripts that we have in evidence?

4  Are you trying to introduce additional transcripts?

5          MR. GILLIS:  No.  Well, I'm going to be

6  introducing transcripts, yes, Your Honor, but they have

7  not stipulated to the identity of the defendant.  They

8  pointed out at length that the interpreter had not

9  spoken directly with either of these folks.

10          THE COURT:  So this is corroborative of the

11  interpreter, this testimony?

12          MR. GILLIS:  Well, no, Your Honor.  Actually,

13  it's direct evidence because he --

14          THE COURT:  All right.  I'll let you do it.

15          MR. GILLIS:  Thank you.

16  BY MR. GILLIS:

17  Q    Did you find any instances when the defendant was

18  identified as being a speaker in a transcript and you

19  found that to be inaccurate based on your review of the

20  recording?

21  A    No, sir, I did not.

22          MR. YAMAMOTO:  Your Honor, I'm not sure he's

23  identified that he knows the defendant's voice and that

24  was her voice on these conversations.  All we're

25  talking about are the transcripts.

Goodman - Direct by Mr. Gillis

1        THE COURT:  The objection is overruled.  I

2  understand his testimony.

3        These relate to the transcripts of the

4  telephone calls; is that correct?

5        MR. GILLIS:  That is correct, Your Honor.

6        THE COURT:  The telephone calls that were

7  intercepted?

8        MR. YAMAMOTO:  The translations of telephone

9  calls.  The telephone calls were in Somalia.

10        THE COURT:  I understand, but that's what

11  we're talking about here.  We're talking about the

12  transcripts of the telephone calls that were

13  intercepted by court authorization, correct?

14        MR. GILLIS:  Yes.

15        THE COURT:  All right.

16  BY MR. GILLIS:

17  Q    Just to clarify that point, Agent Goodman.  So you

18  listened to the actual recording of the call that was

19  captured by the court-authorized surveillance?

20  A    Correct.  I listened to it as it was being

21  captured during the time that we were collecting and

22  also after the fact.

23  Q    Okay.  So you were able to hear a voice of the

24  defendant on those recordings?

25  A    Yes, sir.

Goodman - Direct by Mr. Gillis

1   Q     Were you able to make the comparison between when

2   she was speaking and when she was identified in the

3   transcript?

4   A     Yes, sir.

5              THE COURT:  All right.  I understand his

6   testimony.

7              MR. GILLIS:  Thank you, Your Honor.

8   BY MR. GILLIS:

9   Q     Would you please look at Government Exhibit 193,

10  please.  Oh, I beg your pardon.  Do you have that in

11  front of you?

12  A     Yes, sir, I do.

13  Q     What is that, please?

14  A     This is a summary of the exhibits used to

15  illustrate the defendant's use of certain facilities.

16  These are the government exhibits that were utilized to

17  identify the user of a particular facility.

18  Q     What is a facility in this context?

19  A     In this context, we're talking phone numbers, chat

20  room monikers, e-mail addresses, IP addresses,

21  broadband accounts.

22  Q     So what does the first column show there?

23  A     It identifies the facility, one of those

24  categories I was just talking about.

25  Q     Okay.  What does the third column show?

Goodman - Direct by Mr. Gillis

1   A     It's the type of facility, cell phone, Internet

2   account, e-mail.

3   Q     The fourth column, what does that show?

4   A     These are some of the exhibits that were used to

5   identify the user of that facility.

6   Q     In the fourth column, what do those GEX numbers

7   the government exhibit numbers, refer to?

8   A     These are actual government exhibits.  Sorry.  I

9   don't understand.

10  Q     Okay.  How do they -- like, for example, in the

11  first one, you've got three government exhibits

12  mentioned there.  How do those relate to the facility

13  or establishing the facility?

14  A     These are the basis documents for establishing the

15  user.  In this case, the first one is subscriber

16  records from the provider, chat transcripts.

17  Q     And the collection of those in that that are

18  identified in that row taken together establish that

19  facility?

20  A     That's correct, yes, sir.

21  Q     Okay.  So what, then, does the second column show?

22  A     The user that was identified of that facility.

23  Q     So, for example, let's look down at the Nicmatu

24  Rabbi name there, the sixth one down on Government's

25  Exhibit 193.

Goodman - Direct by Mr. Gillis

1   A     Yes, sir.

2   Q     Can you walk us through how you -- well, let's say

3   this.  So in that instance, you've got subscriber

4   records in the fourth column.  You've got Government's

5   Exhibit 214A and subscriber records.

6   A     Yes, sir.

7   Q     What does that refer to?

8   A     I believe that one is going to be the -- Nicmatu

9   Rabbi was a Paltalk moniker.  So that's going to be the

10  subscriber records from Paltalk.

11  Q     Okay.  If you would, take a look at Government's

12  Exhibit 214A.  Do you have that in front of you?

13  A     I do, yes, sir.

14  Q     What is Government's 214A?

15  A     So this is the subscriber records from Paltalk for

16  Nicmatu Rabbi.

17  Q     Okay.  What does it tell us of relevance there?

18  A     So it identifies the search terms, the search

19  parameter that Paltalk used which was Nicmatu Rabbi

20  with the user ID of 6898 -- sorry -- 0851.

21  Q     All right.  And --

22  A     The second -- sorry.

23  Q     Go ahead.

24  A     The second paragraph there identifies the user ID

25  number.  That's 6898.  It identifies the e-mail address

Goodman - Direct by Mr. Gillis

1    that was used to create that moniker; the moniker

2    itself, Nicmatu Rabbi.  It identifies the IP address

3    that that moniker was created -- the IP address of it

4    during the creation of that moniker.

5    Q    Okay.

6    A    Two lines down, it identifies the creation date.

7    In this case, February 9, 2010, and then any other

8    user-provided information.  In this case, no birth date

9    was provided, no first name.  Last name was provided.

10   Q    What does the registered accounts refer to?

11   A    So these are going to be associated accounts.

12              THE COURT:  Which page are we on?

13              THE WITNESS:  Yes, sir, the first page,

14   12783.

15              THE COURT:  Right.  I see.  All right.

16              THE WITNESS:  Sorry.  Your Honor, he was

17   referring to -- this would be the fourth paragraph

18   where it says six registered accounts.

19   BY MR. GILLIS:

20   Q    All right.  What does that tell us?

21   A    This tells the accounts that are associated with

22   Nicmatu Rabbi.  In this case, you notice that the IP

23   address for the related accounts are all the same as

24   the IP address used to create Nicmatu Rabbi.

25   Q    If you could, just tell us:  What does that

Goodman - Direct by Mr. Gillis

1  signify?

2  A    They were created from the same location.

3  Q    So the first one there is an e-mail address of

4  hindadhirane@yahoo.com?

5  A    Yes, sir.

6  Q    That then was created using the same IP address as

7  the Paltalk moniker Nicmatu Rabbi?

8  A    If I could clarify, sir, that

9  hindadhirane@yahoo.com was the e-mail address used to

10  create Paltalk moniker 1434H at that same IP address,

11  174.

12  Q    Oh, I see.  So the Paltalk moniker for that

13  particular account was actually 1434H?

14  A    Correct.

15  Q    Then for each of the following registered

16  accounts, the Paltalk moniker would be Dacwah_3,

17  Haboon, Nicmatu Rabbi, and Talmiidah?

18  A    Correct.  That's all the user-provided

19  information.

20         THE INTERPRETER:  Your Honor, the interpreter

21  did not get the last username.

22         MR. GILLIS:  Talmiidah.

23         THE INTERPRETER:  Talmiidah.

24         MR. GILLIS:  T-A-L-M-I-I-D-A-H.

25  BY MR. GILLIS:

Goodman - Direct by Mr. Gillis

1  Q     The rest of this document gives what kind of

2  information just generally?

3  A     So it provides the friends for this account,

4  Nicmatu Rabbi.

5  Q     Okay.

6  A     It also provides the IP logs for the IP address of

7  when that account connected to the Internet.

8  Q     I'm sorry.  When which account connected?

9  A     So in this case, this was solely referring to

10 Nicmatu Rabbi.

11 Q     Uh-huh.

12 A     So back thirty-some-odd pages are all the IP logs,

13 which is the date, time --

14 Q     Let me stop you there for a second.

15 A     Yes, sir.

16 Q     So if we look at page 12784, at the top it says

17 Buddies for UID -- which I take it is user ID.

18 A     Yes, sir.

19 Q     -- 68980851.

20 A     Correct.  Yes, sir.

21 Q     Okay.  So that's the Nicmatu Rabbi Paltalk account

22 that we're talking about?

23 A     Correct, yes, sir.

24 Q     Not one of the registered accounts?

25 A     No, sir.

Goodman - Direct by Mr. Gillis

1  Q    All right.  So this is the buddy list for the

2  Nicmatu moniker Paltalk account?

3  A    Yes, sir.

4  Q    All right.  And so, for example, we'll see there

5  Barira.  Is that one of the buddies indicated there?

6  A    That's the second one, it looks like, yes, sir.

7  Q    Then Umu Ibrahim?

8  A    Yes, sir, that's the fourth one down it looks

9  like.

10 Q    Thabaat, for example?

11 A    Yes.  That's the eighth one down right under Abu

12 Kawsar.

13 Q    Below that is Umu Luqmaan?

14 A    Yes, sir, ninth one down.

15        MS. MINTER:  Your Honor, I think, for the

16 record to be clear, that the information needs to be

17 read in as it's displayed on the document.  I mean,

18 some of these, for example, have additional letters or

19 numbers.  I think the record needs to be clear if the

20 witness is going to testify.  I would submit that if

21 it's coming into evidence, it's not necessary for him

22 to testify at all.  But to the extent it does, I think

23 it should reflect the same.

24        MR. GILLIS:  Your Honor, I'd offer then

25 Government's Exhibit 214A.

Goodman - Direct by Mr. Gillis

1          THE COURT:  I'm still unclear what 214A is.

2   It's the facility that's referenced in Exhibit 193 for

3   Nicmatu Rabbi, correct?

4          MR. GILLIS:  Yes.

5          THE COURT:  So this is what?  The e-mail

6   accounts that were used or the IP addresses that were

7   used?

8          MR. GILLIS:  This document tells us, Your

9   Honor, on the first page -- I believe the agent has

10  testified it tells us what is the user ID for Nicmatu

11  Rabbi.  So, then, for example, on one of the --

12         THE COURT:  So this was opened up under the

13  name of Nicmatu Rabbi?

14         MR. GILLIS:  It was opened up using the

15  e-mail address hinda_7@msn.com.

16         THE COURT:  Right.

17         MR. GILLIS:  And then --

18         THE COURT:  With Paltalk?

19         MR. GILLIS:  It was opened with Paltalk using

20  that e-mail address, yes.

21         THE COURT:  All right.

22         MR. GILLIS:  Then below that, it shows the IP

23  address that the person who created the Paltalk account

24  was operating from.

25         THE COURT:  All right.  Does it show the date

Goodman - Direct by Mr. Gillis

1 on which this account was opened?

2          MR. GILLIS:  Can you answer that?

3          THE WITNESS:  Yes, sir, it can.

4          THE COURT:  Yes.

5          THE WITNESS:  If I could just --

6          THE COURT:  Yes.

7          THE WITNESS:  Much like Facebook, which we're

8 all familiar with, we just went to Paltalk and asked

9 for their subscriber information on who registered an

10 account.  So Paltalk -- you register an account online

11 with an e-mail address and a date.  You provide them

12 your username.  Paltalk then assigns a user ID number.

13 It's what they associate with the account information

14 that you provide.

15          THE COURT:  Right.

16          THE WITNESS:  So the first paragraph in this

17 is solely the search parameters.  It's just how Paltalk

18 searched within their computer.

19          THE COURT:  All right.

20          THE WITNESS:  The second paragraph is that

21 user ID assigned by Paltalk, and then the following --

22          THE COURT:  The user ID being --

23          THE WITNESS:  Sorry.

24          THE COURT:  -- Nicmatu Rabbi?

25          THE WITNESS:  No, sir.  That would be the

Goodman - Direct by Mr. Gillis

1  username.

2         THE COURT:  All right.

3         THE WITNESS:  The user ID is an

4  identification number used by Paltalk to identify --

5         THE COURT:  That's the 6898 number?

6         THE WITNESS:  Yes, sir.  So Paltalk is

7  assigned that ID number with the user-provided name.

8  So they wanted their name in this case to be Nicmatu

9  Rabbi.

10         THE COURT:  All right.

11         THE WITNESS:  This individual registered --

12  typed in my name to be Nicmatu Rabbi using the e-mail

13  address hinda_7@msn.com.  Paltalk then captures the IP

14  address in which that person connected to register, and

15  then the date they registered, which is going to be the

16  fourth line --

17         THE COURT:  I see.

18         THE WITNESS:  -- that says created 2010,

19  February 9.

20         THE COURT:  The IP address is the IP address

21  of the computer that was used to open up the account;

22  is that right?

23         THE WITNESS:  Not exactly, sir.  It's the IP

24  address assigned by the Internet service provider for a

25  location.

Goodman - Direct by Mr. Gillis

1          THE COURT:  Right.  Okay.  I understand.

2          THE WITNESS:  Yes, sir.

3          THE COURT:  Not a specific terminal but a

4   location?

5          THE WITNESS:  Not in this case.  So Comcast,

6   for example, as an Internet service provider, will

7   assign a residence an IP address for Internet traffic

8   going in and out of that residence, not necessarily a

9   computer.

10         THE COURT:  Not a particular computer but an

11  address?

12         THE WITNESS:  Correct.  Yes, sir.

13         THE COURT:  All right.

14         THE WITNESS:  Sorry.  That was very simply

15  put.

16         THE COURT:  All right.

17  BY MR. GILLIS:

18  Q    So the Paltalk user ID number that it assigns, is

19  that unique to the username in this case, Nicmatu

20  Rabbi?

21  A    It is, yes, sir.

22         MR. GILLIS:  Your Honor, I'd offer

23  Government's Exhibit 214A.

24         THE COURT:  Are there objections?

25         MS. MINTER:  No objection, Your Honor.

1        THE COURT:  All right.  Without objection,

2   Government Exhibit 214A is admitted.

3        This information was obtained from Paltalk;

4   is that right?

5        THE WITNESS:  Yes, sir, it was.

6        THE COURT:  Where is that located, Paltalk?

7        THE WITNESS:  I'm sorry.  I don't recall.

8   Here in the U.S.

9        THE COURT:  All right.

10  BY MR. GILLIS:

11  Q    Is this an example of one of the pieces of

12  information that you used to establish the user of that

13  facility?

14  A    It is, yes, sir.

15  Q    As we see there, it's a quite voluminous number of

16  documents; is that true?  Would you agree with that?

17  A    Yes, sir.

18  Q    So then if we return to Exhibit 193 --

19       THE COURT:  Before you get to that, the six

20  registered accounts means what?  These are all --

21       THE WITNESS:  They're associated with Nicmatu

22  Rabbi.  It could be Paltalk distinguishes this.

23  Sometimes you can use the same e-mail address to create

24  different accounts.  If you are logging in from the

25  same IP address, you are also going to be -- Paltalk

Goodman - Direct by Mr. Gillis

1  identifies you creating from the same location.  So it

2  identifies those addresses as being the same.

3           THE COURT:  I see.  So in these registered

4  accounts, just a quick glance, it shows that they were

5  all open from the same IP address; is that correct?

6           THE WITNESS:  Correct.  Yes, sir, and then

7  one of them -- yes, sir.  Correct.

8           THE COURT:  When they were opened, they were

9  opened using a different e-mail address than what was

10 originally used to open the account?

11          THE WITNESS:  That is correct, sir.

12          THE COURT:  All right.  Thank you.

13          They were assigned different or the same user

14 ID number?

15          THE WITNESS:  No, sir.  So the user ID is

16 always going to be specific to a name.

17          THE COURT:  I'm sorry.  I didn't mean to

18 interrupt you.

19          So the user ID here is -- for example, the

20 first account is the 843?

21          THE WITNESS:  Yes, sir.

22          THE COURT:  That's an ID username specific to

23 that e-mail address?

24          THE WITNESS:  No, sir, specific to -- it

25 doesn't look like a name, but it's 1434H.  That's the

Goodman - Direct by Mr. Gillis

1  name.

2          THE COURT:  I see.

3          THE WITNESS:  So that user ID is going to be

4  unique and only be used with 1434H.

5          THE COURT:  All right.  What's the 689 user

6  ID?

7          THE WITNESS:  So that's Nicmatu --

8          THE COURT:  Nicmatu Rabbi?

9          THE WITNESS:  That is correct, sir.

10         THE COURT:  I see.  Okay.  Sometimes it's a

11 number; sometimes it's something other than a number?

12         THE WITNESS:  No, sir.  Sorry.  With Paltalk,

13 you're always going to have a user ID and a username.

14 The username is user provided.  So I want my name to be

15 C.J. Goodman.  I can have it whatever I -- it's how I

16 put it in.  Because I can put anything in there,

17 Paltalk is going to assign a user ID number that's

18 always associated with C.J. Goodman.  So one is the ID

19 number assigned by Paltalk.  One is the user name, but

20 they're the same.

21         THE COURT:  But the usernames on the

22 associated accounts is the 1434H, Dacwah_3, Haboon-,

23 and so on?

24         THE WITNESS:  Yes, sir, that is correct, sir.

25         THE COURT:  All right.

1  BY MR. GILLIS:

2  Q    So in other words, Agent, that username of 1434H

3  is simply the username that the user selected for

4  themselves?

5  A    Correct.

6  Q    Now, if you turn back to Government's Exhibit 193,

7  in that same column pertaining to Nicmatu Rabbi --

8            THE CLERK:  Mr. Gillis, can you turn the

9  microphone towards you?

10           MR. GILLIS:  I've been trying to do that.

11  May I have just a moment, Your Honor?

12           THE COURT:  Yes.

13           MR. GILLIS:  I think, like me, it has a screw

14  loose.

15           THE COURT:  There you go.  You probably have

16  to tighten it from the bottom.

17           MR. GILLIS:  That's what I was trying to do.

18           THE INTERPRETER:  You can hold that.

19           MR. GILLIS:  I'm already having trouble

20  enough with the document.  Let me see if I put it over

21  here, Your Honor, and loop this around, maybe it will

22  stay more in my direction.

23           THE COURT:  We'll try to deal with that this

24  evening.

25           MR. GILLIS:  How is that?

1           THE COURT:  All right.

2           THE CLERK:  That's it.

3  BY MR. GILLIS:

4  Q    Then in that same line, you have Government's

5  Exhibit 102, transcript?

6  A    Yes, sir.

7  Q    What does that refer to?

8  A    So it's going to be one of the court-authorized

9  electronic surveillance captures -- sorry -- and a

10 transcript of that call or chat.

11 Q    All right.  Would you take a look at Government's

12 Exhibit 102, and in particular page 19.

13      Do you have that in front of you now?

14 A    I do, yes, sir.

15 Q    How does this help us to identify that username of

16 Nicmatu Rabbi?

17 A    Here the speaker, in this case Ms. Dhirane,

18 states, I used to log in under the name Nicmatu Rabbi.

19      I would point out, again, the C is not a sound.

20           THE COURT:  Where do you see that?

21           THE WITNESS:  Fifth line down, sir.

22           THE COURT:  Of 102?

23           THE WITNESS:  Of Exhibit 102, sir, page 19,

24 which is US-02193.

25           THE COURT:  All right.

Goodman - Direct by Mr. Gillis

1          MR. GILLIS:  Your Honor, do you have a bench

2   set of the exhibits?

3          THE COURT:  I do.  I see it.

4          MR. GILLIS:  Okay.

5   BY MR. GILLIS:

6   Q    Is that an example of one of the pieces of

7   information that you would use to establish the user of

8   that facility?

9   A    It is one of the pieces.  Again, it's

10  multipronged.  So we use -- this is just one of the

11  steps that we use to identify.

12  Q    Right.  Just to be clear, the steps that you used

13  to identify what we're talking about now with respect

14  to that particular username, right?

15  A    Correct.  Yes, sir.

16  Q    Okay.  So in, for example, 193, you've listed

17  three government exhibits?

18  A    The only thing I would point out is --

19  Q    Could you answer that question?

20  A    Yes, sir, I did.  Yes, sir.

21  Q    Taken together, those three government exhibits

22  establish the identity of Nicmatu Rabbi as being

23  Ms. Dhirane, the defendant?

24  A    They are used to identify her, yes.

25          THE COURT:  And 102 is the transcript of an

1  intercepted Paltalk communication?

2          THE WITNESS:  Correct, sir -- no, sir.  102

3  is an intercept of an audio conversation.

4          THE COURT:  An audio conversation.

5          THE WITNESS:  That's what I was going to

6  point out.  The telephone number is another facility on

7  this chart.  So it's multisteps to identify the user,

8  to include the self-identification here that you are

9  referencing.

10 BY MR. GILLIS:

11 Q    Then you have there the postarrest interview.  Did

12 you conduct that interview?

13 A    I did, yes, sir.

14         MR. GILLIS:  Your Honor, I'll go into the

15 voluntariness and whatnot for the statement, but for

16 the time being, may I ask him to tell us what she told

17 him about that?

18         THE COURT:  Yes.

19 BY MR. GILLIS:

20 Q    So what did she tell you during the postarrest

21 interview?

22 A    She stated with regards to this, that she was a

23 user of Nicmatu Rabbi, of the Paltalk user name.

24 Q    Okay.  Would you take a look at Government's

25 Exhibit 30, please.  So what is Government's

Goodman - Direct by Mr. Gillis

1  Exhibit 30?

2  A    So this is a transcript of an audio conversation

3  between Muna Osman Jama and Amina Esse on March 1,

4  2012.

5           THE COURT:  When you say audio conversation,

6  are you talking about a telephone conversation?

7           THE WITNESS:  Yes, sir.  The only reason I

8  distinguish, sir --

9           THE COURT:  It could be voiceover?

10          THE WITNESS:  Yes, sir.  I can just state

11  telephone if that's --

12          THE COURT:  All right.

13  BY MR. GILLIS:

14  Q    The first page of Government's Exhibit 30 shows

15  under the source file information an alphanumeric in

16  what appears to be a telephone number underneath that.

17  Do you see that?

18  A    Correct, under the date, yes, sir.

19  Q    All right.  How do you associate that number with

20  this particular call?

21  A    The target facility is captured at the time of

22  court-authorized electronic surveillance.

23  Q    Can you just explain that maybe in terms that I

24  might understand.

25  A    So as the phone call is placed, it is captured

Goodman - Direct by Mr. Gillis

1    immediately in -- the target facility used to place

2    that call is logged within the collection.

3    Q    Okay.  So you've got court-authorized surveillance

4    on the facility for this telephone number; is that

5    right?

6    A    Correct.

7    Q    Each time that your court-authorized surveillance

8    captures something from that facility, it marks it with

9    the telephone number as the facility number?

10   A    Correct.  That's how it's captured, yes, sir.

11   Q    So looking at the -- pardon me -- that facility at

12   the top of Government's Exhibit 193 on the second page,

13   which is 18891 --

14   A    Yes, sir.

15   Q    -- and looking across that particular number or

16   that particular column, what is referred to there in

17   what are Exhibits 231A and 231 -- actually, 231A is the

18   only one you need because the Certificate of

19   Authenticity has been stipulated to.  So what is

20   that -- those are -- what is that document generically?

21   A    It's the subscriber records from the provider of

22   that telephone number.

23   Q    All right.  So let's have a look at Government's

24   Exhibit 231A.  Would you tell us what that is, please.

25   A    So this is the subscriber information from the

Goodman - Direct by Mr. Gillis

1  parent company, YMAX Corporation, which is the provider

2  of the VoIP number (703) 982-2861.

3  Q    VoIP stands for voiceover Internet protocol?

4  A    Correct.

5  Q    That's the facility in this case that was being

6  monitored?

7  A    Correct.

8  Q    If you would, walk us through what this shows us

9  in terms of identifying who the user of that telephone

10 number is.

11 A    So on the second page, US-13026, is the subscriber

12 information for that telephone number which returns to

13 a name, a physical address.  I have the Internet

14 protocol, the IP address, that this account was

15 created, some of the payment information.

16 Q    The physical address on Ravensworth Road, do you

17 know whose address that is?

18 A    I know who it was at the time during the time of

19 this, yes.

20 Q    Okay.  At the time of this, whose address was

21 that?

22 A    It belonged to Defendant Muna Osman Jama and her

23 husband.

24 Q    What's her husband's name?

25 A    Ali Sheikh.

Goodman - Direct by Mr. Gillis

1          MR. GILLIS:  Your Honor, I'd move the

2  admission of Government's Exhibit 231A.

3          MS. MINTER:  Your Honor, I would object to

4  the immediately previous testimony based on lack of

5  foundation as to how the agent knows that.

6          With respect to this document, Your Honor, we

7  have no objection other than to note that it does not

8  show the identity of any particular speaker at any

9  given time.

10          THE COURT:  I understand.  Over objection,

11  Exhibit 231A will be admitted.

12          Mr. Gillis, we'll take our afternoon break at

13  this time.

14          MR. GILLIS:  Thank you.

15          THE COURT:  All right.  The Court will stand

16  in recess.

17      (Recess from 3:44 p.m. until 4:06 p.m.)

18          THE COURT:  Counsel.

19          Agent Goodman, you remain under oath.

20          THE WITNESS:  Yes, Your Honor.

21          THE COURT:  Mr. Gillis.

22          MR. GILLIS:  Thank you, Your Honor.

23  BY MR. GILLIS:

24  Q    So you were mentioning that the document,

25  Government's Exhibit 231A, shows the date -- or does it

Goodman - Direct by Mr. Gillis

1   show the date that that account was registered?

2   A    It does, sir.

3   Q    What's the date that it shows?

4   A    April 27, 2011.

5   Q    Where are you looking to get that date?

6   A    So on the second page.

7   Q    Okay.

8   A    The third paragraph, as you will, states service

9   began and gives a date and time.

10  Q    Oh, I see, service began.  We're on page 13026.

11           THE COURT:  It's two seven.

12           THE WITNESS:  Two seven, sir.

13  BY MR. GILLIS:

14  Q    Okay.  So that's the date that the facility was

15  registered?

16  A    Correct.

17  Q    Okay.  Then you mentioned that on 13026 it shows

18  the IP address that was used?

19  A    To register that account, yes, sir.

20  Q    Okay.  That is shown where?

21  A    A number of places, but it's at the bottom of the

22  first page, 13026.

23  Q    So it's the number that follows added IP?

24  A    Correct.

25  Q    Okay.  Would you look at page 13034 of that

Goodman - Direct by Mr. Gillis

1    exhibit, please.

2    A    Yes, sir.

3    Q    What does this tell us as far as that e-mail

4    address that's shown there?

5    A    This is an e-mail address.  It's associated with

6    the VoIP number.

7    Q    When you say associated, what do you mean?

8    A    So the individual had to log in with a device and

9    register it.  So in this case, registered the device

10   with the associated telephone number, registered it

11   using that makkah30@hotmail.com, the date they did it,

12   and the IP address.

13   Q    So in other words, that e-mail address belongs to

14   whoever it was that initiated this service for that

15   telephone number, (703) 982-2861; is that correct?

16   A    That is correct, sir.

17   Q    Turning back to Government's Exhibit 193, do you

18   see on that second page, 18891, Umu Luqmaan99?

19   A    Yes, sir.

20   Q    Is that another facility on which you had

21   court-authorized surveillance?

22   A    Yes, sir.

23   Q    Looking over at the last column for that row, do

24   those exhibits listed there taken together establish

25   that Jama was the user of Umu Luqmaan99?

Goodman - Direct by Mr. Gillis

1  A    Yes, sir.

2  Q    So if you'd look at Government's Exhibit 236A,

3  please.

4       MS. MINTER:  Your Honor, while that exhibit

5  is being brought out, we would object to the

6  conclusion, but I assume that's something the Court

7  would prefer for us to take up on cross-examination.

8       THE COURT:  Yes.  Yes.

9  BY MR. GILLIS:

10 Q    What is 236A, please?

11 A    So this is the subscriber information provided by

12 Paltalk for the username Umu Luqmaan99.

13 Q    At the top, we see that username, and next to it,

14 is that the user ID number assigned by Paltalk?

15 A    Yes, sir.

16 Q    That's a unique number to Umu Luqmaan99?

17 A    It is.

18 Q    All right.  So what else of relevance is there in

19 Exhibit 236A?

20 A    In the second paragraph, you have the user ID

21 assigned by Paltalk associated with Umu Luqmaan99.  You

22 have the e-mail address used by the user.

23 Q    What is that?

24 A    Should I spell it?

25      M-A-D-I-I-N-A-L-M-U-N-A-W-A-R-A-N at hotmail.com.

Goodman - Direct by Mr. Gillis

1          THE COURT:  That was the e-mail used to

2     register on Paltalk?

3          THE WITNESS:  That is correct, Your Honor.

4     BY MR. GILLIS:

5     Q    Is there an IP address associated with the opening

6     of that moniker Umu Luqmaan99?

7     A    There is in the third line of that second

8     paragraph.

9     Q    Can you read that to us, please?

10    A    70.174.129.66.

11    Q    All right.  What does it tell us about when it was

12    created?

13    A    The fourth line, created 2006-09-08.

14    Q    What's the significance of the IP address in this

15    case?

16    A    So this all resolved back to the location provided

17    by an Internet service provider at the time the account

18    was created.

19    Q    Is there other information on this that's relevant

20    to you?

21    A    Yes, sir.

22    Q    What is that?

23    A    You have the associated accounts.

24    Q    Where are they?

25    A    So it's the bottom of the first page, 12977.

1  Q    What are those associated accounts then?

2       We have, first, this same e-mail address at

3  hotmail that was used to establish the account?

4  A    So the very first is identifying the account that

5  it's related to, in this case Umu Luqmaan.  That's the

6  first line right underneath where it says user not

7  online.

8       Then you have down towards the bottom -- or

9  sorry -- midway through, it says total accounts five,

10 and it lists out the accounts by user ID number of the

11 accounts associated with Umu Luqmaan99.

12      And then it proceeds on the bottom of that page

13 and the top of the second page to --

14 Q    Well, before we get -- go ahead.  Sorry.

15 A    It then just lists out those related accounts.

16 Q    One of them is this makkah30@hotmail.com that we

17 saw earlier?

18 A    That e-mail account was used to register the

19 Paltalk moniker -- I kind of don't want to say it, so

20 I'll have to spell it.  Al-Quraanu-Dastuurunaa, A-L

21 dash Q-U-R-A-A-N-U dash D-A-S-T-U-U-R-U-N-A-A.

22           THE COURT:  That comes up as an associated

23 account?

24           THE WITNESS:  It does, sir.

25           THE COURT:  Why?

1        THE WITNESS:  So if you notice -- and this is

2  where IP addresses become significant.  So I'd have to

3  refer to the top where it says Umu Luqmaan99 was

4  created in 2006.  It lists that associated IP address.

5        THE COURT:  All right.

6        THE WITNESS:  The fourth line there, it was

7  created, and then it provides the last used date which

8  is November 30, 2012.

9        I highlight that because over that six-year

10  period of time -- an IP address is provided by an

11  Internet service provider for a period of time.  It is

12  dependent on the ISP.  That will change over time.

13  Either the Internet service provider obtains another

14  batch of IPs or the user changes Internet service

15  providers.  So during the use of Umu Luqmaan99 back in

16  the IP logs, the user of Umu Luqmaan99 began using the

17  IP address associated with Al-Quraanu-Dastuurunaa, the

18  68.230.178.149.

19        So during the time that Umu Luqmaan99 was

20  using that IP address and that Internet service

21  provider, the user of that IP address then created

22  Al-Quraanu-Dastuurunaa thus linking the two accounts by

23  location because they came from the same location.

24        THE COURT:  All right.

25  BY MR. GILLIS:

Goodman - Direct by Mr. Gillis

1  Q    If you would, please --

2            MR. GILLIS:  Well, first of all, Your Honor,

3  I'd offer Government's Exhibit 236A.

4            THE COURT:  Any objection?

5            MS. MINTER:  No objection, Your Honor.

6            THE COURT:  Without objection, 236A is

7  admitted.

8  BY MR. GILLIS:

9  Q    Would you look at 235A, please.  We're getting

10 that 235 from that row that you have for Umu Luqmaan99;

11 is that right?

12           THE COURT:  Let's go back to 236A for a

13 second.  Your testimony is that this evidence is that

14 the Al-Quraanu-Dastuurunaa is an associated account

15 based on the IP address that begins 70.174, and that

16 applies to all of the accounts that are listed there as

17 being opened through that IP address?

18           THE WITNESS:  It could also be by the e-mail

19 address, but yes.

20           THE COURT:  That would include those five

21 there beginning 813, and then the second is 778, the

22 third 811, the fourth 4473, and so on?

23           THE WITNESS:  Yes, sir, that is correct.

24           THE COURT:  All right.

25 BY MR. GILLIS:

Goodman - Direct by Mr. Gillis

1   Q    Then on that same exhibit, 236A, that then also

2   lists the buddies of the Umu Luqmaan99 Paltalk moniker?

3   A    That is correct.

4   Q    If you would, then look at Government's Exhibit --

5   actually, I'm sorry.  I was trying to make a point

6   before that.  So we were looking at the column, the row

7   for Umu Luqmaan99 on Exhibit 193.

8   A    Yes, sir.

9   Q    So we were just looking at Government's

10  Exhibit 236A, which was one of the documents that you

11  used to establish that Jama was the user of that

12  Paltalk moniker?

13  A    Correct, yes, sir.

14  Q    All right.  The Certificate of Authenticity is

15  unnecessary in these two cases.  But the next exhibit,

16  then, that's listed in your summary, 193, for that

17  Paltalk moniker is Government's Exhibit 235A; is that

18  right?

19  A    Yes, sir, that's correct.

20  Q    So if you would, turn then to Government's

21  Exhibit 235A.  Do you have that in front of you?

22  A    I do, sir.

23  Q    Would you tell us what that is, please.

24  A    So this is going to be the subscriber information

25  from Cox Communications, which is an Internet service

Goodman - Direct by Mr. Gillis

1  provider, for the IP address 68.100.230.74 --

2  Q    All right.  And --

3  A    -- unique to a period of time.

4  Q    How does that relate to the Umu Luqmaan Paltalk

5  moniker?

6  A    So that IP address from Cox Communications comes

7  back to -- if you look at page 13351 --

8  Q    Okay.

9  A    -- it shows that from February 2011 to June 2011,

10 that IP address was provided by Cox Communications.

11 Q    Sorry.  Where are you getting those dates from?

12 A    I'm sorry.  I just summarized the IP logs, the --

13 there were ten or so pages preceding page --

14 Q    Well, let's do that then.  You can just summarize

15 them.  So from your review of those pages, it tells you

16 the dates during which that IP address was used?

17 A    Correct.

18 Q    All right.  What else does it tell you?

19 A    It tells you that that IP address was provided by

20 Cox Communications to an address, the Ravensworth

21 address in Annandale.

22 Q    Again, that is --

23 A    That is the residence of --

24 Q    -- the defendant's address at the time?

25 A    Yes, it was.

Goodman - Direct by Mr. Gillis

1    Q    Okay.  So how does that IP address then relate to

2    Umu Luqmaan?

3    A    So if I could refer you back to 236A --

4    Q    Okay.

5    A    -- during the time that we know that she resided

6    at this address, in those date ranges, I just mentioned

7    in 2011, the IP logs in the returns from Paltalk -- so

8    when Umu Luqmaan signed in -- signs in with an

9    associated IP address --

10   Q    All right.  Is that IP address on Government's

11   Exhibit 236A?

12   A    If I can refer you to page 12993.

13   Q    All right.

14            THE COURT:  Hold on a second.

15            THE WITNESS:  Yes, sir.

16            THE COURT:  All right.  Proceed.

17   BY MR. GILLIS:

18   Q    Go ahead, please.

19   A    Again, just a sampling -- you'll see the date

20   ranges preceding this and after this, but just a

21   sampling here of -- in that time frame in 2011, we show

22   that Umu Luqmaan logged in on this date and time using

23   this IP address which resolved back to the Internet

24   service provider, Cox Communications, who provided that

25   IP address to the defendant's residence.

Goodman - Direct by Mr. Gillis

1          MR. GILLIS:  Your Honor, I'd move

2   Government's Exhibit 235A.

3          MS. MINTER:  No objection, Your Honor, other

4   than those already stated.

5          THE COURT:  All right.  Without objection,

6   235A is admitted.

7          This IP address, the 688.10 --

8          THE WITNESS:  Yes, sir.

9          THE COURT:  -- is the IP address that Umu

10  Luqmaan99 logged in to Paltalk on; is that right?

11         THE WITNESS:  That is correct.  Yes, sir.

12         THE COURT:  All right.  Which is a different

13  IP address than what was used to register the Umu

14  Luqmaan99 name initially?

15         THE WITNESS:  That is correct, Your Honor.  I

16  would refer back to my earlier explanation.

17         THE COURT:  How it changes over time?

18         THE WITNESS:  Yes, sir.

19         THE COURT:  All right.

20  BY MR. GILLIS:

21  Q    That IP address, is it also one that had been used

22  for the phone number (703) 982-2861?

23  A    That is correct, sir.

24  Q    That's the one we were looking at in Government's

25  Exhibit 30?

Goodman - Direct by Mr. Gillis

1  A    Yes, sir.

2       Again, back to that showing the date, the 2011

3  time frame in which it was created, it was created

4  using -- it was registered during that 2011 time frame

5  with this IP address resolving back to her residence.

6  Q    Okay.  Did you use the same approach for all of

7  the facilities that are listed in Government's

8  Exhibit 193?

9  A    I did.

10 Q    As we've seen, are the documents that underlie

11 that summary voluminous?

12 A    Definitely.

13 Q    Were all of these documents made available in

14 pretrial discovery?

15 A    They were.

16       MR. GILLIS:  Your Honor, I'd move to admit

17 Government's Exhibit 193 pursuant to Federal Rule of

18 Evidence 1006.

19       THE COURT:  All right.  Any objection?

20       MS. MINTER:  Your Honor, there's no objection

21 other than to column 2, which is not, in fact, a

22 summary of these voluminous records but a conclusion

23 drawn by the agent, apparently, based on his

24 investigation.  So beyond that, we would not object.

25       THE COURT:  All right.  The Court is going to

Goodman - Direct by Mr. Gillis

1  admit Exhibit 199 qualified only to the extent the

2  Court recognizes that the username in column 2 is based

3  on not the records themselves but the inferences based

4  on the records.

5          MR. GILLIS:  Your Honor, I believe I heard

6  you say 199.

7          THE COURT:  It's 193.

8          MR. GILLIS:  Thank you, Your Honor.

9  BY MR. GILLIS:

10 Q    All right, sir.  Would you please look at

11 Government's Exhibit 191.

12     Do you have that in front of you?

13 A    I do, sir.

14 Q    Tell us what that is, please.

15 A    This is a summary of the chat participants,

16 referring to Paltalk chat participants, captured during

17 court-authorized electronic surveillance of the

18 defendants.

19 Q    What does the first column show?

20 A    So this is that chat username that the user

21 identified themselves provided when they registered

22 their account.

23          THE COURT:  Does this pertain to any

24 particular chat site?

25          THE WITNESS:  No, sir.  It is the entire

Goodman - Direct by Mr. Gillis

1   collection.  It doesn't encompass all the chat

2   participants, but it encompasses all the chat

3   participants of the transcripts and chats.

4              THE COURT:  Regardless of what chat site they

5   were on?

6              THE WITNESS:  This is solely Paltalk, Your

7   Honor.

8              THE COURT:  Oh, this is Paltalk?

9              THE WITNESS:  This is solely Paltalk, sir.

10  BY MR. GILLIS:

11  Q    So what does the second column refer to there?

12  A    It's listed here as a user account number, but it

13  is a user ID number assigned by Paltalk to that user

14  name.

15  Q    That's the thing that we discussed before that's

16  unique to each username?

17  A    Yes, sir.

18  Q    So that chat username, where does that information

19  come from?

20  A    It was captured during the surveillance of the

21  defendant's facilities.

22  Q    So do I understand, then, that when you have the

23  court-authorized surveillance, as we were discussing

24  with the telephone number, when the data is captured on

25  that facility, it's marked with the chat username of

Goodman - Direct by Mr. Gillis

1  the other participants?

2  A    That is correct.

3  Q    Then the user ID number, where does that

4  information come from?

5  A    So that's also captured in the court-authorized

6  electronic surveillance.

7  Q    What do the third and fourth columns show?

8  A    So this relates to the facility and target of the

9  court-authorized electronic surveillance where there's

10 two names versus one name.  So if that chat username

11 was captured on both Jama's facilities and Dhirane's

12 facilities, we list it there.  If there's only one

13 target and facility, then it's that username and ID

14 were only captured on that defendant's facilities.

15 Q    What are the underlying documents from which this

16 summary was made?

17 A    All the chats collected during the

18 court-authorized electronic surveillance.

19 Q    Okay.  Are those chats taken together voluminous?

20 A    Yes, they are.

21 Q    Were all of those documents made available to the

22 defense in pretrial discovery?

23 A    They were.

24         MR. GILLIS:  Your Honor, I'd move to admit

25 Government's Exhibit 191.

*Goodman - Voir Dire by Ms. Minter*

1        THE COURT:  Any objection?

2        MS. MINTER:  Your Honor, could I very briefly

3  *voir dire* the witness just to clarify one issue?

4        THE COURT:  Yes.

5                  *VOIR DIRE* EXAMINATION

6  BY MS. MINTER:

7  Q    Agent, with respect to the third column where you

8  list target and then either Ms. Jama or Ms. Dhirane's

9  names --

10 A    Yes, ma'am.

11 Q    -- to be clear, when you say, for example, Jama,

12 does that mean that is the individual that the

13 investigation was targeting, or does that mean that,

14 based on the various facilities that you've reviewed,

15 you believe that's the individual that the information

16 comes back to?

17 A    It's based on targeting Ms. Jama's facilities.

18 Q    I guess I'm trying to figure out the cart versus

19 the horse.

20      Does that mean, then, that you were seeking

21 information relating to Ms. Jama and accordingly sought

22 out facilities, or did those facilities direct you to

23 Ms. Jama?

24 A    So we had a predicated investigation on Ms. Jama

25 of which we obtained court-authorized electronic

Goodman - Direct by Mr. Gillis

1  surveillance on her identified facilities referring

2  back to 193, and we -- during the capture of her

3  facilities, her Paltalk accounts -- for instance, Abu

4  Kawsar was in contact with her during that

5  surveillance.

6              THE INTERPRETER:  Your Honor, the interpreter

7  did not get the name.

8              THE WITNESS:  Abu Kawsar.

9              MS. MINTER:  Thank you, Your Honor.

10             I suppose, then, it sounds as though it's

11  sort of cyclical.  So I would lodge the same objection,

12  but no objection generally to the summary.

13             THE COURT:  All right.  Over objection,

14  Exhibit 191 is admitted as a summary.

15             MR. GILLIS:  Thank you.

16                  FURTHER DIRECT EXAMINATION

17  BY MR. GILLIS:

18  Q    First of all, in these cases that you have here,

19  the collection that we've referred to here has been on

20  the broadband account that was going into the

21  residence; is that correct?

22  A    That is correct.

23  Q    So it wasn't being collected from Paltalk

24  directly?

25  A    That is correct.

1  Q    For that column, the final column, you all got

2  court-authorized electronic surveillance?

3  A    Yes, sir.

4  Q    As part of that process of obtaining the

5  authorization to place the tap on those facilities, did

6  you have to establish to the Court's satisfaction that

7  those facilities belonged to Jama and Dhirane?

8  A    Yes --

9  Q    So if --

10  A    -- were used by.

11  Q    Were used by.

12       If we could, go back to Government's Exhibit 193

13  for a moment.

14          MR. GILLIS:  Your Honor, I would ask to move

15  in the underlying documents for those facilities.  They

16  are virtually all subscriber records that are covered

17  by a stipulation and/or transcripts which we'll get

18  around to -- well, we will offer those as well.

19          THE COURT:  Are there any objection to the

20  underlying exhibits?

21          MS. MINTER:  There is no objection except for

22  any conclusions, Your Honor.

23          THE COURT:  All right.  The Court will admit

24  the exhibits listed in Government Exhibit 193.

25          MR. GILLIS:  Similarly, Your Honor, for

1    Government's Exhibit 191.

2              THE COURT:  All right.  Any objection as to

3    that?

4              MS. MINTER:  The Court's indulgence, Your

5    Honor.

6              MR. GILLIS:  I'll withdraw it.

7              THE COURT:  Are there exhibits listed?

8              MR. GILLIS:  I withdraw it, Your Honor.  I

9    beg your pardon.

10              THE COURT:  All right.  Very good.

11   BY MR. GILLIS:

12   Q    All right.  Then if we could, turn to Government's

13   Exhibit 192.  Would you tell us, please, what that is.

14   A    It is a summary of the chat communications related

15   to specific exhibits showing the facility from which

16   they were collected.

17   Q    So, for example, the first row of 192 has the

18   final column Government's Exhibit 31?

19   A    Yes, sir.

20   Q    That was a chat captured on a broadband?

21   A    That is correct.

22   Q    The broadband facility that it was captured on is

23   listed there under facility?

24   A    That is correct.

25   Q    Then the target that you have in column 3 there,

1    what does that refer to?

2    A    Column 1, that's the target of the electronic

3    surveillance, in this case Umu Luqmaan, captured in the

4    broadband.

5    Q    All right.  You have 192 in front of you?

6    A    Yes, sir.

7    Q    So the first column is the date?

8    A    The date of the chat, yes, sir.

9    Q    All right.  The next column is the start and stop

10   date of the exhibit number?

11   A    Yes, sir.

12   Q    Not of the call, the entire call?

13   A    Of the exhibit number.

14   Q    Okay.  Then the target facility, we would refer

15   back to Government's Exhibit 93, am I right to --

16   A    193, yes, sir.

17   Q    Pardon me, 193.

18        -- to establish what the underlying documents are

19   to establish that particular facility and whom it

20   belongs to?

21   A    Yes, sir.

22   Q    Then where it says other participants, where does

23   that come from?

24   A    Captured during the surveillance of other

25   participants in the chat with the targeted facility.

1  Q    Okay.  So as we've discussed, it captures the

2  Paltalk user name and the unique identifying ID number?

3  A    That is correct.

4  Q    That is what was basically stamped on that chat

5  capture --

6  A    That is correct.

7  Q    -- when it came off the facility?

8  A    Yes, sir.

9         MR. GILLIS:  Your Honor, I'd move in

10 Government's Exhibit 192.

11        THE COURT:  Any objection?

12        MS. MINTER:  None except as to the

13 conclusions drawn in column 3.

14        THE COURT:  All right.  The Court, over

15 objection, will admit Exhibit 192.

16 BY MR. GILLIS:

17 Q    Would you please look at Government's Exhibit 42.

18 This is a chat that was captured from the facility --

19 A    Yes.

20 Q    -- or at least a facility?

21      So at the first line there under the date and time

22 stamp, it says unknown user ID.  What does that refer

23 to?

24 A    So as the chat occurs online, it's -- so in this

25 case, it refers to the target of the facility.

1  Q    To the targeted facility?

2  A    Yes.

3  Q    So if we were to look, for example, at

4  Government's Exhibit 191, that -- do you see 40?  I may

5  have picked a bad example.  I think we were looking at

6  192; weren't we?  So on Government's Exhibit 192, for

7  this Exhibit Number 42, the court-authorized electronic

8  surveillance was on that unique user identifying number

9  from Paltalk and for Umu Luqmaan99; is that correct?

10 A    Do you have --

11 Q    I'm sorry?

12 A    Yes.  Now I have it.

13      It was on the broadband for that residence.  This

14 chat was captured during that broadband collection --

15 Q    Okay.  And --

16 A    -- of Umu Luqmaan99.

17 Q    Okay.  So this was captured on the Umu Luqmaan99

18 facility?

19 A    Yes.

20 Q    In some instances, we're going to see that unknown

21 user ID?

22 A    That's correct from this facility.

23 Q    That's simply an artifact of the process that

24 captures the data?

25 A    That's correct.

Goodman - Direct by Mr. Gillis

1  Q     But in every instance that unknown user ID will

2  refer to the facility that was being captured?

3  A     Being targeted, yes, sir.

4  Q     That was being targeted.  Okay.

5        Then in those instances where there is an unknown

6  user ID in the chat, Government's Exhibit 192 would

7  tell you who that unknown user ID referred to?

8  A     Based on the collection, yes, sir.

9            THE COURT:  So Exhibit 42 reflects a chat by

10  someone using the Umu Luqmaan99 identification?

11           THE WITNESS:  That's correct, yes, sir, at

12  that residence.

13           THE COURT:  At that residence.

14  BY MR. GILLIS:

15  Q     Would you please look at Government's Exhibit 190.

16  Can you tell us what that is, please?

17  A     So this is a summary of the call detail records or

18  the toll records associated with the given transcripts.

19  Q     So each of these is basically taken from telephone

20  toll records that you obtained?

21  A     That is correct.

22  Q     Just going across there, the first column is the

23  date of the call; the second is the person who placed

24  the call; the third is the person to whom the call was

25  made?

Goodman - Direct by Mr. Gillis

1   A    Yes, sir.

2   Q    That information is derived, as we talked about,

3   with Government's Exhibit 193?

4   A    So it's obtained from the provider of the

5   telephone.

6   Q    Got it.  Okay.

7        Then the fourth column shows us the duration of

8   the call?

9   A    Yes, sir.

10  Q    The fifth shows the time that the call was made or

11  placed?

12  A    That is correct.

13  Q    The last column shows us the government's exhibit

14  number to which those -- the transcripts for those

15  particular calls?

16  A    That is correct.

17  Q    So, for example, for the transcript that's

18  Exhibit 30, the telephone toll records which show that

19  it was placed from that telephone number to -- from

20  that 703 telephone number to the 612 telephone number

21  and that the call lasted about 38 minutes.

22       Is that correct?

23  A    That is correct, sir.

24  Q    Then it would also tell us that it was made about

25  10 to 11 in the morning?

Goodman - Direct by Mr. Gillis

1  A     Yes, sir.

2            MR. GILLIS:  Your Honor, I'd move in --

3  BY MR. GILLIS:

4  Q     Well, first of all, I take it that those telephone

5  toll records are fairly voluminous.

6  A     Very, yes, sir.

7  Q     Were they all made available in pretrial

8  discovery?

9  A     They were.

10           MR. GILLIS:  Your Honor, I'd move

11  Government's Exhibit 190.

12           THE COURT:  Special Agent, let me ask you.

13           THE WITNESS:  Yes, sir.

14           THE COURT:  These names that appear before

15  each of these telephone numbers, is that based on the

16  determination that that number aligned with the

17  physical residence where that person resided, or is

18  that based on a recognition of the voice that was heard

19  actually in that communication?

20           THE WITNESS:  Both, sir.  So 193, the basis

21  for that telephone also came from the translator as

22  they were identifying it.  So all of the tools that we

23  had.

24           THE COURT:  All right.  Any objection?

25           MS. MINTER:  Your Honor, only as to the

Goodman - Direct by Mr. Gillis

1    conclusions drawn in columns 2 and 3.

2              THE COURT:  All right.  Over objection, the

3    Court is going to admit Government Exhibit 190.  The

4    Court recognizes the basis for the listing of the

5    names.

6    BY MR. GILLIS:

7    Q    All right.  Agent, would you turn to Government's

8    Exhibit 10, please.

9         Can you tell us what that is, please?

10   A    This is the summary of the hawala transactions for

11   Muna Osman Jama.

12   Q    How are those obtained -- well, from whom were

13   they obtained?

14   A    They were obtained from the money remitters.

15   Q    They're basically something similar to bank

16   records?

17   A    Correct.

18   Q    Do the underlying documents reflect the

19   information that's listed in Government's Exhibit 10?

20   A    They do.

21   Q    So the beneficiary location is included in the

22   records that you received from the hawala?

23   A    Correct.

24   Q    The name of the beneficiary that's actually listed

25   on the hawala record applicable to that transaction?

Goodman - Direct by Mr. Gillis

1   A      Provided by the hawala, the money remitter.

2   Q      Okay.  What about in the case of the sender name?

3   A      Also provided by the money remitter.

4   Q      The sender contact information, that telephone

5   number there?

6   A      Provided by the money remitter.

7   Q      The beneficiary contact, what is that?

8   A      That's the telephone number of the beneficiary

9   provided by the sender.

10  Q      That also was reflected in the hawala records?

11  A      That is correct.

12          MR. GILLIS:  Your Honor, I'd move

13  Government's Exhibit 10.

14          THE COURT:  Any objection?

15          MS. MINTER:  No objection.

16          THE COURT:  Without objection, Government

17  Exhibit 10 is admitted.

18  BY MR. GILLIS:

19  Q      If you would, look at Government's Exhibit 11.

20          Can you tell us what that is?

21  A      It's a summary of the hawala transactions for

22  Ms. Hinda Osman Dhirane.

23  Q      These relate to the overt acts in the indictment?

24  A      That is correct, sir.

25  Q      Are the sources for this information in Exhibit 11

1  the same of the kind that we just discussed for

2  Exhibit 10?

3  A    Yes, sir.

4          MR. GILLIS:  Your Honor, I'd move

5  Government's Exhibit 11.

6          THE COURT:  Any objection?

7          MR. YAMAMOTO:  No objection.

8          THE COURT:  Without objection, Exhibit 11 is

9  admitted.

10  BY MR. GILLIS:

11  Q    Then if you would, turn to Government's

12  Exhibit 12.

13      Would you tell us what that is?

14  A    Yes.  This is a summary of the funds that were

15  transferred through a hawala, a money remitter, to

16  Ms. Hinda Osman Dhirane while she was in Somalia.

17  Q    Did you establish this information from the same

18  sorts of documentation that we discussed with 10 and

19  11?

20  A    Yes, sir.

21          MR. GILLIS:  Your Honor, I'd move Exhibit 12.

22          THE COURT:  Any objection?

23          MR. YAMAMOTO:  Objection.  It's irrelevant.

24          THE COURT:  All right.  Over objection, the

25  Court will admit Government Exhibit 12.

1 BY MR. GILLIS:

2 Q    Okay.  Thank you, Agent Goodman.

3      So were you present at the arrest of Hinda Osman

4 Dhirane?

5 A    Yes, sir.

6 Q    Do you see her in court today?

7 A    I do.

8 Q    Would you point her out and tell us where she's

9 sitting?

10 A    She's sitting at the back table dressed with black

11 head and shoulder cover.

12          MR. GILLIS:  Your Honor, may the record

13 reflect that the witness has identified Defendant

14 Dhirane.

15          THE COURT:  The record will so reflect.

16 BY MR. GILLIS:

17 Q    Agent Goodman, after she was arrested, did you

18 interview her?

19 A    Yes, sir.

20 Q    What time of day was that?

21 A    I started the interview around 5 a.m.

22 Q    Do you recall or do you know:  Why did the arrest

23 take place so early?

24 A    Yes.  As we were watching the residence, the

25 lights began coming on.  It was anticipated that she

Goodman - Direct by Mr. Gillis

1  would be leaving.

2  Q    You were at that time on the west coast; is that

3  right?

4  A    That is correct.

5  Q    You were attempting to do a simultaneous arrest

6  with others?

7  A    That is correct.

8  Q    How long did your interview of the defendant last?

9  A    To include the breaks, just under five hours.

10 Q    Where did the interview take place?

11 A    At the Kent Police Department.

12 Q    Where is that?

13 A    In the State of Washington.

14 Q    Was there an interpreter present?

15 A    Yes.  There was a female interpreter present the

16 entire time.

17 Q    Who else, if anybody, was present?

18 A    There was also a female special agent with me as

19 well.

20 Q    Anyone else?

21 A    During the interview?

22 Q    Yes.

23 A    No, sir.

24 Q    During the interview, did anyone display a weapon

25 at any time?

Goodman - Direct by Mr. Gillis

1   A    No, sir.

2   Q    Was the interview audio- and video-recorded?

3   A    Yes, sir.

4   Q    Was the interview recorded in its entirety?

5   A    It was.

6   Q    Have you reviewed the recording since the

7   interview?

8   A    Yes, sir.

9   Q    Did the recording that you looked at accurately

10  and completely capture the interview?

11  A    Yes, sir.

12  Q    Did you *Mirandize* the defendant before asking her

13  any questions?

14  A    Other than the medical questions at the arrest

15  scene, I *Mirandized* her before asking any questions.

16  Q    Well, tell us what those medical questions were.

17  A    At the arrest scene, I asked her if she had any

18  medical conditions, if she needed any medicine from the

19  residence.  I also asked her if she needed any clothing

20  or anything like that, questions of that nature.

21  Q    Apart from questions of that nature, did you ask

22  her any other questions before you gave her her *Miranda*

23  rights?

24  A    No, sir.  I did ask her if she wanted water.

25  Q    Okay.  Well, tell us what occurred in the

1  interview room before any questions were asked of

2  Ms. Dhirane.

3  A     As we were getting to the interview room, I did

4  ask her if she was going to want some water.  She

5  advised that she was fasting during Ramadan.

6       So prior to stepping into the interview room, she

7  asked if she could pray.  So as we sat down in the

8  interview room, I told her that I remembered her

9  telling me that, would she like to do that.  She asked

10  if she could wash and pray before we started the

11  interview.

12  Q     Did you accommodate that request?

13  A     Yes.  I told her that we would leave the room and

14  allow her to pray.  She asked if one of the -- if the

15  women could stay in the room.  She just wanted me to

16  leave the room.  And she proceeded to wash and pray.

17  Q     Was she offered an opportunity to use the

18  restroom?

19  A     Yes, sir.

20  Q     How did the defendant appear to you at the time?

21  I mean, what was her demeanor?

22  A     She was calm, very cooperative.

23  Q     So after you gave Ms. Dhirane the opportunity to

24  do these things, how did you advise her of her *Miranda*

25  rights?

1  A    So up until this point, from the arrest scene to

2  this point, I had been speaking to her without issue in

3  English.  I asked her if she could read the English

4  language.  She stated some.  I asked her if she'd

5  prefer a Somali version.  She stated she would prefer

6  to read it in Somali.  I handed her a Somali version of

7  the advice of rights.  I then read each right to her,

8  had it translated to her by the translator, and she

9  read along with me.

10      Following each right, I asked her if she

11  understood that particular right, to which she answered

12  in the affirmative.

13      Then at the conclusion of all the rights, I asked

14  her if she had any questions.  I then asked her to

15  please review the advice of rights in the Somali

16  language that she had been reading at that time, to

17  review that on her own.  She took a couple of minutes

18  to do that.

19      I then pointed her attention to the section about

20  speaking to me without an attorney present and told her

21  to read that section again, and if she was willing to

22  speak with me without an attorney present, to please

23  sign where it says signature.

24  Q    Did she do that?

25  A    She did, yes, sir.

Goodman - Direct by Mr. Gillis

1  Q    Would you take a look, please, at Government's

2  Exhibit 4H.

3       Do you have that in front of you?

4  A    Yes, sir, I do.

5  Q    What is Government's Exhibit 4H?

6  A    This is the Somali translation of the advice of

7  rights form.

8  Q    Did you witness the defendant sign that document?

9  A    Yes, sir, I did.

10 Q    Whose are the other signatures there, not

11 necessarily the name, just in general, who were they?

12 A    So the top signature is that of Ms. Dhirane.  The

13 second signature is that of the female special agent in

14 the room.  The third signature is mine.

15          MR. GILLIS:  Your Honor, I'd offer

16 Government's Exhibit 4H.

17          THE COURT:  Any objection?

18          MR. YAMAMOTO:  No, Your Honor.

19          THE COURT:  Without objection, 4H is

20 admitted.

21 BY MR. GILLIS:

22 Q    Now, after the defendant had been *Mirandized*, did

23 you ask her any questions about whether she was

24 familiar with al-Shabaab?

25 A    I did.

1  Q    What did she tell you about al-Shabaab?

2  A    It varied over the course of the interview.

3  Q    Well, let's start with initially.  Did she tell

4  you anything about whether she supported al-Shabaab or

5  did not support al-Shabaab?

6  A    So initially, she stated she did not support

7  al-Shabaab.  Later on in the interview, she stated she

8  did verbally support al-Shabaab.

9  Q    Okay.  Well, we are going to get to later on in

10 the interview in a moment.  Okay.  So let's just stick

11 with sort of at the beginning of the thing.

12 A    Okay.

13 Q    So did you ask her whether she knew of

14 al-Shabaab's designation?

15 A    I did.

16 Q    What did she say?

17 A    She said, Haa, I know.  I know haa is yes in

18 Somali.

19 Q    I take it there was an interpreter there at the

20 time.

21 A    There was; although, she did not translate the

22 haa.

23 Q    Did you ask her whether she expressed support for

24 al-Shabaab on Paltalk?

25 A    I did.

Goodman - Direct by Mr. Gillis

1  Q     What did she say about that?

2  A     Initially?

3  Q     Yes.

4  A     She denied her support for al-Shabaab.

5  Q     Initially, what did she tell you about her going

6  on Paltalk?

7  A     That she did listen and that there were people

8  that did express support for al-Shabaab.

9  Q     When that happened, did she say what she did?

10 A     I don't recall.  I mean --

11 Q     Okay.  Do you recall whether she said she remained

12 in or left the chat room?

13 A     She participated and talked about the group that

14 she participated with in Paltalk.  She stated she

15 wasn't responsible for the words that they said.

16 Q     But, initially, at least, she told you that even

17 though she was in that Paltalk chat room, she did not

18 support al-Shabaab?

19 A     That is correct.

20 Q     Did she tell you what chat room it was that she

21 was referring to?

22 A     I believe she referred to it as the Somali Islamic

23 Dacwatu Center or Islamic Somali Dacwatu Center.

24 Q     That's what we've heard referred to as the ISDAC

25 chat room?

Goodman - Direct by Mr. Gillis

1  A    She just didn't say the Tawxiid, which is ISDAC.

2  But yes, that's what she was referring to.

3           THE INTERPRETER:  Your Honor, the interpreter

4  did not get the name of the chat room.

5           THE COURT:  Would you repeat what you just

6  said.

7           THE WITNESS:  She referred to it as the

8  Somali Islamic Dacwatu Center.

9  BY MR. GILLIS:

10 Q    After the defendant had been *Mirandized*, did you

11 ask her any questions about whether she knew some of

12 the women that she was accused of conspiring with?

13 A    Yes, sir, I did.

14 Q    Did you ask her questions about Hodan Ismail

15 Hassan?

16 A    Yes, sir.

17 Q    Did she say whether she knew that woman?

18 A    Yes.  She stated Hodan Ismail Hassan was related

19 to her on her mother's side, that she talked to her

20 often, and sent her money two or three times to support

21 her children, Hodan's children.

22           MR. GILLIS:  If I could, Your Honor, I'd ask

23 for Government's Exhibit 4 -- well, first of all, Your

24 Honor --

25 BY MR. GILLIS:

1 Q    Agent, have you seen clips from the videotape of

2 the interview of the defendant?

3 A    Yes.

4 Q    When you reviewed those, did you find them to be

5 an accurate clip from the interview?  In other words,

6 it wasn't the whole interview, but I'm asking if that

7 portion of the video was accurately captured.

8 A    Yes.  I reviewed the whole video and then

9 established clips within that video from that

10 interview.

11 Q    All right.  One of those clips is Exhibit 4I-1.

12 It may be that it's --

13            MR. GILLIS:  Mr. Burns, there should be a

14 4I-1 through 8 that's on one single disk, and that one

15 single disk --

16            THE COURT:  Do you want to move the clips

17 into evidence?

18            MR. GILLIS:  I beg your pardon?

19            THE COURT:  Do you want to move the clips

20 into evidence?

21            MR. GILLIS:  I do, Your Honor.

22            THE COURT:  Is there any objection to the

23 clips?

24            MR. YAMAMOTO:  No, Your Honor.

25            THE COURT:  All right.  Without objection,

1 Exhibits 4I-1 through 8 are admitted.

2          MR. GILLIS:  All right.  Thank you, Your

3 Honor.

4          If I could ask, then, to have 4I-1 played.

5          THE COURT:  How long is it?

6          MR. GILLIS:  These are all fairly brief, Your

7 Honor.

8          THE COURT:  All right.

9     (A video is played.)

10 BY MR. GILLIS:

11 Q    From your review of the various transcripts of the

12 defendant's communications, are you aware of instances

13 where the coconspirators agreed to say that the people

14 were sending money to relatives?

15 A    Yes.

16 Q    If you would, please look at Government's

17 Exhibit 171.

18     What is Government Exhibit 171?

19 A    So this is a telephone call between Hinda Osman

20 Dhirane and Hodan Ismail Hassan which occurred on

21 September 24, 2013.

22          MR. GILLIS:  Your Honor, I'd move in

23 Government's Exhibit 171.

24          THE COURT:  Any objection?

25          MR. YAMAMOTO:  No, Your Honor.

Goodman - Direct by Mr. Gillis

1           MS. MINTER:  Your Honor, we would lodge the

2    same objections.

3           THE COURT:  Over objection, Exhibit 171 is

4    admitted.

5    BY MR. GILLIS:

6    Q    Would you, please, look at pages 3 and 4 of

7    Government's Exhibit 171.

8    A    Yes, sir.

9    Q    So take a moment to read those two pages.

10          So can you summarize what's being discussed there

11   in pages 3 and 4?

12   A    Yes.  Ms. Dhirane is following up on money that

13   wasn't picked up and trying to identify why it wasn't

14   picked up.  She's talking to Ms. Hodan Ismail Hassan

15   about identifying the sender of the money and who it

16   was addressed to.

17          MR. YAMAMOTO:  Your Honor, the transcript is

18   there.  The reader can read it and determine for

19   themselves what they believe the transcript says or

20   doesn't say.

21          THE COURT:  I agree.

22          What's the purpose of this, Mr. Gillis, at

23   this point?

24          MR. GILLIS:  Your Honor, I was just --

25          THE COURT:  It's in evidence.

Goodman - Direct by Mr. Gillis

1        MR. GILLIS:  I beg your pardon?

2        THE COURT:  It's in evidence.

3        MR. GILLIS:  Yes, Your Honor.  I was just

4   trying to draw the Court's attention to it, but

5   obviously, I don't need to do that.

6        THE COURT:  You don't need to do that.  You

7   can refer to it in argument.

8   BY MR. GILLIS:

9   Q    All right.  Actually, first of all, if you could,

10  look at Government's Exhibit 88.

11       Can you tell us what Government's Exhibit 88 is?

12  A    This is an online chat communication between Muna

13  Osman Jama and Fardowsa Jama Mohamed on July 9, 2012.

14       MR. GILLIS:  Your Honor, I'd move to admit

15  Government's Exhibit 88.

16       THE COURT:  Any objection?

17       MS. MINTER:  The same objection, Your Honor,

18  especially as to the conclusory statements that have

19  been added to the exhibit.

20       THE COURT:  All right.  Over objection, the

21  Court will admit Exhibit 88.  The Court understands the

22  objection as to the names that appear there.

23       MR. GILLIS:  If I may, Your Honor, I would --

24  may I direct the Court's attention to particular pages?

25       THE COURT:  All right.  That's fine.

Goodman - Direct by Mr. Gillis

1          MR. GILLIS:  If I could direct the Court's

2   attention to pages 788 through 91.

3          THE COURT:  All right.

4   BY MR. GILLIS:

5   Q    Would you take a look at Government's Exhibit 79.

6   A    Exhibit 79, sir?

7   Q    Yes, please.  Tell us what that is.

8   A    It's a telephone call between Muna Osman Jama and

9   Hinda Osman Dhirane on June 7, 2012.

10          MR. GILLIS:  If I could direct the Court's

11   attention to pages 3 and 4.  Well, I suppose I need to

12   move it first, Your Honor.  I'd move it into evidence.

13          THE COURT:  Exhibit 79, that's not in yet?

14          THE CLERK:  It is.

15          THE COURT:  It's already been admitted.  What

16   pages?

17          MR. GILLIS:  Pages 3 and 4 of 79, Your Honor.

18   BY MR. GILLIS:

19   Q    Did you also ask the defendant about -- in your

20   interview of her, did you ask her about Barira Hassan

21   Abdullahi?

22   A    I did.

23   Q    What did the defendant tell you about Barira

24   Hassan Abdullahi?

25   A    Initially, she stated that she did not know her.

Goodman - Direct by Mr. Gillis

1  Barira Hassan Abdullahi was Hodan Ismail Hassan's

2  friend.

3  Q    Did she say anything about whom Barira was married

4  to?

5  A    Yes.  She referred to Barira Hassan Abdullahi as

6  the teacher's wife and identified the teacher as

7  Mohamed Ali.

8  Q    What did she say about whether she had met with

9  Barira before?

10 A    Initially, she stated she had not, she did not

11 know her, and then advised that she did meet her once

12 while in Hargeysa while Ms. Dhirane was in Somalia.

13 Q    Did you ask the defendant whether she had sent

14 money to Barira while the defendant was in Somalia?

15 A    Yeah.  She stated she had not and reiterated

16 several times she did not know Barira.  Barira was

17 Hodan's friend, not hers.

18 Q    Did you ask her whether Barira had sent her any

19 money?

20 A    Yes.  Initially, she stated no, again, reiterated

21 she's not my friend.  Eventually, she did state about

22 one time when Barira Hassan Abdullahi had sent her

23 money.

24 Q    Did she offer any explanation as to what the money

25 being sent was for?

Goodman - Direct by Mr. Gillis

1  A    Yes.   She stated that -- Ms. Dhirane stated that

2  she had brought an individual into the store that

3  Barira Hassan Abdullahi worked at.   In the store, they

4  sold goods and also purchased goods such as gold.

5  Ms. Dhirane brought the woman in.   The woman was going

6  to sell her -- sell the gold in the store.   Barira

7  Hassan Abdullahi brought the gold for $3,000.   Barira

8  only had $1500 on her.   So she gave the $1500 to the

9  woman and then told Ms. Dhirane that she would send her

10 the remaining $1500 through the Zaad telephone online

11 banking system, which Dhirane stated Barira did, in

12 fact, send that money.

13 Q    Did she say whether that when she was in Somalia?

14 A    That was while she was in Somalia.

15 Q    Did she say whether she had received any other

16 money from Barira apart from this alleged transaction

17 involving the other woman?

18 A    She said she had not.   She did not know Barira.

19 Barira was not her friend.

20 Q    Did she say anything about how often she talked

21 with or whether she talked with Barira?

22 A    Initially, she stated she did not, but then stated

23 that once she returned from Somalia, she did keep in

24 touch with her simply to say hi.

25 Q    Did Ms. Dhirane say anything about Barira being

1 arrested?

2 A    Yes.  Ms. Dhirane stated that Hodan Ismail Hassan

3 had told her -- had told Dhirane that Barira Hassan

4 Abdullahi had been arrested.

5 Q    Did she say what Barira had been arrested for?

6 A    She had been arrested for supporting al-Shabaab.

7 Q    Did she tell you when Barira had been arrested?

8 A    She stated in 2012.

9 Q    Did she say anything about whether she kept in

10 touch with Barira after Barira was arrested for

11 supporting al-Shabaab?

12 A    No.  She said -- after she had actually talked to

13 Ms. Abdullahi, Barira, Ms. Abdullahi had told Dhirane

14 that she had been arrested for supporting al-Shabaab,

15 and Ms. Dhirane stated that at that point, she stopped

16 having any contact with her whatsoever.

17        MR. GILLIS:  If I could ask my colleagues to

18 play 4I-4, please.

19     (A video is played.)

20 BY MR. GILLIS:

21 Q    If I could ask you to look at Government's

22 Exhibits 4A2 and 4A6.  These are documents previously

23 admitted as being seized from Defendant Dhirane's

24 residence.

25     Do you see there Barira's name on those two

1  documents?

2  A     Yes, sir, I do.

3  Q     And associated telephone number?

4  A     Yes, sir.

5  Q     Did the defendant tell you what number she had

6  used?

7  A     What number Barira or Ms. Dhirane had used?

8  Q     Of Barira.   Sorry.   Yes, the telephone number --

9  no.   I beg your pardon.

10     Did the defendant tell you what telephone numbers

11  she used?

12  A     The defendant?

13  Q     Yes.

14  A     Yes, she did.

15  Q     What did she tell you?

16  A     She stated she had a magicJack number, but she

17  didn't recall the number.   She provided her Kent phone

18  number, her Kenmore phone number.   She provided her

19  government-issued Tracfone number.   She provided the

20  Somali number that her husband had sent her money to,

21  and the phone number she used while in Somalia.

22  Q     Would you be able to identify those on the summary

23  exhibits that we were looking at earlier?

24  A     Yes.

25  Q     That would be on Government's Exhibit 190 -- no.

1  I take that back.  Exhibit 193 we can look at.

2      Can you tell us what Government's Exhibit -- what

3  are the numbers that she told you?

4  A    So it would be the columns 2, 3, 4, and 5 -- oh,

5  sorry -- row.  Sorry.

6          MR. YAMAMOTO:  I'm sorry.  I'm lost.

7  BY MR. GILLIS:

8  Q    Why don't you just give us the number.

9  A    So the second row --

10 Q    What page are you on?

11 A    Sorry.  It's the first page of Government's

12 Exhibit 193, US-18890.

13 Q    Okay.  Which are the numbers there that she told

14 you she had used?

15 A    So she provided phone numbers (425) 420-5938.

16          THE INTERPRETER:  Your Honor, the interpreter

17 needs the number, please.

18          THE WITNESS:  Yes, ma'am.  I'll go slower.

19          (425) 420-5938, (425) 481-0625,

20 (206) 354-9877, 252-24235922.

21 BY MR. GILLIS:

22 Q    You mentioned that the defendant told you that she

23 stopped talking to Barira after she was arrested in

24 2012 for supporting al-Shabaab.

25      Did a review of the calls captured from Dhirane's

Goodman - Direct by Mr. Gillis

1   home phone differ with that claim?

2   A    They did, yes, sir.

3   Q    Are those calls shown on Government's Exhibit 190?

4   A    Yes, sir, they are.

5   Q    How long were most of those calls between

6   Ms. Dhirane and Barira?

7   A    So nine of the ten ranged from 40 to 60 minutes in

8   length.  One of the calls lasted 20 minutes in length,

9   approximately.

10  Q    By the way, do the calls that we have marked as

11  transcripts and exhibits, do those cover the entire

12  period of the call?

13  A    Not the transcript itself, no, sir.

14  Q    The true length -- the actual length of the call

15  is reflected in Exhibit 190?

16  A    That is correct, sir.

17  Q    Were any of these calls after the date that

18  Dhirane told you that Barira had been arrested?

19  A    Yes, sir.

20  Q    How many of those were there?

21  A    So there are approximately ten calls total, six of

22  which occurred at the end of 2012, and the remaining

23  four occurred in 2013.

24  Q    Including one, for example, on January 13 that

25  lasted 42 minutes as shown on page 18210?

Goodman - Direct by Mr. Gillis

1   A     That is correct, sir.

2   Q     Would you please look at Government's Exhibit 99.

3         Tell us what that is, please.

4   A     It was a telephone conversation between Hinda

5   Osman Dhirane and Barira Hassan Abdullahi.  It occurred

6   on December 15, 2012.

7              MR. GILLIS:  Your Honor, I'd offer -- 99 is

8   in evidence, Your Honor.

9              THE COURT:  It's in evidence.

10             MR. GILLIS:  So, Your Honor, if I could

11  direct your attention to pages 4 and 5 of that document

12  and to pages 8 and 9.

13             THE COURT:  All right.

14  BY MR. GILLIS:

15  Q     Please look at Government's Exhibit 101.  What is

16  that, please?

17  A     It was a telephone call between Ms. Hinda Osman

18  Dhirane and Barira Hassan Abdullahi which occurred on

19  December 23, 2012.

20             MR. GILLIS:  Your Honor, I would offer

21  Government's Exhibit 101.

22             THE COURT:  Any objection?

23             MR. YAMAMOTO:  Just the normal objections.

24             THE COURT:  Over objection, Exhibit 101 is

25  in.

1        MR. GILLIS:  Your Honor, I would direct your

2 attention to pages 1 and 2 and 3 and 4.

3 BY MR. GILLIS:

4 Q    Would you look at Government's Exhibit 103,

5 please.

6 A    Yes, sir.

7 Q    Tell us what that is, please.

8 A    It's a telephone conversation between Ms. Hinda

9 Osman Dhirane and Barira Hassan Abdullahi which

10 occurred on December 28, 2012.

11       MR. GILLIS:  Your Honor, I'd move

12 Government's Exhibit 103.

13       THE COURT:  Over objection, Exhibit 103 is

14 admitted.

15       MR. GILLIS:  Your Honor, I would direct your

16 attention to pages 1 and 2 of that document.

17 BY MR. GILLIS:

18 Q    Would you look at Government's Exhibit 110,

19 please.

20 A    Yes, sir.

21 Q    Tell us what that is, please.

22 A    It's a telephone conversation between Ms. Hinda

23 Osman Dhirane and Barira Hassan Abdullahi which

24 occurred on January 10, 2013.

25       MR. GILLIS:  I'd move to admit Government's

1  Exhibit 110, Your Honor.

2          THE COURT:  Over objection, Exhibit 110 is

3  admitted.

4          MR. GILLIS:  If I could, Your Honor, I would

5  direct your attention to pages 3 through 6 of that

6  document.

7          May I have one moment, Your Honor?

8          THE COURT:  Yes.

9          MR. GILLIS:  If I could, Your Honor, I would

10 play for you Government's Exhibit 4I-8.

11         THE COURT:  All right.

12      (A video is played.)

13 BY MR. GILLIS:

14 Q   Agent Goodman, would you tell us:  In this

15 interview of the defendant, did you ask her about

16 Barira Hassan?

17 A    Yes, sir.

18 Q    Initially, did she tell you whether she knew

19 anyone by that name?

20 A    She stated she did not know anybody by that name.

21 Q    Did you ask her if she knew someone by the name of

22 Umu Ibrahim?

23 A    Yes, sir.

24 Q    What did she say?

25 A    She knew Umu Ibrahim from Paltalk.  It was a group

1  of ten women from different countries.  She was one of

2  those.

3  Q    Did the defendant say whether Umu Ibrahim had ever

4  given her her real name?

5  A    She stated she had not.

6  Q    Did she describe how familiar she was with Umu

7  Ibrahim?

8  A    She stated she was not familiar with her -- she

9  was not very familiar with her.  She knew her from the

10  Paltalk group, but she didn't know who -- she didn't

11  know her.

12  Q    Did you ask her about any money transfers

13  involving Umu Ibrahim?

14  A    I did.

15  Q    What did she say about that?

16  A    Initially, she stated that she did not send her

17  money -- Umu Ibrahim did not send her money.  She

18  reiterated that she did not know her.  When pressed

19  later, she stated that one time she did provide Umu

20  Ibrahim with Hodan Ismail Hassan's name and number so

21  that Umu Ibrahim could provide money for a school.

22  Q    Did you ask her about whether she had -- why don't

23  you tell us what else you asked her of a financial

24  nature concerning Umu Ibrahim?

25  A    I asked her several times in several variations

1  about whether she helped Umu Ibrahim send money to

2  anyone in Somalia.  I asked her if she had sent money

3  on her behalf.

4  Q    We're speaking of Umu Ibrahim?

5  A    We're speaking of Umu Ibrahim -- Dhirane speaking

6  of Umu Ibrahim.

7  Q    What did she tell you in answer to those

8  questions?

9  A    Ms. Dhirane stated that she had not aided her in

10 reference to Umu Ibrahim, and she had not assisted her

11 in reference to Umu Ibrahim.

12 Q    When you say aided, did you ask her whether she

13 had arranged for Umu Ibrahim to send money to Somalia?

14 A    Yes, sir, I did.

15 Q    What is it that she told you?

16 A    She stated she did not arrange for Umu Ibrahim to

17 send money to Somalia; later provided the example that

18 she did one time, provided her with Hodan Ismail

19 Hassan's name and number to send money for a school.

20 Q    Was that after she had initially denied?

21 A    Yes.

22 Q    How did she describe her relationship with Umu

23 Ibrahim?

24 A    She stated she only knew her from Paltalk.  They

25 did chat on Paltalk, she thinks.  She doesn't recall if

Goodman - Direct by Mr. Gillis

1  they ever talked on the phone.

2  Q    Did she say whether they were close?

3  A    She stated they were not close.  She knew her from

4  a group of ten women from different countries within

5  Paltalk but met online to talk.

6  Q    Based upon your review of the financial documents

7  that have been summarized here in the transcripts, did

8  you find evidence that Dhirane did, in fact, know

9  Barira Hassan?

10  A    Yes, sir.

11  Q    Did you find evidence that Dhirane did, in fact,

12  arrange for or assist Barira Hassan to send money to

13  Somalia?

14  A    Yes, sir.

15  Q    I'd ask you to look, please, at Government's

16  Exhibit 79.

17            MR. GILLIS:  Exhibit 79 is in evidence, Your

18  Honor.

19            THE COURT:  All right.

20            MR. GILLIS:  I would direct your attention,

21  Your Honor, to pages 4 and 5.

22  BY MR. GILLIS:

23  Q    Also, if you would, look at Government's

24  Exhibit 81.

25            THE COURT:  Is 81 in evidence?

1            THE CLERK:  No.

2            MR. GILLIS:  I beg your pardon, Your Honor?

3            THE COURT:  Is 81 in evidence?

4            MR. GILLIS:  Exhibit 81 is not in evidence,

5    Your Honor.

6            THE COURT:  Are you moving it into evidence?

7            MR. GILLIS:  I am, Your Honor.

8            THE COURT:  Over objection, Exhibit 81 is

9    admitted.

10   BY MR. GILLIS:

11   Q    Who are the participants in that chat that is 81?

12   A    This is Muna Osman Jama and Hinda Osman Dhirane.

13           MR. GILLIS:  Your Honor, I would just like to

14   ask the agent is this the day after the conversation.

15           THE COURT:  All right.

16   BY MR. GILLIS:

17   Q    Is this the day after the conversation in 79?

18           THE INTERPRETER:  I'm sorry.

19           MR. GILLIS:  I'll withdraw the question, Your

20   Honor.

21   BY MR. GILLIS:

22   Q    Would you look, please, at Government's

23   Exhibit 82.

24           MR. GILLIS:  Your Honor, since it's in

25   evidence, I would just note that it is the same day as

1    the conversation in 79 and 81.  I submit that it might

2    be helpful to the Court to have the agent summarize

3    those.

4              THE COURT:  All right.  Go ahead.

5              MR. YAMAMOTO:  Your Honor, they are two

6    different days.

7              THE COURT:  Exhibits 79 and 81?

8              MR. YAMAMOTO:  Exhibits 79 and 81.

9              MR. GILLIS:  Fair enough.  Exhibit 79 is on

10   June 7.  Exhibit 81 is on June 8, and 82 is on June 8.

11             THE COURT:  All right.

12   BY MR. GILLIS:

13   Q    Can you summarize for the Court what's going on

14   there?

15   A    Yes, sir.  So starting off in 79, Ms. Dhirane is

16   relating to Ms. Jama that the girls in Hargeysa have

17   called me.  The hawala Iftiin had told them that

18   somebody had sent money, but we don't know who.  So the

19   girls had called Dhirane, who sent the money.

20   Ms. Dhirane is asking Muna Osman Jama:  Do you know who

21   sent it?  I think it was Umu Ibrahim.  Ms. Jama states,

22   Yeah.  Her name is Barira something.

23   Q    Can you slow down just in case the interpreters

24   are having trouble with that.

25   A    Yep.  It was my fault.  Sorry.

Goodman - Direct by Mr. Gillis

1   Q     Go ahead.

2   A     Ms. Dhirane proceeds to tell Ms. Jama, Please

3   contact Umu Ibrahim and see if she's the one that sent

4   it.

5         You go into 81.  Ms. Jama is asking about a

6   different individual who to send the money to, and in

7   that chat conversation --

8   Q     I'm sorry.  This conversation in 81 is, again,

9   between Jama and Dhirane?

10  A     It is the same.  All three of these are -- sorry.

11  Yes, 79 and 81 are Muna Osman Jama and Hinda Dhirane.

12  Q     Okay.  Go ahead, please.

13  A     Dhirane says the girls received money but don't

14  know who it's from.  They don't know whether to go pick

15  it up.  Ask Umu Ibrahim.  And then in a chat between

16  Dhirane and Jama, Dhirane says, Have you had a chance

17  to talk to Umu Ibrahim?

18        Ms. Jama says, No, not yet.

19        Right after that chat, Ms. Jama contacts Farhia

20  Hassan --

21  Q     Which exhibit is that?

22  A     Sorry.  It's 82.

23        I apologize.

24        And Ms. Jama asks Farhia Hassan, Did you send the

25  money?  The girls were asking about it.

1      Farhia Hassan says, I did.  I sent it under the

2  previous name they knew me as.  I sent it through

3  Iftiin.  They can go get it.

4      Jama offers her appreciation.

5         THE COURT:  All right.

6  BY MR. GILLIS:

7  Q   Would you look at Government's Exhibit 94, please.

8      Would you tell us what that is, please.

9  A   This is a telephone conversation between Muna

10 Osman Jama and Barira Hassan which occurred on

11 October 8, 2012.

12        MR. GILLIS:  Your Honor, I'd offer

13 Government's Exhibit 94.

14        THE COURT:  All right.  Over objection,

15 Exhibit 94 is admitted.

16        MR. GILLIS:  Your Honor, I would just direct

17 your attention to pages 7 and 8 of Exhibit 94.

18 BY MR. GILLIS:

19 Q   If I could ask you to look at Government's

20 Exhibit 171.

21     Would you tell us what that is, please.

22 A   This is a telephone conversation between Ms. Hinda

23 Osman Dhirane and Hodan Ismail Hassan which occurred on

24 September 24, 2013.

25        MR. GILLIS:  Your Honor, I'd offer

Goodman - Direct by Mr. Gillis

1  Government's Exhibit 171.

2          THE COURT:  All right.  Over objection,

3  Exhibit 171 is admitted.

4          MR. GILLIS:  Your Honor, I would direct your

5  attention or request your attention to pages 1 through

6  4 of Exhibit 171.

7          THE COURT:  All right.

8  BY MR. GILLIS:

9  Q    Did you ask in your interview with the defendant

10 about Amina Ali?

11 A    I did.

12 Q    Did this conversation take place in the context

13 of -- what was the context in which you were asking her

14 about Amina Ali?

15 A    This is right after I asked Ms. Dhirane about her

16 understanding of al-Shabaab as a foreign terrorist

17 organization.

18 Q    What did the defendant tell you about whether she

19 knew or was familiar with Amina Ali?

20 A    She was familiar with Amina Ali.  She had not met

21 her.

22 Q    How was she familiar with her?

23 A    She knew that Amina Ali had been arrested for

24 supporting al-Shabaab.

25 Q    Did Ms. Dhirane mention anything about the proof

1  that the government had against Amina Ali?

2  A    Yes.  She stated Amina Ali had been arrested for

3  supporting al-Shabaab.

4  Q    I'm sorry.  Is this what Dhirane is telling you?

5  A    Dhirane told me she knew Amina Ali had been

6  arrested for supporting al-Shabaab, but in that case,

7  the government had proof.  She stated her situation was

8  different because she never --

9  Q    The government had proof of what?

10 A    Ms. Amina --

11        THE INTERPRETER:  Your Honor, the interpreter

12 would like the question repeated.

13        THE COURT:  All right.

14 BY MR. GILLIS:

15 Q    In regard to the Amina Ali case, you said that she

16 said in that case the government had proof?

17 A    Yes, sir.

18 Q    And my question was proof of what?  Did she say?

19 A    This was in the context of Amina Ali had sent

20 money to support al-Shabaab.  In that case, they had

21 proof.  So the inference there was that they had proof

22 that she sent money to al-Shabaab.

23 Q    Did she tell you she knew what happened to Amina

24 Ali?

25 A    She knew she had been arrested.

Goodman - Direct by Mr. Gillis

1  Q    Well, ultimately, did you have any discussion

2  about whether she had been convicted or whether she had

3  been sentenced?  Do you recall?

4  A    I don't recall if I actually asked about her

5  conviction.  I asked her...

6  Q    Did you point out or did you tell the defendant

7  that you believed her situation was the same as Amina

8  Ali's?

9  A    I did.

10  Q    How did she respond to that?

11  A    She stated that her situation was different.  In

12  the Amina Ali case, they had proof, they being the

13  government.  In her case, she never actually sent

14  money, her case being Ms. Dhirane.

15          MR. GILLIS:  Your Honor, if I could, I would

16  like to play for you Government Exhibit 4I-2.

17          THE COURT:  All right.

18      (A video is played.)

19          MR. GILLIS:  If I could also, Your Honor,

20  play Government Exhibit 4I-3.

21          THE COURT:  All right.

22      (A video is played.)

23          MR. GILLIS:  Thank you, Your Honor.

24          THE COURT:  Mr. Gillis, how much longer with

25  this witness do you think you have?

Goodman - Direct by Mr. Gillis

1          MR. GILLIS:  Your Honor, I would say probably

2   about another hour --

3          THE COURT:  All right.

4          MR. GILLIS:  -- or less.

5          THE COURT:  All right.  We're going to recess

6   for the evening.  We'll begin again at 9:00.

7          What other witnesses are there for the

8   government's case?

9          MR. GILLIS:  The agent is our last witness,

10  Your Honor.

11         THE COURT:  All right.

12         MR. GILLIS:  If I could, Your Honor, I just

13  wanted to be clear about the exhibits that we were --

14  the underlying exhibits to Government's Exhibit 194

15  that we were offering.  They are the exhibits listed

16  there.  If I could just read them into the record.

17         THE COURT:  In 194?

18         MR. GILLIS:  Exhibit 193, the summary.

19         THE COURT:  Yes.  Those are admitted.

20         MR. GILLIS:  Your Honor, we do not offer

21  Exhibit 4I, Government's Exhibit 4I.

22         THE COURT:  All right.  Is that listed on

23  193?

24         MR. GILLIS:  It is in a couple of places,

25  Your Honor.

Goodman - Direct by Mr. Gillis

1          THE COURT:  I see.  All right.

2          MR. GILLIS:  And we do not offer it.

3          THE COURT:  All right.  Any others other than

4  4I?

5          MR. GILLIS:  No.

6          THE COURT:  All right.

7          MR. GILLIS:  Thank you, Your Honor, sir.

8          THE COURT:  All right.  Did the defense want

9  4I in?

10         Think about it.

11         All right.  The exhibits other than

12  Exhibit 4I listed in 193 will be admitted.

13         All right.  What's the defense situation as

14  far as your witness that we were talking about?

15         MS. MINTER:  Your Honor, I think at this

16  point we're committed to presenting that witness on

17  Monday.

18         THE COURT:  All right.  That's fine.  All

19  right.

20         MS. MINTER:  Thank you, Your Honor.

21         THE COURT:  All right.  We'll begin tomorrow

22  morning at 9:00.

23         Agent, do not discuss your testimony during

24  the evening break.

25         THE WITNESS:  Yes, Your Honor.

Goodman - Direct by Mr. Gillis

1          THE COURT:  All right.  The Court will stand

2   in recess.

3          ------------------------------------

                    Time:  6:01 p.m.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21        I certify that the foregoing is a true and

22   accurate transcription of my stenographic notes.

23

24
                                        /s/
25                          Rhonda F. Montgomery, CCR, RPR