```
 1                   UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF VIRGINIA
 2                        ALEXANDRIA DIVISION

 3   UNITED STATES OF AMERICA,    )  Case 1:14-cr-00230
                                  )
 4                 Plaintiff,     )
                                  )
 5         v.                     )  Alexandria, Virginia
                                  )  July 14, 2016
 6   MUNA OSMAN JAMA,             )  9:13 a.m.
     and                          )
 7   HINDA OSMAN DHIRANE,         )
                                  )
 8                 Defendants.    )  Day 4
                                  )  Pages 738 - 865
 9

10                     TRANSCRIPT OF TRIAL

11          BEFORE THE HONORABLE ANTHONY J. TRENGA

12             UNITED STATES DISTRICT COURT JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25       COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
```

1  APPEARANCES:

2  FOR THE PLAINTIFF:

3       JAMES P. GILLIS, ESQUIRE
        DANYA E. ATIYEH, ESQUIRE
4       OFFICE OF THE UNITED STATES ATTORNEY
        2100 Jamieson Avenue
5       Alexandria, Virginia  22314
        (703) 299-3700
6
   FOR DEFENDANT MUNA OSMAN JAMA:
7
        WHITNEY E.C. MINTER, ESQUIRE
8       GEREMY C. KAMENS, ESQUIRE
        OFFICE OF THE FEDERAL PUBLIC DEFENDER
9       1650 King Street, Suite 500
        Alexandria, Virginia  22314
10      (703) 600-0800

11      JOSHUA M. SIEGEL, ESQUIRE
        COOLEY, LLP
12      1299 Pennsylvania Avenue, N.W., Suite 700
        Washington, D.C.  20004-2400
13      (202) 842-7800

14 FOR DEFENDANT HINDA OSMAN DHIRANE:

15      ALAN H. YAMAMOTO, ESQUIRE
        LAW OFFICE OF ALAN YAMAMOTO
16      634 South Washington Street
        Alexandria, Virginia  22314
17      (703) 684-6643

18      PAULA SEMMES DEUTSCH, ESQUIRE
        OFFICE OF THE FEDERAL PUBLIC DEFENDER
19      1601 Fifth Avenue, Suite 700
        Seattle, Washington  98101
20      (206) 553-1100

21 THE DEFENDANT, MUNA OSMAN JAMA, IN PERSON

22 THE DEFENDANT, HINDA OSMAN DHIRANE, IN PERSON

23 MARYAM ABDI, SOMALI INTERPRETER

24 HASSAN ABDI, SOMALI INTERPRETER

25

1                          **I N D E X**

2   WITNESS                  EXAMINATION                    PAGE

3   C.J. Goodman         Further Direct by Mr. Gillis   744
                         *Voir Dire* by Ms. Minter       766
4                        Further Direct by Mr. Gillis   767
                         Cross by Ms. Minter            792
5                        Cross by Mr. Yamamoto          799
                         Redirect by Mr. Gillis         818

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              THE COURT:  Good morning.  Ready to proceed?

2              MR. GILLIS:  Good morning, Your Honor.  Yes,

3  sir.

4              THE COURT:  All right.  Agent Goodman, you

5  remain under oath.

6              THE WITNESS:  Yes, Your Honor.

7              MR. GILLIS:  Your Honor, what I'd propose to

8  do since all we've been doing with this witness is to

9  identify the exhibit and not talk about it.

10              THE COURT:  All right.

11              MR. GILLIS:  To significantly shorten things

12  up, what I propose to do is to move into evidence all

13  the calls and chats that have been identified as

14  government exhibits.

15              THE COURT:  All right.

16              MR. GILLIS:  I can give those to you now,

17  sir, or --

18              THE COURT:  Yes.  Did you want to direct my

19  attention to some specific portion of those exhibits?

20              MR. GILLIS:  Your Honor, I can do that in

21  closing depending upon the amount -- actually, could

22  you give us an idea, given that this is such a

23  document-intensive case, how much time you'll allow us

24  for --

25              THE COURT:  What I would like to do is have

1  closing but also give both sides time to submit written

2  summations of their positions.  I think the case

3  requires that in terms of the evidence.

4          MR. GILLIS:  Thank you, Your Honor.

5          So the exhibits that I would move into

6  evidence would be 49, 50, 51, 52, 53, 54, 55, 57, 58,

7  59, 60, 61, 62, 63, 64, 66, 67, 68, 69, 70, 71, 72, 73,

8  75, 76, 77, 80, 83, 85, 87, 89, 91, 92, 93, 95, 96, 97,

9  98, 104, 105A, 105B, 106, 107, 108, 109, 112, 113, 114,

10  115, 117, 118, 119, 120, 123, 125, 128, 129, 132, 133,

11  134, 135, 136, 137, 138, 139, 141, 142, 143, 144, 145,

12  150, 172 -- and although this is a poem, Your Honor, we

13  submit it pursuant to a stipulation as to the accuracy

14  of the translation of the poems, which were written by

15  Defendant Dhirane.

16          Your Honor, that's my understanding of all of

17  the exhibits that were calls or chats that had not yet

18  been moved in.  I will confirm with your court staff to

19  make sure that we have them all in, and, if necessary,

20  I'll add those to the record.

21          Yes.  One moment, Your Honor.

22          THE COURT:  Yes.

23          MS. MINTER:  The Court's indulgence, Your

24  Honor.

25          MR. GILLIS:  The poems were 174.

1           THE COURT:  Exhibit 174?

2           MR. GILLIS:  Yes, sir.

3           THE COURT:  You mentioned 172 as well?

4           MS. MINTER:  I believe that's a call, Your

5  Honor.

6           MR. GILLIS:  Yes, sir, that's a call.  The

7  only one that's not calls or chats would be 174, but we

8  have a stipulation as to that.

9           THE COURT:  All right.  Do you want to state

10 your objections for the record on this?

11          MS. MINTER:  Your Honor, perhaps after the

12 break we could be given a moment to go through the

13 exhibits and reassess.

14          THE COURT:  That's fine.  I'll conditionally

15 admit those subject to your review and objections.

16          MS. MINTER:  Yes, Your Honor.

17          THE COURT:  All right.

18          MR. GILLIS:  Your Honor, what I would propose

19 is to have the agent refer to a few transcripts that

20 are linked together, and I believe it would be helpful

21 to the Court to have the agent explain the connection.

22          THE COURT:  That's fine.

23          MR. GILLIS:  Then a couple of the substantive

24 count transactions, how those were arrived at just as

25 an illustration of the evidence.  I expect that that's

Goodman - Direct by Mr. Gillis

1  not going to take very long, Your Honor.

2           THE COURT:  All right.

3                FURTHER DIRECT EXAMINATION

4  BY MR. GILLIS:

5  Q    Good morning, Agent Goodman.

6  A    Good morning.

7           THE WITNESS:  Good morning, Your Honor,

8  members of the Court.

9  BY MR. GILLIS:

10 Q    First of all, would you take a look at

11 Government's Exhibit J.

12          THE COURT:  Is there a J?

13          MR. GILLIS:  Yes, Your Honor.  Your Honor,

14 it's the jetlag.  I'm afraid that --

15          THE COURT:  4J, is that what it is?

16          MR. GILLIS:  4J, yes.  Thank you, Your Honor.

17          THE CLERK:  I don't have a 4J on my list.

18          MR. GILLIS:  It's a new exhibit that I have

19 given to counsel today.  This was produced in

20 connection with discovery, but we did not add it.  It

21 was omitted from our government's exhibit list by an

22 oversight.

23          THE CLERK:  Thanks.

24 BY MR. GILLIS:

25 Q    Could you take a look at Government's Exhibit 4J.

1  A    Yes, sir.

2  Q    Would you tell us what that is.

3  A    These are Ms. Dhirane's notes during the

4  post-*Mirandized* interview.

5  Q    Okay.  Some of those notes are in your

6  handwriting.  Am I right?

7  A    They are, yes.

8  Q    Can you indicate for us what parts are in your

9  handwriting?

10 A    So on the first page --

11 Q    Yes, sir.

12 A    -- 00434, towards the bottom right-hand corner,

13 there is a drawn outline of a square with several phone

14 numbers inside that square starting at the top with the

15 word "magicJack" and then several phone numbers.

16 Q    Okay.

17 A    Then I denote at the bottom of that square that

18 it's written by SA Goodman, myself.

19 Q    Okay.

20 A    On the second page, 00435, there's another outline

21 of a square at the bottom of the page.  Again, I

22 denoted it's my writing, written by SA Goodman.

23 Q    Okay.  How about the part at the top there where

24 it says Dhirane Notes 07-23-14?

25 A    Yes, sir, that is my handwriting as well.

Goodman - Direct by Mr. Gillis

1  Q     The rest of the document, whose handwriting is

2  that?

3  A     So there's two.  There is another outline of a --

4  Q     I'm sorry.  With respect to Government's

5  Exhibit 4J?

6  A     Yes, sir.

7            THE COURT:  Do you have a copy for the Court?

8            MR. GILLIS:  I beg your pardon, Your Honor.

9  I thought it was given up to the Court, but let me give

10 one to Mr. Burns.

11           THE COURT:  Oh, I have it.  I'm sorry.  We do

12 have it.

13           Thank you, Mr. Farlow.

14 A     So on that first page --

15 Q     Let me ask this first of all.

16 A     Yes, sir.

17 Q     Apart from those that you've already indicated as

18 being in your handwriting, is Defendant Dhirane's

19 handwriting on this document?

20 A     Yes, sir.

21 Q     Apart from Defendant Dhirane's handwriting, is

22 there someone else's handwriting on this document?

23 A     Yes, sir.

24 Q     Are you able to tell us which handwriting is not

25 in the defendant's handwriting?

Goodman - Direct by Mr. Gillis

1   A    Yes, sir.

2   Q    All right.  So if you would, tell us what are the

3   parts that are not -- first of all, in whose

4   handwriting is it?

5   A    So it's both in the female special agent that was

6   in the room with me and my handwriting.

7   Q    All right.  Let me just be clear.  So we've got

8   the two boxes that you've indicated and the Dhirane

9   notes and the date that are in your handwriting?

10  A    Yes, sir.  There's also one other that I failed to

11  mention.

12  Q    Okay.  So mention that now if you would.

13  A    So at the top right corner where it says

14  clarifications by SA Gryz, Special Agent Gryz is the

15  female agent.  I wrote clarifications by SA Gryz.  I

16  wrote those.

17  Q    That's the part that's got a squiggly circle

18  around it?

19  A    Correct.

20  Q    All right.  Apart from those things that you've

21  just identified, is there anyone else's handwriting on

22  this besides the defendant's?

23  A    No, sir.

24  Q    Okay.  So tell us what this is, if you would.

25  A    So as I was interviewing Ms. Dhirane and she

1  provided names and phone numbers, due to the phonetic

2  spelling, I asked her to write down the spellings of

3  certain names and phone numbers.

4  Q    Okay.  Let me ask this:  Are there any parts of

5  this document that are related to the defendant?  In

6  other words, is there anything here that the defendant

7  used as some sort of means of communication?

8  A    That she identified as her means of communication,

9  that is correct.

10  Q    Well, either that or a user -- something that's

11  identified with her as opposed to somebody else?

12  A    Yes, sir.

13  Q    Okay.  What's that?

14  A    The moniker Nicmatu Rabbi.

15  Q    Okay.

16  A    The e-mail address hindadhirane@yahoo.com.

17  Q    Okay.

18  A    Umusafaa@gmail.com.

19  Q    Okay.

20  A    The Bintu Osman, the bottom right.

21  Q    Okay.

22  A    I believe that khadiija13, but I'd have to refer

23  to my interview notes.  But I believe that as well.

24  Q    Well, would it refresh your memory to refer to

25  your interview notes?

Goodman - Direct by Mr. Gillis

1  A    It would be helpful, yes, sir.

2  Q    I'm going to show you your 302 of the defendant,

3  dated July 23, 2014, that was previously provided to

4  the defense counsel.

5        MR. GILLIS:  It's Bates number 17643, Your

6  Honor.

7        THE COURT:  Okay.  You can provide that to

8  the witness for the purposes of refreshing his

9  recollection.

10       What is the pending question?

11  A    Sorry.  Khadiija, sir.  I recall it.  I just

12  didn't recall the context.  Based on my notes and

13  recollection --

14  Q    All right.  Is your memory refreshed at this point

15  as to whether that ID under Bintu Osman, whether that's

16  the defendant's?  Have you looked at that document?

17  A    Yes, sir.

18  Q    Is your memory now refreshed whether it is or it's

19  not?

20  A    Yes, sir.

21  Q    Is your memory refreshed?

22  A    Yes, sir.

23  Q    All right.  Would you hand that document back to

24  Mr. Burns, please.

25       All right.  Now having your memory refreshed, can

Goodman - Direct by Mr. Gillis

1  you tell us whether that user ID was one that she

2  identified as belonging to her?

3  A    No.  It was the one to the left of that, the

4  Khadiija to the left at the bottom.

5  Q    Khadiija?

6  A    Yes, sir.

7         MR. GILLIS:  Your Honor, I'd move in, if I

8  haven't already, Government's Exhibit 4J.

9         THE COURT:  Any objection?

10         MR. YAMAMOTO:  No objection.

11         THE COURT:  Without objection, 4J is

12  admitted.

13  BY MR. GILLIS:

14  Q    Would you take a look, please, at Government's

15  Exhibit 2.

16      Can you tell us what that is?

17  A    This is a visual representation of what we have

18  identified as the participants in the conspiracy here.

19  Q    Are all of the people identified there and the

20  user names underneath, are they identified or mentioned

21  in the calls, chats, or in one of the summaries that

22  have been admitted into evidence?

23  A    Yes, sir.

24         MR. GILLIS:  Your Honor, I'd move in

25  Government's Exhibit 2.

Goodman - Direct by Mr. Gillis

1           THE COURT:  Any objection?

2           MS. MINTER:  Your Honor, we don't object to

3  it as a demonstrative of what the government believes

4  the evidence shows.  It can't speak for itself.

5           THE COURT:  The Court will admit it as a

6  demonstrative exhibit.

7           MR. GILLIS:  Thank you, Your Honor.

8  BY MR. GILLIS:

9  Q    Did you prepare a summary, a chart that shows

10 articles, news media articles that one or the other of

11 the defendants accessed as demonstrated by the

12 court-authorized surveillance?

13 A    I contributed to its formation, yes, sir.

14 Q    You're familiar with it?

15 A    Yes, sir.

16 Q    You've assured yourself of its accuracy?

17 A    Yes, sir, I did.

18 Q    I'd ask you to look at Government's Exhibit 8,

19 please.

20      Is Government's Exhibit 8 the news summary that

21 you prepared?

22      And I'll point out that because of the rule on

23 witnesses, you've not been told that two of the entries

24 have been deleted from the exhibit that was previously

25 in there.

Goodman - Direct by Mr. Gillis

1            MR. GILLIS:  With the Court's permission,

2    I'll point them out to the witness.

3            THE COURT:  All right.

4    BY MR. GILLIS:

5    Q    There were two open source Internet articles,

6    Government's Exhibit Y and Government's Exhibit 8-A

7    that have been -- those exhibits have been withdrawn

8    and --

9            THE COURT:  So it would be --

10           MR. GILLIS:  Well, the old exhibit that the

11   witness is familiar with was Government's Exhibit 8,

12   but it contained two entries referring to open source

13   Internet articles.

14           THE COURT:  Is there a number for the

15   exhibit?

16           MR. GILLIS:  Yes.  It's 8, but it's been --

17           THE COURT:  Exhibit 8.  I thought you said A.

18   I'm sorry.

19           MR. GILLIS:  I beg your pardon.  It's

20   Exhibit 8.  It's the midwestern accent, Your Honor.

21           THE COURT:  No.  That's all right.

22           MR. GILLIS:  So from that exhibit, we've

23   deleted two articles that were open source articles,

24   and I believe I've just identified those two.

25           THE COURT:  A and Y?

Goodman - Direct by Mr. Gillis

1        MR. GILLIS:  That's fine.  I'm sorry for the

2  confusion.

3        Your Honor, we can identify the new exhibit

4  as 8A if that would be convenient.  Oh, there's an 8A

5  already.

6        MR. YAMAMOTO:  Your Honor, we just need to

7  know which one he's deleting out.

8        THE COURT:  Yes.  Which ones have you deleted

9  within 8?

10        MR. GILLIS:  Yes, Your Honor.  All right.  So

11  on page 1885, the second page of the document, we have

12  deleted the last and the third-from-last columns, which

13  refer to -- actually, I'm sorry.  I beg your pardon,

14  Your Honor.  If I may begin again.

15        THE COURT:  That's fine.

16        MR. GILLIS:  On the third page, 18886, we

17  have deleted the last column, and we have deleted the

18  third row -- I'm sorry, thank you -- the last row and

19  the third-from-last row.  Those refer to open source

20  Internet media.  They were marked as Government's

21  Exhibit 8Y1 and 8Y for the third-to-last column, and

22  8A-A for the last column.  So those exhibits have been

23  withdrawn, and those two rows have been deleted from --

24        THE COURT:  All right.  So on 18886, you're

25  saying the last --

1          MR. GILLIS:  The last row, Your Honor.

2          THE COURT:  The last row where it says

3   Puntland?

4          MR. GILLIS:  I'm sorry.  This would be on the

5   third page of -- Your Honor, on the -- I'm sorry for

6   the confusion, Your Honor.  On the exhibit that you now

7   have, that's the new government's exhibit.

8          THE COURT:  I see.  Mr. Farlow has just given

9   me the old exhibit, and I see what you've done.

10          MR. GILLIS:  Okay.  I'm sorry for the

11   confusion, Your Honor.  All right.

12          THE COURT:  So do we have, Ms. Allen, the new

13   Exhibit 8?

14          MR. YAMAMOTO:  We do, Your Honor.

15          THE COURT:  All right.  We have it.  That's

16   fine.  Thank you.

17          MR. GILLIS:  Thank you, Your Honor.

18   BY MR. GILLIS:

19   Q    So you now have the revised Government's Exhibit 8

20   that had simply the deletion of those two rows.  Apart

21   from that, you've assured yourself that all of the

22   other columns and all the other information was

23   accurate; is that right?

24   A    Yes, sir, that's true.

25   Q    Okay.  So if you would, tell us to what these

Goodman - Direct by Mr. Gillis

1   articles pertain in general.

2   A    In general, these pertain to al-Shabaab movements,

3   activities.

4   Q    Are there al-Shabaab figures mentioned as well?

5   A    Yes.  It's al-Shabaab associates, members,

6   leaders, activities.

7   Q    In some cases, al-Shabaab enemies or what are

8   considered al-Shabaab enemies?

9   A    Yes.

10           MR. GILLIS:  Your Honor, I'd move

11  Government's Exhibit 8.

12           THE COURT:  Any objection?

13           MS. MINTER:  Your Honor, there's no

14  fundamental objection, I suppose, to the chart because

15  the chart summarizes the government's exhibits.

16           The Court will recall, though, that we had

17  lodged an objection, and we continue to object to the

18  relevance of open source articles.  But anything that

19  is not open source, Your Honor, I believe has been

20  stipulated to.

21           THE COURT:  All right.  The Court, over

22  objection, will admit Exhibit 8.

23  BY MR. GILLIS:

24  Q    If you would, look at Government's Exhibit 8A --

25  well, actually, let's shorten this up.  So in the

Goodman - Direct by Mr. Gillis

1   second column, what does that refer to?

2   A    The facility of user in which it was collected on.

3   Q    So in that instance, for example, Defendant Jama

4   accessed that news article, and you captured that

5   through the court-authorized surveillance on one of her

6   facilities?

7   A    That is correct.

8   Q    Then with respect to that column showing Defendant

9   Dhirane, the same is true?

10  A    It's from her facility, correct.

11  Q    All right.  So the next column refers to the date

12  of the article.  What is that?

13  A    It's the actual date that the article was written

14  or at least posted online.

15  Q    Okay.  In the date accessed on the Internet, what

16  does that refer to?

17  A    This is the date that it was actually accessed

18  through the broadband.  So the date that the user

19  viewed that article during the court-authorized

20  electronic surveillance.

21  Q    The next column refers to the government's exhibit

22  that is the English translation of the Internet article

23  that the defendants accessed?

24  A    That is correct, sir.

25  Q    Then the last column there, what does that refer

1   to?

2   A    These are the transcripts of the chats and/or

3   phone calls that are associated to that article.  They

4   are speaking about it in some context.

5   Q    They are speaking about it in some context?

6   A    Yes.

7            MR. GILLIS:  Your Honor, I would move into

8   evidence the articles that have not yet been moved in,

9   which would be Government's Exhibits 8A-1, 8D-1, 8O-1,

10  8P-1, 8R-1, 8T-1, 8U-1, 8V-1 only because it's not

11  clear from our notes whether that particular exhibit

12  has been introduced.  If it has, it's already in, Your

13  Honor.  Those are the English translation of the

14  articles.

15           THE COURT:  All right.  Any objection?

16           MS. MINTER:  Your Honor, I don't anticipate

17  any objection.  If we could review them at the break,

18  that would be helpful.

19           THE COURT:  The Court will conditionally

20  admit those subject to giving you an opportunity to

21  assert your objections.

22           MS. MINTER:  Thank you, Your Honor.

23           If I could revise our position with respect

24  to Government's Exhibit 8, I would just say that we

25  would object to the conclusory statements in column 2.

Goodman - Direct by Mr. Gillis

1          THE COURT:  I understand.  The Court has

2   admitted Exhibit 8 understanding the basis for the

3   second column.

4   BY MR. GILLIS:

5   Q    Agent Goodman, would you please look at

6   Government's Exhibit 119, please.  If you would, look

7   at pages 1 through 3 of that document.

8          Have you reviewed those?

9   A    Yes, sir.

10  Q    Then, if you would, look at Government's

11  Exhibit 118 -- I'm sorry.

12         In Government's Exhibit 119, who are the

13  participants in that call or in that chat?

14  A    This is a phone conversation between Hinda Osman

15  Dhirane and Ismahaan Cabdi Cilmi.

16  Q    Who is Ismahaan Cabdi Cilmi?

17  A    She's one of the group of 15.

18  Q    Do you know her username?

19  A    Yeah.  I believe it was Khuluud.

20  Q    If you would, then, look at Government's

21  Exhibit 118 and focus on pages 1 and 2 and 3.

22         Have you had a chance to review those?

23  A    Yes, sir.  Sorry.  One moment.

24         Yes, sir.

25  Q    If you would, could you summarize -- well, first

1  let me, if I didn't, ask you who the participants are

2  in 118.

3  A    This is Hinda Osman Dhirane and Hodan Ismail

4  Hassan.

5  Q    All right.  And if you would, please summarize

6  what's going on here with Exhibits 119 and 118.

7  A    So Abu Kawsar had contacted --

8  Q    Before you do that, I'm sorry.

9         MR. GILLIS:  They aren't in evidence.

10  Technically, Your Honor, they should be first -- well,

11  I take that back.  They are in evidence.  Thank you.

12  BY MR. GILLIS:

13  Q    If you would, please summarize what's going on

14  there with those two conversations.

15  A    Yes.  Abu Kawsar contacted Ms. Dhirane and was

16  asking for money for computers.  They had had to move

17  their location from where they were at to the

18  interior --

19         MR. YAMAMOTO:  My objection is this is his

20  interpretation of what's being said.  It's not

21  necessarily what's being said.

22         THE COURT:  I understand.  I'll hear this as

23  an example of what the government is offering.

24         Go ahead.

25         MR. GILLIS:  Actually, Your Honor, I would

Goodman - Direct by Mr. Gillis

1  also offer it as a summary under Federal Rule of

2  Evidence 1008.

3          THE COURT:  His testimony?

4          MR. GILLIS:  With regard to these two

5  exhibits, I believe the rules permit him to summarize.

6          THE COURT:  I'm not going to let it in as a

7  summary.  I will hear the agent's testimony concerning

8  how he reads what is discussed in here.

9  BY MR. GILLIS:

10 Q    Please continue.

11 A    In the first column between Ms. Dhirane and

12 Ms. Hassan, Dhirane is relaying how Abu Kawsar had

13 contacted her about needing computers because they had

14 to move and they lost five of their computers.  He's

15 asking for $1,000.

16     Ms. Dhirane in the second call is relaying this to

17 Ms. Ismahaan, how Abu Kawsar had contacted about asking

18 for money for the computers.  Ms. Dhirane had stated

19 that she can only pay $100.  She would have to find the

20 other $200 from another source.  When he asked for

21 $1,000, she said, No way.  I can come up with some and

22 agreed upon $100.

23     During that, she's relaying how she went to her

24 husband and had to get the money from her husband.

25 Then she's stating she's going to have to send it to an

Goodman - Direct by Mr. Gillis

1  individual in Qoryoley, Somalia.

2  Q    Do you recall from Mr. Bryden's testimony who Abu

3  Kowthar is?

4  A    Yes.  He was the ISDAC administrator.

5  Q    Do you recall from Mr. Bryden's testimony what the

6  *Somali Memo* was?

7  A    The *Somali Memo* was an al-Shabaab-affiliated

8  website.

9  Q    If you focus your attention on the bottom of

10 page 1 of Exhibit 113 and --

11 A    I'm sorry.  Exhibit 113, sir?

12 Q    Pardon me.  Exhibit 119, page 1.

13 A    Yes, sir.

14 Q    Do the computers relate to that *Somali Memo*?

15 A    Yes.  Ms. Dhirane is relating to Ms. Ismahaan that

16 Abu Kawsar had asked for the money for the computers

17 for *Somali Memo*.

18        MS. MINTER:  Your Honor, I would object to

19 speculation, the lack of foundation, and the document

20 is in evidence.

21        THE COURT:  I understand.  The Court is going

22 to listen to the testimony and give it such weight as

23 it deems appropriate.

24        Let me ask you:  Where on page 1 are you

25 summarizing?

Goodman - Direct by Mr. Gillis

1      THE WITNESS:  So on Government's Exhibit 119.

2      THE COURT:  What do you see as referring to

3 the *Somali Memo*.

4      THE WITNESS:  So on 18351, the third --

5      THE COURT:  I see.

6      THE WITNESS:  -- user up.

7      THE COURT:  All right.

8 BY MR. GILLIS:

9 Q    Would you turn to Government's Exhibit 11, please.

10      MR. GILLIS:  This is in evidence.  It's the

11 summary of the hawala transactions for Defendant

12 Dhirane.

13 BY MR. GILLIS:

14 Q    Would you remind us when the conversation on 118

15 took place between Dhirane and Hodan.

16 A    It occurred on January 23, 2013.

17 Q    And would you remind us -- actually, if you would.

18 Look at the second page of that.  Would you tell us

19 where the payment was going to be going.

20 A    Qoryoley.

21 Q    That's a transliteration.  Are there other

22 spellings of that city?

23 A    There are.

24 Q    Ms. Dhirane says that she would instruct her

25 husband to send the money the next day?

Goodman - Direct by Mr. Gillis

1   A    Correct.

2            THE COURT:  Is this 118 or 119?

3            THE WITNESS:  Exhibit 118, sir.  Sorry.

4            THE COURT:  Where is the reference to

5   Qoryoley?  I see it.  All right.

6   BY MR. GILLIS:

7   Q    Would you look, please, for the entry at

8   January 23, 2013.

9   A    On Exhibit 11?

10  Q    Yes, sir.

11  A    Yes, sir.

12  Q    Do you see that?

13  A    I do, sir.

14  Q    What's the amount of that payment?

15  A    $100.

16  Q    Where is it being sent?

17  A    Qoryoley.

18  Q    That's an alternative spelling for the Qoryoley

19  that appears in Exhibit 118?

20  A    Yes, sir, it is.

21  Q    Who is the recipient of this $100?

22  A    Daahir Abdi, D-A-A-H-I-R, Abdi, A-B-D-I.

23  Q    Did you ask the defendant about Daahir Abdi during

24  your interview of her?

25  A    I did, yes, sir.

Goodman - Direct by Mr. Gillis

1  Q     Could you tell us what she had to say about this

2  person.

3  A     She stated she had sent money to Daahir Abdi.

4  Q     Do you recall, Agent?

5  A     I believe I have it, but I would like to see the

6  notes just to --

7  Q     Would it refresh your memory?

8  A     Yes, sir, it would.

9          MR. GILLIS:  If I could ask Mr. Burns to hand

10 you the same 302.

11         THE WITNESS:  I apologize, Your Honor.  One

12 moment.

13         THE COURT:  All right.

14 A     Yes, sir.

15 Q     Having reviewed your 302, is your memory now

16 refreshed?

17 A     Yes, sir, it is.

18 Q     So can you tell us what the defendant told you

19 about that person, Daahir Abdi?

20 A     She stated she remembered hearing Daahir Abdi in

21 Paltalk asking for money for the poor people in

22 Somalia, and that's why she sent that money.

23 Q     Would you turn with me, please, to Government's

24 Exhibit 44.  If I could direct your attention to the

25 fourth page of that document.

Goodman - Direct by Mr. Gillis

1    A    Yes, sir.

2    Q    What does that refer to?  What is that

3    conversation 44 about?

4    A    This is a phone conversation between Ms. Muna

5    Osman Jama and Hinda Osman Dhirane --

6              MS. MINTER:  Same objection, Your Honor.

7              THE COURT:  Overruled.

8    A    -- in which Ms. Jama is referring to the other

9    side, the Kenya side, and refers to Umu Camaar -- as we

10   know as Fardowsa Jama Mohamed -- talking about the

11   money that reaches her and that she rents the homes

12   that are run by the infidels and collecting the money

13   for the month.

14   Q    How many homes does Jama say they're renting?

15             THE COURT:  Are you on page 4?

16             MR. GILLIS:  I beg your pardon.  Page 4 of

17   Exhibit 44, Your Honor.

18             THE COURT:  I see.  Yes.  All right.

19   BY MR. GILLIS:

20   Q    How many homes does Jama say Umu Camaar in Kenya

21   was renting?

22   A    Two homes.

23   Q    Could you take a look, please, at Government's

24   Exhibit 170 -- I beg your pardon -- 170.

25        Who are the participants in that conversation?

Goodman -- *Voir Dire* by Ms. Minter

1  A    This is Ms. Hinda Osman Dhirane and Ms. Farhia

2  Hassan.

3  Q    Would you focus, please, on pages 6 -- US triple

4  or quadruple 0-6 and 7, please.

5           THE COURT:  Exhibit 170 may not have been

6  admitted.  You're offering it?

7           MR. GILLIS:  Yes, Your Honor.

8           THE COURT:  All right.  Subject to the same

9  objections asserted, the Court will admit 170.

10          MS. MINTER:  Your Honor, could I clarify one

11  point if the witness has the exhibit?

12          THE COURT:  Yes.

13          MS. MINTER:  Or perhaps the government would

14  stipulate.  But if I could just very briefly.

15              *VOIR DIRE* EXAMINATION

16  BY MS. MINTER:

17  Q    Agent Goodman, you have Exhibit 170 in front of

18  you?

19  A    Yes, ma'am, I do.

20  Q    The first line on your copy, is that followed by

21  the name Farhia?

22  A    The date and times?

23  Q    Yes, indicated after the date and time.

24  A    Yes.  It does not say Farhia Hassan.

25  Q    I'm sorry.  It does or does not?

1    A    It does not.

2             MS. MINTER:   Okay.   Your Honor, I would just

3    say that in the exhibits that were presented to us, our

4    understanding is the government added that for clarity

5    of their belief of the speaker, but I would like it to

6    be clear from the record that's not part of the

7    original exhibit as captured.

8             THE COURT:   All right.   The Court will admit

9    the exhibit with that understanding and qualification.

10                   FURTHER DIRECT EXAMINATION

11   BY MR. GILLIS:

12   Q    That identification comes from the summary chart

13   that we talked about earlier with respect to the

14   facilities and the identification of the users?

15   A    Correct, yes, sir.

16             MR. GILLIS:   Your Honor, Mr. Yamamoto has

17   told me that he does not have the pages after Bates

18   number --

19             MR. YAMAMOTO:   I've got them now.

20             MR. GILLIS:   Okay.   I just wanted to confirm

21   that the Court and counsel for Ms. Jama had those

22   pages.

23             THE COURT:   Of Exhibit 170?

24             MR. GILLIS:   Yes, Your Honor.

25             THE COURT:   Yes.   I have 170, Bates Numbers

Goodman - Direct by Mr. Gillis

1  01 through 010.

2          MR. GILLIS:  Thank you, Your Honor.  That's

3  the complete exhibit.

4          THE COURT:  All right.

5  BY MR. GILLIS:

6  Q    So with respect to 170, have you focused on

7  pages 6 and 7?

8  A    Yes, sir.

9  Q    Then if you would, look at Government's

10 Exhibit 171 and focus in particular on pages 4 through

11 6.

12 A    Yes, sir.

13 Q    Could you summarize for us, please, what is going

14 on in those two transcripts.

15        Can I ask you first:  Who are the participants in

16 the second conversation?

17 A    So in the second conversation, it is Hinda Osman

18 Dhirane and Hodan Ishmail Hassan occurring the day

19 after the chat conversation referenced previously.

20 Q    Okay.  So tell us what's going on in those two

21 conversations, please.

22 A    So on the first chat conversation between

23 Ms. Dhirane and Ms. Farhia Hassan in Holland,

24 Ms. Farhia Hassan is informing Ms. Dhirane:  I found

25 two other women who can contribute.  I was going to

Goodman - Direct by Mr. Gillis

1  give them the name of the individual to send it to so

2  they don't think that I'm taking the money.

3      Ms. Dhirane says, Don't do that because she's

4  known.  Don't do that.

5      Ms. Farhia says, Well, I'll tell them it's for

6  orphans.

7      Ms. Dhirane says, No.  It's best just to tell them

8  that it's just for the people for food.

9      The very next day on the second call, 171, you had

10  Ms. Dhirane explaining this conversation to Ms. Hodan

11  Ishmail Hassan.  She relates the previous conversation

12  to Ms. Hodan Hassan in Somaliland.

13      Ms. Hodan Hassan states, No.  It's best not to

14  tell them it's for orphans.  If they come to Somalia,

15  they're going to want to see what orphans we're

16  contributing to, and that will get us in trouble.  It's

17  best to say --

18      In Dhirane's words, it's best to make them believe

19  about a school.

20      Ms. Hodan proceeds to say, Yes, this is good.  We

21  can say about a school, and then we're contributing to

22  many people.  Therefore, there's no specific entity

23  that we can show them who we're contributing to and

24  they wouldn't trip us up.

25  Q    In the end, if you turn to page 8 of Government's

Goodman - Direct by Mr. Gillis

1    Exhibit 171, in particular, toward the middle there

2    where Defendant Dhirane says, No, forget about it, what

3    do Dhirane and Hodan Ishmail Hassan decide to do about

4    these two women who were going to offer money for

5    orphans?

6    A    Because at that time, they were only contributing

7    $10 each.  They felt like this would be too much

8    trouble for those women.  So they decided not to use

9    those women.

10   Q    Well, too much trouble in what sense?

11   A    That the questions that could be raised by them,

12   the amount of explanation they would have to give and

13   they could be called upon because those women do have

14   access to Hargeysa, that in and of itself was too much

15   trouble for the amount of money they were going to

16   give.

17   Q    If you would, please turn to Exhibit 105.  If you

18   would focus in particular, first, on pages 817 to 818

19   and then pages -- pardon me -- 826 and 827.  So pages

20   817 to 818 and then pages 826 to 827.

21        Have you reviewed those?

22   A    Yes, sir.

23   Q    If you'd look, please, at Government's

24   Exhibit 105A, just page 1, would you let me know when

25   you've reviewed that.

Goodman - Direct by Mr. Gillis

1   A     Yes, sir.  I've reviewed it.

2   Q     Then if you'd turn back to 105 and look at

3   pages 834 through 836 and beginning towards the bottom

4   where it says, My husband called me.

5         While we're at it, can you tell us in the first --

6   in 105 that we looked at first, who are the

7   communicants there?

8   A     So this is an online chat communication between

9   Muna Osman Jama and Fardowsa Jama Mohamed on

10  December 31.

11  Q     In 105A, who are the communicants there?

12  A     This is an audio conversation on the telephone, a

13  telephone conversation between Muna Osman Jama and her

14  husband.

15  Q     That's on the same day?

16  A     That's also on December 31, 2012, yes.

17  Q     Then, if you would, turn back with me to

18  Government's Exhibit 105, pages 834 and 836, 834

19  through 836.

20  A     Yes, sir.

21  Q     You've reviewed those three pages?

22  A     Yes, sir, I have.

23  Q     Okay.  Would you summarize for the Court what's

24  going on in these two conversations?

25              MS. MINTER:  Your Honor, I'd just ask the

1  Court to note our continuing objection.

2           THE COURT:  All right.  Overruled.

3           THE WITNESS:  So Ms. Jama was unable to send

4  the money to Ms. Fardowsa Jama Mohamed, the hawala, in

5  this case Dahabshiil, had told her that she could not

6  send the money, that the name was on a list according

7  to Ms. Jama.  Ms. Jama's relating this to Ms. Fardowsa

8  Jama Mohamed saying, I could not send you the money.

9  They said it was on a list.

10          Ms. Fardowsa asks --

11          THE COURT:  This is between 834 and 836?

12          MR. GILLIS:  This is, Your Honor, 817 and 18

13  I believe he's referring to now.

14          THE COURT:  All right.

15  BY MR. GILLIS:

16  Q    If you would, continue with your summary, Agent.

17  A    Ms. Fardowsa Jama is asking was it the American

18  side or the Kenya side.  They're not sure.

19  Q    Rather than the side, is it the government that

20  she mentions, the American or the Kenyan government?

21  A    Yes, sir, that is correct, sir.

22       Ms. Jama relates to Ms. Fardowsa how her husband

23  had told her to stay away from Paltalk, that her mouth

24  is what's causing the trouble.  That's in this 105.

25  Q    So 105A takes place between those two

1  communications between Jama and Fardowsa; is that

2  right?

3  A    That's correct.

4  Q    So she first has the conversation that you just

5  related with Fardowsa --

6  A    Correct.

7  Q    -- about whether it's the Kenyan or the American

8  government list that she might be on?

9  A    Correct.

10      So back to Exhibit 105 between Ms. Muna Osman Jama

11  and Fardowsa Jama Mohamed, Ms. Fardowsa Jama Mohamed

12  tells her -- or Ms. Muna Osman Jama says, I'll state

13  that it was for my aunt who was in hardship.

14      Fardowsa Jama Mohamed concurs and states, I will

15  say that I was your aunt in hardship but

16  nevertheless --

17  Q    That's on page 826 of 105?

18  A    It's on page 826.  Sorry.

19      And then just to further that, going into 827 at

20  the top where Ms. Fardowsa states she will claim that

21  she was in hardship and the money was collected for

22  her.

23  Q    And then the call with the husband occurs; is that

24  right?

25  A    In the midst of this, yes.

Goodman - Direct by Mr. Gillis

1  Q     What does she say to the husband?

2  A     She says, I didn't do anything wrong.

3        She says, I was helping my aunt's child with

4  school expenses.  That is it.  There's nothing else I

5  was doing.  If they accuse me of not working, then I'll

6  just state that my husband was working.

7  Q     Okay.  Then after that, she comes back to Fardowsa

8  and tells her that she's received a call from her

9  husband?

10 A     Yes.

11 Q     What then do Fardowsa and the defendant discuss?

12 A     She relates how her husband told her to stay away

13 from Paltalk.

14            THE COURT:  Which exhibit is this now?

15            THE WITNESS:  I'm sorry.  Back into 105,

16 that's a reference to Exhibit 105A at the top where he

17 says, Stay away from your computer and the Paltalk.

18            THE COURT:  What page?

19            THE WITNESS:  On the first page of 105A,

20 00481.

21 BY MR. GILLIS:

22 Q     No.  I'm sorry.  I think the Court was asking with

23 respect to the chat.  Where is it that refers to the

24 husband having called?

25 A     I apologize.

Goodman - Direct by Mr. Gillis

1  Q     In any event, Agent, during this conversation,

2  this communication between Jama and Fardowsa, the

3  husband calls?

4  A     Correct.

5  Q     From those exhibits, from the two exhibits, do

6  they show the time stamp that the conversation took

7  place?

8  A     They do, yes, sir.

9  Q     So after the conversation involving the husband,

10 what do they then talk about on 126 through 127 or 8

11 rather -- yes, 27.

12            THE COURT:  Of 105?

13            THE WITNESS:  Of 105, yes, sir.

14            MR. GILLIS:  Of 105, yes, Your Honor.

15 BY MR. GILLIS:

16 Q     Actually, I'm sorry.  If you'd look at

17 Government's Exhibit -- if you'd look at page 834

18 through 836.

19 A     Yes, sir.  At the bottom of 834, sir, is where

20 Ms. Jama relates, My husband called me and said stay

21 away from Paltalk.

22 Q     All right.  And I'm sorry.  So then the

23 conversation continues after the call from the husband?

24 A     That's correct.

25 Q     So have you had a chance to review 834 through

1   836?

2   A     Yes, I have, sir.

3   Q     So could you summarize what the two women

4   discussed after the husband's call?

5   A     So Ms. Fardowsa Jama Mohamed proceeds to tell

6   Ms. Muna Osman Jama, Delete the names, delete all of

7   the stuff.  They can't do anything to you but delete

8   any evidence.

9         This is on page 835, sir.

10              THE COURT:  I see.

11  A     Proceeding on to 836, Ms. Muna Osman Jama relays

12  her concerns that what if they're monitoring me, the

13  government?  What if they captured the Sheikh Jama

14  Abdulsalam and the brothers?

15        Ms. Fardowsa Jama Mohamed proceeds to state in the

16  middle there of 836, The infidels cannot do anything to

17  you.  We trust in God.  But remove from your home

18  anything that could be evidence.

19  Q     If you would, look at the last line of 835 and

20  continue on to the middle there of 836.

21  A     Yes, sir.  Right after Ms. Fardowsa Jama Mohamed

22  tells Muna Osman Jama to delete the evidence, Muna

23  Osman Jama says, The money I sent before, God only

24  knows if they were monitoring me to Sheikh Jama

25  Abdulsalam and other brothers.

Goodman - Direct by Mr. Gillis

1           THE COURT:  Where is that?

2           THE WITNESS:  It starts on the bottom of

3  page 835, sir, of Exhibit 105.

4           THE COURT:  I see, yes.

5           THE WITNESS:  And proceeds on to the middle

6  of the page 836.

7  BY MR. GILLIS:

8  Q    Do you recall the testimony of Mr. Bryden as to

9  who this Jama Abdulsalam is?

10 A    I do, yes, sir.

11 Q    Could you tell us what he said about that.

12 A    He said Sheikh Jama Abdulsalam was affiliated with

13 al-Shabaab in 2010 once returning from the United

14 Kingdom, that he had the same ideology as Sheikh Mumin

15 and was a propagandist who reported al-Shabaab online.

16 Q    Would you look, please, at Government's

17 Exhibit 10, in particular on the third and fourth

18 entries on Exhibit 10.

19      What do you see there about those two entries?

20 A    I see here that Muna Osman Jama sent in the two

21 entries for a total of $350 to Jama Abdulsalam in

22 Somalia.

23 Q    Do you see the first entry there for Bashir Gelle?

24 A    Yes, sir, I do.

25 Q    From the testimony of Ms. Esse and Mr. Bryden, can

1  you tell us what their testimony was with respect to

2  Bashir Gelle?

3  A    Yes.  Ms. Esse stated that Bashir Gelle had

4  appeared in the ISDAC chat room soliciting money for

5  al-Shabaab.

6       Mr. Bryden had testified that Bashir Gelle had

7  been a supporter of al-Shabaab in the same context when

8  she mentioned Sheikh Mumin and Jama Abdulsalam.

9  Q    Then, if you would, please turn to Exhibit 168 in

10 particular.

11           MR. GILLIS:  One moment, Your Honor.

12 BY MR. GILLIS:

13 Q    If you'd focus on pages 3 through 5, the top of --

14 actually, 3 and 4.

15      Have you reviewed 3 and 4?

16 A    Yes, sir, I have.

17 Q    Who are the communicants there?

18 A    That is a phone conversation between Ms. Hinda

19 Osman Dhirane and Habiba on September 21, 2013.

20 Q    What event took place on that day?

21 A    The Westgate Mall attack in Nairobi, Kenya.

22 Q    Could you summarize for us what the defendant and

23 Habiba were saying to one another?

24 A    They were referencing the attack in Kenya that's

25 occurring on this day through the context.  They're

Goodman - Direct by Mr. Gillis

1   referencing how it is ongoing.  Ms. Habiba says, A lot

2   of people have been massacred today in Kenya.

3       They're discussing who is doing the shooting.

4   Q    When told that there are many people being

5   massacred, what was Ms. Dhirane's response to that?

6   A    She stated it was actually the police who were

7   doing the shooting because the people inside were just

8   holding hostages.  They are the ones who have massacred

9   the people, the police.

10      This is on the top of page 42422 [sic].

11  Q    Well, if you could, focus on the middle on page 3

12  there.  Habiba tells her that a lot of people have been

13  massacred today in Kenya at a mall.  Dhirane's response

14  to that news is what?

15  A    Ms. Dhirane states, You have seen how the Somalis

16  are dying everywhere.  Let them -- referencing those

17  massacred in the mall -- let them die too.

18  Q    So would you, then, look at Government's

19  Exhibit 169 and focus in particular on pages-- well,

20  first of all, who are the communicants there?

21  A    It says Ms. Hinda Osman Dhirane and Ms. Muna Osman

22  Jama on September 23, 2013.

23  Q    What event took place on that day?

24  A    So the mall attack was still ongoing during this

25  time frame.

Goodman - Direct by Mr. Gillis

1  Q    What is it that they discuss on those pages?

2  A    Towards the bottom of page 117097 [sic], they

3  reference, Have you seen the turmoil?  The heavy rain

4  is still pouring, which is a clear reference to the

5  attack that is still ongoing.  The siege was still

6  ongoing up until the next day.

7       Ms. Dhirane states that, Yes, a lot will change.

8  The grass will be greener.  It has unwoken a sleeping

9  public, going into page 2 of 17098.

10 Q    Exhibit 8, from your recollection of it, was the

11 defendant accessing media reporting on the Westgate

12 attack?

13 A    Yes.

14 Q    At that time?

15 A    Yes, sir.

16       MR. GILLIS:  Your Honor, at this time, we'd

17 like to play a brief audio clip from the conversation

18 that's been translated into 169, and that's 169B1.  In

19 particular, we would begin at 3.31, which is the time

20 stamp on it, and continue to about 6.10.  So it's --

21       THE COURT:  What language is this?

22       MR. GILLIS:  It's in Somali, Your Honor, but

23 it's been subtitled.

24       THE COURT:  All right.  I'll hear it.

25       MS. MINTER:  Your Honor, I would object to

1   that based on a lack of foundation for the subtitling.

2            I would also submit that it's duplicative.

3   The Court has the transcripts, which is the

4   government's preferred method of putting these calls

5   into evidence.  I would say it's cumulative, and I

6   would say it's very likely prejudicial.

7            THE COURT:  All right.  I'll hear it.  The

8   objection is overruled.  Let me hear it.

9            This is in evidence, correct?

10           MR. GILLIS:  The transcript is in evidence,

11  Your Honor, but I should offer that the audio clip,

12  169B.1.

13           THE COURT:  Over objection, I'll let that in.

14       (An audio is played.)

15  BY MR. GILLIS:

16  Q    Agent, would you turn with me, please, to

17  Government's Exhibit 46.

18       First of all, who were the parties to that call?

19  A    It was Ms. Fardowsa Jama Mohamed and Ms. Muna

20  Osman Jama on April 17, 2012.

21  Q    Would you please review pages 763 to 765 of that

22  exhibit.

23  A    I'm sorry.  Through which page?

24  Q    Through 765.

25  A    Yes, sir.

Goodman - Direct by Mr. Gillis

1   Q    What are they discussing there?

2   A    So starting on 763, they're referencing a woman

3   who stated she would be unwilling to pay this month.

4   Ms. Fardowsa Jama Mohamed asked, What happened?  Did

5   they become I'tisaam?  The reason the woman gave for

6   not being able to pay was because she was caring for

7   orphans, but the clerics had taken away the people who

8   donate to her.

9        So she tells Ms. Jama that she was unable to pay

10  this month.  Ms. Jama relays this to Fardowsa Jama

11  Mohamed.  Ms. Muna Jama states to Ms. Fardowsa Jama

12  Mohamed, The living expenses to pay are indispensable.

13  We must pay those first.  I told the woman to register

14  the orphans.  They will be taken care of, but the money

15  for the living expenses is indispensable.

16       Going on to page 765, there in the middle,

17  Everyone must pay 50 for the orphans, 50 for the

18  wounded, 50 for the people in the mountains.

19  Q    If you would, look at page 761 on the first half

20  of that page, rather 761 of 46 and perhaps page 4 for

21  context.

22       So what is Jama saying there?

23  A    In page 761?

24  Q    Yeah.

25  A    She states that she sent her the living expenses

Goodman - Direct by Mr. Gillis

1   last month.

2   Q    All right.  On the 20th, is that what she says?

3   A    I'm sorry.  Yes, sir, on the 20th of last month.

4   Q    Which would be about March 20, 2012; is that

5   right?

6   A    About, yes, sir.

7   Q    All right.  Would you look, please, at

8   Government's Exhibit --

9            MR. GILLIS:  One moment, Your Honor.

10  BY MR. GILLIS:

11  Q    Government's Exhibit 10 -- do you see there

12  payments by Defendant Jama on March 25 and 27 --

13  A    I do, yes, sir.

14  Q    -- to Fardowsa Jama Mohamed?

15  A    Yes, sir, I do.

16  Q    She is the same as this Umu Camaar that she was

17  speaking with?

18  A    She is, yes, sir.

19  Q    Then if you would, turn with me to Government's

20  Exhibit 79.

21           THE COURT:  Exhibit 79?

22           MR. GILLIS:  Yes, Your Honor.

23  BY MR. GILLIS:

24  Q    Who are the parties to that conversation?

25  A    It says Muna Osman Jama and Hinda Osman Dhirane on

1   June 7, 2012.

2   Q    You can review that.

3        Are you familiar with this particular

4   conversation?

5   A    Yes, sir, I am.

6   Q    So would you tell us, then, what's being discussed

7   there.

8   A    So the phone call starts off with Ms. Dhirane

9   relating to Ms. Muna Osman Jama that the girls had

10  called her, that the Iftiin hawala had told the girls

11  that there was money to be picked up but they didn't

12  know who sent it.  So Dhirane had told them that she

13  would check with Muna Osman Jama to see who sent it.

14       Ms. Dhirane is asking Muna Osman Jama if it was

15  Umu Ibrahim, who we know as Fahria Hassan in the

16  Netherlands.  It's either Umu Ibrahim or Khuluud.  I

17  know both of them send through Iftiin.  Please contact

18  Umu Ibrahim and find out if she was the one who sent

19  the money.

20            THE WITNESS:  That's on page 1, Your Honor.

21  BY MR. GILLIS:

22  Q   Okay.  So there's a lot of information being

23  relayed from one person to another here, information

24  that's being communicated by Umu Ibrahim?

25            MS. MINTER:  Objection, leading.

1          THE COURT:  Overruled.  I understand.

2    BY MR. GILLIS:

3    Q    Hayat Abdi, Fahria Hassan.  And she's talking

4    there about sending it -- if you would, look at the

5    next --

6          THE INTERPRETER:  Your Honor, the interpreter

7    cannot hear.

8          Come closer to the mic, please.

9          Thank you.

10   BY MR. GILLIS:

11   Q    So they're discussing sending the money to Jama's

12   father?

13   A    Yes, that comes up.

14   Q    Was there a conversation -- was part of this

15   conversation about the teacher's wife going to the

16   husband to pick up the money?

17   A    Yes, it is on page 2.

18   Q    Was there some concern raised by the people in

19   Somalia that were going to pick up the money from the

20   father?

21   A    Yes, and this relates to other calls as well.  But

22   in this call in particular, these women -- when Osman

23   Jama, Muna Osman Jama's father, had come to talk to

24   them, he had asked them a bunch of questions to the

25   point that they were worried that he was a security

1   person, in Ms. Dhirane's words, as it was relayed to

2   her by the women.

3           THE COURT:  Where do you see this?

4           THE WITNESS:  This is on page 2, US-2305.  It

5   starts out in the middle of the page with Ms. Dhirane,

6   the largest paragraph there starting with, She said.

7           THE COURT:  Right.  I see it.

8           THE WITNESS:  Then if you go further on,

9   Ms. Dhirane -- towards the bottom, she said, We became

10  so worried and wondering if this old man is a security

11  person.

12  BY MR. GILLIS:

13  Q    Actually, if you then look at Government's

14  Exhibit 85, pages 3 and 4, about the middle of 3 to

15  two-thirds into page 4.

16  A    Okay.  Yes, sir.

17  Q    This is on the 11th of June, three or four days

18  after the conversation we were just talking about from

19  Government's Exhibit 79?

20  A    That is correct, sir.

21  Q    So Jama is telling Dhirane that she had sent them

22  up -- well, first of all, there was concern about where

23  to send the money and the living expenses and that it

24  might be a good cover?

25  A    Yes, sir.

1          THE COURT:  Why don't you ask him the

2   question as far as how he reads this.

3          MR. GILLIS:  I beg your pardon.  I will, Your

4   Honor.

5   BY MR. GILLIS:

6   Q    How do you relate this conversation to the one

7   that we were just looking at?  If you could, summarize

8   the conversations in those two exhibits.

9   A    So in the middle of page 3 on 1945, Ms. Jama is

10  stating in regards to the living expenses for the aunt

11  in Hargeysa, how should I send it?  I am scared of it.

12  What should I do?

13         This is still on page 3.  Ms. Dhirane says,

14  Actually, that place is good cover.  It is not one of

15  the suspected places.

16  Q    I mean, do the two conversations that we've been

17  talking about relate to one another in some way?

18  A    They do.

19  Q    Can you just summarize what that relationship is

20  and who was talking to whom about what?

21  A    Yeah.  So based on the concern for how to get

22  money to the women in Hargeysa, they agree that one

23  method they'll employ is Ms. Jama will send her father

24  money and he will then bring it to Hargeysa.  This

25  relates directly to Government's Exhibit 79 in which

1  they're talking about the father coming to the location

2  and asking a number of questions that concern them.

3  Q    I'm sorry?

4  A    I was just going to say that they continue on in

5  Exhibit 79 stating that the women had agreed with the

6  father, Osman Jama, that they would exchange numbers

7  and send the money through Zaad.

8          MS. MINTER:  Your Honor, I presume the Court

9  recognizes this is subject to our continuing objection.

10          THE COURT:  Yes.

11  BY MR. GILLIS:

12  Q    At the bottom of pages 3 and 4 of Government's

13  Exhibit 79 -- at the bottom of 3 and the top of 4,

14  what's that about?

15  A    So this is Ms. Dhirane relating to Ms. Muna Osman

16  Jama about the Zaad system, the Zaad system that the

17  women in Hargeysa had agreed upon to use with

18  Ms. Muna's father, Osman Jama.  Ms. Jama herself --

19  Ms. Muna Jama was not familiar with it.  She is

20  explaining it's a good system.  It's simple.  It's

21  money that can be sent over the phone.

22  Q    I'm sorry?

23  A    So I was putting it into context as far as what

24  the Zaad was.

25  Q    Go ahead.

Goodman - Direct by Mr. Gillis

1   A     So at the bottom of page 3 of Government's

2   Exhibit 79, Ms. Dhirane states, It's a simplified

3   system but things can be hidden on it.  They -- law

4   enforcement -- could use it for investigative tasks.

5         Ms. Jama proceeds to state, Well, we can -- it's

6   fine.  We can just outsmart them.  All we state is

7   that -- have you sent the money?  Did you receive the

8   money?  We do not discuss the actual business of it.

9   And then in this case, all you're referring to is

10  you're sending to your paternal aunt or your maternal

11  aunt.  Who cares?

12  Q     Then in that same conversation -- at the bottom of

13  5 and onto page 6 -- could you summarize, if you

14  would -- after you review it, summarize that aspect of

15  the conversation and how it relates.

16  A     So at the bottom of page 5 of 79?

17  Q     Yes.

18  A     So here Ms. Dhirane and Ms. Jama are talking about

19  what is going on -- this is the bottom of page 5 --

20  what is going on in the central area with the mountains

21  and the other things that are going on.

22        Ms. Dhirane relates that the cleric called them

23  the big paternal uncle who went there in the recent

24  past.  He advised that all the families will be moving

25  out referring -- Ms. Dhirane -- further to -- at

1  page 6, the top of page 6.  He advised the families

2  will be moving out.  There's an impending movement, the

3  family.  So get ready from our side, Ms. Dhirane states

4  in the middle of the page there.

5          MR. GILLIS:  One moment, Your Honor.

6  BY MR. GILLIS:

7  Q    So Ms. Dhirane in there says that she had sent

8  money to her father on page-- pardon me -- in

9  Government's Exhibit 85 on page 4?

10 A    Ms. Jama states that I have already sent one for

11 this after Ms. Dhirane states you will send to your

12 father.

13 Q    She refers to the living expenses?

14 A    Yes, sir.

15 Q    That conversation was done June 11?

16 A    Yes, sir, that is.

17 Q    Turn back to Government's Exhibit 10, please.

18      Do you have that in front of you?

19 A    Yes, sir, I do.

20 Q    Do you see an entry for June 4, 2012, a few days

21 before this conversation?

22 A    I do, yes, sir.

23 Q    What is that?

24 A    It's a transaction from Muna Osman Jama to

25 Mr. Osman Jama in Hargeysa, Somalia.

Goodman - Direct by Mr. Gillis

1  Q     Who is Osman Jama?

2  A     Ms. Muna Osman Jama's father.

3          MR. GILLIS:  If I could, Your Honor, just

4  have a moment to review my notes and consult with my

5  colleagues.

6          THE COURT:  Yes.

7  BY MR. GILLIS:

8  Q     In the conversation there on that exhibit -- in

9  those two conversations we were talking about, the

10 person who went to pick up the payment from the father

11 was the teacher's wife?

12 A     Correct.  Yes, sir.

13 Q     Did you ask the defendant in your interview who

14 this teacher's wife was?

15 A     Yes, sir.

16 Q     What did she tell you?

17 A     She said the teacher's wife was a reference to

18 Barira Hassan Abdullahi.

19          MR. GILLIS:  Your Honor, that's all I have

20 for this witness.

21          THE COURT:  All right.  We'll take our

22 morning recess before the cross-examination.

23          The Court will stand in recess.

24     (Recess from 10:59 a.m. until 11:23 a.m.)

25          THE COURT:  Cross-examination, Ms. Minter.

1          MS. MINTER:  Thank you, Your Honor.

2                    CROSS-EXAMINATION

3  BY MS. MINTER:

4  Q    Agent Goodman, with the assistance of the court

5  security officer, I'd like to show you Exhibit 193 that

6  you testified to previously.

7  A    Yes, ma'am.

8  Q    If I could direct your attention to the second

9  column captioned User?

10  A    Yes, ma'am.

11  Q    With respect to each row, you've -- I apologize.

12  Did you draft this document?

13  A    I contributed to its drafting.

14  Q    So you and the other drafters with respect to each

15  row of information have entered a name, correct?

16  A    Yes, ma'am.

17  Q    That name, as I understand it, is developed as a

18  result of your investigation in the case?

19  A    That is correct, yes, ma'am.

20  Q    If I could summarize what I understood your

21  testimony to be.  You gather records in this case,

22  correct -- or perhaps I should say the court-authorized

23  surveillance gathered records, correct?

24  A    Yes, ma'am.

25  Q    You evaluated those records?

Goodman - Cross by Ms. Minter

1  A    Yes, ma'am.

2  Q    There were other records that were obtained

3  pursuant to subpoena?

4  A    Yes, ma'am.

5  Q    The question was there were other records that

6  were gathered pursuant to subpoena?

7  A    Yes, ma'am.

8  Q    Those included records such as phone records?

9  A    Yes, ma'am.

10  Q    IP address records?

11  A    Yes, ma'am.

12  Q    Internet chat records or subscriber records if

13  that's --

14  A    Yes, ma'am.

15  Q    Records relating to individual's usernames, for

16  example?

17  A    Yes, ma'am.

18  Q    Your testimony was that you compiled those records

19  and reviewed them?

20  A    Yes, ma'am.

21  Q    You also reviewed the audio surveillance that was

22  part of the court-authorized surveillance?

23  A    Yes, ma'am.

24  Q    In doing that, you began to draw connections,

25  correct?

Goodman - Cross by Ms. Minter

1    A    Yes, ma'am.

2    Q    Based on identifying information that occurred in

3    all of these media?

4    A    That's correct.

5    Q    So tying together account numbers, usernames,

6    things like that?

7    A    Yes, ma'am, absolutely.

8    Q    Addresses?

9    A    Yes, ma'am.

10   Q    With respect to the audio, information that might

11   have been stated in the audio recordings?

12   A    Yes, ma'am.

13   Q    Such as identifying information like names?

14   A    Yes, ma'am.

15   Q    Locations?

16   A    Yes, ma'am.

17   Q    As a result, you came to a conclusion about who

18   you believed the individual was that was associated

19   with each of those pieces of identifying information,

20   correct?

21   A    Yes, ma'am.

22   Q    So column 2 reflects your conclusions based on

23   your investigation?

24   A    Yes, ma'am.

25   Q    Column 2 does not reflect any direct evidence that

Goodman - Cross by Ms. Minter

1   was provided to you?  For example, no observations that

2   you made?

3   A    If all of that was observations --

4   Q    No.  Put it this way --

5   A    Yes, ma'am.

6   Q    -- you never directly observed, for example,

7   Ms. Jama using a chat room?

8   A    No, ma'am, I did not.

9   Q    The same with Ms. Dhirane?

10  A    That's correct.

11  Q    You never directly observed Ms. Jama on a

12  particular phone call?

13  A    That is correct.

14  Q    Okay.  The same with Ms. Dhirane?

15  A    That would be correct.

16  Q    You have no witness who has observed Ms. Jama

17  making a particular phone call?

18  A    Yes, that is correct.

19  Q    Okay.  In the course of your investigation, you

20  indicated that you gathered records that indicated the

21  residence or residences of Ms. Jama and Ms. Dhirane

22  over time, correct?

23  A    Yes, ma'am.

24  Q    Okay.  The records that you obtained did not

25  necessarily all directly relate to Ms. Jama for

1  example?

2  A    You have to be more specific, I believe.

3  Q    For example, sometimes you would obtain records

4  that belonged to other family members in that

5  household?

6  A    I think belonged would be -- I'd have a hard time

7  saying belonged to.  There are other records --

8  Q    Associated?

9  A    Yes, ma'am.

10 Q    So, for example, you might get a phone record with

11 the name of Ms. Jama's husband?

12 A    That is correct, yes, ma'am.

13 Q    Based on your investigation, your assumption is

14 that that connects to Ms. Jama because she's a resident

15 in that household?

16 A    I would say that's an assumption.  No, ma'am.  I

17 believe it's a totality of the evidence that directly

18 ties her to that facility.

19 Q    That's your conclusion based on your --

20 A    Yes, ma'am.

21 Q    Agent Goodman, you also, as a result of your

22 investigation, observed the other individuals that you

23 believe are involved in this case, correct?

24 A    Sorry.  With the observation.  I apologize.  I

25 want to be accurate.

Goodman - Cross by Ms. Minter

1  Q    That's my fault.  Let me back up.

2       You've heard a fair amount of testimony about a

3  group of 15 women, correct?

4  A    Yes, ma'am.

5  Q    Part of your investigation involved investigating

6  all of the women of that 15, correct?

7  A    Yes, ma'am.

8  Q    To the extent that you were able to?

9  A    Yes, ma'am.

10  Q   So in the course of reviewing the information, you

11  looked at usernames for the other individuals?

12  A    Yes, ma'am.

13  Q    Phone numbers for the other individuals?

14  A    Yes, ma'am.

15         THE INTERPRETER:  Your Honor, the interpreter

16  is unable to keep up.

17         THE COURT:  You may need to slow down a

18  little bit.

19         MS. MINTER:  Thank you, Your Honor.  I

20  apologize.

21  BY MS. MINTER:

22  Q    You looked at usernames for these other

23  individuals?

24  A    Yes, ma'am.

25  Q    Phone numbers for the other individuals?

1   A    Yes, ma'am.

2   Q    To the extent that it was available, geographic

3   information for the other individuals?

4   A    Yes, ma'am.

5   Q    For example, if they stated they lived in a

6   particular place?

7   A    Yes, ma'am.

8   Q    So you're familiar with all of that information?

9   A    Yes, ma'am.

10  Q    Okay.  As a result of your investigation, you're

11  familiar with an individual named Thabaat?

12  A    Yes, ma'am.

13  Q    Spelled T-H-A-B-A-A-T?

14  A    The online moniker is Thabaat, yes, ma'am.

15  Q    You believe that that individual lived in England

16  for a period of time?

17  A    Yes, ma'am.

18  Q    That that individual at some point went to

19  Somalia?

20  A    I don't believe so.

21  Q    So you do not believe that Thabaat and Barira are

22  the same person?

23  A    I do not believe that Thabaat and Barira Hassan

24  Abdullahi are the same person.  I believe it's very

25  well that Thabaat is Barira something something.

Goodman - Cross by Mr. Yamamoto

1  Q    But the Barira that's been testified here with

2  respect to the group of 15 women, you do not believe is

3  also known as Thabaat?

4  A    That is correct.

5           MS. MINTER:  The Court's indulgence, Your

6  Honor.

7           Nothing further.

8           THE COURT:  Thank you.

9           Mr. Yamamoto or Ms. Deutsch?

10           MS. MINTER:  Your Honor, while Mr. Yamamoto

11  is approaching, I would clarify one of our objections.

12  I think our standing objection covers some of the

13  testimony that Agent Goodman gave before the break.

14  But to be clear, given that there is no other evidence

15  put forth about the identity of the individual that was

16  referred to as Ms. Jama's father, we would certainly

17  object to the speculation with regard to that.  I don't

18  believe that that's summary evidence.

19           THE COURT:  All right.

20                   CROSS-EXAMINATION

21  BY MR. YAMAMOTO:

22  Q    Agent Goodman --

23  A    How are you doing, sir?

24  Q    -- how are you?

25  A    I'm doing well.  Thank you.

Goodman - Cross by Mr. Yamamoto

1   Q    Your interview with Ms. Dhirane started about 5:00

2   in the morning and ended about 10:00 in the morning?

3   A    That's correct.

4   Q    You did an arrest about 4:00 in the morning?

5   A    Yes, sir.

6   Q    So it was a night search and a night arrest?

7   A    It was an early morning search.

8   Q    It was pre-6:00?

9   A    Pre-6:00.

10  Q    So you had to get special permission for that?

11  A    Yes, sir, we did.  Yes, sir.

12  Q    She was cooperative throughout the interview?

13  A    Yes, sir.

14  Q    In looking at it, the majority of it was in

15  English?

16  A    Yes, sir.

17  Q    At times she used an interpreter?

18  A    Yes, sir.

19          MR. YAMAMOTO:  Your Honor, as I begin this,

20  you asked me yesterday about Government's Exhibit 4I

21  which is the complete interview.

22          THE COURT:  Yes.

23          MR. YAMAMOTO:  I would move that in.

24          THE COURT:  All right.  Any objection?

25          MR. GILLIS:  Yes, Your Honor.

1              THE COURT:  The Court is going to admit it

2    under the rule on completeness.

3              MR. GILLIS:  Your Honor, if I may have

4    argument on that point.

5              THE COURT:  All right.

6              MR. GILLIS:  Your Honor, the Fourth Circuit

7    has held and made abundantly clear that the rule of

8    completeness does not apply to the wholesale admission

9    of a defendant's interview.  In particular -- I take it

10   the Court is not interested in argument on why it is

11   not admissible under the hearsay exception.

12             THE COURT:  Right.

13             MR. GILLIS:  Okay.  With respect to the rule

14   on completeness, however, the Fourth Circuit has held

15   that the fairness standard does not apply to the

16   introduction of the entire recording or statement when

17   a party only seeks to introduce a portion of it, in

18   other words, when we only seek to introduce a portion

19   of it.  Rather -- and I'm quoting from -- I'm not

20   quoting, but I'm citing cases I'll give the Court in a

21   moment.  But rather, it necessitates the introduction

22   of those portions that, one, explain an admitted

23   portion; two, place an admitted portion in context; or

24   three, are necessary to avoid misleading the trier of

25   fact.

Goodman - Cross by Mr. Yamamoto

1            Those cases are *United States v. Ricks*, 882

2    F.2d 885 at 892 to 93; *United States v. Shuck*, which is

3    at 1987 U.S. App. LEXIS 19471, at *7 through 11.

4            The Fourth Circuit has said that Federal Rule

5    of Evidence 106 on the rule of completeness has merely

6    a protective purpose, meaning, quote, it goes only so

7    far as is necessary to shield a party from adverse

8    inferences and only allows an explanation or rebuttal

9    of the evidence received.  That's *United States v.*

10   *Moussaoui*, 382 F.3d 453 at 481.

11           The rule serves to place in context

12   statements that may be misleading when viewed alone.

13   That's *United States v. Jamar*, 561 F.2d 1103 at 1108.

14           Federal Rule 106, according to the Fourth

15   Circuit, is not intended as a vehicle for the

16   introduction of substantive evidence, meaning the

17   omitted portions, if admitted, are not to be considered

18   as independent evidence but only to evaluate the

19   introduced portions.  That's the *Jamar* case at 1109.

20           The Fourth Circuit has applied these

21   identical provisions and guidelines to exculpatory

22   statements.  That's *United States v. Lentz*, 524 F.3d

23   501 at 526; *United States v. Chiles*, 185 Fed. Appx. 301

24   at 305; *United States v. Bollin*, 264 F.3d 391 at 414;

25   *United States v. Lutz*, 1998 U.S. App. LEXIS 18301 at

Goodman - Cross by Mr. Yamamoto

1   *18.

2           The Fourth Circuit has held that Federal Rule

3   of Evidence 106 does not require the admission of,

4   quote, self-serving exculpatory statements made by a

5   party which are being sought for admission by that same

6   party.  That's *Lentz* at 526.

7           The fact that some of the omitted -- and I'm

8   quoting now.  The fact that some of the omitted

9   testimony arguably was exculpatory does not, without

10  more, make it admissible under the rule of

11  completeness.  That's *Bollin* at 414.

12          Instead, the exculpatory statements must

13  still serve to clarify or explain the testimony offered

14  by the prosecution -- that's *Lutz* at *18 -- and be

15  otherwise admissible under the Rules of Evidence, which

16  is *Lentz* 526; *United States v. Walker*, 1995, U.S. App.

17  Lexis 26457 at *8.

18          In short, Your Honor, to the extent that any

19  portions of 4I are admissible, they're only admissible

20  to clarify the portions that we've actually introduced.

21  All of the five hours of interview or however long it

22  was, Your Honor, cannot possibly be explanatory of the

23  few portions that we introduced, truly, a matter of a

24  few minutes.

25          Even if it were admissible under the rule of

Goodman - Cross by Mr. Yamamoto

1  completeness, to, in fairness, put those statements in

2  context, the Court could not consider them as

3  substantive evidence but only to clarify or in fairness

4  put in context the parts that we actually admitted.

5          So I submit, Your Honor, that if there's any

6  portion of 4I that should be admitted, it should only

7  be those portions which they specifically identify as

8  being clarifying in some way; otherwise, the rest of it

9  is irrelevant.  It can't be considered by the Court as

10 substantive evidence.  The exculpatory statements can't

11 be considered as such, Your Honor, under the clear law

12 of the Fourth Circuit from the various several cases

13 we've submitted.

14         So for those reasons, Your Honor, we would

15 object to the admissibility of Government's Exhibit 4I

16 in its entirety.

17         THE COURT:  All right.  Thank you.

18         Do you want to respond, Mr. Yamamoto?

19         MR. YAMAMOTO:  It's the government's own

20 exhibit for God's sake.

21         It's not merely exculpatory language that

22 we're looking for.  It was a five-hour interview.  They

23 have taken five or ten minutes of that.  There's other

24 questions, other responses that deal not only with the

25 portions they've admitted.

1        For instance, there's a discussion about the

2   money.  The government has raised that or is attempting

3   to raise it through the IRS documents to show there's

4   no way they could have sent this money to Somalia or

5   how did they raise it.  We would show through the

6   interview where that money went once it went to

7   Somalia.  The totals add up.

8        There are other instances in there where the

9   discussion with Barira and the fact that she denied

10  having ever received money or sent money to Barira.

11  Well, a few minutes later -- that occurs about 7:30.

12  About 7:38, there's a fairly lengthy discussion about

13  Zaad where she then says, Yeah, I went to Barira's

14  store.  I bought items from her.  I gave her money.  I

15  took a lady there who sold her gold.  Barira gave her

16  some money.  Then she sent me the rest of the money

17  through Zaad because the lady didn't have a phone.  So

18  in a number of payments, I got that money and gave it

19  to the lady.

20        So it goes through -- now, I didn't sit

21  down -- I guess I could have sat down and made clips of

22  all of this stuff to give to the Court.  What I

23  intended to do was have it admitted in whole and then

24  point out portions of the testimony in our closing

25  argument for the Court.  If the Court wanted to look at

Goodman - Cross by Mr. Yamamoto

1  that, it could.  If the government wanted to respond to

2  it, it could.  I'm certainly not going to sit here and

3  go through that entire five hours.

4        THE COURT:  Anything else on that?

5        MR. GILLIS:  No, Your Honor.

6        THE COURT:  All right.  The Court recognizes

7  the limited purpose for which the transcript would be

8  admitted.  The government did not admit specific

9  portions of the transcript but rather elicited the

10  substance of testimony during the interview.  So it's

11  going to be important for the Court to consider the

12  other portions of the transcript as they relate to what

13  the government elicited by way of the substance of

14  those interviews under the rule of completeness.

15        So until I review that, I'm not going to be

16  able to make those judgments.  So I'm going to

17  conditionally admit it subject to the Court's further

18  review of the transcript relative to the substance of

19  what the government has put in evidence and will make a

20  final ruling as to the scope of what should be admitted

21  under the rule of completeness.

22        All right.  You may proceed.

23  BY MR. YAMAMOTO:

24  Q    Special Agent Goodman --

25  A    Yes, sir.

1  Q    -- we're going to spend some time on, basically,

2  the interview.

3  A    Yes, sir.

4  Q    If you don't recall something, you could get your

5  302 to refresh your recollection.

6  A    That would be helpful.

7  Q    Now, you talked at length or some length -- let me

8  put it that way -- about Hodan.  Of course, that was

9  clip 1, and she indicated Hodan was her relative on her

10 mother's side?

11 A    That is correct, sir.

12 Q    Did you find any information that came out

13 differently than that, that she wasn't, or did you find

14 any that she was?

15       THE COURT:  Could you adjust the microphone.

16       MR. YAMAMOTO:  Sorry, Your Honor.

17 A    That's correct, sir.

18 Q    What's correct?

19 A    The answer to your question that --

20 Q    You didn't find any information either way?

21 A    Other than the transcripts in which she said that.

22 Q    She said that.  Okay.

23       Now, in clip 4, you talked about Barira and money

24 and whether she got money from Barira or whether she

25 sent money to Barira?

Goodman - Cross by Mr. Yamamoto

1   A    Yes, sir.

2   Q    She said she didn't.  You spent a few minutes on

3   that, and she continually said she didn't.  That was

4   about 7:30.  About 7:38 you started to talk about Zaad?

5   A    Yes, sir.

6   Q    You recall what she said there, that she did go to

7   Barira's store and she did, in fact, buy items from

8   Barira, pay her?

9   A    Correct.  I believe I testified to that, yes, sir.

10  Q    That she took a lady there who sold Barira gold?

11  A    Yes, sir.

12  Q    Barira paid her $1500 at that time, and then she

13  sent an additional $1500 to Ms. Dhirane through Zaad,

14  correct?

15  A    That is correct, sir.

16  Q    That was done over a number of payments a few

17  months later?

18  A    According to Ms. Dhirane, yes, sir.

19  Q    That was done because the lady didn't have a phone

20  to accept Zaad payments with?

21  A    According to Ms. Dhirane, yes.

22  Q    Now, you also asked her about the money that was

23  sent to her by her husband?

24  A    Yes, sir.

25  Q    In total, that money amounted to about $45,600?

Goodman - Cross by Mr. Yamamoto

1  A    That's how much she relayed in the interview.

2  Q    That's what you determined?

3  A    Yes, sir.

4  Q    She indicated to you --

5          THE COURT:  What was the number you

6  mentioned?

7          MR. YAMAMOTO:  $45,600.

8          THE COURT:  All right.

9  BY MR. YAMAMOTO:

10  Q    That is actually on one of your government

11  exhibits where -- it's 13 or something?

12  A    Yeah.  I don't remember the government exhibit,

13  but yes, sir, that was --

14  Q    It was prepared showing the money he sent to her

15  in Somalia?

16  A    From September 2010 to January --

17  Q    January.

18  A    -- January 2012 when she returned.

19          THE COURT:  This is from her father?

20          THE WITNESS:  Her husband.

21          MR. YAMAMOTO:  From her husband.

22  BY MR. YAMAMOTO:

23  Q    Now, she was in Somalia from September 2010 to

24  January 2012, which is 16 or 17 months?

25  A    I would say 15, but yes, sir.

Goodman - Cross by Mr. Yamamoto

1  Q    You have four in 2000 --

2  A    It wasn't all of September.  It wasn't all of

3  January.

4  Q    That is right.  Sixteen or seventeen.

5       You have October, November, December, all of 2011,

6  and then you've got January 2012.  So it comes out to

7  15, 16, 17 months, somewhere in there?

8  A    We can do the numbers, but I think we'll disagree

9  on the 16, 17.

10  Q    Fifteen, sixteen, seventeen?

11  A    Yes, sir.  Fifteen, sixteen, yes, sir.

12  Q    Now, she said that he sent her $9,000 for the

13  return tickets to the United States?

14  A    Yes, sir.

15  Q    She said that he sent her about $1,000 a month for

16  expenses?

17  A    Yes, sir.

18  Q    She also indicated that she paid $200 for rent?

19  A    Yes, sir.

20  Q    $100 for utilities?

21  A    Yes, sir.

22  Q    $300 for her children's education, schooling?

23  A    I don't remember that number.  I'm sorry.  I

24  remembered the other two numbers.  I just didn't

25  remember that.

Goodman - Cross by Mr. Yamamoto

1  Q    She did indicate she gave some money -- do you

2  want to look at your notes?

3  A    Yes, sir.

4           THE COURT:  Do you have an objection?

5           MR. GILLIS:  I do, Your Honor.  Just to be

6  clear, for the reasons I've stated in the Fourth

7  Circuit law, this is appropriate perhaps to put the

8  statement in context, but whether these payments were

9  made or not made cannot be proven through the

10 testimony.

11          THE COURT:  I understand.

12          MR. YAMAMOTO:  We're not proving.  We're just

13 indicating what the interview was about.

14          THE COURT:  I understand.

15          THE COURT SECURITY OFFICER:  I need the

16 document from Mr. Gillis, sir.

17          THE COURT:  Do you have the 302?

18          MR. GILLIS:  Yes, sir.

19          MR. YAMAMOTO:  I've got one.

20          MR. GILLIS:  One moment, Your Honor.  I put

21 it away, but I have it.

22          MR. YAMAMOTO:  It's okay.  I got it.

23          MR. GILLIS:  Oh, I'm sorry.

24 BY MR. YAMAMOTO:

25 Q    If you go to page 9 of your notes.

Goodman - Cross by Mr. Yamamoto

1   A      Thank you.

2   Q      Sorry.  I think I marked it for you.

3   A      Thank you, sir.  Yes, sir.  That's correct, $300

4   for the kid's school.

5   Q      So these were monthly payments she was making?

6   A      In that $1,000 that he was sending, yes, sir.

7   Q      So she would get $1,000 a month, $100 for

8   utilities, $200 for rent, $300 for schooling.  She

9   bought a car for $2,500, she indicated to you?

10  A      Again, I would clarify, sir, that she received

11  $1,000.  That $1,000 was used, in part, for -- the $300

12  for the kids, the $200 for the rent, the $100 for food

13  in that $1,000, not on top of it.

14  Q      That's right.  I'm sorry.  I didn't mean to imply

15  that.  She got $1,000, and she used that money for

16  rent, utility, schooling, and then the $400 she had

17  left over each month went to food and gas for her car,

18  I think she indicated.

19  A      Yes, sir.

20  Q      Now, she also paid $2,500 for a vehicle?

21  A      That is correct, sir.

22  Q      She also was part of a land purchase.  That's not

23  in the interview?

24  A      That's not in the interview, no, sir.

25          THE INTERPRETER:  Your Honor, the interpreter

Goodman - Cross by Mr. Yamamoto

1  did not hear counsel's question.

2  BY MR. YAMAMOTO:

3  Q    She was also part of a land purchase which is not

4  in the interview but which you are aware of?

5  A    I'm aware of the document that you're referring

6  to.

7  Q    Okay.  That was a document that was taken during

8  the search?

9  A    Yes, sir.

10 Q    And has been entered into evidence here --

11 sorry -- as part of the government exhibits?

12 A    Yes, sir, that is correct.

13 Q    It's 4C and 4C1?

14 A    I don't recall the number, but I recall it being

15 introduced.

16 Q    Do you recall the amounts that were paid?

17 A    No, sir, I don't.

18 Q    $14,000 and $5,000?

19 A    I don't recall that.

20 Q    Okay.  But those numbers are on the documents?

21 A    Yes, sir.

22 Q    So when you total those numbers up, they come out

23 to around $46,000?

24 A    Which numbers, sir?

25 Q    The money she was spending for the rent,

Goodman - Cross by Mr. Yamamoto

1  utilities, food, clothing, schooling, gas, $2,500 for

2  the car, $9,000 for the tickets, the money for the

3  land, and that's about it.  That's where the money

4  went, according to her, correct?

5  A    No, sir.  The land did not come up in the

6  interview.

7  Q    Yes.  That's correct.

8  A    Yes, sir.

9  Q    But that's where you determined that money went?

10 A    During the interview, it was determined that she

11 received $1,000 a month for that 15, 16 months, $16,000

12 plus $9,000 for the return ticket home, which she

13 stated he had to borrow.  So that came out to about

14 $24,000, $25,000.

15 Q    Now, she also indicated to you that she had family

16 members both in Somalia, Canada, Italy, and Sweden?

17 A    That's correct, sir.

18 Q    That she would send money to her two sisters and

19 her brother in Somalia on occasion when they asked for

20 it?

21 A    That's correct, sir.

22 Q    In fact, part of the records you obtained from

23 North America Transfer Company was a list of the

24 amounts of money she did send to Somalia?

25 A    That is correct, sir.

Goodman - Cross by Mr. Yamamoto

1  Q    Let me show you.  This is on a return from one of

2  your subpoenas?

3  A    Yes, sir.

4  Q    It indicates money that she sent over the years

5  through that transfer company?

6  A    Yes, sir.

7  Q    Now, when she left Somalia, she went to a number

8  of different countries.  She went to Yemen.  She went

9  to Ethiopia.  Excuse me.  That's out of context.

10  A    Yeah.

11  Q    When she left as a refugee from Somalia --

12  A    Yes, sir.

13  Q    -- she went through Yemen.  She went through

14  Ethiopia, Hargeysa, a number of places she had

15  indicated to you over the period of time before she got

16  to the United States?

17  A    Yes, sir.  I don't recall --

18          MR. GILLIS:  Objection to hearsay, Your

19  Honor.

20          THE COURT:  Overruled.

21  A    I don't recall if that was the order, but yes,

22  sir.

23  Q    I'm not saying that's the order, but those are

24  countries she went through?

25  A    I believe so, yes, sir.

Goodman - Cross by Mr. Yamamoto

1  Q     Areas she went through.

2        Now, she told you she sent money to her family,

3  and she sent money to another individual.  Do you

4  recall that?

5  A     I'd have to refresh my memory, sir.

6  Q     It would be page 10 of your document.

7  A     Thank you, sir.

8  Q     There are two people she sent it to.  She told you

9  she sent money to Daahir Abdi?

10 A     Yes, sir.

11 Q     She told you she sent money to a lady named Dahabo

12 Salaad who was a widow whose husband fought with the

13 Union Courts?

14 A     Yes, sir.

15 Q     So in addition to her family, she did indicate to

16 you that she did send money to other individuals?

17 A     She did, yes, sir.

18 Q     At one point, you asked her about talking to

19 Barira, and she indicated that she had stopped talking

20 to her after that conversation about jail?

21 A     Yes, sir.

22 Q     But then just prior to the Zaad conversation, do

23 you recall her telling you that she hadn't talked to

24 Barira in about a year?

25 A     I don't recall that.

Goodman - Cross by Mr. Yamamoto

1  Q    Okay.  But if it was said, it would be in the

2  video, audio/video?

3  A    Yes, sir.

4           MR. YAMAMOTO:  The Court's indulgence.

5  BY MR. YAMAMOTO:

6  Q    Let me go back.  I'm sorry.

7  A    Yes, sir.

8  Q    Go back to Dahabo Salaad for a moment.

9  A    Yes, sir.

10  Q    There was another lady Xawo Kiin Xasan Raage in

11  the next paragraph.

12  A    Xawo Kiin Xasan Raage.

13           THE INTERPRETER:  The interpreter did not get

14  the name.

15           THE WITNESS:  Xawo is X-A-W-O.  Kiin is

16  K-I-I-N.  Xasan is X-A-S-A-N.  Raage is R-A-A-G-E.

17  BY MR. YAMAMOTO:

18  Q    On the next page, there's a woman named Amina

19  Cabdiraxman.

20      Now, Salaad and Cabdiraxman were people she'd met

21  on Paltalk and sent money to, according to her, right?

22  A    Salaad.  And it was Xawo Kiin.

23  Q    Xawo is one of the people that was talking on

24  Paltalk?

25  A    Correct.  I was asking that question because that

1  phone -- I was showing her the information you just

2  provided me, US-0169 --

3  Q    Uh-huh.

4  A     -- asking about those transactions because the

5  phone number for Xawo Kiin and Dahabo was listed as the

6  unindicted coconspirator in the Amina Ali case.  So she

7  was relating to me how those connected to Amina Ali and

8  why she sent them that money.

9            MR. YAMAMOTO:  Is Government's 20A in

10  evidence?

11            THE COURT:  I'm sorry.  Which exhibit?

12            MR. YAMAMOTO:  20A.

13            THE COURT:  I don't believe so.

14            Is it, Ms. Allen?

15            THE CLERK:  20A, as in alpha, is in evidence.

16            THE COURT:  All right.

17            MR. YAMAMOTO:  Thank you, Your Honor.

18            Nothing further.

19            THE COURT:  All right.  Any redirect?

20            MR. GILLIS:  Yes, Your Honor.

21            First, could I have one moment, Your Honor.

22                    REDIRECT EXAMINATION

23  BY MR. GILLIS:

24  Q    Just to clarify, Agent Goodman, when you were

25  asked by Ms. Minter about the names for the facilities

Goodman - Redirect by Mr. Gillis

1  being developed by your investigation --

2  A    Yes, sir.

3  Q    -- just to be clear, is there anything that you

4  used to identify those users, those names, those

5  facilities?  Is there anything that's contained in that

6  exhibit that is not supported by evidence in this case

7  that's been admitted into evidence?

8  A    I'm sorry.  I'll need you to ask it again, please.

9  Q    Yeah.  It's a bad question.

10      So you were asked by Ms. Minter about whether

11  these names that you've identified with these various

12  facilities --

13  A    Yes, sir.

14  Q    -- whether those were developed by your

15  investigation.  What I'm asking you is, is there

16  evidence outside of the exhibits that have been

17  introduced in this trial that you're relying upon to

18  identify those names?

19  A    No, sir.

20          MS. MINTER:  I would object to the relevance.

21          THE COURT:  I'll let him answer.

22  A    It's all the evidence that we were talking about

23  that's listed on 193, the testimony of the individuals

24  that have testified previously.

25  Q    That's what we went through laboriously yesterday;

Goodman - Redirect by Mr. Gillis

1   is that right?

2   A    It is.  I feel like the Court asked a question

3   about what I used, and I responded with all of the

4   above.  I feel like there's a lot more that could go

5   into that because it's not to take into account that

6   193 was a simple task.  It was --

7   Q    No.  My question is, 193 was constructed only from

8   exhibits that have been admitted into this case?

9   A    That's correct.  Yes, sir.

10  Q    Is that right?

11  A    That is correct.

12  Q    You were asked about whether the names of the

13  defendant and others was not from direct admission.  In

14  other words, you weren't standing on the lawn while she

15  was using the computer?

16  A    That is correct, sir.

17  Q    However, in Exhibit 4J, in the defendant's own

18  handwriting, she told you that she used, for example --

19       I withdraw the question, Your Honor.  I beg your

20  pardon.

21            THE COURT:  All right.

22  BY MR. GILLIS:

23  Q    When you were asked by Mr. Yamamoto whether during

24  the interview of Defendant Dhirane you determined that

25  she received $1,000 per month, did you mean to say that

Goodman - Redirect by Mr. Gillis

1  you independently determined that figure?

2  A    No.  That was stated during the interview by

3  Ms. Dhirane.

4  Q    Then you were asked by Mr. Yamamoto about this

5  Xawo Kiin that is reflected on the document that he

6  showed you.

7  A    Yes, sir.

8  Q    In addition to being an indicted coconspirator in

9  the case you mentioned, do you recall the testimony of

10  Mr. Bryden that she was an al-Shabaab fundraiser?

11  A    Yes, sir.

12  Q    Do you recall the testimony of Mr. Bryden that she

13  collected money for al-Shabaab in the ISDAC chat room?

14  A    That's correct.

15          MR. GILLIS:  That's all I have, Your Honor.

16          THE COURT:  All right.  Thank you.

17          Agent Goodman, you may return to counsel

18  table.

19      (The witness stands aside.)

20          MR. YAMAMOTO:  Your Honor, I'm sorry.  I

21  forgot to move in the exhibit I gave this witness.

22          THE COURT:  What number is it?

23          MR. YAMAMOTO:  HD4, Henry David 4.

24          MR. GILLIS:  No objection, Your Honor.

25          THE COURT:  All right.  Without objection,

1  Defense Exhibit HD4 is admitted.

2          The government will call its next witness.

3          MR. GILLIS:  Your Honor, we have no further

4  witnesses to call.  There's a few exhibits I'd like to

5  move into evidence.  Then if the Court would indulge

6  me, I'd like to take the lunch break to confer with my

7  colleagues here about whether there's anything else,

8  any other documents or exhibits.  We have no more

9  testimony to offer at this point.

10          THE COURT:  All right.

11          MR. GILLIS:  I can tell you the exhibits that

12 we would move in at this point.

13          THE COURT:  All right.

14          MR. GILLIS:  Your Honor, evidently, I skipped

15 a page in listing all of the chats and calls that I

16 wanted to -- well, why don't I go in order, Your Honor.

17 First, I would offer Government's Exhibits 6A, B, and

18 C, which are pursuant to the judicial notice for the

19 Amina Ali documents, the court documents in connection

20 with her charges.

21          Would you like me to go through them all

22 first, Your Honor?

23          THE COURT:  Let me look at these.

24          Is there any objection to those?

25          MS. MINTER:  The Court's indulgence, Your

 1  Honor.

 2          MR. YAMAMOTO:  I'm not sure we need them,

 3  Your Honor.  I don't know what the purpose would be.

 4          THE COURT:  All right.

 5          MR. GILLIS:  Your Honor, the transcripts

 6  mention a number of conversations involving Amina Ali.

 7  We've heard testimony from Ms. Esse about it, and the

 8  timing of the charges and other activities indicated by

 9  the PACER document, we submit, are relevant.

10          THE COURT:  All right.  Over objection, the

11  Court will admit Exhibits 6A, B, and C.

12          MR. GILLIS:  Then, Your Honor, for the same

13  reason, we would offer Government's Exhibits 9A, 9B,

14  and 9C, which refer to the prosecution of another

15  individual mentioned by the conspirators in the

16  transcripts and the calls and chats.

17          THE COURT:  This is Shaker Masri?

18          MR. GILLIS:  Yes, sir.

19          THE COURT:  Any objection to those?

20          MS. MINTER:  Your Honor, our objection to

21  both sets would be that with respect to it being a

22  public record, I don't know that the PACER printout

23  meets the standard.  I would submit that the government

24  needs something more formal.

25          MR. GILLIS:  Your Honor, I believe --

1           THE COURT:  Over objection, the Court is
2   going to admit Exhibits 9A, B, and C.
3           MR. GILLIS:  Then, Your Honor, I overlooked
4   these calls and chats, Government's Exhibits 31, 32,
5   33, 33B -- which apparently there's some question about
6   whether that was admitted -- 37, 41, 42, 44, 45, and
7   47A.
8           THE COURT:  All right.
9           MR. GILLIS:  Pardon me.  And then 105.
10  That's from the set of the calls and chats.
11          THE COURT:  Over objection, subject to the
12  Court's final ruling on the objections that have been
13  raised as to the other chats, the Court will admit
14  Exhibits 31, 32, 33, 33B, 37, 41, 42, 44, 45, 47A, and
15  105.
16          Did I get all of those correctly, Mr. Gillis?
17          MR. GILLIS:  Yes, Your Honor.
18          THE COURT:  All right.
19          MR. GILLIS:  Then, finally, Your Honor, with
20  respect to the calls and chats and other communications
21  by the defendants or among the defendants and the
22  coconspirators, we offer -- in some cases, the Court
23  reserved judgment on their admissibility or with some
24  contingency.  We would offer those for full substantive
25  use.

1            We've proven the existence of the conspiracy.

2    We've proven that these individuals who were discussing

3    these matters were members of the conspiracy, and we've

4    established that the conversations took place during

5    and in furtherance of the conspiracy.

6            Also, so they would all fall under the

7    hearsay exception for coconspirator statements, as well

8    as the statements made by the defendants, which would

9    be independently admissible as admissions by a party

10   opponent.

11           So for those reasons, whatever reservations

12   the Court may have had with respect to the substantive

13   use of those calls and chats, we move them in for that

14   purpose.

15           THE COURT:  All right.  Well, the Court has

16   conditionally admitted all of the chats subject to the

17   Court's final ruling on the hearsay objections based on

18   801(d)(2)(E).  I think I have that correctly, the

19   coconspirator exception.  So the Court is going to make

20   a definitive ruling on that within the context either

21   of Rule 29 or before it renders its verdict.

22           MS. MINTER:  If I may, Your Honor, we have

23   drafted a document outlining our objections to the

24   various exhibits.  I will tell the Court that after

25   this morning's admissions, it's back to being a bit of

1  a garbled mess.  I would ask the Court for permission

2  to file by the end of day today so that we can present

3  it clearly.

4              THE COURT:  That's fine.

5              MS. MINTER:  Thank you.

6              THE COURT:  All right.

7              MR. GILLIS:  Your Honor, there are a few

8  other exhibits that have to do with our request for

9  judicial notice as to the designation of al-Shabaab,

10  al-Qaeda, and other individuals that were mentioned.

11  If I may, Your Honor, over the break, I'll pinpoint

12  which parts of those because the Federal Register in

13  some cases --

14              THE COURT:  All right.

15              MR. GILLIS:  Apart from that, Your Honor, I

16  believe at this point, that's all the exhibits that we

17  are offering.

18              With the Court's indulgence, assuming the

19  Court is going to take a lunch break soon, could I

20  confer with my colleagues over lunch as to whether we

21  have all the evidence in that we want before we rest?

22              THE COURT:  Yes.  All right.

23              MR. GILLIS:  Thank you, Your Honor.

24              THE COURT:  Assuming the government rests,

25  Ms. Minter, Mr. Yamamoto, and Ms. Deutsch, are you

 1  ready to proceed?  How are you ready to proceed at this
 2  point?
 3          MR. KAMENS:  Your Honor, I am ready to
 4  proceed with the Rule 29.  I prefer that the government
 5  rest before we do so.
 6          THE COURT:  All right.  I understand.
 7          In terms of witnesses, is it the fellow on
 8  Monday we're waiting on?
 9          MS. MINTER:  In terms of witnesses, Your
10  Honor, I think at this point we're stuck with Monday.
11          THE COURT:  Okay.  Do you anticipate more
12  than one witness or just one witness?
13          MS. MINTER:  Your Honor, in the event that
14  it's more than one witness, any additional witnesses
15  would be extraordinarily brief.  I think that we will
16  be able to get our evidence to the Court quickly.
17          THE COURT:  All right.
18          MS. MINTER:  In terms of today, Mr. Kamens is
19  prepared to argue the Rule 29, but I think, then, we
20  would ask the Court to recess until Monday.
21          THE COURT:  All right.  We'll go ahead and
22  take our luncheon break now.  We'll reconvene at 1:15
23  at which time we'll hear anything further from the
24  government.  Assuming the government rests, we'll take
25  up Rule 29 motions.

1            The Court stands in recess.

2            MR. GILLIS:  Yes, Your Honor.  Thank you.

3        (Recess from 12:15 p.m. until 1:35 p.m.)

4            THE COURT:  Mr. Gillis.

5            MR. GILLIS:  Your Honor, the government moves

6    in Government Exhibits 301 and 305 and asks the Court

7    to take judicial notice of the fact that al-Shabaab in

8    its various names and al-Qaeda in its various names are

9    foreign terrorist organizations designated under

10   Section 219 of the Immigration and Nationality Act.

11           THE COURT:  All right.  Any objection?

12           MS. MINTER:  Limited to that, no objection,

13   Your Honor.

14           THE COURT:  Mr. Yamamoto, no objection?

15           MR. YAMAMOTO:  No, Your Honor.

16           THE COURT:  All right.  The Court will admit

17   Exhibits 301 and 305 and judicially notice al-Shabaab's

18   designation as a foreign terrorist organization.

19           MR. GILLIS:  And al-Qaeda.

20           THE COURT:  And al-Qaeda.

21           MR. GILLIS:  Thank you, Your Honor.

22           Your Honor, with that the government rests.

23           THE COURT:  All right.  Thank you.

24           Mr. Kamens.

25           MR. KAMENS:  Good afternoon, Your Honor.  I

1  have a written submission I would like to hand up to

2  the Court.

3          THE CLERK:  One is a copy?

4          MR. KAMENS:  That's two copies.  So yes.

5          Your Honor, our Rule 29 motion is based on

6  two arguments.  The first is that a conviction for

7  material support depends upon proof beyond a reasonable

8  doubt of support provided to an organization.  The

9  second argument is that efforts to provide medical care

10  to wounded soldiers in an armed conflict is not a

11  crime.

12          First, the Court on a Rule 29 motion must

13  consider the evidence in the light most favorable to

14  the prosecution.  The evidence in this case, under that

15  standard, establishes for purposes of this motion that

16  Ms. Jama is part of the Somali diaspora; was a local

17  supporter of al-Shabaab; that she participated in a

18  chat room called ISDAC in which participants expressed

19  support for al-Shabaab; she communicated with

20  approximately 14 other women in a smaller private chat

21  room; and she invited Amina Esse in to join that group.

22          Ms. Jama, under this standard, conspired with

23  Amina Esse to send money to a woman based in Nairobi,

24  Kenya, named Fardowsa Jama Mohamed to rent a house

25  where wounded al-Shabaab soldiers were treated and to

1   pay doctors to provide care for the soldiers.  They

2   also sent money for the purchase of an X-ray machine to

3   provide care to al-Shabaab soldiers who were wounded in

4   battle.  Ms. Jama kept a ledger of usernames listing

5   those names of people by their username who contributed

6   money.

7            But after years of investigation, there is

8   almost no evidence about the people who received the

9   money.  Government Expert Bryden described four levels

10  of people, four categories of people who could face

11  U.N. sanctions, al-Shabaab members, financiers,

12  facilitators, and active supporters.  He said that

13  members were those who self-identify, who speak on

14  behalf of the organization, who are a member of the

15  armed forces -- not an aligned militia but the armed

16  forces -- of al-Shabaab, or those who have some role in

17  the organizational structure.  The others, financiers,

18  facilitators, active supporters, are not necessarily

19  members.

20           With respect to Fardowsa, there's very little

21  testimony about who she is.  There is no testimony that

22  she is a member of al-Shabaab, that she had a position

23  within the organizational structure, that she was under

24  the direction and control of al-Shabaab, or that she

25  identified herself as a member or representative of

1   al-Shabaab.

2           The government expert, Bryden, provided no

3   testimony about her.  He did testify that a woman named

4   Barira Hassan had been mentioned in a 2013 U.N. report

5   because she was the business associate of a courier who

6   was involved with a failed suicide attack in Addis

7   Ababa.  We don't know if that is the same Barira who is

8   relevant to this case.  But even so, Bryden said that

9   this person would fit the category of, quote, an active

10  support if not a financier.

11          This is important because the statute

12  requires that the material support be provided to an

13  organization that is designated as a foreign terrorist

14  organization.  Giving money to an independent actor who

15  is not directed or controlled by a foreign terrorist

16  organization but who independently does things that

17  benefit the FTO does not constitute material support.

18          You heard testimony in this case about

19  nongovernmental organizations like Doctors Without

20  Borders and the Red Crescent providing medical care in

21  al-Shabaab-controlled territory.  You've also heard

22  that at least some medical professionals would feel

23  bound to provide care to al-Shabaab fighters because of

24  their ethical obligation to provide care regardless of

25  the individual who needs treatment.

1          The reason that these organizations and the

2    individuals who provide care are not subject and do not

3    fall within the material support statute is, as the

4    *en banc* Seventh Circuit noted, because, quote, an

5    organization like Doctors Without Borders would be

6    helping not a terrorist group but individual patients

7    consistent with the Hippocratic oath.  And I quote from

8    *Boim v. Holy Land Foundation*, 549 F.3d 685 at 699, a

9    2008 *en banc* decision.

10          As the Supreme Court stated in *Holder v.*

11   *Humanitarian Law Project* at 561 U.S. 26, the material

12   support statute does not, quote, prohibit independent

13   advocacy or expression of any kind.

14          One scholar has written about this exception

15   as saying that the chief justice's carve-out from the

16   statute's coverage of independent speech activities

17   that are not coordinated with a foreign terrorist group

18   parallels the distinction in campaign finance cases

19   between independent and coordinated First Amendment

20   activities.

21          Contributions to independent actors are not

22   unlawful even if they advocate or support causes that

23   are also supported by the foreign terrorist

24   organization.

25          THE COURT:  So, as I understand your

 1    argument, conceding for the purposes of this motion the

 2    evidence is sufficient to establish a conspiracy

 3    between Jama and Esse --

 4              MR. KAMENS:  And Fardowsa.

 5              THE COURT:  -- for the purpose of sending

 6    money for the purposes of renting a house, paying

 7    doctors, X-ray machines, all of which would be used for

 8    the treatment of al-Shabaab fighters --

 9              MR. KAMENS:  That's right.

10              THE COURT:  -- is insufficient because

11    there's no proof that Mohamed was a member of

12    al-Shabaab?

13              MR. KAMENS:  That's correct.

14              THE COURT:  Is that the argument?

15              MR. KAMENS:  Yes, and I think it's consistent

16    with the charge in this case.  The government has

17    not --

18              THE COURT:  You are not contending that

19    renting a house, paying doctors, and buying an X-ray

20    machine for al-Shabaab fighters would not constitute

21    material support were it provided to the right person?

22              MR. KAMENS:  Absolutely.  If it's given to

23    the organization, that is a different matter.

24              THE COURT:  What about the attempt part of

25    the statute?

1           MR. KAMENS:  Well, this is twofold.  I think

2   that the attempt is determined by the intent of the

3   individuals.  If the individuals are intending to

4   provide to someone who provides care to individual

5   soldiers, that is not an attempt to provide to the

6   organization.

7           I would also note that the charge --

8           THE COURT:  Without getting to whether the

9   evidence is sufficient, but if the evidence were that

10  the moneys were given to Fardowsa with the intent that

11  they, in fact, reach these al-Shabaab fighters and --

12          MR. KAMENS:  I'm sorry.  Could you say that

13  again?

14          THE COURT:  Yes.  If the money was given to

15  Fardowsa with the intent and the expectation that the

16  moneys would, in fact, be used for these purposes,

17  would that be sufficient evidence to establish an

18  attempt?

19          MR. KAMENS:  No, if Fardowsa is not a member

20  of the organization.  It is as if an individual is

21  providing money to the Red Crescent knowing that the

22  Red Crescent is providing care in an

23  al-Shabaab-controlled area.

24          THE COURT:  Well, what would be the

25  difference, then, between an attempt and conduct that

1   would constitute the substantive offense?  The attempt

2   doesn't have to be successful.

3          MR. KAMENS:  It doesn't, but if you are

4   providing to an independent -- let me get to the point.

5   It comes up in the context of providing personnel.  The

6   material support statute prohibits not only providing

7   funds or tangible goods, it prohibits individuals from

8   serving as themselves or providing others to enter in

9   and come under the management and control of the

10  foreign terrorist organization.

11         And so if I assist my friend in getting on a

12  plane to go to Somalia to fight for al-Shabaab, as

13  we've had cases like that, then we are potentially

14  guilty of the offense of material support for providing

15  that person as personnel for al-Shabaab.  But if you

16  have someone who provides a service to al-Shabaab

17  individually, that is not the same thing as providing

18  personnel.

19         THE COURT:  What if they thought that

20  Fardowsa was the conduit to al-Shabaab?

21         MR. KAMENS:  Well, I think if the intent was

22  to provide to the organization, that is a different

23  matter.  I would concede that trying to give to the

24  organization, even if you are unsuccessful, then that

25  would constitute, I believe, a violation of the

1    statute.

2         But if the -- and we have another argument

3    which I will get to in a moment.  But if you understand

4    this person to be an independent or someone who is

5    simply a supporter, then that is different.  We heard

6    from Mr. Bryden that al-Shabaab has people who are

7    within the organization and people who were simply

8    supporters outside the organization.

9         Now, I understand that doesn't squarely

10   define the scope of what is considered a legal

11   definition of al-Shabaab for purposes of this case, but

12   it does make sense.  There's an organization that has

13   been designated, and there are people who support that

14   organization.

15        It is not the same thing to provide money to

16   a person who merely supports the organization.  It is

17   the same thing as if I wish to support a candidate, and

18   I'm restricted from giving money above a certain limit

19   to that candidate.  But I give to an independent

20   organization that is not coordinated with the candidate

21   for the purpose of assisting that candidate.  The

22   carve-out is parallel to *Citizens United*.

23        THE COURT:  So where's the line between

24   giving funds to someone that you think will allow those

25   funds to ultimately benefit al-Shabaab and giving funds

1   to someone who would be, quote, an independent actor?

2         MR. KAMENS:  I think the line is twofold.

3   First is that we are not at all suggesting that even

4   giving -- you can't insulate yourself from criminal

5   liability by giving money to someone who's not a member

6   but simply passes through the contribution.  Just like

7   in campaign finance, you can't give to someone who's

8   not associated with the campaign who just hands over

9   the money.

10         THE COURT:  Right.

11         MR. KAMENS:  So one part of the line is is

12   this a scheme to simply pass the money on through?  I

13   don't think that's the evidence here.

14         The second part of the line is is the person

15   under the organizational control of the foreign

16   terrorist organization?  And the problem with this case

17   is that there is zero evidence that Fardowsa was under

18   the organizational control of al-Shabaab.

19         So looking to the campaign finance cases,

20   independent expenditures directed at recipients other

21   than a designated foreign terrorist organization

22   itself, as long as such contributions are not somehow

23   directed by the organization, are protected, and they

24   must be treated for constitutional purposes as an

25   independent expenditure and not an indirect

1   contribution.

2           THE COURT:  What is the evidence sufficient

3   to establish as far as who would have been sufficiently

4   associated with al-Shabaab?  There were a number of

5   names.

6           MR. KAMENS:  Soldiers, people who are

7   publicly --

8           THE COURT:  How about Sheikh --

9           MR. KAMENS:  Abdulsalam?

10          THE COURT:   -- Abdulsalam?

11          MR. KAMENS:  Potentially.  I need to review

12  that testimony, and I'll get to that exhibit.  I'm only

13  going to talk about two exhibits.

14          Abdulsalam -- and I think it's Exhibit 105 --

15  refers to a contribution that is not listed as a

16  substantive count and is outside the charged

17  conspiracy.  It's not charged as a substantive count.

18  It is five to ten months before the charged conspiracy.

19  But for the sake of argument, he potentially could be a

20  member of al-Shabaab and giving him money could

21  potentially violate the statute.

22          So in the larger ISDAC chat room where

23  recognized leaders come into the chat room and solicit

24  funds, people who provide money to those individuals

25  who are within the organizational structure of

1  al-Shabaab have clearly violated the statute.

2          It would have been a very easy case had these

3  people been charged with giving to leaders within the

4  organizational structure or even people that they had

5  evidence were members of al-Shabaab, but that is not

6  this case.

7          THE COURT:  Just so I'm clear, your view is

8  that it's insufficient if the evidence only shows that

9  these defendants thought they were sending money to

10  somebody for the purposes of helping al-Shabaab?

11          MR. KAMENS:  Of providing this particular

12  contribution, which is medical care.  We say if you're

13  providing medical care, it is provided to individuals

14  on an individual basis.  It is not provided to the

15  organization as a whole.  Without any evidence that

16  Fardowsa was directed or controlled by the

17  organization, then necessarily the government has

18  failed to adduce proof that these people provided money

19  to the organization.

20          THE COURT:  All right.

21          MR. KAMENS:  The second argument is that the

22  government has not established that Ms. Jama conspired

23  to or did give material support because medicine and

24  medical care do not constitute material support.

25          To prove the substantive counts in the

1  indictment, the government must prove that each of the

2  individual payments were made to provide material

3  support to the al-Shabaab organization, as I've said.

4          But the statutory definition of material

5  support excludes medicine from its definition.  There's

6  no specific testimony as to what any of these

7  individual counts are for.  Of course, to obtain a

8  conviction, the government has to prove that the

9  payments were for material support, not medicine.

10         In this case, the government presented

11  testimony from Amina Esse that she and Umu Luqmaan

12  spoke in code.  They used the term "living expenses" in

13  many of their communications.  In fact, that term is

14  replete in the exhibits introduced by the government.

15         Ms. Esse testified that that term is code for

16  medicine for wounded al-Shabaab soldiers.  So for each

17  of the individual $50, $100 contributions listed in the

18  substantive counts, no reasonable fact finder, based

19  upon that testimony, could conclude that these amounts

20  were not to provide medicine, which is specifically

21  excluded from the definition of material support.

22         THE COURT:  How about the X-ray machine?

23         MR. KAMENS:  The X-ray machine is designed to

24  provide medical care, and it relates to my second point

25  which is much broader.  That is that the United

1  States -- the Court must understand -- is involved in a

2  non-international armed conflict with a nongovernmental

3  armed group, al-Shabaab.  In a non-international armed

4  conflict, it is prohibited to restrict soldiers from

5  receiving medical care.

6          The government said in its opening

7  statement --

8          THE COURT:  What's the source of that?

9          MR. KAMENS:  I'm about to run through it.

10         THE COURT:  All right.

11         MR. KAMENS:  I will explain -- and it's in

12  our papers -- about why this source of law is binding

13  and can serve as a rule of decision in this case.

14         THE COURT:  All right.

15         MR. KAMENS:  The government said in its

16  opening statement that this small group of women sent

17  money to Fardowsa in Nairobi, Kenya, so that

18  Ms. Fardowsa could pay rent on the safe houses we've

19  discussed where she cared for wounded al-Shabaab

20  soldiers.  That's what Amina Esse testified to.  She

21  was told that Fardowsa rented two houses, one for

22  cooking or to store weapons and the other to treat

23  wounded fighters, and the money provided by the women

24  was so Fardowsa could rent the second house where the

25  wounded fighters were treated, to pay doctors.  She

1  also testified about, as the Court just mentioned, the

2  purchase of an X-ray machine.

3          Additional Protocol II to the Geneva

4  Convention says, Under no circumstances shall any

5  person be punished for having carried out medical

6  activities compatible with medical ethics regardless of

7  the person benefiting therefrom.

8          The Department of Defense's Law of War

9  Manual, which is designed to state the international

10 law in this area, says, No one shall ever be molested

11 or convicted for having nursed the wounded or the sick.

12 For example, persons should not be prosecuted for

13 offenses of aiding the enemy because they tended to

14 wounded members of enemy military forces.

15         All of this comes from Common Article 3 of

16 the Geneva Conventions, which says, In the case of

17 armed conflict not of an international character, the

18 wounded and the sick shall be collected and cared for.

19 The commentary to this provision says that this

20 expresses a categorical imperative which cannot be

21 restricted, and it necessarily implies respecting and

22 protecting medical personnel, facilities, and

23 transports.

24         Common Article 3 is so basic that a grave

25 breach of Common Article 3 is a war crime, and it is

1  prohibited by 18 U.S.C. 2441 which specifically states

2  that grave breaches of Common Article 3 constitute a

3  war crime.

4        The Supreme Court has applied Common

5  Article 3 to vacate the conviction in a military

6  commission of an al-Qaeda member in *Hamdan v. Rumsfeld*.

7  As one law review says, The only provisions of the

8  conventions that refer explicitly to criminal

9  prosecutions are those that explicitly proscribe

10  pursuing prosecutions of those engaged in humanitarian

11  relief.

12        This means that the U.S. material support

13  laws inasmuch as they criminalize the provision of

14  specific forms of humanitarian assistance are in direct

15  conflict with the requirements of the Geneva

16  Convention.

17        THE COURT:  What are you reading from?

18        MR. KAMENS:  I'm reading from a law review.

19  It's *Criminalizing Humanitarian Relief:  Are U.S.*

20  *Material Support for Terrorism Laws Compatible with*

21  *International Humanitarian Law?*  It's 46 N.Y.U. Journal

22  of International Law & Policy 399, 2013.

23        The point is that if it is a violation of

24  international law to prohibit the provision of medical

25  care to soldiers in a non-international armed conflict,

1   then it is equally in violation of that law to prohibit

2   people from giving money to people to provide medical

3   care to soldiers in an armed conflict.

4           THE COURT:  That presumes that it would --

5           MR. KAMENS:  I'm about to explain why that

6   matters.  I would think the Court would say who cares.

7           THE COURT:  Well, the Court wouldn't say who

8   cares.  The Court would say how do you reconcile --

9           MR. KAMENS:  How does that matter in this

10  criminal case?

11          THE COURT:  Right.  When you have an

12  affirmative criminal statute that, arguably, has an

13  affirmative substantive offense, the question is how do

14  you accommodate, if at all, these international

15  prohibitions?

16          MR. KAMENS:  Let me explain.

17          THE COURT:  My recollection is that there's

18  the *Charming Betsey* presumption.

19          MR. KAMENS:  That's one of my answers.

20          First, the material support statute was

21  enacted, according to Congress, pursuant to the define

22  and punish clause.  But the define and punish clause,

23  which allows Congress to enact criminal offenses that

24  define and punish violations of the law of nations,

25  does not allow Congress to punish conduct which is not

1  a violation of customary international law, much less

2  punish conduct which international law says is not

3  subject to punishment.

4        We've cited in our papers an Eleventh Circuit

5  case which vacated a conviction because the underlying

6  conduct for a statute that was enacted under the define

7  and punish clause was not a violation of customary

8  international law.

9        Second, Common Article 3 is a binding treaty.

10  It is binding under the supremacy clause.  As Judge

11  Ellis said in the *John Walker Lindh* case, which we've

12  also cited in our papers, the Geneva Conventions are

13  self-executing and can serve as a rule of decision in

14  this case.

15        To all of this, the government has one

16  response, and that is a single line in the conference

17  report that says, quote, Medicine should be understood

18  to be limited to the medicine itself and does not

19  include the vast array of medical supplies.

20        We would say a number of things, but first,

21  certainly, this conference report was not meant to

22  eliminate a basic tenet of the law of non-international

23  armed conflict.

24        Moreover, the resort to legislative history

25  is not the only rule of construction that the Court

1    should look at, as the Court mentioned.  But first,

2    before you even get to rules of construction, the Court

3    must look to the plain language and the plain meaning

4    of the words in the statute, that is for words that are

5    in the statute.  Some of them are defined; some of them

6    are not.  For those that are not, look at the plain

7    meaning, the ordinary terms as they are defined by

8    dictionaries, for example.

9            One plain meaning of the term "medicine"

10   means the practice of medicine.  In other words, the

11   science and art dealing with the maintenance of health

12   and the prevention, alleviation, or cure of disease.

13           Last, as the Court mentioned, at least in the

14   context of construing statutes that would otherwise

15   violate a basic tenet of international law.  The court

16   has said in the case called *Charming Betsey* that,

17   quote, An act of Congress ought never to be construed

18   to violate the law of nations if any other possible

19   construction remains.

20           THE COURT:  That contemplates an ambiguity in

21   the criminal statute; doesn't it?

22           MR. KAMENS:  I think it contemplates a

23   potential ambiguity and a conflict with international

24   law.  In this case, the ambiguity could come from the

25   fact that the word "medicine" is not defined in the

1  statute.  There are two equally plausible definitions

2  of that term.  One is the individual pills that are

3  provided by prescription drug companies, and the other

4  is a broader term referring to providing medical care.

5        Certainly, in the context of a

6  non-international armed conflict or an armed conflict

7  of any type, construing a statute in that context to be

8  consistent with Common Article 3 and the other

9  provisions of international law which, as we've cited

10 in our papers, are very basic, considered customary

11 norms of international law, that in the context of

12 armed conflict, the parties cannot restrict the ability

13 of the other side's soldiers to receive medical care.

14 It is one of the initial tenets of the Geneva

15 Convention from 1864.  It is in the Lieber Code.  If

16 you have a U.S. military soldier who has custody of a

17 wounded al-Shabaab soldier, he must provide care.  That

18 is the requirement of the law.

19        In conclusion, after years of investigation,

20 surveillance, millions of dollars, the government has

21 uncovered a conspiracy to provide medical care to

22 wounded al-Shabaab soldiers.

23        Now, it is certainly true that the government

24 can point to individual calls, for example, the call in

25 Exhibit 105 that I mentioned earlier.  But that

1  certainly does not prove the conspiracy.  It is outside

2  of the time period of the conspiracy, and the words

3  themselves are important in Government Exhibit 105.  In

4  that call, a woman who is identified as Ms. Jama says,

5  Sister, the money I sent before -- God knows if they

6  were monitoring me -- to Sheikh Jama Abdulsalam and

7  other brothers.

8            Question:  When did you send it?  This year?

9            Answer:  No.  Two years ago.

10           As you can see from Government Exhibit 105,

11  those transfers occurred in 2010.  This suggests two

12  things:

13           First, the other participant of the call, who

14  is identified as Fardowsa Jama Mohamed, the linchpin to

15  the conspiracy in this case, was not involved in those

16  transfers.  She does not know about them.  She asks

17  about them:  When were they sent?

18           The second is that the clear inference is

19  that the person who is identified as Ms. Jama has not

20  sent money to the, quote, brothers, since 2010.  As I

21  said, this is not alleged as a substantive count.  It

22  is outside the scope of the conspiracy.

23           THE COURT:  What's the statute of

24  limitations?  Is it five years?

25           MR. KAMENS:  I think it's ten.

1           So it is not a part of this case.  We don't
2   know, for example, in 2010, if the government has any
3   transcripts, if they could bring a charge, if they
4   could establish that Ms. Jama knew that al-Shabaab --
5   which had been recently designated as a terrorist
6   group -- whether that knowledge was possessed by her at
7   that time.  What we know is in this case, it is not
8   charged either as part of the conspiracy or as a
9   substantive count.

10          THE COURT:  What about the argument, I
11  suspect I'll hear, that irrespective of what the
12  evidence is as to the specific payments, the evidence
13  is sufficient to establish a conspiracy broader than
14  those particular payments, that it was a conspiracy to
15  provide material aid more generally than what the
16  evidence shows the specific payments, in fact, were?

17          MR. KAMENS:  There is very little evidence to
18  suggest that the government knows what the payments
19  were for.  What they have are a bunch of calls that
20  refer primarily to something like living expenses,
21  which we know is code for medical care or medicine for
22  soldiers.

23          THE COURT:  There is evidence they spoke in
24  much broader terms, such as helping our brothers in the
25  mountains which refers to helping al-Shabaab generally

1  or arguably does.

2          MR. KAMENS:  Well, there are also calls --

3  and we can lay this out -- that talk about providing

4  living expenses to the north, providing living expenses

5  to the brothers in the mountains.

6          THE COURT:  Right.

7          MR. KAMENS:  The term is used throughout the

8  calls.  So if the government were to shift course at

9  this point and say, well, we're going to concede that

10 living expenses, medicine, may be outside the scope of

11 the statute, it would be difficult for them to

12 establish the conspiracy as they've set it out.

13         I'd point to, for example, Government

14 Exhibit 46, which is, I think, one of their principal

15 pieces of evidence.  There is certainly the reference

16 to living expenses where they refer to, I sent it on

17 the 20th last month also, living expenses.

18         They matched Government Exhibit 46 to a

19 transfer to Fardowsa from the previous month.  It shows

20 that living expenses were sent.

21         Later on in Government Exhibit 46 there is

22 the statement which the government has emphasized,

23 which the person who is identified as Umu Luqmaan says,

24 Every family that believes in Tawhid must pay at least

25 $150, $50 for the orphan, $50 for the wounded, $50 for

1   the people in the mountains.  I would have divided it

2   that way.

3             So this itself provides a statement of how

4   Ms. Jama would have divided the money.  It is not a

5   statement about any of the particular substantive

6   counts, and it is not a statement about the agreement,

7   the meeting of the minds, amongst the so-called

8   conspirators in this case, which was to provide living

9   expenses, as far as we know, to a woman named Fardowsa

10  Jama Mohamed.  Those living expenses, we know, are code

11  for medicine for wounded al-Shabaab soldiers.

12            Because the participants in a

13  non-international armed conflict cannot restrict the

14  access to medical care for the enemy soldiers, this

15  Court should enter a judgment of acquittal on all

16  counts.

17            THE COURT:  All right.  Thank you.

18            Mr. Yamamoto or Ms. Deutsch.

19            MR. YAMAMOTO:  Your Honor, we'd just join

20  Ms. Jama's motion.

21            THE COURT:  All right.  Ms. Atiyeh.

22            MS. ATIYEH:  Thank you, Your Honor.

23            THE COURT:  Yes.

24            MS. ATIYEH:  Ms. Jama didn't provide medicine

25  to Fardowsa Jama Mohamed.  She didn't provide medical

1  care to Fardowsa Jama Mohamed.  She wasn't nursing the

2  wounded.  Ms. Jama and Ms. Dhirane provided money to

3  Fardowsa Jama Mohamed, and the case law is, frankly

4  unequivocal, Your Honor.

5          THE COURT:  So is it your position that the

6  purpose of the money is irrelevant?

7          MS. ATIYEH:  Yes, Your Honor.  I think that

8  the Supreme Court's holdings in *Holder* bear that out

9  and *Humanitarian Law Project*.  The statute makes very

10  clear -- and I don't want to read law quotes to Your

11  Honor -- money is fungible, and when foreign terrorist

12  organizations that have a dual structure raise funds,

13  they highlight the civilian --

14          THE INTERPRETER:  Excuse me.

15          MS. ATIYEH:  Oh, I'm so sorry.

16          -- and when foreign terrorist organizations

17  that have a dual structure raise funds, they highlight

18  the civilian and humanitarian ends to which such moneys

19  could be put.  But there is reason to believe that

20  foreign terrorist organizations do not maintain

21  legitimate financial firewalls between those funds

22  raised for civil, nonviolent activities, and those

23  ultimately used to support violent, terrorist

24  operations.  That's at page 31 of that case.

25          THE COURT:  No.  I understand.  It's material

1  support regardless of what the money is used for

2  subject to these arguments I'm hearing.  It doesn't

3  matter if they're using it to feed children or build

4  schools because that would be moneys that they

5  otherwise would redirect towards terrorist activities.

6       MS. ATIYEH:  That's correct.  That's the

7  plain meaning of the statute as well.  I mean, when the

8  statute makes these exceptions for medicine and

9  religious materials, it's not making an exception for

10  money for medicine and religious materials.  It's

11  making an exception for those specific humanitarian

12  ends.

13       THE COURT:  Oh, I understand.

14       MS. ATIYEH:  I think that Mr. Kamens was

15  making something of a nuanced argument with regard to

16  that point, which is that the money sent for medical

17  purposes to Fardowsa Jama Mohamed isn't to al-Shabaab

18  for the purposes of that sort of *Holder v. Humanitarian*

19  *Law Project* concept because it was to an individual

20  rather than to the organization.

21       To that, Your Honor, I would just say,

22  ultimately, all money that's being sent to a foreign

23  terrorist organization must be directed to an

24  individual.  There's not an al-Shabaab fundraising

25  account somewhere that one can send money to.

1          THE COURT:  What is the evidence concerning

2    who Fardowsa Jama Mohamed is or was in terms of

3    relationship to al-Shabaab?

4          MS. ATIYEH:  Well, Your Honor, the evidence

5    is --

6          THE COURT:  She was obviously a sympathizer.

7          MS. ATIYEH:  She was obviously a sympathizer.

8          So the first thing we have is the testimony

9    of Amina Esse herself, which was that the monthly

10   payments to Fardowsa Jama Mohamed were to run two safe

11   houses, the one for wounded al-Shabaab fighters to go

12   for treatment, which is what we've been discussing, and

13   also the second safe house, which she said was to store

14   weapons and ammunition where al-Shabaab soldiers would

15   go get ready to fight.  She also said that was for

16   cooking.  I don't know that those two statements are

17   actually, in fact, inconsistent with one another.

18         Then that testimony from Ms. Esse is

19   bolstered by Government's Exhibit 44, which is the

20   conversation where Ms. Jama says to Ms. Dhirane that

21   Umu Camaar rents homes run by infidels; two homes are

22   rented; she receives $600 a month in support of that

23   rent, which corroborates Ms. Esse's testimony that

24   there were, in fact, two safe houses for al-Shabaab

25   being run by Fardowsa Jama Mohamed.

1          We also have the additional comments by
2   Ms. Jama that the money is intended for the brothers in
3   the mountains, that $50 should go to the brothers in
4   the mountains.
5          We've heard substantial testimony, both from
6   Ms. Esse and from Mr. Bryden, that when the defendants
7   are referring to brothers in the mountains in this
8   context, they are, in fact, referring to al-Shabaab.
9          THE COURT:  All right.
10          MS. ATIYEH:  To be clear, Your Honor, that's
11   also just limiting the conspiracy to only the money
12   being sent to Fardowsa Jama Mohamed and only the money
13   being sent for the first of the two safe houses.
14          Ms. Jama is also charged with sending money
15   to her father intended for Barira Hassan Abdullahi, who
16   Mr. Bryden testified was an al-Shabaab facilitator in
17   the region who, essentially, leads the fundraising
18   campaigns for al-Shabaab soldiers in the area.
19          It's also supported by the conversations
20   about the Somali -- or I guess it was the Puntland
21   government's capture of the truck full of supplies
22   intended for al-Shabaab.  We've seen Government's
23   Exhibit 100, Ms. Dhirane discussing with Khuluud or
24   Ismahaan Cabdi Cilmi the incident about the truck
25   capture.  Then we later see in Government's Exhibit 102

1  essentially a confirmation where the women are saying,

2  Yes, the vehicle was ours.

3          Your Honor, I don't want to go into

4  considerable detail about the additional transactions

5  that we talked about that Mr. Kamens argued was outside

6  the scope of the conspiracy with the funds sent to Jama

7  Abdulsalam, the funds sent to Bashir Gelle who

8  Mr. Bryden testified was an al-Shabaab fundraiser who

9  raised in the ISDAC chat rooms, the funds Ms. Dhirane

10 sent to Xawo Kiin Raage who, again, Mr. Bryden

11 testified was an al-Shabaab facilitator, a fundraiser

12 who raised money in the ISDAC chat rooms.  I think

13 those transactions largely speak for themselves.

14         I think there is significant evidence in this

15 case that the money going to what both of the

16 defendants described as the Nairobi side and the money

17 going to what the defendants described as the Hargeysa

18 side was intended for al-Shabaab and was, in fact, for

19 the benefit of al-Shabaab.

20         THE COURT:  All right.

21         MS. ATIYEH:  Your Honor, if I may very

22 briefly respond to Mr. Kamens' Geneva Conventions

23 arguments.

24         THE COURT:  Yes.

25         MS. ATIYEH:  Your Honor, this is --

1          THE COURT:  I don't know if you've become
2    familiar with those or not before --
3          MS. ATIYEH:  I'm relatively familiar with
4    them.  We can certainly offer briefing to the Court
5    later.  I think there's abundant writing at the
6    district court level, at least, and possibly some of
7    the appellate court level that we can get for Your
8    Honor.
9          THE COURT:  All right.
10          MS. ATIYEH:  Certainly, there has been some
11   ruling in the district court in Richmond that to the
12   extent that the Geneva Convention relies on the Laws of
13   War, it doesn't apply to al-Shabaab because al-Shabaab
14   is like al-Qaeda, an unconventional, unformed guerrilla
15   armed force that's not under the control of any
16   recognized government.  It's not engaged in an armed
17   conflict within the meanings of the Geneva Convention.
18          THE COURT:  Which judge?
19          MS. ATIYEH:  That was Judge Hudson, I
20   believe.
21          THE COURT:  In a material support case?
22          MS. ATIYEH:  That was a material support
23   case.
24          Your Honor, I'm not familiar enough with the
25   ruling to be able to argue it thoroughly, but we can

1  certainly provide you further briefing if that's

2  necessary.

3          THE COURT:  All right.

4          MR. KAMENS:  Your Honor, I am familiar with

5  that case.  I'm involved in that case.  It has nothing

6  to do with this case, and I'll explain why.  In that

7  case, a defendant, our client, sought to assert

8  prisoner of war combatant immunity.  Combatant immunity

9  is only available to prisoners of war in an

10 international armed conflict -- so not

11 non-international armed conflicts -- international

12 armed conflicts between states.  If you're in a

13 non-international armed conflict, you have no POW

14 immunity.

15         So in that case, the court didn't rule on the

16 question of whether there was an international armed

17 conflict in Afghanistan, denied prisoner of war

18 combatant immunity because of the lack of the uniform

19 and the violations of the Laws of War by the Taliban.

20 It has nothing to do with a non-international armed

21 conflict which does encompass non-state actors like

22 al-Qaeda and like al-Shabaab.

23         That is the import of the ruling, for

24 example, in *Hamdan v. Rumsfeld* in which a person

25 affiliated with al-Qaeda, Mr. Hamdan, a former driver

1    of Osama bin Laden, picked up in Afghanistan.   The

2    court had to determine not whether he was a POW, was

3    entitled to combatant immunity under Geneva IV, the

4    fourth Geneva Convention, but whether he was entitled

5    to the benefits of Common Article 3 which is in all

6    four Geneva Conventions and applies in a

7    non-international armed conflict like this one.   We're

8    asking for the same article applied by the Supreme

9    Court in that case to apply in this case.

10            As I mentioned, it applies for a number of

11   reasons:   One, because of the enumerated power under

12   which material support was enacted; two, because it is

13   a binding treaty, as Judge Ellis -- he was referring to

14   Geneva IV, but it would apply equally to Common

15   Article 3; and third, because it can be used as a tool

16   of statutory construction.

17            If I can respond briefly to the points that

18   Ms. Atiyeh made.

19            THE COURT:   Before you do that, have any

20   courts squarely dealt with this issue?

21            MR. KAMENS:   With respect to Common Article 3

22   or with --

23            THE COURT:   Yes.

24            MR. KAMENS:   I would suggest that the Court

25   look at *Hamdan*.

1            THE COURT:  No.  I mean in terms of the

2   material aid to terrorism specifically with respect to

3   this kind of a case.

4            MR. KAMENS:  Well, let's see.  Whether an

5   individual can use international law as a defense in a

6   criminal case?

7            THE COURT:  Yes.  Well, as a defense to a

8   charge in material aid to terrorism case where the aid

9   presumably -- not conceding that the evidence is

10  limited to that -- but the evidence would show that it

11  was for medicine.

12           MR. KAMENS:  This has not been raised.

13           The issue of medicine has been raised in one

14  case in the Second Circuit where, I believe, the

15  defendant was a doctor who wanted to offer his services

16  to al-Qaeda.  The Second Circuit -- and we can provide

17  the cite; it's *United States v. Farhane* -- says no.

18  This statute says in its conference report that

19  medicine is limited to pills.  So it doesn't apply to

20  medical treatment.

21           In the district court case in that case, the

22  defendant said, Well, what about Doctors Without

23  Borders?  What about an organization that provides

24  medical care?  The government said that is not material

25  support because they are independent and they're not

1   controlled by the organization; whereas someone who

2   offers himself as a doctor to serve in al-Qaeda is

3   within the organizational structure.

4           So we would suggest that not only was that

5   court wrong in the context of its statutory limitation

6   based on the conference report, but secondly, that it

7   affirms, at least at the district court level, that if

8   you were providing medical care by someone who was not

9   within the structural organization, that that is not

10  something that violates the statute.

11          Ms. Atiyeh's first argument was about *Holder*,

12  and I would say two things:

13          First, *Holder* was limited and expressly

14  limited to the activities that were at issue in *Holder*.

15  It says that the opinion is limited to the particular

16  activities the plaintiffs have told the court they wish

17  to pursue.  The opinion did not address the resolution

18  of more difficult cases that may arise in the future.

19  That is on the first page of the opinion.

20          In the context of the opinion is

21  organizations that wish to provide services, mostly

22  advocacy and legal services, to organizations

23  themselves.  The premise of *Holder* and its fungibility

24  analysis is that the service is being provided to the

25  organization directly.  In that context, the court

 1  said, Well, if you're giving resources to the

 2  organization, even if they're benign, that allows the

 3  organization to use resources that it would otherwise

 4  have to devote to that area to something else.  So the

 5  premise is that you're giving it to the organization.

 6          It does not apply when the service is not

 7  provided to the organization, such as the Red Crescent

 8  or Doctors Without Borders.  They are providing care to

 9  individuals, not to the organization.  Even if they

10  provide care for wounded soldiers, that allows the

11  organization to divert resources elsewhere.  *Holder*

12  does not apply, and its fungibility analysis does not

13  apply because those providers are not within the

14  organization.

15          Ms. Atiyeh also pointed to two facts:

16          First, that Ms. Esse said there were two safe

17  houses.  She stated that the money was provided for

18  both safe houses, the first where weapons were stored

19  or where cooking occurred and the second where medicine

20  was provided and medical care and doctors were brought.

21          Now, of course, this was very important

22  testimony to the defense.  On cross-examination, the

23  testimony was very clear that Ms. Esse said the purpose

24  of providing these funds was solely for the second

25  house where medical care was provided.

1            You know what?  That is exactly the same

2    statement that Ms. Atiyeh made in opening statement.

3    Do you know why she made that?  Because the previous

4    statements by Ms. Esse said that this money was just

5    for the second safe house.  So the testimony before the

6    Court on cross-examination was absolutely clear that

7    the money was just for medical care, and there was no

8    redirect by the government.  They let it go.

9            The second thing she said was that there's a

10   lot of testimony about providing money for brothers in

11   the mountains.  Again, there are calls where they talk

12   about providing living expenses for the brothers in the

13   mountains.  As we know from the only person who has

14   testified who was in on that code, living expenses

15   means medicine for wounded al-Shabaab soldiers.

16            THE COURT:  Who said that?

17            MR. KAMENS:  Esse, and I can find it, Your

18   Honor.  Obviously, this was very important to us.  It

19   was adduced by Mr. Gillis right before the first break

20   on the first day that Ms. Esse testified.  Quote,

21   living expense was code for medicine for the wounded

22   al-Shabaab soldiers.

23            Ms. Atiyeh also mentioned Government

24   Exhibit 100 where they talk about a truck, and they say

25   that was one of ours or one of our trucks.  I would say

1  two things; although, we can flesh this out in greater

2  detail:

3           First, the reference there is as if they were

4  referring to a team, as if they were referring to one

5  of ours like we would say for one of our American

6  soldier's trucks:  That's one of ours.  They did not

7  state that in the context as if they had provided

8  funding for that truck.

9           Secondly, I would say on this evidence, there

10 is absolutely nothing before the Court to suggest that

11 any financial transactions or any conspiracy related to

12 the funding for trucks.  It is an offhand statement in

13 one call referring to a news report.  It does not

14 define what constituted the meeting of the minds among

15 the defendants.  The meeting of the minds between,

16 supposedly, Ms. Jama, Ms. Fardowsa, and Ms. Esse was to

17 provide medical care.

18           THE COURT:  All right.  Thank you.

19           The Court is going to reserve on the motion

20 pending completion of the evidence and the briefing

21 that I would like to have filed.

22           All right.  So we'll start Monday morning.

23           MS. MINTER:  Very well, Your Honor.

24           At 9:00 a.m.?

25           THE COURT:  Yes.

1          How long do you anticipate your witness to

2  take?

3          MS. MINTER:  Your Honor, I expect our

4  evidence will be in within the morning.  I don't

5  anticipate them being -- one witness.  Our expert will

6  certainly be longer, Your Honor, but I don't think he

7  will be tremendously long.  I certainly don't expect

8  his testimony to be as long as Mr. Bryden's, for

9  example.

10          THE COURT:  All right.  Mr. Yamamoto,

11  Ms. Deutsch, do you anticipate any --

12          MR. YAMAMOTO:  No.  We are going to move some

13  documents, but that's it.

14          THE COURT:  Ms. Atiyeh, Mr. Gillis, are you

15  anticipating any rebuttal?  I know you're going to want

16  to wait and hear what you hear but --

17          MR. GILLIS:  I don't expect to, Your Honor,

18  depending on what their expert may have to say.

19          THE COURT:  All right.  Very good.

20          We'll adjourn until Monday morning at 9:00.

21          -----------------------------------
                      Time:  2:27 p.m.

22      I certify that the foregoing is a true and

23   accurate transcription of my stenographic notes.

24

                                 _____
                                        /s/
25                               Rhonda F. Montgomery, CCR, RPR


       Rhonda F. Montgomery   OCR-USDC/EDVA   (703) 299-4599