<pre>
 1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF VIRGINIA
 2                  ALEXANDRIA DIVISION

 3  UNITED STATES OF AMERICA,   )  Case 1:14-cr-00230
                                )
 4              Plaintiff,       )
                                )
 5         v.                    )  Alexandria, Virginia
                                )  July 18, 2016
 6  MUNA OSMAN JAMA,             )  9:09 a.m.
    and                         )
 7  HINDA OSMAN DHIRANE,         )
                                )
 8              Defendants.      )  Day 5
    _____)  Pages 866 - 919
 9

10                  TRANSCRIPT OF TRIAL

11        BEFORE THE HONORABLE ANTHONY J. TRENGA

12          UNITED STATES DISTRICT COURT JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25     COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
</pre>

1  APPEARANCES:

2  FOR THE PLAINTIFF:

3       JAMES P. GILLIS, ESQUIRE
        DANYA E. ATIYEH, ESQUIRE
4       OFFICE OF THE UNITED STATES ATTORNEY
        2100 Jamieson Avenue
5       Alexandria, Virginia  22314
        (703) 299-3700
6
   FOR DEFENDANT MUNA OSMAN JAMA:
7
        WHITNEY E.C. MINTER, ESQUIRE
8       GEREMY C. KAMENS, ESQUIRE
        OFFICE OF THE FEDERAL PUBLIC DEFENDER
9       1650 King Street, Suite 500
        Alexandria, Virginia  22314
10      (703) 600-0800

11      JOSHUA M. SIEGEL, ESQUIRE
        COOLEY, LLP
12      1299 Pennsylvania Avenue, N.W., Suite 700
        Washington, D.C.  20004-2400
13      (202) 842-7800

14 FOR DEFENDANT HINDA OSMAN DHIRANE:

15      ALAN H. YAMAMOTO, ESQUIRE
        LAW OFFICE OF ALAN YAMAMOTO
16      634 South Washington Street
        Alexandria, Virginia  22314
17      (703) 684-6643

18      PAULA SEMMES DEUTSCH, ESQUIRE
        OFFICE OF THE FEDERAL PUBLIC DEFENDER
19      1601 Fifth Avenue, Suite 700
        Seattle, Washington  98101
20      (206) 553-1100

21 THE DEFENDANT, MUNA OSMAN JAMA, IN PERSON

22 THE DEFENDANT, HINDA OSMAN DHIRANE, IN PERSON

23 MARYAM ABDI, SOMALI INTERPRETER

24 HASSAN ABDI, SOMALI INTERPRETER

25

1                           **I N D E X**

2    <u>WITNESS</u>              <u>EXAMINATION</u>                    <u>PAGE</u>

3    Roger Middleton        Direct by Mr. Siegel           869
                            Cross by Ms. Atiyeh           905

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Middleton - Direct by Mr. Siegel

1          THE COURT:  Good morning.

2          MR. GILLIS:  Good morning, Your Honor.

3          THE COURT:  Ms. Minter, are you ready to

4   proceed?

5          MS. MINTER:  I am, Your Honor, and Mr. Siegel

6   will be calling the first witness.

7          THE COURT:  All right.  Any matters to take

8   up before we proceed?

9          Mr. Gillis.

10         MR. GILLIS:  Your Honor, I believe it's the

11  common practice in this district to permit expert

12  witnesses to be present in the courtroom, and I'd

13  request that Mr. Bryden be allowed to do that.

14         THE COURT:  All right.  Any objection?

15         MS. MINTER:  No objection, Your Honor.

16         THE COURT:  All right.  Mr. Bryden may remain

17  in the courtroom for this testimony.

18         Call your next witness, please.  Mr. Siegel,

19  who is your witness?

20         MR. SIEGEL:  Roger Middleton.

21         THE COURT:  Mr. Middleton will come forward,

22  please.

23      ROGER MIDDLETON, DEFENDANT'S WITNESS, AFFIRMED

24                   DIRECT EXAMINATION

25  BY MR. SIEGEL:

Middleton - Direct by Mr. Siegel

1  Q    Good morning.

2  A    Good morning.

3  Q    Can you please state your name and spell it for

4  the Court, please.

5  A    Yes.  My name is Roger Middleton.  That's

6  R-O-G-E-R, M-I-D-D-L-E-T-O-N.

7  Q    Thank you.

8       Where do you currently live, Mr. Middleton?

9  A    I live in Nairobi, Kenya.

10 Q    How long have you lived in Nairobi?

11 A    I've been a resident in Nairobi for the past five

12 years.

13 Q    Do you travel outside of Kenya as part of your

14 work right now?

15 A    I do frequently, yes.

16 Q    To where?

17 A    Mainly to Somalia, including Somaliland, all parts

18 of Somalia.

19 Q    How often do you travel there?

20 A    I would say on average around twice a month.

21 Q    I'd like to talk about your educational

22 background.

23 A    Sure.

24 Q    Did you attend a university?

25 A    I did, yes.

Middleton - Direct by Mr. Siegel

1  Q    What's the first university you attended?

2  A    The first university I attended is the University

3  of Dublin, Trinity College.

4  Q    Did you earn a degree?

5  A    I did, yes.

6  Q    What did you study?

7  A    I studied history, and I received a bachelor of

8  arts with honors.

9  Q    Did you attend another university after that?

10  A    I did.  I studied at the School of Oriental and

11  African Studies at the University of London.

12  Q    What did you study at the University of London?

13  A    I did a master of arts in African studies.

14  Q    After you left the University of London, what was

15  your first position?

16  A    I went to work at the Royal Institute of

17  International Affairs, Chatham House.

18  Q    What was your position at Chatham House?

19  A    I had various positions, but I was for most of the

20  time a consultant researcher with the Africa program at

21  Chatham House.

22  Q    How long did you work there?

23  A    I worked there for roughly five years.

24  Q    What kind of work did you do at Chatham House?

25  A    My work focused mainly on the Horn of Africa, and

Middleton - Direct by Mr. Siegel

1    that comprised two elements, I'd say.  One of those was

2    convening of meetings and events, both public and

3    off-the-record events, aimed at senior policymakers to

4    help them understand the region.  And the second

5    element of my work was mainly focused on research,

6    conducting research, writing, and disseminating that

7    research.

8    Q    Which countries did your work involve?

9    A    So primarily, my work focused on the Greater Horn

10   of Africa.  So that would have been Somalia,

11   Somaliland, Ethiopia, Eritrea to some extent, and also

12   Sudan and South Sudan.

13   Q    Can you describe generally what the Chatham House

14   is?

15   A    Chatham House is a foreign policy think tank.

16   It's a sister institute of the Council of Foreign

17   Relations, a well-known think tank here in the United

18   States.  I think it's fair to say Chatham House is the

19   leading foreign policy institute outside of the United

20   States.  It's certainly the leading institute in

21   Europe.  It's an independent institute without any

22   partisan ties.

23   Q    Are you familiar with the Somali diaspora?

24   A    Yes, very familiar.

25   Q    What is the Somali diaspora?

Middleton - Direct by Mr. Siegel

1  A     The Somali diaspora is those Somalis who have left

2  the country and now live all over the world, many in

3  East Africa, certainly in Kenya, for example, but also

4  many here in the United States and Canada, in many

5  European countries, particularly the United Kingdom and

6  the Netherlands and Norway and Sweden, but also other

7  parts of the world, as far afield even as New Zealand

8  and Australia.

9  Q     As part of your work at the Chatham House, did you

10 work with members of the Somali diaspora?

11 A     Yes.  We did a lot of work with the Somali

12 diaspora, primarily those based in London, but also

13 those who are passing through.  Obviously, London is an

14 international harbor, attracts people from all over the

15 world, including Somalis coming from North America, for

16 example, or from East Africa to visit relatives.

17     We did a lot of work with the diaspora, both as

18 participants in the meetings that we organized and as

19 people who helped inform and help us to understand the

20 research that we were conducting.

21 Q     After you left the Chatham House, where was your

22 next place of employment?

23 A     When I left Chatham House, I went to work for

24 Oxfam.

25 Q     How long were you at Chatham House?

Middleton - Direct by Mr. Siegel

1  A    I was at Chatham House for five years, sir.

2  Q    Can you describe Oxfam?

3  A    Oxfam is a large internationally focused

4  nongovernmental organization.  Its primary work is on

5  humanitarian relief.  So it provides primarily water

6  and food services, also some health and sanitation

7  services in countries facing natural disasters, manmade

8  disasters.

9  Q    What was your position at Oxfam?

10 A    I was the policy and advocacy lead for Somalia for

11 Oxfam, and that work involved work within the

12 organization to help my colleagues to understand the

13 political dynamics and the cultural dynamics of Somalia

14 and Somaliland, but also externally with those that

15 Oxfam was seeking to work with -- be they governments

16 or other nongovernmental organizations or international

17 organizations like the United Nations -- to help them

18 understand what Oxfam was seeing on the ground and to

19 understand the issues that we were trying to advocate

20 for.

21 Q    Did you have a particular geographical focus when

22 you worked at Oxfam?

23 A    Yes.  My focus was on Somalia and Somaliland.

24 Q    When you worked at Oxfam, where were you based?

25 A    I was based in Nairobi, Kenya.

Middleton - Direct by Mr. Siegel

1   Q      Where were you?

2   A      In Nairobi in Kenya.

3   Q      Are you familiar with money transfer

4   organizations?

5   A      I am, yes.

6   Q      Can you describe, generally, what a money transfer

7   organization is?

8   A      So a money transfer organization in the Somali

9   context is an organization that facilitates the

10  transfer of money, as the name suggests, from a sender

11  to a receiver.  An example of a slightly different

12  system but a similar example would be Western Union or

13  a company like that.  But in Somalia, there's a

14  slightly unique set of circumstances.

15  Q      When you were at Oxfam, did your work involve

16  money transfer organizations?

17  A      It did, yes.

18  Q      How so?

19  A      Well, when I joined Oxfam in 2012, at the

20  beginning of 2012, we were in the middle of a very

21  severe famine in Somalia that was affecting many

22  hundreds of thousands of people.  At the same time, as

23  we know, there was some concern around armed groups in

24  Somalia and terrorism coming from Somalia.  So there

25  was some concern in western countries, particularly in

Middleton - Direct by Mr. Siegel

1  the United States and the United Kingdom, about the

2  flow of money to Somalia.

3      People in Somalia are very dependent on receiving

4  remittances -- that's money sent by relatives abroad --

5  for their day-to-day survival.  Now, with the famine

6  going on, obviously, as you can imagine, those

7  remittances took on an even greater importance for

8  people's day-to-day survival.  But many of the banks

9  that helped to facilitate money transfer organization's

10  work began to get quite nervous about the regulatory

11  environment in which they were operating.

12      So there were some -- well, there were several

13  occasions where banks sought to close the accounts that

14  money transfer organizations held with them, which

15  would have made it almost impossible for those money

16  transfer organizations to continue to operate.

17      So we identified this as a problem, both

18  ourselves -- we were seeing this with the vulnerable

19  populations that our colleagues were working with, but

20  also more broadly in Somalia.  This was very much being

21  identified as a real challenge that people were facing.

22      So what our work sought to do was to do two

23  things:

24      One was to help government and regulators in the

25  west, principally in the United States and in the

Middleton - Direct by Mr. Siegel

1  United Kingdom, to understand the importance that money

2  transfer organizations and the remittances that they

3  were sending played in the Somali economy and in the

4  humanitarian response.

5      Secondly, to help work with those regulators to

6  look at ways to improve, if possible, the regulation of

7  the system, such that they would be comfortable with

8  this.  That would then help banks to continue to

9  provide the services they had been providing to the

10 money transfer companies.

11 Q    As part of that work, were you required to meet

12 with the money transfer organizations?

13 A    Yes, I was.

14 Q    As a result of that work, were you required to

15 gain an understanding of regulatory framework in which

16 they operate?

17 A    Yes, I think that's fair to say.

18 Q    Are you generally familiar with the process of

19 money transfers used to actually transfer funds?

20 A    Yes, I am.

21 Q    As it relates to the countries in which you work

22 right now, where do the money transfer organizations

23 operate?

24 A    So money transfer --

25          MS. ATIYEH:  Your Honor, I object to some of

1   this testimony before he's been noticed as an expert.

2          THE COURT:  Yes.  I think some of this is

3   substantive.

4          Are you offering him as an expert?

5          MR. SIEGEL:  I'm still laying a foundation,

6   Your Honor, but we can circle back to the substance.

7          THE COURT:  All right.  I think this does

8   cross over into substantive testimony.

9   BY MR. SIEGEL:

10  Q    After you left Oxfam, where did you work after

11  that?

12  A    After I left Oxfam, I went to work for an

13  organization called Conflict Dynamics International.

14  Q    What's your role at Conflict Dynamics

15  International?

16  A    I am currently the acting program director for the

17  Somali program for Conflict Dynamics International.

18  Q    How long have you been doing that?

19  A    I've been doing that role since the beginning of

20  this year, and previous to that, the last three and a

21  bit years, I was acting as the senior program manager

22  for Conflict Dynamics International in Somalia.

23  Q    Can you describe Conflict Dynamics International,

24  generally what they do?

25  A    Sure.  Conflict Dynamics International is a

1  nonprofit organization that provides mediation and

2  facilitation services.  So primarily, that means we

3  help groups that have disputes in Somalia -- that could

4  be the government and state governments, for example --

5  to speak to one another, to explore in looking at what

6  their interests are to come to politically

7  accommodating resolutions to that.

8  Q    As part of your work advising people and

9  interpreting the situation in and around Somalia, what

10 sort of information do you rely upon?

11 A    A very wide range of information.  Certainly,

12 formal structured interviews with people from Somalia,

13 people in Somalia be they government officials, for

14 example, members of parliament, members of civil

15 society organizations, academics, journalists, and so

16 on.  So certainly structured interviews.

17      But also informal conversations with colleagues

18 and friends from Somalia.  Those conversations would

19 take place both inside Somalia and in Nairobi and other

20 locations.

21      But there's also a huge amount of open source

22 information available in Somalia.  Much of that is

23 available from Somali websites and radio stations and

24 so on which is freely accessible using the Internet.

25 So we look at that a lot.

1           We also use information that is provided in

2    expert reports and books and so on.  Again, there's a

3    lot of that.

4           There's a fairly vibrant community of people

5    who are interested in Somalia and who study Somalia

6    quite intensively, and there are forums in which ideas

7    are exchanged, talks and conferences and so on.  So

8    there are a very wide range of information sources, I

9    would say.

10   Q    You mentioned expert reports.  What sort of

11   reports and organizations create those reports?

12   A    So, for example, those might come from think

13   tanks, like the CSIS here in Washington or from the

14   Rift Valley Institute which is based in Nairobi, or

15   they may be in the form of books and so on.

16          Another example, of course, is the United Nations

17   produce almost annual, sometimes a little bit more

18   frequently from the sanctions monitoring group for

19   Somalia.  That is another very in-depth and detailed

20   report that is available for people.

21   Q    I'm sorry.  What was the U.N. group that creates

22   those reports?

23   A    That is the United Nations sanctions monitoring

24   group, the United Nations monitoring group for Somalia

25   and Eritrea.

1  Q    How do you rely on those reports?

2  A    We certainly use those reports.  They're produced,

3  as I say, about once a year, sometimes with a little

4  bit more frequency.  They are a very useful source of

5  information in giving us an understanding both of some

6  of the things that maybe haven't been reported in the

7  press that are going on.  But also, they help us to

8  understand the motivations and perhaps the interest

9  behind the positions of different parties in Somalia.

10  Q    Does your work involve al-Shabaab in any way?

11  A    I think any work in Somalia has to be said

12  involves al-Shabaab.  Al-Shabaab is probably the

13  preeminent force in Somali politics.  It's the force

14  around which other processes rotate, if you like, and

15  it has a big impact whether one is working on a

16  humanitarian issue, on the issue of famine, for

17  example, or if one is working on a political process.

18  It's impossible to ignore al-Shabaab as a dominating

19  force there.

20  Q    So what method do you use to obtain information

21  about al-Shabaab?

22  A    Al-Shabaab, as we know, is a fairly secretive

23  organization itself about its very inner workings.

24  They do have, for example, a press wing, if you like.

25  So they release statements and they release videos,

Middleton - Direct by Mr. Siegel

1  which is something that we are able to access freely

2  and to see.  There's also a lot of open source analysis

3  on al-Shabaab conducted by counterterrorism experts and

4  others on that.  But also, it's true that in

5  conversations with Somali colleagues and conversations

6  with academics and other experts on Somalia, the issue

7  of al-Shabaab comes up very frequently.

8  Q    How would you describe Conflict Dynamics

9  International's political role or role in politics as

10 it relates to Somalia?

11 A    So Conflict Dynamics International is an impartial

12 organization.  So we don't seek any particular outcome.

13 Our role is to help different groups in Somalia to come

14 to mutually satisfactory agreements.  So we are there

15 as a -- I don't want to say umpire but as a supporter

16 to negotiations or conversations that are happening

17 between Somali parties.

18      We see our role very much as helping them to reach

19 the agreements that they want to reach to avoid some of

20 challenges that can be in any negotiated settlement if

21 you haven't thought it through perhaps as much as you

22 could have done.

23 Q    When you say working with groups in Somalia in

24 different parties, what are you referring to?

25 A    So primarily our work, although not exclusively,

1  is with the federal government of Somalia.  So one

2  example is we work with the federal government of

3  Somalia and the government of Somaliland in their

4  negotiations with one another as they seek to settle

5  the -- or to come to some arrangement for the future

6  relations between Somaliland, which, as you know, is a

7  self-declared independent break-away state from

8  Somalia, and the federal government, how they will

9  manage that relationship.

10      So we work between those two to help them inform

11  their discussions but also, for example, between the

12  federal government of Somalia and some of the federal

13  member states.  Jubaland, which is in the far south of

14  Somalia around Kismayo, for example, to work with them

15  and the federal government, how they will share powers,

16  how they will share responsibilities, how they will

17  resolve disputes between themselves.

18  Q    As part of your current work --

19          THE COURT:  Let me ask a question:  Are there

20  other organizations playing a same or similar role?

21          THE WITNESS:  There are several organizations

22  who do similar work.  One would be the Centre for

23  Humanitarian Dialogue, which is a Swiss organization,

24  and they do some similar work, particularly between

25  Somaliland and Puntland in the far north of the

Middleton - Direct by Mr. Siegel

1  country.

2  BY MR. SIEGEL:

3  Q     As part of your work right now, do you work with

4  the Somali diaspora?

5  A     Yes, I do.

6  Q     How so?

7  A     Well, Somali diaspora is very present in the

8  United States and in Europe, but also in Nairobi where

9  people who have either relocated from Somalia to

10 Nairobi, Kenya, as the sort of nearest neighbor, of

11 course, but also those who have gone further afield,

12 maybe to Norway or to the United Kingdom, who are

13 looking to -- perhaps thinking about moving back to

14 Somalia or are engaged in business or political

15 activity in Somalia.  Many of those people use Nairobi

16 as a hub.  So I meet regularly with members of the

17 Somali diaspora either on a one-to-one basis or at

18 various conferences and talks that may be going on.  So

19 we engage with them fairly frequently.

20       Also, through my previous work at Chatham House, I

21 have a fairly extensive network with members of Somali

22 diaspora who, you know, either solicited or

23 unsolicited, often share stories and anecdotes about

24 things that are happening and opinions, of course,

25 about things that are happening in Somalia.

1  Q    You said you have conversations and meetings with

2  this source of information for you.  What's generally

3  the topic and the substance of those meetings?  What

4  does it concern?

5  A    Well, that can be, really, a whole range of

6  things, but very often it would be a particularly

7  pertinent current event.  If a big political event or

8  military event is happening in Somalia, we would,

9  obviously, talk about that trying to understand what's

10 happened, why it's happened, what does this mean for

11 the future.  That would be one thing.

12       Then we also talk more generally about direction

13 of travel for Somalia, what are the political

14 developments or the economic developments that are

15 happening in the country.

16            MR. SIEGEL:  Thank you, Mr. Middleton.

17            Your Honor, we tender Mr. Middleton as an

18 expert witness in the field of the politics and culture

19 of Somalia and remittances back to Somalia and the Horn

20 of Africa.

21            THE COURT:  Any objection?

22            MS. ATIYEH:  No objection, Your Honor.

23            THE COURT:  All right.  Without objection,

24 Mr. Middleton will be recognized as a witness qualified

25 by education and experience to express opinions in the

1  area of Somali culture and politics and remittances.

2          MR. SIEGEL:   Thank you.

3  BY MR. SIEGEL:

4  Q    Mr. Middleton, we've been talking about the Somali

5  diaspora.   Based on your experience, what sources are

6  available to members of the diaspora to get news about

7  Somalia?

8  A    Many, many sources I think it's fair to say.

9  Certainly, as I previously mentioned, there is a very

10 vibrant presence for Somali news organizations on the

11 Internet.   So Somali diaspora, like the rest of us,

12 have access to that, whether that's a written article,

13 sometimes audio articles, or video that is available on

14 the Internet.   So there's certainly that.

15         But I think something that is very significant in

16 how people share information is that we -- Somalia is

17 still a fairly verbal society.   So there's a huge

18 amount of information that is exchanged between

19 individuals.   That may take place at a tea shop between

20 people talking, within a family, or also by telephone

21 or by e-mail or WhatsApp and these kind of services.

22 People will share information, and that may be within a

23 community that is living in a particular district of

24 Nairobi or London, for example, but can also -- and is

25 frequently also between communities in different parts

Middleton - Direct by Mr. Siegel

1  of the world.

2      So Somali diaspora is the nature of the sort of

3  fallout from the collapse of the state.  Families can

4  be scattered, some in East Africa, some in North

5  America, some in Europe.  Friends also will be

6  scattered in a similar way.  So information will flow

7  between those people across the world.

8  Q    I think you mentioned telephone calls and

9  WhatsApp.  Is that a chat room?

10  A    WhatsApp is a SMS service that people can use on

11  their smart phones, but also, people do use chat rooms

12  on the Internet, either ones that are based on typing.

13  But I think also there are chat rooms that people can

14  call in to and telephone where multiple people are able

15  to speak to one another.

16  Q    During these conversations among the diaspora,

17  does one of the parties need to be in Somalia?

18  A    That may be the case, but it is very often, I

19  believe, not the case.  People -- somebody in Canada

20  can be talking to somebody in the Netherlands, for

21  example, and exchanging views and ideas about what's

22  happening in Somalia, exchanging news, both family

23  news, of course, but also about political or other

24  events happening in Somalia.

25  Q    Based on your experience, how would you

Middleton - Direct by Mr. Siegel

1 characterize the frequency by which they discuss

2 current events?

3 A     Based on my experience, I would say it's very

4 frequent.   I think those of us who are from other

5 countries but work with Somali people, it's always

6 notable to us how engaged Somalis are with the current

7 events of their country of origin and how good an

8 information network people are able to access about

9 this.

10 Q     Based on your knowledge of Somalia, was al-Shabaab

11 part of the current events in Somalia between 2011 and,

12 say, 2013?

13 A     Yes, very much.

14 Q     How so?

15 A     Well, during that period and continuing to this

16 day actually al-Shabaab has been engaged in fighting

17 with government forces and also with the African Union

18 Mission in Somalia.  At various times, al-Shabaab has

19 controlled major population centers, Kismayo, for

20 example, Mogadishu at times, and then has lost

21 territory or regained territory.

22      Al-Shabaab has been engaged during that time in

23 acts of terrorism.  They've been engaged in a whole

24 range of activities, including putting out their own

25 propaganda, seeking media coverage for themselves.  So

1   they are very much one of the -- I think it would be

2   fair to say, if you were looking for the dominant news

3   stories for Somalia during that period and even until

4   today, al-Shabaab would be right up there.

5   Q     Would you consider some of the events you talked

6   about a minute ago high-profile events?

7   A     Very much so, yes.

8   Q     What sort of events, generally, do you consider to

9   be high-profile news events in Somalia?

10  A     Well, certainly, whenever al-Shabaab are engaged

11  in a large or significant or complex attack perhaps

12  against a hotel or a civilian target or a government

13  target, that is very much a very high-profile event in

14  Somalia.

15  Q     Are you familiar with a person named Ahmed Abdi

16  Godane?

17  A     Yes.

18  Q     Are you aware of an incident in May 2013 involving

19  him?

20  A     Yes.

21  Q     Can you describe that event generally?

22  A     There was an attempt by the Somaliland Security

23  Services to interdict him, to arrest him when they

24  believed he was present in Hargeysa, the capital of

25  Somaliland.

1  Q    In your opinion, would you consider that to be a

2  high-profile news event?

3  A    I would consider that to be a high-profile news

4  event, yes.

5  Q    Are you familiar with an attack at Westgate Mall?

6  A    Yes.

7  Q    Can you describe that generally?

8  A    That was an attack perpetrated by a number of

9  al-Shabaab recruits against a shopping mall in Nairobi,

10 Kenya, and it went on for several days with a great

11 loss of life.  It was a huge news event in East Africa,

12 in Somalia, but also globally -- so extremely

13 high-profile -- and resulted in the loss of many lives.

14 Q    Based on your experience, do you have an opinion

15 about the likelihood of members of the Somali diaspora

16 discussing high-profile events versus other events?

17 A    I think it's very fair to say that people are more

18 likely to discuss a high-profile event.  Like the

19 Westgate attack, for example, I think is extremely

20 high-profile and was obviously a topic of conversation

21 for those who even knew nothing about Somalia.  So

22 certainly within Somali communities, both inside

23 Somalia and abroad, that would very much have been

24 probably the main topic of conversation at that time.

25 Q    You mentioned that you worked with money transfer

Middleton - Direct by Mr. Siegel

1  organizations.  How does the Somali diaspora use money

2  transfer organizations?

3  A    So the Somali diaspora across the world but

4  especially those who are in either the Gulf or in

5  Europe or North America where their earning power is

6  perhaps a little bit higher use money transfer

7  organizations primarily to send money back home to

8  relatives or friends in Somalia.  And much of that

9  would be in small payments as support to a mother, an

10 aunt perhaps who has remained in Somalia.

11      There is, I think it's fair to say, a sort of a

12 social obligation to send money home to support your

13 broader family network.  Even if your immediate family

14 have been able to get out of Somalia and perhaps are

15 with you wherever you are abroad, there will very often

16 be cousins or aunties or grandparents or some other

17 type of relative still in Somalia that people will seek

18 to support.

19 Q    What's the source of that obligation?

20 A    That is a cultural obligation within Somali

21 culture going back -- well, culture goes back a long

22 way.  But also, I think, for many people it's an

23 obligation they consider as part of their religious

24 duty as well to support family and those in need back

25 home.

Middleton - Direct by Mr. Siegel

1   Q    When you say back home, does that mean only

2   Somalia?

3   A    In general, people would -- most remittances go

4   back to Somalia and back to their families in Somalia.

5   People may also, if they have families who are perhaps

6   in a refugee camp maybe in East Africa somewhere, in

7   Ethiopia or Kenya primarily, send remittances to them

8   to help them.  Or they may also be helping a relative

9   who is in another country in the west, for example, who

10  is trying to go to a university or go to school or

11  something.  They may send help to them.  But primarily

12  in Somalia or the region.

13  Q    What sort of things are these remittances used by

14  the recipients for?

15  A    Well, at the most basic level, those moneys are

16  used for the normal household maintenance.  So the

17  buying of food, the paying of rent, paying of transport

18  cost to get to work and so on.  People also often talk

19  about using them to pay school fees, to pay medical

20  fees.  Perhaps if people are receiving a little bit

21  more, they are able to use it as investment capital for

22  a business, to buy goods to sell, for example, in a

23  shop, and those kind of activities.

24  Q    You mentioned medical fees.  What do you mean by

25  that?

1    A    Well, if you are in Somalia and you're sick --

2    perhaps you have dysentery or malaria or something --

3    in many cases, people will need to pay a doctor or a

4    nurse to help them, or they will need to be buying some

5    kind of prescription medicine for whatever ailment they

6    have.  So people may send them money to help them with

7    those costs.

8    Q    Medical treatment?

9    A    Medical treatment, yeah.

10   Q    Could you identify some of the money transfer

11   organizations that exist in Somalia and Kenya?

12   A    Yeah.  So there are many.  The biggest, of course,

13   is Dahabshiil, which I think -- I don't know the exact

14   proportions, but it has the most significant amount of

15   the market.

16            THE COURT:  Why don't you spell that.

17            THE WITNESS:  D-A-H-A-B-S-H-I-I-L, I think.

18            THE COURT:  Thank you.

19            THE WITNESS:  I can confirm later.

20   BY MR. SIEGEL:

21   Q    Is Qaran one of them?

22   A    Qaran is also another one, yes.

23   Q    Can you describe for the Court, generally, the

24   process by which money is sent through a money transfer

25   organization.

Middleton - Direct by Mr. Siegel

1  A    So what would normally happen is that the

2  sender -- and in general, those people tend to be in

3  the west or outside of Somalia -- they will go to their

4  local branch of the money transfer organization.  They

5  fill in the form, which includes their name, their

6  contact details, the name and contact details of the

7  person that they're sending the money to.  They present

8  their identification.  Then the money transfer company

9  will receive the money and run a check of the sender

10 and the receiver against a list provided by the

11 government and the United States to check that there

12 are no blacklisted individuals in that train.  That.

13      Assuming that that is all okay, that money is then

14 taken by the agent at the money transfer company who

15 enters the information into the computer system and

16 takes the money and deposits it into a bank, a normal

17 bank.

18      That then, the information and the money, sort of

19 goes to a clearinghouse of the money transfer

20 organization where further checks are made on that

21 money.  Assuming, again, that everything is acceptable

22 and going according to plan, the recipient of the money

23 in Somalia will receive a text message from the money

24 transfer organization saying, You have some money.

25 Come into the office of Dahabshiil or Qaran or

Middleton - Direct by Mr. Siegel

1  whichever organization and receive your money.  That

2  person can then go to the office, present the text

3  message and their identification, and receive the

4  money.

5  Q    Are transactions subject to different levels of

6  scrutiny depending on where the recipient is located?

7  A    Yes, I think that's fair to say.

8  Q    Can you describe that a little bit more?

9  A    So, for example, if we go back to the far history

10  of these money transfer organizations -- they've been

11  known as hawalas also -- that system when it was first

12  initiated was very much a trust-based system.  So I

13  would give money to somebody that I knew or had a

14  relation with or a business partnership with, and they

15  would arrange for somebody else that they knew or were

16  related to or had a business partnership with to give

17  money to the person I had designated at the other end.

18            THE COURT:  How far do they go back in time?

19            THE WITNESS:  As a historical thing, very far

20  back.  In the last thirty, forty -- twenty to thirty

21  years, they've become much more formalized.  We now,

22  obviously, have paper trails and a much more regulated

23  system that we're seeing.  But that trust-based element

24  is still, I think, very important in it.

25            What we see -- if, for example, we were to

Middleton - Direct by Mr. Siegel

1   send money from the United States to Kenya, we know

2   that at the end of the United States government, there

3   is strong oversight and strong regulation of these.  We

4   also know that when the money arrives in Kenya, there

5   is a strong capacity to oversee and to regulate.

6         The Kenyan government issues ID cards to

7   every resident in Kenya.  They have fairly good

8   intelligence services who are able to know who they're

9   looking for and monitor things.  The Central Bank of

10  Kenya has an agreement to monitor not only banks,

11  standard banks, but also money change organizations and

12  money transfer organizations.  So in Kenya, I would say

13  there is a fairly good oversight of the recipient end

14  of the money.

15        The same could also be said in Somaliland,

16  for example, where the government since at least 1997

17  has been getting progressively more capable and

18  certainly has the capacity to monitor fairly closely in

19  most cases -- certainly in Hargeysa, for example -- the

20  recipients of money coming from abroad.

21        I think in Somalia itself, so in Puntland and

22  parts of south central Somalia, that capacity of the

23  government to monitor is much weaker, obviously.  The

24  Central Bank of Somalia officially has agreement to do

25  that, but its capacity to keep records, to be on top of

Middleton - Direct by Mr. Siegel

1  this, is fairly limited.

2          So in some cases, people who are receiving

3  money in Somalia and Mogadishu, for example, will have

4  a form of ID.  That may be a passport if they're lucky.

5  It may be an older ID from a previous regime in

6  Somalia.  It may be some form of ID issued by a United

7  Nations organization of some description.  But other

8  people will not have formal ID.  There other methods

9  would have to be used to check that that is, indeed,

10  the correct person who's receiving the money.  And that

11  could be through checking their social networks, so

12  talking to an elder from their community -- is this

13  person who they say they are -- through using telephone

14  calls, verifying with the sender, and so on.

15  Q    You mentioned when you were discussing Kenya the

16  Kenyan Intelligence Agency.  How would they have

17  involvement or oversight or knowledge of money

18  transfers coming into Kenya?

19  A    Well, in theory, as a Kenyan government agency,

20  the money transfer is monitored by the Central Bank of

21  Kenya; therefore, the Kenyan Intelligence Services, in

22  theory at least, would be able to access that and use

23  that information.

24  Q    Does Somaliland have an intelligence service?

25  A    Yes, it does.

1  Q     How would you characterize that compared to Kenya,

2  for example?

3  A     Not as capable as Kenya certainly, but the

4  Somaliland Intelligence Services have received support

5  from, among others, the United Kingdom, particularly on

6  counterterrorism issues.  So they are pretty effective.

7  I think we see that.  There are a number of reasons for

8  it, but one of the reasons there are fewer attacks in

9  Somaliland is that their intelligence services are

10  quite effective.

11  Q     Does Somaliland have a regulatory authority for

12  these financial transfers?

13  A     Yes.  Somaliland has a Central Bank also, and that

14  is able to provide some level of regulatory oversight.

15  Some of the -- at least Dahabshiil, the largest of the

16  money transfer organizations, has one of its

17  headquarter offices in Hargeysa.  So there is a

18  relatively robust monitoring and oversight regime

19  there.

20  Q     How would you compare the Central Banks of

21  Somaliland and Kenya and their regulatory effectiveness

22  as compared to Somalia?

23  A     Much, much more impressive I would say.  I think

24  for very understandable reasons, the Central Bank of

25  Somalia is much less effective at its regulatory

Middleton - Direct by Mr. Siegel

1    functions.  It's still, in many ways, struggling with

2    some of the basic functions of the Central Bank,

3    providing storage facility for government money,

4    ensuring that there is proper processes in place for

5    disbursement of government funds, and that is really

6    their sort of main focus over the last year or two.

7  Q    How would you compare the Kenyan and Somaliland

8    Intelligence Services to one in Somalia?

9  A    Certainly, the Kenyans would be by far the most

10   capable of those three, and the Somaliland is behind

11   that.  The Somalia Intelligence Services are becoming

12   certainly much more effective now.  But I think it's

13   fair to say that certainly over the period that we've

14   been discussing, they would have been less effective,

15   although not completely ineffective.  But certainly

16   less effective than their counterparts.

17 Q    What period of time?

18 A    I think 2011 to 2013.

19 Q    A few minutes ago, you mentioned identification

20   cards.

21 A    Uh-huh.

22 Q    I believe you said Kenya and Somaliland have a

23   national ID system?

24 A    Uh-huh.

25 Q    Does Somalia have a national ID system?

Middleton - Direct by Mr. Siegel

1    A    No, it does not.

2    Q    If the recipient of a money transfer is not able

3    to verify the details of the recipient information,

4    what would happen to the transfer?

5    A    It would be either held by the money transfer

6    organization or returned to the sender.

7    Q    Thank you.

8         You mentioned earlier that you rely on U.N.

9    reports?

10   A    Uh-huh.

11   Q    Those are from the U.N. monitoring group in

12   Somalia?

13   A    Yes.

14   Q    What do these reports contain in your experience?

15   A    They contain a very broad range and a huge amount

16   of information.  They report on all threats to peace

17   and security in Somalia, and so they cover both

18   specific instances -- for example, of an arms transfer,

19   they would record who sent the weapons, who received

20   them, and how they got to Somalia.  But they also

21   cover, I find, a broad range of political and other

22   developments in Somalia.  And they use that as a way of

23   illuminating what's happened with particular

24   individuals or particular groups that might be threats

25   to or involved in the peace and security of Somalia.

Middleton - Direct by Mr. Siegel

1  Q    What sorts of groups would that include?

2  A    So that would include government groups, for

3  example, but also al-Shabaab or other groups of that

4  nature.

5  Q    As it relates to al-Shabaab, what sort of

6  information do the U.N. reports contain typically?

7  A    So they would contain reports on trustees

8  (phonetic) or attacks that al-Shabaab have committed.

9  So they would detail what happened, where it happened,

10  who may have responsible for some of it, or who they

11  judge to have been responsible for some of it, who was

12  involved in those attacks, that kind of information.

13  Q    You mentioned who was involved in the attacks.

14  What basis is used to report someone as having

15  involvement in al-Shabaab or in an al-Shabaab attack?

16  A    So my understanding of how the monitoring group

17  tends to work is they have minimum standards.  I think

18  they have to have two independently corroborated

19  sources of information before they can include -- and,

20  obviously, they generally try to have more than that.

21  Some of that may, I believe, come from interviews that

22  they conduct with people from confidential intelligence

23  sources but also sometimes from media sources that they

24  are able to use to help verify the things that they're

25  reporting.

Middleton - Direct by Mr. Siegel

1  Q     Is there any basis or minimum basis that's needed

2  for an open source news organization to identify

3  someone as related to al-Shabaab or having involvement

4  in an al-Shabaab attack?

5  A     You mean for a newspaper?

6  Q     For example.

7  A     Only their own internal editorial standards, yeah.

8  Q     In your experiences, is anyone ever incorrectly

9  reported to have an al-Shabaab affiliation?

10 A     Yes.  Yeah.

11 Q     Can you explain?

12 A     So there's a recent example of a young man named

13 Mohamed Zubeyr who was reported as having been involved

14 in a suicide attack in Garoowe in Puntland and reported

15 to have been killed in that attack.  It turned out, in

16 fact, that the gentleman named in the U.N. report and

17 in a number of media reports is, in fact, alive and

18 well.  He's also currently serving as the Director

19 General of the Ministry of Constitutional Affairs in

20 Mogadishu, and there's no suggestion that he has any

21 involvement or sympathy with al-Shabaab.

22     It transpires -- certainly, according to

23 Mr. Zubeyr's account of what happened is that he in a

24 previous role had been forced to fire somebody, and

25 that person had leaked stories to the press which had,

1  let us say, taken on a life of their own being reported

2  in multiple news sources that he, in fact, had been a

3  suicide bomber.  That was then picked up by a

4  monitoring group report.

5  Q    You said his account.  How do you know his

6  account?

7  A    Well, he released a video online where he

8  explained what had happened to him.  He's also passed

9  his story to me and to others who have worked with him

10 in the course of our professional interactions.

11 Q    So you know him personally?

12 A    I know him personally, yeah.

13 Q    Can you think of any other examples of someone

14 falsely reported?

15 A    Well, a slightly different example is of a recent

16 case, and this didn't make it into the monitoring group

17 report.  But a -- there was a story and a letter that

18 was available in the press about a gentleman called

19 Hassan Khaire who was accused -- Hassan Khaire, that's

20 K-H-A-I-R-E -- in part of his business dealings, he

21 works for an oil company in Somalia, and it was

22 reported that the monitoring group had been

23 investigating him for links with al-Shabaab.  This,

24 obviously, got into the media, and there was a very big

25 discussion about this.  He is a relatively prominent

Middleton - Direct by Mr. Siegel

1  individual.  And over time and a few months later, the

2  monitoring group released a letter saying that they had

3  concluded the investigation into Mr. Khaire, and there

4  was no evidence of any links between him and

5  al-Shabaab.

6      So it's a very difficult thing, I think, sometimes

7  for people to prove.

8  Q    As it relates to Mr. Zubeyr, the first person you

9  talked about, what was the U.N.'s ultimate conclusion

10  as to his relationship after he was initially reported

11  as having a relationship to al-Shabaab?

12  A    So the initial news reports were used, my

13  understanding, to include his name as the suicide

14  bomber in the report.  I think it was the 2015 report,

15  but I'd have to check.  Since the sort of

16  clarifications or corrections to the story have come

17  out -- I haven't seen an official response for them,

18  but I would imagine that they would correct that in

19  subsequent reports.

20  Q    Your understanding is it has not been officially

21  corrected yet?

22  A    That's my understanding, but I could be wrong.

23  Q    Is it possible for someone with the same name to

24  be reported in the media or in a report?

25  A    Yes, that could be possible.

Middleton - Cross by Ms. Atiyeh

1    Q    Can you explain how that would work?

2    A    Well, many people in Somalia and other places will

3    have similar names.  Certainly and increasingly as

4    we've seen them move to more Islamic names, for Somali

5    people, there's a relatively limited number of names

6    that people use.  So it's certainly true that even in

7    our personal interactions with people, we certainly

8    have to identify is this Osman X or Osman Y?  Sometimes

9    it requires a little bit extra information to identify

10   who you're talking about.  So it's certainly possible

11   that there could be some confusion in media reports, I

12   suppose.

13            MR. SIEGEL:  The Court's indulgence, Your

14   Honor.

15            That's all we have, Your Honor.

16            THE COURT:  Thank you.

17            Ms. Atiyeh?

18            MS. ATIYEH:  May I confer with my cocounsel?

19            THE COURT:  Yes.

20                    CROSS-EXAMINATION

21   BY MS. ATIYEH:

22   Q    Good morning, Mr. Middleton.

23   A    Good morning.

24   Q    Are you familiar with the indictment in this case?

25   A    I am, yes.

Middleton - Cross by Ms. Atiyeh

1  Q     You've reviewed it?

2  A     Yes.

3  Q     Have you reviewed the transcripts in this case

4  that have made up the government's exhibits?

5  A     I have seen some of them, yes.

6  Q     But you haven't seen all of them?

7  A     No.

8            MS. ATIYEH:  Nothing further.

9            THE COURT:  All right.  Any redirect?

10           MR. SIEGEL:  No, Your Honor.

11           THE COURT:  Mr. Middleton, I have a question.

12  Tell me a little bit more about this blacklist that

13  I've been hearing about.  What is that?  Who compiles

14  it?  What information do they use to compile it?  Who

15  oversees it?

16           THE WITNESS:  So this is compiled, I think,

17  by the U.S. Treasury Department under the regulations

18  that cover that, and it will -- I don't know exactly

19  the process through which they add people to that list,

20  but my understanding is that they would receive from

21  other U.S. government agencies so-and-so is a person of

22  concern to us.  Then they could add them to the list if

23  they suspected that that person -- I don't know -- may

24  have links to a terrorist organization.

25           THE COURT:  Is this a list specific to

1   Somalia, or is this a more general list?

2           THE WITNESS:  I couldn't say for sure, but I

3   believe they have a specific list for Somalia and,

4   presumably, also a broader list for other contexts as

5   well that they're concerned about.

6           THE COURT:  Do other countries do that as

7   well for Somalia?

8           THE WITNESS:  My understanding is yes, that's

9   the case in some countries but not all.

10          THE COURT:  These lists are distributed to

11  whom?

12          THE WITNESS:  These lists, I believe, again,

13  are held only by the agency that is the owner of them.

14  They will use that with the money transfer

15  organizations to cross-check people's names.  So

16  they're not publicly available.

17          THE COURT:  So when a money transfer agent

18  receives a remittance, it checks with the U.S. Treasury

19  Department?

20          THE WITNESS:  Yes, that's correct.

21          THE COURT:  All right.  Thank you.

22          Any questions based on the Court's questions?

23          MS. ATIYEH:  Nothing from the government,

24  Your Honor.

25          MR. SIEGEL:  No, Your Honor.

1            THE COURT:  All right.  Thank you.

2            Mr. Middleton, you are excused.  Do not

3   discuss your testimony outside the courtroom with any

4   other witness.

5            THE WITNESS:  Thank you.

6        (The witness stands aside.)

7            THE COURT:  Any other witnesses?

8            MS. MINTER:  No further witnesses on behalf

9   of Ms. Jama, Your Honor.  We would rest.

10            THE COURT:  All right.  Mr. Yamamoto,

11   Ms. Deutsch, any witnesses?

12            MR. YAMAMOTO:  Ms. Deutsch has some, Your

13   Honor.

14            THE COURT:  All right.

15            MS. DEUTSCH:  Good morning, Your Honor.

16            THE COURT:  Good morning.

17            MS. DEUTSCH:  Your Honor, we would like to

18   introduce on behalf of Ms. Dhirane three exhibits.

19   They are parts of transcripts which I believe are

20   already admitted into evidence.  I've talked with the

21   government, and they are agreeing to stipulate.

22            THE COURT:  All right.  Very good.  Why don't

23   you identify what those are.

24            MS. DEUTSCH:  I have identified them as HD1,

25   HD2, and HD3, Your Honor.

 1            THE COURT:  All right.  Those are in evidence

 2  already?

 3            MS. DEUTSCH:  I believe that the

 4  corresponding transcripts are in evidence.

 5            THE COURT:  All right.  No objection, I take

 6  it?

 7            MR. GILLIS:  No, Your Honor.

 8            THE COURT:  All right.  Without objection,

 9  HD1, 2, and 3 are admitted.

10            Thank you.

11            MS. MINTER:  Your Honor, if we could just

12  consistent with our previously lodged objections to the

13  extent that any of them overlap with this exhibit.

14            THE COURT:  All right.  Very good.

15            With that, both defendants rest; is that

16  correct?

17            MR. YAMAMOTO:  Yes, Your Honor.

18            MS. MINTER:  We rest, Your Honor.

19            THE COURT:  All right.  Does the government

20  have any rebuttal?

21            MR. GILLIS:  No, Your Honor.

22            THE COURT:  All right.  I'm going to take a

23  short recess, and then we'll come out and proceed from

24  there.

25        (Recess from 10:03 a.m. until 10:26 a.m.)

 1                THE COURT:  Anything further, Mr. Gillis?

 2                MR. GILLIS:  No, nothing from the government.

 3                I don't know if this is the time to do it,

 4    but the parties have talked about a briefing schedule.

 5                THE COURT:  All right.  For the record, the

 6    Court will continue to reserve on the Rule 29 motion.

 7                MS. MINTER:  Thank you, Your Honor.

 8                I think as a technical matter, we should

 9    renew the Rule 29 motion at this time.

10                THE COURT:  All right.  That's fine.  The

11    Court will reserve on that.

12                MS. MINTER:  Thank you.

13                THE COURT:  Yes.  Did you talk about among

14    yourselves about a schedule that you want the Court to

15    consider?

16                MS. MINTER:  We have, Your Honor.  We would

17    propose August 12 as an initial filing date.  That

18    would be for the government's written closing argument

19    but also for any posttrial motions from the defense.

20    Then responses respectively, we would propose, be due

21    on August 26 with replies due September 2.  And if the

22    Court is available, we would ask for September 7 if any

23    additional oral argument was needed.

24                THE COURT:  All right.  The Court would want

25    additional oral argument.

1           MS. MINTER:  Very well then, Your Honor.  We

2  would propose September 7.

3           THE COURT:  What would be filed on the 12th

4  other than your posttrial motions?

5           MS. MINTER:  The government's closing

6  argument, Your Honor.

7           THE COURT:  Then you'd respond to that on the

8  26th?

9           MS. MINTER:  Precisely, Your Honor.

10          THE COURT:  That would be the last filing

11  before the 7th?

12          MS. MINTER:  Your Honor, we would propose

13  September 2 if any replies were necessary for either

14  category.

15          THE COURT:  All right.

16          MR. GILLIS:  That would be the government's

17  rebuttal argument, and then it would be then the

18  defendant's reply to our response to their Rule 29.

19          THE COURT:  All right.  The Court will set

20  that schedule.  Posttrial motions on September 12 and

21  the government's closing argument on September 12,

22  replies --

23          MR. GILLIS:  Pardon me, Your Honor.  We were

24  suggesting August 12.

25          THE COURT:  I'm sorry.  August 12, yes.  The

1  defendant's posttrial motions and the government's

2  closing brief on August 12 with responses on

3  August 26 --

4          Is that what you proposed?

5          MS. MINTER:  Please, Your Honor.

6          MR. GILLIS:  Yes, Your Honor.

7          THE COURT:  -- with any further replies on

8  September 2, and I'll hear oral argument on

9  September 7.

10         MR. YAMAMOTO:  Your Honor, Ms. Deutsch is

11 going to be gone on the 13th.  Could we postpone oral

12 argument until the 13th?

13         THE COURT:  After the 13th of September?

14         MR. YAMAMOTO:  Well, we have a problem

15 because --

16         THE COURT:  How about the 14th?

17         MR. YAMAMOTO:  Your Honor, we have --

18         MS. MINTER:  Your Honor, we had selected the

19 7th because I don't anticipate that I will be available

20 in the range of the 12th or the 13th or 14th.

21         MR. GILLIS:  Unless the Court could order the

22 delivery date, Your Honor.  We can probably fit that

23 in.

24         THE COURT:  I'll just issue an order

25 postponing the delivery.

1          Well, Ms. Deutsch, when do you become

2   unavailable?

3          MS. DEUTSCH:  I'm unavailable, Your Honor,

4   August 23 through September 13.

5          THE COURT:  All right.

6          MS. DEUTSCH:  I'm coming back into the

7   country September 13.

8          THE COURT:  Ms. Minter, when are you planning

9   on stopping your professional activities?

10          MS. MINTER:  Your Honor, I will tell the

11   Court I am due the 13th of September.  So I will

12   continue my professional activities as long as possible

13   up until that date.

14          THE COURT:  All right.

15          MR. GILLIS:  We could -- Ms. Deutsch is

16   leaving on August 13.

17          MS. DEUTSCH:  August 23.

18          MR. GILLIS:  As far as the government is

19   concerned, we can push all of those dates up in order

20   to accommodate her schedule.  I don't know how that

21   works with the defense's needs.  But so long as we, the

22   government --

23          THE COURT:  Well, here's what I'm going to

24   do.  I'm going to leave the schedule as is.  I'll let

25   the defendants confer among themselves and see if you

 1   can come up with an alternative schedule that would

 2   facilitate Ms. Deutsch's participation on closing

 3   argument.

 4            MS. MINTER:  Certainly, Your Honor.

 5            THE COURT:  All right.  Let me just say a

 6   couple of things about what I would like to see in the

 7   briefing.  This does not reflect any extended thought

 8   or analysis by the Court.

 9            It seems to me that there are a number of

10   significant evidentiary and substantive issues that are

11   being raised by the indictment, the first and perhaps

12   the most fundamental of which is what evidence is

13   sufficient and necessary to establish the fact of

14   material support to a foreign terrorist organization,

15   specifically al-Shabaab.  By that, I mean can someone

16   other than the person or entity that actually provides

17   the material support be deemed the person who provides

18   material support because that person, for example,

19   provided the funding that was used to procure the

20   material support?

21            And if so, under what theory do you reach

22   that person that is somewhat remote from the actual

23   situs of the material support?

24            Also, what does the government contend and

25   what precisely is the material support in this case?

1  Is it the money that was delivered to either of the two

2  persons identified in the indictment, or is it the

3  provision of the actual services to members of

4  al-Shabaab?

5         If it's the funding that was used to procure

6  and provide those services, again, under what theory do

7  you reach the person that provided that funding if

8  different than the person who actually provided the

9  services or procured those services through the

10  funding?

11        Also, whether the government is relying upon

12  either an aiding and abetting theory or an attempt

13  theory.  If so, precisely what evidence do they contend

14  is necessary and sufficient for either of those bases

15  for liability?

16        Likewise, what's necessary for the conspiracy

17  claim, including specifically whether one can establish

18  an actionable conspiracy where the money or funding was

19  not, in fact, delivered to someone sufficiently

20  associated with al-Shabaab to constitute direct

21  delivery of those funds to that organization?

22        I think that gets to the other issue.  I know

23  this is a little bit disjointed, but I hope it provides

24  some guidance.  What's the evidence as far as who

25  Fardowsa was and whether the government contends that

1   Fardowsa is, in fact, sufficiently aligned or

2   associated with al-Shabaab to constitute al-Shabaab for

3   the purposes of the material aid statute?  If so, why?

4          If the evidence were deemed insufficient to

5   establish her as sufficiently associated with

6   al-Shabaab to constitute the foreign terrorist

7   organization, what evidentiary significance does the

8   defendant's intent or expectations have with respect to

9   the delivery of money to that person?

10         For example, for the purposes of the

11  conspiracy count, does it matter who Fardowsa was

12  relative to al-Shabaab if the evidence were that the

13  defendants intended or expected those funds delivered

14  to that person to reach al-Shabaab or be used for

15  material support for al-Shabaab?

16         Likewise, I would like to see a careful

17  discussion of the medicine exemption, what the scope of

18  that is, and how the scope of that exemption needs to

19  be construed in light of the international law issues

20  that the defendants have raised.

21         As part of that analysis, I would like to see

22  some discussion about whether the Geneva convention

23  articles, specifically Common Article 3, or any of the

24  relevant associated protocols are to be deemed

25  self-executing; and secondly, whether separate and

1  apart from the Geneva convention, whether there are

2  customary international law obligations that need to be

3  considered in connection with the construction of the

4  material aids exemption for medicine.

5          I think that generally covers broadly what

6  I'd like to see discussed.

7          All right.  Any questions about any of that?

8          MR. GILLIS:  Your Honor, only with respect to

9  is it the services provided to al-Shabaab.  The

10  question the Court has is with respect to services that

11  might have been provided downstream from Fardowsa, for

12  example, or are you talking about services taking place

13  before?

14          THE COURT:  Well, I would like to hear

15  precisely what the government contends the material aid

16  was.

17          MR. GILLIS:  Yes, sir.

18          THE COURT:  Once that's been established

19  under the government's theory, why the defendants'

20  conduct was sufficient to establish that they provided

21  the material aid and under what theory.

22          MR. GILLIS:  Yes, sir.

23          THE COURT:  All right.

24          MR. GILLIS:  Yes, sir.

25          THE COURT:  Unless there's something else --

 1          MR. GILLIS:  Your Honor, there is one matter

 2   that we suggest.  I assume that the defendants are

 3   going to be continued on bond.  Given that we now have

 4   the full case in, which would be one of the

 5   considerations the Court might take into account on

 6   what conditions or whether to grant bond, we're asking

 7   only that there be some arrangement with the marshal

 8   service or the pretrial services folks so that if

 9   either monitoring bracelet should be cut -- I

10   understand that pretrial services does receive an

11   immediate notification.  Occasionally, it may be that

12   it's not actually seen until later.  What we'd request

13   is that the FBI receive that same immediate notice if

14   either bracelet should be cut.

15          THE COURT:  Does anybody want to respond to

16   that?

17          MS. MINTER:  Your Honor, we don't necessarily

18   have any objection.  I don't know that we have any

19   ability to facilitate that.  I think that's through

20   probation.

21          THE COURT:  No, I wouldn't think so.  I think

22   that's just a function of pretrial services

23   coordinating with the FBI, correct?

24          MR. GILLIS:  That's correct, Your Honor.

25          THE COURT:  The Court will direct pretrial

1    services to make those arrangements.

2            MR. GILLIS:  Thank you.

3            THE COURT:  All right.  Mr. Yamamoto.

4            MR. YAMAMOTO:  Your Honor, we just want to

5    make sure we join defense's Rule 29 motion.

6            THE COURT:  All right.  We'll stand in recess

7    until September 7 or such other day as the Court may

8    schedule for final argument.

9            The defendants will be continued on pretrial

10   release under the same terms and conditions as have

11   been previously established.

12           All right.  Anything further?

13           MS. MINTER:  No, Your Honor.

14           MR. YAMAMOTO:  No, Your Honor.

15           MR. GILLIS:  No, Your Honor.

16           THE COURT:  All right.  The Court will stand

17   in recess.

18           -----------------------------------
                   Time:  10:40 a.m.
19

20

21

         I certify that the foregoing is a true and
22
      accurate transcription of my stenographic notes.
23

24
                              _____
                                       /s/
25                            Rhonda F. Montgomery, CCR, RPR