UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

UNITED STATES OF AMERICA     )
     )
    v.     )   1:14cr230-AJT
     )
MUNA OSMAN JAMA, *et al.*,     )
     )
   Defendants.     )

GOVERNMENT'S OPPOSITION TO
DEFENDANTS' POST-VERDICT MOTIONS

The defendants' post-verdict motions are no more than old packages in new wrapping

paper.  They comprise only arguments already considered and rejected by the Court.  For the

reasons that follow, the United States respectfully submits that the defendants' motions should be

denied.

I.    THE STANDARD OF REVIEW FOR THE DEFENDANTS' POST-VERDICT MOTIONS IS
    EXACTING.

As the Supreme Court said in *Jackson v. Virginia*, 443 U.S. 307 (1979):

> [T]he critical inquiry on review of the sufficiency of the evidence to support a
> criminal conviction must be . . . to determine whether the record evidence could
> reasonably support a finding of guilt beyond a reasonable doubt. . . . [T]he
> relevant question is whether, after viewing the evidence in the light most
> favorable to the prosecution, any rational trier of fact could have found the
> essential elements of the crime beyond a reasonable doubt.  This familiar standard
> gives full play to the responsibility of the trier of fact fairly to resolve conflicts in
> the testimony, to weigh the evidence, and to draw reasonable inferences from
> basic facts to ultimate facts.  Once a defendant has been found guilty of the crime
> charged, the factfinder's role as weigher of the evidence is preserved through a
> legal conclusion that upon judicial review all of the evidence is to be considered
> in the light most favorable to the prosecution.

*Id.* at 318–19 (citations and footnotes omitted).  *See also United States v. Cameron*, 573 F.3d

179, 183 (4th Cir. 2009) (same).

The same is true for bench trials.  "[C]hallenges to the sufficiency of the evidence at a bench trial [are reviewed] under the same demanding standard applied to a jury trial." *United States v. Wasson*, 679 F.3d 938, 949 (7th Cir. 2012).  *See also, e.g., United States v. White*, 506 F.3d 635, 641 (8th Cir. 2007) (standard of review for sufficiency-of-evidence challenge after bench trial is same as standard applied when reviewing jury verdict; if district court's account of evidence is plausible in light of record in its entirety, court of appeals may not reverse even if convinced it would have weighed evidence differently had it been sitting as trier of fact); *United States v. Hubbard*, 603 F.2d 137, 142 (10th Cir. 1979) ("The same standards of review on appeal apply to both court trials and jury trials.").

Finally, the settled law of the Fourth Circuit, as in other circuits, is that the testimony of just one of a defendant's accomplices "standing alone and uncorroborated" can provide an adequate basis for conviction.  *See, e.g., United States v. Burns*, 990 F.2d 1426, 1439 (4th Cir. 1993); *United States v. Figurski*, 545 F.2d 389, 392 (4th Cir. 1976); *United States v. Price*, 155 F.3d 563, 1998 WL 390572, at *6 (4th Cir. June 26, 1998) (unpublished table decision) ("[T]he uncorroborated testimony of a single witness may be sufficient to survive a Rule 29 motion ... even when the single witness happens to be the defendant's former accomplice in crime").

Judged by these standards, the defendants' motions must be denied.

II.    THE UNITED STATES FULLY MET ITS BURDEN TO PROVE THE DEFENDANTS GUILTY OF CONSPIRING TO PROVIDE AND PROVIDING MATERIAL SUPPORT TO A FOREIGN TERRORIST ORGANIZATION.

The Indictment charged the defendants with twenty-one counts of violating 18 U.S.C. § 2339B: one count of conspiring to provide material support or resources to a foreign terrorist organization, and twenty separate counts of providing material support, each based on an

individual financial transaction.[1]  The statute criminalizes the knowing provision of material

support or resources to a foreign terrorist organization, or an attempt or conspiracy to do so.  18

U. S. C. § 2339B; *Holder v. Humanitarian Law Project*, 561 U.S. 1, 7 (2010).  This was no secret

to the defendants, and the Court's findings demonstrate that the United States fully met its

burden of proving – beyond any reasonable doubt – that the defendants conspired to and did

provide material support to al-Shabaab.

A.      A SECTION 2339B CONSPIRACY DOES NOT REQUIRE PROOF THAT THE
        CONSPIRATORS PLANNED TO PROVIDE MATERIAL SUPPORT TO ANY
        PARTICULAR INDIVIDUAL.

To violate the conspiracy prohibition of 18 U.S.C. § 2339B, the defendants need not

commit any overt act.[2]  Nor is there any requirement that the defendants were successful in

actually providing material support to the terrorist organization.[3]  The crime of conspiracy to

violate 18 U.S.C. § 2339B was therefore complete at the instant that the defendants agreed to

send money to support al-Shabaab – regardless of whether they took *any* further step to effect the

purpose of the conspiracy.[4]  It necessarily follows, therefore, that for the defendants to have

---

[1] Congress enacted Section 2339B as part of the Antiterrorism and Effective Death Penalty Act
(AEDPA) of 1996, Pub. L. No. 104-132, § 303, 110 Stat. 1214, 1250.

[2] *See, e.g.*, *United States v. Ahmed*, 94 F. Supp. 3d 394, 431 (E.D.N.Y. March 24, 2015)
("[T]here are two types of conspiracy statutes: those that are modeled after 18 U.S.C. § 371,
which requires an overt act, and those that are modeled after the common law of conspiracy,
which does not require an overt act. . . .  Where . . . 'Congress ha[s] omitted from the relevant
provision any language expressly requiring an overt act, the Court [will] not read such a
requirement into the statute.'") (quoting *United States v. Abdi*, 498 F. Supp. 2d 1048, 1064 (S.D.
Ohio 2007))

[3] *United States v. Jama*, --- F. Supp. 3d ---, 2016 WL 6573959, at *5 (E.D. Va. Nov. 4, 2016)

[4] This is based on the well-established principle of statutory construction that "absent contrary
indications, Congress intends to adopt the common law definition of statutory terms."  *Whitfield
v. United States*, 543 U.S. 209, 213 (2005) (quoting *United States v. Shabani*, 513 U.S. 10, 13-14
(1994)).  It has been long held that "the common law understanding of conspiracy" makes the act
of conspiring itself criminal, with no other act required for liability.  *Shabani*, 513 U.S. at 13-14.

violated the Section 2339B conspiracy prohibition, they need not have even known *how* to get the money to al-Shabaab, much less through whom they would do so.  The defendants would have been just as guilty if they had agreed to use a carrier pigeon to drop off a check payable to al-Shabaab in the Golis Mountains intending that it reach the organization, but with no knowledge as to how that might happen, who might deliver it, or who might receive it.  It simply is not an element of the offense.

To find a defendant guilty of conspiring to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B, the United States must prove three elements:

> (1) two or more persons entered into an agreement that had as its objective providing material support or resources to a foreign terrorist organization in violation of 18 U.S.C. § 2339B; (2) the defendant knew that the objective of the agreement or the means by which it was to be accomplished was unlawful; and (3) the defendant knowingly and voluntarily became a part of that agreement.  In order to prove that a defendant knowingly and voluntarily joined the conspiracy, the United States must prove that the substance of their agreement contemplated conduct that satisfied the elements of a substantive offense under Section 2339B.

*United States v. Jama*, 2016 WL 6573959, at *2.

That the defendants "entered into an agreement"[5] is plain from their course of conduct, for example, their "central coordinating, facilitating, and supervisory roles with respect to the

---

[5] "A conspiracy exists whenever there is a combination, agreement, or understanding, tacit or otherwise, between two or more persons, for the purpose of committing the unlawful act." *Fisher v. United States*, 13 F.2d 756, 757 (4th Cir. 1926).  It is not necessary to prove any formal agreement; a "mutual understanding among or between the parties will suffice." *United States v. Depew*, 932 F.2d 324, 326 (4th Cir. 1991).  The government need not prove that "everybody involved sat down together and worked out all the details," only that "those who were involved shared a general understanding about the crime." *United States v. Guevara*, 706 F.3d 38, 44 (1st Cir. 2013).  Indeed, the agreement may be entirely unspoken. *See, e.g., United States v. Salahuddin*, 765 F.3d 329, 345 (3d Cir. 2014), *cert. denied*, 135 S. Ct. 2309 (2015); *United States v. Becker*, 569 F.2d 951, 959 (5th Cir. 1978) ("the testimony of several witnesses that no plan was ever discussed among the alleged conspirators did not prevent the jury from concluding, nevertheless, that the parties were proceeding according to an unspoken agreement to work together to defraud investors").

Group of Fifteen and the ISDAC chatroom," *id.* at *8; their coordination with al-Shabaab

leadership and other al-Shabaab supporters to track and meet the needs of al-Shabaab, *id.* at *4;

their agreements about how and whom to approach to become members of the Group of Fifteen,

Tr. 512; GEX 48, US-00777-78; *see also id.* at *4; and their division of labor with respect to the

"Hargeisa side" and the "Nairobi side," *id.* at *5.

Indeed, in a number of cases, the defendants' agreement was explicit, such as on June 7,

2012, when Dhirane told Jama that Thabaat had "proselytized" a woman named "Zuhuur" and

they decided that Thabaat should "connect her to the Northerners."

> Dhirane:  . . . [Thabaat] also said that [Zuhuur] was previously registered on
> the list for the orphans . . . that Mr. Big Laptop used to roam
> around with. . . . She said, "Since those days, she is associated with
> those orphans; and now she was told to send a large amount of
> money." She said that she told her to forget about those tasks;
> there are many other tasks but what would she pledge? "She
> agreed to 50.00," she said. I told her that if she has agreed to a
> 50.00, she should connect her to our sister Umu Camaar instead of
> to the Northerners.
>
> Jama:  Yes.
>
> Dhirane:  The girl who was left behind by the woman, . . . I said to link that
> 50.00 to her. She said that afterwards when the girl's issue is done
> then have that 50.00 go to the Nairobi side. I told [her] to leave
> her alone, but if you want to turn your attention to the Northerners
> side then go ahead and turn your attention to.
>
> Jama:  Right, right. . . . Thabaat has told to me, "I cannot afford 50.00
> going towards the Northerners." Do you know?
>
> Dhirane:  What? Yes! Yes, she said, "I will send it to this side." But she
> also said, "If the one on that side is no longer needed, I will then
> put my efforts towards your side." I think she told me that she will
> send 200.00 this month.
>
> Jama:  Yes. She said, she will send 200.00 this month, . . . but she said, "I
> cannot afford every month sending $50.00 to that side and another
> $50.00 to the other side."

GEX 79, US-02316-17 (emphasis added).

> Similarly, on December 31, 2012, when Jama became quite distressed that a payment she intended to send to Fardowsa Jama Mohamed had been rejected because Jama was on a "list," Jama and Mohamed discussed a plan to get their stories straight:

| | |
|---|---|
| Jama: | Sister, money that I sent before – God knows if they were monitoring me – to Sheikh Jama Abdisalan and other brothers. |
| Mohamed: | Sister, the infidels cannot do anything to you.  We trust in God, but remove for your home anything that could be used as evidence.  When did you send it? . . . |
| Jama: | Two years ago. . . .  I have to talk to the brothers/sisters . . . and then stay away from Paltalk after notifying them. . . .  It is not right for me to just disappear. |
| Mohamed: | Because we must agree on something. |
| Jama: | Right. |

GEX 105, US-00836-838 (emphasis added).

That the defendants "knew that the objective of the agreement or the means by which it was to be accomplished was unlawful" is similarly clear from the record, from the many occasions on which the defendants discussed the risks and penalties for sending money to al-Shabaab.  An example, was on January 10, 2013, when Dhirane told Barira Hassan Abdullahi, "where we are, if you are found with one cent – one cent. . . .  [T]hey said, 'Anyone found with one cent and belongs to that place no questions asked; he will be sentenced to 15 years in prison.' Here it is already decided. . . .  That means the noose is in your neck."  GEX 110, US-18580.[6]  Another was on January 16, 2013, when Dhirane and Jama discussed an associate who

---

[6] The defendants were acutely aware of the illegality of and penalties for providing material support to al-Shabaab.  As Amina Esse testified, the defendants and their co-conspirators followed closely the arrests and convictions of women whom they knew were involved in the same fundraising as they were.  Tr. 556-58.  Her testimony was corroborated by the many conversations the defendants had about these other prosecutions.  For example, on December 12, 2012, in the same conversation Jama and Dhirane discussed Nima Yusuf – who was sentenced on December 11, 2012, after having been convicted in San Diego for sending money to al-Shabaab, GEX 7B, and Shakir Masri – who was sentenced on December 10, 2012, after having

-6-

was "approached" by law enforcement agents. Dhirane mentioned the lack of "concrete

evidence" and that "the worst is the small amounts – the living expenses for the families."

| | |
|---|---|
| Dhirane: | That is the only reason could look towards us. Even that one, I am not sure if they have the power to decide. In our location, it is 15 years if the person is found guilty of it. |
| Jama: | Really? |
| Dhirane: | I swear. If you are indicted because of those living expenses amount, you will just have to be in for 15 years. |
| Jama: | God Almighty! |
| Dhirane: | It is fifteen years. They made that an established process. . |
| Jama: | The process – did they sentence the young girl to 15 years? |
| Dhirane: | No. No her case – she was sent to prison a long time ago, you know. She has been in jail for four years. |
| Jama: | Yes. |
| Dhirane: | That was her case, but the case they now charged her with, as well as using it to terrorize people – |
| Jama: | Yes. |
| Dhirane: | – they said, "The person found guilty of it will get 15." For her it is as if she is serving 15. For her it is eight – it is almost the same. |
| Jama: | Yes, it is like eight years; poor thing. |
| Dhirane: | It is not that different – she was arrested a long time ago. |
| Jama: | Yes, really. May God make it easy for her. |

---

been convicted in Chicago for plotting to attend a Somali training camp and to become a suicide bomber for al-Shabaab, GEX 9B. Dhirane had a similar conversation with "Hargeisa-side" facilitator Hodan Ismail Hassan on December 15, 2012. (GEX 98) These conversations demonstrate that the defendants were well aware that supporting al-Shabaab as these other women were doing was illegal and carried significant penalties.

Dhirane:  Yes.  Therefore, may God protect us from them – the thing – that case is the worst one, you know.  That one is the one thing they could use against us.

GEX 115, US-00244-45.

That the defendants knowingly and voluntarily joined the conspiracy and that "the substance of their agreement contemplated conduct that satisfied the elements of a substantive offense" is also overwhelmingly supported by the myriad conversations in which the defendants discussed their intention to provide, and indeed their having provided, material support and resources to al-Shabaab, principally in the form of money sent by hawalas from the defendants and their various co-conspirators.  The specific conduct satisfying the elements of the defendants' violations of 18 U.S.C. § 2339B is discussed below.

> B. A SUBSTANTIVE VIOLATION OF SECTION 2339B DOES NOT REQUIRE PROOF THAT THE DEFENDANT PROVIDED MATERIAL SUPPORT TO ANY PARTICULAR INDIVIDUAL.

Section 2339B does not require proof that the defendant provided the "material support" to any identifiable individual.  The statute speaks only of "knowingly provid[ing] material support or resources to a foreign terrorist organization."  18 U.S.C. § 2339B(a)(1).  The only time the word "individual" appears in the statutory language is in the definition of "material support or resources," *i.e.*, "personnel (1 or more *individuals* who may be or include oneself)."  18 U.S.C. § 2339A(b)(1).  Thus, the statute only uses the word "individual" to define *what kind* of material support can be provided.  It says nothing about any "individual" *to whom* the material support must be provided.

This makes perfect sense.  If, intending to provide material support to wounded al-Shabaab fighters, the defendants had sent the money to an unwitting individual, such as Jama's father, with instructions to give the money to another individual who used the money unwittingly to treat the wounded who came to her home, not knowing that they were al-Shabaab fighters, the

defendants would be just as guilty of providing material support to al-Shabaab.  Thus, the defendants could have provided the material support directly to al-Shabaab without there ever having been any "individual" affiliated with al-Shabaab in the supply chain.  Again, it is simply not an element of the substantive offense.

To find a defendant guilty of providing material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B, the United States must prove four elements. *United States v. Jama*, 2016 WL 6573959, at *3.  First, the government must show that the defendant provided (or attempted to provide) material support.  For purposes of this statute, "material support" has the same meaning as the term in 18 U.S.C. § 2339A, which defines "material support" to be:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1).

Second, the government must show that the support was provided to a foreign terrorist organization.  For purposes of the statute, the term "terrorist organization" means "an organization designated as a terrorist organization under section 219 of the Immigration and Nationality Act."  18 U.S.C. § 2339B(g)(6).  Both al-Shabaab and al-Qa'eda have been designated foreign terrorist organizations under the relevant provision of the Act.[7]

---

[7] Designation of al-Shabaab as a Foreign Terrorist Organization, 73 Fed. Reg. 53,14550 (Mar. 18, 2008); Redesignation of Foreign Terrorist Organizations, 68 Fed. Reg. 191,56860-861 (Oct. 2, 2003).

Third, the government must prove that the defendant provided the support "knowingly" and demonstrate that the aid was intentional (*i.e.* not provided by accident or mistake). *See, e.g.*, *United States v. Al Kassar*, 660 F.3d 108, 129 (2d Cir. 2001).

Finally, the government must show that the defendant had

knowledge that the organization is a designated terrorist organization (as defined in subsection (g)(6)), that the organization has engaged or engages in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), or that the organization has engaged or engages in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989).

18 U.S.C. § 2339B(a)(1); *Holder v. Humanitarian Law Project*, 561 U.S. at 16-17.

In its factual findings, the Court decided that each of these elements had been met. As to the first, "that the defendant provided (or attempted or conspired to provide) material support," the Court found that the defendants "played prominent, if not leadership, roles within the Group of Fifteen," which, the Court found, "was committed to providing financial contributions . . . for the benefit of [al-Shabaab]." *United States v. Jama*, --- F. Supp. 3d ---, 2016 WL 6573959, at *4 (E.D. Va. Nov. 4, 2016). This material support also included:

1.  "arranging for representatives or persons associated with AS to speak to both the chatroom and the Group of Fifteen, during which time these AS members solicited support, including financial resources"; *Id.*

2.  "monitor[ing] whether the individual members had satisfied their monthly commitments and whether those sums had been successfully transmitted to and received by AS contacts on both the Nairobi side and the Hargeisa side, and . . . following up with those members of the Group of Fifteen who had not paid their monthly commitments on time"; *Id.*

3.      through Fardowsa Jama Mohamed, "operat[ing] two safe houses in Nairobi, Kenya for [al-Shabaab]," one used to "provid[e] medical care and treatment to injured [al-Shabaab] soldiers" and the other "used as a staging ground in various respects for [al-Shabaab] military operations";[8]  *Id.*

4.      through Barira Hassan Abdullahi, "receiving money for [al-Shabaab] in Somalia for such purposes as providing transportation, trucks, and other supportive services to [al-Shabaab]"; *Id.* at *5.

5.      "generating and delivering funds for the benefit of [al-Shabaab], through the transmission of those funds to these other individuals such as Mohamed and Abdullahi"; *Id.*

6.      "engag[ing] in a substantial amount of significant activities on behalf of and in coordination with the [al-Shabaab] organization itself over an extended period of time"; *Id.* at *8.

As to the second element of 18 U.S.C. § 2339B, "that the support was provided to a foreign terrorist organization," the Court found that al-Shabaab "was designated as a foreign terrorist organization by the United States Department of State under Section 219 of the Immigration and Nationality Act and is also an organization that both had engaged and was engaging in terrorist activities at the time of the events involved in this case and therefore was then and remains today an FTO for the purposes of Section 2339B(a)(1)."  *Id.* at *3.

As to the third element, that the defendants acted "knowingly" and "intentionally," the Court found that, among other activities, the defendants:

---

[8] These were "coordinated . . . with the specific needs of [al-Shabaab] for years."  *Id*

1.  "had access to leaders within [al-Shabaab] and, through those contacts, had access to non-public information pertaining to [al-Shabaab's] financial needs as well as other activities with which it was involved, including military activities" and "coordinated . . . their fundraising with the specific needs of [al-Shabaab]"; *Id*. at *5.

2.  "associated and coordinated with other supporters of [al-Shabaab], who "were actively involved in arranging for and facilitating support for [al-Shabaab] and who "coordinated their own activities in light of the specific needs of [al-Shabaab] as events unfolded as a result of [al-Shabaab] military operations"; *Id*. at *4.

3.  "understood, intended, and planned that, when they provided money to [Mohamed and Abdullahi]" – whose "roles . . .  and their respective associations with [al-Shabaab] were well known to Jama and Dhirane" – the defendants "provided money to [al-Shabaab]"; *Id*. at *8.

4.  "played such central coordinating, facilitating, and supervisory roles with respect to the Group of Fifteen and the ISDAC chatroom that they were also operationally integrated into [al-Shabaab] as part of its fundraising network" and "were engaged in significant activities on behalf of [al-Shabaab]" and "constituted parts of [al-Shabaab] for the purposes of the material support statute."  *Id*.

Finally, as to the fourth element, "knowledge that the organization is a designated terrorist organization, . . . has engaged or engages in terrorist activity . . . , or that the organization has engaged or engages in terrorism," the Court found that the defendants were

"ardent, committed, and active supporters of [al-Shabaab] who knew and associated with persons who were themselves part of [al-Shabaab], and that the defendants "knew that [al-Shabaab] was a designated FTO, that it had engaged and was engaging in terrorist activities, and that it was unlawful to provide certain kinds of support to that organization." *Id.* at *3.  As mentioned above, the Court found that the defendants "had access to non-public information pertaining to [al-Shabaab] . . . , including military activities." *Id.* at *5.  The record amply demonstrated the defendants' awareness of al-Shabaab's attacks on the Banadir Courthouse and the Westgate Mall in Nairobi, GEX 169, US-17097-100; GEX 169B; GEX 143, US-00319-20, and its attempts to assassinate a Somali government leader using a suicide bomber, GEX 130, US-00288; GEX 131, US-18581.

Accordingly, the United States proved beyond a reasonable doubt each of the elements of conspiring to provide and providing material support to al-Shabaab.

III.    THE COURT'S ANNOUNCEMENT OF ITS REASONS FOR FINDING THAT THE DEFENDANTS PROVIDED MATERIAL SUPPORT TO AL-SHABAAB DID NOT VIOLATE THE DEFENDANTS' DUE PROCESS RIGHTS.

The defendants' arguments that the Court's application of Section 2339B violated their Due Process right to "fair notice" is meritless, as it their rehashing of the argument – already rejected by this Court and the Supreme Court – that their conduct was protected by the First Amendment.  Repeatedly asserting that their conduct was protected expression does not make it so, and it does not affect the assaying of whether the Court's application of the material support statute gave the defendants "fair warning" that their monetary support for al-Shabaab was unlawful, regardless of their alleged intention to provide only medically-related support.

"The basic principle that a criminal statute must give fair warning of the conduct that it makes a crime . . . 'is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.'" *Bouie v. City of Columbia*, 378 U.S. 347,

350-51 (1964) (quoting *United States v. Harriss*, 347 U.S. 612, 617 (1954)).  The test for

deciding whether a criminal statute gives the required "fair notice" has be set out by the Supreme

Court:

> There are three related manifestations of the fair warning requirement.  First, the vagueness doctrine bars enforcement of "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application."  Second, as a sort of "junior version of the vagueness doctrine," the canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered.  Third, although clarity at the requisite level may be supplied by judicial gloss on an otherwise uncertain statute, due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope.  In each of these guises, the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal.

*United States v. Lanier*, 520 U.S. 259, 266 (1997) (citations omitted).

Obviously, the defendants here had abundantly "fair notice" that their conduct was

criminal, as they themselves often remarked while discussing identical prosecutions in their

home state and in other jurisdictions.  More generally, as we discuss below, Section 2339B,

"either standing alone or as construed, made it reasonably clear at the relevant time that the

defendant[s'] conduct was criminal."  *Id.*

A.    SECTION 2339B IS NOT VAGUE

The material support statute is "sufficiently explicit to inform those who are subject to it

what conduct on their part will render them liable to its penalties."  *Bouie*, 378 U.S. at 351

(quoting *Connally v. General Const. Co.*, 269 U.S. 385, 391 (1926)).  It was not so vague that the

defendants had to "guess" or "speculate" as to its meaning.  *Bouie*, 378 U.S. at 351.  What was

true in *United States v. Williams*, 553 U.S. 285 (2008) is equally true here:

> Vagueness doctrine is an outgrowth . . . of the Due Process Clause of the Fifth Amendment.  A conviction fails to comport with due process if the statute under

-14-

which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.

* * *

What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is.

* * *

There is no such indeterminacy here. Whether someone held a belief or had an intent is a true-or-false determination, not a subjective judgment . . . . To be sure, it may be difficult in some cases to determine whether [the statute's] clear requirements have been met. "But courts and juries every day pass upon knowledge, belief and intent—the state of men's minds—having before them no more than evidence of their words and conduct, from which, in ordinary human experience, mental condition may be inferred." And they similarly pass every day upon the reasonable import of a defendant's statements . . . .

*United States v. Williams*, 553 U.S. 285, 304-306 (2008) (citations omitted).

The same can be said of Section 2339B and its application here. In effect, the entire case rested upon the factual determination of whether the defendants knowingly provided material support and resources to al-Shabaab – not to any particular individual. There is no "indeterminacy" in the statute. The defendants were not required to "guess" at its meaning. The Court's elucidation of the factors that it considered in determining whether the defendants and their co-conspirators were "sufficiently associated with [a foreign terrorist organization] to constitute the organization itself,"[9] did not create any vagueness in the statute or in the Court's formulation. It made explicit the determinations that judges and juries have implicitly made in most Section 2339B prosecutions to determine an essential element of the offense – that is, whether the defendant knowingly provided material support to a foreign terrorist organization.

---

[9] *United States v. Jama*, 2016 WL 6573959, at *6.

-15-

An "extreme level of factual specificity . . . is [not] necessary in every instance to give fair warning." *Lanier*, 520 U.S. at 268. It was patently obvious to Jama and Dhirane, as was their obvious desire, that providing money to Mohamed and Abdullahi would go to al-Shabaab to fund two safehouses for al-Shabaab fighters and to provide materiel for "the brothers in the mountains." Moreover, both from their close attention to identical prosecutions in the United States was illegal *and* to the investigations of their own co-conspirators in foreign jurisdictions, the defendants knew that their conduct was illegal. Greater specificity in the statute concerning "every instance" that might violate the statute plainly would have been of no value in providing the defendants' "fair warning" that they were violating the law.

In this particular case, the Court found it necessary to explore the nature of the relationship of Mohamed and Abdullahi to al-Shabaab, but this did not deprive the defendants of fair warning of what Section 2339B forbade. "[D]ue process requirements are not 'designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited.'" *Lanier*, 520 U.S. at 271 (quoting *Colten v. Kentucky*, 407 U.S. 104, 110 (1972)).

The Court's consideration of certain factors it would employ in determining the defendants' guilt or innocence did not make vague in any way the fundamental questions that any judge or jury would have to address in deciding whether the government had met its burden of proving every element of the offense. First, the factfinder would have to decide whether the defendant acted knowingly. After that determination, the factfinder would have to decide whether the material support was received by the terrorist organization. In some cases, the material support to the organization may have gone to, or passed through, an identified

individual, as in this case.  In other cases, there may not be any individual involved, as in the

case of a defendant who traveled or assisted someone to travel to a particular country to join the

Islamic State, al-Qa'ida, or al-Shabaab.  In cases where an individual was an unwitting

intermediary or was merely a knowing conduit, the factfinder would have to consider whether

the organization itself did in fact receive the support or resources (resulting in a conviction for

the completed offense) or did not (resulting in a conviction for the attempt).  In other cases, the

factfinder could conclude that the individual to whom the defendant provided the support was

himself a member of the organization, in which case the factfinder could end the inquiry there.

In all cases, however, the essential question and the essential element remain the same: was the

material support provided to a foreign terrorist organization.

Finally, the Supreme Court's admonition in *Boyce Motor Lines v. United States*, 342 U.S.

337 (1952) is particularly apt here:

> A criminal statute must be sufficiently definite to give notice of the required
> conduct to one who would avoid its penalties, and to guide the judge in its
> application and the lawyer in defending one charged with its violation.  But few
> words possess the precision of mathematical symbols, most statutes must deal
> with untold and unforeseen variations in factual situations, and the practical
> necessities of discharging the business of government inevitably limit the
> specificity with which legislators can spell out prohibitions.  Consequently, no
> more than a reasonable degree of certainty can be demanded.  Nor is it unfair to
> require that one who deliberately goes perilously close to an area of proscribed
> conduct shall take the risk that he may cross the line.

*Id.* at 340.

There can be no doubt at all in this case that the defendants "deliberately [went]

perilously close to an area of proscribed conduct," and indeed the Court in its finding of guilt

determined that they deliberately went much farther than "perilously close" to violating Section

2339B.  Had they wanted to "avoid its penalties," the defendants plainly had "more than a

reasonable degree of certainty" that providing material support to al-Shabaab – whether through

Mohamed and Abdullahi or otherwise.  Their vagueness challenge therefore must fail.

>    B.    THE RULE OF LENITY HAS NO APPLICATION HERE.

The defendants' appeal to the rule of lenity must also fail.  First, as discussed above,

there is no vagueness in Section 2339B, and consequently, the Court need not consider

application of the rule of lenity.  *See United States v. Balint,* 201 F.3d 928, 934 (7th Cir. 2000)

("vagueness is a condition precedent to a 'fair warning' challenge"); *United States v. Helem,* 186

F.3d 449 (4th 1999) ("The rule of lenity, which requires the court to strictly construe criminal

statues, does not apply in this case because the statute is not ambiguous.").  In any case, there are

no circumstances here that would call for application of the rule:

> The simple existence of some statutory ambiguity, however, is not sufficient to
> warrant application of that rule, for most statutes are ambiguous to some degree.
> " 'The rule of lenity applies only if, "after seizing everything from which aid can
> be derived," ... we can make "no more than a guess as to what Congress
> intended." ' "  To invoke the rule, we must conclude that there is a " ' "grievous
> ambiguity or uncertainty" ' in the statute." . . . The problem of statutory
> interpretation in these cases is indeed no different from that in many of the
> criminal cases that confront us.  Yet, this Court has never held that the rule of
> lenity automatically permits a defendant to win.

*Muscarello v. United States*, 524 U.S. 125, 138-39 (1998) (citations omitted).   *See also, e.g.*,

*Barber v. Thomas*, 560 U.S. 474, 488 (2010) ("the rule of lenity only applies if, after considering

text, structure, history, and purpose, there remains a 'grievous ambiguity or uncertainty in the

statute'") (quoting *Muscarello*, 524 U.S. at 139); *Chapman v. United States*, 500 U.S. 453, 463

(1991) ("The rule [of lenity] comes into operation at the end of the process of construing what

Congress has expressed, not at the beginning as an overriding consideration of being lenient to

wrongdoers.") (quoting *Callanan v. United States*, 364 U.S. 587, 596 (1961)); *United States v.*

*Lowe*, 860 F.2d 1370, 1376 (7th Cir. 1988) (rule of lenity "comes into play only 'when choice

has to be made between two readings of what conduct Congress has made a crime'") (quoting *United States v. Bass*, 404 U.S. 336, 350 (1971)).

Congress left no doubt concerning what conduct came within the ambit of 18 U.S.C. § 2339B, as is reflected in the Court's conclusions of law concerning Congress' intent. *United States v. Jama*, 2016 WL 6573959, at *7. These is no "grievous ambiguity or uncertainty" in the statute. *Muscarello*, 524 U.S. at 138. Accordingly, the defendants' argument based upon the rule of lenity should be rejected.

C.    THE COURT'S LIST OF FACTORS DID NOT APPLY A NOVEL OR UNFORESEEABLE CONSTRUCTION OF SECTION 2339B.

The Court's list of factors did not, as the defendants claim, amount to "applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *Lanier*, 520 U.S. 266 (1997). However, this third iteration of the fair notice doctrine applies only to "an unforeseeable enlargement of a criminal statute" such that "it operates precisely like an ex post facto law,"[10] that is, "one 'that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action.'" *Bouie*, 378 U.S. at 353 (quoting *Calder v. Bull*, 3 Dall. 386, 390, 1 L.Ed. 648 (1798)). Nothing of the kind happened here. There was no "unforeseeable and retroactive judicial expansion of narrow and precise statutory language." 378 U.S. at 352. There was no "judicial construction of a criminal statute is 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue.'"

_____

[10] Strictly speaking, it is the Due Process Clause that vindicates this right in the courts. "The Ex Post Facto Clause is a limitation upon the powers of the Legislature, and does not of its own force apply to the Judicial Branch of government. But the principle on which the Clause is based [is] the notion that persons have a right to fair warning of that conduct which will give rise to criminal penalties is fundamental to our concept of constitutional liberty. As such, that right is protected against judicial action by the Due Process Clause of the Fifth Amendment." *Marks v. United States*, 430 U.S. 188, 191 (1977).

*Id.* at 365 (citation omitted).  The defendants were not "lull[ed] . . . into a false sense of security, giving [them] no reason even to suspect that conduct clearly outside the scope of the statute as written [would] be retroactively brought within it by an act of judicial construction."  *Id.* at 352.

Likewise, the Court's list of seven factors it used to determine whether "a person is to be deemed part of an FTO" did not change or eliminate any element required for a violation of Section 2339B, which at all times remained the same: whether the defendants knowingly provided material support to a foreign terrorist organization.  The case is therefore squarely governed by the Supreme Court's holding in *Splawn v. State of California*, 431 U.S. 595 (1977). There, the district court gave a jury instruction that was based upon a law that had been modified after the defendant had committed the crime.  Nonetheless, the Court rejected the defendant's due process challenge, finding that the amended statute and the subsequent jury based upon it did not "fail[] to give him constitutionally fair warning of the prohibited conduct with which he was charged."  *Id.* at 599-600.  Thus even when the jury is given an instruction based upon a statute amended *after* the defendant's conduct, this is not necessarily fatal to a conviction.  It is only when there is a "change in the interpretation of the elements of the substantive offense" such "as to deny to accused defendants fair warning of the crime prohibited" that a defendant may avail himself of a due process claim.  *Id.* at 601.[11]

As in *Splawn*, the Court's consideration of the seven factors it used to determine whether Mohamed and Abdullahi where members of al-Shabaab, "[did] not create any new substantive offense, but merely declare[d] what type of evidence may be received and considered in deciding

---

[11] To the same effect is *United States v. Wilder*, 680 F.2d 59, 60 (9th Cir. 1982), in which the district court gave a jury instruction that was based upon a Ninth Circuit decision that was issued after the defendant's conduct.  The court rejected the defendant's due process claim finding that the subsequent decision "was not the type of radical, unforeseeable departure from prior law that would implicate the ex post facto clause."

whether the matter in question was [established]." *Id.* at 600.  That the Court concluded that

"[t]here is surprisingly little case law concerning by what standard to determine whether a

particular individual is sufficiently associated with an FTO to constitute the organization itself,"

*Jama*, 2016 WL 6573959, at *6, is of no moment.  The Supreme Court "ha[s] long held that a

statute as construed 'may be applied to conduct occurring prior to the construction, provided

such application affords fair warning to the defendant[]." *Osborn v. Ohio*, 495 U.S. 103, 188

(1990) (quoting *Dombrowski v. Pfister*, 380 U.S. 479, 491, n. 7 (1965)).  It is only when there is

a "'clear break' in the law that imposes criminal liability for acts not previously punishable" that

a judicial construction of a statute "may not be applied retroactively." *United States v. Burnom*,

27 F.3d 283, 284 (7th Cir. 1994).  Where an interpretation of a statute is applied in a defendant's

case and "d[oes] not make punishable any conduct that was previously legal . . . , d[oes] not

overrule any other case and was a logical application" of existing law, the fair warning doctrine

of *Lanier* is not implicated.  *Id.*

　　　"The beginning point for a *Bouie* analysis is the statutory language at issue, its legislative

history, and judicial constructions of the statute," and "*Bouie* is not violated unless the judicial

construction of the criminal statute represents a 'radical and unforeseen departure from former

law.'" *Webster v. Woodford*, 369 F.3d 1062, 1069 (9th Cir. 2004).  In the present case, in fact,

the Court's annunciation of the seven factors it would consider did not and, since there had been

no prior decisions on point, could not "represent[] a 'radical and unforeseen departure from

former law.'" *Webster*, 369 F.3d at 1069.  Under these circumstances, the *Bouie* and *Lanier*

considerations are much more limited.  For example, in *Ortiz v. N.Y.S. Parole in Bronx*, 586 F.3d

149 (2009), in a case of first impression, the lower court interpreted an anti-rioting statute to

impose criminal liability for injuries caused by the riot even after the accused rioters had left the

scene, and the court so instructed the jury.  *Id.* at 154.  The Second Circuit recognized that the

absence of previous decisions called for a more limited *Bouie* review:

> Unlike Bouie and Rogers [v. Tennessee, 532 U.S. 451 (2001)], this case does not
> involve any expansion in the scope of criminal liability beyond that indicated by
> previous decisional law.  Until Ortiz's case, the New York courts had not
> addressed the issue whether defendants can be responsible under the riot statute
> for physical injuries or substantial property damage that may occur after they have
> left the scene of a riot in which they have participated.  Thus, we need only
> consider whether the New York courts have worked an impermissible retroactive
> change in the law, violating due process by adopting a new judicial interpretation
> that was "unexpected and indefensible" by reference to what courts had said
> before.  Instead, we consider simply whether it was reasonable for the Appellate
> Division to find in upholding his conviction that [the anti-rioting statute] itself
> provided Ortiz fair notice of the construction the court adopted, or whether this
> construction was so unreasonably novel as to deprive Ortiz of fair warning that
> his conduct was prohibited.

*Id.* at 158. (emphasis by the court, citations omitted).

It deciding whether a court's interpretation of a statute is "unreasonably novel," the

Second Circuit relied upon the familiar: it must be one that "neither the statue nor any prior

judicial decision has fairly disclosed to be within its scope" such that the defendant had "no

reason even to suspect that his conduct might be within its scope."  *Id.* at 158-59 (citations

omitted).  The Tenth Circuit has a similar construction:

> A judicial construction of a statute is unforeseeable if it is "unexpected and
> indefensible by reference to the law which had been expressed prior to the
> conduct at issue."  Unforeseeable judicial decisions include expansion of a statute
> narrow and precise on its face beyond those terms, the overruling of precedent, or
> when "an in-depth inquiry by a dedicated and educated student of [the relevant]
> law would have revealed nothing to foreshadow the [controlling court] opinion."

*Johnson v. Kindt*, 158 F.3d 1060, 1063 (10th Cir. 1998) (citations omitted).  And so does the

Seventh Circuit:

> But we withhold application of "novel" interpretations only if those
> interpretations amount to an unpredictable shift in the law.  Due process does not
> require insulating defendants when our decision merely clarifies the meaning of a
> statute.

*United States v. Balint*, 201 F.3d 928, 935–36 (7th Cir. 2000).

Section 2339B and prior Supreme Court decisions *had* fairly disclosed that the defendants' conduct was within its scope.  Before setting forth its list, the Court observed that "[a]lthough the material support statute does not specifically define or address who is part of an FTO, it does have other terms that are either defined or have been construed in ways that are useful in fashioning a test to determine whether someone is sufficiently acting for or on behalf of an FTO to be deemed a part of the FTO."  *United States v. Jama*, 2016 WL 6573959, at *7.  As the Court concluded, based upon existing statutory language and Supreme Court decisions:

1.  "Congress plainly intended for courts to consider the nature of an individual's actions broadly in relation to the overall goals of the terrorist organization in determining whether someone is to be deemed part of that organization"; *Id.*

2.  "Congress also clearly envisioned that courts would not apply the material support statute to those engaged merely in independent advocacy or only isolated, marginal, or tangentially related activities relative to the FTO"; *Id.*

3.  "Congress also did not intend to limit Section 2339B's application to situations where prohibited support is delivered to designated or recognized leaders or to those who operate under some identifiable command and control structure"; *Id.*

4.   "Congress intended to reach all persons who act on behalf of an FTO to further its goals and objectives in significant ways"; *Id.*

5.      "The Supreme Court has emphasized that because the statute requires that

the 'service' or other prohibited support be 'to' an FTO, there must be a

sufficient connection between the service provided and an FTO"; *Id.*

This is not an instance in which a statute was used "to place 'the accused on trial for an

offense, the nature of which the statute does not define and hence of which it gives no warning.'"

*Lanier*, 520 U.S. at 267 (quoting *Screws v. United States*, 325 U.S. 91, 101 (1945)) (internal edits

omitted).  On the contrary, as the Supreme Court said in *Lanier*,

> When [criminal statutes] have been "made specific" by the text or settled
> interpretations, willful violators "certainly are in no position to say that they had
> no adequate advance notice that they would be visited with punishment.... [T]hey
> are not punished for violating an unknowable something."

520 U.S. at 267 (quoting *Screws*, 325 U.S. at 105).

The text of Section 2339B "made specific" what constitutes a violation of the statute:

knowingly providing material support to a foreign terrorist organization – of which, the evidence

leaves no doubt, the defendants are guilty.  That the Court announced the method by which it

would assess what was, in its essence, a factual issue raised by the defense – their claim that they

did not know that Abdullahi and Mohamed were members of, or channeling money to, al-

Shabaab – did not create an "unknowable something" in the statute when none existed before.

The Court's non-exclusive seven-factors test would offer an excellent jury instruction for

determining whether the material support was provided to a foreign terrorist organization

through identified individuals.[12]  They provide a clear and straightforward approach to an issue

---

[12] We are mindful that the Court stated that the list of factors was "non-exclusive (and somewhat overlapping)" and that "[r]arely would the evidence bear on all, or even most, of these factors." *United States v. Jama*, 2016 WL 6573959, at *7.  We respectfully submit, however, principally to preserve the argument on appeal, that it was unnecessary to decide whether Mohamed and Abdullahi were members of al-Shabaab, given the strength of the evidence that – by whatever means – the defendants intended to and did provide material support to the al-Shabaab organization.  Similarly, we respectfully submit that even if Mohamed and Abdullahi had been

that had not been previously raised before.  However, in the analysis of *Bouie*, *Lanier*, and their progeny, they were, in essence, "[a]n unsurprising conclusion about a clearly drafted statute," and this "is not the 'unforeseeable judicial expansion of statutory language' contemplated by *Bouie*."  *Collins v. Clark*, 642 Fed. Appx 212, 219 (4th Cir. 2016).  They did not, therefore, violate the defendants' due process right to fair notice.  This argument, the defendants' third and final attack upon their convictions, must also be rejected.[13]

---

found *not* to be members of al-Shabaab, the government nonetheless proved beyond a reasonable doubt the essential element that the defendants knowingly provided material support to the al-Shabaab organization.  The Court's findings of fact about the defendants and Mohamed and Abdullahi, whether considered in the context of the seven factors or simply standing on their own, satisfy all of the essential elements of the offense.

[13] The defendants' First Amendment argument has already been raised and rejected not only by this Court but by the Supreme Court as well.  Before the conspiracy began as alleged in the Indictment, the Supreme Court had already decided *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) and had denied First Amendment protection to proposed conduct that was much more benign than that engaged in by the defendants.  What the Court said of providing child pornography in *United States v. Williams*, 553 U.S. 285 (2008), is every bit as true for providing material support to a terrorist organization:

> Offers to engage in illegal transactions are categorically excluded from First Amendment protection. . . . This . . . is based . . . on the principle that offers to give or receive what it is unlawful to possess have no social value and thus, like obscenity, enjoy no First Amendment protection.  Many long established criminal proscriptions—such as laws against conspiracy, incitement, and solicitation— criminalize speech . . . that is intended to induce or commence illegal activities. Offers to provide or requests to obtain unlawful material . . . are similarly undeserving of First Amendment protection.

*Id.* at 301 (citations omitted)

III.    Conclusion

For the foregoing reasons, the United States respectfully submits that the defendants'

post-verdict motions should be denied.

Respectfully submitted,

DANA J. BOENTE
UNITED STATES ATTORNEY


By:    _____/s/_____
       James P. Gillis
       Virginia Bar No. 65055
       Danya E. Atiyeh
       Virginia Bar No. 81821
       Assistant United States Attorneys
       Justin W. Williams United States Attorney's
          Office
       2100 Jamieson Avenue
       Alexandria, VA 22314
       (703) 299-3700
       (703) 299-3982 (fax)
       James.P.Gillis@usdoj.gov
       Danya.E.Atiyeh@usdoj.gov

CERTIFICATE OF SERVICE

I certify that on January 27, 2017, I filed the foregoing using the ECF system, which will

send a copy to defense counsel of record.

/s/
_____
James P. Gillis
Virginia Bar No. 65055
Assistant United States Attorney
Justin W. Williams United States Attorney's
    Office
2100 Jamieson Avenue
Alexandria, VA 22314
(703) 299-3700
(703) 299-3982 (fax)
James.P.Gillis@usdoj.gov
