UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:14cr230-AJT |
| | ) | |
| MUNA OSMAN JAMA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

GOVERNMENT'S SENTENCING MEMORANDUM

The United States, for the reasons discussed below, respectfully submits that the only just

sentence in this case is a lengthy period of incarceration for both defendants. The advisory

sentencing guidelines, as correctly determined by the Probation Officer, call for a sentence of life

in prison.[1] More importantly, the sentencing factors in 18 U.S.C. § 3553(a) that the Court must

consider also warrant an enduring disruption of the defendants' support for terrorism and a

strong deterrent to the many others who are currently engaged in similar terrorist fundraising

activities. The defendants are fervid followers of al-Shabaab "clerics" who exhort their devotees

to kill "infidels" – not only abroad, but in the United States as well. It is not hyperbolic to

characterize these defendants as vicious, unregenerate, and, until their arrest, active supporters of

a terrorist organization responsible for the slaughter of innocents simply because the victims'

religious beliefs differed from their own. To account for the history and characteristics of the

defendants, to provide just punishment, to protect the public from the defendants themselves, to

adequately deter others who would do us harm, and, as important, to avoid unwarranted

---

[1] Technically, because none of the counts of conviction carries a life sentence in the defendants'
cases, the guidelines provide that the sentences on each count are to run consecutively for a total
advisory sentence of 3,780 months in Jama's case (PSR ¶ 97) and 1,260 months in Dhirane's
case (PSR ¶ 85). *See* USSG § 5G1.2(d).

disparities in the sentences received by identically-situated defendants, these defendants should be removed from society for a long time. In nearly identical cases in various parts of this country, including in our own District, defendants have received decades-long sentences. We respectfully submit that justice calls for similar sentences here.

I.      THE SENTENCING GUIDELINES

        A.      THE BASE OFFENSE LEVEL OF U.S.S.G. § 2M.3

Appendix A to the sentencing guidelines provides that U.S.S.G. § 2M5.3 is the applicable guideline for violations of 18 U.S.C. § 2339B. That section begins with a base offense level of 26. A specific offense characteristic requires an additional 2-level increase:

> If the offense involved the provision of (A) dangerous weapons; (B) firearms; (C) explosives; (D) funds with the intent, knowledge, or reason to believe such funds would be used to purchase any of the items described in subdivisions (A) through (C); or (E) funds or other material support or resources with the intent, knowledge, or reason to believe they are to be used to commit or assist in the commission of a violent act, increase by 2 levels.

U.S.S.G. 2M5.3(b)(1). In this case, the defendants both had at least a "reason to believe" that the funds they provided al-Shabaab would be used to obtain dangerous weapons or firearms and that the funds would be used to commit or assist in the commission of violent acts. As just one example, Jama was a prominent, respected member of the larger ISDAC chatroom where the "clerics" of al-Shabaab would explicitly solicit "funds for weapons" while exhorting their listeners to "kill . . . infidels." Tr. 474-75. Abu Kowthar, the ISDAC administrator, was one who solicited money in the ISDAC chatroom. Tr. 467-68. To prove to the participants in the chatroom, of which Jama was an every-day participant, Abu Kowthar would show the online audience photographs of money being given to al-Shabaab fighters. Tr. 470. He did this to show that "the money went to . . . the fighting mujahids," that is, to al-Shabaab. (Tr. 470-72)

Clearly then, the defendants perfectly understood that the money they were sending was to be used in the commission of violent acts.  Accordingly, a 2-level increase is warranted here.

B.    THE TERRORISM ENHANCEMENT

The "terrorism enhancement," U.S.S.G. § 3A1.4, requires an additional 12 levels, as well as an increase of the criminal history to Category VI.

(a) If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.

(b) In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

U.S.S.G. 3A1.4.  The Application Note 1 provides that a "federal crime of terrorism" for purposes of this guideline is defined in 18 U.S.C. § 2332b(g)(5), which states, in relevant part:

(5) the term "Federal crime of terrorism" means an offense that –

(A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and

(B) is a violation of –

(i) . . . 2339B (relating to providing material support to terrorist organizations), [or] 2339C (relating to financing of terrorism) . . . .

18 U.S.C.A. § 2332b(g)(5).

The record is replete with evidence that the defendants intended to influence the conduct of the Transitional Federal Government in Somali and to retaliate against that government's actions.  Further, the offense conduct here was plainly one that "involved, or was intended to promote," the crimes listed above.  U.S.S.G. § 3A1.4(a).  Indeed, violations of 18 U.S.C. § 2339B, the counts of conviction, and violations of 18 U.S.C. § 2339C, which prohibits the financing of terrorism, are specifically listed in the definition of a "Federal crime of terrorism." Moreover, not only did the defendants themselves provide funds to al-Shabaab, but a principal

-3-

purpose of the private chatroom of the "Group of Fifteen" was to insure that the other co-conspirators were keeping up their monthly payments and to discuss the recruitment of other like-minded women. Thus, the defendants' conduct not only "involved" providing material support to al-Shabaab, but it was also "intended to support" al-Shabaab by finding other sources of money to carry on its activities. Accordingly, the defendants' offense level should be increased by 12 levels.

### C. THE DEFENDANTS' LEADERSHIP ROLES

The defendants are also deserving of enhancements for their leadership roles in the material support conspiracy. As the Court found in its Memorandum Opinion, Jama and Dhirane were *at least* "supervis[ors]" of criminal activity, Mem. Op. ¶ 6, and of course the Group of Fifteen comprised "five or more participants."

> Both Defendants also played *prominent, if not leadership,* roles within the Group of Fifteen. One or both of these Defendants were involved in arranging for representatives or persons associated with AS to speak to both the chatroom and the Group of Fifteen, during which time these AS members solicited support, including financial resources. . . .

> Defendant Jama *supervised* the monthly payments by the Group of Fifteen members. Occasionally, she personally solicited contributions. She also monitored whether the individual members had satisfied their monthly commitments and whether those sums had been successfully transmitted to and received by AS contacts on both the Nairobi side and the Hargeisa side, and she *served in the nature of an enforcer* by following up with those members of the Group of Fifteen who had not paid their monthly commitments on time. Jama also instructed Dhirane on how to perform these roles, and *Dhirane came to play a similar role* as Jama within the Group of Fifteen.

Mem. Op. ¶¶ 5 & 6 (emphasis added)

Section 3B1.1 of the sentencing guidelines governs here:

> (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

> (b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.

U.S.S.G. § 3B1.1.  Section 3B1.1 provides additional guidance for assessing a defendant's aggravating role in the commentary:

> In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling. Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.  There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.

*Id*., comment. (n.4).  The defendants abundantly fulfill each of these factors.[2]

First, the defendants "exercise[d ] . . . decision-making authority" by, among other things, directing to which "side" funds would be sent.  They also decided how the money would continue to be sent to the "Hargeisa side" when co-conspirator Bariira Hassan Abdullahi came under scrutiny.  *See* GEX 105-107.  They also decided whether and how to approach women from the ISDAC chatroom for contributions – and which lies to tell them to encourage them to part with their money.  *See, e.g.,* GEX 172, US-17105-106.

Second, the defendants' "participation in the commission of the offense" was obviously prominent, as the Court found.  Mem. Op. ¶ 5.  Jama lectured to the Group of Fifteen and told them to "collect money to support al-Shabaab."  Tr. 491.  Both defendants "had access to leaders

---

[2] "[T]he claimed right to a larger share of the fruits of the crime," is not literally applicable here since the "fruits" of this conspiracy were not of a kind that could be divided among the participants.  Nonetheless, by their direction of the other women in the Group of Fifteen and their oversight of the payment and receipt of the money sent by the women to the two "sides," the defendants claimed, and received, a right to a larger role in the group.  Esse testified that Jama was "someone that was very respected and highly regarded" in both the ISDAC chatroom and in the smaller Group of Fifteen.  Tr. 464-65.

within [al-Shabaab] and . . . to non-public information pertaining to [al-Shabaab's] . . . military activities." Mem. Op. ¶ 11.  Both defendants coordinated with other al-Shabaab devotees who were actively arranging for and facilitating support for al-Shabaab.  Mem. Op. ¶ 7.  Dhirane, for example, was well acquainted with ISDAC administrator Abu Kowthar, and she chatted with him in the private chatroom.  GEX 119, US-18351-52.  When he needed to replace five computers that had burned out after a move due to differing electrical voltage, Abu Kowthar asked Dhirane for the money to replace them.  GEX 118, US-18552; GEX 119.  Dhirane's discussion with Abu Kowthar shows the extent of her fundraising connections: She did not need from him a contact in Qoryoley for sending the money – she already had one of her own.  GEX 118, US-18553-54.  On the same day that she spoke with Abu Kowthar, Dhirane sent $100 to Daahir Abdi in Qoryoley.  GEX 11.  Daahir Abdi's name, together with the telephone number that was used to send Abu Kowthar these funds, was listed in one of Dhirane's notebooks.  GEX 4A-8.

Third, as a plethora of transcripts demonstrate, the defendants actively oversaw "the recruitment of accomplices."  For example, in April 2012, Jama and Amina Esse were talking about recruiting a woman to contribute money.  "I will not give her details," Jama told her, "I will be tactical about it, and I will not tell her where I am, you understand."  GEX 48, US-00778.  Shortly thereafter, Jama sent Dhirane "on a mission to proselytize someone."  GEX 50, US-02636-37.  Later, Jama and Dhirane discussed how they would go "fishing" or "hunting" for others from whom they could get money.  GEX 52, US-02644.  Jama later reported to Dhirane that she was "trying to proselytize" another woman.  GEX 60, US-02457-58.  Jama had told the woman that someone would connect her to a private chat room the next evening and that "I approached you because my intentions are good," but that "it will take some time to trust each

other."  *Id*.  After discussing this interaction with Dhirane, Jama asked her, "Correct me if you

see any mistakes."  *Id*.  Dhirane responded, "Wonderful, you did good.  You are responsible for

the missionary work from now on."  GEX 61, 62.  Dhirane later advised Jama and the others on

how to go about another act of "missionary work."  "Invite her to the lectures, initially," Dhirane

told them.  "I am the one who invited Zuhuur.  I didn't tell Zuhuur about it.  I thought, let her

first acclimate."  GEX 68, US-02527.  In like manner, Jama told Dhirane in April 2012, "You

have to tell them [on the Hargeisa side], 'Give us several people names – several people names.

We do not want only one person.' . . .  On the Nairobi side, we send to three people – their stuff.

Do you understand?"  GEX 45, US-00446.  As Esse testified, it was Dhirane's responsibility

"[t]o find someone or to send the money to someone there [Hargeisa] . . . for al-Shabaab."  (Tr.

525)

  Fourth, "the degree of [the defendants'] participation in planning or organizing the

offense" was remarkable.  As the Court found, because of the defendants' special access to al-

Shabaab leaders and to non-public information about its financial needs and military activities,

the defendants "coordinated . . . their fundraising with the specific needs of [al-Shabaab]."  Mem.

Op. ¶ 11.  Moreover, even before the formation of the Group of Fifteen, the defendants

"associated and coordinated with other supporters of [al-Shabaab]" who "were actively involved

in arranging for and facilitating support for [al-Shabaab]."  Mem. Op. ¶ 7.

  Fifth, the nature and scope of the illegal activity was vast, engaging co-conspirators from

at least three continents and at least ten countries.  The defendants were engaged in the support

of terrorism before and during the conspiracy, from at least March 2010 through their arrest in

July 2014.  GEX 10 & 11.  Moreover, these crimes were decidedly *not* about the provision of

medicine or medical treatment – although even if it were, the aid simply would have been so that

al-Shabaab fighters wounded in battle could return to engage in more violence.  These crimes *were* about directly supporting a safe house used by al-Shabaab fighters to stage attacks.  They were about providing weapons and other materiel to al-Shabaab fighters in the Golis Mountains.  They were about supplying computers to the administrator of the ISDAC chatroom where al-Shabaab leaders solicited money to carry on their version of violent *jihad*.  They were about calculatedly lying to women who thought they were supporting orphans, not terrorists.  The defendants' crimes involved providing money for no purpose other than violence – the kind of violence that was targeted against civilians in shopping malls and courthouses, that encouraged fourteen-year-old children to use their bodies as bombs, and that rejoiced at any "heavy rain" that fell upon those whom they hated, included the deluge that was visited upon the victims of the Boston Marathon bombing.

Finally, with regard to "the degree of control and authority exercised over others," the defendants "supervised the monthly payments by the Group of Fifteen members" and "monitored whether the individual members had satisfied their monthly commitments."  Mem. Op. ¶ 6.  They "served in the nature of . . . enforcer[s]."  *Id*.  The defendants' co-conspirator Amina Esse testified that Jama was "someone that was very respected and highly regarded" in the ISDAC chatroom.  Tr. 464-65.  "Very few people were respected like that."  Tr. 465.  Jama herself also told Esse this.  Tr. 466.  Moreover, Jama was part of the leadership of the Group of Fifteen, and in this smaller group too she received deferential treatment.  Tr. 488-89.  Jama also threatened Esse when Esse wanted to leave the group after learning that her money was being sent to al-Shabaab.  Tr. 500-501.

For these reasons, the defendants plainly qualify as leaders of the criminal enterprise made up of the Group of Fifteen.  They deserve a 4-level increase in offense level for their leadership role.

D.     THE TOTAL OFFENSE LEVEL AND ADVISORY GUIDELINE RANGE

Applying the guidelines provisions discussed above leads to a total offense level of 42: Base Offense Level – 26 (U.S.S.G. 2M5.3(a)); Specific Offense Characteristic – 2 additional levels (U.S.S.G. 2M5.3(b)(1)); Terrorism Enhancement – 12 additional levels (U.S.S.G. § 3A1.4); and Leadership Role – 4 additional levels (U.S.S.G. 3B1.1)[3].  As discussed above, the terrorism enhancement requires that the criminal history category be increased to Category VI. For Total Offense Level 44 with Criminal History Category VI, the guidelines call for a sentence of life in prison.

When, as here, the low end of the guidelines sentencing range is greater than the statutory maximum for the counts of conviction, the guidelines call for the sentences on the counts to run consecutively as necessary to permit the imposition of the full advisory guideline sentence. U.S.S.G. § 5G1.2(d).

II.     THE SENTENCING FACTORS UNDER 18 U.S.C. § 3553

The Section 3553(a) factors that the Court should consider to impose a sufficient sentence all point to the need for a lengthy sentence.  The reasons for this are apparent in the Court's Memorandum Opinion, in the Government's Closing Argument and its Rebuttal, and in the pages above.  Accordingly, we will endeavor to be succinct in addressing each of the relevant factors.

---

[3] The Probation Officer awarded a 3-level, rather than 4-level, increase for the defendants' roles in the offense, for a total offense level of 43.  Because the maximum offense level in the sentencing table is 42, the difference has no effect upon the guideline calculation.

A.     The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

In one sense, the nature and circumstances of the offense stand on their own and are obvious from a reading of the Court's findings of fact.  In another sense, and particularly in the context of determining the appropriate sentence, the nature and circumstances of the offense are bound up with the history and character of the defendants and are to be found in a deeper review of the many conversations that they had among themselves and their co-conspirators as they glorified the violence of al-Shabaab and – quite literally – laughed at the consequent casualties to innocents.

At the time of the September 2013 attack by al-Shabaab on civilians at the Westgate Mall in Nairobi, Dhirane "almost flew" with happiness:

| Ismahan: | Hey, give me - give me an update about the people; the broad-nosed, the broad-nosed ones.[4] |
| Dhirane: | [Chuckle] The broad-nosed, they are there still in mourning. |
| Ismahan: | [Laughter] . . . I was watching the *BBC*. |
| Dhirane: | Yes, yes, yes. . . . |

* * *

| Ismahan: | Hey, these men have planned not to return at all. . . . They planned to die. |
| Dhirane: | [I]f you see their last pictures posted on Twitter, they are just sitting there. . . . They are just sitting there; one is chatting, another one is reading the Quran . . . as if nothing is bothering them. . . . You will be amazed how good they looked. |

* * *

| Ismahan: | [T]his was a lesson.  It was planned. |

---

[4] The government's expert, Matt Bryden, testified that this was a translation of a Somali term used to refer to other Africans, in this case the Kenyans where the attack occurred.  Tr. 260.

| | |
|---|---|
| Dhirane: | [T]hey taught them a lesson.  Oh my God!  How happy I was. [W]e were on the clouds; we almost flew [laughter].  We almost flew [laughter]. |
| Ismahan: | Yes, thanks to God. |

GEX 173, US-18427-29.  *See also* GEX 168, US-02421 ("It is said that a mall was attacked.  I think they are saying it is the Somalis. . . .You have seen how the Somalis are dying everywhere. Let them die too. . . . I was watching on CNN and they are reporting fifty."); GEX 169, US-17097-100 (Jama and Dhirane laughing at the "very heavy rain" in Somalia that was "still pouring" and the "similar rain" that had occurred at the World Trade Center).

Similarly, on March 18, 2013, although disappointed by al-Shabaab's failed attempt to assassinate the head of the Somali intelligence services, Dhirane found the civilian casualties to be amusing: "Yesterday, the guy who escaped from the explosion said only one of my policeman died and no other casualties; yet they were reporting that civilians lost their lives. [Laughs]." GEX 131, US-18581.

Dhirane was indifferent to the killing of civilian women and children when al-Shabaab attacked the Benadir Courthouse Complex in Mogadishu in April 2013:

| | |
|---|---|
| Rashid: | At that place –  Fight is going on –  a lot of people died –  a lot of civilians in a court building . . .  [M]any civilians perished.  It is said that al-Shabaab, perhaps about 10 of them with bombs entered the court building, closed the doors behind them, and killed the people. . . .  [I]t was reported over a dozen [UI] so it is – |
| Dhirane: | Let them perish.  Let them perish.  Nonbelievers are present in Somalia. |
| Rashid: | It is really surprising.  Why don't they target the nonbelievers instead of killing some poor civilians who were sitting there? |
| Dhirane: | No one kills poor people.  Probably they are people with purpose. |
| Rashid: | No, no, no.  They were children and women who were attending the trial.  They should not wear gear and strafe them with AK.  If they have to kill then they should – the leaders and those . . . |

-11-

> Dhirane:   [OV] No, the thing – this is something they reported.  Who has listened to their side?
>
> Rashid:    Of course they would be listened to, but that is what the news is saying now. . . . Why would the doctor – . . .  A doctor presented with the dead bodies has to look at them, civilians who were attending trial.  That is stupid.
>
> Dhirane:   The civilians themselves – let them be killed.

GEX 140, US-0226-27.  *See also* GEX 141, US-18499 (Dhirane comparing the Benadir Courthouse attack to the contemporaneous Boston Marathon bombing and referring to both as "a blessing").

Dhirane also praised al-Shabaab's execution of two young "spies" in June 2013.  Dhirane discussed these developments, quoting from an article, with her "Hargeisa-side" facilitator, defendant Bariira Hassan Abdullahi:

> Dhirane:   Those two spies were killed yesterday in Baraawe but I did not read about them. "The judge of the movement . . . read the ruling before the court.  The ruling says those killed were found to be guilty of working with AMISOM and foreign companies located in Mogadishu.  Those sentenced were: Fu'aad Nur Alasow, 24; he was working with the P.S. company of the TFG and AMISOM." What a low life!  "Also Ali Hussein Wiil, 24, was found to have reported a lot of people to the government.  He was pretending to be from the security forces.  These people were working at the Ex-Control, Afgoye, and Bakara Market."  Imagine that; they were in the midst of our boys.  Amazing!
>
> Abdullahi:  Yes.  That is right.
>
> Dhirane:   Oh! "The Bakara Market – " "This is not the first time that the movement has sentenced spies working with foreigners."  Thanks to God.  O God, enlighten them.
>
> Abdullahi:  They never learn a lesson.  They are being killed, yet they never learn a lesson.

GEX 158, US-01973-74.

-12-

The defendants' history and character were also on display in the lengths to which they would go to provide for al-Shabaab. Jama's desire to support al-Shabaab violence came at the expense of her own children, as she told Amina Esse. GEX 35, US-18194 ("God is my witness that sometimes I do not buy for my children some of the things they need; all that is just to please Allah -- I do that to please Allah and to share the pain with or assist those who are in dire situations."). To raise money so that al-Shabaab could conduct attacks, Jama and Dhirane lied about what they were raising the money for, and appealed to Somali women's desire to help to feed orphans or to build schools and mosques.

| | |
|---|---|
| Dhirane: | . . . I said, we will set a strategy to get a permanent monthly collection from those people, so make it good. Well, if they are going to pay it that manner. |
| Hodan: | Yes, very much so. We take care of orphans. We are taking care of an entire school. |
| Dhirane: | We could have told them about the school. Also, if they call you then you can talk in detail about Miskiin Kalkaal school. They are willing to contribute to that, you know. . . . These people are very enthusiastic toward that cause. |
| Hodan: | Very much so. |
| Dhirane: | Yes, so I said one day we will set them up. You will give them the phone number, I said. I said they will speak with them. But first we will make them believe about the school, the Miskiin Kalkaal, the orphans, and many other issues. |

GEX 171, US-18612-13. *See also, e.g.,* GEX 172, US-17106 ("What they sent now was fifty. She told me she said to those sisters, that it is for orphans cared at their place. She appealed to their principles").

The defendants' own words betray their true character. They regarded the life of anyone who was not al-Shabaab, anyone who in their eyes was an "infidel," with a near sociopathic disregard. The fact that the defendants were not themselves wearing the suicide vests, shooting the AK assault rifles, or carrying out the attacks is of little moment. They financed the suicide

vests and the machine guns; they fed, equipped, and gave shelter to the al-Shabaab fighters as they prepared to carry out their attacks; they provided the machinery that permitted the al-Shabaab fighters to return to kill again.  This is the defendants' history and character, and these attributes are an integral part of the nature and circumstances of the defendants' offenses.  As such, they should receive considerable weight, not only in arriving at the appropriate "punishment," as such, for these crimes, but also in assessing the likelihood of their recidivism, the need to protect the community from them, and the level of deterrence necessary to dissuade others who are like minded.  All of these factors point to the need for a substantial sentence.

B.    THE NEED FOR THE SENTENCE IMPOSED TO REFLECT THE SERIOUSNESS OF THE OFFENSE, TO PROMOTE RESPECT FOR THE LAW, AND TO PROVIDE JUST PUNISHMENT

The seriousness of the offense and the need to provide just punishment is obvious from a mere recitation of the facts of these crimes.  Because the Court is thoroughly familiar with them, they will not be belabored again here.  The need to promote respect for the law and need to deter similar criminal conduct do merit particular attention, however.

Jama and Dhirane were intimately familiar with the prosecutions of the nearly identical crimes that were happening even as the defendants plotted to continue to support al Shabaab and its indiscriminate violence.  They were aware of law enforcement efforts in other countries to disrupt the support of terrorism – including the actions of members of the Group of Fifteen. Rather than conform their behavior to the laws of the country that gave them shelter – that would have protected their First Amendment rights even to openly and vocally advocate for al-Shabaab – they gave money at the behest of al-Shabaab "clerics" who exhorted their followers to kill the "infidels" in whatever country they found themselves, including the United States, if travel to fight in Somalia was not possible.

-14-

Jama and Dhirane actively sought to enlist others who could replace their co-conspiring financial conduits who had come under scrutiny by the authorities in Somalia, the United Kingdom, Sweden, and elsewhere.  They agreed upon false exculpatory stories they would tell law enforcement agents who might visit them.  They changed the times and amounts that they would send money, arranging for rotating members of the Group of Fifteen to send larger payments, but less frequently, so that their payments could remain the same while drawing less attention.  They agreed upon the destruction of evidence.  Jama, Dhirane, and their co-conspirators explicitly discussed not only that what they were doing was illegal, but also that the penalties for doing so were severe.  Yet, in spite of all, Jama and Dhirane steadfastly pursued their goal of providing shelter and materiel to al-Shabaab so that it could continue the violence against soldiers and civilians alike that the defendants so morbidly enjoyed.

Obviously, these defendants have no respect for the laws of the United States, and no sentence will ever persuade them otherwise.  But there are others who may be dissuaded from supporting al-Shabaab and other terrorist organizations.  There may be others for whom the specter of a substantial period of incarceration would cause them to stop if they already were providing material support.  This was the case with Amina Esse who, both before and for some time after she was a part of the conspiracy, was an ideological supporter of al-Shabaab.  Nonetheless, she had no interest in financially supporting al-Shabaab because of the possibility of being caught and imprisoned.  Accordingly, shortly after she learned of the true purpose for the money she was sending, she withdrew from the conspiracy.  Also, as the defendants themselves discussed, others among their co-conspirators became "paranoid" and stopped sending payments when law enforcement officials in their respective countries came to scrutinize their activities.

A substantial period of incarceration for Jama and Dhirane would of course appropriately reflect the seriousness of their offenses and accord them the just punishment they deserve. Perhaps even more important, substantial sentences would also promote a respect for our anti-terrorism laws sufficient to cause others to reject the entreaties being made daily across world-wide social media outlets to support and engage in terrorism.  Substantial sentences send messages.

C.    THE NEED TO AFFORD ADEQUATE DETERRENCE TO CRIMINAL CONDUCT

The earliest transcripts of the electronic surveillance of Jama and Dhirane date from the beginning of March 2012.  GEX 30.  According to Amina Esse, by the time of these recordings, she had been a part of the conspiracy since April 2011.  Tr. 490.  We also know that Jama began sending money to al-Shabaab at least as early as March 2010.  GEX 10.

As the Court knows, these crimes are extremely difficult to discover, investigate, and prosecute.  The conspiratorial agreements, the recruitment of accomplices, the discussions of who has paid the "living expenses," to whom they should be sent, and whether they were received all take place in private chat rooms to which admission is by invitation only.  Even when a material support cell is discovered, establishing the identities of the co-conspirators is a difficult task, as the Court knows from hearing the testimony of Special Agent Goodman.  The defendants here operated only from behind computer screens in their own homes.  They were careful to keep their identities hidden behind user names that they changed when they believed that they or their co-conspirators might have come under scrutiny.  In many cases, the defendants and their co-conspirators kept their identities secret even from *each other*.  Establishing the identities of co-conspirators in foreign countries who are identified only by their user names sometimes requires Herculean effort by the FBI and its foreign counterparts.

-16-

Proof of the actual payment of money to a foreign terrorist organization can only be seen as if through a glass, darkly. The payments in this case, for example, were often made via the ZAAD system – the records of which are scarce and difficult to obtain from a country such as Somalia. Adding further to the difficulty of detecting and prosecuting cases of this kind is their far-flung international scope. Here, the co-conspirators were located in Kenya, Somalia, the Netherlands, the UK, Sweden, Egypt, Finland, Canada, the UAE, as well as in Virginia, Seattle, San Diego, and Minneapolis. Obtaining evidence from foreign countries requires the laborious and sometimes Byzantine process of mutual legal assistance treaties and the involvement of court proceedings in the foreign country. For example, although co-conspirator Farhia Hassan was arrested in the Netherlands on the same day as were Jama and Dhirane, and while her residence was searched there on the same day as were the Jama and Dhirane residences, we are *still* waiting for a response to our requests for her extradition *and* for the production of the evidence that was seized during the search. In territories such as Somaliland, which the U.S. government does not recognize, there is no such mechanism at all.

That all of the written and spoken communications take place in Somali is another complicating factor, requiring the translation and transcription of hundreds of conversations over multi-year periods. The entirety of the recordings of conversations must all be monitored by Somali-speaking linguists so that any relevant conversations, whether inculpatory or arguably exculpatory, can be identified. As the Court is aware, these recordings, text messages, and other intercepted information constituted terabytes of data. These must then be translated, at least in summary form, for review by the trial team. Any conversations that would be introduced at trial or disclosed as potential *Brady* must then be translated and transcribed in full. All of these transcripts must then be quality controlled by a final Somali linguist who can testify to their

accuracy at trial.  As the Court itself witnessed, finding qualified Somali interpreters and translators is itself a difficult task.  Adding to the difficulty is the co-conspirators use of code words and guarded speech, spoken in a language that does not always translate well into English.  It is a testament to the difficulty of these tasks, as well as the accuracy with which they were carried out, that out of all of these recordings, translations, and transcriptions, the defendants – who had equal access to all of the intercepts – asked only that two or three transcripts be moderately enlarged.  They never raised an objection to the accuracy of any translation.

As the difficulty in detecting and prosecuting violations of our anti-terror laws increases, the risk of capture and conviction diminishes.  *A priori*, respect for our anti-terror laws diminishes commensurately.  Where the risk of detection is seen as relatively small and the punishment for violations is regarded as relatively slight, there can be no deterrence of these crimes.  To promote respect for the law in such cases, when a perpetrator *is* captured and *is* convicted, the penalties for such crimes must be significant.

    D.    THE NEED FOR THE SENTENCE IMPOSED TO PROTECT THE PUBLIC FROM FURTHER CRIMES OF THE DEFENDANTS

As noted above, the possibility of being prosecuted for their crimes had no deterrent effect whatsoever on the defendants.  There is no reason to believe that, once released from whatever sentence is imposed, the defendants will become peace-loving, law-abiding citizens.  There is every reason to believe that the possibility of a second prosecution (or any number of them) would have absolutely no deterrent effect upon their actions.

Moreover, as mentioned, the defendants were adherents of al-Shabaab leaders whom they themselves arranged to speak to the larger ISDAC chatroom as well as to the Group of Fifteen.  Indeed, not only were Jama and Dhirane adherents of al-Shabaab leaders, their contacts with those leaders were close enough that they had access to non-public information involving, among

other things, al-Shabaab's military activities.  Mem. Op. ¶ 9.  Similarly, the conspirators with whom the defendants dealt directly on the "Nairobi side" and the "Hargeisa side" enjoyed relationships with al-Shabaab leadership to such a degree that Mohamed and Abdullahi "coordinated their own activities in light of the specific needs of [al-Shabaab] . . . as a result of [its] military operations."  Mem. Op. ¶ 7.  In the speeches that the defendants arranged for their co-conspirators, these al-Shabaab leaders preached a message of hate and violence – and if the violence could not be accomplished in Somalia, then they encouraged their followers to commit terrorist acts in their respective home countries.  Members of the Group of Fifteen also had murderous desires, and when one of them voiced a wish to be turned into a bomb to strike the "infidels" – as had the fourteen-year-old boy of whom they were speaking – the defendants vigorously agreed.

Their many conversations about pending prosecutions and the sentences handed down had no effect upon their terrorist fundraising or their unshakable belief in violence as the appropriate means to achieve al-Shabaab's ends.  For example, on December 12, 2012, Jama and Dhirane discussed Nima Yusuf, who, as they knew, had engaged in the same conduct and pled guilty to material support charges.  Yusuf had been sentenced in San Diego the day before for sending money to al-Shabaab.  The defendants noted that Yusuf had been sentenced to eight years in prison.  GEX 97, US-01923.  They then immediately turned their attention to who in the Group of Fifteen had and had not paid the "living expenses."  *Id.*, US-01926.  *See also* GEX 98, US-18453-54, 18460 (After discussing Yusuf's eight-year sentence and Amina Ali's arrest and detention in Minnesota, Dhirane and "Hargeisa side" conduit Hassan pledged their fealty to al-Shabaab leader Ahmed Abdi Godane).  Obviously, Yusuf's sentence was no deterrent to them.

On January 10, 2013, following the refusal of the money transmittal business to allow Jama to transfer money overseas, Jama and Dhirane discussed the fact that it appeared that their "Nairobi-side" conduit for sending money to al-Shabaab had been "compromised" because she was on a "list."  Later that same day, Dhirane called her "Hargeisa-side" conduit to inform her of Jama's inability to send money.  Dhirane told Abdullahi, "where we are, if you are found with one cent – one cent. . . .  [T]hey said, 'Anyone found with one cent and belongs to that place no questions asked; he will be sentenced to 15 years in prison.'"  GEX 110, US-18580.  *See also* GEX 115, US-00244-45 (Dhirane told Jama, "In our location, it is 15 years if the person is found guilty of it. . . . If you are indicted because of those living expenses amount, you will just have to be in for 15 years.").  Yet the defendants *still* were not deterred.

One conclusion that is abundantly clear from the defendants' conversations is that not even sentences of up to twenty years – including when one was imposed upon the sister of one of the Group of Fifteen – were enough to deter these defendants from supporting al-Shabaab and its violence.  Perhaps Jama and Dhirane do not present a danger that they themselves would resort to *violence* upon their release from prison.  Perhaps.  But they certainly made every effort to financially assist, and vocally cheer on, those who carried out the al-Shabaab agenda of undifferentiating bloodshed.  Their own words and all of the other evidence at trial establish that they will only cease to do so for the time that they remain in prison.

E.     THE NEED TO AVOID UNWARRANTED SENTENCE DISPARITIES AMONG DEFENDANTS WITH SIMILAR RECORDS WHO HAVE BEEN FOUND GUILTY OF SIMILAR CONDUCT

As the defendants themselves followed and discussed, there are a number of defendants convicted of virtually identical conduct, providing financial support to al-Shabaab.  Their sentences provide important benchmarks for the Court to consider in determining the sentences to impose on the defendants.

    *1.     Amina Farah Ali and Hawo Mohamed Hassan*

Amina Farah Ali and Hawo Mohamed Hassan were charged in a multi-count indictment with conspiring to provide and providing material support to al-Shabaab, in violation of 18 U.S.C. § 2339B. *United States v. Ali*, No. 0:10cr187 (D. Minn. July 6, 2010) (indictment filed). The indictment alleged that the defendants had used conduits to send money to an individual who was "an al-Shabaab financial representative" and later an administrative governor of a Somali area under al-Shabaab control. *Id.*, Dkt No. 8, ¶ 5. A reading of the indictment, attached, demonstrates that the crimes committed by those defendants were in all material respects identical to those involved here, although it appears that Ali was more active than Hassan. Ali and Hassan "raised funds for al-Shabaab by direct appeal to participants in telephone conferences." *Id.* ¶ 18. Ali did so "under the false pretense that the funds were for the poor and needy." *Id.* ¶ 19. Ali "used false . . . names to identify the recipient of the funds in order to conceal that the funds were being provided to al-Shabaab." *Id.* ¶ 21. Ali contacted members of al-Shabaab to arrange for "a speaker to address Ali's audience in an upcoming teleconference," *id.* ¶ 23, and she too lectured the group, telling them to "'forget about the other charities' and focus on 'the Jihad,'" *id.* ¶ 29. She told others to "always collect under the name of the poor." *Id.* ¶ 28.

On October 20, 2011, the defendants were found guilty as charged after a jury trial, and on May 16, 2013, they were sentenced. Ali, who was charged in the Section 2339B conspiracy count and in the twelve substantive material support counts, was sentenced to twenty years in prison.[5] When Ali and Hassan committed the Section 2339B violations, the statutory maximum

---

[5] The sentencing guidelines for both Ali and Hassan were calculated by the Probation Officer to be Level 40/Category VI with a guidelines sentencing range of 360 months to life. *Id.*, Dkt Nos 223 & 224.

was fifteen years' imprisonment, which is also true in Jama and Dhirane's case.  Nonetheless, to

reach the twenty-year sentence, the sentencing judge imposed the statutory maximum 180

months for the material support conspiracy count and sixty-month sentences on the substantive

counts, which would run concurrently to one another, but *consecutively* to the conspiracy count.

*Id.*, Dkt No. 252.  Hassan was charged in the conspiracy count, but in none of the substantive

material support counts.[6]  That is, she was not alleged to have sent money to al-Shabaab herself.

Hassan received a sentence of ten years' imprisonment.[7]  *Id.*, Dkt No. 255.

> ### 2.   *Nima Ali Yusuf*

On December 1, 2011, Nima Ali Yusuf – the sister of Group of Fifteen member Amran

Yusuf, Tr. 450 – pled guilty to conspiring to provide material support to al-Shabaab, in violation

of 18 U.S.C. § 2339B.  *United States v. Yusuf*, No. 3:10cr4551 (S.D. Calif. Nov. 12, 2010)

(indictment filed).  The statement of facts in the plea agreement shows that the Nima Ali Yusuf

case, like the Ali and Hassan case discussed immediately above, is virtually identical to Jama

and Dhirane's case.  Between February and September 2010, Yusuf sent fourteen payments

totaling $1,450 to four individuals who had left the United States to join al-Shabaab in Somalia.

*Id.*, Dkt No. 53.  Yusuf and her co-conspirators used coded language much like that used by the

defendants here.  *Id.*, Dkt No. 63.

Yusuf attempted, unsuccessfully, to recruit an individual to travel to Somalia to join al-

Shabaab.  *Id.*  Jama and Dhirane personally, and successfully, recruited numerous woman to join

them in financially supporting al-Shabaab, and trained other women in how to do so.  Yusuf

attempted, unsuccessfully, to send a video camera and laptop to one of the four co-conspirators.

---

[6] Hassan was also convicted of two counts of making false statements to agents; Ali was not charged in these counts.

[7] Hassan also received concurrent sentences of ninety-six months on the false statement counts.

*Id.*  Jama and Dhirane successfully sent money to Hargeisa and Mogadishu to be used to purchase trucks for al-Shabaab and to Nairobi to fund x-ray machines and two safe houses used by al-Shabaab fighters.  Yusuf was about twenty-three years old when she committed her crime, and was described by the *government* in its sentencing memorandum as "an insecure, immature young woman" who had an "obvious crush" on one of her four co-conspirators.[8]  *Id.*  Jama was about thirty-four when she was arrested, and Dhirane was about forty-five.  Their motivations were a bloodlust for al-Shabaab and its tactics, regardless of the consequences to children and other innocent civilians, as is evident in virtually every conversation among themselves and their co-conspirators.  Yusuf pled guilty and met with agents and prosecutors.  Jama and Dhirane, of course, eschewed any acceptance of responsibility and chose to go to trial.

Nima Yusuf was sentenced to eight years in prison on January 9, 2013.  *Id.*, Dkt No. 73.

### 3.   *Agron Hasbajrami*

On June 26, 2015, Agron Hasbajrami pled guilty in the Eastern District of New York to a two-count information for providing material support to terrorists.  *United States v. Hasbajrami*, No. 1:11cr623 (E.D.N.Y. June 26, 2012) (superseding information filed).[9]  With regard to the offense conduct, "the parties agreed that the defendant sent money to, and attempted to join, a group of people whom he believed were engaged in fighting in the FATA" – the Federally Administered Tribal Areas, a semi-autonomous tribal region in northwestern Pakistan.  *Id.*, Dkt No. 39.  Hasbajrami "was only able to send approximately $1,000 overseas, and . . . his attempt to join a terrorist organization was disrupted well before he even left the United States."  *Id.*

---

[8] After agreeing to plead guilty, she met voluntarily with FBI agents, at which time she appeared "lively," with a "pleasant, youthful demeanor."  *Id.*

[9] Hasbajrami had pled guilty in June 2012 to one count of attempting to provide material support to terrorists, but was permitted to withdraw that plea.  He later entered a conditional plea to the superseding information that preserved his right to appeal certain issues.

Moreover, "the government [did] not argue that the defendant's conduct contributed to any actual harm overseas."[10]  *Id.*  Hasbajrami was about twenty-six years old when he committed these crimes.

Agron Hasbajrami was sentenced to sixteen years in prison on August 13, 2015.  *Id.*, Dkt No. 161.

### 4.  *Ali Shukri Amin*

On June 11, 2015, Ali Shukri Amin pled guilty in this District to conspiring to provide material support to the foreign terrorist organization known as the Islamic State in Iraq and the Levant.  *United States v. Ali*, No. 1:15cr164 (E.D. Va.  June 11, 2015) (information filed) (Hilton, J.).  According to the statement of facts, Ali used a Twitter account "to conduct twitter-based conversations regarding ways to develop financial support for ISIL using on-line currency, such as Bitcoin, and ways to establish a secure donation system or fund for ISIL."  *Id.*, Dkt No. 7.  Ali also facilitated the travel of an individual who intended to join ISIL in Syria.  *Id.* Ali (and his family) began cooperating with the FBI even before his arrest, and he admitted his guilt at his first meeting with the FBI.  *Id.*, Dkt No. 16.  After his arrest and under the direction of the FBI, he contacted ISIL supporters in an effort to provide evidence helpful to terrorist investigations in other countries.  *Id.*  He waived his juvenile transfer hearing, accepted

---

[10] As the government said in a subsequently-filed sentencing memorandum,

> While questions remain as to the actual nature of Individual #1's specific conduct overseas, and whether he may have exaggerated or fabricated certain of his actions in order to solicit funds, Individual # 1's stated purpose for raising money and recruiting personnel was unequivocally to support jihadist fighting operations. The defendant's own communications establish that he understood this stated purpose, and eagerly wished to support those operations. To be clear, the government refers to these communications not to prove what the defendant's confederates undertook in the cause of jihad, but rather to establish the defendant's state of mind in attempting to support such activity.

*Id.*, Dkt No. 148.

responsibility, renounced ISIL, and pled guilty.  *Id.*  Ali was seventeen years old when he committed these crimes.

Ali Shukri Amin was sentenced to more than eleven years in prison on August 28, 2015. *Id.*, Dkt. No. 20.

> 5.    *Mohamud Abdi Yusuf*

On November 3. 2011, Mohamud Abdi Yusuf pled guilty in the Eastern District of Missouri to conspiring to provide and providing material support to al-Shabaab.  *United States v. Yusuf*, No. 4:10cr547 (E.D. Mo. Oct. 21, 2010) (indictment filed).  According to the plea agreement, Yusuf agreed with individuals in Somalia to help raise money to purchase a vehicle for al-Shabaab that would be used to transport fighters and their weapons.  *Id.*  As did Dhirane and Jama, Yusuf and his co-conspirators used coded language such as "orphans" and "the youth" to refer to al-Shabaab, its leadership, and its activities.  *Id.*  In June, July, and August 2008, Yusuf sent or arranged for others to send a total of $5,000 to two of the individuals in Somalia. *Id.*  Yusuf was about twenty-eight years old when he committed these crimes.

Mohamud Abdi Yusuf was sentenced to more than eleven years in prison on June 19, 2012. *Id.*, Dkt No. 124.

> 6.    *Gufran Ahmed Kauser Mohammed and Mohamed Hussein Said*

On July 15, 2014, Gufran Ahmed Kauser Mohammed pled guilty in the Southern District of Florida to conspiring to provide material support to al-Shabaab.  *United States v. Mohammed*, No. 1:13cr20364 (S.D. Fla. May 21, 2013) (indictment filed).  According to the factual proffer for his plea, "the core of this case involves Western Union wire transfers that Mohammed sent through [his co-defendant Mohamed] Said for the support of al-Shabaab, and that Mohammed sent to the OCE [an undercover FBI agent] for the support of al-Qa'ida and al-Qa'ida in Iraq." *Id.*, Dkt No. 76.  Between May 2011 and May 2013, Mohamed gave about $30,000 in money

and other assets to the two individuals. *Id.* In addition to providing funds for general purposes, on occasion Mohammed believed they would be used to purchase weapons, to recruit personnel, or to support a terrorist attack. *Id.* Mohammed was about thirty years old when he committed these crimes.

Gufran Ahmed Kauser Mohammed was sentenced to fifteen years in prison on December 17, 2014. *Id.*, Dkt No. 126.

### 7. *Mohamed Hussein Said*

On May 29, 2015, Mohamed Hussein Said, Gufran Mohammed's co-defendant, pled guilty in the Southern District of Florida to conspiring to provide material support to al-Shabaab. *United States v. Said*, No. 1:13cr20364 (S.D. Fla. May 21, 2013) (indictment filed). According to the factual proffer supporting his plea, Said served as a fundraiser and recruiter for al-Shabaab and received approximately $11,600 from Mohammed. *Id.*, Dkt No. 233. Said also communicated with an FBI undercover agent (UCE) who was posing as a terrorist fundraiser, recruiter, and supplier. *Id.* Said introduced the UCE to an experienced al-Shabaab or al-Qa'ida fighter and gave the UCE the names of others. *Id.* He also attempted, unsuccessfully, to arrange for three potential recruits to travel to Somalia. Said was twenty-five years old when he committed these crimes.

Mohamed Hussein Said was sentenced to fifteen years in prison on August 28, 2015. *Id.*, Dkt No. 248.

### 8. *Mohamad Youssef Hammoud*

On July 31, 2000, Mohamad Youssef Hammoud was charged in an indictment with violations of 18 U.S.C. § 2339B and numerous other offenses, all of which were connected to his support for Hizballah. *United States v. Hammoud*, No. 3:00-147 (W.D.N.C. July 31, 2000)

(indictment filed). *See also United States v. Hammoud*, 381 F.2d 316, 325 (4th Cir. 2004).[11]

After a jury trial, he was found guilty on June 24, 2002. *Hammoud*, No. 3:00-147, Dkt No. 829.

The "largely undisputed" facts relevant to the material support charges were as follows:

> In 1996, Hammoud began leading weekly prayer services for Shi'a Muslims in Charlotte. These services were often conducted at Hammoud's home. At these meetings, Hammoud—who is acquainted with both Nasserallah and Fadlallah, as well as Sheikh Abbas Harake, a senior military commander for Hizballah—urged the attendees to donate money to Hizballah. Hammoud would then forward the money to Harake. The Government's evidence demonstrated that on one occasion, Hammoud donated $3,500 of his own money to Hizballah.

*Hammoud,* 381 F.2d at 326. At trial, one of the government's witnesses testified that although there had been some talk of obtaining "dual use" technology such as global positioning systems for Hizballah, "Hammoud had declined to become involved in providing equipment because he was helping Hizballah in his own way." *Id.*

Thus, but for the terrorist organizations involved, Hammoud's offense conduct was essentially the same as that of Jama and Dhirane – leaving aside the fact that they did provide money for specific equipment and safe houses. At the sentencing hearing, in considering the Section 3553(a) factors, the judge specifically noted that the defendant's "crimes were not violent" and that he "was young at the time of his crimes." *Hammoud*, No. 3:00-147, Dkt No. 1150, at 69. Hammoud was about twenty-two years old when he began leading the weekly fundraising meetings that led to his conviction.

Mohamad Youssef Hammoud was sentenced to thirty years in prison on January 27, 2011. *Id.*

---

[11] Following *United States v. Booker*, 543 U.S. 220 (2005), the decision was vacated and remanded for resentencing. The Fourth Circuit later re-affirmed the decision in all material respects, relying upon the same facts. *United States v. Hammoud*, 483 Fed. Appx 865 (4th Cir. 2012).

III.    CONCLUSION

For all of the foregoing reasons, the United States respectfully submits that the Section 3553(a) factors that the Court must consider – including the life sentence recommended by the sentencing guidelines, the remorseless character of the defendants, the need for general and *specific* deterrence in this case, and the sentences received by identically situated defendants – lead inexorably to a very substantial sentence for these defendants.  Given their leadership roles, their failure to accept responsibility, their lack of any claim to consideration for cooperation, and their convictions that came only after a full trial, the United States respectfully submits that the only just sentence in this case is the same one that was imposed upon Amina Farah Ali, the defendant in Minnesota discussed above, who committed exactly the same crimes in exactly the same way as Jama and Dhirane and whose prosecution, trial, and sentence were well known to them.

Ali was sentenced to twenty years in prison.  That is also the just sentence for these defendants.

Respectfully submitted,

DANA J. BOENTE
UNITED STATES ATTORNEY


By: _____/s/_____
    James P. Gillis
    Virginia Bar No. 65055
    Danya E. Atiyeh
    Virginia Bar No. 81821
    Assistant United States Attorneys
    The Justin W. Williams
        United States Attorney's Office
    2100 Jamieson Avenue
    Alexandria, VA 22314
    (703) 299-3700
    (703) 299-3982 (fax)
    James.P.Gillis@usdoj.gov
    Danya.E.Atiyeh@usdoj.gov

CERTIFICATE OF SERVICE

I certify that on February 14, 2017, I will file the foregoing using the ECF system, which

will send a copy to defense counsel of record, who also received a copy of this motion by hand.

                                                         /s/

                                            James P. Gillis
                                            Virginia Bar No. 65055
                                            Assistant United States Attorney
                                            The Justin W. Williams United States
                                               Attorney's   Office
                                          2100 Jamieson Avenue
                                          Alexandria, VA 22314
                                          (703) 299-3700
                                          (703) 299-3982 (fax)
                                          james.p.gillis@usdoj.gov