IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA          :
                                  :
vs.                               :          Criminal No. 1:14cr230
                                  :
HINDA OSMAN DHIRANE               :
                                  :
          Defendant               :

DEFENDANT DHIRANE'S POSITION ON SENTENCING

Hinda Dhirane, by and through counsel, in accordance with 18 U.S.C. § 3553(a) and

Section 6A1.2 of the Sentencing Guidelines and Policy Statements submits this memorandum

regarding the sentencing factors.

**I.      Advisory Sentencing Guidelines.**

The probation office calculated Ms. Dhirane's sentencing guidelines pursuant to U.S.S.G.

§ 2M5.3 at offense level 26, criminal history category I, increased by two levels pursuant to §

2M5.3(b)(1)(C)[1] for providing funds or other material support or resources with the intent

knowledge, or reason to believe they are to be used to commit or assist in the commission of a

violent act, increased by an additional three levels pursuant to § 3B1.1(b) for role in the offense

resulting in an offense level 31, criminal history category I, guideline range 108-135 months.

Ms. Dhirane's guidelines were further increased by 12 levels as mandated by § 3A1.4 for the

federal crime of terrorism to offense level 43, criminal history category VI.  The resultant

guidelines were an offense level 43, criminal history category VI, resulting in an advisory

---

[1]The presentence report mistakenly cited to § 2M5.3(b)(1)(C) instead of § 2M5.3(b)(1)(E) for the
Specific Offense Characteristic.

1

guideline sentence of life imprisonment.

Even though the advisory guideline sentence is life imprisonment and the probation office, following the provisions of § 5G1.2(d) to impose consecutive sentences, calculated the sentence at 1260 month (105 years), the Court is not required to sentence Ms. Dhirane to a sentence within the advisory guideline range but may depart downward or grant a variance sentence.

## II.    SENTENCING[2]

### A.    The Sentencing Guidelines Do Not Rationally Reflect The Offense Conduct

The Presentence Report (PSR) calculates the sentencing under the guidelines as 1260 months, running counts 1 and 16 to 21 consecutively pursuant to § 5G1.2(d).  Without the § 5G1.2 enhancement, Ms. Dhirane's guideline range with adjustments pursuant to § 2M5.3(b)(1)(E) and § 3B1.1(b) is 108 to 135 months.  Without the adjustments, Ms. Dhirane's guideline range is 63-78 months.

In *Nelson v. United States*, 555 U.S. 350-51 (2009), the Supreme Court clarified its rejection of the presumption that sentences within the applicable guideline range are reasonable. In reversing the Fourth Circuit's presumption that sentences within the applicable guideline range are reasonable, the Court stated, "Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable."  The Court went on to state, "The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* to be reasonable."

---

[2] We wish to thank Attorney Dan Scott for his sentencing arguments from *United States v. Amina Farah Ali*, C10-187-(MJD/FLN) (D. Minn.  2013).

2

The provisions of 18 U.S.C. § 3584 provide:

The court, in determining whether the terms imposed are to be ordered to run concurrently or consecutively shall consider, as to each offense for which a term or imprisonment is being imposed, the factors set forth in section 3553(a).

The provisions of 18 U.S.C. § 3553(a) instruct the Court to consider the factors set forth in § 3553(a)(2) to impose a sentence "sufficient, but not greater than necessary."  This Court considered those factors in imposing a sentence substantially below the guideline range in *United States v. Farrokh*, 1:16cr20 (E.D. Va. 2016).  *See United States v. Benkahla*, 501 F. Supp.2d 748 (E.D. Va. 2007).

Judges also may consider arguments that the applicable guidelines fail properly to reflect §3553(a) considerations, reflect an unsound judgment, do not treat defendant characteristics in the proper way, or that a different sentence is appropriate regardless of the stated guidelines. *Rita v. United States,* 551 U.S. 338, 351, 357 (2007). Judges "may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough v. United States,* 552 U.S. 85, 101 (2007) (internal quotation marks and citations omitted).

Whether a judge may draw any useful advice from a guideline depends first on whether the Commission, in promulgating or amending it, acted in "the exercise of its characteristic institutional role." *Kimbrough,* 552 U.S. at 109. As described in *Rita ,*  the exercise of this role has two basic components:  (1) reliance on empirical evidence of pre-guidelines sentencing practice, and (2) review and revision in light of judicial sentencing data, and consultation with participants in and experts on the criminal justice system. *Rita,* 551 U.S. at 348-50. Where a guideline was not developed based on this "empirical data and national experience," it is not an abuse of discretion to conclude that it "yields a sentence 'greater than necessary' to achieve

3

§3553(a)'s purposes, even in a mine-run case." *Kimbrough,* 552 U.S. at 109-10. See also *Spears v. United States,* 129 S. Ct. 840, 843-44 (2009) ("[W]e now clarify that district courts are entitled to reject and vary categorically from the crack-cocaine Guidelines based on a policy disagreement with those Guidelines.")

Over the past eleven years, the Supreme Court has given judges the power to impose sentences that are not greater than necessary to satisfy the statutory purposes of sentencing, to consider all of the characteristics of the offender and circumstances of the offense, to reject advisory guidelines that are not based on national sentencing data and empirical research, and to serve their function in the constructive evolution of responsible guidelines. *See United States v. Booker,* 543 U.S. 220 (2005); *Rita v. United States,* 127 S. Ct. 2456 (2007); *Gall v. United States,* 128 S. Ct. 586 (2007); *Kimbrough v. United States,* 128 S. Ct. 558 (2007); *Spears v. United States,* 129 S. Ct. 840 (2009); *Nelson v. United States,* 129 S. Ct. 890 (2009); *Pepper v. United States,* 131 S. Ct. 1229 (2011).

### 1.    The terrorism enhancement, §3Al.4, is not rationally applied to a violation of 18 U.S.C. § 2339B.

The first place to look is the statute.  At the time of the offense conduct, giving material aid to a designated foreign terrorist organization in violation of 18 U.S.C. § 2339B had a maximum sentence of 15 years (180 months).  Subsumed within the statutory definition of the material support statute are the factors that define terrorism; that the organization has already been defined as a Foreign Terrorist Organization, that the contributor knows the designation, or in the alternative, that the contributor knows that the organization engages in terrorism; and the support is provided despite that knowledge.  The offense level set by the Sentencing Commission

in §2M5.3 for this offense already covers the high end of sentencing possibilities.  For a first offender, the base offense level with no enhancements is 26 and the guideline range is 63-78 months.[3]

The terrorism enhancement in §3A1.4 applies to a federal crime of terrorism as defined in 18 U.S.C. § 2332b(g)(5).  That statute has a two part test: 1) that the offense is calculated to influence or affect the conduct of government by intimidation or coercion or to retaliate against government conduct; and 2) is  a violation of one of 50 or so listed criminal statutes.  The overwhelming majority of those statutes do not relate to terrorism but are general crimes, such as protecting unauthorized access to computers (18 U.S.C. § 1030(a)(l)), or specific crimes of violence like the killing of a federal employee (18 U.S.C. § 1114).  Also contained within the list are a few terrorism related offenses, including 18 U.S.C. § 2339B.  So, for the most part, the terrorism enhancement does not result in double counting for terrorist related offenses.

Unlike most of the offenses that are contained in the definition of a "federal crime of terrorism," the statutory definition of the material support statute is the same factor that defines § 3A1.4 the terrorism enhancement: the requirement that the conduct is intended to influence the conduct of a government by intimidation or coercion (contained within the definition of terrorism, see 18 U.S.C. § 2331).  While the Sentencing Guidelines often result in double counting, there is usually a clear intent to do so.  Here, most of the offenses listed in §2332b(g)(5) are separate offenses that do not by definition include terrorism, e.g., arson, murder, harming government buildings or vehicles, etc., so a separate enhancement for terrorism

---

[3] By contrast, the statutory maximum sentence for bank fraud, 18 U.S.C. § 1344, is 30 years but the offense level for a first offender begins at offense level 7, 0-6 months.

makes sense.  For §2339B the separate terrorism enhancement would not add anything new to the underlying guideline.

Still, the terrorism enhancement might carry weight if the underlying guideline somehow undervalued the criminal conduct. As noted, it does not.  By starting at an offense level 26 the guideline virtually eliminates any sentence in the bottom portion of the sentencing range set by statute and virtually assures a prison sentence out of proportion to the criminal act committed.

Prior to 1994, the Sentencing Guidelines did not include an enhancement for conduct relating to terrorism offenses.  Instead, the Guidelines included a policy statement that provided: "If the defendant committed the offense in furtherance of a terroristic action, the court may increase the sentence above the authorized guideline range."  See former U.S.S.G. § 5K2.15.[4]

In 1994, Congress passed the Violent Crime Control and Law Enforcement Act of 1994.[5] Under that Act, Congress directed the Sentencing Commission to amend its sentencing guidelines to provide an appropriate enhancement for any felony, whether committed within or outside the United States, which involves or is intended to promote international terrorism, unless such involvement or intent is itself an element of the crime.  Pub. L. 103-322 §120004 (1994) (emphasis supplied).

Accordingly, the Sentencing Commission deleted the upward departure policy statement and promulgated former §3A1.4, effective November 1, 1995:

(a)     If the offense is a felony that involved, or was intended to promote, international terrorism, increase by 12 levels; but if the resulting offense level is less than level

---

[4]Section 5K2.15 was effective November 1, 1989 (*see* Appendix C, amendment 292) and was deleted effective November 1, 1995 (*see* Appendix C, amendment 526.)

[5]Pub. L. 103-322 (1994).

32, increase to level 32.

(b)     In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

In 1996, Congress passed the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).[6] As part of the Act, Congress directed the Sentencing Commission to "amend the sentencing guidelines so that the chapter 3 adjustment relating to international terrorism **only** applies to Federal crimes of terrorism, as defined in section 2332b(g) of Title 18, United States Code." (Emphasis supplied).[7]

Accordingly, the Sentencing Commission promulgated an emergency Amendment to § 3Al.4 that replaced the term "international terrorism" with "federal crime of terrorism."[8]  The amendment was otherwise re-promulgated without change, effective November 1, 1997[9]:

(a)     If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level   32.

(b)     In each case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category  VI.

Looking to Congressional intent, the directive from Congress was to set up a separate enhancement for terrorism for offenses, "unless such involvement or intent is itself an element of the crime."  The Sentencing Commission did not follow the directive of Congress in

---

[6] See Pub. L. 104-132.

[7] *Id*. §730 (1996).

[8] U.S.S.G. Appendix C, amendment 539.

[9] U.S.S.G. Appendix C, amendment 565.

7

promulgating §3A1.4.  The Commission's lack of precision is perhaps understandable when Congress tried to limit the application "only" to offenses listed in 18 U.S.C. § 2332b(g)(5). That section happens to include, within a long list of other offenses, Ms. Dhirane's offense, 18 U.S.C. § 2339B. But what the Commission did not follow, was the proscription not to include offenses that already related to terrorism.  In other words, Congress specifically directed the Commission not to double count offenses using the terrorism enhancement.  This Court should consider whether the guideline range set by the Commission is reasonable and rationally based.  It appears that the terrorism enhancement for violation of §2339B offenses is not a rational classification.

At the time of the commission of the offense conduct, the statute carried a maximum penalty of 15 years and no minimum penalty.[10]  Because it falls into Class C, probation is an allowable term. See 18 U.S.C. §§ 3559(a)(3) and 3561(a)(1).  Counsel suggests this may reflect an understanding of the vast breadth of conduct that can run afoul of this law. See *Holder v. Humanitarian Law Project,* 130 S. Ct. 2705 (2010), humanitarian and political activities in the form of monetary contributions, other tangible aid, legal training, and political advocacy is legitimately prohibited conduct.

>      **2.      The material support guidelines permit the Court to consider
>              downward departures.**

The Commentary for §2M5.3 specifically provides that the Court may consider departures based upon:

> [T]he degree to which the violation threatened a security interest of the United
> States, the volume of the funds or other material support or resources involved ,
> the extent of the planning or sophistication, and whether there were multiple

---

[10] The statute now carries a maximum penalty of 20 years with no minimum penalty.  The statute is still classified as a C Felony.

occurrences.  (comment n. 2 (A)).

It is obvious from the trial testimony, that the Transitional Federal Government (TFG) was providing no assistance to the general populous of Somalia.  Any monies going to the TFG were being diverted to the pockets of the politicians.  There are knowledgeable commentators that have declared that the TNG/TFG were set up originally for the sole purpose of obtaining assistance from outside interests for their own self-enrichment.  Al Shabaab was the only non-clan based group fighting the Ethiopian invasion that began in 2006.  For years the group was broadly supported by the Somali people, both those in Somalia and those in the Diaspora.

Ms. Dhirane had no history of radicalism. She was known in the community to be a devout Muslim.  Her concern was her home country, Somalia.  She was not consumed by the clan-based politics that were the downfall of Somali unity.  She believed that Al Shabaab was the hope of the Somali people for national unity and a country free of greed and corruption.

Ms. Dhirane's offenses did not threaten the security interests of the United States nor has Al Shabaab attacked the United States unlike the attack in San Bernardino perpetrated by an ISIL sympathizer.  The conflict in Somalia is a civil war between factions which want to control the country.  Both Kenya and Ethiopia have an interest in the outcome of the conflict and have sent troops to Somalia to provided military support to various factions during the conflict.

While there were multiple transactions alleged in the conspiracy, the total amount for all of the transactions alleged in the Superseding Indictment is $4,750 which is a minuscule amount of money.  Of the 26 overt acts listed in count 1 of the Superseding Indictment, Ms. Dhirane was involved in the conspiracy for only 8 transactions totaling $1000.  Of the $3,600 provided by the conspirators listed in counts 2 through 21 of the Superseding Indictment, Ms. Dhirane was held

responsible for only $700 in counts 16 through 21, having been acquitted of counts 2 through 15.

Another factor which the Court should consider in determining whether to downward depart from the guidelines under § 2M5.3, is the length of time during which Ms. Dhirane participated in the conspiracy.  The indictment alleges that the conspiracy began in 2011 and continued to the present, presumably when the first indictment was filed on June 24, 2014.  Ms. Dhirane was in Somaliland from September 2010 to January 24, 2012.  The Court found that she entered the conspiracy in April 2012.  The last transaction in the indictment was on January 23, 2013.  Therefore, Ms. Dhirane was involved in the conspiracy for approximately nine months.

Moreover, the "planning or sophistication" involved the defendants and others talking in a chatroom once a month to talking on their phones to report their contributions and discussing current events involving Somalia and Al Shabaab.  This was hardly a sophisticated scheme.

> **3.      The funds were not provided with the intent, knowledge, or reason to believe they were to be used to commit or assist in the commission of a violent act.**

Ms. Dhirane objects to the § 2M5.3(b)(1)(E)[11] two level enhancement.  The money sent to Al Shabaab was not sent with the intention, knowledge or understanding that it would be used in the commission or assist in the commission of violent acts.  Ms. Dhirane's guidelines were enhanced by 2 levels pursuant to § 2M5.3(b)(1)(C)[12] because the probation office determined that the money was sent with the intent, knowledge, or belief that it would be used to commit or assist in the commission of a violent act.  Ms. Dhirane intended and understood that the money was

---

[11]As noted above, the presentence report mistakenly cites § 2M5.3(b)(1)(C) instead of § 2M5.3(b)(1)(E) as the Specific Offense Characteristic.

[12]As noted above, the presentence report mistakenly cites § 2M5.3(b)(1)(C) instead of § 2M5.3(b)(1)(E) as the Specific Offense Characteristic.

being used for humanitarian reasons, to provide food, medicine, supplies and shelter not for the commission of violent acts.  The defendants were told that the money being sent to Kenya was being used to purchase an x-ray machine to be used in a clinic and to assist in paying the rent for a facility to treat wound soldiers and to provide a place for soldiers to rest.  The defendants were told that the money sent to Somalia was being used to purchase food, and supplies.  It was their understanding that the funds were used to obtain food and other supplies but that the vehicle containing the food and supplies purchased with the defendants funds was seized by government soldiers before reaching its intended destination.

Since Ms. Dhirane and the other conspirators intention, knowledge and understanding was that the money was used for humanitarian purposes, such as food medicine, and shelter and not for the commission of violent acts, the two level enhancement should not have been applied.

It is true that once the money was received, Al Shabaab could have used the money for any purpose it chose, regardless of Ms. Dhirane and the other conspirators intention and understanding.  But the Sentencing Commission was directing the language "intent, knowledge, or reason to believe," to refer a specific state of mind when it included the language in the guidelines.  Otherwise any and all funds sent to a terrorist organization would be subject to the two level enhancement.  The Sentencing Guidelines are subject to the same statutory construction as any statute.  *United States Cross,* 371 F.3d 176, 180 (4th Cir. 2004) ("Interpreting a guideline is no different from interpreting a statute; the standard rules of statutory construction apply."

Al Shabaab is a terrorist organization and like any terrorist organization will take funds it receives and use them for whatever purpose it wishes.  By inserting those specific terms, the

Sentencing Commission in § 2M5.3(b)(1)(E) determined that an individual had to send funds specifically intending, knowing or believing the funds are going to be used for or to assist in the commission of a violent act and not that the individual sends funds for a non-violent purpose but knows that the funds may be diverted by the terrorist organization for use in the commission or assisting the commission of a violent act.

The currency and monetary instruments are included in the definition of "material support" in § 2M5.3[13] and, therefore, are included in the base offense level.  Thus, it is not sending money knowing that a terrorist organization could divert its use to commit violent acts that subjects the sender to the two level enhancement but it is the sender's specific intention, knowledge or understanding that the intended purpose of the money is for the specific purpose of committing violent acts that subject the sender to the two level enhancement.  Otherwise all funds sent to a terrorist organization are subject to the two level enhancement of § 2M5.3 and the "intent, knowledge and reason to believe" provision is superfluous.  Inserting superfluous language could not have been the intention of the Sentencing Commission in promulgating the provision.  Like any statutory provision, the guideline must be given "its plain meaning, as determined by the examination of its language, structure, and purpose." *Id.*

Unless it can be shown that Ms. Dhirane intended, knew or had reason to believe that the funds were going to be used to commit violent acts, the two level enhancement in §2M5.3(B)(1)(E) can not be applied to enhance her guidelines.  There was no evidence that Ms. Dhirane was contributing money to be used for any violent acts by Al Shabaab.

---

[13]*See* § 2M5.3 comment. (n.1) referencing 18 U.S.C. § 2339B(g)(4) which refers to the definition of "material support or resources" in 18 U.S.C. § 2339A(b)(1) which includes "currency or monetary instruments."

### 4.      Role in the Offense

Ms. Dhirane objects to the § 3B1.1 three level enhancement for role in the offense as a manager or supervisor in the Group of Fifteen.  In order to qualify for a role in the offense enhancement, the Court must consider:

> [1] the exercise of decision making authority; [2] the nature of participation in the commission of the offense; [3] the recruitment of accomplices; [4] the claimed right to a larger share of the fruits of the crime; [5] the degree of participation in planning or organizing the offense; [6] the nature and scope of the illegal activity; and [7] the degree of control and authority exercised over others.

*United States v. Cameron*, 573 F.3d 179, 184 (4th Cir. 2009) *citing* § 3B1.1; and *United States v. Sayles*, 296 F.3d 219, 224 (4th Cir. 2002).

This was a loosely organized group of women located in various parts of the world and there was no leader or any organizational structure.  They would meet once a month or so in an internet chatroom on PalTalk to discuss the contributions, if any, they could make that month to send to support Al Shabaab in Kenya or Somalia and to discuss the events in Somalia.  All the women were in the same relative position with no one holding a leadership position.  Women might or might attend depending on their individual schedules.  Women came and went from the group as they pleased.  There was no role call of participants nor any penalty for failure to attend.

Each woman determined individually how much, if any, she would be able to contribute each month.  Generally, the amount contributed was between $25-$100.  If money was being collected for a particular reason, the group would determine how much to could raise.  Occasionally, a speaker might be found by one of the women to address the group. While one woman or another might remind an individual that their contribution was due, there was no penalty for failure to pay or method of enforcement of non-payment.

The conspiracy is alleged to have existed from in or about February 2011 to June 2014. The group had been meeting online for over a year before Ms. Dhirane was joined in April 2012. The routine for the chatroom and the contributions had been in existence for over a year before Ms. Dhirane joined.  There were 18 contributions made by the group prior to Ms. Dhirane joining it.  Once she joined in the chatroom, she merely joined in and took part.  According to Amina Esse, Ms. Dhirane participated very little in the chatroom.  Ms. Dhirane made no changes to the chats or contributions.  Of the 26 contributions sent to support Al Shabaab, Ms. Dhirane took part in only 8 and her last contribution was in January 2013.  Ms. Dhirane was a member of the group for only 8 or 9 months.  Chats and contributions continued to be made on those occasions Ms. Dhirane did not join in chats with the group.

The trial testimony and evidence concentrated on the phone calls and messages between Ms. Dhirane and Ms. Jama which gave the Court a somewhat distorted view of the role played by Ms. Dhirane.  Ms. Dhirane did not manage or supervise anyone in the group, nor did she have managerial or supervisory authority over the group as a whole.  Ms. Dhirane did not keep track of the monthly contributions pledged by each of the women.  Ms. Dhirane had no say in determining how much a woman might decide to contribute each month and had no ability to enforce the sending of any contribution but her own.  While she might remind others of their pledges, she was also reminded by others of hers.  Ms. Dhirane had no more say than any other member of the group as to where the contributions were to be sent or for what purpose.  Neither Ms. Dhirane nor any other woman had final decision making authority for any action the group took.

Ms. Dhirane was not the only member of the group who arranged for individuals to speak

to the group.  Other women would bring in individuals speak to the group.  Ms. Dhirane did not recruit anyone to join the group.  Ms. Dhirane did not receive any of the fruits of the contributions or receive any other benefit.

Ms. Dhirane participation as part of the group in the chatroom does not meet any of the seven factors the Court is to consider in determining whether to apply a role in the offense enhancement and her guidelines should not have been enhanced by three levels.

**B.    The Court is to consider the 18 U.S.C. § 3553 factors to impose a sentence that is sufficient, but not greater than necessary.**

**1.    The law of variance.**

Although the probation office found no factors to warrant a departure from the applicable sentencing guideline range, Ms. Dhirane contends that there are factors to warrant a downward departure or variance sentence.

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.

*Gall v. United States,* 128 S. Ct. 586, 598 (2008), quoting *Koon v. United States,* 518 U.S. 81.

The Sentencing Guidelines are merely the starting point under the factors to be considered in fashioning an appropriate sentence under 18 U.S.C. § 3553.  The United States Supreme Court in *Kimbrough v. United States,* 128 S. Ct. 558 (2008), and *Gall v. United States,* 128 S. Ct. 586 (2008), dictate the imposition of a sentence "sufficient but not greater than necessary" to achieve the statutory purposes of sentencing, after considering the circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, and the need to avoid unwarranted disparities.

15

Beginning with *Rita v. United States,* 127 S. Ct. 2456 (2007) and continuing with *Gall v. United States,* supra, and *Kimbrough v. United States,* supra, the Supreme Court fleshed out the considerations for the sentencing courts in fashioning a sentence under §3553(a) after the surgery performed upon it by the Court in United States v. Booker, 543 U.S. 220 (2005).  In *Rita,* the Supreme Court made clear that the *"sentencing judge* "has the statutory duty to apply the seven factors of §3553(a) to the individual facing sentence before the court. In determining the sentence the court "may hear arguments by prosecution or defense that the Guidelines sentence should not apply, perhaps because (as the Guidelines themselves foresee) the case at hand falls outside the 'heartland' to which the Commission intends individual Guidelines to apply, U.S.S.G. § 5K2.0, perhaps because the Guidelines sentence itself fails properly to reflect §3553(a) considerations, or perhaps because the case warrants a different sentence regardless." 124 S. Ct at 2465.

In *Gall and Kimbrough,* the Supreme Court addressed the question specifically left open in *Rita,* the limits of review for sentences imposed outside the guideline range calculated for an individual case.

> "We reject, however, an appellate rule that requires "extraordinary" circumstances to justify a sentence outside the Guidelines range. We also reject the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence.
>
> As an initial matter, the approaches we reject come too close to creating an impermissible presumption of unreasonableness for sentences outside the Guidelines range."

*Gall v. US.* 128 S. Ct at 595. As the Supreme Court noted in *Rita,* and again in *Kimbrough,*

although the Sentencing Commission was entitled to come to its own conclusion on how to weigh the factors of §3553(a) in determining the guidelines, the District Court has a separate statutory duty to evaluate each individual defendant.

Courts in this district and other districts have granted downward departures or variances from § 3A1.4 to arrive at a sentence "sufficient, but not greater than necessary." *See United States v. Meskini*, 319 F.3d 88, 92 (2nd Cir. 2003) ("A judge determining that § 3A1.4(b) over-represents the 'seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes' always has the discretion under 4A1.3 to depart downward in sentencing.")

In *United States v. Benkahla*, 501 F. Supp. 2d 748, 759 (E.D. Va 2007), Benkahla traveled to Pakistan and Afghanistan to a jihad training camp where he received training in the use of automatic weapons and rocket propelled grenades.  Subsequently Benkahla lied to the FBI and to a federal grand jury.  This Court determined that § 4A1.3 gave the Court the authority to depart downward where § 3A1.4 "clearly over-represents the serousness of [the] criminal history" of "an individual with no criminal history and no evidence of ever having committed an illegal act in his life outside the conduct for which he is convicted."  The Court also found that increasing the criminal history category to VI over-represented the likelihood that Benkahla would commit other crimes, lacking the "same likelihood of recidivism, the difficulty of recidivism, or the need for incapacitation" *Id.* at 759.  Alternatively, the Court held that "a variance sentence was necessary to serve the factors set forth in §3553(a)" which "provides that a court shall impose a sentence '*sufficient, but not greater than necessary*' to reflect" the factors set forth in § 3553(a)

17

On review, the Fourth Circuit noted that the government called the calculation of the criminal history category "baseless" and "mystifying" but that the sentence imposed "did not constitute an abuse of discretion" when treated as a variance.  The Fourth Circuit, in dicta, stated,

> 'As far as the law is concerned, the judge could disregard the Guidelines and apply the same sentence . . . in the absence of the special facts.' . . .'When applying the Guidelines in an advisory manner, the district court can make factual findings using the preponderance of the evidence standard.'  The point is thus that the Guidelines must be advisory, not that judges may find no facts .  Here, in the case in which the district court slashed the defendant's Guidelines sentence in half, no one could doubt that the Guidelines were advisory. (Internal citations omitted)

*United States v. Benkahla*, 530 F.3d 300, 312 (4th Cir. 2008).  *See United States v. Ali*, 528 F.3d 210, 260 (4th Cir. 2008).  *See United States v. Farrokh,* 1:16cr20 (E.D. Va. 2016) in which this Court granted a variance sentence to Farrokh who tried to travel overseas to Syria to join and fight with ISIL.  This Court determined that criminal history category VI over represented Farrokh's criminal history and, taking into consideration his prior convictions, sentenced him based on a criminal history II.  In weighing the § 3553(a) factors, the Court imposed a variance sentence of 102 months from a guideline range of 292-365 months.

In *United States v. Mohamed Abdullah Warsame*, 651 F. Supp. 2d 978 (D. Minn. 2009), Mohamed Warsame pleaded guilty to providing material support to Al Qaeda in violation of 18 U.S.C. § 2339B.  Warsame attended Al Qaeda training camps in Afghanistan and intended to bring his family to join him but was told by Osama bin Laden that with his Canadian passport he could be of more value to Al Qaeda by returning to the West.  Warsame's guidelines after the application of U.S.S. G. § 3A1.4 and a reduction for acceptance of responsibility was level 35, criminal history category VI (292-365 months).  The government sought a variance sentence of 150 months from the statutory maximum sentence at that time of 180 months and Warsame

sought a variance sentence of 67 months.  After considering the sentences in dozens of other terror-related cases, the court sentenced Warsame to 92 months.

### 2.    18 U.S.C. § 3553(a) Sentencing Factors

#### a.    Nature and circumstances of the offense.

Ms. Dhirane, along with Ms. Jama, and others chatted monthly in a PalTalk chatroom about their families and current events including the events occurring in Somalia.  Occasionally, there were speakers or religious clerics who would lecture.  During the course of these chats, money was pledged and sent with the intention that it be used to support Al Shabaab.  Over the course of the conspiracy approximately $4,700 was sent overseas to support Al Shabaab.

#### b.  Ms. Dhirane's History and Characteristics

##### (1).  Background

###### (a).    Growing Up Years

Hinda Osman Dhirane was born in Tuli, which is located in the area of Somalia known as Somaliland, in 1969.  Her father, Osman Dhirane, and her mother, Maryan Musa, had six children (Mohamed Osman, now 58 years old; Nimo Osman, now 52 years old; Abdisalam, now 45 years old; Abdishakur, 33 years old; Abdikadir, now 41 years old; Shukri, now 35 years old). Ms. Dhirane's father had been married before he married her mother and had two children from that marriage, Yasin Osman and Khadan Osman, both of whom are deceased.  At the time Ms. Dhirane was growing up, those two half-brothers lived in the household with the family. Additionally, Ms. Dhirane's father married another woman at the same time he was married to her mother and had a daughter, Adar, now 43 years old, who also lived in the household.[14]

---

[14] It is common in Somalia for men to marry more than one wife.  In the Muslim religion, a man can marry up to four wives as long as he can support them.

When Ms. Dhirane was approximately six years old, her father moved the family to Mogadishu, Somalia.  There, she attended first, second and third grades.  When Ms. Dhirane was in the second grade, her father went to Saudi Arabia to work.  It was common for Somali men to go to Saudi Arabia and Qatar to find work to support their families.  He was to remain in Saudi Arabia for approximately 10 years.  He visited the family three or four times a year and always sent home money and boxes of exotic foods.

After Ms. Dhirane finished third grade in Mogadishu, her mother moved Ms. Dhirane and her brother to Tuli.  Ms. Dhirane's older brothers, Mohamed and Khadan, were going to a university in Mogadishu and supervised Ms. Dhirane's other siblings. Additionally, a close family friend helped by cooking and cleaning and Ms. Dhirane's step-sister's mother and aunt lived nearby.[15]

In Tuli, Ms. Dhirane's father owned houses, a block of shops, businesses and a restaurant, and the family had a reservoir of water.  Ms. Dhirane states that her father "was like an engineer even though he did not go to school." Ms. Dhirane's mother sometimes worked in the shop which was located in their home.  Sometimes, Ms. Dhirane and her brother worked there as well. They sold rice, spaghetti, tea, sugar, candy, and Vimto Orange soft drinks.

Tuli did not have a middle school, so Ms. Dhirane walked two hours to the nearest school in Jaaraa-Horoto where she attended fourth, fifth and sixth grades.  She states that she was not the "top person" in her class, but ranked about third or fourth.  Ms. Dhirane liked school and participating in sports with neighborhood children and her siblings.  She remembers enjoying hiking and high jumping with the other children, as well as swinging on a tire suspended from a

---

[15] It is common in Somalia for families to split up with close family members or clan members taking care of the children.

tree.

When it came time for Ms. Dhirane to enter high school, there was no school nearby so she moved to Boorama and lived with her uncle.  She attended Sheikh Ali Jauhar High School.

In approximately 1985 or 1986, while Ms. Dhirane was still in high school, her father returned from Saudi Arabia.  He had learned how to farm during the time he was in Saudi Arabia and bought a piece of land near Dila, Somaliland where he established a "big beautiful farm."  He grew tomatoes, beans, corn, onions and garlic.

Ms. Dhirane stayed in Boorama until she finished high school.  Then, she fulfilled her compulsory national service for the two years after that by teaching math to grade school children.  After Ms. Dhirane finished her national service, she took an exam to attend the University in Mogadishu; however, she failed the exam.  Thereafter, she went to work for a company that published school books.   During that time, Ms. Dhirane applied to the College of Health to enter the midwife program.  She finished about one year of the program.

Meanwhile, Ms. Dhirane's father became ill.  Ms. Dhirane did the best she could to help her father, who was living in Dila, while she was going to school.  Her father died in 1987.

In Somali culture, when a woman's husband dies, she "does not take care of herself" for a period of four months and ten days after the death.  Ms. Dhirane's mother, not only "did not take care of herself" for the requisite time, she went into a deep depression and became more and more ill.  Ms. Dhirane herself was distraught and became depressed.  She dropped out of school; her father's death haunted her.

Meanwhile, Ms. Dhirane had tried to go to Dila to be with her mother before she died.  However, traveling was not an easy task.  Ms. Dhirane states:

21

> This was the worst time to be in Somaliland.  There were bombardments.  The airports were closed and destroyed in Hargeisa.  Hargeisa was leveled.

Ms. Dhirane's cousin, who worked for the government, secured a place for her on a military plane which was going to Boorama.  There she stayed with an uncle and was able to get a car to Dila.  By the time Ms. Dhirane reached Dila, her mother had already died (just eight months after Ms. Dhirane's father died).  Some of Ms. Dhirane's siblings were living at the farm in Dila: Abdishakur, Abdikadir, Shukri, and Nimo.  Nimo was responsible for maintaining the home and the farm animals (cattle and sheep).  Ms. Dhirane stayed there for approximately one year.  Then, Ms. Dhirane's uncle arranged a marriage for Abdishakur, who was only 15 years old at the time.  Ms. Dhirane and her other siblings believed that her uncle was trying to control the farm and finances.  They became angry and sold off the sheep and cattle.

### (b).   Refugee Years

Ms. Dhirane and her sisters, Nimo and Shukri, left Dila for Boorama shortly thereafter, leaving her brothers, Abdishakur and Abdikadir, in Dila.  Soon after arriving in Boorama, Ms. Dhirane and her two sisters decided to go back to Mogadishu as "Somaliland was destroyed."[16]

Ms. Dhirane and her sisters went to Mogadishu through Ethiopia.  The journey took six weeks.  Along the way, they saw many Somalis fleeing and living in camps.  There were lots of

---

[16] In 1969, the civilian government of Somalia was overthrown by a military coup lead by General Siad Barre.  At first, the government was popular with the Somali people.  However, General Barre ruled as a dictator whereas, between 1960 to 1969, Somalia had a democratic system of government with elections.  General Barre's dictatorship became increasingly unpopular. There were rebellions against his rule until he was overthrown in 1991 by northern political parties and warlords intent on creating a new "reform" government.  Fighting erupted amongst the northern parties with competing militaries turning on each other after General Barre fled the capital.  General Mohamed Farrah Aidid's army gained power and the struggle broke down along clan lines – the Hawiye in the north battling Darod in the south.  There was widespread dislocation for Somalis, particularly in the south.

checkpoints where they were stopped.  In Mogadishu, Ms. Dhirane lived with two brothers and two cousins.  The conditions in Mogadishu were deplorable.  People were looting the banks, shooting at each other.  There were swollen dead bodies in the street.  The infrastructure was destroyed.  She remembers having to lay next to dead bodies to avoid being hit by gunfire.  Ms. Dhirane suffered from nightmares from the bombardments.  She states that, "Somalia was destroyed."

By this time, Mogadishu was an urban battle zone and in the surrounding countryside, harvesting and herding were completely disrupted by fighting.  There was a famine and by 1992, the economy in the capital had collapsed.  Food and work were nonexistent.  Hawiye militia groups in the city deliberately targeted Darod neighborhoods to perpetrate violence against residents, clearing areas house by house.

Ms. Dhirane's oldest brother, Mohamed, who by then had immigrated to Canada, was sending money for her and her siblings.  After a year living in Mogadishu, Ms. Dhirane walked to Afgoye with friends. It was 30 kilometers from Mogadishu to Afgoye and the way was dangerous.  They shared one room with a woman who was from the same clan.  There were 11 people living in the room.  She remembers spending two weeks in Afgoye the first time.  From there, she went back and forth from Afgoye to Mogadishu and finally to Ethiopia.

Ms. Dhirane left Mogadishu with a group of people and traveled to Ethiopia in a rental truck.  There was long simmering animosity between the Ethiopians and the Barre regime. Somalis viewed mostly Christian Ethiopia as an unfriendly neighbor bent on destroying Somalia and taking control of its coastline.  Ethiopian troops also had a reputation for using rape as a weapon against defenseless civilians.  It was well known amongst Somalis in Mogadishu that

northern warlords were being financed and trained, at least in part, by Ethiopia.  Young boys were sometimes kidnaped and pressed into Ethiopian militias and sent into the fighting.  Despite these problems, Ms. Dhirane felt she would be better off in Ethiopia than in Somalia.

At a checkpoint in Godey in Ethiopia, Ethiopian forces would not let the truck in which Ms. Dhirane and others were traveling pass through.  Ms. Dhirane and the others in her group turned back and Ms. Dhirane returned to Dila.

The Somali National Movement came to Dila and fighting started.  Ms. Dhirane and one of her brothers fled to the mountains and from there to Boorama.  Meanwhile, Ms. Dhirane's sister, Nimo, and their aunt had been hit with shell fragments and were looking for Ms. Dhirane in Dila.  The Somali government troops were waging war with the Somali National Movement in Dila and Ms. Dhirane could not go back. She learned that her sister, Shukri, had fled with their aunt to Ethiopia and Ms. Dhirane decided to walk to Ethiopia to check the refugee camps.

Ms. Dhirane literally ran into her brother, Abdishakur, in a camp and learned that their aunt and sister were also in the refugee camp.  Ms. Dhirane lived in the camp, Awbarre, for about one year.  At that point, she did not know where Nimo was.

The conditions in the camp were bad.  The Ethiopians beat the refugees and when the United Nations (UN) workers distributed rations, there was chaos amongst the refugees and the Ethiopians fired at them.  The Ethiopians often stole rations.  There were gang wars in the camps. There was no sanitation in the camps and shelter was created by spreading animal hides on top of tree branches which leaked when it rained.

Ms. Dhirane had no news of Nimo for approximately three months until a woman told her that Nimo was in Hargeisa living with a cousin and her husband.  Ms. Dhirane ran into her

brother Abdishakur's wife who was with a little girl.  (Ms. Dhirane's brother, Abdishakur, and his wife had divorced.)

Ms. Dhirane returned to their uncle's house in Boorama.  Meanwhile, her uncle was in Addis Ababa, Ethiopia.  After three months, Nimo joined them in Boorama.  By that time, there were five siblings living together in the uncle's house in Boorama.

Next, Ms. Dhirane went to Djibouti.  She remembers taking a car to the border; walking at night and being smuggled to Djibouti City.  There, she stayed with a cousin for approximately one year.  She was able to make contact with her brother in Canada who agreed to send her a small amount of money every month and to help her get sponsorship to Canada as a refugee.  Ms. Dhirane stated that she was crying on one end of the line and her brother in Canada was crying on the other end.  In the end, Ms. Dhirane did not get sponsorship and so decided to move on to Yemen.

She boarded a boat to Mukha, Yemen with two other young women from her clan.  They went to an area of San'aa where a lot of other Somali refugees were living.  Ms. Dhirane desperately needed a job.  She had a friend who was a pharmacist in a small town nearby.  She and another young woman became midwives at a clinic there.  Ms. Dhirane needed documents to stay in Yemen and so returned to Somalia to obtain a visa.  She went back to Yemen; it was 1993 and she stayed approximately seven months.  There, she met Rashid Jama Barhadle whom she originally met in Mogadishu and the couple became engaged.  He was a teacher and had graduated from a university in Somalia.  Rashid wanted to immigrate to the United States.  The couple married in October 1993, in San'aa, Yemen.

Ms. Dhirane called her brother, who lived in Canada, who said that a cousin would help

Ms. Dhirane immigrate to Canada.  Her brother explained that they would make other arrangements for Rashid.  Rashid's sister, who lived in Texas, was helping Ms. Dhirane and Rashid financially.  His sister helped in other ways.  Her friend's family was going to Kenya and included Ms. Dhirane and Rashid as members of their family, so that they could get into Kenya, too.  By this time, Ms. Dhirane was pregnant with their first child, Abdimalik.

Before Ms. Dhirane and Rashid could go to Kenya, they first had to get an Ethiopian passport.  Ms. Dhirane and Rashid went to Ethiopia where they were joined by Ms. Dhirane's brother.  Ms. Dhirane, her brother, Abdisalam, and Rashid went first to Nairobi and then to a refugee camp, Utanga.  They stayed in the camp for six months.  Then Kenyans torched another Somali refugee camp and Ms. Dhirane was fearful that they would torch Utanga, too.  After six months in the camp, Ms. Dhirane and Rashid returned to Addis Ababa. Ms. Dhirane stayed in Addis Ababa for four years from 1994 to 1998.  She had her second child, Sahra, now 19 years old, during that time.  Also, during that time, her brother, Abdisalam, who returned to Addis Ababa to live with her, married.

Rashid left for the United States, applying for refugee status in 1996.  He went directly to Dallas, Texas where his sister lived.  He lived first with his sister and then he rented a two bedroom apartment; he drove a cab to support himself and his growing family in Addis Ababa.

During the time she was in Addis Ababa, Ms. Dhirane joined with a group of other Somali women to help the new refugees coming in.  They collected money and gave it to refugees.  Ms. Dhirane remembers a Somali comedian, Awkombe, who was famous in Somalia.  His family were refugees in Addis Ababa.  Somali actors, singers and musicians all over the world collected money to send to him and his family in Addis Ababa.  Ms. Dhirane reflects that

it is a Muslim responsibility to help others.

### (c).    Life in the United States

Finally, in 1998, Ms. Dhirane and her two children came to the United States.  At first, they lived with Rashid in Dallas, Texas where Rashid's brother and three sisters lived.  Nine months later, the family moved to Seattle.  Rashid had known a Somali who lived in the Seattle area.  That man proved to be very helpful.  He introduced Ms. Dhirane to a woman who lived in the Rainier Valley area.  She connected them to a Somali nonprofit organization.  She also helped Ms. Dhirane and the children find a shelter where they could stay.  Meanwhile, Rashid returned to Dallas to work.

The people at the shelter helped Ms. Dhirane fill out an application for King County Housing.  She then went to a motel for two weeks after which she was accepted into public housing.  Rashid returned to Seattle to rejoin the family.  He sent out numerous applications for work, but after four months, was still unable to find a job.  Meanwhile, Ms. Dhirane was pregnant and was able to receive benefits through social services.  Finally, Rashid found work in a factory in Tacoma.

Ms. Dhirane was very lonely without family members in the Seattle area; however, she met people from her clan and others from Somalia who began visiting her.  When a new family moves into an area, it is common for members of the Somali community to visit to see what the family needs.  Members of the community did so with Ms. Dhirane.  They brought beds and coats and food.

Ms. Dhirane gave birth to her third child, S., during this time.  While living in the Seattle area, Ms. Dhirane and Rashid had three more children, S., now 13 years old; S., now 12 years

old; and S., now seven years old.  For the most part, Ms. Dhirane has stayed home to take care of the house and children.  However, she worked at ABM Janitorial Company for one year in 2001, and in the last two and a half years worked at Alamo, National, and Enterprise Car Rental Companies shuttling cars from one lot to another.  Often she has worked double shifts.

In about the year 2000, Ms. Dhirane and Rashid bought a computer.  The children were using the computer for school.  Additionally, there were two young relatives living with Ms. Dhirane, Rashid and the children, and they also used the computer.  Ms. Dhirane began watching news about Somaliland and Somalia in approximately 2007.  She went to a number of different Somali-speaking websites throughout the day.  They got Skype capacity in 2007.  Ms. Dhirane listened to and watched teachers from Somaliland, Sudan, and Kenya on Pal Talk lecture about the Koran or news from Somalia and Somaliland.

In 2004, the Transitional Federal Government was formed in Kenya and then relocated to Somalia.  The Islamic Courts began to play an important role.  The Courts' roots began in the 1990s.  They were established in different parts of Somalia, based in Sharia law, and were linked to various clans.  The Islamic Courts Union was set up in 1998 to coordinate various clan-based courts.  It took power in Mogadishu in 2000.  In the early 2000s, Al-Shabaab became established as an underground militia as part of the Islamic Courts.

In 2006, the Islamic Courts Union fought with elements of the Transitional Federal Government (TFG) and subsequently expanded its control.  Ms. Dhirane became aware that the United Courts were becoming more powerful in 2007.  She states, "They made the country peaceful and took away the chaos."  The Transitional Federal Government invited the

28

governments of Kenya and Ethiopia to send troops to Somalia to support the government.  Many of the Somali citizens became angry at this invasion.

Al-Shabaab, as stated above, grew out of the United Courts and became a fighting force against the government as well as the foreign troops.  Ms. Dhirane was supportive of the fighters of Al-Shabaab because she believed they were the only ones who were fighting to expel the foreign troops and institute Sharia law.  The Islamic Courts fell in 2007.  Increasingly, Al-Shabaab took the lead in the insurgency against the Transitional Federal Government.  Many other Somali people supported the insurgents and Al-Shabaab.

By this time, almost all of Ms. Dhirane's siblings were part of the diaspora.  Her brothers, Mohamed and Abdikadir, live in Edmonton, Alberta, Canada; her brother, Abdisalam and her sisters, Nimo and Adar, live in Boorama, Somaliland; her brother, Abdishakur, lives in Milan, Italy; her sister, Shukri, lives in Sweden.  Skype has allowed Ms. Dhirane to visit with those relatives.

### (d).    Somaliland Visit

Ms. Dhirane and her six children visited Somaliland from September 20, 2010 to January 24, 2012.  She spent most of the time in Hargeisa, Somaliland and some of the time in Boorama where three of her siblings live.  It is common for Somali immigrants to return for long periods of time to their homeland to visit family, friends, and familiar places.  Ms. Dhirane was homesick for family, friends and homeland.  She hoped that her children would want to stay in Somaliland and that Rashid would join them.

Rashid stayed home and, as usual, drove a taxi to support the family. While in Hargeisa, the children attended school and Ms. Dhirane attended an Islamic school for Arabic and religious

studies, five days a week, two hours a day.  She met the wife, Kaltun, of a Koran teacher, Abu

Zeinab.  Ms. Dhirane kept in touch with them and later when she returned home, arranged for

him to lecture in Pal Talk.

Ms. Dhirane visited relatives in Hargeisa and Boorama.  When she visited Boorama, she

lived in her uncle's house with her six children, her cousin and her cousin's five children, her

sister and her sister's five children, her brother and his five children.  In all, there were 25 people

in the household with four bedrooms.  At the same time, Ms. Dhirane's cousin, whom Ms.

Dhirane had not seen in 20 years, and her children visited from Canada.  Ms. Dhirane loved the

interaction amongst the family members.  She had missed this communal living in the United

States.  She stated that the women did all the work, that is, the cleaning and the cooking and that

they talked all night long.

Rashid sent money regularly for expenses.  He also sent money to buy a piece of land

with his sister, Khadra, and another friend who lived in Minnesota.  The land is located in

Boorama and Ms. Dhirane and Rashid hope to one day build a small house on the land and return

to live in Somaliland.  Rashid also sent money for other family members to include Ms.

Dhirane's sister, brother, and cousin.

While living in Hargeisa, Ms. Dhirane became acquainted with her mother's cousin's

daughter, Hodan Ismail Hassan.  Through Hodan, Ms. Dhirane met a friend, Fawsia, who took

Koran classes with Ms. Dhirane.  Ms. Dhirane worked with Hodan and Fawsia and a group to

which they belonged, Miskenkalkal, "Poor Helpers."  They worked together to collect donations

of money, rice, flour and any other food they could find.  Ms. Dhirane had a car while in

Hargeisa and she was able to reach families farther away from town. She herself donated money

30

to the group every month.

Ms. Dhirane met Barira Hassan Abdullahi, a named coconspirator, through her cousin, Hodan.  Barira lived in Hargeisa and owned a small shop where she sold clothing and bought gold from people.

Later, Barira was to discuss with Ms. Dhirane the fact that she was deeply in debt.  She took a $10,000 loan from Telesom, a major communications company in Somalia, and was required to repay the sum of $1,540 per month.  She used the large sum to pay down some of her more pressing debts.  At one point, she asked Ms. Dhirane and co-defendant, Muna Jama to send money to her so that she could repay Telesom.

### (e).     Return to Seattle, Washington Area

On January 23, 2012, Ms. Dhirane traveled with her six children back to the Seattle, Washington area.  They arrived January 24, 2012.  Upon her return to Washington, Ms. Dhirane enrolled her children in school and again became a housewife.  She was very interested in continuing her Koran studies.  She did so through various websites to include Pal Talk.  In Pal Talk, she met a group of women including three of the co-defendants who met on a monthly basis partially for the purpose of raising money. Some of the money which they raised went to Abu Zeinab who lectured about the Koran before there was a computer malfunction.

Ms. Dhirane and Rashid also sent money to a widow with children in Mogadishu of whom they had learned in Pal Talk in 2007.  (They sent her approximately $50 every month between 2007 and 2012.)  They also sent money to another woman, Amina Abdiraxman, whose name they had gotten from Pal Talk.

Not only did Ms. Dhirane raise money in the chatroom because the Koran required all

persons of the Muslim faith to do charity, she also attended the chatroom group because she liked being in the company of other like-minded Muslim women.  The women studied the Koran, they did charity work, and they had all been through the difficulties of fleeing wartime, immigrating to other countries, settling in cultures foreign to their own.  The women who came together in the chatroom were all Somalis, but lived in many different countries.

### (2).      Considering the history and characteristics of the defendant.

Once can look at the fact that Ms. Dhirane's life was difficult because she was a refugee in Somaliland, Somalia, Ethiopia, Kenya, Yemen and the United States.  Her siblings are disbursed all over the world.

Ms. Dhirane experienced frustration as she watched the governments of Somalia engage in corruption and fraud.  Ms. Dhirane truly believed that Al Shabaab was the only organization that could bring the country to Sharia law and lead Somalia without engaging in corruption.

Ms. Dhirane is 47 years old.  She is the wife of Rashid Burhadle and together they have six children.  Mr. Burhadle works many hours a week driving a taxi to support the family.  While much of the time during their marriage Ms. Dhirane had been a stay-at-home mother, she worked as an airport shuttle driver for more than two years, often working double shifts.  (Attached are a letter from Rashid Burhadle and letters from friends and family.)

Ms. Dhirane was arrested on July 23, 2014, and released on July 29, 2014, to Pretrial Services supervision.  She was remanded to custody on October 25, 2016.  During the more than two years she was on Pretrial Services supervision, she complied with all conditions of supervision.

32

Since her incarceration at the Alexandria City Jail, Ms. Dhirane has attended a number of classes: preparation to take the GED, mindfulness or meditation classes, and knitting classes in which the knitted products are donated to hospitals. She attends weekly lectures which vary from drug awareness to self-improvement.  She will be attending a culinary arts program, the goal of which is to prepare inmates for jobs in the culinary industry.  (Attached is Ms. Dhirane's Certificate of Achievement.)

> **(c).     The sentence will adequately and reasonably reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.  The sentence will afford adequate deterrence to criminal conduct and will adequately and reasonably protect the public from further crimes of the defendant.**

A variance sentence substantially below the advisory guideline range will provide a just punishment and will adequately and reasonably reflect the seriousness of Ms. Dhirane's offense. She is a 47 year old housewife with six children ranging in age from 5 through 22, all of whom live at home and are devastated by her incarceration.  Her husband drives a taxi or Uber to support the family.  Ms. Dhirane and other women met in a chatroom and sent a few thousand dollars overseas in an effort to support Al Shabaab.  Ms. Dhirane did not attempt to travel overseas to join Al Shabaab and did not attempt to commit or incite any terrorist acts on behalf of Al Shabaab in the United States.  During her two years of pretrial supervision, Ms. Dhirane followed all the directions given to her by the pretrial office.  There is little or no chance that Ms. Dhirane will commit any future crimes or terrorist acts.  A variance sentence promote respect for the law and will afford adequate deterrence for and protect the public from any future criminal conduct by Ms. Dhirane.

**(d).    The sentence is necessary to provide the defendant with needed educational training, medical care, and other correctional treatment in the most effective manner.**

Ms. Dhirane has taken advantage of the educational and training programs in the Alexandria Detention Center during her incarceration.  Ms. Dhirane has taken classes to obtain her GED, taken mindfulness or meditation classes and knitting classes with the knitted products being donated to local hospitals.  She attends lectures which vary from drug awareness to self-improvement.  She plans to attend a culinary arts program which prepares inmates for employment in the culinary industry.

Ms. Dhirane plans to take advantage of education and vocational training offered by the BOP.

**(e).    Types of sentences available.**

There is little support that the length of a sentence pays any role in specific deterrence to others.  "Here, the findings are uniformly negative: there is no evidence that increases in sentence length reduces crime through deterrence." Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime and Justice: a review of Research, 28-29 (2006). In a study of specific deterrence, involving federal white collar offenders in the pre-guideline era, no difference in deterrence was found between probation and imprisonment.  David Weisbrud, et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes,* 33 Criminology 587 (1995).

Not surprisingly, studies confirm that it is the certainty of punishment, not its length which has any deterrent value. See Andrew Von Hirsch, et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999).  *See also* "United States

34

Sentencing Commission studies on recidivism; Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines" (May 2004), www.ussc.gov/publicat/Recidivism_General.pdf, and "Recidivism and the First Offender" (May2004), www.ussc.gov/publicat/ Recidivism FirstOffender.pdf.  The Sentencing Commission has discovered that lower rates of recidivism are associated with age, stable employment, marriage, nonviolent offenses, and first offense.

The guidelines calculated by the probation office suggest a term of incarceration beyond the maximum sentence of 180 months for this offense.  The guidelines without the enhancements calls for a term of incarceration of 63-78 months.  There is no mandatory minimum term of incarceration.  As noted above, the Court may impose a downward departure or variance sentence of less than 180 months and Ms. Dhirane asks the Court to consider such a sentence.  Ms. Dhirane asks the court to recommend placement in a BOP facility as close to her family in Seattle, Washington as possible.

> **(f).  Whether the sentence will create an unwarranted disparity between the defendant and others with similar records who have been found guilty of similar conduct.**

Defendants in the Eastern District of Virginia who have been sentenced for similar charges have received downward departures or variance sentences:[17]

### *United States v. Qamar*, 1:16cr227 (E.D. Va. 2017)

Qamar pleaded guilty to attempting to provide material support to ISIL.  Qamar planned to travel overseas to join ISIL but he plan was thwarted when his parents refused to

---

[17]Other case pending sentencing are *United States v. Wehelie* which is scheduled for sentencing on March 17, 2017; *United States v. Khaweis* which is scheduled for trial on May 3, 2017; *United States v. Young* which has not been scheduled for trial; *United States v. Niknejad* in which there is an outstanding warrant for the defendant.

give him his passport.  Subsequently, Qamar purchased and assisted in the purchasing of

Google Play Cards to be used by ISIL to contact and assist potential recruits in joining ISIL.

Qamar also assisted in taking photographs of Washington, D.C. locations and landmarks

including the Pentagon, Arlington Cemetery, the Marine Corps Memorial for a propaganda

video to be aired by ISIL.  Qamar's guidelines after the application of § 3A1.4 and a

reduction for acceptance of responsibility was level 35, criminal history category VI (292-

365 months).  The government sought the statutory maximum sentence of 240 months and

Farrokh sought a sentence of 63-78 months.  After considering the § 3553(a) factors and

determining that the criminal history category was overstated, the court sentenced Qamar to

a variance sentence of 102 months.

### *United States v. Jalloh*, 1:16cr163 (E.D. Va. 2017)

Jalloh pleaded guilty to attempting to provide material support to ISIL.  Jalloh came

into contact with an individual who Jalloh knew to be an ISIL figure plotting attacks on

United States soil.  Jalloh was arrested after purchasing an AR-15 firearm which he believed

would be used in an attack on United States soil.  Jalloh, a former member of the Army

National Guard, also attempted to join ISIL while in Africa and, on numerous occasions

provided ISIL with money.  In addition to the enhancement pursuant to U.S.S.G. § 3A1.4,

Jalloh received an enhancement pursuant to § 2M5.3(B)(1)(E) for providing ISIL with funds

resulting in a level 37, criminal history category VI (360-life).  The government sought the

statutory maximum sentence of 240 months and Jalloh sought a sentence of 78 months.

After considering the § 3553(a) factors and determining that the criminal history category

was overstated, the court sentenced Jalloh to a variance sentence of 132 months.

**United States v. Farrokh**, 1:16cr20 (E.D. Va. 2016)

Farrokh pleaded guilty to attempting to provide material support to ISIL by providing personnel.  Farrokh and Mahmoud Amin Mohamed Elhassan[18] planned to travel overseas to Syria to join ISIL.  Farrokh lied when questioned by the FBI about his activities and also lied in the grand jury.  Farrokh's guidelines after the application of U.S.S. G. § 3A1.4 and a reduction for acceptance of responsibility were level 35, criminal history category VI (292-365 months).  The government sought the statutory maximum sentence of 240 months and Farrokh sought a sentence of 63 months.  The Court concluded that Farrokh's criminal history category was over represented and after taking into consideration Farrokh's prior criminal history reduced his criminal history category from VI to II.  After considering the § 3553 factors, the Court to sentenced Farrokh to a variance sentence of 102 months.

**United States v. Amin**, 1:15cr164 (E.D. Va. 2015)

Amin pleaded guilty to attempting to provide material support to ISIL.  Amin attempted to set up a substantial revenue stream for ISIL through the use of bitcoins by creating a "Dark Wallet."  Amin also facilitated an individual's travel to Syria to join ISIL.  The government noted that Amin "was a prolific source of support, sophisticated advice, and facilitation of would-be ISIL members all over the world" and Amin's "conduct online and in person was well-considered, sophisticated and calculated to support ISIL. . ."  Amin's guidelines after the application of U.S.S. G. § 3A1.4 and a reduction for acceptance of responsibility was level 35, criminal history category VI (292-365 months).  The government recommended the maximum sentence at that time of 180 months and Amin sought a sentence

---

[18]Elhassan is scheduled to be sentenced in this Court on February 24, 2017.

of 75 months.  After considering the § 3553(a) factors, the court sentenced Amin to a variance sentence of 136 months

### United States v. Benkahla, 501 F. Supp. 2d 748, 759 (E.D. Va 2007)

Benkahla lied to the FBI and a federal grand jury about traveling to Pakistan and Afghanistan to train in jihad training camps where he received training in the use of automatic weapons and grenade launchers.  Bekahla proceeded to trial and was convicted of all counts.  At sentencing, the Court determined that it had the authority to depart downward or to impose a variance sentence.  Based on the Court's assessment that Benkahla had not committed any other illegal act in his life and had no criminal history, the Court found that Benkahla's criminal history category VI was overstated.  The Court proceeded to depart downward and, alternatively, held that the § 3553(a) factors required the imposition of a variance sentence.  The Court proceeded to impose a sentence of 121 months.

Defendants in other districts have also been sentenced to variance sentences for violations of § 2339.

### United States v. Wolfe, 1:14 cr213 (W.D. Tex. 2014)

Wolfe pleaded guilty to attempting to provide material support to ISIL in violation of 18 U.S.C. § 2339A.  Wolfe planned to travel to Syria with his wife and children to join ISIL. Wolfe made preparations to travel by raising funds to travel to Syria, purchasing a plane ticket to Turkey and obtaining certifications for his family's birth certificates to facilitate travel.  The court documents except the criminal information and judgment are sealed.  The court sentenced Wolfe to 82 months.

### United States v. Mohamed Warsame, 651 F. Supp. 2d 978 (D. Minn. 2009)

38

Mohamed Warsame pleaded guilty to providing material support to Al Qaeda in violation of 18 U.S.C. § 2339B.  Warsame attended Al Qaeda training camps in Afghanistan and intended to bring his family to join him but was told by Osama bin Laden that with his Canadian passport he could be of more value to Al Qaeda by returning to the West. Warsame's guidelines after the application of U.S.S. G. § 3A1.4 and a reduction for acceptance of responsibility was level 35, criminal history category VI (292-365 months). The government sought a variance sentence of 150 months from the statutory maximum sentence at that time of 180 months and Warsame sought a variance sentence of 67 months. After considering the sentences in dozens of other terror-related cases, the court sentenced Warsame to 92 months.

### *United States v. Abdirizak Warsame,* **16cr37 (D. Minn. 2016)**

Abdirizak Warsame was charged with conspiracy to provide material support to a terrorist organization in violation of 18 U.S.C. § 2339B.  Warsame was the emir of a group who at least on three occasions attempted to send persons to Syria to join ISIL.  After his arrest, Warsame cooperated with the government and testified against those who went to trial.  The government filed a § 5K1.1 motion for a downward departure for Warsame requesting a sentence of 54 months and the Warsame asked for a sentence of 18 months.  The court sentenced Warsame to 30 months.

### *United States v. Abdullahi Mohamud Yusuf*, **15cr46 (D. Minn. 2016)**

Abdullahi Yusuf was involved in the conspiracy with Abdirizak Warsame and was charged with conspiracy to provide material support to a terrorist organization in violation of 18 U.S.C. § 2339B.  Yusuf also cooperated and testified at trial.  The government asked for a

sentence of 42 months and Yusuf asked for a sentence of 18 months time served.  The court sentenced Yusuf to 18 months time served.

### *United States v. Abdifatah Yusuf Isse*, 09cr50 (D. Minn. 2013)

Abdifatah Isse was involved in a conspiracy involving providing personnel to a terrorist organization, Al Shabaab, and was charged with conspiracy to provide material support to a terrorist organization in violation of 18 U.S.C. § 2339A.  Isse cooperated and testified at the trial of others involved in the conspiracy.  The government submitted a 5K1.1 motion under seal.  The court sentenced Isse to 36 months.

### *United States v. Salah Osman Ahmed*, 09cr50 (D. Minn. 2013)

Salah Ahmed was involved with Abdifatah Isse in the Al Shabaab conspiracy. Ahmed also cooperated and the government filed a 5K1.1 motion.  The court also sentenced Ahmed to 36 months.

### *United States v. Avin Marsalis Brown*, 5:14cr58 (E.D. N.C. 2016)

Avin Brown was charged with conspiracy to provide material support to a terrorist organization in violation of 18 U.S.C. § 2339A.  Brown claimed that a friend was hurt in Syria and Brown wanted to join the fighting.  He planned to travel to Syria to join ISIL.  The court documents are sealed except for the court's judgment.  The court sentenced Brown to 92 months.

### *United States v. Nima Ali Yusuf*, 3:10cr4551 (S.D. Ca. 2013a)

Yusuf was convicted of conspiracy to provide material support to Al Shabaab in violation of 18 U.S.C. § 2339B.  Yusuf had sent money to support Al Shabaab and then lied to FBI agents.  Yusuf was sentenced to 96 months.

There have also been defendants who have been allowed to plead guilty to provisions other than § 2339A or B for providing material support.

**United States v. Heather Elizabeth Coffman, 3:15cr16 (E.D. Va. 2015)**

Coffman pleaded guilty to providing a false statement involving international terrorism in violation of 18 U.S.C. § 1001(a).  Coffman is a case where the government did not charge a violation of 18 U.S.C. § 2339 but rather a significantly lesser offense of §1001 false statement which carried a maximum of 96 months for a case involving international or domestic terrorism.  Coffman attempted to assist a foreign national living outside the United States to travel to Syria to join ISIL.  Coffman also attempted to assist an FBI CI to travel to Syria to join ISIL.  When confronted by the FBI, Coffman made false statements to protect the individuals.  The parties agreed not to seek a sentence outside the recommended guideline range of 46-57 months, the government seeking a sentence of 57 months and Coffman seeking a sentence of 46 months.  The court sentenced Coffman to 54 months.

**United States v. Mohamad Saeed Kodaimati, 3:15cr1298 (S.D. Ca. 2016)**

Saeed Kodaimati was charged with false statements involving international terrorism in violation 18 U.S.C. § 1001.  Saeed Kodaimati made false statements to the FBI regarding his involvement with ISIL while in Syria  The court documents are under seal.  The court sentenced Saeed Kodaimati to 96 months.

**Abdul Rhaeem Habil Ali-Skelton, 16cr77 (D. Minn. 2016)**

Ali-Skelton made false statements to FBI agents concerning his involvement with ISIL recruiters in Great Britain in violation of 18 U.S.C. § 1001.  After making the false statements, Ali-Skelton was arrested by local police after making terroristic threats at a

Walgreens store.  Ali-Skelton pleaded guilty in state court to making terroristic threats.  He was subsequently charged with a violation of § 1001 in federal court.  Because the case involved international or domestic terrorism, the statutory maximum was 96 months.  The guidelines with the enhancement was level 29, criminal history category VI, 151-188 months.  The court sentenced Ali-Skelton to a variance sentence of 38 months.

### *United States v. Shannon Conley,* 1:14cr163 (D. Co. 2014)

Conley joined U.S. Army Explorers to learn military training and skills which she intended to use while fighting for ISIL in Syria with a friend she met online.  Conley was allowed to plead to a § 371 conspiracy charge referencing § 2339B and was sentenced to 48 months by the court.

The government sought sentences at the statutory maximum of 15 or 20 years for nearly all of these cases but, after considering the § 3553 factors, the courts determined that a substantial downward departure or variance sentence was warranted in imposing its sentence.  In a number of cases, the government permitted the defendant to plead to an offense other than§ 2339A or B which substantially reduced their guidelines and, ultimately, their sentence.  Those who cooperated with the federal government received time served or relatively short sentences for their offenses.

While there is a fairly wide range of sentences in these cases, the court, in all these cases, granted a substantial downward departure or variance.

Ms. Dhirane asks the Court, after taking into consideration the sentences given in other cases and reviewing the § 3553(a)factors, to substantially depart downward or impose a substantial variance sentence in her case.

III.      **CONCLUSION**

Ms. Dhirane respectfully requests that, for all the above reasons, this Court impose as

a variance sentence substantially lower than those defendants who intended to harm the

United States, or intended to provide personnel to a terrorist organization or provided

substantial funds to a terrorist organization.

Respectfully submitted,

Hinda Osman Dhirane
By Counsel

_____/s/_____
Alan H. Yamamoto VSB #25872
Attorney for Hinda Osman Dhirane
Law Offices of Alan H. Yamamoto
643 S. Washington Street
Alexandria, Virginia  22314
Phone:  (703) 684-4700
Fax: (703) 684-6643
yamamoto.law@verizon.net


Paula Semmes Deutsch
Washington Bar No. 23949
The Federal Public Defender Office
1601 Fifth Avenue, Suite 700
Seattle, Washington  98101
Phone: (206) 553-1100
Fax: (206) 553-0120

Attorneys for Hinda Osman Dhirane

<u>CERTIFICATE OF SERVICE</u>

I certify that on the 20th day of February 2017, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

James P. Gillis, Esquire
U.S. Attorney's Office
2100 Jamieson Avenue
Alexandria, VA  22314

A copy of the foregoing will be emailed to

Kelly M. Smihal
U.S. Probation Office
401 Courthouse Square
Alexandria, Virginia

_____/s/_____
Alan H. Yamamoto VSB #25872
Attorney for Hinda Osman Dhirane
Law Offices of Alan H. Yamamoto
643 S. Washington Street
Alexandria, Virginia  22314
Phone:  (703) 684-4700
Fax: (703) 684-6643
yamamoto.law@verizon.net

44