1                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
2                        ALEXANDRIA DIVISION

3   UNITED STATES OF AMERICA,    )  Case 1:14-cr-00230
                                 )
4                 Plaintiff,     )
                                 )
5        v.                      )  Alexandria, Virginia
                                 )  October 12, 2016
6   MUNA OSMAN JAMA,             )  10:07 a.m.
    and                          )
7   HINDA OSMAN DHIRANE,         )
                                 )
8                 Defendants.    )  Day 6
                                 )  Pages 920 - 1012
9

10                      TRANSCRIPT OF TRIAL

11           BEFORE THE HONORABLE ANTHONY J. TRENGA

12              UNITED STATES DISTRICT COURT JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25        COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

1  APPEARANCES:

2  FOR THE PLAINTIFF:

3       JAMES P. GILLIS, ESQUIRE
        DANYA E. ATIYEH, ESQUIRE
4       OFFICE OF THE UNITED STATES ATTORNEY
        2100 Jamieson Avenue
5       Alexandria, Virginia   22314
        (703) 299-3700
6
   FOR DEFENDANT MUNA OSMAN JAMA:
7
        WHITNEY E.C. MINTER, ESQUIRE
8       GEREMY C. KAMENS, ESQUIRE
        OFFICE OF THE FEDERAL PUBLIC DEFENDER
9       1650 King Street, Suite 500
        Alexandria, Virginia   22314
10      (703) 600-0800

11 FOR DEFENDANT HINDA OSMAN DHIRANE:

12      ALAN H. YAMAMOTO, ESQUIRE
        LAW OFFICE OF ALAN YAMAMOTO
13      634 South Washington Street
        Alexandria, Virginia   22314
14      (703) 684-6643

15      PAULA S. DEUTSCH, ESQUIRE
        OFFICE OF THE FEDERAL PUBLIC DEFENDER
16      1601 Fifth Avenue, Suite 700
        Seattle, Washington  98101
17      (206) 553-1100

18 THE DEFENDANT, MUNA OSMAN JAMA, IN PERSON

19 THE DEFENDANT, HINDA OSMAN DHIRANE, IN PERSON

20 MARYAM ABDI, SOMALI INTERPRETER

21

22

23

24

25

922

1                              **I N D E X**

2                                                         PAGE

3   Closing Argument by Mr. Gillis                        926

4   Closing Argument by Mr. Kamens                        959

5   Closing Argument by Ms. Deutsch                       991

6   Rebuttal Argument by Mr. Gillis                       1007

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              THE CLERK:  Criminal Case 1:14-230, *United*

2 *States of America v. Muna Osman Jama and Hinda Osman*

3 *Dhirane*.

4              Will counsel please identify themselves for

5 the record.

6              MR. GILLIS:  Good morning, Your Honor.  Jim

7 Gillis for the United States with Danya Atiyeh.  We

8 also have at table with us Special Agent C.J. Goodman

9 and, of course, the lead agents on the case, Wayne

10 Sharp and Kate Holden, also at the FBI.

11             THE COURT:  All right.  Welcome.

12             MR. GILLIS:  Thank you.

13             MR. KAMENS:  Good morning, Your Honor.

14 Geremy Kamens and Whitney Minter on behalf of Ms. Jama.

15 We also have Joseph Boyd, a paralegal, who just stepped

16 out to make a copy, but he will also be sitting with

17 us.

18             THE COURT:  Good morning.

19             MR. YAMAMOTO:  Good morning, Your Honor.

20 Alan Yamamoto along with Paula Deutsch and Paralegal

21 Donna Maxwell.

22             THE COURT:  All right.  Welcome to everybody.

23 We're here for oral argument on the evidence both by

24 way of closing statement and also a pending Rule 29

25 motion.

1          Before we begin, let me ask Mr. Kamens,

2    Mr. Yamamoto, Ms. Minter, and Ms. Deutsch whether you

3    have any reaction or position with respect to the

4    latest pleading by the government in terms of

5    procedurally how the Court should deal with the Rule 29

6    motion.

7          MR. KAMENS:  We do, Your Honor, on behalf of

8    Ms. Jama.  The Court has three opportunities -- or

9    there are three times at which a Rule 29 can be

10   addressed by the Court, at the close of the

11   government's case, at the close of all the evidence, or

12   following a verdict.

13         As for timing under Rule 29(b), the Court can

14   reserve its ruling on the Rule 29 motion and give the

15   case or issue a verdict, but Rule 29(b) does say that

16   the Court must decide the Rule 29 motion on the basis

17   of evidence at the time that the Court reserved its

18   decision.  So at least the rule is very clear about

19   that, that it doesn't affect whether the Court issues a

20   verdict or not.  It doesn't affect the Court's initial

21   evaluation of the Rule 29 that the Court reserved on.

22         We think it makes sense to start with legal

23   principles regardless of how the Court wishes to

24   prioritize the decisions in this case because the legal

25   principles provide the framework for evaluating the

1  factual evidence.

2          In other words, it doesn't make sense to

3  issue a verdict without addressing the legal questions,

4  such as what is a foreign terrorist organization, what

5  constitutes its membership, and what is material

6  support.  Those questions directly affect the

7  evaluation of the facts.  So we ask the Court to

8  consider those legal principles before issuing a

9  verdict.

10          THE COURT:  Within the context of a ruling on

11 a Rule 29 motion or within the context of the Court's

12 verdict?

13          MR. KAMENS:  Well, I think that the Court has

14 to address those legal questions for both.

15          THE COURT:  Right.

16          MR. KAMENS:  That is, that they're directly

17 relevant to the Rule 29, and they're directly relevant

18 to the verdict.

19          Essentially, we're dealing in this case with

20 standards.  So the Rule 29 question is does the

21 Court -- does it find that a reasonable fact finder on

22 the Rule 29 must have doubt that these defendants

23 provided money to the al-Shabaab organization.  Based

24 on the government's evidence at the close of their

25 evidence, must a reasonable fact finder have doubt?

1  The question for the verdict is simply is there some

2  reasonable doubt that the defendants provided material

3  support, in this case money, to the al-Shabaab

4  organization.

5          THE COURT:  All right.  Mr. Yamamoto,

6  anything you'd like to add?

7          MR. YAMAMOTO:  Nothing, Your Honor.

8          THE COURT:  Mr. Gillis, anything more you

9  want to say on that motion?

10          MR. GILLIS:  No, Your Honor.

11          THE COURT:  All right.  What I'm going to do

12  is I'd like to have argument on both, what would

13  constitute a Rule 29 and also closing statement.  The

14  Court will decide how to proceed.  My inclination at

15  this point is to reserve until after the Court makes a

16  determination as to the merits of the case and issues

17  of verdict and then take up, if necessary, the Rule 29

18  motion.  I'll make a final decision before we adjourn

19  today.

20          All right.  Let me begin with the government.

21                    CLOSING ARGUMENT

22          MR. GILLIS:  Thank you, Your Honor.

23          Much has been said in probably nearly 200

24  pages that we filed, Your Honor, and I don't want to

25  rehash all of that.  I trust, obviously, that the Court

1  has read those thoroughly.  I would like to just focus

2  on a few matters, and then if the Court has any

3  questions, I can attempt to answer those.

4            THE COURT:  All right.

5            MR. GILLIS:  First of all, with respect to

6  the question of whether it was merely medicine that was

7  being provided, as we say, legally, that's irrelevant

8  here because clearly they did not provide medicine

9  under any circumstances.  None of this indicates

10  anything about either of the defendants traveling to

11  provide medicine to anyone.  Obviously, they were

12  providing money, and that's exactly what the defense

13  has acknowledged in their pleadings.  However, it is

14  also clear that they did not just provide money.

15            THE COURT:  Let me ask you a question:  At

16  what point in time is the support to be characterized?

17            MR. GILLIS:  I beg your pardon?

18            THE COURT:  At what point in time is the

19  nature of the support to be characterized?  Is it at

20  the time of the initial contribution, if you will, or

21  is it based on what was actually received by the

22  terrorist organization, however you define that

23  concept, and then you trace back to what caused that

24  material support to be provided?

25            So does the inquiry end with, in this case,

1   the delivery of money in the first instance to the

2   first person to receive it, or does the analysis

3   require consideration of what, in fact, ended up being

4   provided to the organization, what was the nature of

5   that, and then who provided it, in what fashion, and

6   whether the connection is sufficient?

7            MR. GILLIS:  Well, Your Honor, on the facts

8   of this case, we would say both, but the statute says

9   whoever knowingly provides material support or

10  resources to a foreign terrorist organization.

11           So it would be necessary for the substantive

12  counts -- at least for the substantive completed counts

13  as opposed to the inchoate attempt aspect of this case,

14  it would be necessary for us to show that it made it to

15  al-Shabaab.  We submit that once it made it to Fardowsa

16  Jama Mohamed on the Nairobi side and once it reached

17  Barira Hassan Abdullahi on the Hargeysa side, because

18  of their relationship to al-Shabaab, that was reaching

19  al-Shabaab.

20           THE COURT:  That was money in your view?

21           MR. GILLIS:  It's all money, Your Honor.

22  This case is about money.  It's not about medicine, and

23  it's not about providing personnel.  It's just money

24  provided by these two defendants with the intent of it

25  reaching al-Shabaab.

1          THE COURT:  Under that analysis, those

2 individuals who you mentioned would need to constitute

3 the organization for purposes of the statute?

4          MR. GILLIS:  For purposes of the statute,

5 Your Honor --

6          THE COURT:  The substantive counts.

7          MR. GILLIS:  For the substantive counts, if

8 that were as far as it went, then I would submit, yes,

9 we'd have to prove that they were a part of al-Shabaab.

10 This member issue that's been raised, we submit, is a

11 question of law and not so much one of fact.  Because,

12 as the cases say, the meaning of what an organization

13 is is somewhat elastic when we're talking about a

14 criminal organization, and it's clearly not limited

15 only to those RICO cases or VICAR cases.  The court

16 speaks about the elasticity of the membership in a

17 criminal organization.

18          THE COURT:  Well, what would be your working

19 definition that you would urge the Court to use in

20 terms of what constitutes the organization and who is

21 part of the organization?

22          MR. GILLIS:  Well, as we said in our brief,

23 Your Honor, I would say that it is those who are

24 working, in this context, who are forwarding money to

25 al-Shabaab knowing that that's where the money is going

1  to be going.  So what constitutes al-Shabaab in this

2  instance would be the safe houses being used by

3  al-Shabaab fighters and by those who are wounded and

4  those who are fighting in the Golis mountains and those

5  who are part of the organization that finances those

6  activities.  And because these women were part of the

7  financing of those organizations, that makes them fall

8  within the ambit of the organization.

9           THE COURT:  Well, under that

10 conceptualization, would you consider the group of 15,

11 that is the smaller group of the chat room, part of

12 al-Shabaab?

13          MR. GILLIS:  Some of them would be, Your

14 Honor.  As the evidence shows, they had a very close

15 connection to al-Shabaab.  As you heard testimony from

16 Mr. Bryden, some of them by their statements indicated

17 that they were in very closely with the central core of

18 al-Shabaab, including --

19          For example, one of the transcripts talks

20 about how -- I think it was Umu Camaar.  But she had

21 received information from someone before it became

22 public of this split between Godane and the other

23 three, including Fu'aad and those others.  But there

24 was clearly inside information that she had that she

25 heard from a brother, and she specifically asked Jama

1  and Dhirane not to reveal this until it came out

2  publicly.  And so in that instance, she's someone who's

3  clearly close to the core of the al-Shabaab leadership.

4          The same is true for Ayan Jama Warsame, who,

5  as Mr. Bryden testified, based upon her location at the

6  time being in an al-Shabaab-controlled area and based

7  upon the fact that she was able to speak with those who

8  were right in the attack of the courthouse, that that

9  kind of contact, close association with the central

10  part of al-Shabaab, all the indices of that being the

11  case with respect to her indicates that she is part of

12  the al-Shabaab organization whether you characterize

13  that as a member or a financier or however.

14          But we would not contend, Your Honor, that

15  every one of them was similarly situated.

16          THE COURT:  Well, where is the dividing line?

17  What I'm hearing you say is that anyone who is acting

18  on behalf of or in furtherance of the purposes of

19  al-Shabaab would be considered sufficiently associated

20  with al-Shabaab to constitute al-Shabaab for the

21  purposes of the statute.

22          MR. GILLIS:  Well, I would submit, Your

23  Honor, that it is a fact-based -- it would have to be a

24  fact-based determination, and that's what the cases

25  have said.

1           THE COURT:  Right, but fact based as to what
2  operative principle?
3           MR. GILLIS:  Well, for example, one who
4  knowingly provides $100 to go to al-Shabaab knowing
5  that it's going to al-Shabaab and having the requisite
6  knowledge of its terrorist activities, etc.  One who
7  submits one $100 payment, I would submit, is not --
8  factually would not be a member of al-Shabaab.  They
9  certainly would be guilty of violating 2339B, but
10  factually based, I would submit that that person
11  probably is not a part of the al-Shabaab organization.
12           As we said in our papers, we do believe that
13  Jama and Dhirane, as fairly characterized in the
14  evidence, certainly were a part of al-Shabaab because
15  of their concerted effort to not only send significant
16  sums of money over a long period of time but the
17  lengths to which they went to recruit others and to
18  keep track of the money that was being sent and to
19  ensure that people were keeping up with their monthly
20  payments.  That really is the role of a financier.  She
21  was providing money to presumably a larger financier
22  when she's sending it to the Hargeysa side.
23           But along that spectrum, Your Honor, I would
24  submit that certainly when they get around to sending
25  the money upstream to the people in Hargeysa and

 1  Nairobi, they're reaching the organization.  And so --
 2          For example, with the Nairobi side, Umu
 3  Camaar or Fardowsa Jama Mohamed with respect to that,
 4  even if you took the facts as the defendant concedes
 5  they establish, she was running two safe houses.  And
 6  that's not only from the testimony of Ms. Esse, but
 7  that's also corroborated by the transcript in which
 8  they're talking about $600 being received by Fardowsa
 9  and that that money has to be paid to the infidels for
10  the rent on the two houses that are rented.  These are
11  the words of the defendants themselves.
12          And so for someone who is running two safe
13  houses, one of which is being used as a staging area to
14  store ammunition and to ready fighters for the next
15  battle and another that's being used to treat the
16  al-Shabaab wounded so that they can go back and
17  continue to fight, someone who's doing that is clearly
18  part of the organization.
19          And so on this spectrum of this fact-based
20  analysis, I would submit that she clearly is -- I mean,
21  how much closer could one get unless you're saying that
22  it has to be Godane, who's the head of the
23  organization?  Obviously, they have a lot of operations
24  that they're conducting that Godane knows nothing
25  about.

```
1              THE COURT:  So from your perspective, on the
2    Nairobi side, it was Fardowsa who was the organization,
3    correct?
4              MR. GILLIS:  Yes, Your Honor.
5              THE COURT:  And who else?  Hassan?
6              MR. GILLIS:  And, Your Honor, beyond her.
7    Because, obviously, the defendants knew that the money
8    was going to Fardowsa and then on to the safe houses
9    for the rent for the safe houses and that it was being
10   received for the rent on the safe houses.  So those
11   facilities belong to al-Shabaab.  There's no other way
12   to characterize what those two safe houses are.
13             THE COURT:  All right.
14             MR. GILLIS:  So even if the Court didn't
15   regard Fardowsa as al-Shabaab, certainly by the time
16   the money reaches the safe houses, whoever is running
17   those safe houses, it's clearly al-Shabaab assets there
18   and al-Shabaab fighters that are using it.
19             THE COURT:  All right.  So it was Fardowsa on
20   the Nairobi side, and then on the Hargeysa side, it was
21   Abdullahi?
22             MR. GILLIS:  That's correct, Your Honor.
23   That was Barira Hassan Abdullahi.
24             Similarly with her, Your Honor, she is
25   providing money to the brothers in the mountains.
```

1   Based upon all the testimony not only from Ms. Esse

2   about what that meant, which was the al-Shabaab

3   fighters in the Golis mountains, but also from the

4   defendants' own conversations after they were reading

5   articles about, for example, Sheikh Mumin, this emir

6   who was one of the leaders of the organization in the

7   mountains, they're closely following that activity.

8   And in the context of that, they talk about the

9   brothers in the mountains.

10          But also, Mr. Bryden with his intimate

11  familiarity with al-Shabaab, with Somalia, with the

12  geography of Somalia, with the events that were taking

13  place at that time, as well as his expertise from

14  having been involved in decoding this veiled speech

15  that he referred to, that too, he said, referred to

16  al-Shabaab.

17          THE COURT:  Let me just back up.

18          MR. GILLIS:  Yes, sir.

19          THE COURT:  With respect to the Hargeysa

20  side, none of the substantive counts allege any

21  payments from either of these defendants to Abdullahi,

22  correct?

23          MR. GILLIS:  Well, actually, Jama had --

24  pardon me.  Jama had Esse send money to Ifrah Abdi

25  Bashir, who was the conduit for money going ultimately

 1   to Abdullahi.  So certainly she did.

 2           THE COURT:  Well, I'm just looking at the

 3   substantive Counts 2 through 21 as alleged in the

 4   superseding indictment.

 5           MR. GILLIS:  Well, in terms of the

 6   substantive counts?

 7           THE COURT:  Yes, substantive counts.

 8           MR. GILLIS:  We did not have venue for any of

 9   those counts, Your Honor, because those that were paid

10   were outside of the Eastern District.  We've alleged

11   them as overt acts in furtherance of the conspiracy.

12           THE COURT:  All right.  So you're saying that

13   they're not charged with the substantive counts in

14   Counts 2 through 21?

15           MR. GILLIS:  That those particular -- may I

16   have a moment, Your Honor?

17           THE COURT:  Yes.

18           MR. GILLIS:  Your Honor, I've been reminded.

19   Again, there are the two payments that Jama

20   orchestrated through her father that were clearly

21   intended to go to Barira Hassan Abdullahi.

22           THE COURT:  That's not alleged in the

23   superseding indictment, is it, as a substantive count?

24           MR. GILLIS:  I believe it is, Your Honor.  If

25   I may, Your Honor.

1            Yes, Your Honor.  Count 18 is based upon a

2  payment from Jama to Osman Jama, her father, and

3  Count 21 is based upon a payment from Jama to her

4  father again.

5            THE COURT:  Those counts, then, are based on

6  the evidence that those payments then were passed on to

7  Bashir or Abdullahi?

8            MR. GILLIS:  One of the three, Your Honor.

9  Either Ifrah Abdi Bashir or Hodan or to Barira Hassan

10  Abdullahi.  They refer to Hassan and Hodan going to the

11  father to retrieve the money and from him asking a

12  number of questions that made them nervous on a couple

13  of different occasions.  He ultimately turned the money

14  over to them.  But in the context of that, they were

15  talking about the teacher, the teacher's wife, and that

16  referred to Barira Hassan Abdullahi.  I believe the

17  first time that they went, it was just Hodan.

18            THE COURT:  Just so I'm clear, though, the

19  government is seeking conviction with respect to the

20  substantive counts only on Counts 18 and 21 as to

21  Defendant Jama; is that correct?

22            MR. GILLIS:  That's correct, Your Honor.

23            THE COURT:  All right.

24            MR. GILLIS:  As to Defendant Jama with

25  respect to the Hargeysa side.

1              THE COURT:  All right.  Right, on the

2    Hargeysa side.

3              All right.  Then what about Dhirane?  Which

4    of the substantive counts?

5              MR. GILLIS:  Also, Your Honor, based upon the

6    *Pinkerton* theory, we would, of course --

7              THE COURT:  That goes to the conspiracy?

8              MR. GILLIS:  Yes, Your Honor.  Well, it goes

9    also to the liability for the substantive counts.

10             THE COURT:  For the substantive counts.

11             MR. GILLIS:  Yes.

12             THE COURT:  All right.

13             MR. GILLIS:  Now, the payments weren't just

14   intended for medical treatment, doctors, X-ray

15   machines, and that sort of thing; though, as we've

16   said, those nonetheless would be illegal.  But there

17   was a great deal of conversation, Your Honor, about the

18   camels that were fully loaded and the trucks that were

19   needed to move the supplies for al-Shabaab to reach the

20   Golis mountains.

21             And in those conversations, Dhirane indicates

22   a particular understanding of what was being done and

23   what trucks had made it through.  For example, in

24   Government's Exhibit 74, she says, The previous camels

25   were not seized, and they made it through because of

1    the way that they shipped them.  They shipped them with

2    other civilian equipment or personnel, and so it was

3    not obvious where they were going.  And incidentally,

4    they refer to what those trucks or camels were carrying

5    was water, not living expenses or medicine or the like,

6    indicating, as we will say later, that this living

7    expense was not exclusively used to refer to medical

8    treatment or medical supplies.  But that evolved over

9    time and, as we said in our papers, much of the

10   conversation in the conspiracy continued long after

11   Esse testified about living expenses meaning medicine

12   long after she had left the conspiracy.

13            But there is also, then, in Government's

14   Exhibit 100 -- shortly after a media report on the

15   seizure of a truck going to al-Shabaab in the Golis

16   mountains, they're lamenting there the capture of the

17   truck and the amount of materials that were in those

18   trucks because they were fully loaded.  Those examples

19   indicate, again, her close knowledge of what's going on

20   but -- excuse me.

21            And so, for example, on the first page of

22   Government's Exhibit 100, Ismahan asks Dhirane, Did you

23   see the other day the small --

24            I'll wait a moment, Your Honor, if you'd

25   like.

1              THE COURT:  I have it.

2              MR. GILLIS:  So near bottom of that, just

3    after where it says verbatim starts at 1:16:  Did you

4    see the other day the small Danhu vehicle which was

5    loaded?  What was it?

6              Dhirane says, Did you ask this woman and the

7    others because they used to send this type of stuff?

8              So this is not just them talking generally

9    about the seizure of al-Shabaab trucks.  It's about a

10   shipment that they knew other women had been loading

11   onto -- not they themselves but had been providing for

12   the material support that was going onto these trucks.

13             She asks -- Dhirane asks Ismahan, Did you ask

14   this woman and the others because they used to send

15   this type of stuff?

16             Stuff, not living expenses.

17             And then on the very next page at the top,

18   she says -- Dhirane says, In fact, they sent a couple

19   of times in the past and both went through.

20             How would she know?  She would only know that

21   because she's privy to the information that only

22   Shabaab would know about.

23             THE COURT:  The government's theory is that

24   it's not necessary to link up these specific payments

25   to any particular items of support, whether it's the

1  trucks or the safe houses or anything else, because

2  delivery to these conduits, as you've described them,

3  these particular conduits in and of itself completes

4  the crime of the substantive offense?

5         MR. GILLIS:  Yes, Your Honor, that's true.

6  Although, not knowing how the Court is going to rule on

7  that particular issue, I was going to demonstrate how

8  that was not the case and at the same time demonstrate

9  Dhirane's close association with and intimate knowledge

10  of inside information with respect to al-Shabaab.

11         THE COURT:  Right.  There's very little

12  evidence, and it would be difficult to see how there

13  could be, frankly.

14         MR. GILLIS:  I beg your pardon?

15         THE COURT:  There's very little evidence --

16  and it's difficult to see how there could be -- linking

17  specific $100 payments or $50 payments to specific

18  purchases or applications that benefited the

19  organization, correct?  I mean, there's some general

20  comments about moneys having been received and used,

21  but what evidence is there actually linking up these

22  very specific payments that are alleged in the

23  substantive counts to what you would regard as the

24  actual material support on behalf of the organization?

25         MR. GILLIS:  Well, there is the instance of

1   money being provided to Abu Kowthar for the purchase

2   of --

3           THE COURT:  Computers.

4           MR. GILLIS:  -- computers.  The payment on

5   that closely matches the -- pardon me.  It closely

6   matches the conversation about the need for that

7   information.

8           We know that there are calls for money and

9   the needs of brothers in the north or the safe houses

10  in Nairobi, that there are calls for that sort of

11  money, and we can see shortly thereafter statements by

12  the coconspirators that the money was received.

13          So with respect to a particular purpose, if

14  we're talking about a truck or medical supplies or an

15  X-ray machine, you will recall, for example, that Esse

16  testified about a particular amount that she had sent

17  that she knew was for this X-ray machine because she

18  knew by the amount and the date and what was happening

19  at that time that that's what the purpose of this

20  special collection was for.  So with respect to that

21  one, too, we could link that directly to it; although,

22  admittedly, that's not one of the substantive counts as

23  charged.

24          But certainly, we could link up requests for

25  money and the receipt of money at the other end when

1    we're talking about payments from the group of fifteen.

2              And also, the testimony that there's been

3    about these monthly payments, the monthly payments that

4    couldn't be stopped for any purpose.  Then we see

5    regular monthly payments from Jama to these conduits.

6    So no, in most instances, we could not demonstrate a

7    specific linkage, nor -- frankly, if that were the

8    requirement, then it basically would hobble any

9    extraterritorial material support charge.  Because once

10   the money leaves the United States, it's a little

11   difficult to establish, except to the degree that we

12   have, in more general senses what the money was being

13   used for.

14             In any case, we submit, Your Honor, that all

15   that the statute requires is that money knowingly be

16   provided to al-Shabaab, and the purpose of the money is

17   irrelevant.  As we said, they could be purchasing it

18   for -- they could be receiving it from Druids used to

19   construct Stonehenge.  It's the provision of the money

20   to al-Shabaab that makes the crime, and the Supreme

21   Court has said as much.

22             Because money is so fungible that any money

23   given to a terrorist organization, as Congress, the

24   Executive Branch, and the Supreme Court have

25   recognized, that it is so pervaded by the criminal ends

1    that any money provided to them -- because it could be

2    used to displace money that they would otherwise have

3    to spend on those more, let's say, benign purposes --

4    then could be used to purchase arms and the like.  So

5    it is the provision of money to al-Shabaab that makes

6    the crime, not what ultimately al-Shabaab does with

7    that money.

8              Nor is it necessary for the defendants to

9    have an intent that it be used for a particular

10   purpose.  The law just requires that they know that

11   al-Shabaab commits terrorist acts or is designated or

12   engages in terrorism and knowingly providing money to

13   that organization makes the crime complete.

14             THE COURT:  All right.

15             MR. GILLIS:  Also, Your Honor, it is very

16   significant -- and I'd like to draw the Court's

17   attention to Government's Exhibit 87, in particular,

18   page 2 of that document or at least beginning on page 2

19   of that transcript.  There Thabaat, one of the group of

20   15, is telling Jama that she has spoken with Ayan, Ayan

21   Jama Warsame being the woman who's on the scene in

22   Hargeysa who is -- or rather in the mountains there and

23   who is being asked by Jama and Dhirane to provide an

24   update to the other women of the group of 15 in the

25   private chat room because she knows what's going on.

1   That's clear from the other conversations that the

2   defendants have with her.

3            So she's a prominent member of the group of

4   15.  As I argued before, she is, we submit, a part of

5   the al-Shabaab organization.  But whatever her position

6   within the organization might be, that whole

7   conversation is specifically about plastic containers

8   for drinking water that they can turn into canteens for

9   the young guys who are in need of this thing.

10           And so they are asking this group of 15

11  whether they can take responsibility for procuring

12  these plastic containers, and then they talk about how

13  the women would cover them with burlap and turn them

14  basically into containers to be used as canteens.  So

15  the money in this instance is clearly not going to

16  medical purposes or others, and it also indicates that

17  they clearly know that their money is going to

18  al-Shabaab because it's going to the fighters who are

19  going to need these canteens.

20           So we submit, Your Honor, that that at least

21  factually straightforwardly debunks the notion that

22  these payments were exclusively for medical treatment

23  of some kind.

24           We mentioned earlier that Fardowsa Jama

25  Mohamed was receiving secret information that would

1   be -- that regarded this al-Shabaab leadership

2   dispute -- that's Government's Exhibit 38.

3            Interestingly, in Government's 78, Your

4   Honor, Jama asks Mohamed to invite Godane to speak to

5   their small group, and Mohamed says to her he's not

6   going to do that because he never speaks on the

7   telephone. And that's at 02604.

8            So that conversation between Jama and

9   Fardowsa indicates the close connection that Fardowsa

10   has with -- or at least that Jama believes she has with

11   the supreme leader of al-Shabaab. She's asking

12   Fardowsa to arrange for him to speak to their little

13   group. And when she says he never speaks on the phone,

14   then Jama says, Well, let him send us someone.

15            And then Mohamed says, Unless I invite

16   al-Mahdi.

17            And to complete Jama's sentence there, she

18   says, Let him send us someone who can convey his

19   messages.

20            So they clearly have a relationship with

21   al-Shabaab that goes far beyond these one-off

22   contributions to al-Shabaab, particularly if Jama is

23   asking Fardowsa to arrange for a conference with Godane

24   himself.

25            Interestingly, then later on in Exhibit 86,

1   they're talking about providing money for Sheikh Hassan

2   Hussein who had been arrested and then released, and

3   their concern was for -- ultimately, the concern was

4   for the young fighters who would be left leaderless if

5   he were not to be present anymore.  But in that

6   context, the sending of money for his benefit, the

7   money that they're talking about is going to involve

8   al-Mahdi, the same person who Fardowsa and Jama talked

9   about being a mouthpiece for Godane.

10          In 88, again, Mohamed talks about how after

11  there was this paranoia or this dissatisfaction with

12  being able to find someone who could act as the

13  recipient because of the scrutiny that was now coming

14  down on these women, Mohamed related that these other

15  women asked me what if we send it through al-Mahdi.

16  Government's Exhibit 88.

17          There Jama says, Let's not shine a flashlight

18  on --

19          THE COURT:  What page?

20          MR. GILLIS:  I beg your pardon?

21          THE COURT:  What Bates number of 88?

22          MR. GILLIS:  One moment, Your Honor.

23          That is on US00797.  The previous discussion

24  leading up to that talks about the paranoia of the

25  women following a couple of law enforcement activities

1  that had affected a couple of the women from the group

2  of 15.

3          THE COURT:  All right.

4          MR. GILLIS:  Mr. Bryden talked about Barira

5  Hassan Abdullahi's associations with al-Shabaab, and

6  the defense makes a lot about whether she was a member

7  or not for the U.N. definition purposes.  Clearly,

8  whatever definition she had -- and Mr. Bryden put her

9  somewhere on the spectrum between active supporter and

10  financier.  He described what those people would do,

11  and that included providing weapons and the like.  And

12  so, even if she was not viewed by the U.N. as a member,

13  by any standard that would apply to 2339B, she was a

14  part of al-Shabaab.

15          Moreover, the notion that they would just be

16  talking sort of generally about some person named

17  Barira Abdullahi just doesn't make -- it's implausible.

18  It's unbelievable given all the other connections that

19  are demonstrated by the conversations among the group

20  of 15, all of these various chats and conversations

21  about getting money to her when she had been identified

22  as a financier of al-Shabaab by Mr. Bryden's

23  independent examination of the facts, his independent

24  research.  So it's just utterly unlikely that she's

25  somebody else, as identified in the U.N. reports, being

1    associated with people who conducted operations and who

2    conducted suicide bombings.  It's entirely implausible

3    that somehow we got the wrong person mentioned in the

4    U.N. report.

5          But even leaving that to one side, whether

6    you credit or not the U.N. report and whether you

7    accept Mr. Bryden's testimony on that point, the

8    testimony of Ms. Esse corroborated by all of the calls

9    and chats demonstrates Barira Hassan Abdullahi's close

10   relationship to al-Shabaab.  And more importantly,

11   clearly her reporting that, you know, that she had

12   checked and the money had been received -- and, indeed,

13   frequently that conversation takes place.

14         Also, Your Honor, Dhirane's close connections

15   with al-Shabaab are also indicated in Government's

16   Exhibit 149 where it indicates that she's been talking

17   with her compatriots in Hargeysa.  That conversation

18   there, taken in context of what they had just been

19   reading, refers to a search of Godane's mother's house,

20   the fact that Godane's brother had been in custody.

21   All of those things indicate clearly that they were

22   in -- the fact that they took a briefcase, which was

23   also reported in the media that she was reading at the

24   same time as this.

25         She then goes on to say, They said lately we

1   have been harassed by the airplanes.

2             There weren't any other people being harassed

3   by the airplanes in Somalia other than al-Shabaab.  She

4   certainly wasn't talking to the Amazon forces to find

5   out whether they had been harassed somehow by

6   al-Shabaab airplanes, which, of course, they didn't

7   have.  So this, again, indicates her close relationship

8   with al-Shabaab.

9             And then turning to Government's

10  Exhibit 89 -- this is US02621 -- where Jama --

11            THE COURT REPORTER:  I'm sorry?

12            MR. GILLIS:  Jama in this case using her

13  moniker of Taaibah --

14            THE INTERPRETER:  Your Honor?

15            THE COURT:  Yes.

16            THE INTERPRETER:  The interpreter did not

17  hear the moniker.

18            MR. GILLIS:  Would you like me to -- I can

19  spell it.  It's T-A-A-I-B-A-H.

20            She's speaking with Nicmatu Rabbi, who is

21  Defendant Dhirane.

22            There Jama says on that 2621 page, The

23  brothers in the north, did you speak with them?  Did

24  they receive the living expenses?

25            She says, They only received mine and the one

1  from Umu Ibrahim.

2          Jama then asks, They didn't receive mine?   I

3  sent them -- I sent both last month and this month.

4          And then Dhirane says, They received the

5  previous one, but dad asked them questions.

6          That, Your Honor -- if I may, look at -- I

7  believe that links up to a payment that was made around

8  that time.  As indicated by Government's Exhibit 11,

9  that conversation took place on July 9, 2012, and on

10  June 30, 2012, Dhirane had sent a payment to --

11          THE COURT REPORTER:  I'm sorry?

12          MR. GILLIS:  Exhibit 11 summarizes the hawala

13  record shows that at about the same time, only a few

14  days before, Dhirane had sent a payment to the Hargeysa

15  side conspirator, Ismail Hassan, Hodan Ismail Hassan.

16          Nor was the Hargeysa side money sent for

17  medicine versus -- I mentioned the plastic containers,

18  the reference to the wounded al-Shabaab soldiers, that

19  being the necessity for this money, and that that's

20  where the money was going.  When Dhirane was hearing

21  about the possibility that al-Shabaab could move, she

22  was ecstatic to hear that.  That's in Government's

23  Exhibit 79.

24          And, of course, in Government's Exhibit 84,

25  Jama is saying to Esse, What we're sending the money

1    for is for the brothers in the north, so that the work

2    they are doing gets easier.

3            It's not that they received medicine but that

4    the money is used for the -- I beg your pardon, Your

5    Honor.  That's 46 instead of --

6            THE COURT:  Come to the microphone.

7            It's 46 instead of what?

8            MR. KAMENS:  It's 47.

9            THE COURT:  It's Exhibit 46 instead of 84?

10           MR. GILLIS:  Yes, Your Honor.  It's in 46 and

11   continues onto 47, but she talks there about the

12   brothers being indispensable and that the orphans will

13   be taken care of.  That's also where she makes the

14   distinction between the orphans, the wounded, and the

15   people in the mountains, clearly indicating that that

16   is not -- that it's not merely medicine or medical

17   treatment that they're giving.

18           The reference that I was making --

19           Thank you, Geremy.

20           -- was indeed in Exhibit 47.  That's where

21   Esse is telling her, We shouldn't use the subterfuge of

22   a lecture to get money.  We should just tell them what

23   the money is needed for.

24           In that context, Jama says -- and I'm looking

25   now at US00773 in Government's Exhibit 47, Your Honor.

1  In the middle of the page there, Jama is saying,

2  Sister, the money is a help intended for supporting the

3  brothers in the mountain so that the work they are

4  doing gets easier for them.

5          Not so we can treat them, but so the work

6  they are doing gets easier for them.

7          We do submit that the payments to Jama

8  Abdulsalam, who was mentioned in the testimony of

9  Mr. Bryden and in the testimony of Ms. Esse as being

10 somebody high up in the al-Shabaab organization --

11 there were payments that Jama made to him on May 22,

12 2010.

13         THE COURT:  That was before the conspiracy

14 period alleged, correct?

15         MR. GILLIS:  Well, Your Honor, we alleged in

16 the conspiracy that it began at least as early as

17 February 2011.  So yes, the September payment and the

18 May payment were before the date alleged in the

19 indictment.  However, the case law says that even a

20 period as long as 11 months, particularly in a

21 long-lasting conspiracy can be considered within the

22 scope of the conspiracy.

23         The *Chandia* court -- the Fourth Circuit in

24 the *Chandia* case, which is 514 F.3d 365, says in a

25 footnote -- I beg your pardon, Your Honor.  I'm noting

 1    the wrong information.

 2                 THE COURT:  In any event, that payment is not

 3    a substantive count, and you're relying on it for

 4    purposes of knowledge and intent; is that right?

 5                 MR. GILLIS:  We are relying on it for

 6    purposes of knowledge and intent at least to the extent

 7    that the Court does not regard it as intrinsic to the

 8    conspiracy and reasonably near the time of the dates

 9    alleged.

10                 As the Fourth Circuit has held, it's not an

11    element of the offense, the dates of the conspiracy, as

12    long as it's reasonably near.  In this case, the Fourth

13    Circuit cited to a Sixth Circuit case of -- first of

14    all, the Fourth Circuit case is *United States v.*

15    *Johnson*.  It's 409 Fed. Appx. 688, a 2011 decision.  In

16    footnote 1, they note that the beginning and end dates

17    of a conspiracy are not elements of the offense.  So

18    they go on to say that all that's required is that it

19    be reasonably near the dates alleged in the indictment.

20    They cite to *Benson*.

21                 THE COURT:  I understand, but it's not one of

22    your substantive counts, correct?

23                 MR. GILLIS:  Yes, Your Honor.  I'm sorry.

24    Yes, Your Honor.

25                 THE COURT:  So you're pointing to this both

1    for knowledge and intent and as an overt act connected

2    to the conspiracy; although, I understand your position

3    overt acts aren't necessary.

4              MR. GILLIS:  That's true.

5              THE COURT:  All right.

6              MR. GILLIS:  But it also goes to the point

7    that they make in their arguments that there was no

8    indication that they sent money to anybody who was in

9    that larger chat room.  This shows that indeed she did

10   send money to Abdullahi, as well as to Bashir Gelle,

11   who, as you recall from the testimony, was someone who

12   was listed as the person to receive money during the

13   solicitations.

14             THE COURT:  All right.  You've laid out in

15   detail in your closing argument submission a lot of the

16   evidence.  Is there anything that you would want to add

17   or summarize based on that?

18             MR. GILLIS:  If I may, Your Honor, just one

19   moment.

20             THE COURT:  Yes.

21             MR. GILLIS:  Yes.  I would like to address,

22   to the extent the Court believes that this medicine or

23   medical treatment issue may be relevant, that there are

24   numerous instances where the group of 15 made up -- and

25   that's clear from the chats and the conversations --

1  that they made up this veiled speech on the fly.  Much

2  of it happened after -- most of it, in fact, happened

3  after Esse had left the conspiracy.  So yes, they used

4  the term "living expenses" as she testified.

5          THE COURT:  What was the date that she left

6  the conspiracy?

7          MR. GILLIS:  She left the conspiracy, Your

8  Honor, in -- one moment, if I may.

9          THE COURT:  Was it May 2013?

10          MR. GILLIS:  It's in the briefing.

11          THE COURT:  Of 2013, right?

12          MR. GILLIS:  I beg your pardon?

13          THE COURT:  It was 2013 that she left?

14          MR. GILLIS:  No, no, no.

15          THE COURT:  Twelve?

16          MR. GILLIS:  It was 2012, mid-2012.

17          THE COURT:  All right.

18          MR. GILLIS:  And the conspiracy and chats

19  continue well into 2013 and beyond.

20          THE COURT:  Right.

21          MR. GILLIS:  So examples of that, if I can

22  just point that out, are in -- for example, Exhibit 82

23  where they talk about needing, you know, nine with

24  large wings, and the other conversant obviously does

25  not understand.  She says, You mean money?  You mean

1 zeros?

2          Yes, zeros.  So nine --

3          THE COURT:  I'm familiar with that exhibit.

4          MR. GILLIS:  Thank you, Your Honor.

5          There's also instances where they use terms

6 "stuff" and "the thing."  They also use money

7 frequently in contexts that sometimes arguably could

8 refer to safe houses and obviously do not.  So there

9 are those Exhibits -- in no particular order, Your

10 Honor -- 170, 45, 66, 82, 100, 102, 74, and 82.  They

11 use a number of different terms to refer to the

12 monetary support that they were providing to

13 al-Shabaab.

14          I would like to finish, then, with respect to

15 the vehicles, Your Honor.

16          THE COURT:  All right.

17          MR. GILLIS:  So the last thing that happens

18 in that exchange -- and we lay them out in our brief.

19 But the last thing that happens is that Dhirane does

20 find out, ultimately, that the stuff was ours.  They

21 talk about this notion of ours being like just rooting

22 for team al-Shabaab.

23          But in this instance, Your Honor, as these

24 newspaper articles indicate, they knew that the

25 money -- that the trucks were Shabaab trucks and

1    heading for the Golis mountains.  They're not talking

2    about that being ours in the sense that it's

3    al-Shabaab.  They already knew that.  So they didn't

4    need to have this back-and-forth conversation about was

5    it these women, have you talked to these women, how

6    much money they must have had to spend to raise this

7    money.  And then, ultimately, Jama -- Dhirane, rather,

8    reports that shipment was ours.  They knew already that

9    that was al-Shabaab.  What she was communicating there

10   is that that shipment was ours, our bus, we

11   conspirators.

12                 THE COURT:  All right.

13                 MR. GILLIS:  All right.  Thank you, Your

14   Honor.

15                 THE COURT:  We are operating with only one

16   interpreter.  So I'm going to take a short break and

17   then continue with you, Mr. Kamens.

18                 The Court will stand in recess.

19         (Recess from 11:11 a.m. until 11:27 a.m.)

20                 THE COURT:  Before we begin, would the

21   interpreter identify herself and be sworn, please.

22                 THE INTERPRETER:  Maryam Abdi.

23         (The interpreter affirms.)

24                 THE COURT:  Have you accurately interpreted

25   the proceedings so far?

1          THE INTERPRETER:  Yes, Your Honor.

2          THE COURT:  All right.  Thank you.

3          Mr. Kamens.

4                    CLOSING ARGUMENT

5          MR. KAMENS:  Good morning, Your Honor.

6          Let me start with the idea of membership in a

7    foreign terrorist organization.  There are two ways to

8    prove the material support charge.  There is an easy

9    way, and there is a hard way.

10          The easy way is to prove that a defendant has

11   provided money or some other prohibited support to a

12   member of a foreign terrorist organization.  If the

13   government produces such evidence, they must merely

14   prove that the intention of that provision was to

15   support the organization; that is, if the money is

16   provided to a recognized proven member of the

17   organization, the case is very easy.

18          The hard way to prove one of these cases is

19   to establish that the defendants provided money to

20   someone who is not a member of the organization but

21   simply passed the support on to the organization.  That

22   is hard because, as we can see in this case, it is very

23   difficult for the government to adduce proof of what

24   happened to the money once the recipients in this case

25   received it.

1           Now, the Court asked at what point do you
2   characterize the nature of the support?  Well, the
3   answer is very clear, and that is when the support is
4   received by the foreign terrorist organization.
5           I'll give you an example.  If someone
6   provides medicine, which we know is not material
7   support, but they provide it to an arm's dealer for the
8   purpose of payment, they're not using money.  They're
9   using shipments of medicine to purchase weapons, and
10  the weapons are to go to the foreign terrorist
11  organization.  It does not matter that the person paid
12  for those weapons in medicine.  What matters is that
13  they intended and did purchase weapons which were then
14  provided to the foreign terrorist organization.
15          Let me give you another example.  Trash
16  collection.  If someone gives money to Hamas, which was
17  designated as a foreign terrorist organization in 1997,
18  for the purpose of picking up trash in Hamas-controlled
19  areas, that violates the statute.
20          The Humanitarian Law Institute says that
21  providing money for whatever purpose to the foreign
22  terrorist organization is material support regardless
23  of whether it is meant to promote terrorism because
24  that money in the hands of the organizational
25  structure, in the hands of the foreign terrorist

1  organization is fungible.

2          However, if someone gave money to an

3  independent organization to pick up trash in a

4  Hamas-controlled area and the organization is not

5  controlled by Hamas and they pick up trash, that is not

6  material support.

7          The point here is that membership is both a

8  legal and a factual question.  As a matter of law, a

9  foreign terrorist organization is a term of art, and it

10 refers to the 60 groups -- and I'm getting that from

11 the state.gov website -- the 60 organizations that have

12 been designated as a foreign terrorist organization by

13 the Secretary of State.  At a basic level, as a matter

14 of law, the organization must be defined as those who

15 give or take orders to effect the group's objectives.

16          THE COURT:  Where do you get that definition?

17          MR. KAMENS:  That is from the definition

18 that -- we've provided it in our papers, but it is the

19 definition that is provided in the context of the

20 targeting of foreign terrorist organizations and the

21 detention of individuals who are members of foreign

22 terrorist organizations.  It is also from the

23 language --

24          THE COURT:  Whose definition is that?

25          MR. KAMENS:  Well, it is the definition of

1  courts that have determined whether someone may be

2  detained as an enemy combatant because they are part of

3  a terrorist organization.

4          Let me point to something closer to home, and

5  that is *Holder v. Humanitarian Law Project*, which says

6  that the statute prohibits providing a service to a

7  foreign terrorist organization.  I'm quoting from

8  561 U.S. 24, the *Holder v. Humanitarian Law Project*

9  opinion.  The statute prohibits providing a service,

10 quote, to a foreign terrorist organization.  The use of

11 the word "to" indicates a connection between the

12 service and the foreign group.

13         If independent activity in support of a

14 terrorist group could be characterized as a service,

15 the statute's specific exclusion of independent

16 activity in the definition of personnel would not make

17 sense.  Congress would not have prohibited under

18 service what it specifically exempted from prohibition

19 under personnel.

20         You'll see in the papers that the government

21 essentially ignores this language from *Holder*, and they

22 try to water down the standard of what constitutes a

23 foreign terrorist organization.  They say these cases

24 involving personnel, they have a specific definition of

25 personnel that exempts individuals who are vigorously

1  advocating but independent of the organization.

2          But the First Amendment exclusion for

3  independent activity applies to the entire statute.

4  What that means is that an individual who may be an

5  active supporter, may be vigorously promoting the goals

6  of the organization but is not under their control,

7  does not take or give orders, they are not for purposes

8  of the statute considered 1 of 60 organizations

9  designated by the Secretary of State.

10         THE COURT:  Well, it comes down to whether

11 they are, quote, independent and what your definition

12 of independent is and what factual criteria you're

13 going to use in order to determine independence.

14         You're drawing the line very closely to,

15 basically, command and control.  The government would

16 say that under the cases you need to look much more

17 fact specific in terms of did they play a coordinating

18 role, did they play a supervisory monitoring role, were

19 they organizing, were they proselytizing, a whole

20 broader range of relevant facts.

21         MR. KAMENS:  I am, but I would say two

22 things.  One, if you look at any material support case

23 that has resulted in a published opinion, we cannot

24 find one which involves providing money simply to

25 someone who has a close connection, as the government

1  says --

2            THE COURT:  How about *U.S. v. Ali*?

3            MR. KAMENS:  That is the Eighth Circuit case

4  that they point to?

5            THE COURT:  Yes.

6            MR. KAMENS:  That is money that was provided

7  to -- a meticulous examination of money provided to a

8  known member of al-Shabaab.  The person is specifically

9  identified as a member of al-Shabaab, and the money is

10 provided to him or his associates.  That is not the

11 case that we have here.

12           The second thing I would say is that apart

13 from the fact that there is zero case law to support

14 the government's argument, it is the government's

15 burden to present factual evidence, testimony about

16 what the structure of al-Shabaab is, to prove that the

17 recipients of the funds -- if they want to choose the

18 easy path of proving material support, that the

19 recipient of the funds is a member of the organization.

20 We simply don't have that here.

21           What we have, at best, is the testimony of

22 Mr. Bryden, who the government now disavows, as saying

23 he can describe the scope of membership for this

24 organization.  But that's the best that they produced.

25           And if it is their burden to show the Court

1    that the recipients -- if they want to prove this easy

2    theory, that the recipients are members, then it is

3    their burden to establish the factual testimony.

4              THE COURT:  How about somebody who was

5    operating safe houses on behalf of a terrorist

6    organization?  Do you think that person could be found

7    by a fact finder to be a member or sufficiently

8    associated with that group?

9              MR. KAMENS:  It depends upon the evidence.  I

10   would certainly not exclude the possibility that they

11   were under the control of the organization.  But

12   certainly, on this evidence, we don't have evidence

13   that Fardowsa was under the control or the direction of

14   al-Shabaab.

15             THE COURT:  Do you think the evidence would

16   allow the finding that she was operating safe houses

17   for the benefit of al-Shabaab?

18             MR. KAMENS:  Well, let me say this:  As a

19   factual matter, we, frankly, have no evidence on the

20   ground of what she was doing.  What we do have is

21   conversations about what Ms. Esse understood or what

22   Ms. Jama understood.

23             So whether Ms. Fardowsa pocketed the money

24   and went out and bought a nice vehicle for herself --

25   whether there was actually a safe house is my point, we

1 don't know.  But what we do know is what they said,

2 which suggests what they understood.

3          I would suggest at a 30,000-foot level, when

4 the government doesn't have evidence on the ground that

5 the money actually went to the foreign terrorist

6 organization, they cannot prove the substantive counts.

7          What I'm talking about here is what the

8 people understood and what their understanding was.

9 What Ms. Esse's understanding was was that the money

10 was collected to provide funds to Fardowsa Mohamed to

11 rent a safe house -- or rent a house, I would say.  The

12 government calls it a safe house.  I call it a house, a

13 clinic, a local place where wounded soldiers received

14 care.

15          THE COURT:  Well, there were two houses that

16 were referenced in the evidence.  One was what you're

17 referring to.  The other one was more of a staging

18 ground.

19          MR. KAMENS:  That is correct.  There were two

20 that were referenced, but Ms. Esse was very clear in

21 her testimony that the money was collected solely to

22 pay rent and to pay doctors for the medical house.

23          THE COURT:  Well, that's what she understood.

24          MR. KAMENS:  That's all we're talking about

25 is what she understood because we don't have any other

1  evidence.

2          THE COURT:  Wasn't there evidence that she

3  became very upset when she learned that she understood

4  incorrectly and that the money was --

5          MR. KAMENS:  That's right, and that was the

6  government's theory at the beginning of the case.

7  Ladies and gentlemen or Your Honor, this is what the

8  evidence is going to show:  Ms. Esse was brought into

9  this and told the money was for orphans.  Then the veil

10 was lifted from her eyes, and she was told the truth.

11 And that truth, as the government said in its opening

12 argument, was that the money was provided to provide

13 rent and care for wounded soldiers.  That's what the

14 government said in its opening.

15         And what we say and the government has very

16 little response to is that that does not constitute

17 material support.  Now, I will grant you that's it's

18 possible depending on --

19         THE COURT:  Wasn't the government's point the

20 opposite, that is, that she was originally told the

21 money was going to be used for medicine and the medical

22 care safe house, and she then learned that there was

23 another safe house that was being funded with that

24 money?

25         MR. KAMENS:  No.  No.  The evidence is she

1  was told the money was for an innocuous purpose to

2  provide money for orphans.  That was how she was

3  brought in.  She paid a couple of times, and then she

4  was told the truth, the money was for the medical safe

5  house.

6          The government -- admittedly, they brought

7  out testimony:  Weren't there two safe houses?  Didn't

8  she rent two safe houses from the infidels?  First off,

9  these were not controlled by al-Shabaab.  They were

10 rented, apparently, from infidels.  That's Government's

11 Exhibit 44.  It does not say that the defendants' money

12 was used to rent both safe houses, and Ms. Esse is very

13 clear that her understanding was the money was for the

14 second safe house.

15         THE COURT:  How about on the Hargeysa side?

16 There were no medical safe houses referenced on the

17 Hargeysa side.

18         MR. KAMENS:  There is even less evidence

19 about the Hargeysa side.

20         Let me address the membership question first

21 about whether Ms. Barira is a member of al-Shabaab

22 because, again, it is very easy for the government to

23 prove these cases if Barira is established as a member

24 of al-Shabaab.

25         But what the government has done is rather

1   than present evidence of actual membership, that is,

2   she is actually within the -- takes orders or gives

3   orders within the structure of this designated

4   terrorist group, what they have done is tried to water

5   it down and say she is someone who is affiliated with

6   members of al-Shabaab and, therefore, is a member.

7          We discuss these arguments about Barira in

8   our papers, and specifically pages 24 through 26 of our

9   closing argument.  But let me just say here that there

10  is absolutely no testimony that Ms. Barira Abdullahi is

11  a member of al-Shabaab.  The best that we heard from

12  Mr. Bryden is that someone with that name was mentioned

13  in a U.N. report, not as a member of al-Shabaab.  But

14  he described her, again, as the government had said,

15  between an active supporter and a financier, neither of

16  which he testified, under his view admittedly,

17  constitutes a member of al-Shabaab.

18          So without much --

19          THE COURT:  But within categories subject to

20  sanctions?

21          MR. KAMENS:  That's right.  That's absolutely

22  true, but that's not our fault that they didn't present

23  more factual testimony.

24          THE COURT:  You keep using the word "member"

25  in a very formal way.  These organizations don't have

1  card-carrying members in the same sense that -- it's

2  not IBM with a corporate charter and a group of

3  identifiable members.  Don't you have to determine the

4  membership in terms of the roles that people are

5  playing relative to the purposes of that organization?

6          MR. KAMENS:  I will grant you that these are

7  not like publicly traded corporations, but I would also

8  suggest that they are not like the corner street gang

9  investigated by the local FBI agent.  These are 60

10 defined groups that have political aims.  Many of them

11 have armed forces.  Many of them have political wings.

12 Many of them have identifiable command-and-control

13 structures.  So this is not your run-of-the-mill street

14 gang that is subject to your run-of-the-mill criminal

15 statute.  These are defined organizational structures

16 that have aspirations that are political, that involve

17 control of territory.  And in that context, the meaning

18 of a foreign terrorist organization is a term of art.

19          The government cannot say, Well, the

20 Secretary of State designated this group as a foreign

21 terrorist organization, but, you know, we think anybody

22 who has got a passing affiliation or even a close

23 affiliation or is vigorously supporting the

24 organization, that is the type of person who can be

25 targeted with violent force, that can be detained as an

1   enemy combatant, and that we can prosecute criminally.

2          No.   The point of *Humanitarian Law Institute*

3   is that there is a First Amendment restriction on the

4   actual identification of the scope of this

5   organization, and that is not true in the context of

6   the ordinary criminal case.   The government responds

7   not one word on this First Amendment limitation on the

8   scope of the organization.

9          THE COURT:   Well, their argument is we're not

10  talking about speech; we're talking about conduct.

11         MR. KAMENS:   Well, that's right.   But in

12  order to understand who is a member of the

13  organization, *Humanitarian Law Institute* says that

14  vigorous support or promotion of the political aims of

15  an organization, as long as you are not controlled by

16  them, does not mean that you are providing material

17  support.   If that is so, then that person necessarily

18  is not a member.

19         The government says no.   If someone is

20  strongly affiliated with members -- the language that

21  they use is very vague, and it was not at all clear to

22  us during the --

23         THE COURT:   There's no First Amendment

24  prohibition in considering speech for the purposes of

25  determining what someone's relationship to an

1   organization is; is there?

2          MR. KAMENS:  No.  I absolutely agree.  The

3   Court can consider all of the evidence that is relevant

4   in determining whether these people are members, but it

5   has to evaluate membership based upon the evidence

6   before it.  There is not one piece of evidence that

7   Fardowsa or Barira fell within the definition that I

8   provided, which is they took or received or gave orders

9   within the organizational structure or were otherwise

10  even identified as members of the organization.

11         And so with that premise that these people

12  are simply active supporters but are not controlled by

13  members of the organization, then this becomes a very

14  hard case for the government to prevail on.

15         THE COURT:  The cases that you rely on for

16  this received-orders or directions standard would be

17  what?  The *Holder* case?

18         MR. KAMENS:  *Holder* and -- I mean, I can --

19  they're listed in our reply.

20         And let me say this:  The government's

21  argument citing to the VICAR cases, that wasn't raised

22  until September 30 in this entire case.  There was no

23  warning that that was their understanding of what would

24  be a member of an organization.

25         What we cite to is on pages 10 and 11 of our

```
 1   reply.   That is that the statutory phrase "terrorist
 2   organization" is a term of art and that the designation
 3   does not provide that al-Shabaab and its supporters are
 4   considered a foreign terrorist organization.   We cite
 5   to the law review by Rachel VanLandingham about
 6   Meaningful Membership and defining what constitutes a
 7   member of these organizations.
 8            We cite to Hamlily v. Obama, which is a
 9   District of D.C. case authored by Judge Bates,
10   616 F. Supp.2d 63, Pinpoint 76, which specifies and
11   rejects the government's argument in the context of a
12   habeas --
13            THE COURT:   Habeas.
14            MR. KAMENS:   -- for an enemy combatant
15   designation where the government says, Look, anybody
16   who substantially supports the organization can be
17   detained.   He rejects that.
18            We also point out -- and I think this is
19   important -- that the premise of the Holder
20   Humanitarian Law Institute argument that providing
21   funds to a foreign terrorist organization is prohibited
22   regardless of the nature of the funds -- because those
23   funds are fungible.   They can be used to free up
24   resources to pursue the nefarious aims of the
25   organization.   The premise of that argument is that
```

1   those funds are under the control of the foreign

2   terrorist organization.  Providing funds to someone who

3   is an active supporter but is not otherwise within the

4   organization or the structure of the foreign terrorist

5   organization does not free up any funds at all.

6           So the basic point of *Holder* is that there is

7   a relatively precise understanding of what is a foreign

8   terrorist organization.  It is not this amorphous zone

9   of people affiliated with the group that constitutes

10  membership.

11          THE COURT:  Speak to the conspiracy.

12          MR. KAMENS:  Your Honor, once we get to the

13  point of -- if the Court were to agree with us that the

14  recipients were not, in fact, members, the government

15  must prove that the intention of the group, the

16  conspiratorial aim is that the money would be passed

17  through from these people to the foreign terrorist

18  organization.

19          THE COURT:  Well, they would have to show

20  that they entered into an agreement to provide material

21  support to a terrorist organization.

22          MR. KAMENS:  That's right.  That's right.

23  But in the context of providing it to pass-throughs, I

24  think there has to be an understanding that the money

25  doesn't stop with the conduit.  It has to --

 1         THE COURT:  Well, what evidence is there in

 2 this case that these defendants thought anything other

 3 than that they were providing money for the purposes of

 4 supporting al-Shabaab?

 5         MR. KAMENS:  Because the only information

 6 that we actually have about where the money was to go

 7 was specifically in two examples.  One is to purchase

 8 an X-ray machine, and the second is to provide rent and

 9 pay doctors at a house where Fardowsa would provide

10 care for wounded soldiers.  All of the other extraneous

11 statements about what the money was for really don't

12 show what the conspirator supposedly understood.

13         THE COURT:  Well, let's assume that's true.

14 I'm not suggesting that the Court would view it that

15 way, but let's assume that the agreement was as

16 restrictive as you're suggesting.  That still

17 constitutes material support except for your reliance

18 on the medicine exception.

19         MR. KAMENS:  That's right.

20         THE COURT:  All right.  So from your

21 perspective, there was an agreement to provide

22 material -- exempt material support?  Is that a fair

23 summary?

24         MR. KAMENS:  We say that there was a

25 conspiratorial agreement to provide living expenses,

1  and living expenses was code.  The evidence provided by

2  the government is that living expenses meant medicine

3  for al-Shabaab.

4          THE COURT:  Right.  But absent the exemption,

5  that would qualify as material support?

6          MR. KAMENS:  If the agreement was to provide

7  it directly -- well, let me say two things.  Yes, in

8  response to that, but there is no evidence that the

9  conspirators agreed for Barira to give it to a specific

10 member of al-Shabaab.

11         The government says, Clearly, all of these

12 people intended for the money to simply be passed

13 through from Barira on the north or Fardowsa in Nairobi

14 to al-Shabaab.  But there's no evidence of what

15 happened to that money or that the conspirators

16 understood that --

17         THE COURT:  Why is that necessary?  If the

18 conspiracy is to provide material support and the crime

19 is complete upon the entering of the agreement -- I

20 know you have an issue as far as overt acts are

21 concerned.  But if the conspiracy count only requires

22 an agreement to engage in an unlawful act, which in

23 this case would be providing material support to a

24 terrorist organization, why absent your medicine

25 exception would that not constitute sufficiently -- the

1    evidence would be sufficient legally to constitute an

2    illegal conspiracy?

3              MR. KAMENS:  If the premise of your question

4    is, Hey, if we all agree that the money is simply to go

5    to a foreign terrorist organization and the way we're

6    going to do that is give money to a conduit, you're

7    absolutely right.

8              But what we suggest is that on the evidence

9    before us, we have a bunch of people that may have

10   agreed to provide money to a conduit or a person who is

11   an active supporter and no understanding of what that

12   person was to do with the money or what happened to it.

13             THE COURT:  Under that view, the Court would

14   need to conclude that they had agreed to give money to

15   these particular people with no expectation, no

16   understanding that the money would, in fact, be passed

17   along for the benefit of al-Shabaab?

18             MR. KAMENS:  Well, let me say this:  It is

19   perfectly lawful for people to gather up money and give

20   money to an active supporter of al-Shabaab who then

21   vigorously promotes the goals of al-Shabaab but is not

22   otherwise controlled by al-Shabaab.

23             So what I'm saying is that there are two

24   deficiencies here in the evidence.  The first is that

25   there's no information or evidence that the

1   conspirators agreed upon Ms. Barira Abdullahi being

2   simply a conduit in passing it on to someone.  Two,

3   what we do have is ample evidence that to the extent

4   there was an agreement, it was to provide living

5   expenses, which based on the government's evidence --

6   and let me say this:  Living expenses means medicine,

7   and I'm quoting specifically --

8           THE COURT:  Well, how does that fit with the

9   Hargeysa side payments?  How would that fit into all

10  the evidence pertaining to the Hargeysa side?  Because

11  there were no safe houses for medicine.  There were no

12  X-ray machines.  The only evidence was that they needed

13  it for, quote, living expenses, trucks, camels, water,

14  canteens, people in the north.

15          MR. KAMENS:  There's zero evidence that the

16  conspirators agreed upon providing money for water

17  canisters or trucks or anything like that.  Those

18  discussions are completely unrelated and not connected

19  by the --

20          THE COURT:  So from your perspective, what

21  would a fact finder reasonably conclude as to the

22  purpose of the payments to the Hargeysa side?

23          MR. KAMENS:  For living expenses meaning --

24          THE COURT:  For whom?

25          MR. KAMENS:  The purpose would be to provide

1   medical care to wounded soldiers.  Let me go through --

2              THE COURT:  On the Hargeysa side?

3              MR. KAMENS:  On the Hargeysa side.

4              Government Exhibit 76, the conversation

5   allegedly between Ms. Jama and Fardowsa at US2579,

6   talking about money, $100 for the girl, $50 for the

7   living expenses, $50 for the displaced which will be

8   addressed to Asho, and $50 for the living expenses of

9   those in the north.

10             Government Exhibit 78 --

11             THE INTERPRETER:  Your Honor, the interpreter

12  can't keep up.

13             MR. KAMENS:  I'm sorry.  Let me slow down.

14             Government Exhibit 76 --

15             THE COURT:  And so the $50 for living

16  expenses for the people in the north, you think the

17  evidence would require a finding that that was for

18  medicine?

19             MR. KAMENS:  Well, two things.  For the

20  purposes of the Rule 29, must a reasonable fact finder

21  have doubt about what that money was for?

22             When the government itself presents evidence

23  that the meaning of this word as code for medicine, a

24  reasonable fact finder must accept the government's

25  evidence at least at some level and have doubt as to

1   what it's for.  It's their burden to eliminate doubt at

2   the Rule 29 stage.  If their own evidence leaves doubt

3   as to whether this was prohibited material --

4          THE COURT:  It's also to be viewed most

5   favorably to the government.

6          MR. KAMENS:  Absolutely.  But there is no way

7   to view the testimony from Ms. Esse about the meaning

8   of this code word other than what it is, and that is

9   living expenses means medicine.

10          If the Court is reviewing the Rule 29 at the

11   close of the government's evidence, we're not at the

12   point of evaluating the credibility of the testimony or

13   anything like that.  That is for a later stage in the

14   process.  At this point, it is simply whether a

15   reasonable fact finder would have doubt based upon

16   their evidence.

17          THE COURT:  All right.  I understand.

18          MR. KAMENS:  Government's 78, another

19   conversation, and this is at US2604:  The number of

20   living expenses required has increased and now the

21   north also requires....

22          Government's 85, Ms. Jama and Ms. Dhirane at

23   US1945:  In regards to the living expenses for the aunt

24   in Hargeysa....

25          Government's 89, Ms. Jama and Ms. Dhirane at

US2621:   The sisters/brothers in the north, did they receive the living expenses?

There are ample conversations reflected in the government's exhibits that the money provided to the north was defined as living expenses which means medicine for wounded soldiers.

Now, the government also points to Exhibits 46 and 47.  Exhibit 47 is the one where Ms. Esse and Ms. Jama talk about money, and Ms. Jama allegedly says, The money is help intended for supporting the brothers in the mountains, so the work they are doing gets easier for them.

First, this conversation is with Ms. Esse who testified in the trial about what her understanding of what the money was for, and secondly, it is not inconsistent with providing money for medical care for wounded soldiers.

The government puts a lot of weight on the word "work," but the fact that these people are talking about assisting soldiers is exactly what we're talking about in a very narrow context that does not constitute material support.

Government Exhibit 46, this is the hypothetical how-I-would-have-divided-the-money conversation supposedly between Ms. Fardowsa and

1  Ms. Jama.  As we've said in our papers, her hypothesis

2  about how the money would be divided isn't evidence of

3  what the conspirators agreed upon.

4          The prosecutor also misstates about the words

5  in this exhibit.  In this conversation on page US764,

6  they say that the living expenses are indispensable.

7  And so if you take the government's evidence at face

8  value, living expenses means medicine.  And the only

9  specific evidence that we have of support that is

10  provided to the organization, the X-ray machine and

11  medical care, does not constitute material support.

12          Let me speak briefly about Government

13  Exhibit 82.  This is the one about the wings on

14  Number 9.  The Court said it was familiar with this

15  exhibit.  On page 2339, there's a statement:  The cost

16  of the three that was planned is around nine, nine with

17  large wings.

18          Quote, We have prepared the price of one

19  he-camel, and say an amount equivalent to half the

20  price of another camel.

21          On page 88 of the trial testimony, Mr. Bryden

22  describes the price of a saloon car and a four-wheel

23  drive, neither of which are related to this

24  conversation in that this is an example of what they're

25  talking about.

1              On page 171, Mr. Bryden says that the

2    conversation in Government's Exhibit 82 seems to be

3    about something other than camels, but then on

4    page 234, he says, I can't make sense of what this is

5    supposed to mean.

6              And the government puts a lot of weight on

7    this discussion without any evidence of what they're

8    actually talking about.  We can certainly speculate

9    about it.  We can come to some kind of conclusion, but

10   whatever conclusion that is, it is not based on

11   evidence.

12             The vast majority of the conversations at

13   some point in this case talk about living expenses.

14   Based on the bare testimony adduced by these people

15   here, that means medicine for wounded soldiers which is

16   not material support.

17             I don't want to belabor the Court's patience.

18             I did want to say that given that the

19   government itself adduced the testimony that living

20   expenses means medicine and the only detailed

21   description of what was actually given to the

22   organization from their star witness, Ms. Amina Esse,

23   who was an alleged coconspirator of the defendants, is

24   that these people were providing money for medical care

25   for wounded soldiers, we submit that a reasonable fact

1  finder at the close of the government's case would have

2  doubt that this money was intended to be passed through

3  to al-Shabaab.

4          THE COURT:  As a matter of just statutory

5  construction, why would the money fall within the

6  medicine exemption?

7          MR. KAMENS:  Money does not.  And so we

8  concede if the money is provided to the organization,

9  even if it is intended to pay for medical care, that

10  constitutes material support.  The premise of our

11  argument is that the recipients of the money were not

12  members of al-Shabaab.  What was provided to al-Shabaab

13  was medical care.

14          When the Court asks what is the time frame at

15  which the Court characterizes the nature of the

16  support, it is what is provided to the organization.

17  The information that we have is that -- the only real

18  specific testimony that we have is what was provided to

19  this organization is medical care through a house that

20  was rented by Ms. Fardowsa.  Do we actually know what

21  Ms. Barira provided to the organization, if anything?

22  No.  We have zero.

23          THE COURT:  So under that view, if the Court

24  were to find that Fardowsa was, in fact, al-Shabaab,

25  then you would concede that the money to her would not

1  fall within the medicine exception?

2          MR. KAMENS: It would not. Absolutely, we

3  concede that if money is provided to a member of

4  al-Shabaab for the purpose of supporting the

5  organization --

6          THE COURT: Right.

7          MR. KAMENS: -- then absolutely, that

8  constitutes material support.

9          The problem for the government here is that

10  there's not one piece of testimony that Ms. Fardowsa

11  was a member of al-Shabaab. Not even did Mr. Bryden

12  testify that she was a member of al-Shabaab even under

13  his U.N. sanctions theory of membership. There is zero

14  other evidence that she was a member under the control

15  of al-Shabaab, and it's their burden to provide that

16  factual testimony to the Court.

17          Without it, then this becomes an

18  extraordinarily hard case for them given their anemic

19  response to the medicine exception and certainly as

20  outlined in the amicus brief, which I hope the Court

21  has received.

22          It is very clear that there is a fundamental

23  obligation among parties to a non-international armed

24  conflict not only to not inhibit the care that is

25  received by wounded soldiers in a non-international

1  armed conflict, but also that it may not punish or

2  inhibit in any way the provision of that care.  Those

3  caregivers and their facilities and their transports

4  are absolutely barred from being the subject of

5  punitive action by parties to a non-international armed

6  conflict.

7          Let me say briefly that the government says

8  that this would be some dramatic decision by the Court

9  that would significantly affect material support

10 prosecutions.  I think that is not true.  This is a

11 relatively narrow exception that we're talking about.

12 Even in the context of the medicine exception, what we

13 are saying is simply that medicine must have a broader

14 meaning in the context of a non-international armed

15 conflict.

16          As I said, there are 60-some foreign

17 terrorist organizations that are listed by the State

18 Department as foreign terrorist organizations.  Not all

19 of them are involved in non-international armed

20 conflicts.

21          THE COURT:  I guess I'm a little confused in

22 terms of your analysis.

23          On the one hand, you say that if the

24 recipient is deemed to be sufficiently aligned with the

25 terrorist organization, it doesn't matter what the

1   money is used for.  On the other hand, you say that if

2   the person who receives the money is not sufficiently

3   aligned -- they are, quote, independent or an

4   independent supporter -- then it becomes important what

5   that money is ultimately used for.

6           MR. KAMENS:  Either for the substantive

7   counts, what it is used for, or for --

8           THE COURT:  Right.  So under that theory, if

9   someone gives money -- the only thing that these

10  defendants ever gave was money to a particular

11  person -- why doesn't the case rise or fall in terms of

12  the status of the recipient as opposed to what that

13  recipient later did with it if the person was truly

14  independent?

15          MR. KAMENS:  Because the government has two

16  theories of liability.  Their first theory of liability

17  is that all of these people are members of al-Shabaab,

18  and providing money to the recipients, who are members

19  of al-Shabaab, constitutes a violation of the statute.

20          THE COURT:  Right.

21          MR. KAMENS:  So that is one theory, but that

22  is not their only theory.  Their second theory is

23  regardless of whether these people are considered

24  members of al-Shabaab, what they did with the money was

25  to provide material support to the foreign terrorist

1   organization.  That is what we've described as the

2   harder path for proving material support.  Because

3   either for purposes of the substantive counts or for

4   purposes of the conspiracy count, the government must

5   prove that it actually was passed through and the money

6   was given to al-Shabaab or that that was the intention,

7   that these people simply intended for this money to be

8   passed through.

9         THE COURT:  Through conduits that may not be

10   itself al-Shabaab?

11         MR. KAMENS:  That's right.

12         THE COURT:  So under your theory, if a

13   defendant gave money to an intermediary, a

14   non-al-Shabaab intermediary if you will, with the

15   understanding and expectation that it would, in fact,

16   be passed on ultimately to al-Shabaab --

17         MR. KAMENS:  Yes.

18         THE COURT:  -- and then what ultimately

19   reaches al-Shabaab was money which al-Shabaab then used

20   for medicine, that it falls within the medicine

21   exception?

22         MR. KAMENS:  That violates the statute.

23         THE COURT:  That violates the statute?

24         MR. KAMENS:  That violates the statute,

25   absolutely.

1          THE COURT:  So how do they benefit from the

2   medicine exception?

3          MR. KAMENS:  They benefit from the medicine

4   exception because Fardowsa is not a member of

5   al-Shabaab.

6          THE COURT:  I understand.  I said if they

7   gave it to a non-al-Shabaab intermediary but with the

8   expectation that that person would, in fact, pass it on

9   and that the money would ultimately reach al-Shabaab --

10         MR. KAMENS:  It depends on whether --

11         THE COURT:  -- and that the organization

12  receives the money but then uses the money to buy

13  medicine, under your theory, that would be within the

14  medicine exception?

15         MR. KAMENS:  No.  That violates the statute.

16         THE COURT:  No.  Then how does that defense

17  even become available to you?

18         MR. KAMENS:  Let me explain.  Ms. Fardowsa,

19  if you agree with our position she's not a member of

20  al-Shabaab and she provides medical care to wounded

21  soldiers, she is no different from any other

22  independent --

23         THE COURT:  Right.  Let's assume Fardowsa is

24  not al-Shabaab but she passes it on to al-Shabaab --

25         MR. KAMENS:  If she passes money on to

```
 1   al-Shabaab --

 2            THE COURT:  Yes.

 3            MR. KAMENS:  -- that is a violation of the

 4   statute.

 5            Let me give you another example.  Doctors

 6   Without Borders.  If I contribute money to Doctors

 7   Without Borders with the intention that Doctors Without

 8   Borders --

 9            THE COURT:  So your theory is that it's

10   within the medicine exception if the recipient is not

11   al-Shabaab and then uses the money for medicine --

12            MR. KAMENS:  Right.  That's right.

13            THE COURT:  -- and provides that medicine as

14   an independent supporter --

15            MR. KAMENS:  That's right.

16            THE COURT:  -- that is not deemed to be

17   al-Shabaab?

18            MR. KAMENS:  That's right.

19            THE COURT:  Like the International Red Cross?

20            MR. KAMENS:  The International Red Cross --

21   although, there is a separate international protection

22   for those regimes.  There's a separate right that's not

23   at issue here.  We're talking about a local person who

24   is providing medical care, but the principles are the

25   same.
```

1            If I provide money to Doctors Without Borders

2    with the intention that Doctors Without Borders will

3    hand over money to al-Shabaab, that violates the

4    statute.  But if I give money to someone who is not

5    part of a foreign terrorist organization with the

6    intention that they provide medical care to al-Shabaab,

7    that falls within the medicine exception.  What we are

8    saying is that that does not violate the statute.

9            THE COURT:  I understand.

10            MR. KAMENS:  It is the difference between

11    providing money and providing medical care to the

12    organization, and what matters is what the organization

13    receives.

14            THE COURT:  All right.  Thank you.

15            Mr. Yamamoto?  Ms. Deutsch?

16            MR. YAMAMOTO:  Ms. Deutsch will be arguing.

17            THE COURT:  All right.

18            MS. DEUTSCH:  Your Honor, could we have like

19    a two-minute break, please.

20            THE COURT:  Sure.  Why don't we take a

21    ten-minute recess.

22        (Recess from 12:07 p.m. until 12:24 p.m.)

23            THE COURT:  Ms. Deutsch.

24                    CLOSING ARGUMENT

25            MS. DEUTSCH:  Good afternoon, Your Honor.

1           THE COURT:  Good afternoon.

2           MS. DEUTSCH:  With the Court's permission, I

3    would like to start by first talking about the

4    indictment itself.  The Court had talked a little bit

5    about that as well.

6           The first thing I'd like to mention is that

7    the government alleges that the indictment -- or that

8    the conspiracy started in or about February 2011 and

9    continued through the present.  I'd like to point out

10   that Ms. Dhirane was in Somaliland in Hargeysa from

11   September 2010 to January 24, 2012.  So for a large

12   part of this conspiracy, she was in Hargeysa and didn't

13   know any of the other members of the conspiracy,

14   including Ms. Jama.

15          The one exception to that, Your Honor, is

16   Barira Hassan Abdullahi.  There is testimony that she

17   had met Barira through her cousin Hodan.  Hodan is not

18   alleged to be a charged conspirator, but I believe the

19   government believes she is a non-charged coconspirator.

20          The evidence shows that the first

21   conversation which Ms. Dhirane had with Ms. Jama was

22   actually on April 13, 2012, after she returned to the

23   U.S.  Her first chat with anyone was on April 10, 2012.

24   So before that, she had had no contact with anyone in

25   this alleged conspiracy, Your Honor.

1            I'd like to also talk about the six overt

2    acts pertaining to Ms. Dhirane which the government

3    alleges in the indictment.   The indictment alleges

4    twenty-six overt acts of which six pertain to

5    Ms. Dhirane.

6            Of those six acts, Your Honor, there are

7    three remittances from Barira to Ms. Dhirane, one

8    remittance from her husband Rashid to Ms. Dhirane.

9    Those four remittances occurred before Ms. Dhirane

10   returned to the U.S.  So four of the six overt acts

11   alleged by the government occurred before Ms. Dhirane

12   actually participated in any conversations with

13   coconspirators.

14           Now, in regard to the substantive counts in

15   the indictment, Your Honor, there are 20 substantive

16   counts.   That would be Counts 2 through 21.   The six

17   overt acts are not alleged as substantive counts, and

18   there are twenty overt acts which are alleged as

19   substantive counts.  But, again, Ms. Dhirane is not

20   charged with any of the substantive counts.

21           I want to talk next, Your Honor, about the

22   behaviors that are the basis of the overt acts.

23           THE COURT:  The government claims that she's

24   liable under *Pinkerton*.

25           MS. DEUTSCH:  I understand, Your Honor.

1          THE COURT:  All right.  You'll speak to that
2  at some point?

3          MS. DEUTSCH:  Yes.

4          THE COURT:  All right.

5          MS. DEUTSCH:  Your Honor, the government has
6  failed to prove that the behaviors that are the basis
7  of these overt acts were in furtherance of the
8  conspiracy.

9          I'd like to talk about Barira Hassan
10 Abdullahi first.  The overt acts involve money that she
11 sent to Ms. Dhirane before Ms. Dhirane came back, as I
12 said.  Now, the government's reasoning in their brief
13 was basically that Ms. Dhirane must have gotten some
14 contacts over in Somaliland, and that's why
15 Ms. Abdullahi sent the money to her.

16         But it doesn't make sense.  There's
17 absolutely no evidence Ms. Dhirane had any contacts in
18 Somaliland while she lived there, and it doesn't make
19 sense that Ms. Abdullahi or Barira, who was living in
20 Hargeysa, would pass money to Ms. Dhirane for a foreign
21 terrorist organization while they were both living
22 there.

23         One of the things that happened when
24 Ms. Dhirane was being interrogated at or about the time
25 of her arrest was she talked about these moneys, these

1  remittances from Barira to her.  She told the agent

2  that Barira had a clothing store in Hargeysa in which

3  she bought and sold gold.  Ms. Dhirane took someone --

4  her name was Farhia Abdi -- to the store so that

5  Ms. Abdi could sell her own gold.

6        Barira offered to pay $3,000 for the gold,

7  but she didn't have enough money.  So she paid her

8  $1,500 for the gold.  She said that she would send the

9  remainder to Ms. Dhirane over Zaad, which is the

10 application on the phone through which one can send

11 money, and that these three amounts of moneys were

12 basically the moneys owed to Ms. Abdi.  In other words,

13 Ms. Dhirane was to be the go-between between money owed

14 from Barira to Ms. Abdi.  Those remittances were sent

15 December 31, 2011; January 1, 2012; and January 2,

16 2012.

17        It's also our position that the government

18 cannot prove that other moneys that were sent to Barira

19 or another one of the Hargeysa conduits was sent for

20 the purpose of supporting al-Shabaab.  There is

21 evidence in the way of conversations, Your Honor, that

22 Ms. Abdullahi was deeply in debt.  She had incurred a

23 lot of debt, and also, her land was being taken,

24 foreclosed on by the government.  Her land was near an

25 airport, and the government wanted to expand the

1 │ airport.  So they were condemning her land.

2 │          She had borrowed money from Telesom, and

3 │ Telesom is a big communications company.  She had

4 │ borrowed $10,000, and in a conversation, she stated

5 │ that she had paid the most urgent of her bills -- and

6 │ that was the word she used, the most urgent of her

7 │ bills -- and that people were basically hounding her

8 │ for the money she owed.  She had to pay $1,540 a month

9 │ to Telesom, and she simply had no money.

10 │          She talked to Ms. Dhirane about that and

11 │ suggested that Ms. Dhirane and Ms. Jama and one

12 │ other -- I believe she was referring to Farhia Hassan,

13 │ whose nickname or moniker is Umu Ibrahim -- that they

14 │ pay that money for the first month and perhaps in

15 │ subsequent months.

16 │          The day after or the day of that conversation

17 │ with Barira, Ms. Dhirane had a conversation with Jama

18 │ and repeated what Ms. Abdullahi had said.  They were

19 │ flabbergasted that she would expect that they could

20 │ come up with $1,540 a month.  It wasn't going to be

21 │ possible.

22 │          Another reason for which, I think, money was

23 │ sent through a conduit in Hargeysa -- and, again, the

24 │ conduits are alleged to be Barira, Hodan, and Hodan's

25 │ daughter, Ifrah Abdi Bashir.  But there are telephone

1   conversations about the fact that money was going for a

2   teacher to teach the women the Koran.  I think that

3   there can be not just one reason why money was being

4   sent through a conduit in Hargeysa but maybe several

5   different reasons.

6          Also, money was sent for the medical care of

7   wounded al-Shabaab soldiers, and that was briefed by

8   Ms. Jama's lawyers.

9          Now, Your Honor, there isn't any evidence

10  that Barira is a member of al-Shabaab.  Of course, all

11  of these women talked incessantly about al-Shabaab and

12  what was going on in al-Shabaab, about fights and

13  attacks and so on.  But that didn't make any of them

14  members of al-Shabaab.

15         Mr. Bryden, again, as the Court knows, said

16  that she was an active supporter and, if not a

17  financier, a financial organizer for the group.  He did

18  not say she was a member.

19         He talked about a couple of different

20  instances that he knew about Barira, one of which

21  involved a U.N. report that said that she was somehow

22  connected to a bombing -- a suicide bombing in

23  Djibouti.  There was a second instance where Mr. Bryden

24  said that she had like a business friend or a business

25  partner who was implicated in the bombing of a

1  restaurant in Addis Ababa, Ethiopia, but he did not say

2  she was a member of al-Shabaab.

3        Another overt act which is alleged in the

4  indictment, Your Honor, occurred on January 17, 2012,

5  and that was a remittance from Ms. Dhirane's husband to

6  her.  Again, she was still in Hargeysa.  There is

7  absolutely no evidence that that money was sent on to

8  al-Shabaab or that her husband was a member of

9  al-Shabaab.

10        She was leaving one week later and, in fact,

11  left one week later.  That money very likely could have

12  been for paying bills.  It could have been for

13  expenditures.  It could have been for spending money on

14  the trip home.  So again, this occurred before she

15  returned home and met all of the other women in the

16  chat room.

17        There are two other overt acts alleged in the

18  indictment, and these overt acts allegedly occurred

19  after Ms. Dhirane returned to the United States.  One

20  of them occurred on June 12, 2012.  It was a remittance

21  of $200 sent to Abdinur Mohmed Mahdi for Sheikh Hassan

22  Hussein.

23        In a conversation the day after with

24  Ms. Jama, Ms. Dhirane said that she had learned there

25  was to be a big fundraiser for the sheikh because the

1  sheikh was in prison.  She went to her husband Rashid

2  and said, I want money to send for the sheikh's

3  release.  He gave her $200.  She sent it to Abdinur

4  Mohmed Mahdi for the sheikh's release.

5           And in a conversation, again, the next

6  morning to Muna Jama, she repeated what she had said

7  over the phone to Abdinur Mohmed Mahdi.  And he said,

8  Well, I have the money, and the sheikh has been

9  released.

10           I think one thing that's important to

11  consider with that overt act is there was no discussion

12  which Ms. Dhirane had with any of the other women who

13  are allegedly in the conspiracy before she sent that

14  money to the sheikh.  The sheikh was an individual.  He

15  wasn't al-Shabaab.  He was not a terrorist organization

16  himself.

17           I think that if one considers acts that are

18  performed by individuals who are alleged to be in a

19  conspiracy, one has to consider that these acts are

20  foreseeable to the rest of the people in the conspiracy

21  before these acts can be considered to be in

22  furtherance of the conspiracy.

23           Now, as to the sheikh, we know that he came

24  out strongly in favor of Godane's leadership.  He said

25  other things, such as he believed it was legitimate to.

1  Kill anyone who opposed the leadership of al-Shabaab,

2  and he acknowledged that the killing of Sheikh

3  Abdulkadir Nur Farah was consistent with his views.  He

4  did not say he had killed him or had participated in

5  killing.  It was consistent with his views.

6          Again, it's our position that Ms. Dhirane was

7  acting alone and not part of any conspiracy.  If, in

8  fact, she was in a conspiracy -- because none of the

9  other people allegedly in that conspiracy knew about

10 the fact that she was sending the money to him.  The

11 first person to know was Ms. Jama the next day.

12         The next overt act -- and this is the last

13 one alleged in regard to Ms. Dhirane -- was money sent

14 to someone named Daahir Abdi, and that money was sent

15 on January 23, 2013, about one year after Ms. Dhirane

16 came back.  And again, she did not discuss sending this

17 money with any one of the other women in the

18 conspiracy, the alleged conspiracy.

19         Rather, she did it on her own.  She asked

20 someone named Abu Kowthar -- and we've heard about him.

21 He was the manager of the chat room.  He contacted

22 Ms. Dhirane and asked her for money.  He needed the

23 money either to fix computers or for new computers

24 because five computers had burnt up.  Apparently, there

25 was a problem with the wiring.

1    And she could come up with $100 at that time.

2  She got it from her husband, Rashid.  And she told Abu

3  Kowthar that she had a contact in Qoryoley, and she

4  sent the money to that contact.  That was Daahir Abdi.

5    Now, Your Honor, there is no evidence that

6  that money was to go to al-Shabaab.  The money was to

7  go to pay for computers or either to fix the computers,

8  and there's no testimony that those computers were

9  being used for al-Shabaab.

10    Now, I wanted to talk a little bit about

11  Ms. Dhirane's participation in the chat room.  Again,

12  the first phone call that she had with anybody in the

13  chat room was on -- I believe it was April 13, 2012.

14  That was, again, after she came back from Somaliland.

15    Ms. Esse had left the chat room in June 2012.

16  So they overlapped maybe three months in the chat room.

17  And Ms. Esse testified that the women got together in

18  the small chat room on the 25th of the month.  So at

19  most, the contact with Ms. Esse that Ms. Dhirane had

20  would have been three times, on the 25th of three

21  months.  There's no evidence that the two of them had

22  any telephone contact.

23    In regard, Your Honor, to any moneys that

24  Ms. Dhirane provided herself, there is a notation in a

25  notebook -- and that was Government Exhibit 3C-2 -- her

1    name and then $500 next to her name.  There was

2    testimony from Ms. Esse that Ms. Jama kept notebook

3    ledgers of women in the chat room and whether women

4    pledged in the chat room.  And if they pledged, there

5    was a check mark put next to their name.  That amount

6    had no check mark next to it.

7            Now, Your Honor, the government has talked

8    about all of these conversations which these women had

9    about events happening in Somalia.  Mr. Bryden

10   testified about the fact that Somalis are very much an

11   information society.  It would not be odd for someone

12   to read something or hear something on the Internet one

13   day and be on the phone that same day talking about it.

14   And there was a lot of events that were happening in

15   Somaliland and Somalia at the time these women were

16   talking.

17           Mr. Gillis talked about the fact that

18   Ms. Dhirane spoke about the raid of Godane's parents'

19   home in Hargeysa.  These women referred to him as the

20   grandfather, but it was very clear that they were

21   talking about the raid of his home.  He was not killed

22   during that raid.

23           There was talk about the Westgate Mall, and

24   there was talk about the bombing involving the Somalia

25   Intelligence Service Chief Khalif Ahmed Ereg.  At times

1  during these conversations, the women used veiled

2  words, such as rain, downpour, and flooding for bombs

3  and bullets, a lot of new greener grass for the

4  aftermath of bombings, heavy downpour for bombings.  It

5  was clear, obviously, in their conversations that they

6  were supportive of al-Shabaab, that they were

7  supportive of what al-Shabaab was doing, but that

8  doesn't mean they were providing material support to

9  al-Shabaab.  And again, they were following these

10  reports very assiduously as many Somalis in the

11  diaspora and probably also in Somalia were doing at the

12  time.

13         I think the government's position is that

14  using veiled language is because they were conscious of

15  their guilt, that it shows a consciousness of guilt.  I

16  would suggest, Your Honor, that it doesn't show a

17  consciousness of guilt.  There are a number of factors

18  going on in these conversations which the women are

19  talking about that would cause them to use veiled

20  language.

21         For example, they were targeted by hawalas,

22  and they talked about it.  Fardowsa could not receive

23  money anymore because she was targeted by, I think,

24  Dahabshiil.  It was the hawala through which money was

25  sent.  Muna, Ms. Jama, also was apparently targeted and

1  wasn't allowed to send or receive money through a
2  hawala.  Hodan was called a target, and that's why her
3  daughter, Ifrah Bashir Abdi, was enlisted as a conduit
4  through which money was sent.
5          And Ms. Dhirane herself had a conversation in
6  which she talked about the fact that she was not
7  allowed to pick up money at a hawala even though she
8  had American ID -- she was an American citizen -- and
9  that she was told at the hawala that she would need a
10 guarantor.  So these ladies, because of that alone,
11 were becoming paranoid.
12         But also, there was conversation in which one
13 woman who was not in the group of 15 -- it was Ayan
14 Warsame -- said that she believed her phone was tapped
15 and that the conversations were being listened to.
16         There were people that these women knew who
17 were being approached by law enforcement officers
18 either in America or in Somalia or Somaliland, and that
19 included an American-Somali woman who was arrested in
20 Boorama along with her family and the family maid.  And
21 Hinda or Ms. Dhirane expressed that, I think they were
22 looking for me.  I mean, obviously, Ms. Dhirane was a
23 Somali woman who was an American citizen.  She was
24 staying in Somaliland, and so she thought in a paranoid
25 way that perhaps they were looking for her at that

1   time.

2        Then also these women talked about the three

3   prosecutions they knew of.  That was Amina Ali and Hawo

4   Hassan, both codefendants in the Eighth Circuit.  They

5   talked about Nima Yusuf, who was prosecuted in

6   California, and they also talked about Shaker Masri,

7   who was prosecuted in Missouri.

8        They knew that Amina Ali and her codefendant

9   and Nima Yusuf were convicted of sending money to

10  al-Shabaab, in other words, providing material support

11  to an FTO.  That led Ms. Dhirane to complain on several

12  occasions that if you send one penny, it's fifteen

13  years, one penny.

14       Now, the government makes much of the fact

15  that these women knew consequences for sending money to

16  al-Shabaab.  Obviously, at that time, the statute

17  required 15 years.  But that isn't necessarily

18  indicative that Ms. Dhirane or anyone else was sending

19  money to al-Shabaab or believed that they were guilty

20  of doing any such thing.  I think that, Your Honor,

21  there's no evidence here that money was sent to

22  al-Shabaab.

23       Finally, Your Honor, the government likens

24  the veiled language in this case to veiled language

25  which is used in narcotics cases and called narcotics

1  code.  We know from being involved in narcotics cases

2  that frequently the defendants in those cases will call

3  narcotics some other word like tapes or blouses or

4  whatever.  The difference between the coded language

5  there and the coded language here is that in those

6  narcotics cases, generally, the government has a whole

7  lot more evidence than they have in this case.

8          In those cases, the coded words are just

9  maybe a piece of the evidence to look at, but they also

10 have audio-taped conversations between an informant and

11 the target in which they discuss where to meet and what

12 the target wants.  They have audio and video footage of

13 the actual deal going down.  They have testimony by one

14 or more backup police officers about the fact that they

15 searched the informant before he did the deal and gave

16 him buy money, prerecorded buy money, and that when he

17 came back from the deal, he had the drugs and no buy

18 money.  There's other evidence in those cases.

19         Here, basically, what the government has is

20 some telephone conversations, some of it in coded

21 language, and some of the conversations in coded

22 language don't involve the talk of sending money

23 anywhere.  It's just code.  And they have remittances.

24         I would submit, Your Honor, that none of this

25 proves that money was intended for al-Shabaab, and it

1   doesn't prove that money was actually passed on to

2   al-Shabaab.

3           Thank you.

4           THE COURT:  Thank you.

5           Mr. Gillis, I'll give you the last

6   opportunity here.

7                      REBUTTAL ARGUMENT

8           MR. GILLIS:  Your Honor, the last word from

9   Ms. Esse on what money was going to the houses on the

10  Nairobi side was that the money was for rent.  That was

11  something that was drawn out by defense counsel in

12  their cross-examination.  We mention that in our

13  rebuttal.

14          As we said, there were a number of different

15  codes that were invented on the fly, plus the fact that

16  these codes were used much longer after Ms. Esse was in

17  the conspiracy.  These terms were not ossified as of

18  whatever date it was that Ms. Esse was in the

19  conspiracy.

20          It's obvious from the various transcripts and

21  calls, chats that living expenses to these two

22  defendants and to their coconspirators went far beyond

23  medical expenses.  So when the defense says that the

24  only evidence that we've presented was that living

25  expenses meant medicine, that's just not true.  I mean,

1   it's borne out by scores of transcripts.

2           With respect to the membership issue, again,

3   they talk -- Mr. Kamens mentioned the standards for

4   targeting and for detaining which would require a

5   certain higher level of proof of connection to

6   al-Shabaab than would someone who's in the middle of an

7   Article III court receiving the full benefits of the

8   excellent counsel that they have and all of the

9   procedural and evidentiary safeguards at issue here.

10          So if we're talking about targeting somebody

11  for a drone strike, it makes sense that you would want

12  to have a certain level higher of their association

13  with al-Shabaab.  Certainly, no one would suggest that

14  either one of these two would be targeted for a drone

15  strike, nor likely any of the people that were in

16  Somalia and Nairobi.

17          However, we've demonstrated the very close

18  connections that they had with Godane.  In fact, in one

19  of the transcripts, they talk about having the approval

20  of Godane to seek money for the support of al-Shabaab,

21  and they say that we have the approval of the

22  grandfather.  To the extent that -- whether somebody

23  can be targeted or not is any evidence of whether

24  somebody is a member of al-Shabaab, Godane was droned

25  by, at least as reported, by the U.S.  And these folks

1  were close to them, and their coconspirators were close

2  to them.

3          If I understood the defense, Mr. Kamens'

4  argument was -- what he last said was that what matters

5  is what was received by al-Shabaab.  We went through

6  these questions about whether money that went to a

7  conduit that went then to al-Shabaab would be unlawful,

8  and what I understood to be said at the last was that

9  it matters what is actually provided.  So if it's

10  money, it violates the statute.  But if it's medicine,

11  it does not.

12          But that would make the defendants'

13  culpability turn upon events that happen long after she

14  provides the money and over which she has no control.

15  She provides the money knowing that it's going to be

16  going to al-Shabaab.  If somebody decides later whether

17  to give the money for al-Shabaab to buy medicine or if

18  they later give the money or rather just buy the

19  medicine themselves and give the medicine, that would

20  make the difference as to whether the defendants were

21  culpable or not culpable.  That can't be the law, Your

22  Honor.

23          They make an argument in their brief.  I

24  don't know if it's still part of the defendants'

25  argument, but in their reply to our brief, Ms. Jama's

1  attorneys make a point -- at least try to make the

2  point that although the government -- this is on

3  page 15 of their reply brief on the Rule 29 motion.

4  Although the government asserts a distinction between

5  providing money and providing personnel, a restriction

6  on contributing money is equivalent to a restriction on

7  speech itself.  That's quoting the lines of cases

8  dealing with election law contributions.

9          Then they make the leap from there to talk

10  about the *Humanitarian Law Project*, and they say that

11  then a narrowing category of speech has to be -- it has

12  to be established that there's two under the direction

13  of or in coordination with foreign groups that the

14  speaker knows to be a terrorist organization.

15          Well, first of all, that is completely

16  contrary to the holding of *Humanitarian Law Project*

17  that providing money is illegal, does violate the

18  statute.  And so whether they adhere to that position

19  still is not clear.  But in any case, it is certainly

20  contrary to Supreme Court law, as well as the other

21  cases that we cite in our papers.

22          Even if what's being provided is medical

23  care, is a doctor going to provide medical services or

24  treatment to al-Shabaab personnel or is even -- in the

25  example of the *Hussain* case is simply teaching at a

1    school that's run by Hamas.  All of those things are

2    services, the rendition of doctoral care, the rendition

3    of medical treatment as opposed to a substance.

4            Medicine violates the statute, and that is

5    clear from *Holder* in particular, but also *Shah* and

6    *Farhane*, as well as the *Hussain v. Mukasey* case, all of

7    which we cite in our papers.

8            I would like to leave, then, the Court with

9    this:  Their argument carried to its logical

10   conclusion, Your Honor, would be that if Mohamed

11   received the money in Nairobi for the rent on the safe

12   houses and if she paid that rent to the infidel and

13   then used those safe houses to store weapons and house

14   al-Shabaab fighters, that would not be enough because

15   Mohamed did not give the money to the organization in

16   some way.  The money went from Jama and Dhirane to

17   Mohamed and then moved from Mohamed to the infidel.

18           Clearly, that is not the case, Your Honor.

19   That cannot be the law because by paying the rent on

20   these two safe houses, they provided shelter.  And safe

21   houses are exactly what these things were, and safe

22   houses are specifically included in the definition of

23   material support.

24           So for all of those reasons, Your Honor, I

25   submit that the defendants are guilty and we proved

1  them guilty beyond a reasonable doubt.  We ask the

2  Court to return a verdict of guilty as charged.

3           THE COURT:  All right.  Thank you.

4           The Court is going to take the matter under

5  advisement, and I'll advise the parties when it's

6  reached a verdict.  It will not be this week, but I'm

7  hopeful that shortly thereafter I'll be able to get

8  back to you and advise you the Court has reached a

9  verdict and, if necessary, deal with the Rule 29

10 motion.

11          All right.  I thank counsel for their

12 arguments and briefing.

13          Counsel is excused.

14          The defendants are continued on release on

15 the same terms and conditions.

16          The Court will stand in recess.

17          -----------------------------------
                    Time:  1:00 p.m.
18

19

20

21
        I certify that the foregoing is a true and
22
     accurate transcription of my stenographic notes.
23

24
                                  /s/
25                       Rhonda F. Montgomery, CCR, RPR


      Rhonda F. Montgomery   OCR-USDC/EDVA   (703) 299-4599