<pre>
 1                UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF VIRGINIA
 2                     ALEXANDRIA DIVISION

 3  UNITED STATES OF AMERICA,   )  Case 1:14-cr-00230
                                )
 4               Plaintiff,     )
                                )
 5        v.                    )  Alexandria, Virginia
                                )  October 25, 2016
 6  MUNA OSMAN JAMA,            )  9:12 a.m.
    and                         )
 7  HINDA OSMAN DHIRANE,        )
                                )
 8               Defendants.    )  Day 7
                                )  Pages 1013 - 1058
 9

10                     TRANSCRIPT OF TRIAL

11          BEFORE THE HONORABLE ANTHONY J. TRENGA

12            UNITED STATES DISTRICT COURT JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25       COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
</pre>

1014

1   APPEARANCES:

2   FOR THE PLAINTIFF:

3        JAMES P. GILLIS, ESQUIRE
         DANYA E. ATIYEH, ESQUIRE
4        OFFICE OF THE UNITED STATES ATTORNEY
         2100 Jamieson Avenue
5        Alexandria, Virginia  22314
         (703) 299-3700
6
     FOR DEFENDANT MUNA OSMAN JAMA:
7
         WHITNEY E.C. MINTER, ESQUIRE
8        GEREMY C. KAMENS, ESQUIRE
         OFFICE OF THE FEDERAL PUBLIC DEFENDER
9        1650 King Street, Suite 500
         Alexandria, Virginia  22314
10       (703) 600-0800

11       JOSHUA M. SIEGEL, ESQUIRE
         COOLEY, LLP
12       1299 Pennsylvania Avenue, N.W., Suite 700
         Washington, D.C.  20004
13       (202) 842-7800

14   FOR DEFENDANT HINDA OSMAN DHIRANE:

15       ALAN H. YAMAMOTO, ESQUIRE
         LAW OFFICE OF ALAN YAMAMOTO
16       634 South Washington Street
         Alexandria, Virginia  22314
17       (703) 684-6643

18       PAULA S. DEUTSCH, ESQUIRE
         OFFICE OF THE FEDERAL PUBLIC DEFENDER
19       1601 Fifth Avenue, Suite 700
         Seattle, Washington  98101
20       (206) 553-1100

21   THE DEFENDANT, MUNA OSMAN JAMA, IN PERSON

22   THE DEFENDANT, HINDA OSMAN DHIRANE, IN PERSON

23   MARYAM ABDI, SOMALI INTERPRETER

24

25

1            THE CLERK:  Criminal Case 1:14-cr-230, *United*

2  *States of America v. Muna Osman Jama and Hinda Osman*

3  *Dhirane*.

4            Will counsel please identify themselves for

5  the record.

6            MR. GILLIS:  Good morning, Your Honor.  Jim

7  Gillis for the United States with Danya Atiyeh, our

8  newest addition as an Assistant U.S. Attorney in the

9  Eastern District of Virginia.

10            THE COURT:  Welcome.

11            MR. GILLIS:  With me are Agents C.J. Goodman,

12  Kate Holden, and Wayne Sharp.

13            THE COURT:  All right.

14            MR. KAMENS:  Good morning, Your Honor.

15  Geremy Kamens and Whitney Minter from the Office of the

16  Federal Public Defender, also Joshua Siegel from the

17  firm of Cooley, LLP, representing Ms. Jama.

18            MR. YAMAMOTO:  Good morning, Your Honor.

19  Alan Yamamoto and Paula Deutsch for Ms. Dhirane.

20            THE COURT:  All right.  We also have our

21  interpreter.

22            Would the interpreter identify herself and be

23  sworn, please.

24            THE INTERPRETER:  Maryam Abdi.

25     (The interpreter affirms.)

1    THE COURT:  The Court has reached a verdict

2    and also on some related outstanding issues.

3    Before the Court publishes its verdict, does

4    either the government or the defendants wish to raise

5    anything?

6    Mr. Kamens.

7    MR. KAMENS:  Your Honor, we'd ask the Court

8    if the Court intends to make specific findings of fact

9    in accordance with Rule 23(c).

10   THE COURT:  All right.

11   MR. KAMENS:  Does the Court intend to do

12   that?

13   THE COURT:  Yes.

14   MR. KAMENS:  Thank you, Your Honor.

15   THE COURT:  Anything further?

16   MR. GILLIS:  Not from the government, Your

17   Honor.

18   THE COURT:  All right.  The Court has heard

19   the evidence and is prepared to render a verdict.

20   On June 26, 2014, a grand jury returned a

21   21-count superseding indictment against these two

22   defendants together with three other codefendants who

23   have not been arrested and appear to be located out of

24   the United States.

25   In Count 1, the defendants are charged with

1  conspiracy to provide material support to a foreign

2  terrorist organization, in violation of Title 18,

3  United States Code, Sections 2339B, and in Counts 2

4  through 21, they're charged with providing material

5  support to a foreign terrorist organization, in

6  violation of Title 18, United States Code,

7  Section 2339B and 2.

8          The defendants waived trial by jury, and the

9  Court held a bench trial beginning on July 11, 2016.

10  On July 14, after the government rested its case in

11  chief, the defendants moved for a judgment of acquittal

12  pursuant to Federal Rule of Criminal Procedure 29 on

13  which the Court reserved decision.  Thereafter the

14  parties continued the presentation of evidence with all

15  the parties resting on July 18, following which the

16  defendants renewed their Rule 29 motion.  The Court

17  then ordered the filing of supplemental briefing and

18  heard closing arguments on October 12, 2016.

19          Let me first rule on the defendants'

20  outstanding evidentiary objections to statements made

21  by persons other than Defendants Jama and Dhirane

22  identified as such.  Based on all the evidence, the

23  Court finds that there is a sufficient foundation to

24  bring the challenged evidence within Federal Rule of

25  Evidence 801(d)(2)(A) or (E) or to establish that this

1   evidence was qualified as verbal facts probative of

2   knowledge, intent, motive, plan, preparation, or

3   absence of mistake.  Those objections are, therefore,

4   overruled.

5           With respect to the specific charges, Count 1

6   of the superseding indictment alleges that, quote, From

7   at least in or about February 2011 and continuing

8   through the date of the superseding indictment, these

9   two defendants, together with Fardowsa Jama Mohamed,

10  Fahria Hassan, and Barira Hassan Abdullahi, conspired

11  with each other and with others knowingly to provide

12  material support and resources to a foreign terrorist

13  organization, that is al-Shabaab, in violation of

14  Title 18, United States Code, Section 2339B.

15          The superseding indictment further alleges

16  that in furtherance of the conspiracy, these defendants

17  and their coconspirators engaged in a series of 26

18  transfers of funds beginning on February 8, 2011, with

19  the transfer from Defendant Jama to Fardowsa Mohamed

20  and ending on January 23, 2013, with a transfer from

21  Defendant Dhirane to Daahir Abdi.

22          With respect to Counts 2 through 21, the

23  superseding indictment alleges that on the specific

24  dates alleged in each count, a defendant or

25  coconspirator transmitted a certain amount of money as

1    alleged in each count to a specific individual and,

2    through that transaction, provided material support to

3    al-Shabaab or attempted to do so, in violation of

4    Title 18, United States Code, Section 2339B.

5            These alleged transfers begin in Count 2 on

6    February 8, 2011, with transfers of money from

7    Defendant Jama to Mohamed and end in Count 21 with a

8    transfer on August 8, 2012, from Jama to Osman Jama,

9    her father.

10           Fourteen of the twenty-one counts of material

11   support involve transfers from Defendant Jama to

12   Mohamed; four from Ali Bakri Sheikh, Jama's husband, to

13   Mohamed; and two transfers from Defendant Jama to Osman

14   Jama, her father.

15           In order to convict the defendants of

16   conspiracy to provide material support to a foreign

17   terrorist organization as alleged in Count 1, the

18   government must prove beyond a reasonable doubt the

19   following elements:

20           First, that the defendants conspired to

21   provide material support or resources to a foreign

22   terrorist organization;

23           Secondly, that the foreign terrorist

24   organization was a designated foreign terrorist

25   organization and was engaged in terrorist activities;

1       The defendant knowingly and intentionally

2  provided material support or resources; and

3       The defendant had knowledge that the

4  organization is a designated terrorist organization,

5  has engaged or engages in terrorist activity, or has

6  engaged or engages in terrorism.

7       In order to convict each defendant of the

8  substantive charge of providing material support or

9  resources to a foreign terrorist organization, the

10  government must prove beyond a reasonable doubt the

11  following elements:

12       First, the defendants provided material

13  support or resources to a foreign terrorist

14  organization;

15       The foreign terrorist organization was

16  designated a foreign terrorist organization and was

17  engaged in terrorist activities;

18       The defendant knowingly and intentionally

19  provided material support or resources; and

20       The defendant had knowledge that the

21  organization is a designated terrorist organization and

22  has engaged or engages in terrorist activity or has

23  engaged or engages in terrorism.

24       The Court has jurisdiction as to each count

25  with respect to each defendant if she is either a

1  national of the United States or an alien lawfully

2  admitted for permanent residence in the United States

3  or the offense occurs in whole or in part within the

4  United States or the offense occurs in or affects

5  interstate or foreign commerce.

6          This case involves inherently difficult

7  issues of proof, both because of the secretive and

8  amorphous nature of a terrorist organization and the

9  limited transparency as to the specific roles and

10  associations of particular persons, and also because of

11  the limited practical ability to trace the

12  extraterritorial movement of specific funds for

13  specific purposes.

14          Here there is substantial direct evidence,

15  principally in the form of recorded chat room

16  statements by these defendants and others, but the

17  probative value of that evidence is limited and has to

18  be considered with other circumstantial evidence and

19  the reasonable inferences that can be drawn from that

20  evidence, as well as the expert testimony that's been

21  presented concerning the nature of al-Shabaab's

22  operations, its known leadership, and those who are

23  associated with its operations, and the timing of the

24  alleged transfers relative to actual events involving

25  al-Shabaab.

1    Based on all the evidence and the reasonable
2 inferences that can be drawn from that evidence, the
3 Court finds that the following facts have been
4 established:
5    Al-Shabaab is designated as a foreign
6 terrorist organization by the United States Department
7 of State under Section 219 of the Immigration and
8 Nationality Act and is also an organization that has
9 engaged in terrorist activities and is, therefore, a
10 foreign terrorist organization for the purposes of
11 Section 2339B(a)(1).
12    Each of these defendants is a United States
13 citizen and resident of the United States who was born
14 in Somalia.
15    At all material times, both were ardent,
16 committed, and active supporters of al-Shabaab.
17    Both knew that al-Shabaab was a designated
18 foreign terrorist organization and that it engaged and
19 currently does engage in terrorist activities and that
20 it was unlawful to provide certain kinds of support to
21 that organization.
22    Beginning no later than April 2011 in the
23 case of Defendant Jama and April 2012 in the case of
24 Dhirane, these defendants participated in a chat room
25 known as ISDAC or Dactu al-Tawhid.  That chat room was

1  composed of members of the Somali community in the

2  United States and around the world, commonly referred

3  to as the Somali diaspora.

4          These participants discussed current events

5  concerning Somalia and also the activities of

6  al-Shabaab as they appeared in the worldwide press.

7  Also on various occasions, al-Shabaab leaders and

8  representatives would speak to the group and solicit

9  various forms of support, including financial support.

10         Within a smaller private chat room hosted by

11  Paltalk, a subgroup of participants, known as the group

12  of 15, held separate and more confidential discussions

13  approximately once or twice per month.

14         Only those participants from the larger chat

15  room who were thought to be or could be persuaded to be

16  committed supporters of al-Shabaab were invited into

17  the group of 15.

18         Both of these defendants were members of the

19  group of 15 which had committed to providing financial

20  contributions on a monthly basis for the benefit of

21  al-Shabaab.

22         This money was delivered to persons either on

23  what was referred to as the Nairobi side, referring to

24  an area in and around Nairobi, Kenya, or the Hargeysa

25  side of al-Shabaab's operations, referring to an area

1   in and around Hargeysa, Somalia.

2          The chat room itself was sponsored,

3   supported, and financed through persons closely linked

4   to al-Shabaab and its fundraising efforts.

5          Both defendants played prominent, if not

6   leadership roles within the group of 15.

7          One or both of these defendants were involved

8   in arranging for representatives or persons associated

9   with al-Shabaab to speak to both the chat room and the

10  group of 15 during which these al-Shabaab-associated

11  persons solicited support, including financial support.

12         More specifically, Defendant Jama supervised

13  the monthly payments by the group of 15, on occasion

14  personally soliciting contributions.

15         She also monitored whether the individual

16  members had satisfied their monthly commitments and

17  whether those sums had been successfully transmitted to

18  al-Shabaab contacts on both the Nairobi side and

19  Hargeysa side.

20         She served in the nature of an enforcer by

21  following up with those members of the group of 15 who

22  had not paid their monthly commitments on time.

23         Defendant Jama also instructed Defendant

24  Dhirane on how to perform these roles, and Defendant

25  Dhirane came to play a similar role.

1       As part of their activities within the group

2  of 15, the defendants actively and closely coordinated

3  with others, including Codefendant Fardowsa Jama

4  Mohamed located in Nairobi, Kenya, and Codefendant

5  Barira Hassan Abdullahi located in Hargeysa, Somalia.

6       These individuals were actively involved in

7  arranging for and facilitating support to al-Shabaab.

8  More specifically, Mohamed operated two safe houses in

9  Nairobi, Kenya, for al-Shabaab.  One of these was

10  focused, at least in part, on providing medical care

11  and treatment to injured al-Shabaab soldiers, and the

12  other was used as a staging ground in various respects

13  for al-Shabaab military operations.

14       Barira Hassan Abdullahi was involved in

15  receiving money for al-Shabaab in Somalia or Somaliland

16  for such purposes as providing transportation, trucks,

17  and other supportive services to al-Shabaab.  This

18  included what codefendants referred to as living

19  expenses in the coded language that they employed to

20  conceal the true nature of their discussions.

21       Defendants Jama and Dhirane were also

22  involved in generating funds for the benefit of

23  al-Shabaab through the transmission of those funds to

24  these individuals with Defendant Jama principally

25  focused on the delivery of funds to Mohamed and others

1 on the Nairobi side and Defendant Dhirane principally

2 on the delivery of funds to Abdullahi on the Hargeysa

3 side often through various intermediaries in order to

4 conceal the sources and purposes of those funds.

5        As part of the fundraising activities, both

6 defendants had access to those who held leadership

7 positions within al-Shabaab and, through those

8 contacts, had access to nonpublic information

9 pertaining to al-Shabaab's financial needs, as well as

10 certain other activities that it was involved with,

11 including military activities. To a certain extent,

12 these defendants actually coordinated the fundraising

13 activities in light of the specific needs of

14 al-Shabaab.

15        The Court first finds and concludes that it

16 has jurisdiction over these defendants with respect to

17 each of the counts in the indictment.

18        With respect to Count 1, the evidence clearly

19 establishes that each of these defendants entered into

20 an agreement between themselves and others to provide

21 funds intended for the support of al-Shabaab.

22        For the substantive counts, 2 through 21,

23 that certainly these alleged transfers to be discussed

24 took place knowingly and intentionally for the purpose

25 of providing that support.

1          The central factual and legal issue is

2    whether the substance of that agreement and the actual

3    transfers had as its objective providing unlawful

4    material support and resources to a foreign terrorist

5    organization and, in fact, were delivered to a foreign

6    terrorist organization or whether, as the defendants

7    contend, the substance of their agreement was simply to

8    provide funds to persons who were supportive but

9    independent and not part of al-Shabaab, who in turn

10   provided exempted assistance to al-Shabaab.

11         The required analysis is somewhat different

12   for the conspiracy count than for the substantive

13   counts.  For the conspiracy count, the central issue is

14   whether the defendants' agreement constituted an

15   agreement to engage in an unlawful act, specifically to

16   provide to al-Shabaab nonexempted material support

17   either directly to persons they thought were part of

18   al-Shabaab or through independent conduits regardless

19   of whether they were, in fact, successful in doing so.

20   In the substantive counts, the central issue is whether

21   the specifically alleged transfers did, in fact,

22   constitute nonexempted material support to al-Shabaab.

23         The defendants contend that their fundraising

24   activities and their transmission of the alleged funds

25   were done in the context of relationships they believed

1  to be entirely independent relationships as between

2  al-Shabaab and the recipients of Defendants Jama's and

3  Dhirane's financial transfers and that these

4  independent recipients provided services or assistance

5  that they believed were not lawful to provide.

6        The alleged basis for this claimed exemption

7  is the notion that what was provided was medicine as

8  defendants claim that term is to be defined, both as a

9  matter of statutory construction and also consistent

10 with customary international law in the United States

11 treaty obligations.

12       These positions require the Court, first, to

13 determine whether the alleged recipients of those

14 funds, such as Mohamed and others on the Nairobi side

15 and Abdullahi on the Hargeysa side, are considered part

16 of al-Shabaab for the purposes of the material support

17 statute.

18       If the Court decides that the delivery of

19 these funds to these individuals does constitute

20 delivery to al-Shabaab, then the Court must next

21 determine for the conspiracy count whether these

22 defendants thought and intended in delivering these

23 funds to these individuals that they were delivering

24 funds to al-Shabaab as opposed to some person

25 independent of al-Shabaab who was merely supportive of

1    al-Shabaab.

2           If the Court decides that the delivery of

3    these funds to these individuals does not constitute

4    delivery to al-Shabaab upon the receipt by these

5    individuals, the Court must then decide whether the

6    defendants understood and intended that these funds

7    would be passed on to al-Shabaab in a form that

8    constituted nonexempt material support, and for the

9    substantive counts, that any such provision of support

10   that was delivered or attempted to be delivered to

11   al-Shabaab was, in fact, exempt.

12          The Court must begin in that analysis by

13   articulating an operative legal standard by which to

14   factually determine whether someone should be deemed,

15   in fact, part of a foreign terrorist organization for

16   the purpose of determining whether a foreign terrorist

17   organization has received prohibited material aid.

18   There is surprisingly little case law that has dealt

19   with this issue.  There's no definitive Supreme Court

20   case or Fourth Circuit case concerning what constitutes

21   delivery to a foreign terrorist organization under

22   Section 2339B.

23          In *United States v. Ali*, the Eighth Circuit

24   considered facts very similar to those in this case

25   involving fundraising through chat rooms, but the court

1  did not consider specifically whether the persons to

2  whom defendants delivered their funds constituted

3  delivery to al-Shabaab as that evidence at trial was

4  apparently not challenged as insufficient on appeal.

5  The Eighth Circuit, therefore, had no occasion to

6  articulate a specific legal test.

7          In *Holder v. Humanitarian Law Project*,

8  561 U.S. 1, 2010, an opinion by the Supreme Court, the

9  Court considered various constitutional challenges to

10 certain aspects of Section 2339B principally under the

11 First Amendment, as did the Fourth Circuit in

12 *U.S. v. Hassan*, 742 F.3d 104, which is a Fourth Circuit

13 2014 opinion with respect to related sections.  But,

14 again, neither court specifically considered what

15 involvement or association a person must have with a

16 foreign terrorist organization to be deemed part of

17 that organization for the purposes of Section 2339B.

18         The defendants argue for a test that requires

19 a showing that a particular individual essentially

20 operates under what they have called the command and

21 control of recognized al-Shabaab leadership before that

22 individual may be deemed a part of al-Shabaab for the

23 purposes of the material support statute.  In support

24 of that position, they rely on cases that consider who

25 should be deemed an enemy combatant or a nonprivileged

1   belligerent.

2          They also contend that only someone who is

3   deemed a member of al-Shabaab as opposed to a mere

4   supporter or financier or facilitator should be

5   considered a person with sufficient association with

6   al-Shabaab to be deemed part of that organization.  In

7   support of that position, they point, in part, to the

8   matrix of designations used by the United Nations as

9   referenced in expert testimony presented by the

10  government which distinguishes between a member of a

11  foreign terrorist organization and a supporter,

12  financier, or facilitator; although, all of those

13  persons in all of those categories may be subject to

14  sanctions under the U.N. framework.

15         Implicit in the defendants' analysis is the

16  notion that while a foreign terrorist organization is

17  not comparable to a formally organized corporation or

18  other legal or lawful entity, it does have an

19  identifiable structure with identifiable leaders and

20  persons who act under the command and control of that

21  leadership.

22         The defendants also contend that any working

23  definition of who constitutes a part of a foreign

24  terrorist organization must accommodate the First

25  Amendment rights of advocacy and association, including

1 First Amendment protections that extend to the

2 expressive conduct embedded in financial donations as

3 recognized in such cases as *Buckley v. Valeo*.  For that

4 reason, a central element of the conspiracy claim,

5 according to the defendants, is a nonspeech protected

6 overt act in furtherance of the conspiracy.

7       The government proposes a much less formal

8 showing that requires only that a particular person is

9 acting on behalf of a foreign terrorist organization, a

10 fact-intensive inquiry based on the assessment of all

11 the evidence.

12       Although the material support statute does

13 not specifically define or address who is part of a

14 foreign terrorist organization, it does have other

15 terms that are either defined or have been construed in

16 a way that are useful in determining whether someone is

17 sufficiently acting for or on behalf of a foreign

18 terrorist organization to be a part of that

19 organization.

20       For example, Section 2339B(h) explains that

21 providing prohibited personnel involves providing

22 someone, which may include himself or herself, who,

23 quote, works under the terrorist organization's

24 direction or control or organizes, manages, supervises,

25 or otherwise directs the operation of that

1    organization.

2           That subsection further provides that

3    individuals who act entirely independently of the

4    foreign terrorist organization to advance its goals or

5    objectives shall not be considered to be working under

6    the foreign terrorist organization's direction or

7    control.

8           Clearly, Congress wanted courts to consider

9    the specific nature of an individual's actions in

10   relation to the goals and objectives of a terrorist

11   organization in determining whether someone is to be

12   deemed part of that organization and intended this

13   definition not to include those engaged in merely

14   independent advocacy or only isolated, marginal, or

15   tangentially related activities relative to that

16   organization.

17          But the emphasis on complete independence and

18   the inclusion of activities beyond those occurring

19   through the direction and control to those that involve

20   organizing, managing, or supervising various aspects of

21   a foreign terrorist organization makes clear that

22   Congress also did not intend to limit the universe of

23   persons who are deemed sufficiently associated with a

24   foreign terrorist organization to those who are part of

25   some identifiable command-and-control structure but

1  rather intended to include all persons who are acting

2  on behalf of a foreign terrorist organization to

3  further its goals and objectives.

4         Also helpful in this regard are the court's

5  pronouncements in *Holder v. Humanitarian Law Project*

6  where the court cited with approval a dictionary

7  definition of prohibited service as an act done for the

8  benefit or at the command of another emphasizing that

9  the statute requires that the service or other

10 prohibited support be to a foreign terrorist

11 organization.  Therefore, it requires a connection

12 between the services provided and that group.

13        In light of these considerations, the Court

14 concludes that for the purposes of Section 2339B, a

15 person is to be deemed a part of a foreign terrorist

16 organization whenever that person has engaged in

17 substantial activities on behalf of the foreign

18 terrorist organization, determination to be made on the

19 basis of all of the facts and circumstances pertaining

20 to an individual's relationship with a foreign

21 terrorist organization.

22        And to determine whether and to what extent a

23 particular individual involved in providing or

24 receiving funds for use by a foreign terrorist

25 organization constitutes a part of that organization,

1  the Court has considered the following nonexclusive

2  list of relevant factors:

3           First, whether the individual, in fact,

4  provided financial, logistic, or other forms of support

5  to the foreign terrorist organization or advanced the

6  foreign terrorist organizations' purposes in any form

7  and for what period of time;

8           Secondly, whether that person's activities

9  are specifically and exclusively for in this case

10 al-Shabaab or whether the individual undertakes similar

11 activities for other organizations for the public at

12 large;

13          Third, the degree to which the individual's

14 actions were directed by or coordinated with al-Shabaab

15 or its representatives;

16          Fourth, the nature and extent of the

17 individual's contacts with al-Shabaab or with others

18 acting on behalf of al-Shabaab, including access to

19 al-Shabaab's leadership and access to nonpublic

20 information pertaining to al-Shabaab's activities;

21          Further, whether the individual

22 self-identifies with al-Shabaab or represents himself

23 or herself as being part of al-Shabaab or purports to

24 act on behalf of al-Shabaab; and

25          Sixth, whether an individual is reliably

1 identified as part of al-Shabaab by recognized

2 international law enforcement or other organizations.

3      It would be unusual if the evidence

4 established that all or even most of these factors are

5 satisfied; although, in some cases, there may be

6 sufficient evidence in just one of these categories to

7 establish an adequate link between a person and a

8 foreign terrorist organization so as to be deemed part

9 of that organization.

10      Here the evidence establishes that these two

11 defendants, as well as Fardowsa Mohamed and Abdullahi,

12 were engaged in substantial activities on behalf of and

13 in coordination with the al-Shabaab organization itself

14 over an extended period of time.

15      Mohamed operated two safe houses, one for

16 injured al-Shabaab soldiers and one that facilitated

17 al-Shabaab military operations.  She was not someone

18 operating an independent organization, like Doctors

19 Without Borders or the international Red Cross, which

20 has purposes, goals, and objectives that are not tied

21 to any one particular beneficiary of its assistance,

22 but rather solicits donations for humanitarian services

23 generally.

24      Here the funds Mohamed solicited and received

25 were specifically for al-Shabaab and for no one else,

1  and the evidence is quite clear that she was

2  operationally integrated into the al-Shabaab

3  organization and coordinated her own strategy in

4  relation to the broader organization's goals over a

5  period of years.

6  　　　　Likewise, Abdullahi obtained funds for the

7  use of al-Shabaab and solicited those funds for that

8  purpose and for no other.

9  　　　　Both Mohamed and Abdullahi had access to

10 al-Shabaab leadership and coordinated their own

11 activities with the specific needs of al-Shabaab,

12 whether it be in the purchase of an X-ray machine, the

13 payment of rent on safe houses, the purchase of trucks,

14 or the payment for al-Shabaab's other specific needs as

15 events unfolded as a result of al-Shabaab military

16 operations.

17 　　　　For these reasons, these two individuals

18 undertook substantial activities on behalf of

19 al-Shabaab so as to be appropriately considered parts

20 of al-Shabaab for the purposes of the material support

21 statute.

22 　　　　The evidence also establishes that the role

23 played by Mohamed and Abdullahi and their respective

24 associations with al-Shabaab were well-known to these

25 two defendants.  For that reason, these defendants

1  understood, intended, and planned that when they agreed

2  to provide money to these individuals or to those

3  associated with either the Nairobi or Hargeysa side,

4  they were providing money to al-Shabaab as a foreign

5  terrorist organization and were doing so knowingly and

6  intentionally.

7            The Court also concludes that these two

8  defendants, Defendant Jama and Defendant Dhirane,

9  themselves played a central coordinating, facilitating,

10 and supervisory role with respect to the group of 15

11 and the ISDAC chat room such that they also were

12 operationally integrated into al-Shabaab as part of its

13 fundraising network.  They, too, therefore, were

14 engaged in substantial activities on behalf of

15 al-Shabaab and also constitute parts of al-Shabaab for

16 the purposes of the material support statute.

17            Both kept books and records with respect to

18 al-Shabaab fundraising, were actively involved in

19 raising and transmitting funds they raised, and

20 maintained and promoted relationships, not only with

21 Mohamed, Abdullahi, and others, but also known and

22 recognized representatives and spokespersons for

23 al-Shabaab.

24            In short, the group of 15 itself was part and

25 parcel of al-Shabaab's fundraising network that was

1   integrated organizationally into its structure and was

2   part of it as a foreign terrorist organization.

3           For all of these reasons, the Court finds

4   that these two defendants knowingly entered into an

5   agreement to provide money to al-Shabaab as opposed to

6   independent persons.

7           The issue, then, is whether that agreement to

8   provide money to al-Shabaab was an agreement to provide

9   prohibited material support in support of

10  Section 2339B.

11          The defendants argue that the moneys provided

12  were not material support because, first, these funds

13  were not delivered directly to al-Shabaab but

14  independent persons and, secondly, the funds were used

15  for the provision of exempted medicine or other

16  medical-related care that should be considered within

17  the scope of the medicine exemption under the

18  definition of material support or resources.

19          In that regard, the defendants argue that

20  their use of the term "living expenses" was code for

21  medicine or medical services and that they intended

22  only that medical-related services be provided to

23  al-Shabaab with the funds they provided.

24          The Court has addressed defendants and

25  disposed of defendants' defense based on the first

1  grounds because the Court has determined that those to

2  whom the defendants sent the money and who did, in

3  fact, receive it were part of al-Shabaab.  The

4  defendants themselves concede that the provision of

5  money directly to a foreign terrorist organization is,

6  in fact, a crime under the material support statute

7  regardless of what the money is ultimately used for.

8          Here the defendants did not provide medicine

9  or medical-related services but rather unrestricted

10  money which is expressly identified as a type of

11  material support by the statute.

12          It is, therefore, not necessary for the Court

13  to rule on whether the medicine exemption should be

14  construed broadly to include not only medicine itself

15  but also medical-related services that may have been

16  provided with the funds these defendants raised and

17  delivered.

18          The Court would observe, however, that there

19  was no evidence that the assistance purchased with the

20  money transferred by these defendants or other members

21  of the group of 15 and actually provided to al-Shabaab

22  was, in fact, medicinal substances as opposed to

23  medical-related services or equipment or clearly

24  prohibited material support such as nonmedical safe

25  houses and nonmedical-related living expenses and

1  military support.

2          And were it necessary for the Court to rule

3  on this issue, the Court would adopt the reasoning of

4  the Second Circuit in *U.S. v. Farhane*, 634 F.3d 127, a

5  2011 decision, that the medicine exemption is limited

6  to providing a substance or preparation as opposed to

7  services within the science or art of medicine.

8          The Court would also find nothing in any

9  international treaty or other international obligations

10  of the United States that would require the medicine

11  exemption to be construed broadly to include medical

12  care or humanitarian aid generally in the context of

13  its provision to a foreign terrorist organization.

14          By way of summary, based on all the evidence

15  and the Court's assessment of the credibility of the

16  relevant witnesses and the weight to be given any

17  particular piece of evidence together with the

18  reasonable inferences drawn from that evidence, the

19  Court concludes that the United States has proven

20  beyond a reasonable doubt that the defendants knowingly

21  and intentionally agreed to provide material support to

22  al-Shabaab, which it knew was a foreign terrorist

23  organization, all in violation of Title 18, United

24  States Code, Section 2339B.  The Court, therefore,

25  finds both defendants guilty of conspiracy as charged

1  in Count 1.

2          In rendering this verdict, the Court has

3  considered the defendants' position that an overt act

4  is required to be proven even though it's not

5  explicitly stated in the statute in light of the First

6  Amendment issues that would exist were an overt act not

7  an element of the offense.

8          In the *Holder* case, the Supreme Court made

9  clear that independent advocacy is protected and cannot

10 be the basis for a conviction under Section 2339B, but

11 it also made clear that the statute involves conduct

12 and there was no First Amendment restriction

13 considering speech to determine knowledge and intent

14 with respect to the prohibited conduct.

15          Here the defendants agreed to engage in

16 prohibited conduct and are not being punished for any

17 advocacy, but rather for their actions.

18          To the extent that an overt act in

19 furtherance of the conspiracy is required, the Court

20 finds that both defendants engaged in wide-ranging

21 overt acts in furtherance of the conspiracy, including

22 but not limited to maintenance of books and records

23 with respect to the prohibited agreement and the

24 unlawful objective of the conspiracy, as well as the

25 overall supervision of the group of 15's fundraising

1  efforts and the solicitation and transmission of funds

2  intended for the benefit of al-Shabaab.

3           With respect to the substantive counts

4  alleged in Counts 2 through 21, the issue boils down to

5  whether the government has established beyond a

6  reasonable doubt that the specifically alleged

7  transfers to the referenced persons on the dates

8  alleged constituted payments of money to al-Shabaab by

9  either of these two defendants.

10          Based on all the evidence, the Court finds

11  that the government has proven beyond a reasonable

12  doubt that the alleged transfer in each and every count

13  was a transfer by or at the direction of Defendant Jama

14  of unlawful material support to a foreign terrorist

15  organization.  Defendant Jama clearly understood and

16  intended that the payments to Mohamed as alleged in

17  Counts 2, 3, 5, 7, 8, 9, 12 through 17, 19, and 20 were

18  payments to al-Shabaab.

19          Likewise, the government has proven, as

20  required, that Defendant Jama directed the payment to

21  Mohamed by her husband Ali Bakri Sheikh, as alleged in

22  Counts 4, 6, 10, and 11 as payment to al-Shabaab and

23  that her payments to her father, Osman Jama, as alleged

24  in Counts 18 and 21 were intended to be, at least in

25  part, payments to al-Shabaab.  The Court, therefore,

1 finds Jama guilty as charged in each of Counts 2

2 through 21.

3          Based on these convictions, the government

4 also seeks the conviction of Defendant Dhirane based on

5 *Pinkerton* liability.  That doctrine provides that the

6 overt acts of one partner in crime is attributable to

7 all.  In other words, the *Pinkerton* doctrine makes a

8 person liable for substantive offenses committed by a

9 coconspirator when the commission is reasonably

10 foreseeable and in furtherance of the conspiracy.

11 Although each defendant must have some knowledge of the

12 conspiracy, each individual coconspirator need not be

13 aware of its full scope in order to be deemed guilty

14 for the acts of the other members.

15          The Court finds under *Pinkerton* liability

16 that Defendant Dhirane is guilty of providing material

17 support in Counts 16 through 21 based on Jama's

18 convictions on those same counts.

19          The Court finds that Dhirane joined the

20 conspiracy no later than April 2012 with knowledge of

21 the scope and nature of the conspiracy, and Defendant

22 Jama's transfers of funds to al-Shabaab as alleged in

23 Counts 16 through 21 occurred after her joining the

24 conspiracy and were reasonably foreseeable within the

25 scope of the conspiracy that she joined.  The Court,

1 therefore, finds her guilty as charged in Counts 16

2 through 21 and not guilty as to Counts 2 through 15.

3          Let me also deal with Defendant Jama's

4 Rule 29 motion for judgment of acquittal which remains

5 outstanding.

6          Defendant Dhirane moved to join that motion

7 in a memorandum filed in support of that motion, and

8 the Court grants that motion to join Jama's Rule 29

9 motion.

10          Those Rule 29 motions are to be decided based

11 on the evidence as it existed as of the close of the

12 government's case but based on an assessment of the

13 evidence in the light most favorable to the government.

14 Although the Court based its verdict on all the

15 evidence and its determinations of credibility and

16 weight and not based on viewing the evidence most

17 favorably to the government for the reasons and based

18 on the findings stated in connection with its verdict,

19 the Court concludes as a matter of law that the

20 evidence when viewed in the light most favorable to the

21 government was sufficient at the time the motion was

22 made to sustain convictions as to Jama on every one of

23 the counts.

24          For Defendant Dhirane, the Court concludes

25 that the evidence was sufficient to sustain a

1   conviction as to Count 1 and Counts 16 through 21 but

2   not as to Counts 2 through 15 as the evidence did not

3   sufficiently establish that Defendant Dhirane joined

4   the specific conspiracy alleged in the indictment until

5   approximately April 2012 even though the evidence would

6   be sufficient to establish that she was involved in

7   al-Shabaab-related activities and may have been

8   participating in a separate illegal conspiracy prior to

9   that date.

10          So for those reasons, Defendant Jama's

11  Rule 29 motion is denied, and Defendant Dhirane's

12  Rule 29 motion is denied as to Counts 1, 16 through 21,

13  and granted as to Counts 2 through 15.

14          Will the defendants come to the podium,

15  please.

16          Ms. Jama, in accordance with the Court's

17  verdict, the Court finds you guilty of Counts 1 through

18  21 of the superseding indictment.

19          Ms. Dhirane, would you come forward, please.

20          In accordance with the Court's verdict, the

21  Court finds you guilty of Count 1 and Counts 16 through

22  21 of the superseding indictment and not guilty of

23  Counts 2 through 15.

24          Have a seat for a moment.

25          I'm going to set this matter down for

1   sentencing on January 19 at 9:00 a.m.

2           Mr. Gillis, what's the government's position

3   on release pending sentencing?

4           MR. GILLIS:  Your Honor, we ask that they be

5   remanded to the custody of the U.S. marshals.  We

6   submit that there is not a substantial likelihood that

7   a Rule 29 post verdict would be granted.  Under those

8   circumstances, the statute requires that they be

9   remanded because of the nature of the crime.

10          I have a brief memorandum that I can pass up

11  to the Court if the Court wishes.

12          THE COURT:  All right.

13          MR. GILLIS:  I'm handing it to Mr. Burns and

14  to counsel.

15          (Documents are passed up to the Court.)

16          THE COURT:  All right.  Ms. Minter.

17          MS. MINTER:  Your Honor, we would submit that

18  there are exceptional reasons under 3145(c) to continue

19  Ms. Jama's release on conditions.  As the Court knows,

20  she was released on conditions originally in August

21  2014.  So it's been over two years, and she's been

22  compliant with all of those conditions.

23          Those conditions have changed over time.  As

24  the Court knows, they were originally somewhat more

25  stringent.  Ms. Jama was required to be released under

1 the supervision of a third-party custodian.  She did

2 that.  She was required to reside with that third-party

3 custodian.  She did that even though it meant moving

4 her rather large family into that individual's home and

5 living in a very small home with all of those people

6 for an extended period of time.  She ultimately

7 requested and the Court granted a request to return to

8 their own home.  But during the time of the initial

9 conditions, she complied with that requirement.

10          She has also been subject to electronic

11 monitoring the entire time that she has been on

12 release.  She's been subject to conditions which

13 restricted her access to the Internet, and she has

14 complied with all of those things.

15          Your Honor, assuming without agreeing that

16 the government has proven that these individuals

17 discussed the nature of these offenses and the possible

18 sanctions of committing these offenses, as the

19 government argued in their case in chief that they did,

20 in short, that they were aware of the violation of this

21 particular statute and they were aware of the

22 consequences via other individuals who had been

23 convicted, then clearly -- again, assuming without

24 agreeing -- these two defendants have been aware of the

25 possible consequences all of this time.  Nevertheless,

1  they didn't continue to engage in this activity.

2  They've made no effort to flee or avoid prosecution.

3           They have appeared.  Ms. Jama has appeared,

4  and Ms. Dhirane from the other end of the country have

5  appeared for all required court appearances and

6  hearings.  I can represent with respect to Ms. Jama

7  that she has been consistently in contact with counsel

8  and appeared for all necessary meetings and

9  discussions.

10          So in short, Your Honor, despite the

11 exceptionally long amount of time that Ms. Jama has

12 been on conditions, she has nevertheless complied with

13 all of those very stringent conditions.

14          We would submit in light of those

15 circumstances that there are exceptional reasons under

16 3145(c) to continue release.

17          The sentencing is not an extended period of

18 time, especially in light of the length that the case

19 has been going on.  I would also proffer to the Court,

20 as I think the Court is aware, that Ms. Jama has

21 substantial family obligations, and it will require

22 some time to make arrangements for any potential

23 incarceration at sentencing.

24          Accordingly, we would submit that all of the

25 conditions have been complied with up until this point.

1  We would ask the Court to find that there are

2  exceptional reasons under 3145(c) to grant her

3  continued release on conditions of release.

4          Certainly, should the Court have concerns,

5  they could be made more stringent at this point as they

6  were initially.  We would submit that's not necessary

7  given her exceptional compliance thus far.

8          All right.  Mr. Yamamoto or Ms. Deutsch.

9          MR. YAMAMOTO:  Your Honor, we would join

10 Ms. Jama and Ms. Minter in asking the Court to consider

11 the provisions of 3145(c) and exempt Ms. Dhirane from

12 mandatory detention, of course, for similar reasons

13 with respect to Ms. Jama.  She's followed all the

14 requirements of supervised release -- not supervised

15 release, pretrial release.

16          For the two-and-a-half years this case has

17 been going on, there have been no problems with

18 pretrial.  She's done everything they've asked.  She's

19 come to the hearings when asked by the Court.  The

20 Court has made arrangements for her travel, and she's

21 made those arrangements at all times.

22          She knew the sanctions and knew that she was

23 facing what she said was 15 years in some of the

24 conversations.  Yet, she's been here.  She's followed

25 all directions.

1    For two-and-a-half years, we've been on Skype
2  almost weekly for three and four hours at a time.
3  She's been to all of these meetings at the federal
4  public defender's office in Seattle.  We've sat down
5  and talked and discussed things.
6          She's got family she needs to take care of.
7  She's got six kids that she needs to make arrangements
8  for or else we dump all this on her husband, who's
9  sitting in the back of the courtroom.  He's really not
10 prepared to try to handle that.
11         Most importantly, the Court has not faced --
12 courts as a whole have not faced this particular issue
13 and these particular fact situations before.  As the
14 Court indicated, it's looked at cases.  I looked at
15 something like 490 cases involving material support and
16 2339, and I found absolutely nothing -- which probably
17 was something I should have raised but didn't.  But
18 there was nothing in any of the case law similar to
19 this situation, similar to these ladies, and there's
20 really -- though I thought the Court's decision and
21 ruling was excellent -- it was terrific -- there's no
22 guarantee that the Fourth Circuit or the Supreme Court
23 will see the case in a similar light as the Court has.
24         So it's not like this is a slam bang dunk for
25 the government.  There's still issues that can be

1  raised and will be raised in the Fourth Circuit, and if

2  the Fourth Circuit rules against us, in the Supreme

3  Court.  We'll see whether or not the Court of Appeals

4  or the Supreme Court supports the rulings of this

5  Court.  But, again, there's no case law at this point.

6  So I think that's an appropriate reason to have these

7  ladies continue on supervised release.

8           If the Court wishes them to be on home

9  detention as opposed to the release they're on now,

10  then we support that, whatever is necessary.

11          If they did what the government alleges, they

12  sent small amounts of money, $50, $100 here and there.

13  They were asked to raise -- asked for hundreds and

14  hundreds of dollars, and they laughed because there was

15  no way they could raise those amounts of money.  So

16  we're talking about a bunch of ladies who sit at home,

17  gossip all day long on the phone for hours about

18  everything under the sun.  You get these snippets of

19  conversations about al-Shabaab mixed in with

20  everything.  They do these things.  They send pin money

21  actually, $50 here, $100 a month we're talking about,

22  not a day or a week.  So that's a sufficient reason or

23  sufficient exceptional reason to add to those that I've

24  mentioned.

25          There are no guns or personnel involved.

1   This happened several years ago.  This is three years

2   down the line from their activity.  They have not done

3   anything since that time, since their arrest.  So

4   there's no reason to believe that they're a danger to

5   society.  There's no reason to believe they're a flight

6   risk.  There's no reason to not release them.

7              Thank you, Your Honor.

8              THE COURT:  Mr. Gillis, anything you want to

9   say further?

10             MR. GILLIS:  Your Honor, all of those

11  arguments go to the question of flight risk or danger

12  to the community and are irrelevant unless the Court

13  first finds that there is a substantial likelihood that

14  a motion for acquittal or new trial will be granted.

15             Thus the question of what might or might not

16  be done on appeal is a question not for this Court but

17  perhaps for the Fourth Circuit or the Supreme Court, if

18  the case gets that far, whether under the appropriate

19  statutes governing release pending appeal, those courts

20  might reach those decisions.

21             Based upon the Court's detailed findings of

22  fact and its observation that the evidence was

23  overwhelming, we submit that there could not be a

24  substantial likelihood that a motion for acquittal or a

25  new trial would be granted.  The only one that could be

1   made would be a posttrial Rule 29, and I doubt that

2   there are any other factual or legal arguments that

3   could be raised at this point that would result in any

4   kind of ruling other than the one that the Court has

5   already reached.

6           Also, up until this point, these defendants

7   have been presumed innocent as certainly they should

8   have been.  At this point, they are now convicted of

9   providing material support to a violent organization,

10  such as al-Shabaab.

11          Congress made the decision that when

12  convicted of certain crimes, the defendants must be

13  remanded immediately after sentencing.  I submit, Your

14  Honor, that these arguments just are irrelevant given

15  Congress' decision that these statutes require

16  detention.

17          But I also would submit, Your Honor, that

18  even if the question of danger to the community or risk

19  of flight were a consideration, the Court heard the way

20  in which these defendants rejoiced at the slaughter of

21  innocent civilians, women and children running from the

22  Westgate Mall, and rejoiced at the slaughter at the

23  Boston marathon, laughed at the mayhem that al-Shabaab

24  caused.  They couldn't have been more joyous as the

25  Court heard from their recorded conversations and

1  certainly read *ad nauseam* in the transcript.

2          So I submit, Your Honor, that even if the

3  Court were to reach the second condition after -- if it

4  were to first make the finding of a substantial

5  likelihood of a Rule 29 being granted, that now having

6  been convicted of supporting al-Shabaab, of being -- as

7  I understand the Court's ruling, of being closely

8  associated with members of al-Shabaab, with having

9  inside information from leaders of al-Shabaab, and

10 having laughed at violence by al-Shabaab here at home

11 in the United States, I submit for all of those reasons

12 that they do submit a danger to the community, as well

13 as a risk of flight.

14          But finally, as I've said already, that

15 condition we submit is not relevant unless the Court

16 first finds that there is a substantial likelihood that

17 a Rule 29 would be granted.

18          THE COURT:  Whether the defendants should be

19 continued on release pending sentencing is governed by

20 18 U.S.C. Section 3143 through which Congress mandated

21 that defendants who are convicted of certain crimes,

22 including the crimes for which these defendants have

23 now been found guilty, must be detained pending

24 sentencing absent certain specific circumstances as set

25 forth in either that statute or for exceptional reasons

1   as set forth in 3145.

2          It's clear in the Court's judgment that none

3   of the subsections of 3143(2) would apply such that

4   release would be authorized.  The issue really comes

5   down to whether there are exceptional circumstances

6   under 3145.  The Court has construed that provision as

7   applying as a further exception to 3143; although, that

8   also is an open issue.  The Court is also familiar with

9   the appellate standards for what constitutes

10  exceptional circumstances.  The Court's own view has

11  been that one exceptional circumstance is when the

12  government joins in the request or does not object to

13  release, the Court would consider that an exceptional

14  circumstance.  We don't have that here.

15         So the issue is whether that provision, as

16  construed by the Fourth Circuit, would allow release in

17  this case.  I don't take issue with anything that

18  Ms. Minter said or with the observations of

19  Mr. Yamamoto concerning these particular defendants and

20  their own particular circumstances.  The simple fact is

21  that there's nothing here that would qualify as an

22  exceptional circumstance, and the Court is mandated

23  under Section 3143 to order detention at this time.

24         The defendants will come to the podium.

25         Ms. Minter.

1     MS. MINTER:  Your Honor, if the Court is

2 inclined to remand the defendants, I would ask that

3 Ms. Jama be allowed to self-surrender at some point in

4 the near future to allow her to make arrangements with

5 her family.  Given the long period of time that she has

6 been on supervision, I think that a brief extension of

7 a week would be appropriate in this case.

8     THE COURT:  All right.  Any objection to

9 that, Mr. Gillis?

10     MR. GILLIS:  Yes, Your Honor.  I don't

11 believe the statute permits it.

12     THE COURT:  All right.  The Court is going to

13 order detention at this time for both defendants.

14     Would the defendants come to the podium,

15 please.

16     Ms. Jama and Ms. Dhirane, the Court has set

17 this matter down for sentencing on January 19 at

18 9:00 a.m. in this courtroom.

19     Between now and then, you will have the

20 opportunity to be interviewed by Pretrial Services and

21 Probation.  That's an opportunity for you to provide to

22 that office and through that office this Court any

23 information you think would be helpful to the Court in

24 assessing what an appropriate sentence is.  You may be

25 accompanied by your lawyers during that interview.

1    Between now and when you return here for
2  sentencing on January 19, you're remanded to the
3  custody of the United States marshals.
4    Anything further?
5    MR. GILLIS:  No, Your Honor.
6    THE COURT:  Anything further?
7    MR. KAMENS:  Yes, Your Honor, one request.
8    We have written a lot in this case.  So I
9  don't suggest that anything more that we could write
10 would necessarily change the mind of the Court.  But
11 under the circumstances, we would ask the Court for 45
12 days if we wish to file post-verdict motions.
13    THE COURT:  All right.  The Court will grant
14 that motion.
15    MR. KAMENS:  I'm not promising that we will.
16    THE COURT:  All right.  Anything further?
17    (No response.)
18    THE COURT:  All right.  Counsel is excused,
19 and the defendants are remanded.
20    The Court will take a brief recess.
21    -----------------------------------
              Time:  10:15 a.m.
22
     I certify that the foregoing is a true and
23
   accurate transcription of my stenographic notes.
24
                          _____
                              /s/
25                        Rhonda F. Montgomery, CCR, RPR