**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 17-4205

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

HINDA OSMAN DHIRANE, a/k/a Nicmatu Rabbi,

    Defendant - Appellant.

No. 17-4226

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

MUNA OSMAN JAMA, a/k/a Asha Ali Amin, a/k/a Umu Luqmaan, a/k/a Taaibah,

    Defendant - Appellant.

Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria. Anthony John Trenga, District Judge. (1:14-cr-00230-AJT-1; 1:14-cr-00230-AJT-2)

Argued: May 10, 2018                                                          Decided: July 16, 2018

Before NIEMEYER, KEENAN, and HARRIS, Circuit Judges.

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Keenan and Judge Harris joined.

**ARGUED:** Geremy C. Kamens, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexandria, Virginia, for Appellants. Jonathan Y. Ellis, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Whitney E.C. Minter, First Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexandria, Virginia; Alan H. Yamamoto, LAW OFFICE OF ALAN YAMAMOTO, Alexandria, Virginia, for Appellants. Dana J. Boente, United States Attorney, James P. Gillis, Assistant United States Attorney, Danya E. Atiyeh, Assistant United States Attorney, Joseph S. Attias, Special Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

NIEMEYER, Circuit Judge:

Following a bench trial, the district court found Muna Osman Jama and Hinda Osman Dhirane guilty of conspiracy to provide and of providing on numerous occasions material support to al-Shabaab, a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B. The defendants, naturalized American citizens who were born in Somalia, collected money from members of online chat rooms and transmitted the funds to coconspirators in Somalia and Kenya to assist al-Shabaab's terrorist activities in the Horn of Africa. The district court sentenced Jama to 144 months' imprisonment and Dhirane to 132 months' imprisonment.

On appeal, the defendants contend (1) that the district court erred in denying their motion to suppress evidence obtained pursuant to warrants issued under the Foreign Intelligence Surveillance Act ("FISA"), arguing that the evidence was obtained unconstitutionally in light of FISA's *ex parte* and *in camera* judicial review process; (2) that the district court applied an incorrect legal standard to conclude that two coconspirators in Somalia and Kenya, to whom the defendants transmitted monies, were "part of" al-Shabaab; and (3) that the district court erred in applying sentencing enhancements under U.S.S.G. § 2M5.3(b)(1)(E) (providing for a two-level enhancement when the support to a foreign terrorist organization was provided with the intent, knowledge, or reason to believe it would be used to assist in the commission of a violent act).

For the reasons that follow, we affirm.

I

In 2008, the U.S. Department of State designated al-Shabaab a foreign terrorist organization under § 219 of the Immigration and Nationality Act, 8 U.S.C. § 1189. At that time and continuing through the events of this case, al-Shabaab was engaged in terrorist activities in the Horn of Africa region, principally in Somalia.

In the period from 2011 to 2013, the defendants participated in an online chat room composed of members of the Somali diaspora in the United States and around the world. Participants generally discussed current events concerning Somalia, including al-Shabaab's activities there, and, on various occasions, al-Shabaab leaders and representatives would speak to the group and solicit support, including financial support, for their terrorist activities. During that time, the defendants also participated in a smaller, private chat room known as the "Group of Fifteen." Only those participants from the larger chat room who had been or who could be persuaded to become committed supporters of al-Shabaab were invited to join. The Group of Fifteen conversed confidentially approximately once or twice a month, where members pledged to make periodic payments ranging from $50 to $200 in support of al-Shabaab's operations. The defendants kept track of those commitments and contributed money themselves. They also arranged for representatives or persons associated with al-Shabaab to speak to the Group of Fifteen and solicit support, including financial resources, for al-Shabaab's activities.

As the money was collected, the defendants transmitted it to persons involved with al-Shabaab either on "the Nairobi side," referring to the geographical area around

Nairobi, Kenya, or "the Hargeisa side," referring to the geographical area around Hargeisa, Somalia. Defendant Jama "personally solicited contributions" from the Group of Fifteen, "monitored whether the individual members had satisfied their monthly commitments," and saw to it that the sums were "successfully transmitted to and received by [al-Shabaab] contacts," both on the Nairobi side and the Hargeisa side. And defendant Dhirane played a similar role, mostly for the Hargeisa side. The monies sent to the Nairobi side were transmitted principally to a woman named Fardowsa Jama Mohamed, who used the funds to operate two safehouses in Nairobi for al-Shabaab fighters. The monies sent to the Hargeisa side were transmitted principally to a woman named Barira Hassan Abdullahi, described as a financial organizer on behalf of al-Shabaab, who used the funds to purchase vehicles and other supplies for al-Shabaab fighters in the Golis Mountains just north of Hargeisa.

The government gathered evidence of the defendants' activities through electronic surveillance authorized under FISA. Transcripts of conversations collected during this surveillance showed the defendants and their coconspirators using coded language and sharing advice about how to avoid being caught and what to say if questioned. They also showed the defendants discussing instances where their financial help had assisted fighters in the field. On one occasion, Dhirane described a news report of an attack by al-Shabaab on Somali government troops as an ambush "by our forces," stating, "Thanks to God; let him die. . . . Yes, wonderful; that one will benefit us."

In June 2014, the defendants, along with others — including Mohamed and Abdullahi — were indicted and charged with one count of conspiracy to provide material

support to al-Shabaab, a designated foreign terrorist organization, and both defendants were charged with 20 substantive counts of providing material support in the form of money to al-Shabaab — one count for each transmission of money — all in violation of 18 U.S.C. § 2339B(a)(1).

Prior to trial, the government filed a notice of its intent to present evidence gathered during the surveillance that was conducted pursuant to warrants issued under FISA. The defendants filed a joint motion to suppress the evidence, even though they had not reviewed the warrant application and supporting materials due to the fact that they were classified, contending that the information was unlawfully acquired or the surveillance was not made in conformity with an order of authorization or approval, citing 50 U.S.C. §§ 1806(e) and 1825(f). They also requested that their counsel, who possessed a security clearance, be given access to the classified FISA materials. While the district court denied their counsel access to the FISA materials, it nonetheless conducted an *in camera* and *ex parte* review of the materials and thereafter denied the defendants' motion to suppress. The court concluded that there was probable cause to issue the warrants; that the surveillance complied with all applicable procedures; and that nothing in the materials suggested that a false statement or misleading omission had been made to the Foreign Intelligence Surveillance Court that issued the warrants authorizing the surveillance.

The defendants waived their right to a jury trial, and the district court conducted a bench trial beginning in July 2016. During trial, the defendants argued that they provided monies exclusively for the purpose of procuring medicine and medical services for

6

al-Shabaab members, which they claimed fell within the "medicine" exception to "material support" as used in 18 U.S.C. § 2339B. *See id*. § 2339A(b)(1). At the conclusion of trial, the court found both defendants guilty of conspiracy, Jama guilty of all substantive counts, and Dhirane guilty of those substantive counts covering conduct that occurred after she joined the conspiracy, acquitting her on the remaining counts. The court issued a written opinion dated November 4, 2016, providing its findings of fact and addressing the various legal issues that had been presented at trial.

The court found as facts that the defendants were "ardent, committed, and active supporters of [al-Shabaab]"; that they knew that al-Shabaab was a designated foreign terrorist organization and was engaging in terrorist activities; and that they knew that it was unlawful to provide support to that organization. The court found further that the defendants played a prominent role in the Group of Fifteen chat room, arranging for representatives of or persons associated with al-Shabaab to solicit funds from members of the chat room and then organizing the collection of those funds and their transmission to Kenya and Somalia. It found that the defendants transmitted the funds mostly to coconspirator Mohamed on the Nairobi side and coconspirator Abdullahi on the Hargeisa side for the specific purpose of supporting al-Shabaab's activities in those areas. Mohamed, it found, operated two safehouses in Nairobi, one for providing medical care and treatment to injured al-Shabaab soldiers and the other as a staging ground for al-Shabaab's military operations. Abdullahi, it found, received the monies in Hargeisa and used them to provide transportation, trucks, and other support services to al-Shabaab soldiers. The court found generally that the defendants, as part of their fundraising

activities, had access to al-Shabaab leaders and to nonpublic information pertaining to al-Shabaab's financial needs, including for its military activities. In this regard, the court found specifically that these defendants coordinated "to some degree their fundraising" with respect to the specific military activities of al-Shabaab. In sum, the court found that the defendants "understood, intended, and planned that, when they provided money to [Mohamed, Abdullahi, and others], they provided money to [al-Shabaab]."

The district court sentenced Jama to 144 months' imprisonment and Dhirane to 132 months' imprisonment, applying sentencing enhancements to their Guidelines ranges under U.S.S.G. § 2M5.3(b)(1)(E) (providing for a two-level enhancement when the support to a foreign terrorist organization was provided with the intent, knowledge, or reason to believe it would be used to assist in the commission of a violent act).

From the district court's judgments, the defendants filed these appeals.

II

The defendants contend first that the statutory framework that allowed the district court to determine *ex parte* and *in camera* the legality of the government's surveillance of them pursuant to the FISA warrants was "fundamentally at odds with our adversary system." They argue that it was contrary to our constitutionally established adversary system to deny their counsel, who possessed the requisite security clearance, access to the warrant applications and supporting materials to assess whether they met statutory requirements and were consistent with the Fourth Amendment. Such a review on behalf of any defendant, they assert, should only be made by the defendant's counsel as an

advocate, not by the court. *See Dennis v. United States*, 384 U.S. 855, 875 (1966) (recognizing, in the context of a trial witness's grand jury testimony, that "[t]he determination of what may be useful to the defense can properly and effectively be made only by an advocate"). Moreover, they contend that by refusing to allow defense counsel to review the materials, the district court effectively precluded counsel from obtaining a *Franks* hearing. *See Franks v. Delaware*, 438 U.S. 154, 171–72 (1978) (authorizing an adversarial hearing on the validity of a warrant upon a showing of an intentional or reckless falsehood in a warrant affidavit). The defendants make clear, however, that they do not challenge on appeal the conclusions reached by the district court, only the statutory framework that allowed the court to reach those conclusions without the participation of counsel.

The defendants filed a motion to suppress the surveillance evidence before trial, and because the Attorney General filed an affidavit stating that disclosure of the classified materials involved in obtaining the warrants would harm national security, the district court conducted an *ex parte* and *in camera* review of the warrant applications and underlying materials, as provided by FISA. The court found that it was able to adjudicate the legality of the FISA surveillance without the assistance of defense counsel, although the statute provided it with discretion to seek that assistance, and it concluded that the surveillance was properly authorized and lawfully conducted.

In enacting FISA, Congress intended that the procedures provided strike a reasonable balance between the competing interests in protecting individuals' constitutional guarantees and in protecting matters involving national security. The Act

provides that when a defendant files a motion to suppress and the Attorney General files "an affidavit under oath that disclosure or an adversary hearing would harm the national security of the United States," the court must review the materials *ex parte* and *in camera* "to determine whether the surveillance of the aggrieved person was lawfully authorized and conducted." 50 U.S.C. § 1806(f); *see also id.* § 1825(g). The Act gives the court authority to disclose the materials to the party moving to suppress, but "only where such disclosure is necessary to make an accurate determination of the legality of the surveillance." *Id*. § 1806(f); *see also id*. § 1825(g)

The government notes that every federal court to have considered the constitutionality of these procedures has concluded that FISA reached a reasonable and therefore constitutional balance of competing interests. *See, e.g.*, *United States v. Pelton*, 835 F.2d 1067, 1075 (4th Cir. 1987); *see also United States v. El-Mezain*, 664 F.3d 467, 567–68 (5th Cir. 2011); *United States v. Damrah*, 412 F.3d 618, 624–25 (6th Cir. 2005); *United States v. Belfield*, 692 F.2d 141, 148–49 (D.C. Cir. 1982). And we share that view. It is consistent with the general notion, even in the criminal context, that the right to an adversarial proceeding to determine disputes of fact is not absolute. *See Kaley v. United States*, 571 U.S. 320, 338 (2014) ("This Court has repeatedly declined to require the use of adversarial procedures to make probable cause determinations"); *Taglianetti v. United States*, 394 U.S. 316, 317 (1969) (noting that "an adversary proceeding and full disclosure" is not required for "resolution of every issue raised by an electronic surveillance"); *United States v. Daoud*, 755 F.3d 479, 482 (7th Cir. 2014) (similar).

Nonetheless, the defendants contend that the FISA structure denied them their constitutionally established right to a *Franks* hearing. In *Franks*, the Supreme Court recognized that a defendant has the right to challenge the veracity of an affidavit made in support of a warrant, but in order to procure an evidentiary hearing on the matter, the defendant must first specifically identify what aspect of the affidavit used by the judicial officer to issue the warrant was allegedly false and must accompany that allegation with an offer of proof. 438 U.S. at 167, 171. FISA similarly provides for court review of a warrant application's veracity and legality and, if the court finds it necessary, a hearing. In conducting its review, however, the court relies on the input of various executive officers and its own review of the relevant materials to decide whether a hearing is necessary. *See* 50 U.S.C. § 1806(e)–(g); *see also Daoud*, 755 F.3d at 484 ("[T]he judge makes the additional determination, based on full access to all classified materials and the defense's proffer of its version of the events, of whether it's possible to determine the validity of the *Franks* challenge without disclosure of any of the classified materials to the defense").

We recognize the benefit that an open, adversarial proceeding could provide, particularly in cases where a falsehood in the affidavit could be more readily identified by the defendant or his counsel than by a court perhaps less familiar with the subject matter. But Congress did not run afoul of the Constitution when it reasoned that the additional benefit of an unconditional adversarial process was outweighed by the Nation's interest in protecting itself from foreign threats. And even then, it took care to mitigate the loss of any such benefit by requiring the involvement of a number of high-ranking executive

officials who, subject to additional oversight by the Attorney General, must participate in the FISA-warrant application process. *See* 50 U.S.C. § 1804 (requiring, *inter alia*, (1) that the application be made by a federal officer upon oath or affirmation, (2) that the Attorney General personally approve the application, (3) that a high-ranking executive official certify the application, and (4) that other affidavits or certifications be provided as the judge or Attorney General may demand).

At bottom, we reject the defendants' challenge to the FISA framework and thus to the district court's decision not to disclose the classified FISA materials to the defendants' counsel under that framework, even though, as the defendants repeatedly noted, their counsel had the requisite security clearance.

III

For their main argument on appeal, the defendants contend that the district court, in the course of its opinion after trial, erred by "redefin[ing] an element of § 2339B," without any legal support, when it defined "a foreign terrorist organization" as used in the statute to include any person "engaged in significant activity on behalf of [a foreign terrorist organization] relative to [its] goals and objectives" and developed a list of non-exclusive factors to determine if someone met that definition. They argue that with this broadened definition of "organization," the court concluded that coconspirators Mohamed and Abdullahi, to whom the defendants sent money, were part of al-Shabaab. This was, the defendants maintain, critical to the finding of guilt, because they claimed at trial that Mohamed and Abdullahi were independent of any foreign terrorist organization

and that therefore the defendants' transmission of funds to them was not "to a foreign terrorist organization." They then elaborate on the consequences of the court's error:

> Federal courts have no power to invent their own definitions of the elements of federal criminal offenses. Doing so violates the fundamental principle that Congress, not courts, defines the elements of a federal crime. Devising a novel and unforeseeable construction of an element of a federal crime at the end of a criminal case, and then applying that construction retroactively, violates the Due Process Clause. And devising a novel non-exclusive seven-factor test to define an element of a federal offense violates the void-for-vagueness doctrine. At bottom, the district court's common law construction of the "foreign terrorist organization" element of § 2339B reconfigured an element of a federal crime into something that was previously unknown to the law.

In its written opinion finding the defendants guilty, the district court began with its factual findings. It then applied § 2339B to the facts. In applying the statute, however, the court seemed to assume, as the defendants had argued, that the transmission of monies by the defendants for use by al-Shabaab could only satisfy the elements of the statute if the monies were transmitted to persons — here, Mohamed and Abdullahi — who were "*part of* al-Shabaab." (Emphasis added). The court's discussion was in response to the defendants' particular argument for acquittal — that Mohamed and Abdullahi, to whom the defendants transmitted the monies, were "independent of" al-Shabaab and that the monies paid to them were "for purposes the Defendants believed were lawful," thus insulating them from criminal liability as they "did not intend to deliver these funds to [al-Shabaab] or anyone who could be considered part of [al-Shabaab]." As the court thus understood its task, it was looking for a standard "to determine whether someone [was] sufficiently *acting for or on behalf of* [a foreign terrorist organization] *to be deemed a part of* the [foreign terrorist organization]."

13

(Emphasis added). When looking for the substance of that standard, however, the court observed:

> There is surprisingly little case law concerning by what standard to determine whether a particular individual is sufficiently associated with [a foreign terrorist organization] to constitute the organization itself.

Therefore, the court, on its own, developed a seven-part balancing test from analogous sources to determine whether Mohamed and Abdullahi, "to whom the defendants delivered their funds[,] were *part of* [al-Shabaab]." (Emphasis added). The court then applied the test to the facts and concluded that both Mohamed and Abdullahi, as well as the defendants, were indeed *part of* al-Shabaab.

The defendants on appeal now seize on this portion of the court's analysis, arguing that the district court had no legal justification to create and apply a new standard under the statute during the course of a criminal prosecution and that, in doing so, the court not only erred but also acted unconstitutionally by introducing a new element into the crime.

The district court's adoption of a test to determine whether someone was *part of* a foreign terrorist organization for purposes of § 2339B was, we conclude, unnecessary and resulted from a misunderstanding of what § 2339B required in the context of this case. Section 2339B does not require that persons such as Mohamed and Abdullahi be *part of* a foreign terrorist organization, nor does it require that the defendants themselves be *part of* the organization. The statute prohibits *anyone* from knowingly providing or attempting to provide material support or resources to a foreign terrorist organization. As § 2339B provides:

14

> Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be [punished]. . . . To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization . . . has engaged or engages in terrorist activity . . . or that the organization has engaged or engages in terrorism.

The statute defines "material support or resources" to include, among other things, "any property," "currency," "safehouses," "facilities," or "transportation," but it excludes "medicine or religious materials." 18 U.S.C. §§ 2339B(a)(1), 2339B(g)(4), 2339A(b)(1). Accordingly, to prove a violation, the government must establish that a defendant (1) knowingly provided or attempted or conspired to provide material support (2) to a foreign terrorist organization (3) that the defendant knew had been designated a foreign terrorist organization or had engaged in terrorism. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 16–17 (2010) (clarifying that the requisite "mental state" required to violate § 2339B is "knowledge about the organization's connection to terrorism, not specific intent to further the organization's terrorist activities").

Thus, determining that Mohamed and Abdullahi, to whom monies were transmitted, were part of al-Shabaab was not necessary to finding that the defendants had provided or attempted to provide material support to al-Shabaab. Soliciting money to satisfy al-Shabaab's expressed needs, collecting that money, and then transmitting it to individuals in Africa who were associated with al-Shabaab for the sole purpose of funding al-Shabaab's activities violated § 2339B. And while such an attempt alone is all that is necessary — *see Humanitarian Law Project*, 561 U.S. at 30 (noting that even "working in coordination with" a designated terrorist organization "serves to legitimize

15

and further their terrorist means") — in this case the monies actually went to maintain safehouses for al-Shabaab militants and to acquire trucks, transportation, and other support services for the militants. As the court found, the monies reached the defendants' intended objects and accomplished the intended purpose of assisting al-Shabaab. That undoubtedly fulfills the elements of the prohibited conduct.

The defendants' argument that support given to assist a terrorist organization might thereafter have been used to purchase medical equipment or supplies was therefore irrelevant. The defendants were charged with providing *money*, not medical supplies, and in particular money that they had solicited and collected with the stated purpose that it would be sent to support al-Shabaab and its various activities. As the Supreme Court has observed in this context, even material support given to a terrorist organization to promote "peaceable" or "lawful" conduct furthers terrorism as it "frees up other resources within the organization that may be put to violent ends." *Humanitarian Law Project*, 561 U.S. at 30; *see also id*. at 32 (noting that providing material support to terrorist groups in any form "also furthers terrorism by straining the United States' relationship with its allies and undermining cooperative efforts between nations to prevent terrorist attacks"). "Money," the Court observed, "is fungible." *Id*. at 31. There was thus no need for the district court to respond to the defendants' assertion that at least some of the money they sent was used for medical supplies.

Yet, while the district court's development and application of its multi-factor test was unnecessary, its factual findings nonetheless amply satisfied each element of the offense. The court began by finding that al-Shabaab was designated as a foreign terrorist

16

organization, that it "had engaged and was engaging in terrorist activities at the time of the events involved in this case," and that the defendants knew of these facts. It also found that the defendants were "ardent, committed, and active supporters of [al-Shabaab]." Indeed, it found that the defendants were "involved in arranging for representatives or persons associated with [al-Shabaab] to speak to [their] chat room . . . during which time these [al-Shabaab] members solicited support, including financial resources." The court found further that the defendants, as members of the chat room, were "committed to providing financial contributions approximately monthly for the benefit of [al-Shabaab]" and that "[t]his money was delivered to persons involved in [al-Shabaab's] operations." In particular, it found that Jama "personally solicited contributions," "monitored whether the individual members had satisfied their monthly commitments and whether those sums had been successfully transmitted to and received by [al-Shabaab] contacts," and served "in the nature of an enforcer by following up with those . . . who had not paid their monthly commitments." Dhirane, the court found, came to play a similar role. The court found that the defendants "associated and coordinated with other supporters of [al-Shabaab], including Codefendant Mohamed . . . and Codefendant Abdullahi." "All of these other individuals," it found, "were actively involved in arranging for and facilitating support for [al-Shabaab]." Finally, the court found that neither Mohamed nor Abdullahi was involved with or was using the money for any entity other than al-Shabaab and that the defendants knew this.

In short, the defendants engaged, over a lengthy period of time, in collecting monies for the purpose of providing material support to al-Shabaab, which they knew

17

was a terrorist group engaged in military activities, and then in sending those monies to individuals they knew were associated with al-Shabaab and involved in providing it with various resources and support. That conduct constitutes the provision of or at least the attempt to provide material support to al-Shabaab in the form of money. And these facts, which the defendants do not challenge on appeal, amply satisfy each of the elements for a conviction under § 2339B. Thus, while we do not subscribe to the analysis conducted by the district court in response to the defendants' position that the court had to find the coconspirators to be *part of* the subject terrorist organization, we conclude that the court appropriately found both defendants guilty of violating § 2339B. We therefore affirm.

IV

Finally, the defendants contend that the district court erred in calculating their sentencing ranges under the Sentencing Guidelines by applying a two-level enhancement for providing material support or resources to a terrorist organization "with the intent, knowledge, or reason to believe they are to be used *to commit or assist in the commission of a violent act*." U.S.S.G. § 2M5.3(b)(1)(E) (emphasis added). They argue that the enhancement requires a showing of the defendants' intent or knowledge that "the specific support [they] provide[] is to be used in the commission of a violent act." (Quotation marks omitted). According to the defendants, the district court's findings do not sufficiently specify the linkage between their support and a violent act.

Section 2M5.3(b)(1)(E), however, does not require, as the defendants seem to be suggesting, that support be traced to or be designed to lead to a *specific* act of violence.

What it does require is that the defendants be shown to have intended, known, or had reason to believe that their support would be used to assist in acts of violence by the terrorist organization.

In this case, the district court expressly found that al-Shabaab was engaged in terrorist activities in fighting wars in Somalia and in Kenya and that the defendants engaged the leaders of al-Shabaab to learn of and respond to specific needs arising "as a result of [al-Shabaab] military operations." And the court found that the defendants "coordinated to some degree their fundraising" with those specific needs. Because the defendants' financial support was directed at and designed to support al-Shabaab's military operations in fighting a war of terrorism in Somalia and Kenya, we conclude that the district court had sufficient evidence with which to apply the enhancement under § 2M5.3(b)(1)(E).

*    *    *

The judgments of the district court in convicting and sentencing the defendants are accordingly affirmed.

AFFIRMED